UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWARD DAY                                    )
J.B. Johnson Nursing Center                   )
901 First St. NW, Washington, DC 20001;       )
                                              )
LARRY MCDONALD                                )
J.B. Johnson Nursing Center                   )
901 First St. NW, Washington, DC 20001;       )
                                              )
VIETRESS BACON                                )
Washington Nursing Facility                   )
2425 25 St. SE, Washington, DC 20020; and     )
                                              )
BONITA JACKSON                                )
Washington Nursing Facility                   )
2425 25 St. SE, Washington, DC 20020;         )
                                              )
on behalf of themselves and all others        )
similarly situated,                           )
                                              )
            Plaintiffs,                       )
                                              )
      v.                                      )      **COMPLAINT**
                                              )
DISTRICT OF COLUMBIA, a municipal             )      Civil Action No._____
Corporation;                                  )
                                              )
ADRIAN M. FENTY, in his official              )
capacity as Mayor of the District of Columbia,)
John A. Wilson Building,                       )
1350 Pennsylvania Avenue, NW                   )
Washington, DC 20004;                          )
                                              )
JULIE A. HUDMAN, in her official capacity      )
as  Director of the District of Columbia       )
Department of Health Care Finance,             )
825 North Capitol Street NE,                   )
Washington, DC 20002; and                      )

```
                                                    )
STEPHEN BARON, in his official capacity             )
as Director of the District of Columbia             )
Department of Mental Health,                        )
64 New York Avenue, NE                              )
Washington, DC 20002,                               )
                                                    )
              Defendants.                           )
_____           )
```

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Federal law requires that the District of Columbia provide services to people with disabilities in the most integrated setting appropriate to their needs. But the District has failed to comply with this obligation, leaving between 500 and nearly 3,000 people with disabilities unnecessarily institutionalized in nursing facilities, segregated and isolated from their families and friends. These individuals desperately want to return to their communities and could do so if the District were to comply with federal law. This class action therefore seeks injunctive and declaratory relief to require the District of Columbia and its officials to comply with their long-standing, federally-mandated obligations.

## PRELIMINARY STATEMENT

1.      Plaintiffs are the named individuals and a class of similarly-situated individuals with disabilities who desperately desire the freedom to live in their community but instead remain institutionalized in nursing facilities against their will. Plaintiffs could be served in community-integrated settings, but most have and will remain in nursing facilities for years

2

because Defendants provide few opportunities, if any, for Plaintiffs to obtain services in more integrated settings.

2.      Defendants, the District of Columbia, its Mayor, and the officials who plan, oversee, fund, and regulate services, programs, and activities for persons with disabilities, have unnecessarily and inappropriately institutionalized Plaintiffs in nursing facilities despite federal law requiring that Defendants honor the class members' desires and abilities to live in more integrated settings in the community with appropriate services and supports.

3.      Defendants are in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, because they unlawfully discriminate against Plaintiffs by institutionalizing them in nursing facilities and isolating them from their communities.

4.      Title II of the ADA prohibits discrimination against individuals with disabilities. In enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. § 12101(a)(5). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The United States Department of Justice promulgated regulations under Title II requiring that "[a] public entity shall administer services, programs, and activities *in the most integrated setting appropriate to the needs* of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added).

3

5.      Section 504 of the Rehabilitation Act provides that no person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Regulations implementing Section 504 require that a public entity administer programs, services, and activities in "the most integrated setting appropriate" to the needs of individuals with disabilities. 28 C.F.R. §41.51(d).

6.      The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. The Court concluded that state and local governments may be held liable for failing to serve people with disabilities in the most integrated settings appropriate to their needs.

7.      Despite the passage of eleven years since *Olmstead,* Defendants continue to fail to facilitate access to community-based long-term care services and supports for Plaintiffs in the most integrated setting appropriate to their needs.

8.      Because of Defendants' failure to fund or otherwise make available sufficient community-based alternatives, individuals with disabilities often have nowhere to go but nursing facilities. Indeed, many individuals with disabilities are forced to choose between residence in a nursing facility or homelessness.

9.      Defendants' programs and activities for persons with disabilities systematically deny or ignore Plaintiffs' choices and preferences for integrated community care, leaving them to languish in institutional nursing facilities even though appropriate community-based services and settings exist that could be made available at the same or even lower cost.

4

10. Defendants are able to appropriately discharge Plaintiffs with community-based support services.

11. Plaintiffs are thus needlessly segregated from their families, friends, and community life.

12. Plaintiffs' plight is shared by many. According to federal and state data, when offered a choice between community and nursing facility-based care, more than 500 District of Columbia nursing facility residents would choose to receive long-term care services in more integrated settings in the community instead of being forced to remain in a nursing facility.

13. Upon information and belief, many more nursing facility residents would choose to live in more integrated settings in the community if they were informed about community-based options.

14. Plaintiffs bring this action to compel Defendants to comply with their federal legal obligations.

## JURISDICTION

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983. At all times relevant to this action, Defendants have acted under color of state law.

16. Plaintiffs' claims for violations of Title II of the ADA, 42 U.S.C. §§ 12131 and 12132 *et seq.*, are asserted against the individual Defendants in their official capacities; Plaintiffs do not assert claims against the District of Columbia for violations of Title II of the ADA.

5

17.     Plaintiffs' claims for violations of Section 504 of the Rehabilitation Act, 29

U.S.C. § 794 *et seq.*, are asserted against both the individual Defendants in their official

capacities and the District of Columbia.

## VENUE

18.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) because

the Defendants reside in the District, and under 28 U.S.C. § 1391(b)(2) because a substantial part

of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

## DEFENDANTS

19.     Defendant District of Columbia is responsible for operating its programs,

services, and activities in conformity with the ADA and Section 504 of the Rehabilitation Act.

In light of the violations by its governmental agencies individually and collectively, the District

of Columbia is sued under the Rehabilitation Act.

20.     Defendant Adrian Fenty is the Mayor of the District of Columbia, and is sued in

his official capacity.  Mayor Fenty is the chief executive officer of the District of Columbia

responsible for directing, supervising, and controlling the executive departments of the District

of Columbia government.  D.C. Code § 1-204.22.  He is responsible for establishing and carrying

out the Medicaid Program in the District of Columbia.  D.C. Code § 1-307.02.  Mayor Fenty is

ultimately responsible for ensuring that the District of Columbia operates its long-term care and

Medicaid systems for people with disabilities in conformity with the ADA, the Rehabilitation

Act, and all other federal laws.  District of Columbia law expressly requires the Mayor to

establish and implement an "*Olmstead* Plan" by March 8, 2008, and issue annual *Olmstead*

6

Compliance Plans beginning January 1, 2009. D.C. Code § 2-1431.04(8)(A). He has failed to do so.

21.     Defendant Julie A. Hudman is the Director of the District of Columbia's Department of Health Care Finance Administration ("DHCF"), and is sued in her official capacity. DHCF is a public agency and a recipient of federal financial assistance. DHCF is responsible for administering the District of Columbia's long-term care system for people with disabilities. *See* D.C. Code § 7-771.07(9). DHCF must "maximize federal assistance," "[c]oordinate with other District government agencies to ensure effective and efficient use of Medicaid dollars," and "ensure coordinated health-care access and delivery for publicly funded health-care services." D.C. Code § 7-771.07(3)-(5). DHCF also is "the single state agency" that administers the District of Columbia's Medicaid program. *See* 42 U.S.C. § 1396a(a)(5); D.C. Code § 7-771.07(1). Ms. Hudman, in her role as the Director of DHCF, is responsible for the oversight, supervision, and control of DHCF operations, and is ultimately responsible for ensuring that the agency's services for people with disabilities are provided in conformance with federal law.

22.     Defendant Stephen Baron is the Director of the District of Columbia's Department of Mental Health ("DMH"), and is sued in his official capacity. DMH is a public agency and a recipient of federal financial assistance. DMH is the primary agency responsible for planning, developing, coordinating, and monitoring "comprehensive and integrated mental health systems of care for adults . . . in the District." D.C. Code § 7-1131.04(1). As director of DMH, Mr. Baron coordinates and manages funding for all publicly funded health services and mental health supports for District of Columbia residents. D.C. Code §§ 7-1131.04(2), (3).

7

DMH is responsible for screening, evaluating, and monitoring individuals with mental illness who reside in, or are at risk of entry into, nursing facilities in the District. Among the services within DMH's jurisdiction are community support, service planning, counseling and medication management, assertive community treatment, housing assistance, and day treatment programs; some or all of these are the very types of services that could enable Plaintiffs to leave nursing facilities and live in more integrated settings.

23.     At all times relevant to this Complaint, Defendants have acted and continue to act under color of District of Columbia law and knew or should have known of the policies, practices, acts, and conditions alleged herein.

## PLAINTIFFS

### All Plaintiffs

24.     Plaintiffs are all District of Columbia residents with disabilities that substantially limit their ability to perform major life activities. They are also regarded by Defendants as having such impairments, and therefore are individuals with disabilities for purposes of the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12102; 29 U.S.C. § 705(20).

25.     Plaintiffs are all currently housed in nursing facilities that are located in the District of Columbia or are otherwise funded by Defendants.

26.     All Plaintiffs could be served in the community through services Defendants already have available.

8

27.     Although residing in the community with support services is the most integrated setting where the Plaintiffs' needs can be met, Defendants have offered them personal care and health care services only in a nursing facility setting.

28.     All Plaintiffs want to leave the nursing facilities in which they reside, and could do so with appropriate services and supports.

### The Named Plaintiffs

#### Plaintiff Edward Day

29.     Plaintiff Edward Day is a 75-year-old man who is diagnosed with diabetes, peripheral vascular disease, hypertension, a seizure disorder, and depression. He has had both of his legs amputated because of his diabetes. Although his nursing facility fitted him for a prosthetic device for one of his legs, it did not give him access to use it. Mr. Day is able to ambulate independently in his wheelchair, but he needs assistance with bathing, dressing, transferring, and using the bathroom.

30.     Mr. Day has resided at JBJ Johnson Nursing Center ("JBJ") in the District of Columbia since December 4, 2006. He was placed at JBJ after he retired from his job of 37 years with the District of Columbia government.

31.     Mr. Day could live in the community if appropriate supports and services were made available to him. In 2009, the staff at JBJ identified Mr. Day as "high functioning" and "able to live in the community."

32.     Mr. Day prefers to live in the community rather than stay in the nursing facility.

9

**Plaintiff Larry McDonald**

33.     Plaintiff Larry McDonald is a 56-year-old man who is diagnosed with a seizure disorder, hypertension, and dementia.  Mr. McDonald is a veteran of the Army.  His nursing facility records indicate that he requires supervision for two activities of daily living: bathing and dressing.

34.     Mr. McDonald has resided at JBJ since September 2004, when he was admitted after suffering a stroke.

35.     Mr. McDonald could live independently with appropriate supports and services in the community.  Mr. McDonald prefers to live independently in the community, with either a family member or on his own with appropriate health care, personal care, and residential support services.

**Plaintiff Vietress Bacon**

36.     Plaintiff Vietress Bacon is a 46-year-old woman who was admitted to Washington Nursing Facility ("WNF") on September 22, 2008, when she could no longer live with her elderly mother.  Ms. Bacon has bi-polar disorder, depression, arthritis, traumatic brain injury, and paralysis due to a childhood car accident followed by multiple surgeries.

37.     Ms. Bacon uses a motorized wheelchair to ambulate independently.  She needs assistance with bathing, dressing, transferring, and using the bathroom.  Ms. Bacon could live in the community with this assistance and mental health services.

38.     Ms. Bacon has a strong preference to live in the community rather than a nursing facility.

10

**Plaintiff Bonita Jackson**

39.     Plaintiff Bonita Jackson is a 52-year-old woman who was admitted to WNF on January 4, 2007, after a stroke and subsequent surgery.  Ms. Jackson is diagnosed with pneumonia, anemia, seizures, and Hepatitis C.  Due to her equilibrium problems, she uses a walker for mobility.

40.     Ms. Jackson could live in the community with assistance to help with personal grooming, meal preparation, and light cleaning.

41.     Ms. Jackson prefers to live in the community instead of in a nursing facility.

## STATEMENT OF FACTS

42.     Individuals with certain diagnosable mental, behavioral, or emotional disorders are eligible to receive services, including long-term care services, from the District of Columbia.

43.     Defendants fund these services largely through the Medicaid program, a joint federal and state program that provides medical services to low-income persons pursuant to Title XIX of the Social Security Act,  42 U.S.C. § 1396 *et seq*.

44.      Approximately 70 percent of D.C. nursing facility residents are D.C. Medicaid recipients.

45.     The District receives 70 cents in federal reimbursement for every dollar it spends on Medicaid services.

46.     The District also participates in the federal Money Follows the Person ("MFP") program designed to provide federal funds to state Medicaid programs to transition people into

11

community-based settings.  The District would receive 85 cents in federal reimbursement for each dollar it spends to transition people from nursing facilities under that program.

47.     Defendants provide nursing facility-based services through privately-owned and operated nursing facilities – many of which are for-profit businesses – and through nursing facilities (such as JBJ and a skilled nursing facility unit at United Medical Center) that are owned by the District and operated through leasing arrangements or contracts with nursing facility management companies.

48.     There are approximately 2,700 beds in skilled nursing facilities in the District of Columbia, with an occupancy rate of approximately 98 percent.

49.     Approximately 200 *additional* D.C. residents currently are placed in out-of-state nursing facilities; D.C. Medicaid continues to fund their care.

50.     The District also provides in-home and community-based services to people with disabilities under the Medicaid program.

51.     People with disabilities are entitled to personal care aide services in their homes under the District of Columbia's Medicaid State Plan and the Medicaid Waiver Programs for those who are Elderly or have Physical Disabilities ("EPD Waiver").   The District's EPD Waiver program has a fixed number of slots (4,000) for beneficiaries.

52.     The District's Medicaid Waiver Programs provide home healthcare services, home- and community-based care for functionally disabled individuals, personal care services, and other medical and remedial care recognized under the Medicaid State Plan such as skilled nursing services.

53.     Under these options, people with disabilities who would otherwise qualify for nursing facility services are able to live independently with community-based supports and services, including healthcare, personal care services, personal emergency response services, and other long-term care services otherwise found in nursing facilities.

54.     Defendants offer a range of other Medicaid- and locally-funded services to adults with mental illness living in the community in D.C., such as service planning, community support, assertive community treatment, diagnosis, assessment, medication management, day treatment, and crisis intervention services.

55.     Defendants license, certify, or contract with private home health agencies and community support agencies to provide these long-term care services in the community.

**Nursing Facilities Are Institutions**

56.     Nursing facilities are, for the most part, neither integrated into nor part of the communities in which their residents live.  They are not real homes or even home-like.  They are segregated institutions housing large numbers of unrelated people, both elderly and non-elderly, in congregate settings.  Many nursing facilities provide only beds, meals, and sparse rehabilitative services.

57.     Many nursing facilities resemble hospitals and secure facilities.  For example, JBJ is surrounded by a security fence with an electronic lock and requires most residents to have escorts and special permission to leave the facility even for brief periods of time.  Some D.C. nursing facilities have curfews, and, at times, security guards posted to monitor people entering

13

and leaving the facilities.  Inside, many facilities have nurses' stations and are filled with the hard sterile surfaces normally found in medical facilities.

58.     Often there is little, if any, privacy for nursing facility residents.  Often residents must share rooms and bathrooms with other residents they did not know previously and with whom they did not choose to live; their beds are separated by only a curtain.  In some facilities, such as JBJ, entire wards of individuals share bathrooms and shower facilities.  Often residents have minimal space to call their own or to use to safeguard their personal belongings, and many residents report that their personal property has been stolen or damaged.  Nursing facility residents often lack their own telephones and are frequently restricted in the use of the nursing facility telephones, which lack privacy.  Medications are often dispensed publicly at specific times, with residents waiting in line.

59.     Nursing facilities often place many limitations on residents' autonomy.  In many facilities, residents are subjected to a highly regimented lifestyle characterized by restrictive rules and policies.  Daily activities are often conducted in a central location in the facility, in the company of large numbers of other individuals with disabilities.  As a result, residents may sit idle for most of the day, with little or nothing to do.  Many nursing facilities offer few places for residents to gather or meet with visitors.

60.     Often residents have limited access to the community; it is difficult for most, and impossible for many, to participate in community activities offered by churches, clubs, or other organizations.

14

**Plaintiffs Desire and Are Able to Live in the Community**

61.     The Named Plaintiffs (those identified in paragraphs 29 to 41 above) and class members prefer to live in the community with appropriate assistance, rather than reside in nursing facilities.

62.     All Plaintiffs would prefer to live with family, in their own apartments or homes, or in permanent supportive housing – all more integrated settings appropriate to their needs than the nursing facilities in which they currently reside.

63.     The District of Columbia nursing facilities' self-reported Medicaid data reports that, in the third quarter of 2010, 526 D.C. nursing facility residents indicated that they wanted to live in the community instead of a nursing facility.

64.     This data vastly undercounts the preferences of nursing home residents because of their lack of awareness of community-based options.

65.     Many of the class members may need education and support in order to make an informed choice about whether to receive services in nursing homes or in the community in more integrated settings.

66.     All of the Plaintiffs could be served safely and appropriately in the community if Defendants facilitated their access to community-based, long-term care services and supports. These options would afford far more choice, freedom, and privacy, as well as the opportunity to maintain regular family relationships and interact with and form friendships with a variety of people.  With appropriate supports and services, persons with disabilities of all ages and levels of disability can successfully move into and remain in the community and live more independently.

15

67.    All of the Plaintiffs desire and are capable of living in a community-based setting with appropriate services and supports.

### Defendants Continue to Violate Title II of the ADA and *Olmstead*

68.    Despite Plaintiffs' desire and ability to live independently in the community with the services they need, Defendants have failed to take any meaningful action to ensure that Plaintiffs receive services in the most integrated setting appropriate to their needs.

69.    Eleven years after the United States Supreme Court decision in *Olmstead,* the District of Columbia still does not have a comprehensive, effectively-working plan to implement the requirements described in that decision.

70.    Instead of providing community-based services, Defendants rely heavily on nursing facilities to provide services to individuals with disabilities and to provide long-term care.

71.    Defendants' services, programs, and activities for persons with mental or physical disabilities leave many hundreds of people languishing, isolated in nursing facilities. Defendants' collective actions and inactions have resulted in the needless isolation, segregation, and institutionalization of individuals with disabilities in nursing facilities.

72.    Many of the individuals to whom Defendants currently provide community-based services have mental and physical conditions and functional capacities that are the same as, or are similar to, the class members currently living in nursing facilities.

73.    The Medicaid-funded personal care services all Plaintiffs receive in the nursing facility could be provided in the community at the same or lower cost.

16

74.     The District of Columbia's average annual expenditure for nursing facility care is more than $60,000 per year per person, and the average annual cost per patient in a psychiatric hospital is over $230,000.

75.     In contrast, the annual cost per person to provide community-based mental health services is approximately $25,000, or 60 percent less than the District's cost for nursing facility-based care.

76.     Among other things, Defendants collectively fail to:

i.      Assure that individuals with mental or physical disabilities receive services in the most integrated setting appropriate to their needs;

ii.     Develop or implement a comprehensive and effective working plan that identifies individuals with mental or physical disabilities who are needlessly in nursing facilities and helps them move to more integrated settings;

iii.    Provide adequate and appropriate community services;

iv.     Provide information about community-based alternatives or comprehensive discharge planning to enable Plaintiffs to live in more integrated settings;

v.      Assure that people with mental or physical disabilities are not unnecessarily placed in nursing facilities by, for example, informing them of the availability of integrated, community-based options for mental health and other health care services as an alternative to nursing facility placement, offering them a meaningful choice of community placement, or offering any assistance to those who seek to return to live in the community;

vi.     Properly identify persons with mental or physical disabilities who should not be admitted into nursing facilities;

vii.    Assure that individuals with mental or physical disabilities residing in nursing facilities are periodically reviewed and assessed for community-based treatment;

viii.   Assure that individuals with mental or physical disabilities are discharged from nursing facilities when appropriate;

17

       ix.   Provide supportive housing as necessary to enable Plaintiffs' to no longer be unnecessarily segregated in nursing facilities; and

       x.   Take adequate steps to preserve individuals' community housing subsidies during periods of placement in nursing facilities so that people can maintain homes to which they may return.

77.     DMH has failed to provide adequate outreach to people in nursing homes or administer services such as community-based residential supports, service planning, counseling and medication management, assertive community treatment, housing assistance, and day treatment programs for people with mental illness in nursing homes seeking to transition to the community, and to avert placement in nursing homes in the first instance.

### Defendants' Policies Undermine *Olmstead's* Requirements

78.     Defendants administer their Medicaid program and mental health services in a manner that perpetuates the segregation of persons with disabilities. These methods of administration arbitrarily limit access to integrated, community support services by persons with disabilities in nursing facilities. As a result of the District's unbalanced long-term care system, community-based long-term care services are unavailable to many people with disabilities who need and want them, effectively compelling their institutionalization in nursing facilities.

79.     For example, Defendants refuse to pay mental health service providers to provide services to individuals in nursing facilities who qualify for and need mental health services. Instead, providers are required to terminate those services entirely once individuals enter a nursing facility. This practice prevents individuals from leaving nursing facilities because they cannot access appropriate services to transition to the community.

18

80.     Additionally, in 2006, the District was approved to receive over $26 million in federal funds through a five-year grant to support the transition of 1,100 people from nursing facilities and other institutions to the community to live independently with the services they need.  Now in its fifth year of the grant period, the District still has not transitioned a single person from a nursing facility under the grant.

81.     *Olmstead*'s integration mandate may be excused only where a state demonstrates that compliance with the mandate would result in a "fundamental alteration" of the state's services and programs.  *Olmstead*, 527 U.S. at 603.  This defense is not available, however, to states that have not developed a plan to comply with the *Olmstead* mandate.  *Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 158-59 (3d Cir. 2005).

82.     In 2009, Defendants circulated a draft of a written "*Olmstead* Plan" which was never finalized or implemented.

83.     Defendants' Draft *Olmstead* Plan is not a comprehensive, working plan because, among other things, it fails to establish or implement mechanisms to transition Plaintiffs into more integrated settings.   Even if Defendants were to finalize a written *Olmstead* plan, the District of Columbia's system of long-term care does not operate effectively to meet its obligations under *Olmstead* and the ADA.

84.     Defendants' violations of their federal obligations are already expected to expand in January 2011, when DHCF will reduce home-based personal care aide services under the Medicaid State Plan from 1,040 hours per year per person, with additional hours available pursuant to physicians' orders and DHCF prior authorization, to 520 hours per year per person, with no provision for additional hours.  As a result of these cuts, approximately 2,900 Medicaid

beneficiaries were advised to apply for EPD Waiver slots, further restricting (and possibly eliminating) the availability of these slots for Named Plaintiffs and class members.

85.     The addition of even several hundred of the approximately 2,900 Medicaid beneficiaries to the EPD Waiver program and its related waiting list will likely exhaust the 4,000 allotted community-based EPD Waiver slots.   Defendants' service reduction thus will foreclose Plaintiffs from accessing waiver services.

86.     On May 7, 2010, counsel for Named Plaintiffs sent a letter to Defendant Fenty and Attorney General Peter Nickles detailing the violations of Plaintiffs' rights under the integration mandate of Title II of the ADA and the Supreme Court's ruling in *Olmstead.* The letter cited policies and practices such as the District's "failure to inform nursing home residents about the availability of integrated community-based options for mental health and other health care" and the lack of a "comprehensive and effective plan for identifying individuals with mental or physical disabilities who are needlessly in nursing facilities and for helping them move to more integrated settings."   The letter urged Defendant Fenty "to take strong and swift action to enable people with disabilities in nursing facilities to receive services in integrated settings."

87.     On July 13, 2010, and July 27, 2010, Plaintiffs' counsel met with Defendant Fenty's designees, including Attorney General Peter Nickles, regarding Plaintiffs' May 7th letter. The July 27th meeting also included designees of Defendant Baron.

88.     Defendants have not resolved Plaintiffs' grievances.

## CLASS ACTION ALLEGATIONS

89.　　Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, and

Local Rule 23.1, the Named Plaintiffs bring this action for prospective relief on behalf of

themselves and all other persons similarly situated.

90.　　The proposed class consists of:

> All those persons who (1) have a disability; (2) receive
> services in nursing facilities located in the District of
> Columbia or funded by Defendants at any time during the
> pendency of this litigation; (3) could live in the community
> with appropriate supports and services from Defendants; and
> (4) prefer to live in the community rather than in nursing
> facilities.

91.　　***Numerosity***:  The Plaintiff class is so numerous that joinder of all its members is

impracticable.  The exact number of individuals in the class is not known but is believed to be

between 500 and 2,900 individuals.

92.　　Joinder is also impracticable because class members lack the knowledge and

financial means to maintain individual actions.

93.　　***Commonality***:  There are questions of law or fact that are common to all the

Named Plaintiffs, as well as to all class members, including:

> a.　　Whether Defendants violate the integration mandate of Title II of the
> ADA and Section 504 of the Rehabilitation Act by requiring Named
> Plaintiffs and class members to be confined to nursing facilities in order to
> receive long-term care services, rather than providing those services in
> more integrated, community-based settings;
>
> b.　　Whether Defendants administer their services, programs, and activities in
> the most integrated setting appropriate to the needs of individuals with
> disabilities residing in nursing facilities;

     c.      Whether Defendants fail to offer sufficient discharge planning to enable individuals with disabilities residing in nursing facilities to be served in more integrated, community-based settings;

     d.      Whether Defendants fail to develop, fund, and effectively utilize existing community-based programs so that individuals with disabilities residing in nursing facilities may be placed in more integrated, community-based settings;

     e.      Whether Defendants fail to establish and implement a comprehensive, effective working plan to place individuals with disabilities who reside in nursing facilities into more integrated, community-based settings;

     f.      Whether Defendants fail to effectively administer and implement federal programs such as Medicaid waivers and Money Follows the Person to afford access to community-based programs by people with disabilities in nursing homes; and

     g.      Whether Defendants fail to effectively inform and provide Plaintiffs with meaningful choices of community-based long-term care alternatives to nursing facilities.

94.    ***Typicality:***  The claims of the Named Plaintiffs are typical of the claims of the class as a whole in that both the Named Plaintiffs and the class members currently are unnecessarily isolated in nursing facilities located in or funded by the District of Columbia; they could live in more integrated settings with appropriate health care, personal care, and residential support services; and they desire to live in more integrated, community-based settings.

95.    Named Plaintiffs' claims that Defendants have failed to administer the District's mental health and long-term Medicaid programs to provide services in the most integrated setting appropriate to their needs are typical of the claims of the class.

96.    ***Adequate representation***:  The Named Plaintiffs will fairly represent and adequately protect the interests of members of the class as a whole because they suffer from deprivations identical to those of the class members and have been denied the same federal rights

that they seek to enforce on behalf of the other class members, many of whom are unable to pursue claims on their own behalf as a result of their disabilities, their limited financial resources, and the actions of the Defendants to deprive them of their rights. The Named Plaintiffs' interests are consistent with and are not antagonistic to those of other class members. By filing this action, the Named Plaintiffs express their interest in vindicating their rights, as well as the rights of others who are similarly situated. The relief sought by the Named Plaintiffs will inure to the benefit of members of the class generally. The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, disability discrimination, Medicaid law, practice and procedure in the federal courts, and the prosecution and management of class action litigation.

97.     Defendants have acted or refused to act on grounds generally applicable to the class by unnecessarily segregating class members, thereby making final injunctive relief appropriate with respect to the class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure. For example, Defendants have failed to inform class members of their right to community services and failed to provide them with services in the most integrated setting appropriate to their needs. Although the specific disabilities of the class members vary, they also share a common need for Medicaid and locally-funded services.

98.     A class action is superior to individual lawsuits for resolving this controversy. Declaratory and injunctive relief with respect to the entire class is appropriate.

## COUNT 1

## <u>AMERICANS WITH DISABILITIES ACT</u>

99.     Paragraphs 1 through 98 are incorporated by reference.

100.     Each Named Plaintiff and class member is an "individual with a disability" within the meaning of the ADA in that they have disabilities that substantially limit one or more major life activities, such as self-care and social interaction.  They also have a history of such impairments and are regarded by Defendants as having such impairments.

101.     Each Named Plaintiff and class member is a "[q]ualified individual with a disability" within the meaning of the ADA, 42 U.S.C. § 12131(2), because he or she is qualified to participate in Defendants' more integrated, community-based programs and services.

102.     Defendants are directly responsible for the operation of public entities covered by Title II of the ADA.   42 U.S.C. §§ 12131(1)(A) & (B).  As such, the ADA prohibits them from discriminating against individuals with disabilities in their programs and services.  *See* 42 U.S.C. §§ 12131 and 12132.

103.     Regulations implementing Title II of the ADA require that a public entity administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities.  28 C.F.R. § 35.130(d).

24

104.    The ADA's implementing regulations further provide:

>A public entity may not, directly or through contractual or
>other arrangements, utilize criteria or [other] methods of
>administration: (i) that have the effect of subjecting
>qualified individuals with disabilities to discrimination on
>the basis of disability; [or] (ii) that have the purpose or
>effect of defeating or substantially impairing
>accomplishment of the objectives of the public entity's
>program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3).

105.    Defendants have caused the Named Plaintiffs and class members to be confined

unnecessarily in nursing facilities in order to obtain long-term care services, rather than facilitate

their transition to the community with appropriate services and supports.

106.    Defendants' actions violate Title II of the ADA.

## COUNT II

### Section 504 of the Rehabilitation Act

107.    Paragraphs 1 through 106 are incorporated by reference.

108.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

109.    Defendant District of Columbia and its governmental agencies receive federal

financial assistance within the meaning of Section 504.

110.    Each Named Plaintiff and class member is an "individual with a disability" within

the meaning of Section 504 because they have disabilities that substantially limit one or more

25

major life activities, such as self-care, transferring to and from wheelchairs, and social interaction. They also have such impairments and are regarded by Defendants as having such impairments.

111.    Each Named Plaintiff and class member is a "qualified person with disabilities" within the meaning of Section 504 because he or she is qualified to participate in Defendants' more integrated, community-based programs and services.

112.    Regulations implementing Section 504 require that a public entity administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

113.    Regulations implementing Section 504 prohibit recipients of federal financial assistance from:

> [U]tiliz[ing] criteria or methods of administration . . . (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3)(i).

114.    Defendants' actions violate Section 504 of the Rehabilitation Act.

26

## REQUEST FOR RELIEF

WHEREFORE, Named Plaintiffs and class members respectfully request that this Court:

a.  Certify this action as a class action;

b.  Declare that Defendants' failure to provide Named Plaintiffs and class members with services in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act;

c.  Declare that Defendants' failure to provide Named Plaintiffs and class members with services in the most integrated setting appropriate to their needs violates Section 504 of the Rehabilitation Act;

d.  Enter a permanent injunction requiring Defendants to promptly take such steps as are necessary to serve Named Plaintiffs and class members in the most integrated settings appropriate to their needs;

e.  Award Named Plaintiffs and class members their reasonable attorneys' fees, litigation expenses, and costs; and

f.  Grant such other relief as this Court deems just and proper.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

27

Dated:  December 23, 2010

Respectfully submitted,

Marjorie Rifkin, D.C. Bar No. 437076
Jennifer Lav, D.C. Bar No. 499293
mrifkin@uls-dc.org
jlav@uls-dc.org
University Legal Services–Protection &
Advocacy
220 I Street NE #130
Washington, DC 20002
(202) 547-0198 ext. 128
Fax: (202) 547-2662

Kelly Bagby, D.C. Bar No. 462390
Bruce Vignery, D.C. Bar No. 297911
Kbagby@aarp.org
Bvignery@aarp.org
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049
(202) 434-2060
Fax: (202) 434-6424

Barbara Wahl, D.C. Bar No. 297978
Brian D. Schneider, D.C. Bar No. 983171
wahl.barbara@arentfox.com
schneider.brian@arentfox.com
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5339
(202) 857-6000
Fax: (202) 857-6395

*Counsel for Plaintiffs*

28