# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EDWARD DAY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  10-2250 (ESH) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs, five individuals who have sued on their behalf and on behalf of a proposed

class of similarly-situated individuals, commenced this action for declaratory and injunctive

relief against the District of Columbia, its Mayor, and several city officials (collectively

"defendants"),[1] alleging that individuals with disabilities who are covered by Medicaid are being

unnecessarily institutionalized in nursing facilities and isolated from their communities in

violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*,

and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*  Before the Court is

defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of

---

[1]The named individual defendants, all sued only in their official capacities, include: Vincent Gray, the Mayor of the District of Columbia, Wayne Turnage, Director of the District of Columbia's Department of Health Care Finance ("DHCF"), and Stephen Baron, Director of the District of Columbia's Department of Mental Health ("DMH").  (Am. Compl. ¶¶ 16-17, 20-22.)

Civil Procedure or, in the alternative, for summary judgment pursuant to Rule 56.[2]  For the

reasons stated herein, defendants' motion is granted in part and denied in part.

## BACKGROUND

I. **INTEGRATION MANDATE**

    A. **Statutory and Regulatory Background**

Title II of the ADA provides that "no qualified individual with a disability[3] shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity,[4] or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  One "for[m] of discrimination," according to Congressional

---

[2]Defendants filed their motion to dismiss or for summary judgment ("Defs.' Mot."), memorandum in support thereof ("Defs.' Mem."), statement of undisputed material facts ("Defs.' Facts") and exhibits ("Defs.' Ex.") on April 27, 2011 [Dkt. No. 19].  After a period of discovery to allow plaintiffs' to respond to the summary judgment aspect of defendants' motion, plaintiffs filed their memorandum in opposition ("Pls.' Opp."), statement of disputed material facts ("Pls.' Facts") and exhibits ("Pls.' Ex.") on September 1, 2011 [Dkt. No. 28].  Defendants filed their reply ("Defs.' Reply") with additional exhibits ("Defs.' Reply Ex.") on October 3, 2011 [Dkt. No. 30].  In addition, the United States filed a Statement of Interest on October 3, 2011("US Statement of Interest" with exhibits ("US Ex.") [Dkt. No. 32]), to which defendants responded on December 19, 2011.  ("Defs.' Resp." [Dkt. No. 40].)  Defendants' motion to strike the United States' Statement of Interest (Defs.' Mot. to Strike, Oct. 7, 2011 [Dkt. No. 33]) was denied.  (*See* Minute Order, Dec. 1, 2011.)

[3]In the ADA, a "qualified individual with a disability" is defined as

    an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, and transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

[4]A "public entity" includes "any State or local government," and "any department, agency, [or] special purpose district."  §§ 12131(1)(A), (B).  The District of Columbia is a public entity covered by Title II of the ADA.  (Am. Compl. ¶ 108.)

findings," includes "segregation" of persons with disabilities."  *Id.* § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); *see also id.* § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation").  The ADA's implementing regulations[5] include an express "integration" provision, requiring that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), which is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. B.

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial  assistance." 29 U.S.C. § 794(a).[6]  Although the Rehabilitation Act contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination, its implementing regulations require that programs, services, and activities be administered in "the most integrated setting appropriate" to the needs of individuals with disabilities.  28 C.F.R. § 41.51(d).

---

[5]Congress instructed the Attorney General to issue regulations implementing Title II's discrimination proscription.  *See* 42 U.S.C. § 12134(a).

[6]The District of Columbia and its governmental agencies receive federal financial assistance within the meaning of Section 504.  (Am. Compl. ¶ 115.)

In addition to directing that programs, services and activities be administered in the "most integrated setting appropriate," the implementing regulations for both the ADA and the Rehabilitation Act prohibit either "directly or through contractual or other arrangements," the

> utiliz[ation of] criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3)(i)-(ii) (ADA); *see also* 45 C.F.R. § 84.4(b)(4)(i)-(ii) (Rehabilitation Act); 28 C.F.R. § 41.51(b)(3)(i)-(iii) (same).

Under the ADA, a public entity must

> make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (1998). Similarly, under the Rehabilitation Act, the recipient of federal funds must

> make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

28 C.F.R. § 41.53.[7]

**B.      *Olmstead v. L.C. ex rel. Zimring***

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court considered whether the "proscription of discrimination" in Title II of the ADA "may require placement of

---

[7]Although the language of these two regulations is not identical, they are intended to be "consistent." *See* 42 U.S.C. § 12134(b) (directing Attorney General that the regulations implementing the ADA "shall be consistent with" the regulations implementing Section 504).

persons with mental disabilities in community settings rather than in institutions."[8]  *Id.* at 587.

The Court's answer was "a qualified yes."  *Id.* at 587.  The Court first held that "[u]njustified

isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 597.[9]  However,

the Court  also recognized that "nothing in the ADA or its implementing regulations condones

termination of institutional settings for persons unable to handle or benefit from community

settings," there is no "federal requirement that community-based treatment be imposed on

patients who do not desire it,"[10] and States "need to maintain a range of facilities for the care and

treatment of persons with diverse mental disabilities, and [have an] obligation to administer

services with an even hand."  *Id.* at 601-02.  In light of these considerations, the Court held[11] that

community placement for individuals with mental disabilities

---

[8]Generally, courts have found that the Rehabilitation Act is "similar in substance" to the ADA and, therefore, "cases interpreting either are applicable and interchangeable."  *The Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1262 n.2 (D.C. Cir. 2008).

[9]The Court rejected the argument that to show discrimination based on disability "necessarily requires uneven treatment of similarly situated individuals."  *Olmstead*, 527 U.S. at 598.  Rather, noting that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA, the Court held that:

> Dissimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice.

*Id*. at 601.

[10]*See* 28 C.F.R. § 35.130(e)(1) (1998) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept."); 28 C.F.R. pt. 35, App. B ("persons with disabilities must be provided the option of declining to accept a particular accommodation").

[11]This holding of *Olmstead* will hereinafter be referred to as the "Integration Mandate."

> is in order when the State's treatment professionals have determined that
> community placement is appropriate, the transfer from institutional care to a less
> restrictive setting is not opposed by the affected individual, and the placement can
> be reasonably accommodated, taking into account the resources available to the
> State and the needs of others with mental disabilities.

*Id.* at 607.[12]  Although the plaintiffs in *Olmstead* had exclusively mental disabilities (mental

retardation and mental illness), its holding also applies to individuals with physical disabilities.

*See* 42 U.S.C. § 12102(1)(A) (qualifying disability under the ADA includes "a *physical or*

*mental impairment* that substantially limits one or more of the major life activities of such

individual" (emphasis added)); *see, e.g.*, *M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011)

(*Olmstead* case where plaintiffs had both mental and physical disabilities); *Grooms v. Maram*,

563 F. Supp. 2d 840, 852 (N.D. Ill. 840) (*Olmstead* case where plaintiff had physical rather than

mental disability).

        In *Olmstead*, there was no dispute that the two plaintiffs were individuals "'qualified' for

noninstitutional care" who did not "oppose[] such treatment."  *Id.* at 602-03.  As for whether

community placement for those plaintiffs was a "reasonable accommodation," the Court majority

expressed no opinion, simply remanding "for further proceedings."  *Id.* at 607.  A plurality,

however, went on to address in greater detail what might be the scope of "[t]he State's

responsibility, once it provides community-based treatment to qualified persons with

disabilities," noting that it was "not boundless."  *Id.* at 603.  The plurality started its analysis

with the "reasonable-modifications regulation," pointing out that it "speaks of 'reasonable

---

[12]The Court, however, explained that it was not holding "that the ADA imposes on the
States a 'standard of care' for whatever medical services they render, or that the ADA requires
States to 'provide a certain level of benefits to individuals with disabilities,'" but it was holding
"that States must adhere to the ADA's nondiscrimination requirement with regard to the services
they in fact provide."  *Olmstead*, 527 U.S. at 603 n.14.

modifications' to avoid discrimination, and allows States to resist modifications that entail a

'fundamenta[l] alter[ation]' of the States' services and programs." *Id.* at 603 (quoting 28 C.F.R.

§ 35.130(b)(7).  The plurality went on to observe that "[t]o maintain a range of facilities and to

administer services with an even hand, the State must have more leeway than the courts below

understood the fundamental-alteration defense to allow." *Id.* at 605.  For example, the plurality

stated:

> The Court of Appeals' construction of the reasonable-modifications regulation is
> unacceptable for it would leave the State virtually defenseless once it is shown
> that the plaintiff is qualified for the service or program she seeks. If the expense
> entailed in placing one or two people in a community-based treatment program is
> properly measured for reasonableness against the State's entire mental health
> budget, it is unlikely that a State, relying on the fundamental-alteration defense,
> could ever prevail.

*Id.* at 603.[13]  Thus, the plurality opined:

> Sensibly construed, the fundamental-alteration component of the
> reasonable-modifications regulation would allow the State to show that, in the
> allocation of available resources, immediate relief for the plaintiffs would be
> inequitable, given the responsibility the State has undertaken for the care and
> treatment of a large and diverse population of persons with mental disabilities.

*Id.* at 604.  Finally, the plurality set forth one way that it believed a State could meet its burden

of establishing a fundamental alteration defense:

---

[13]The majority did agree that the Court of Appeals' understanding that the fundamental
alteration defense was "unduly restrictive" insofar as it "permit[ted] a cost-based defense only in
the most limited of circumstances":

> In evaluating a State's fundamental alteration defense, the District Court must
> consider, in view of the resources available to the State, not only the cost of
> providing community-based care to the litigants [individuals with mental
> disabilities], but also the range of services the State provides others with mental
> disabilities, and the State's obligation to mete out those services equitably.

*Id.* at 597, 603.

If, for example, the State were to demonstrate that it had *a comprehensive, effectively working plan* for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

*Id.* at 605-606 (emphasis added).[14]

### C.    Compliance with *Olmstead*'s Integration Mandate

Since *Olmstead*, public entities and courts (although none in this Circuit) have grappled with what is required to demonstrate the existence of an *Olmstead* Integration Plan and/or what is required to satisfy the Integration Mandate.  *See* Terence Ng, Alice Wong, and Charlene Harrington, Home and Community Based Services: Introduction to Olmstead Lawsuits and Olmstead Plans, Table 2 (2011), *available at* http://www.pascenter.org/olmstead/downloads/OlmstCasesTable_2011.pdf.  A number of States (26 as of August 2011) have expressly adopted so-called *Olmstead* Plans.  *See* id. at Table 1, *available at* http://www.pascenter.org/olmstead/downloads/Olmstead_Plan_2011.pdf.  And the Department of Justice (DOJ) has issued a Statement setting forth its view "[t]o assist individuals in understanding their rights under title II of the ADA and its integration mandate, and to assist state and local governments in complying with the ADA and its integration mandate, and to assist state and local governments in complying with the ADA."  U.S. Department of Justice, Statement of Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (2011) ("DOJ Statement") (attached as

---

[14]The plan described by the *Olmstead* plurality will hereinafter be referred to as an "*Olmstead* Integration Plan."

8

Pls.' Ex. J.)  In the District, it is undisputed that no formal *Olmstead* Plan has been adopted,[15] but the District maintains that its existing programs and services for individuals with disabilities meet the requirements of an *Olmstead* Integration Plan and, thus, satisfy the Integration Mandate.

## II.   FACTUAL BACKGROUND

### A.   The District's Provision of Long-Term Care to Individuals with Disabilities

Medicaid is a joint federal and state program that provides medical services to certain low-income persons, including individuals with disabilities, pursuant to Title XIX of the Social Security Act,  42 U.S.C. § 1396 *et seq.*  Participation is voluntary, but all 50 States and the District participate.  States submit Medicaid Plans, which must be approved by the federal government.  *See* 42 USCS § 1396a(a); 42 C.F.R.§ 430.[16]  Under the Medicaid Act, there are

---

[15]The District established the "Office of Disability Rights" as of March 8, 2007, "to advance the civil rights of people with disabilities by coordinating the District's ADA Compliance Program and by ensuring and overseeing District-wide compliance with the ADA and related disability-rights laws."  D.C. Code § 2-1431.03(a)-(b).  The Office's responsibilities included submitting an "*Olmstead* Compliance Plan to the Mayor and City Council" by March 8, 2008, and by "January 1 of each year thereafter."  D.C. Code § 2-1431.04(8)(A); (Am. Compl. ¶ 20).  The D.C. Code defines an "*Olmstead* Compliance Plan" as "a comprehensive working plan, developed in collaboration with individuals with disabilities and with District agencies serving individuals with disabilities, which shall include annual legislative, regulatory, and budgetary recommendations for the District to serve qualified individuals with disabilities in accordance with *Olmstead v. L.C.*, 527 U.S. 581, and in the most integrated setting as provided in 28 C.F.R. Part 35, App. A."  § D.C. Code § 2-1431.01(9).  In addition, the Mayor is supposed to "[e]stablish and implement an annual *Olmstead* Compliance Plan, as developed under § 2-1431.04(8)."  D.C. Code § 2-1431.02 (b)(2).  Apparently, the District "ceased trying to formally adopt an *Olmstead* Plan after attempts during the previous administration failed."  (Pls.' Opp. at 6 (citing Pls.' Ex. I (Decl. of Gerald Kasunic), at ¶¶ 15, 18; Pls.' Ex. H at 213:19 – 214:8.2).)

[16]In the District, the Mayor is responsible for establishing and carrying out the Medicaid Program, D.C. Code § 1-307.02, and the DHCF is "the single state agency" that administers the

(continued...)

twenty-eight services which may be provided as part of a State's Medicaid Plan, seven of which, including nursing facility services, are mandatory.[17]   42 U.S.C. § 1396a(a)(10)(A)(1).  In the District, individuals with physical or mental health disabilities who are covered by Medicaid can receive long-term care services either in: (1) nursing facilities; (2) the community if the services needed are covered by DC's Medicaid State Plan; or (3) the community through a Medicaid waiver program.  (Am Compl. ¶¶ 58, 59.)

---

[16](...continued)
D.C. Medicaid State Plan.  *See* 42 U.S.C. § 1396a(a)(5); D.C. Code§ 7-771.07.  According to statute, DCHF's stated purposes are to:

> (1) Maximize the well-being and quality of life for eligible low-income individuals and other populations through the provision of leadership and direction in administering responsive, effective, and efficient health-care benefits; (2) Develop a comprehensive, efficient, and cost-effective health-care system for the District's uninsured, under-insured, and low-income residents; (3) Develop eligibility, service coverage, and service delivery and reimbursement policies for the District's health-care-financing programs that ensure improved access and efficient delivery of service; (4) Ensure that District health-care programs maximize available federal financial assistance; and (5) Support the health-care policy, delivery, and access initiatives of the Department of Health and other District agencies through sound health-care financing.

D.C. Code § 7-771.03.  In addition, DCHF is supposed to "maximize federal assistance," "[c]oordinate with other District  government agencies to ensure effective  and efficient use of Medicaid  dollars," and "ensure coordinated health-care access and delivery  for publicly funded health-care  services."  D.C. Code § 7-771.07(3)-(5).  DHCF is also supposed to "[d]evelop a long-term-care-finance infrastructure, in cooperation with other District agencies, including the Department of Disability Services, Office on Aging, Long-Term Care Ombudsman, and DOH [Department of Health].  D.C. Code § 7-771.07(9).

[17]The other six mandatory services are inpatient and outpatient hospital care, laboratory and x-ray services, nurse-midwife services, and certified nurse practitioner services.  42 U.S.C. § 1396a(a) (10)(A).  Within this federal framework, States retain "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage."  *Alexander v. Choate*, 469 U.S. 287, 303 (1985).

1.      **Nursing Facilities**

A "nursing facility" (or a "nursing home") is defined a "24-hour inpatient facility, or distinct part thereof, primarily engaged in providing professional nursing services, health-related services, and other supportive services needed by the patient/resident."[18] D.C. Code § 4-204.61(3).[19] The District provides nursing facility-based services "through privately-owned and operated nursing facilities . . . and through nursing facilities . . . that are owned by the District and operated through leasing arrangements or contracts with nursing facility management companies." (Am. Compl. ¶ 53.) Whether an individual is eligible for nursing facility care under the District's Medicaid Plan is determined by Delmarva Foundation for Medical Care, Inc., the agency the District contracts with the to determine the "level of care" designation for Medicaid eligible consumers. (Pls.' Ex. G at 19:19 – 20:20, 22:6 – 24:17 & Ex. 2.)

There are approximately 2,700 beds in the District's nursing facilities, with an approximate occupancy rate of over 90 percent. (Am. Compl.  ¶ 54; Pls.' Facts ¶ 17 (citing Pls.' Ex. G at 150:4-152:2  (Dep. of Ericka Bryson-Walker, Interim Program Manager, Office of Chronic and Long Term Care, DHCF) (nursing facilities have been over 90% occupied since

---

[18]In addition to long-term care, nursing facilities may provide "[s]killed nursing or medical care and related services" and "[r]ehabilitation needed due to injury, disability, or illness." *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Institutional-Care/Nursing-Facilities-NF.html.

[19]Plaintiffs describe nursing facilities as "segregated institutions housing large numbers of unrelated people, both elderly and non-elderly," that are "neither integrated into nor part of the communities in which their residents live," that "resemble hospitals and secure facilities," where there is "little, if any, privacy for . . . residents," where there are "many limitations on residents' autonomy," where "residents may sit idle for most of the day, with little or nothing to do," where there are "few places for residents to gather or meet with visitors," and where "residents have limited access to the community." (Am. Compl. ¶¶ 62-66.)

2000); US Ex. BB at 158:8-159:8 (Bryson-Walker Dep.) (2009 nursing facility population was 2,531; 2005 population of 2,576).  Approximately 70 percent of nursing facility residents are D.C. Medicaid recipients (Am. Compl. ¶ 50), plus there are approximately 200 additional D.C. Medicaid recipients currently placed in out-of-state nursing facilities.  (Am. Compl. ¶ 55.) Pursuant to federal law, Delmarva collects information about all of the District's nursing facility residents on a quarterly basis (known as Minimum Data Set ("MDS") information), including whether any resident wishes to speak to someone about the possibility of returning to the community.  (Defs.' Facts ¶ 17; *see* 42 C.F.R. 483.20(c) ("A facility must assess a resident using the quarterly review instrument specified by the State and approved by CMS not less frequently than once every 3 months.")  Presently, according to the most recent data, there are between 526 and 580 nursing facility residents who, in response to the MDS written questionnaire, have expressed a preference for living in the community.[20]  (Defs.' Ex. 8, at 35; Pls.' Facts ¶ 33; Pls.' Ex. H at 32:18-33:16; Pls.' Ex. G at 48:4-20;.)

### 2. District's Medicaid State Plan

The District's Medicaid State Plan covers certain community-based services, including personal care assistance, skilled nursing and mental health rehabilitation services.  (Pls.' Facts ¶ 29 (citing Pls.' Ex. H at 23:14-24:5); Am. Compl. ¶ 57.)  For example, the District covers home-based personal care aide services for up to 1,040 hours per year, with additional hours available pursuant to physicians' orders and DHCF prior authorization.  (Am. Compl. ¶ 90.)  The present record does not reflect how many individuals are receiving services under this aspect of the District's Medicaid Plan.

---

[20]These numbers are not limited to nursing facility residents with disabilities.

### 3.      Medicaid Waiver Program – EPD Waiver

Finally, since 1981, Medicaid has provided funding for home and community-based care

for individuals, who would otherwise require institutional care, through the Medicaid Home and

Community-Based Services (HCBS) Waiver Program.  *See* 42 U.S.C. § 1396n(c).[21]

> The [waiver] program permits a State to furnish an array of home and
> community-based services that assist Medicaid beneficiaries to live in the
> community and avoid institutionalization.  The State has broad discretion to
> design its waiver program to address the needs of the waiver's target population.
> Waiver services complement and/or supplement the services that are available to
> participants through the Medicaid State plan and other federal, state and local
> public programs as well as the supports that families and communities provide.

(Defs.' Ex. 4, at 4.)  The federal government reimburses the District 70% of the cost of services

and supports for people enrolled in a HCBS Waiver.  In order to obtain approval of a waiver

program, a State submits an application to the Center for Medicaid and Medicare Services

("CMS").  Among other requirements, a State must demonstrate that the program is "cost-

---

[21]Section 1396n(c) states in relevant part:

> The Secretary may by waiver provide that a State plan approved under this
> subchapter may include as "medical assistance" under such plan payment for part
> or all of the cost of home or community-based services (other than room and
> board) approved by the Secretary which are provided pursuant to a written plan of
> care to individuals *with respect to whom there has been a determination that but
> for the provision of such services the individuals would require the level of care
> provided in a hospital or a nursing facility or intermediate care facility for the
> mentally retarded* the cost of which could be reimbursed under the State plan. . . .

42 U.S.C. § 1396n(c)(1) (emphasis added).  Under waiver programs, the federal government
agrees to "waive" certain requirements of the Medicaid Act without jeopardizing federal
financial participation in the State's plan.  42 U.S.C. § 1396n(c)(3).  One of the requirements
waived is the "comparability" requirement, which requires State plans to offer services to all
Medicaid recipients in the same amount, duration and scope.  42 U.S.C. § 1396(a)(10)(B).  In
addition, a State is permitted to "cap" the number of persons receiving waiver services, 42
U.S.C. § 1396n(c)(9)-(10), and it may elect not to offer waiver services on a statewide basis.  42
U.S.C. § 1396n(c)(3).

neutral" – that the "cost of the program in its entirety cannot exceed the cost of care absent a

waiver program."[22]  (Defs.' Facts ¶ 6 (citing Defs.' Ex. 2, ¶ 9); Pls.' Facts ¶ 12; Pls.' Ex. M at

53:4 – 54:14).)  In addition, the number of beneficiaries who can participate in a waiver program

is limited to the number proposed by a State and approved by CMS.  (Defs.' Facts ¶ 6 (citing

Defs.' Ex. 2, ¶ 10)); *see* 42 C.F.R. § 441.303(f)(6); Pls.' Facts ¶ 32.)

Waiver programs vary from state to state.  In the District, individuals with physical

disabilities or those who are over sixty-five years old who would otherwise require the level of

care provided in a nursing facility can receive home and community-based care through the

District's "Elderly and Physically Disabled Waiver" ("EPD Waiver").[23]  (Defs. Ex. 4, at 1-2;

---

[22]Defendants contend that cost-neutrality also means that "nor can the cost of community-based services necessary to meet an individual's needs exceed the cost of services the individual would receive in a nursing facility."  (Defs.' Facts ¶ 6 (citing Defs.' Ex. 2, ¶ 9)); Although the waiver rules permit a State to adopt that as a requirement for waiver eligibility, "the District did not adopt an individual cost limitation as a basis for determining cost neutrality."  (Pls.' Facts ¶ 13 (citing Pls.' Ex. M at 54:15-55:6); Pls.' Ex. G at 141:14-142:14).)

[23]The District has another HCBS waiver program for individuals with intellectual and developmental disabilities (ID/DD Waiver).  (Pls.' Facts ¶ 37.)  The ID/DD Waiver, through an agreement with DHCF, is overseen by the Department on Disability Services, Developmental Disabilities Administration (DDS/DDA), which oversees and coordinates care for 2,094 individuals with intellectual and developmental disabilities.  (Defs.' Ex. 6, ¶ 5 (Aff. of Cathy Anderson, Deputy Director, DDS/DDA); Defs.' Facts ¶ 33; Pls.' Facts ¶ 37.)  As of December 31, 2010, only five individuals served by DDS/DDA resided in nursing facilities (Defs.' Ex. 6, ¶ 14), and these individuals are not part of the proposed class in this case.  (Defs.' Ex. 6, ¶ 15; Pls.' Facts ¶ 89.).  DDS/DDA's use of the ID/DD Waiver has been a critical issue in a class action, *Evans v. Gray*, Civil Action No. 76-0293 (D.D.C.), which was commenced in 1976 and in which there was a finding that the District's institutionalization of individuals with intellectual and developmental disabilities in an institution known as Forest Haven violated the plaintiffs' constitutional rights.  Evans v. Washington, 459 F. Supp. 483 (D.D.C. 1978).  In recent years, DDS/DDA has successfully used the ID/DD Waiver to provide home or community-based services to a substantial number of former residents of Forest Haven along with other individuals with intellectual and developmental disabilities.  (*See* Defs.' Ex. 8, at 3 (as of October 2010, DDS/DDA had enrolled 1212 individuals onto the ID/DD Waiver).)

Defs.' Facts ¶¶ 1,2; Defs.' Ex. 2, ¶ 4 (Aff. of Ericka Bryson-Walker); Am. Compl. ¶ 57); *see also* 42 USCS § 1396a (a)(10)(ii)(VI); 42 USC § 1396n(c); 42 C.F.R. § 441.301. The District first received approval for the EPD Waiver in 1999 (Defs.' Facts ¶ 1; Defs.' Ex. 2, ¶ 3), and it has since been renewed twice, most recently on March 29, 2007.[24]  (Defs.' Ex. 2, ¶ 3; Defs.' Ex. 4.)[25]

Under the EPD Waiver, which is administered by DHCF, the District may pay for case management services, homemaker services, personal care aides, respite care, environmental accessibility adaptation services and accessibility, personal emergency response system services, assisted living services, and chore aide services (Defs.' Facts ¶ 4; Defs' Ex. 2, ¶ 5; Defs.' Ex. 4,

---

[24]The District's 2007 application for renewal included the following assurances:

E. Average Per Capita Expenditures: The State assures that, for any year that the waiver is in effect, the average per capita expenditures under the waiver will not exceed 100 percent of the average per capita expenditures that would have been made under the Medicaid State plan for the level(s) of care specified for this waiver had the waiver not been granted.

F. Actual Total Expenditures: The State assures that the actual total expenditures for home and community-based waiver and other Medicaid services and its claim for FFP in expenditures for the services provided to individuals under the waiver will not, in any year of the waiver period, exceed 100 percent of the amount that would be incurred in the absence of the waiver by the State's Medicaid program for these individuals in the institutional setting(s) specified for this waiver.

G. Institutionalization Absent Waiver: The State assures that, absent the waiver, individuals served in the waiver would receive the appropriate type of Medicaid-funded institutional care for the level of care specified for this waiver.

(Defs.' Ex. 4, at 10.)

[25]CMS initially approves a waiver program for three years, and then approves renewals for five-year intervals.  (Defs.' Ex. 4, at 5; *see also* Defs.' Ex. 2, ¶ 3.)  The record does not reflect whether the District applied to renew the EPD Waiver, which would otherwise have expired on January 3, 2012, or, if so, the status of any such application.

at 1, 48-88), but not "[h]ousing, meals, room and board or 24-hour skilled care or supervision."
(Defs.' Facts ¶ 4 (citing Defs.' Ex. 2, ¶ 8).)  In order to demonstrate cost-neutrality, the District
projected "average costs for services each year of the waiver to be thousands of dollars less that
nursing facility costs of services, with projected savings ranging from $19,970.10 in year one to
$32,875.05 in year five."  (Pls.' Facts ¶ 13 (citing Pls.' Ex. M at 62:20-63:19 &  Ex. 3).)

To qualify for the EPD Waiver, an individual need not already be institutionalized
(Defs.' Facts ¶ 3 (citing Defs.' Ex. 2, ¶ 4)), and spots are not set aside for individuals already in
nursing facilities nor allocated between the elderly and physically disabled.  (Pls.' Facts ¶¶ 1, 5
(citing Pls.' Ex. G at 54:12-17).)  Enrollment for the EPD Waiver is capped at 3,940 individuals
(Defs.' Facts ¶ 6 (citing Defs.' Ex. 2, ¶ 10)), and the District has no present plan to seek an
increase in that number.  (Pls.' Facts ¶ 18 (citing Pls.' Ex. G at 66:5-20).)  As of July 29, 2011,
approximately 3700 of the spots had been filled,[26] many by individuals who were already in the
community receiving services under the District's Medicaid State Plan (Pls.' Facts ¶ 18 (citing
Pls.' Ex. G at 59:8-60:18, 63:4-16)), although the precise distribution between individuals in
nursing facilities versus individuals who were already in the community is not part of the record
and is not tracked by DHCF.  (Pls.' Facts ¶ 6 (citing Pls.' Ex. G at 77:10-21); *see* Pls.' Ex. G at
45:7-12.)  The record also does not reveal how many EPD Waiver slots have been used by the
elderly versus individuals with physical disabilities, or to what extent these two groups may
overlap.

---

[26]As of April 2010, there were 2,179 EPD Waiver participants.  (Pls.' Ex. H at Ex. 18.)
By April 2011, 3,278 individuals had been enrolled.  (Defs.' Facts ¶ 6 (citing Defs.' Ex. 2, ¶
12).)

Anticipating that the waiver slots will soon be used up, the District has established a first-come, first-served waiting list:

> As a result of the enrollment cap and in accordance with the federally approved EPD Waiver, DHCF is initiating a waiting list. Individuals placed on the waiting list will be enrolled in the EPD Waiver program on a first-come, first-served basis. Applicants who are currently in Casenet with an approved level of care (LOC) and completed EPD Waiver application will be placed on the waiting list first.

58 D.C. Reg. 33 (Aug. 19, 2011), *available at*

http://www.dcregs.org/Gateway/NoticeHome.aspx?noticeid=1560844 (*see also* Pls.' Facts ¶ 18;

Pls.' Ex. G at 67:9-68:6); Defs.' Ex. 4, at 24.)

"Information about the EPD Waiver is available on the DHCF and District of Columbia

Office on Aging websites." (Defs.' Facts ¶ 7; Defs.' Ex. 2, ¶ 11.) In addition, individuals who

call DHCF's Office of Chronic and Long-Term Care or the Office of the Ombudsman are sent

information. (Defs.' Facts ¶ 7.) Once an individual is referred as a candidate for the EPD

Waiver, the District provides "a list of Medicaid-enrolled providers who provide case

management services," from which "[t]he candidate is responsible for selecting the provider

from whom he or she would like to receive case management services." (Defs.' Ex. 2, ¶ 6;

Defs.' Facts ¶ 5.) The case manager is responsible for "creat[ing] an individual service plan

("ISP") that is subject to DHCF approval and that must specify the community-based services to

be furnished, their frequency, the type of provider who will furnish each specified service, and

how backup and emergency services will be provided." (Defs.' Facts ¶ 5 (citing Defs.' Ex. 2, ¶¶

6-7).)

**B.     District's Programs Supporting Transitions to Home and Community-Based
Care**

**1.     Money Follows the Person Rebalancing Demonstration Program**

As described above, the District provides long-term care for Medicaid-covered

individuals with physical or mental health disabilities either in nursing facilities or in the

community through the EPD Waiver or its Medicaid State Plan.  In addition, the District

participates in the federal Money Follows the Person Rebalancing Demonstration Program

("MFP Program"), which provides additional federal funds to State Medicaid programs to help

move individuals from "inpatient facilities" to "home and community-based long-term care

services under State Medicaid programs."  Deficit Reduction Act (DRA) of 2005, P.L. 109-171,

Title VI, § 6071(a), 120 Stat. 102, Feb. 8, 2006, *as amended* Pub. L. 111-148, Title II, § 2403(a),

(b)(1), Mar. 23, 2010 ("MFP  Statute")[27]; (Defs.' Facts ¶ 9 (citing Defs.' Ex. 3, ¶ 4 (Aff. of Leyla

---

[27]The program's "objectives" are:

(1) Rebalancing. – Increase the use of home and community-based, rather than
institutional, long-term care services.

(2) Money follows the person. – Eliminate barriers or mechanisms, whether in the
State law, the State Medicaid plan, the State budget, or otherwise, that prevent or
restrict the flexible use of Medicaid funds to enable Medicaid-eligible individuals
to receive support for appropriate and necessary long-term services in the settings
of their choice.

(3) Continuity of service. – Increase the ability of the State Medicaid program to
assure continued provision of home and community-based long-term care services
to eligible individuals who choose to transition from an institutional to a
community setting.

(4) Quality assurance and quality improvement. – Ensure that procedures are in
place (at least comparable to those required under the qualified HCB program) to
provide quality assurance for eligible individuals receiving Medicaid home and

(continued...)

Sarigol, MFP Project Director)); Am. Compl. ¶ 52.)  An "inpatient facility" is defined as "a

hospital, nursing facility, or intermediate care facility for the mentally retarded" and "an

institution for mental diseases . . . to the extent medical assistance is available under the State

Medicaid plan for services provided by such institution," and qualified home and community-

based services includes services provided under a State Medicaid Plan or a waiver program.

MFP Statute, § 6071(b)(3), (5).  In addition to funding services to aid in transitions (Defs.' Ex. 8,

at 52), the MFP program covers the first year of community and home-based services at an

increased federal match rate.  (Defs.' Facts ¶ 10.)[28]  It does not pay for housing.  (Defs.' Ex. 3, ¶

16.)  In its application to participate in the MFP Program, a State must identify the "target groups

of eligible individuals,"[29] "the projected numbers of eligible individuals in each targeted group of

---

[27](...continued)
community-based long-term care services and to provide for continuous quality
improvement in such services.

MFP Statute, § 6071(a).  Initially Congress authorized 1.75 billion in funding through fiscal year
2011.  Mathematica Policy Research, Inc., Money Follows the Person Demonstration Grants:
Summary of State MFP Program Applications 28 (2007) (report prepared for CMS) ("2007 MFP
Report").  In 2010, Congress increased the total MFP grant funding to $4 billion and extended
the demonstration to 2016.  *See* Pub. L. 111-148, Title II, § 2403(a), (b)(1); Mathematica Policy
Research, Money Follows the Person Demonstration: Overview of State Grantee Progress xi
(Dec. 2011), *available at*
http://www.mathematica-mpr.com/publications/PDFs/health/mfp_jan-jun2011_progress.pdf
("2011 MFP Report").  States now have until the end of federal fiscal year 2019 to transition
people and until the end of fiscal year 2020 to expend all their grant funds.  *Id.*

[28]States must use the additional money received due to the increased federal match rate,
known as MFP rebalancing funds, to invest in programs or initiatives that help to shift the
balance of long-term supports and services toward home and community-based services.  2011
MFP Report at xii.

[29]To be eligible for transition under the MFP Program, an individual must have lived in a
long-term care facility for at least 90 continuous days.  (Defs.' Ex. 8, at 25.)

eligible individuals to be assisted," and the "estimated total annual qualified expenditures for each fiscal year of the MFP demonstration project." *Id*. § 6071(c).

The District's MFP Program is aimed at three target groups: individuals with intellectual and developmental disabilities in Intermediate Care Facilities for Individuals with Mental Retardation (ICFs/MR) who are eligible for the ID/DD Waiver (*see supra* note 23); elderly and/or physically disabled individuals in nursing facilities are eligible for the EPD Waiver; and individuals with serious mental illness residing in either nursing facilities, St. Elizabeth's Hospital, or other "qualified institutions" (as defined by CMS) who are eligible for services covered by the District's Medicaid State Plan.  (Defs.' Ex. 3, ¶ 3; Defs. Ex. 8, at 50.)  In 2007, when the District first applied for and received approval to participate in the MFP Program[30] (Defs.' Ex. 3, ¶ 4; Defs.' Facts ¶ 12), the District proposed transitioning a total of 1110 individuals over five years, allocated as follows: 645 individuals with physical disabilities, 100 individuals with mental illness, 215 elderly, and 150 individuals with intellectual and developmental disabilities.[31]  2007 MFP Report at 27.  Based on these projections, the District was awarded a one-year grant in the amount of $2,546,569 and a five-year commitment of

---

[30]In 2007, CMS awarded MFP demonstration grants to 30 States and the District of Columbia.  2011 MFP Report at xi.  It awarded grants to 13 more States in 2011.  *Id*.

[31]Broken down by year, the District's MFP Program proposed the following transitions:

|  | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | Total |
|---|---|---|---|---|---|---|
| All transitions | 120 | 175 | 230 | 265 | 320 | 1,110 |
| Elderly | 25 | 35 | 45 | 50 | 60 | 215 |
| ID/DD | 0 | 15 | 30 | 45 | 60 | 150 |
| Physically Disabled | 75 | 105 | 135 | 150 | 180 | 645 |
| Mental Illness | 20 | 20 | 20 | 20 | 20 | 100 |

2007 MFP Report at 27.

$26,377,620.  2007 MFP Report at 26; (*see also* Defs.' Reply Ex. 2, at 13:1-4 (Sarigol Dep.)  For

each participant, the MFP Program covers the first year of qualified community-based services at

an enhanced Federal match rate of 85%.  (Defs.' Facts ¶ 10; Defs.' Ex. 3, ¶ 5.)  After the initial

year, MFP participants who continue to meet the eligibility requirements are transitioned from

the MFP Program to a waiver program or to home and community-based services allowed under

the District's Medicaid State Plan.  (Defs' Facts ¶ 10;  Defs.' Ex 3, ¶ 5.)

The District began using its MFP Demonstration grant in June 2008,[32] but its pilot

program was initially limited to the transfer of individuals with intellectual and developmental

disabilities to the ID/DD Waiver administered by DDS/DDA – individuals who are not in the

proposed class.  (Defs.' Facts ¶ 12; Defs.' Ex. 3, ¶ 4; Defs.' Ex. 8, at 3; *see supra* note 23.)[33]  In

August 2010, the District decided to expand the pilot to include forty nursing facility residents

who were eligible for the EPD Waiver (at least sixteen of whom would be part of the  proposed

class in this case).[34]  (Defs.' Facts ¶ 20; Defs.' Ex. 3, ¶ 23; Defs.' Ex. 8)).  To begin

implementation of the MFP Program for the EPD Waiver, the District "established an Aging and

---

[32]States were required to submit an "operational protocol" within one year of the grant
award.  CMS approved the District's initial Operational Protocol in June 2008.  (Defs.' Facts ¶
12; Defs.' Ex. 3, ¶ 4; Defs. Ex. 8, at 3.)

[33]By April 2011, approximately seventy-seven individuals with intellectual and
developmental disabilities had been transitioned under the MFP Program from Medicaid-funded
ICF/MRs to the ID/DD Waiver.  (Defs.' Facts ¶ 14; Defs.' Ex. 3, ¶ 4.)  By December 2011, that
number had increased to 86.  2011 MFP Report at 27.

[34]In March 2010, presumably to start the process of using the MFP Program to transition
individuals from nursing facilities to the EPD Waiver, University Legal Services, counsel for
plaintiffs in this case, identified for DHCF thirty nursing facility residents with disabilities who
wanted to transition to the community though the MFP Program. (Defs.' Facts ¶ 20; Defs' Ex 3,
¶ 23.)  By August 2010, sixteen of those thirty still resided in nursing facilities, and they were
included in the expanded pilot.  (Defs.' Facts ¶ 20; Defs.' Ex. 3, ¶ 23.)

Disability Resource Center Transition Team." (Defs.' Facts ¶ 16; Defs.' Ex. 3, ¶ 24).) In September 2010, the District submitted a formal amendment to its "Operational Protocol" to cover the expansion to individuals in nursing facilities who are eligible for the EPD Waiver. (Defs.' Ex. 3, ¶ 11; Defs.' Ex. 8.) CMS approved the expansion on October 22, 2010, and the District began to implement the change starting at the end of 2010.[35] (Defs.' Ex 3, ¶¶ 11-12; Defs.' Ex. 8; Defs.' Facts ¶ 12.)

The MFP Program is designed so that a MFP candidate is referred to a "Transition Coordinator," who "provides the candidate with a list of [EPD Waiver] providers who provide case management services, from which the candidate selects the EPD Waiver case manager with whom he or she would like to work. (Defs.' Ex. 3, ¶ 14.) The selected case manager then "work[s] with an ISP team to create an ISP," subject to DHCF approval, that "specif[ies] the community-based services to be furnished, their frequency, the type of provider who will furnish each specified service, and how backup and emergency services will be provided." (Defs.' Facts ¶ 11 (citing Defs.' Ex. 3, ¶ 15).) The ISP team usually includes the candidate, the Transition Coordinator, the EPD Waiver Case Manager, the candidate's legal representative, and nursing facility staff. (Defs.' Ex. 3, ¶ 15.) Transition Coordinators also "meet with nursing home administrators and staff to inform them about the EPD waiver program," "assist with housing arrangements," "help coordinate the participant's initial move, and assess existing barriers that prevent an otherwise willing and eligible person from successfully transitioning to the

---

[35]Defendants' statement that CMS "prevent[ed] the District from beginning to expand th[e] [MFP] program to nursing home residents" before December 2010 (Defs.' Facts ¶ 12) is not supported by the record. The District submitted its expansion request in September 2010 (Defs.' Ex. 3, ¶ 11; Defs.' Ex. 8) and CMS approved it the following month. (Defs.' Facts. ¶ 12.)

community."  (Defs' Facts ¶¶ 15, 23 (citing Defs.' Ex. 3, ¶ 16).)  The District has two full-time

Transition Coordinators focused on transitions from nursing facilities.  (Defs' Facts ¶ 15 (citing

Defs.' Ex. 3, ¶ 26).)[36]  Candidates "are not given a spot in the program and transitioned to the

community until all necessary community-based services are identified and approved and

[appropriate] housing is procured."  (Defs.' Ex. 3, ¶ 20; Defs.' Facts ¶ 22.)

    As previously noted, neither the EPD Waiver nor the MFP Program provides housing,

although for transition to the EPD Waiver, the MFP Program pays for "a maximum $5,000

one-time transition service payment to purchase furniture, cooking utensils, and other essential

items for community life[] and to cover moving expenses."  (Defs.' Facts ¶ 10; Defs.' Ex. 3, ¶

19; Defs.' Ex. 8, at 55).)  Candidates who lack housing may apply to the District of Columbia

Housing Authority for a spot in the Housing Choice Voucher program or the Moderate

Rehabilitation program; however, both are available to any qualified individual regardless of

disability. (Defs.' Facts. ¶ 23 (citing Defs.' Ex. 3, ¶ 17).)  Other barriers to transition include

poor credit histories that "prevent property owners from approving leasing application," "a lack

of family members or friends willing to provide support in the community in preparation for,

during, and post-transition," a need for services not provided by the EPD Waiver package or the

District's Medicaid State Plan (*e.g.*, adult day services, 24-hour care), and a lack of providers

with the capacity or willingness to provide the needed services.  (Defs.' Facts ¶¶ 24, 25 (citing

Defs.' Ex. 3, ¶ 21).)

---

[36]As of April 2011, DCOA/ARDC was "in the process of hiring two [] additional
full-time MFP Transition Coordinators" to focus on transitions from nursing facilities.  (Defs.'
Facts ¶ 15.)  The record does not reflect whether those positions have been filled.

As of April 27, 2011, when the District filed its summary judgment motion, one "nursing home resident eligible for the EPD waiver had transitioned to the community under the MFP program" – on April 13, 2011 (Defs.' Facts ¶ 26; Defs.' Ex. 3, ¶ 25; Pls.' Facts ¶ 67), and it was working with twenty-six additional EPD Waiver candidates.[37]  (Defs.' Facts ¶ 21; Defs.' Ex. 3, ¶ 25.)  At that time, the District predicted that "[a]ll pilot participants should be transitioned by September 2011 barring any unanticipated barriers."[38]  (Defs.' Ex. 3,  ¶ 25; Defs.' Facts ¶ 26.) On June 13, 2011, the second nursing facility resident (plaintiff Jackson) transitioned.  (Pls.' Ex. B, ¶ 10 (Decl. of Bonita Jackson); *see also* 2011 MFP Report at 27 (two individuals with physical disabilities transitioned to EPD Waiver by June 2011).  By the beginning of September 2011, the District reduced its projection to twelve individuals by September 2011, with another eleven by December 2011.  (Pls.' Facts ¶ 67 (citing Pls.'  Ex. H at 74:10-19).)[39]  On September

[37]It is not apparent from the existing record what happened to the other thirteen pilot participants.

[38]By April 2011, Transition Coordinators had met with all pilot participants to discuss housing and health services, had submitted Housing Choice Voucher applications for participants, and had connected participants with EPD Waiver case managers to conduct initial EPD Waiver assessments.  (Defs.' Ex. 3, ¶ 25.)

[39]The District's projected use of the MFP Program to transition individuals to the EPD Waiver has repeatedly changed, having been dramatically decreased. In June 2007, when the District was approved for an MFP Program grant, it projected that from 2007 to 2011, using the MFP Program, it would transition a total of 645 people with physical disabilities and 215 elderly to the EPD Waiver. (*See supra* note 31; *see also* Pls.' Ex. H at 14:11-15:6; Pls.' Facts ¶ 33; Pls.' Ex. H at 14:11-15:6).)  In December 2009, having not yet begun to use its MFP grant for the EPD Waiver population, the District amended its Operational Protocol to propose the following "benchmarks" for transitions from nursing facilities: 30 people in 2010, 40 people in 2011, and 40  people in 2012 (for a total of 110).  (Pls.' Ex. H, at 34:16-35:2; Defs.' Ex. 3, ¶ 8; Defs.' Ex. 8, at 22.)  In 2010, having not yet implemented the MFP Program for the EPD Waiver population, the District proposed a revised benchmark of transitioning 80 EPD Waiver qualified individuals from nursing facilities in 2010 and 2011.  (Pls. Ex. H at 36:12-21.) In January 2011, at which point not one person had moved, the District represented to CMS that it "anticipate[d]

(continued...)

13, 2011, a third nursing facility resident (plaintiff Bacon) transitioned.  (Defs.' Reply Ex. 3, ¶ 3

(Second Decl. of Leyla Sarigol).)  Thus, by October 3, 2011, three individuals, including two of

the plaintiffs, had transitioned.  (Pls.' Facts ¶ 24; Pls.' Ex. H at 68:3-11; Pls.' Ex. H at 85:14-17;

Defs.' Reply at 12).) The record does not reflect how many, if any, of the remaining pilot

participants have transitioned since that time.  As for the remainder of the nursing facility

population, the District "maintain[s] a list" of individuals who have requested transition

assistance from the MFP Program, but at least as of September 2011, it was doing nothing

further to assist them.  (Pls.' Facts ¶ 50 (citing Pls.' Ex. H at 96:4-97:1, 97:2-99:5).)

## 2.     Department of Mental Health ("DMH")

Although the Department of Mental Health ("DMH") does not operate or provide

services in nursing facilities (Defs.' Facts ¶ 29), for any individual with a mental health

diagnosis (primary or secondary), the DMH plays a role in their placement or continued

residence in a nursing facility through its administration of the federally-required "Pre-admission

Screening and Resident Reviews" (PASRR).  (Defs.' Facts ¶¶ 28-29 (citing Defs.' Ex. 5, ¶ 3

(Decl. of Elspeth C. Ritchie, Chief Clinical Officer, DMH).); *see* 42 C.F.R. § 483.104 ("As a

condition of approval of the State [Medicaid] plan, the State must operate a preadmission

screening and annual resident review program that meets the requirements of §§ 483.100 through

438.138.")

---

[39](...continued)
transitioning nursing home residents to the community under the MFP [P]rogram" at the rate of
80 per year for each year from 2011 through 2016, for a total of 480.  (Defs.' Ex. 3, ¶¶ 27, 28;
Defs.' Facts ¶ 13.)

On the front end, the referring clinician must conduct a "Level I Screening to determine whether an individual being referred to a nursing facility has a primary or secondary diagnosis of mental illness."  (Defs.' Ex. 5, ¶ 4).)  "If so, DMH conducts a Level II Screening, which requires an independent psychiatric evaluation of the individual and a determination as to whether the level of care provided by a nursing facility is required."  (Defs.' Facts ¶ 28 (citing Defs.' Ex. 5, ¶ 4); *see also* 42 C.F.R. § 483.112 ("For each [nursing facility] applicant with [mental illness] or [mental retardation], the State mental health or mental retardation authority (as appropriate) must determine, in accordance with § 483.130, whether, because of the resident's physical and mental condition, the individual requires the level of services provided by a [nursing facility].").

Once admitted, an individual with a mental health diagnosis must be reviewed annually. 42 C.F.R. § 483.114.  In addition, the facility is "required to notify DMH and request a PASRR review if a patient with a primary or secondary mental health diagnosis has undergone significant change in his or her physical or mental conditions."  (Defs.' Facts ¶ 30 (citing Defs.' Ex. 5, ¶ 5).)  "In the event that a PASRR review . . . identifies a resident as capable and willing to return to the community, the DMH Office of Integrated Care is responsible for coordinating with the [nursing facilities] and the [DHCF] to assist those [nursing facility] residents with mental illness in the discharge process."  (Defs.' Ex. 5, ¶ 5.)

Dr. Elspeth Ritchie, the Chief Clinical Officer at DMH, "is responsible for managing the [PASRR] determinations for current and potential nursing facility [] residents."  (Defs. Ex. 5, ¶ 2; Defs.' Facts ¶ 32.)  On October 18, 2010, and again on January 12, 2011, DMH sent letters to the nineteen nursing facilities within the District "attaching the DMH PASRR Policy and reminding [them] of their continuing obligation to notify DMH of any significant changes in the

physical or mental condition of a [nursing facility] resident." (Defs.' Ex. 5, ¶ 6; Defs.' Facts ¶ 31.) And, as of the fall of 2011, Dr. Ritchie had visited seven nursing facilities "to discuss continued implementation of the PASRR program and coordination with DMH on discharge planning." (Defs.' Ex. 5, ¶ 6; Defs.' Facts ¶ 32;)

### C.    Costs of Institutional and Home and Community-Based Long-Term Care

The present record includes the following information about the costs of institutional and community-based long-term care:

### 1.    Overall Spending on Long-Term Care Services

In fiscal year 2010, the District spent a combined total of $494,434,042 on all long-term care services – $274,141,306 (55.4%) on institutional care (including both nursing facilities and intermediate care facilities) and $220,292,737 (44.6%) on home and community-based services under waiver programs (including both the EPD Waiver and ID/DD Waiver).[40] (Defs.' Ex. 1, ¶ 3 (Aff. of Darrin Shaffer, Agency Fiscal Officer, DHCF).) Of that amount, approximately $278 million went to either long-term care services in nursing facilities, which would include, but is not limited to, individuals with physical disabilities, or long-term care services via the EPD Waiver, which also includes but is not limited to individuals with physical disabilities. (Pls.' Facts ¶ 16.) Out of that $278 million, approximately 26% went to home and community-based services via the EPD Waiver. (Pls.' Facts ¶ 16 (citing Pls.' Ex. M at 38:14-39:9).)

---

[40]For reasons that are not apparent from the record, the numbers that defendants use in their statement of facts are close, but not identical, to the numbers in the affidavit cited in support thereof. (*Compare* Defs.' Facts ¶ 8 *with* Defs.' Ex. 1, ¶ 3.)

### 2.      Average Costs of Long-Term Care Services

The average annual cost of long-term care services in a nursing facility typically exceeds the annual average cost of long-term care services provided under the EPD Waiver.  For example, in 2008, the average annual cost of long-term care services in a nursing facility was $58,957, whereas the average annual cost of services provided via the EPD Waiver was $21,849. (Pls.' Facts ¶14 (citing Pls.' Ex. G at 135:2-138:12).)  In 2007, the average annual cost of services in a nursing facility was $62,633, as compared to an annual average cost of $46,186.23 under the EPD Waiver.  (Pls.' Facts. ¶ 15 (citing Pls.' Ex. L at 226:17-227:5); Pls.' Ex. G at 134:3-11; *see also* Pls. Ex. G at 140:13-17 (average cost per enrollee in 2010 was $29, 938).)

### 3.      Mental Health Care Costs

The annual average cost of  community-based mental health services is less than treatment in a psychiatric hospital.  (*Compare* Am. Compl. ¶ 81 (alleging that average annual cost of community mental health treatment is approximately $25,000) *and* Pls.' Facts ¶ 14 (citing Pls.' Ex. L at 226:17-227:5)  (agreeing that $4,200 was a reasonable estimate of the average annual cost of mental health rehabilitation services cost) *with* Am. Compl. ¶ 80 (alleging that average annual cost in a psychiatric hospital is over $230,000).

## III.    PROCEDURAL BACKGROUND

On December 23, 2010, five individuals with disabilities[41] who were receiving Medicaid-covered long-term care services in nursing facilities, initiated this litigation, claiming that the District has "caused [them] to be confined unnecessarily in nursing facilities in order to obtain

---

[41]All five plaintiffs have physical disabilities; some also have mental health diagnoses. *See infra* notes 43-47.

long-term care services, rather than facilitate their transition to the community with appropriate

services and supports" (Am. Compl. ¶ 111; *see also id.* ¶¶ 74-79), which could be provided by

the District's Medicaid State Plan, the EPD Waiver, and Medicaid- and locally-funded services

for adults with mental illness.  (Pls.' Facts ¶ 89.)  Specifically, each named plaintiff is alleged to

be an individual with a disability,[42] who resides in a nursing facility, who "could live in the

community if appropriate supports and services were made available," who "has been

determined by health care professionals to be appropriate for community placement," and who

would "prefer[] to live in the community rather than staying in a nursing facility."  (Am. Compl.

¶¶ 29-32 (plaintiff Edward Day[43]); *id.* ¶¶ 33-36 (plaintiff Larry McDonald[44]); *id.* ¶¶ 37-40

---

[42](*See* Am. Compl. ¶ 106 ("Each Named Plaintiff and class member is an 'individual with a disability' within the meaning of the ADA in that they have disabilities that substantially limit one or more major life activities, such as self-care and social interaction.  They also have a history of such impairments and are regarded by Defendants as having such impairments."); *id.* ¶ 107 ("Each Named Plaintiff and class member is a '[q]ualified  individual with a disability' within the meaning of the ADA, 42 U.S.C. § 12131(2), because he or she is qualified to participate in Defendants' more integrated, community-based programs and services.").)

[43]Plaintiff Day "is a 75-year-old man who is diagnosed with diabetes, peripheral vascular disease, hypertension, a seizure disorder, and depression."  (Am. Compl. ¶ 29.)  "He has had both of his legs amputated because of his diabetes," but he "is able to ambulate independently in his wheelchair."  (*Id.*)  He "needs assistance with bathing, dressing, transferring, and toileting." (*Id.*)  Day "has resided at Unique Residential Care Center ("Unique Residential") (formerly JB Johnson Nursing Center) in the District of Columbia since December 4, 2006."  (*Id.* ¶ 30.)  He was placed there after he retired from his job of 37 years with the District of Columbia government.  (*Id.*)  In 2009, the staff at Unique Residential identified  Day as "high functioning" and "able to live in the community." (*Id.* ¶ 31.)

[44]Plaintiff McDonald "is a 57-year-old man who is diagnosed with a seizure disorder, hypertension, and dementia."  (Am. Compl. ¶ 33.)  He "requires supervision for two activities of daily living: bathing and dressing."  (*Id.*)  "McDonald has resided at Unique Residential since September 2006, when he was admitted after suffering a stroke."  (*Id.* ¶ 34.)

(plaintiff Vietress Bacon[45]); *id.* ¶¶ 41-43 (plaintiff Bonita Jackson[46]); *id.* ¶¶ 44-47 (plaintiff Roy Foreman[47])).  Pursuant to Federal Rule of Civil Procedure 23, plaintiffs also seek to certify a class of between 500 and 2900 similarly-situated individuals (Am. Compl. ¶ 97) that would be comprised of "District of Columbia residents with disabilities that substantially limit their ability to perform major life activities," who are "currently housed in nursing facilities that are located in the District of Columbia or are otherwise funded by [d]efendants," whose personal care and health care services could be provided in the community, rather than in a nursing facility, and who would prefer to reside in the community.[48]  (Am. Compl. ¶¶ 24-28, 29-47; 67-73.)[49]

---

[45]Plaintiff Bacon "is a 47-year-old woman" who has "bi-polar disorder, depression, arthritis, traumatic brain injury, and orthopedic limitations due to a childhood car accident followed by multiple surgeries."  (Am. Compl. ¶ 37.)  She was "admitted to Washington Nursing Facility ("WNF") on September 22, 2008, when she could no longer live with her elderly mother."  (*Id.*)  She "uses a motorized wheelchair to ambulate independently," but she "needs assistance with bathing, dressing, transferring, and toileting."  (*Id.* ¶ 38.)  Plaintiff Bacon is one of the three nursing facility residents to have  transitioned to the community through the MFP Program as of October 3, 2011.  (Defs.' Reply Ex. 3, ¶ 3.)

[46]Plaintiff Jackson "is a 52-year-old woman [who] is diagnosed with anemia, seizures, and Hepatitis C."  (Am. Compl. ¶ 41.)  "Due to her equilibrium problems, she uses a walker for mobility."  (*Id.*)  She "was admitted to WNF [Washington Nursing Facility] on January 4, 2007, after a stroke and subsequent surgery."  (*Id.*)  She requires "assistance to help with personal grooming, meal preparation, and light cleaning."  (*Id.* ¶ 42.)  Plaintiff Jackson is one of the three nursing facility residents to have transitioned to the community through the MFP Program as of October 3, 2011.  (Pls.' Ex. B, ¶ 10.)

[47]Plaintiff Foreman "is a 65-year-old man" who is "diagnosed with decubitus ulcers, diabetes, and depression.  (Am. Compl. ¶ 44.)  "He uses a wheelchair to ambulate independently."  (*Id.*)  He "was admitted to Washington Center for Aging Services in May 2006 when he was discharged from Providence Hospital following treatment for mobility issues."  (*Id.*)  He requires assistance with "bathing, dressing, transferring, and toileting."  (*Id.* ¶ 45.)

[48]According to the complaint, the proposed class would consist of:

All those persons who (1) have a disability; (2) receive services in nursing facilities located in the District of Columbia or funded by Defendants at any time

(continued...)

Plaintiffs claim that the District's "failure to provide [them or the proposed class] . . . services in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act . . . [and] Section 504 of the Rehabilitation Act."[50]  In addition, plaintiffs allege that defendants' "methods of administration arbitrarily limit access to integrated, community support services by persons with disabilities in nursing facilities." (Am. Compl.  ¶ 84.) Specifically, according to plaintiffs, defendants have "collectively fail[ed] to:

(i)  Assure that individuals with mental or physical disabilities receive services in the most integrated setting appropriate to their needs;

(ii)  Develop or implement a comprehensive and effective working plan that identifies individuals with mental or physical disabilities who are needlessly in nursing facilities and helps them move to more integrated settings;

(iii)  Provide adequate and appropriate community services;

(iv)  Provide information about community-based alternatives or comprehensive discharge planning to enable Plaintiffs to live in more integrated settings;

(v)  Assure that people with mental or physical disabilities are not unnecessarily placed in nursing facilities by, for example, informing them of the availability of integrated, community-based options for mental health and other health care services as an alternative to nursing facility placement, offering them a

---

[48](...continued)
during the pendency of this litigation; (3) could live in the community with appropriate supports and services from Defendants; and (4) prefer to live in the community rather than in nursing facilities.

(Am. Compl. ¶ 96.)

[49]Plaintiffs further allege that the MDS data (Defs.' Facts ¶ 17) "vastly undercounts the preferences of nursing home residents because of their lack of awareness of community-based options."  (Am. Compl. ¶ 70.)

[50]The complaint also alleges that plaintiffs are "individuals with disabilities for purposes of the ADA and the Rehabilitation Act."  (Am. Compl. ¶ 24 (citing 42 U.S.C. § 12102; 29 U.S.C. § 705(20)).)

meaningful choice of community placement, or offering any assistance to those who seek to return to live in the community;

(vi)  Properly identify persons with mental or physical disabilities who should not be admitted into nursing facilities;

(vii) Assure that individuals with mental or physical disabilities residing in nursing facilities are periodically reviewed and assessed for community- based treatment;

(viii)  Assure that individuals with mental or physical disabilities are discharged from nursing facilities when appropriate;

(ix)  Provide information, transitional assistance, and referrals to facilitate Plaintiffs' access to supportive housing as necessary to enable Plaintiffs to no longer be unnecessarily segregated in  nursing facilities; and

(x)  Take adequate steps to preserve individuals' existing community housing subsidies during periods of placement in nursing facilities so that people can maintain homes to which they may return.

(Am. Compl. ¶ 82.)  In addition to class certification, plaintiffs ask the Court to declare that defendants' "failure to provide Named Plaintiffs and class members with services in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act . . . [and] Section 504 of the Rehabilitation Act"; issue an "injunction  requiring [d]efendants to  promptly take such  steps  as  are necessary  to  serve  Named  Plaintiffs  and  class members in the most integrated settings appropriate to their needs"; and award "reasonable attorneys' fees, litigation expenses, and costs."  (Am. Compl. at 27.)  Defendants have moved to dismiss or, in the alternative, for summary judgment.

## ANALYSIS

Defendants' motion to dismiss or for summary judgment includes the following arguments: (1) that the amended complaint should be dismissed for failure to state a claim; (2) that defendants are entitled to summary judgment because they have an *Olmstead* Integration

Plan; or (3) that the individual defendants should be dismissed because the claims against them

are duplicative of the claims against the District.  Each of these will be addressed herein.[51]

## I.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A.   Legal Standard

"In ruling on a motion to dismiss for failure to state a claim, the court must 'accept as

true all of the factual allegations contained in the complaint.'"  *Phillips v. Fulwood*, 616 F.3d

577, 581 (D.C. Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  A court should

dismiss a complaint for failure to state a claim if the complaint does not "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007)); *Rudder v. Williams*, ___ F.3d ___, 2012 WL 119589, at *2 (D.C. Cir.

---

[51]Defendants' motion also argues that there is no private right of action against the Mayor to challenge the implementation of the *Olmstead* Compliance Plan (Defs.' Mem. at 28-29.) Plaintiffs' response makes clear that they are not making any such claim.  (Pls.' Opp. at 36 n.17.) In its reply, defendants raises an additional argument, challenging the standing of the individual plaintiffs.  (Defs.' Reply at 7).  According to the District, each of the plaintiffs lack standing because (1) Jackson and Bacon have already moved from nursing facilities to apartments; (2) Day wants to obtain "prostheses for [his] legs . . . before [he] return[s] to the community"; (3) McDonald is already working with the MFP Program to obtain a housing voucher and locate housing in the community; and (4) Foreman has not been able to locate a private, community-based home health aide provider and has not sought to enroll in the EPD Waiver program.  (*Id.* at 7-8.)  However, as plaintiffs have not had the opportunity to respond to this argument, the Court will not consider it at this time.  *Jones v. Mukasey*, 565 F. Supp. 2d 68 (D.D.C. 2008.) ("As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply.  *See, e.g.*, *Am. Wildlands v. Kempthorne*, No. 07-5179, 2008 WL 2651091, at *8 (D.C.Cir. July 8, 2008) ("We need not consider this argument because plaintiffs ... raised it for the first time in their reply brief."); *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir.1986) ("Considering an argument advanced for the first time in a reply brief ... is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.").  That said, whether the case is moot as to any of these plaintiffs or whether they cannot properly function as class representatives under Rule 23 will undoubtably have to be resolved at some future time.

2012).  To state a facially plausible claim, a complaint must set forth "factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 129 S. Ct. at 1949.

>    **B.     Causal Connection Between Plaintiffs' Placement in Nursing Facilities and
>             the District's Actions**

Citing the test for Article III standing,[52] defendants contend that plaintiffs have not stated

a claim for relief because they have not alleged "a causal connection between the injury and the

conduct complained of" – *i.e.*, that "the injury [is] fairly traceable to the challenged action of the

defendant."  (Defs.' Mem. at 10-11 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992)).  Specifically, defendants argue that the District cannot be held responsible for plaintiffs'

residence in a nursing facility "if the District did not cause this placement or otherwise fund the

individual's stay in a nursing facility."  (*Id.* at 11.)  According to defendants, the complaint's

allegations fail to meet this requirement because there is no allegation that the District (1) places

individuals in the nursing facility where they reside; (2) reviews or approves an individual's

placement in a nursing facility; or (3) funds plaintiffs' care in nursing facilities.  Defendants

further argue that "licensing nursing facilities within the District does not create the necessary

---

[52]In order for a plaintiff to have Article III standing, there must be: "(1) an injury in fact,
(2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that
the injury will be redressed by a favorable decision."  *United Food & Com. Workers Union
Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996).  However, although defendants cite
to this legal standard, their motion seeks dismissal pursuant to Rule 12(b)(6) for failure to state a
claim, not dismissal pursuant to 12(b)(1) for lack of jurisdiction.  "The distinctions between
[Federal Rules of Civil Procedure] 12(b)(1) and 12(b)(6) are important . . . .  Rule 12(b)(1)
presents a threshold challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on
the merits with res judicata effect."  *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C.2003)
(quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).

relationship between the District and a third-party non-licensee, much less create an obligation to provide community-based care to these individuals." (*Id.*)

Under either Title II of the ADA or Section 504 of the Rehabilitation Act, the District is required to "administer" services, programs, and activities "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (ADA implementing regulations); 28 C.F.R. § 41.51(d) (Rehabiliation Act implementing regulations). In addition, the District is prohibited from utilizing "criteria or methods of administration" that have either the "effect of  subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment  of the objectives of the [District's] program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(i)-(ii) (ADA); *see also* 45 C.F.R. § 84.4(b)(4)(i)-(ii) (Rehabilitation Act); 28 C.F.R. § 41.51(b)(3)(i)-(ii) (same).  Accordingly, to state a claim under either the ADA or the Rehabilitation Act, plaintiffs do not need to allege that the District "caused" plaintiffs' placement in a nursing facility.  Rather, to allege the necessary "causal connection" between the District's actions and plaintiffs' injury, it is sufficient to allege, as plaintiffs do, that the District provides, administers and/or funds the existing service system through which plaintiffs receive long-term care services and/or that the District, in so doing, has utilized criteria or methods of  administration that have "caused [plaintiffs] . . . to be confined unnecessarily in nursing facilities in order to obtain long-term care services, rather than facilitate their transition to the community with appropriate services and supports."  (Am. Compl. ¶ 111; *see id.* ¶¶ 84, 99;  *see, e.g.*, *Conn. Office of Prot. & Advocacy v. Connecticut*, 706 F. Supp. 2d 266, 276-77, 284 (D. Conn. 2010) (State's conduct in administration of State Medicaid Plan

made it a proper defendant even though plaintiffs resided in privately operated nursing

facilities); *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 319 (E.D.N.Y. 2009)

(plaintiffs stated integration claim against State officials even though "State officials do not

require anyone to be in an adult home," because the " [d]efendants plan, fund and administer the

State's existing service system such that more than 12,000 adults are receiving the State's

services in adult homes"); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 293 (E.D.N.Y. 2008)

(rejecting State's claim, on motion to dismiss, that plaintiffs had to show that the State was

specifically responsible for their placement in nursing facilities); *see also* DOJ Statement at 3 ("a

public entity may violate the ADA's integration mandate when it: (1) directly or indirectly

operates facilities and or/programs that segregate individuals with disabilities; (2) finances the

segregation of individuals with disabilities in private facilities; and/or (3) through its planning,

service system design, funding choices, or service implementation practices, promotes or relies

upon the segregation of individuals with disabilities in private facilities or programs").

### C.      Determination of Plaintiff's Eligibility for Community-Based Care

The District next argues that the amended complaint should be dismissed because there is

no allegation that the District has determined that community-based services are appropriate for

plaintiffs, but only alleges that each named plaintiff "has been determined by health care

professionals to be appropriate for community placement."  (Defs.' Mem. at 11 (citing Am.

Compl. ¶¶ 31, 35, 39, 42, 46))  According to defendants, "[i]f Plaintiffs expect the District to

fund their community-based services, Plaintiffs are subject to the District's determination of

whether or not such services are appropriate to meet their needs.  A bald assertion that some

unidentified healthcare professional has determined that community-based services are

appropriate to meet the medical and physical needs of the named plaintiffs is not enough."
(Defs.' Mem. at 11-12 (internal citations omitted).)

The Court disagrees. *Olmstead* established that where a State's own professionals have determined that community-based treatment is appropriate, a State may be required to provide community-based services. *Olmstead*, 527 U.S. at 587. However, although the Court in *Olmstead* noted that a State "generally may rely on the reasonable assessments of its own professionals," *id*. at 602, it did not hold that such a determination was required to state a claim. Since *Olmstead*, lower courts have universally rejected the absolutist interpretation proposed by defendants. *See Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 539-40 (E.D. Pa. 2001) (denying defendants' motion to dismiss *Olmstead* claims and rejecting the argument that *Olmstead* "require[s] a formal recommendation for community placement."); *Disability Advocates, Inc.v. Paterson*, 653 F. Supp. 2d 184, 258-59 (E.D.N.Y. 2009) (requiring a determination by treating professionals, who are contracted by the State, "would eviscerate the integration mandate" and "condemn the placements of [individuals with disabilities in adult homes] to the virtually unreviewable discretion" of the State and its contractors); *Joseph S*., 561 F. Supp. 2d at 291 ("I reject defendants' argument that *Olmstead* requires that the State's mental health professionals be the ones to determine that an individual's needs may be met in a more integrated setting."); *Long v. Benson*, No. 08-0026, 2008 WL 4571904, at *2 (N.D. Fla. 2008) (refusing to limit class to individuals whom state professionals deemed could be treated in the community, because a State "cannot deny the [integration] right simply by refusing to acknowledge that the individual could receive appropriate care in the community. Otherwise the right would, or at least could, become wholly illusory."); *see also* DOJ Statement at 4 ("the ADA

and its regulations do not require an individual to have had a state treating professional make

such a determination. . . . This evidence may come from their own treatment providers, from

community-based organizations that provide services to people with disabilities outside of

institutional settings, or from any other relevant source.  Limiting the evidence on which

*Olmstead* plaintiffs may rely would enable public entities to circumvent their *Olmstead*

requirements by failing to require professionals to make recommendations regarding the ability

of individuals to be served in more integrated settings.").

Indeed, even the one case cited by defendants, *Boyd v. Steckel*, 753 F. Supp. 2d 1163

(M.D. Ala. 2010)), does not support its position.  In *Boyd*, the court denied the motion for a

preliminary injunction based in part on the fact that state medical professionals had determined

that community-based treatment was not appropriate and that, "[w]ithout more at this stage, this

Court cannot find that Boyd has established a substantial likelihood of proving his qualification

for the community-based services requested—i.e. that they are appropriate to meet his needs."

*Id.* at 1174.  However, the court recognized that the plaintiff would have the opportunity to

"demonstrate, at summary judgment or trial, that [the state medical professional's] assessment is

unreasonable or that he is still qualified for community-based services even under [that]

assessment." *Id.*  Thus, *Boyd* recognized that whether community-based treatment is appropriate

for a particular individual is a factual question that does not depend solely on a determination by

a state medical professional.

Finally, plaintiffs' claim here is based in part on the District's alleged failure to

systematically assess whether a nursing facility resident would qualify for community-based

treatment.  (Am. Compl. ¶¶ 92, 99.)  Under such circumstances, to allow the District to rely on

the absence of an assessment by its own professionals as grounds for dismissal would

"eviscerate" the Integration Mandate.  *See, e.g.*, *Colbert v. Blagojevich*, No. 07-4737, 2008 WL

4442597, at *2-3 (N.D. Ill. Sept. 29, 2008) (plaintiffs appropriately sought injunction directing

defendants "to create a set of objective criteria against which all proposed class members will be

regularly assessed for their eligibility for community placement").  Accordingly, the Court

concludes that plaintiffs' allegation that "health-care professionals" have determined that

community-based treatment is appropriate is sufficient to survive a motion to dismiss.

### D.      Comparative Costs

According to defendants, "the District is not required to fund community-based services

for Medicaid recipients for whom the cost of such services would exceed the cost of care in a

nursing facility."  (Defs.' Mem. at 12 (citing 42 U.S.C. § 1396n(c)(4)(A).)  Thus, defendants

argue that the complaint must be dismissed because plaintiffs fail to allege that the cost of

community-based services on an individual basis for each plaintiff would be less than the cost of

care in a nursing facility.  (*Id*. at 12.)  Plaintiffs counter that there is no need to make any such

allegation to state a claim under the ADA.  (Pls.' Mem. at 33.)  In their view, the issue of cost is

relevant only to a fundamental alteration defense and, even then, the proper question is "whether

the sought-after community services, *in the aggregate*, would cost the same or less than the

services in the nursing facility.  (Pls.' Opp. at 34.)

Defendants cite only 42 U.S.C. § 1396n(c)(4)(A) as legal authority for their novel

proposition that there can be no liability under the ADA if the cost of funding community based

services for an individual would exceed the cost of care for that individual in a nursing facility.

That statutory section, however, is part of the Medicaid Act, not the ADA, and it provides only

that a State may include such a individual cost-neutrality requirement as part of its waiver

eligibility standards.  *See* 42 U.S.C. § 1396n(c)(4)(A) ("A waiver granted under this subsection

may . . . limit the individual's provided benefits under such waiver to individuals with respect to

whom the State has determined that there is a reasonable expectation that the amount of medical

assistance provided with respect to the individual under such waiver will not exceed the amount

of such medical assistance provided for such individual if the waiver did not apply.")[53]  This

provision has nothing to do with establishing the elements of an ADA integration claim.  Indeed,

defendants cite no persuasive authority for their suggestion that to state a claim under Title II of

the ADA, an individual must allege that the cost of the sought-after accommodation be will  less

than maintaining the status quo.  In many instances, there will be additional costs associated with

a sought-after accommodation.  Nor does the Court in *Olmstead* suggest that any such allegation

is required to state an *Olmstead*-type integration claim; rather, the point the Court makes in

*Olmstead* is that the allegation that community-based care for a particular individual will be less

costly is not sufficient to defeat a fundamental alteration defense – not that such an allegation is

required.  Accordingly, it is not a basis for dismissal that plaintiffs did not allege that the cost of

community care for a given individual would be less than the cost of institutional care.

## II.     MOTION FOR SUMMARY JUDGMENT

### A.     Legal Standard

Summary judgment is appropriate if the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

[53]As previously noted (*see supra* note 22), the District did not include individual cost-neutrality as a waiver eligibility requirement.

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A

material fact is one that "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A "genuine issue" of material fact

arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.  *Anderson*, 477 U.S. at 255. "In considering a motion for summary judgment, the

'evidence of the non-movant is to be believed, and all justifiable inferences drawn in his favor.'"

*Anderson v. Liberty Lobby, Inc*., 477 U.S. at 248 (1986). "If material facts are at issue, or, though

undisputed, are susceptible to divergent inferences, summary judgment is not available." *Carney

v. American University*, 151 F.3d 1090 (D.C. Cir. 1998) (internal quotations omitted).  In

addition, "[s]ummary judgment is not generally appropriate if both parties have marshaled

inconsistent facts to support their arguments." *U.S. ex rel. Purcell v. MWI Corp.*, ___ F. Supp.

2d ___, 2011 WL 5517352 (D.D.C. 2011).  Accordingly, if "reasonable minds could differ as to

the import of the evidence," summary judgment will be denied. *Anderson*, 477 U.S. at 250-51.

### B.       Compliance with *Olmstead*'s Integration Mandate

Defendants seek summary judgment on the ground it is undisputed that the District has

an *Olmstead* Integration Plan (Defs.' Mem. at 13), *i.e.*, a "comprehensive, *effectively working*

plan for placing qualified persons with . . . disabilities in less restrictive settings, and a waiting

list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its

institutions fully populated." *Olmstead*, 527 U.S. at 606-07 (emphasis added).  Defendants claim

that the District has "comprehensive and effective working plans that ensure it does not place

individuals in nursing facilities unless it is necessary and appropriate to do so, as well as

programs that fund community-based services and specifically support the transition of disabled

41

individuals from nursing facilities to community-based settings." (Defs.' Mem. at 14.)

Defendants' arugment relies primarily on: (1) the existence of programs that "facilitate

community-based services for disabled residents," including the EPD Waiver and the MFP

Program; (2) the use of the PASRR screening and review process by the DMH to ensure that

individuals with mental health diagnoses are not inappropriately placed or kept in nursing

facilities; and (3) the existence and successful use of the ID/DD Waiver and MFP Program for

individuals with intellectual and developmental disabilities. (Defs.' Mem. at 16-27.) To the

extent there remain individuals in nursing facilities who are not being served in the "most

integrated setting appropriate" to their needs, defendants contend that there are external barriers

(*e.g.*, lack of housing), for which they are not responsible. (Defs.' Mem. at 24.)

In response, plaintiffs contend that the District's existing programs do not qualify as an

*Olmstead* Integration Plan. (Pls.' Opp. at 4-24). According to plaintiffs, the "mere existence" of

"[t]hese programs fall far short of what the law requires," especially given that the District has

no written "*Olmstead* Plan" and that "material disputes of fact abound as to what [d]efendants

existing programs accomplish with respect to deinstitutionalizing people with disabilities from

nursing facilities." (Pls.' Opp. at 5, 7.) Plaintiffs base their argument primarily on the standards

for an "*Olmstead* Plan"[54] set forth in the DOJ Statement. As described therein, an *Olmstead* Plan

should

> do more than provide vague assurances of future integrated options or describe
> the entity's general history of increased funding for community services and
> decreased institutional populations. Instead, it must reflect an analysis of the

---

[54]An "*Olmstead* Plan," as defined in the DOJ Statement, "is a public entity's plan for
implementing its obligation to provide individuals with disabilities opportunities to live, work,
and be served in integrated settings." DOJ Statement at 6.

extent to which the public entity is providing services in the most integrated setting and must contain concrete and reliable commitments to expand integrated opportunities.  The plan must have specific and reasonable timeframes and measurable goals for which the public entity may be held accountable, and there must be funding to support the plan, which may come from reallocating existing service dollars.  The plan should include commitments for each group of persons who are unnecessarily segregated, such as individuals residing in facilities for individuals with developmental disabilities, psychiatric hospitals, nursing homes and board and care homes, or individuals spending their days in sheltered workshops or segregated day programs.  To be effective, the plan must have demonstrated success in actually moving individuals to integrated settings in accordance with the plan.  A public entity cannot rely on its *Olmstead* plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case.  Any plan should be evaluated in light of the length of time that has passed since the Supreme Court's decision in *Olmstead*, including a fact-specific inquiry into what the public entity could have accomplished in the past and what it could accomplish in the future.

DOJ Statement at 6-7.  Relying largely on this framework, plaintiffs argue that the District

"lacks every one of the hallmarks of a comprehensive and effective integration plan" because it

has

> (1) no process for identifying people who want to be reintegrated into the community from a nursing facility or (2) for assessing the needs of those individuals; (3) no policies, procedures, or practice to assist nursing facility residents who want to be deinstitutionalized in making the transition from nursing facilities to the community with necessary services and supports; (4) no idea of how many individuals who are institutionalized in nursing facilities have transitioned to the community; or (5) whether the nursing facility census has decreased over time.

(Pls.' Opp. at 36.)[55]

---

[55]Plaintiffs also contend that even if an *Olmstead* Integration Plan did exist, defendants would still have to show that plaintiffs' requested modifications would require a fundamental alteration of that plan.  (Pls.' Opp. at 3 ("The accommodation is reasonable unless the state can show that it already has in place a 'comprehensive, effectively working plan for placing qualified persons . . . in less restrictive settings,' *and* accommodating individuals further would "fundamentally alter the nature of the service, program, or activity." (emphasis added).)

(continued...)

Neither the absence of a formal *"Olmstead* Plan" nor the failure to have a plan that fully complies with the requirements set forth in the DOJ Statement precludes summary judgment,[56] but there are other fatal flaws in the District's argument.  Although existing law does not establish what precisely constitutes an legally sufficient *Olmstead* Integration Plan, there is wide-spread agreement that one essential component of an "effectively working" plan is a measurable commitment to deinstitutionalization.  *See, e.g.*, DOJ Statement at 7 (plan must have "demonstrated success in actually moving individuals to integrated settings in accordance with the plan"); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 157, 160 (3d Cir. 2005) (plan must "demonstrate[] a reasonably specific and measurable commitment to

---

[55](...continued)
Defendants, on the other hand, take the view that establishing the existence of an *Olmstead* Integration Plan is all that is required to establish compliance with the Integration Mandate. (Defs.' Mem. at 14 ("a program available to all Medicaid recipients, based on spots available in the program, the recipients' medical needs, and the recipients' ability to secure needed services in the community, satisfies the principle set forth by the *Olmstead* plurality")  The United States shares plaintiffs' view.  (*See* US Statement of Interest at 12-13 & n.8; DOJ Statement at 7 ("The Department of Justice has interpreted the ADA and its implementing regulations to generally require an *Olmstead* plan as a prerequisite to raising a fundamental alteration defense, particularly in cases involving individuals currently in institutions or on waitlists for services in the community.  In order to raise a fundamental alteration defense, a public entity must first show that it has developed a comprehensive, effectively working *Olmstead* plan that meets the standards described above.  The public entity must also prove that it is implementing the plan in order to avail itself of the fundamental alteration defense.").)  But there are cases on either side. *Compare, e.g., Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 157 (3d Cir. 2005) (existence of an *Olmstead* Integration Plan is a "necessary element" of a successful fundamental alteration defense) *with Pitts v. Greenstein*, No. 10-635, 2011 WL 1897552, at *3 (M.D. La. May 18, 2011) (State "can satisfy its obligations" by demonstrating that it has an *Olmstead* Integration Plan).  However, as summary judgment is not warranted for other reasons, it is unnecessary to resolve the issue of whether the existence of an *Olmstead* Integration Plan is sufficient to defeat liability.

[56]Nor would the existence of a written *Olmstead* Plan necessarily prove compliance with *Olmstead. See, e.g., Benjamin v. Dep't of Pub. Welfare of Pa.*, 768 F. Supp. 2d 747, 755-56 (M.D. Pa. 2011) ("The existence of the Plan does not, however, automatically defeat liability.')

deinstitutionalization for which [the State] may be held accountable"); *Penn. Prot. & Advocacy, Inc. v. Penn. Dep't of Public Welfare*, 402 F.3d 374, 381 (3d Cir. 2005) ("plan must demonstrate a commitment to action in a manner for which it can be held accountable by the courts" (internal quotations omitted)); *The Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 620 (9th Cir. 2005) (State must be "genuinely and effectively in the process of deinstitutionalizing disabled persons"); *Williams v. Quinn*, 748 F. Supp. 2d 892, 897-98 (N.D. Ill. 2010) (consent decree approved that required individualized analysis of needs and specific timeframe for transition); *Sanchez v. Johnson*, 416 F.3d 1051, 1066 (9th Cir. 2005) (State had legally sufficient plan where it had "a successful record of personalized evaluations leading to a reasonable rate of deinstutionalization").

With respect to the District's claim to have a plan that demonstrates a measurable commitment to deinstitutionalization, the undisputed numbers clearly undercut any such contention. First, the District's nursing home population from 1995 to 2009 decreased by only 45 individuals. (*See* US Ex. BB, 158:8-159:8.) Second, the District's EPD Waiver has been available since 1999 (Defs.' Facts ¶ 1; Defs.' Ex. 2, ¶ 3), but since the District does not keep track of how many, if any, individuals have moved from nursing facilities directly to the EPD Waiver (Pls.' Facts ¶ 6; Pls.' Ex. G at 45:7-12, 77:10-21), it is impossible to determine whether the EPD Waiver demonstrates a measurable commitment to deinstutionalization. Third, the District's MFP Program was first authorized in 2007 (Defs.' Ex. 3, ¶ 4; Defs.' Facts ¶ 12), yet as of October 3, 2011, only three individuals have actually moved from a nursing facility to the community using the MFP Program. (Pls.' Facts ¶ 24; Pls.' Ex. H at 68:3-11; Pls.' Ex. H at 85:14-17; Defs.' Reply at 12.) Nationwide, the District's MFP Program (even including

45

transitions to the ID/DD Waiver) ranks at or near the bottom in terms of achieving its transition

targets.  2011 MFP Report at 30 (District achieved 9.3% of its transition target as of June 2011).

In addition, the MFP Program relies on having EPD Waiver slots available, but the District is

close to or has reached EPD Waiver enrollment cap of 3,940 (Defs.' Facts ¶ 6; Defs.' Ex. 2, ¶

10) and has no present plans to increase it.  (Pls.' Facts ¶ 18; Pls.' Ex. G at 66:5-20.)  Finally, the

problem of this lack of measurable movement to home and community-based services is

magnified by the fact that there are at least 526 individuals in nursing facilities who have

expressed a desire to live in the community.  (Defs.' Ex. 8, at 35;  Pls.' Facts ¶ 33; Pls.' Ex. H at

32:18-33:16.)  Even assuming that community placement would only be appropriate for a subset

of that group, and that there might be other barriers for which the District is not responsible, the

District has not demonstrated "actual success" or "meaningful progress" when only three

individuals have moved and it cannot establish a baseline from which to measure that number.

The District attempts to ignore the above undisputed facts by emphasizing the undisputed

facts that establish the existence of the EPD Waiver, the MFP Program and other components of

the District's service system.  Yet, there are other facts, both disputed and undisputed, that, when

viewed in the light most favorable to the plaintiffs and drawing all reasonable inferences

therefrom in plaintiffs' favor, contradict or undermine defendants' attempt to equate the

existence of a specific programs designed to further deinstitutionalization with a legally adequate

Olmstead Integration Plan.

### 1.      EPD Waiver

Defendants point to the EPD Waiver as a critical component of its *Olmstead* Integration

Plan, but ignore the evidence that creates genuine issues as to its availability for and utilization

by individuals in nursing facilities.  First, as previously noted, defendants do not even know how many nursing facility residents with physical disabilities have transitioned to the community using the EPD Waiver (Pls.' Ex. G at 45:7-12), and the only undisputed evidence establishes that by October 3, 2011, only three nursing facility residents (including two of the plaintiffs) have transitioned to the EPD Waiver, all through the MFP Program.  (Pls.' Facts ¶ 24; Pls.' Ex. H at 68:3-11; Pls.' Ex. H at 85:14-17; Defs.' Reply at 12).)  In addition, DHCF does not have "any policies or procedures about transitioning people from nursing facilities to the community" using the EPD Waiver.  (Pls.' Ex G at 45:13-46:3.)  Indeed, there is evidence that with the exception of the MFP Program, discussed further *infra*, there is no one in the District government who "ha[s] a hand in assisting individuals who seek to get out of nursing facilities" (Pls.' Ex. G at 42:16-21) or an awareness of how many individuals might want to do so.  (Pls.' Ex. G at 46:4-47:12 ("I'm not familiar with the MDS data"); Pls.' Facts ¶ 45 (citing Pls.' Ex. G at 97:1-16 ("DHCF has neither requested nor reviewed any MDS lists").)

In addition, use of the EPD Waiver is not limited to individuals with disabilities in nursing facilities.  It is also available to the elderly in nursing facilities, who may or may not qualify as disabled, and to individuals (either elderly or physically disabled) who are not already institutionalized.  No slots are reserved for nursing facility residents, and there is an enrollment cap that the District may have already reached.  (As of October 2011, only 240 slots remained open.)  Even assuming technical availability for individuals such as the proposed class of plaintiffs, there is evidence that individuals seeking to enroll in the EPD Waiver confront a number of systemic barriers.  For example, there is evidence that nursing facility residents may lack information about the existence of the EPD Waiver.  (*See* Pls.' Facts ¶ 20 (citing Pls.' Ex. H

47

at 108:8-18 ("[d]efendants' internet postings include minimal and outdated information that, in

any case, most nursing facility residents cannot access")); Pls.' Facts ¶ 21 (citing Pls.' Ex. G at

43:1-10, 44:12-17, 121:2-16; Pls.' Ex. H at 48:16-50:3) (defendants have failed "to conduct

outreach targeted to those people who express an interest in transitioning out of nursing

facilities, provide information to all people in nursing facilities about their community-based

alternatives, and follow up with transitional assistance to help people in nursing facilities apply

for and obtain their identification documents and housing"); Pls.' Facts ¶ 22 (citing Pls.' Ex. G at

43:1-10, 44:1-17, 121:2-11 ("in the past four to five years, defendants have not visited nursing

facilities to give presentations or distribute printed materials about the EPD Waiver Program");

Pls.' Facts ¶ 22 (citing Pls.' Ex. G at 41:19-42:6, 121:12-16) (the District "provide[s]

information about the EPD Waiver Program only [in response to] specific requests from nursing

facility staff or residents").)  There is also evidence of inadequate ISP's (Pls.' Facts ¶ 9 (ISP

"failed to identify [plaintiff's] needs, or the services to be provided, or the agencies designated to

provide her services") (citing Pls.' Ex. H. 141:2-21, 142:1-20), and other ongoing problems with

the process of application, approval and enrollment.  (*See, e.g.*, Pls.' Ex. B, ¶ 11-15 (plaintiff

Jackson discharged before Medicaid EPD Waiver services authorized); Pls.' Ex. H at 142:17 –

144:6 (same); Pls.' Ex. C, ¶¶ 14-18 (Decl. of Vietress Bacon) (discharge date repeatedly

postponed due to case manager's failure to complete EPD Waiver application); Pls.' Ex. D, ¶¶

15-17 (Decl. of Roy Foreman) (lack of authorized community services prevented move to

community); Pls.' Ex. H at 180:10-15, 181:16-20, 182:17-183:19, 184:5-7, 184:12-185:12

(same); Pls.' Facts ¶¶ 2-3 (same).)  The evidence cited above creates genuine issues of material

fact as to the efficacy of the EPD Waiver in terms of transitioning individuals with physical

disabilities out of nursing facilities, and this, in turn, undermines defendants' reliance on the EPD Waiver as evidence that it has an operational *Olmstead* Integration Plan.

### 2. MFP Program

Defendants also point to the MFP Program as a component of its *Olmstead* Integration Plan. (Defs.' Mem. at 17-21.) However, there are again genuine issues as to its availability and efficacy. Although the MFP Program is the only help the District provides to assist individuals seeking to get out of nursing facilities (*see* Pls.' Ex. G at 42:16-21),[57] as previously noted, its actual success in transitioning such individuals has been minimal – as of October 3, 2011, only three nursing facility residents had transitioned to the community through the MFP Program (Pls.' Facts ¶ 24 (citing Pls.' Ex. H at 68:3-11); Pls.' Ex. H at 85:14-17; Defs.' Reply at 12).) In addition, the evidence suggests potential systemic problems such as not knowing how many nursing facility residents would prefer to live in the community (Pls.' Facts ¶ 44 ("MFP Project Team requested and received only two [MDS] partial lists of nursing facility residents in selected facilities") (citing Pls.' Ex. H at 92:3-12)), and "delayed payments for transition costs such as security deposits, housing applications, and furnishings." (Pls.' Facts ¶ 28 (citing Pls.' Ex. H at 48:16-50:3)).[58] Accordingly, as there is substantial evidence to support plaintiffs' position that the "MFP Program does not operate as an effective system to transition people who wish to leave

---

[57]In apparently contradictory testimony, Leyla Sarigol, the MFP Program Director, has testified that the MFP Program is not the "primary way" for transitioning people out of nursing facilities to the EPD Waiver. (Pls.' Ex. H at 18:5-14, 85:9-86:13; Pls.' Facts ¶ 29). If that is the case, then the existence of the MFP Program does little to support defendants' claim.

[58]The apparently more successful use of the MFP Program by DDS/DDA to transition individuals with intellectual or developmental disabilities from ICF/MR institutions (Defs.' Facts. ¶ 14; *see supra* note 33) may not even be relevant to an analysis under *Olmstead*.

nursing facilities and receive services and supports in the community" (Pls.' Facts ¶ 26), it cannot count as significant evidence that defendants have an adequate *Olmstead* Integration Plan.

### 3.     PASRR/DMH

Defendants also point to DMH's administration of PASRR as a component of its *Olmstead* Integration Plan.  Specifically, they claim that PASRR plays an important role in ensuring that placement in a nursing facility is appropriate.[59]  Again, this claim does not withstand scrutiny.

In the first place, PASRR affects only individuals with primary or secondary mental health diagnoses.  (Defs. Ex. 5, ¶ 4.)  Although a substantial percentage of the nursing facility population may fall into this category (Pls.' Facts ¶ 75 (defendants estimate "10-20% of nursing facility residents have a diagnosis of schizophrenia"), the majority do not. In addition, PASRR review is designed to assure that individuals with mental illness who do not need the level of care provided by a nursing facility are not placed there in the first instance and that those who no longer need that level of care are not kept there.  (Defs.' Ex. 5, ¶ 3.)  It is not designed to identify individuals who qualify for the nursing facility level of care, but who could nonetheless receive those services in the community through the EPD Waiver or other community-based service options.  (*See, e.g.*, Defs.' Mem. at 22 n.7 ("DMH has conducted a [PASRR] review of [plaintiff] Bacon and determined that her physical disabilities required the level of care provided in a

_____

[59]In another apparent contradiction, after first relying on PASRR as evidence that the District has an *Olmstead* Integration Plan, defendants' reply discounts its relevance on the ground that only one of the named plaintiffs has a mental health diagnoses, and she is no longer in a nursing facility.  (Defs.' Reply at 24-25.)

nursing facility.  [Plaintiff] Bacon therefore is working with DHCF, as part of the MFP pilot program, to transition from the nursing facility in which she currently resides to the community.") In addition to the limited scope of a PASRR review, the facts do not support defendants' attempt to rely on it as part of its *Olmstead* Integration Plan.  (*See, e.g.*, Pls.' Facts ¶ 83 ("[d]efendants cannot identify a single individual with a mental illness that they have transitioned from a nursing facility) (citing Pls.' Ex. L at 159:2-162:13); Pls.' Facts ¶ 72 ("Prior to Spring 2011, DMH did not have any staff person assigned to work with individuals with serious mental illness in nursing facilities.") (citing Pls.' Ex. L at 42:17-44:6)); *id.* ("Currently, DMH has only two individuals whose part-time job is to "work with" individuals in nursing facilities, meaning to oversee the PASRR assessment process; only one of these individuals is assigned to assist with transitions from nursing facilities on a part-time basis") (citing Pls.' Ex. L at 42:17-46:6); Pls.' Facts ¶ 75 ("DMH has no mechanism, policy, or protocol regarding how to assist individuals in nursing facilities who seek to move back to the community with the services and supports they need") (citing Pls.' Ex. L at 195:20-196:15; Pls.' Facts ¶ 74 (DMH's Department of Integrated Care "has never transitioned an individual from a nursing home to the community") (citing Pls.' Ex. L at 50:7-14, 52:2-53:4); Pls.' Fact ¶ 79 ("[d]efendants only recently started tracking what happens to individuals who received PASRR II screenings") (citing Pls.' Ex. L at 167:15-168:15; Pls.' Facts ¶ 79 ("DMH does not know specifically how many individuals with serious mental illness are in nursing facilities") (citing Pls. Ex. L at 170:18-171:19); Pls.' Facts ¶ 84 ("DMH does not collaborate with the MFP Program or utilize information collected by DHCF") (citing Pls.' Ex. L at 182:7-183; Pls.' Ex L at 173:16-177:5).)

Accordingly, the District's administration of PASRR reviews does little, if anything, to establish an *Olmstead* Integration Plan.

### 4.   Money Expended by the District

As further evidence of an *Olmstead* Integration Plan, defendants rely on the overall amount of money spent on community services and their efforts to increase available funding.  It is undisputed that the District spent $494,434,042 in long-term care services in institutions (including both nursing facilities and intermediate care facilities) and under waiver programs (including both the EPD Waiver and ID/DD Waiver)  in fiscal year 2010, and of that amount, $274,141,306 (55.4%) covered institutional services and $220,292,737 (44.6%) covered home and community-based services waiver programs.  (Defs.' Ex. 1, ¶ 3.)  However, as plaintiffs point out, if only the cost of  long-term care in nursing facilities is compared to the costs of community-based services provided under the EPD Waiver, the District only spends about 26% of its total expenditures on community-based services.  (Pls.' Facts ¶ 23; Pls' Ex. M at 38:4-39:9)  More importantly, although the District's balance of expenditures is undoubtably relevant, *see Sanchez v. Johnson*, 416 F.3d at 1066 (9th Cir. 2005); *Disability Advocates, Inc.*, 653 F. Supp. 2d at 269, a mere comparison between the amount spent on community-based services and long-term care in nursing facilities tells us very little in terms of whether the District can satisfy *Olmstead*.

### 5.   Barriers to Integration

The most significant barrier to integration identified by defendants is the need for housing.  Neither the EPD Waiver nor the MFP Program pays for housing and, although individuals may apply to the District's Housing Authority to participate in the Housing Choice

Voucher program, that program is not limited to persons with disabilities.  (Defs.' Facts ¶ 23;

Defs. Ex. 3, ¶ 17.)  The Court agrees that it is not the District's responsibility to provide housing,

but the record does not establish that this factor has resulted in the continued residence in

nursing facilities of the proposed plaintiff class or that the housing issue cannot be overcome.

Other potential barriers to integration such as the need for care not covered by the EPD Waiver,

credit history problems, lack of providers and lack of family or friends willing to assist in

transition (Defs.' Mem. at 24-25), are similarly plausible, but their concrete impact (or whether

the District could alleviate that impact) is not established by the present record.

    In sum, the undisputed facts do not establish that the District has an *Olmstead* Integration

Plan or that it has moved individuals to the "most integrated setting" as required by *Olmstead*.

Therefore, defendants are not entitled to summary judgment.[60]

## III.    MOTION TO DISMISS INDIVIDUAL DEFENDANTS

    The individual defendants, the Mayor of the District, the Director of the DHCF, and the

Director of the DMH, move for dismissal of all claims against them on the ground that as they

are sued only in their official capacities, the claims against them are redundant of the claims

against the District.  Defendants are correct, and plaintiffs do not disagree, that plaintiffs' claims

against the individual defendants are duplicative of the claims against the District.  *See*, *e.g.*,

---

[60]Denying defendants' motion for summary judgment does not preclude a later
determination that an individual plaintiff's request for home or community-based services or any
proposed systemic changes cannot be "reasonably accommodated, taking into account the
resources available to the state and the needs of others with [similar] disabilities."  *Olmstead*,
527 U.S. at 607.  *Id.*  Nor does it answer the question whether *Olmstead* requires that the
District's system should be analyzed as a whole to include all types of disabilities, including the
intellectually and developmentally disabled, or limited to individuals with physical and/or mental
health disabilities.

*Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1985) (a suit against a municipal official in his or her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent"); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Johnson v. District of Columbia*, 572 F. Supp. 2d 94, 112 (D.D.C. 2008) ("a lawsuit against the Mayor acting in his official capacity is the same as a suit against the District") *Brown v. Corr. Corp. of Am.*, 603 F. Supp.2d 73, 79 (D.D.C. 2009); *Holmes-Ramsey v. District of Columbia*, 747 F. Supp. 2d 32, 42 (D.D.C. 2010) ("claims against [District] officials in their official capacities are effectively claims against the District").

Plaintiffs argue, however, that the need for public accountability and the effective implementation of any injunctive relief counsels against dismissal of the individual defendants. Defendant, conceding that dismissal is "not required," *Owens v. District of Columbia*, 631 F. Supp.2d 48 (D.D.C. 2009), argue that dismissal is nonetheless appropriate because "[p]laintiffs fail to explain why the harm they have allegedly suffered cannot be remedied in an action against the District alone."  (Defs.' Reply at 24.)  On balance, the Court is persuaded that for reasons of judicial economy and lack of prejudice there is no reason to refrain from dismissing the redundant claims against the District's officials.  Accordingly, plaintiffs' claims against individual defendants Gray, Turnbrage, and Baron are dismissed, leaving the District of Columbia as the sole remaining defendant in the case.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss or, in the alternative, for

summary judgment is GRANTED in part and DENIED in part.  An separate Order accompanies

this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 14, 2012