Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WILLIAM DIXON, *et al.*,      )
     )
     Plaintiffs,      )
     )
v.      )
     )     Civil Action No. 74-285 (TFH)
     )
VINCENT C. GRAY, *et al.*,      )
     )
     Defendants.      )
_____)

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Agreement") is entered into this 8th day of September, 2011, by and between Class Plaintiffs, William Dixon, *et al.*, and the Defendants, Vincent C. Gray, *et al.* (the "District"),(collectively, the "Parties").

## RECITALS

WHEREAS, in 1974, Plaintiffs filed this lawsuit alleging constitutional and statutory violations based on the federal[1] and District of Columbia governments' failure to treat all persons who were or who could be hospitalized in a public hospital  in lesser restrictive environments in the community;

WHEREAS, from 1980 through 1997, the Court entered multiple consent orders setting forth specific plans and requirements that the District agreed to implement to develop a community-based mental health system;

WHEREAS, from 1997 through 2002, the Court appointed a receiver to ensure compliance with the Court's orders;

WHEREAS, in 2003, the Parties agreed to a Consent Decree establishing 19 Exit Criteria

_____

[1] The federal government was formally dismissed from the lawsuit in 1992.

and to date the Court Monitor has found that the District has met or substantially complied with 15 of the 19 Exit Criteria;

WHEREAS, the District has filed a Motion to Vacate the 2003 Consent Decree and to dismiss the case based upon substantial compliance with the Exit Criteria and the Supreme Court's decision in *Horne v. Flores*, 129 S. Ct. 2579 (2009) and the Plaintiffs have opposed the Motion;

WHEREAS, the *Dixon* Plaintiffs believe that the terms of this Settlement Agreement are fair, reasonable and adequate and the District does not contend otherwise; that this Settlement Agreement provides substantial benefits to the class members; and that the settlement of the action on the terms set forth in this Settlement Agreement is in the best interests of the class members;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties have agreed to compromise and settle all remaining claims and disputes related to this litigation, subject to the terms and conditions below:

## I. Definitions

The following definitions are applicable only to the terms of this Agreement and do not otherwise affect, implicate, impact, or modify any obligations of the District under applicable federal or local law.

1. "Effective Date" means the date of entry of a Court Order granting Final Approval of this Agreement.

2. "Lawsuit" means the instant action, Civil Action No. 74-285 (TFH) (D.D.C.).

3. "Parties" means, collectively, Plaintiffs and Defendants.

4.      "*Dixon* Decree" means the decision *Dixon v. Weinberger*, 405 F. Supp. 974, 979 (D.D.C. 1975) and all subsequent Consent Decrees.

5.      "Fiscal Year 2012" or "FY 2012" means October 1, 2011 through September 30, 2012.

6.      "Fiscal Year 2013" or "FY 2013" means October 1, 2012 through September 30, 2013.

7.      "DMH" or "Department" means the District of Columbia's Department of Mental Health.

8.      "Consumer" means adults, children, or youth who seek or receive mental health services or mental health supports funded or regulated by the Department of Mental Health.

9.      "Evidence-Based Practice" means preferential use of mental and behavioral health interventions for which systematic empirical research has provided evidence of statistically significant effectiveness as treatments for specific problems.

10.     "Supported Employment" means services and supports designed to assist consumers with significant mental health diagnoses in obtaining competitive employment. Supported employment services may include obtaining a part-time or full-time job in which the consumer earns at least minimum wage.

11.     "Supported Housing" means services, supports, and less than 24-hour supervision that help consumers obtain and/or maintain safe, decent, affordable, and permanent housing. Services improve residential stability and community tenure and help consumers fulfill their rights and responsibilities as tenants.

12.     "Continuity of Care" means a collaborative team-based care planning process designed to ensure that persons discharged to the community from inpatient psychiatric treatment

facilities promptly receive a documented, non-emergency, non-residential, community-based service from a community service provider.

13.    "Serious Mental Illness" means a primary mental health diagnosis of 295-297.1, 298.9, 300.4, 309.81, or 311 as published in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (Transitional).

14.    "Serious Emotional Disturbance" means a primary mental health diagnosis of 295-297.1, 298.9, 300.4, 309.81, 311, 312.8-9, 313.81, or 314 as published in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (Transitional).

15.    "Multi-Systemic Therapy" means an intensive model of treatment based on empirical data and evidence-based interventions that target specific behaviors of children and youth. In the District of Columbia, Multi-Systemic Therapy is also known as community-based intervention level I.

16.    "Functional Family Therapy" means a research-based prevention and intervention program for at-risk youth and their families provided by a team of trained therapists by a certified DMH provider with Functional Family Therapy site certification. In the District, Functional Family Therapy is also known as community-based intervention level IV.

17.    "High Fidelity Wraparound Services" means a collaborative team-based care planning process where the family and the team implement, track, and adapt an individualized Plan of Care (POC), working toward the youth and family's long term vision for the purpose of achieving positive outcomes in the home, school, and community.

18.    "Home First Subsidy" means a rental subsidy funded by DMH on behalf of low-income DMH consumers and paid directly to the landlord for a supported housing unit.

19.     "Local Rent Supplement (Project-Based) Voucher" means a rental subsidy funded by the District of Columbia and administered by the District of Columbia Housing Authority ("DCHA") and paid directly to the landlord.

20.     "Federal Voucher (Project-Based)" means a federally-funded housing subsidy for low income consumers that is administered by the DCHA.

21.     "Federal Vouchers (Tenant-Based)" or Housing Choice Voucher Program ("HCVP")" means a federally-funded housing subsidy administered by the DCHA for low-income consumers that may be transferred by the consumer to another unit if approved by DCHA.

22.     "Shelter Plus Care" means a federal housing subsidy program that links rental assistance with supportive services for homeless persons with disabilities.  The program is administered by the Community Partnership for the Prevention of Homelessness ("TCP") in collaboration with DMH.

23.     "Capital-Funded Unit" means a housing unit that has received capital funding from DMH via grant funds administered by the District Housing and Community Development for construction, renovation, or rehabilitation and in return the unit is reserved for low-income DMH consumers for a period of up to twenty-five (25) years.

## II.     Settlement Class and Class Counsel

24.     The Class, as certified pursuant to Fed. R. Civ. P. 23(a), 23(b)(1) and (2) in the District Court's February 7, 1975 Order, is defined as follows:

> All persons who are now or who may be hospitalized in a public hospital pursuant to 21 D.C. Code § 501, et seq., and who need outplacement from that public hospital, as presently constituted, into alternative care facilities, such as nursing homes, foster homes, personal care homes and half-way houses, in order to receive suitable care and treatment in the least restrictive setting possible.  This class includes patients who are or who may be on convalescent leave status from

the public hospital and who have been or may be placed in alternative care facilities that are not providing suitable care and treatment in the least restrictive setting consistent with the patients' needs for care and treatment.

25.     Class Counsel are as follows:

>        Anthony Herman, Esq.
>        Mark H. Lynch, Esq.
>        Iris Y. González, Esq.
>        Christian J. Pistilli, Esq.
>        Covington and Burling, LLP
>        1201 Pennsylvania Avenue, N.W.
>        Washington, D.C. 20004
>        Tel: (202) 662-5544
>        Fax: (202) 778-5544

## III.    Agreement Terms

26.     This Agreement is a contract binding upon the Parties and their officials and employees. The Court shall retain jurisdiction over this matter and the parties for the purpose of enforcing the terms of this Agreement.

27.     Subject to Paragraph 28, this Agreement, and all claims arising from this Agreement, will expire on the 181st day immediately following the District's final compliance report detailing progress as of September 30, 2013.

28.     Plaintiffs may, within 180 days of the District's final compliance report referred to in Paragraph 27, file an action alleging breach of this Agreement. Prior to Plaintiffs filing any action alleging a breach of the Agreement and no later than 90 days after receipt of Defendants' final compliance report, Plaintiffs will provide to the Defendants written notification of the specific factual grounds of the alleged breach and will provide at least 60 (sixty) days to cure any such breach or to otherwise respond to Plaintiffs' allegations. The 180-day period for Plaintiffs to file an action for any alleged breach will begin to toll on the date that Plaintiffs provide written

notice to Defendants of the alleged breach, and the tolling will continue until Defendants respond to the notice, cure the breach, or until the 60-day response period expires, whichever is sooner.

29.     The Court has not made any findings or expressed any opinion concerning the merits, validity, or accuracy of any of the allegations or claims in the District's Motion to Vacate or Plaintiffs' Opposition thereto.  In the event that Final Approval of this Settlement Agreement is not obtained or the Settlement Agreement is deemed null and void for any reason, the Parties will revert to the positions they occupied prior to the execution of the Agreement, and nothing herein shall be deemed to waive any of the Parties' claims, arguments, objections, and/or defenses.

30.     Class counsel warrant that, in the absence of consultation with the original named plaintiffs in this long-running litigation because named plaintiffs are unavailable or deceased, they have made reasonable efforts to consult with members of the class, including seeking input from such secondary sources as public interest organizations and caregivers who have day-to-day contact with class members.  Plaintiffs' acceptance of this Agreement is reflected by Class Counsel's signatures upon this Agreement and is binding on the Class.

31.     Prior to the Court's final approval, either Party reserves the right to withdraw from this Agreement in the event that any provision is rejected or modified by the Court.

32.     The Parties agree to provide notice of the Settlement Agreement to the Class in the following manner (with all costs of notice to be borne by Defendants):

        a) By personal delivery to class members who are currently receiving treatment at Saint Elizabeths hospital and/or to their legal guardians, if known;

b) By U.S. First Class Mail to class members diagnosed with a serious mental illness and who are currently enrolled in Mental Health Rehabilitation Services and/or to their legal guardians, if known;

c) By U.S. First Class Mail to the parents, foster parents, or legal guardians of children/youth diagnosed with a serious emotional disturbance who are currently receiving mental health services in a Psychiatric Residential Treatment Facility;

d) By U.S. First Class Mail to the parents, foster parents, or legal guardians of children/youth diagnosed with a serious emotional disturbance who are currently receiving mental health services in the community and are enrolled with a DMH-certified child/youth service provider;

e) By publication to all other class members whose identity is not known in The Examiner and Street Sense, newspapers of general circulation;

f) By U.S. First Class Mail to the directors of the following advocacy or service organizations:

    (1) University Legal Services

    (2) Consumer Action Network

    (3) Consumer Leadership Forum

    (4) DC Behavioral Health Association

    (5) DC Chapter of the National Alliance on Mental Illness

      (6)  Washington Legal Clinic for the Homeless

      (7)  Children's Law Center

      (8)  Bread for the City

      (9)  Legal Aid Society for the District of Columbia

      (10) Archdiocesan Legal Network

      (11) Homeless Shelters

      (12) Core Service Agencies that have Human Care Agreements with the District; and

    g)  By posting on the DMH website.

33.    The Parties agree to the following procedure for receiving objections and providing the relevant information to the public:

    a)  All objections and requests to be heard will be submitted to the Court and counsel for all parties in writing and at least 30 days before the scheduled hearing; and

    b)  Pleadings, objections, and other operative documents related to the proposed Settlement Agreement and fairness hearing will be posted in a designated area on the DMH website.

34.    The Parties agree to the form of notice in the Proposed Notice to Class that is attached as Exhibit 1 to this Agreement.

35.    Upon execution of this Agreement by the Parties, the Parties will notify the Court of this Settlement.  The Parties will move the Court for an order preliminarily approving the settlement and setting a fairness hearing in the form attached hereto as Exhibit 2.  Prior to the fairness hearing, the Parties will move to dismiss this case with prejudice and enter the proposed

"Consent Order Dismissing Case with Prejudice and Retaining Jurisdiction For Purpose of Enforcing Settlement Agreement" attached as Exhibit 3 to this Agreement.

36. Class Members and their agents, heirs, and assigns agree to accept the terms and relief contained in this Settlement Agreement as full satisfaction of any and all claims, rights, demands, and/or causes of action, damages, interest, of whatsoever kind and nature, whether based on federal, state or local law, statute, ordinance, regulation, common law or any other sources, that they have or could have had against the District and/or its agents, servants, officers, officials, and/or employees, in their individual and official capacities, arising out of the allegations raised by Plaintiffs in the complaint or in any amended complaints in this Lawsuit. This release is binding on Class Members, even if they never received actual notice of the lawsuit or this Agreement.

37. It is the Parties' intent that this Settlement Agreement bars any and all named plaintiffs and class members, and their privies, from bringing a subsequent suit or enforcement action in this court, or another, alleging the same or similar claims for relief as contained in the complaint or in any amended complaints in this Lawsuit based upon events occurring prior to the execution of the Settlement Agreement. Notwithstanding the foregoing, and for the avoidance of doubt, the preceding sentence shall not bar or limit any action to enforce the terms of this Agreement, as contemplated by paragraph 28 above.

38. The parties agree that opt-outs for equitable relief are not permitted under applicable law.

39. This Agreement constitutes the entire understanding between the Parties hereto and is intended as the complete and exclusive statement of the agreement between the Parties with respect to the subject matter hereof, and supersedes all prior agreements and negotiations

thereto. All Exhibits attached hereto are incorporated herein by reference and made a part of this Agreement.

40.     The undersigned representatives of the Parties certify that they are fully authorized to enter into and to execute the terms and conditions of this Agreement and to make such Agreement fully and legally binding upon and enforceable against every Party on whose behalf they have executed this Agreement. The individuals signing for the District are its officials acting within the scope of their authority. The Parties stipulate, agree, and warrant that they will not challenge or contest in any way the capacity or the authority of any Party hereto to make the agreements, covenants, and stipulations herein.

41.     This Agreement creates no obligations or duties on the part of Parties other than as stated specifically in this Agreement. The Parties stipulate, agree, and acknowledge that nothing in this Agreement may be used by any person or entity for any purpose in any legal proceeding other than by Plaintiffs as stated specifically in this Agreement. This Agreement does not create any rights that can be relied upon or enforced by individuals who are not Parties to this lawsuit.   An alleged violation of this Agreement shall not create a new, independent private right of action beyond the enforcement mechanism provided for in this Agreement, above. The Parties agree that any enforcement action will be on behalf of the Class and that this Agreement does not permit enforcement proceedings on behalf of individuals. The Parties stipulate, agree, and acknowledge that neither this Agreement nor the proposed Order is intended to create any third party beneficiaries.

42.     This Agreement may not be amended or modified in any respect other than by an agreement in writing signed by the Parties and only if such amendment is agreed to prior to notice to the Class Members and Final Approval by the Court.

43.     This Agreement shall be construed without regard to any presumption or other rule of law requiring construction against the party who caused it to have been drafted.

44.     This Agreement shall be governed by and construed and enforced in accordance with applicable federal statutes, federal decisional law, and the laws of the District of Columbia.

45.     Each Party waives and assumes the risk of any and all claims that exist as of the date this Agreement is signed, which that Party does not know of or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, with respect to either facts or law, and which if known, would materially affect its decision to enter into this Agreement.

46.     None of the obligations and duties of any Party set forth in this Agreement may be assigned or delegated to any other person without the express, prior written consent of all other Parties.

47.     This Agreement is not severable except with the prior written consent of all Parties.

48.     Provided that all Parties hereto execute a copy of this Agreement, the Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  Executed copies of this Agreement may be delivered by facsimile transmission or other comparable means.  This Agreement shall be deemed fully executed and entered into on the date of execution by the last signatory required hereby.

49.     Service of any information or documents required or necessitated by this Agreement shall be made to the following persons or to such other persons as they may designate in writing.  If upon Plaintiffs or their attorneys, by both email and first-class mail to the following:

Mark H. Lynch, Esq.
Iris Y. González, Esq.
Covington and Burling, LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
mlynch@cov.com
Tel: (202) 662-5544
Fax: (202) 778-5544

If upon the District or its attorneys, by both email and first-class mail to the following:

Grace Graham
Chief, Equity Section
Office of the Attorney General for the District of Columbia
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
grace.graham@dc.gov
Tel: (202) 442-9784
Fax: (202) 741-8892

50.    The Parties agree this Agreement is contingent upon restoration of $3,500,000 to

DMH's FY 2012 budget, which was proposed in the Mayor's Supplemental Budget Plan

submitted to the Council on July 1, 2011, and approved by the Council on August 1, 2011.

51.    Plaintiffs agree to waive any and all attorneys' fees or costs accrued from June 1,

2010, through the Effective Date of the Agreement, and that all parties shall bear their own costs,

including attorneys' fees, after the Effective Date and in any subsequent proceeding related to

this Agreement.

52.    The Parties agree that failure to comply with the provisions of this Agreement

shall not be a basis for an entry of contempt or sanctions against the District.

53.    The Parties agree that the District has, prior to this Agreement, complied or

substantially complied with 15 of the 19 Exit Criteria set forth in the 2003 Dixon Consent

Decree.  Specifically, those Exit Criteria are as follows:

- Exit Criterion # 1: Consumer Satisfactions Methods

- Exit Criterion # 2:  Consumer Functioning Review Method(s)

- Exit Criterion # 3:  Demonstrated Planning for and Delivery of Effective and Sufficient Consumer Services (Adult)

- Exit Criterion #5: Provision of Services to Children/Youth (Penetration Rates)

- Exit Criterion # 6: Provision of Services to Children/Youth with SED (Penetration Rates)

- Exit Criterion # 7: Provision of Services to Adults (Penetration Rates)

- Exit Criteria # 8: Provision of Services to Adults with SMI (Penetration Rates)

- Exit Criterion # 11: Assertive Community Treatment (ACT)

- Exit Criterion # 12: Newer-Generation Medications

- Exit Criterion # 13: Homeless - Adults

- Exit Criterion # 14: Children/Youth in Natural Setting

- Exit Criterion # 15: Children/Youth in Own or Surrogate Home

- Exit Criterion # 16: Homeless – Children

- Exit Criterion # 18: Community Resources

- Exit Criterion # 19: Medicaid Utilization

54.     The terms below address the Parties' agreement to the remaining Exit Criteria, specifically, Exit Criterion # 4 - Demonstrated Planning for and Delivery of Effective and Sufficient Consumer Services (Children), Exit Criterion # 9 - Supported Housing, Exit Criterion # 10 - Supported Employment, and Exit Criterion # 17 - Continuity of Care.

## Children/Youth Services (Exit Criterion # 4)

55.     The District shall conduct annual Community Service Reviews (CSRs) for children/youth during FY 2012 and FY 2013.

56.     The District shall contract with Human Systems and Outcomes, Inc. (HSO) to provide support for the annual CSRs and to provide consultation regarding targeted interventions for providers and system capacity building:

      a)     HSO shall provide case consultation (case judging) during the CSRs.

      b)     HSO shall train DMH staff to provide case judging.

      c)     HSO shall provide consultation to DMH staff to develop practice guidelines and training modules to help improve system and practice performance.

      d)     HSO shall provide consultation to DMH staff to develop a plan to shift the focus from the single annual CSR towards smaller, provider-driven CSRs in which DMH provides case judging, quality improvement, training assistance, and mentoring.

57.     The District shall implement targeted interventions with low-performing child/youth providers with a goal of improving their scores.

58.     By September 30, 2013, the District shall achieve an overall system performance level of 70% on the CSRs for children/youth.

59.     The District shall establish a baseline for the total number of days that District children/youth spend in Psychiatric Residential Treatment Facilities (PRTF) ("bed-days") during one year by using placement data for the period from May 1, 2011 through April 30, 2012 ("baseline").  By September 30, 2013, the District shall reduce the number of bed-days that children/youth with serious emotional disturbances spent in PRTFs by 30%.  For the purpose of

calculating the 30% reduction, the parties agree to compare the baseline to the period from May 1, 2012 through April 30, 2013.

60.     The District shall track and report length of stay, reasons for discharge, community services, and outcomes for children/youth discharged from PRTFs in FY 2012 and FY 2013.

61.     The District shall increase the provision of evidence-based practices that are appropriate for children/youth by 20% in FY 2012 (baseline FY 2011), and 20% in FY 2013 (baseline FY 2012).  These evidence-based practices are as follows:  Multi-Systemic Therapy and Functional Family Therapy.   In addition, the District shall increase the number of children/youth who receive High Fidelity Wraparound planning and care coordination by 10% in FY 2012 (baseline FY 2011) and 20% in FY 2013 (baseline FY 2012).  The percentage increase in the provision of Multi-Systemic Therapy, Functional Family Therapy, and High Fidelity Wraparound will be calculated by comparing the unduplicated number of children/youth served during the baseline time period to the unduplicated number of children/youth served during FY 2012 and FY 2013.

### Supported Housing (Exit Criterion # 9)

62.     The District shall develop 300 net new supported housing vouchers/subsidies and/or capital housing units by September 30, 2013, as follows:

a)      at a minimum, 200 of the 300 shall be net new supported housing vouchers/subsidies.  The District shall fund or obtain for DMH consumer use 200 net new housing vouchers/subsidies by September 30, 2013.   Any net new supported housing voucher/subsidy provided to a DMH consumer and that was

made available by DMH to the consumer will count towards the 200 regardless of source of funding; and

b)     the District may satisfy the remaining 100 of the 300 requirement through either net new supported housing vouchers/subsidies or net new capital units "in development" by September 30, 2013. A capital housing unit will be deemed to "be in development" for purposes of counting towards the 100 if the developer has a signed grant agreement with the District of Columbia government any time after October 1, 2011 and no later than September 30, 2013 committing the developer to provide a 25-year set aside on the unit.

63.     Prior to submitting the Settlement Agreement for final Court approval, the District shall provide the Plaintiffs the baseline number of vouchers, subsidies and capital units in development as of September 30, 2011 and the methodology used to calculate this baseline number. The baseline number and methodology shall be attached to this Agreement as Exhibit 4 hereto. The categories of vouchers/subsidies and capital housing units to be counted are as follows:

a)     Home First Vouchers;

b)     Local Rent Supplement (Project-Based) Vouchers;

c)     Shelter Plus Care;

d)     Federal Vouchers (Project- and Tenant-Based); and

e)     Capital-Funded Units.

64.     The 300 new housing units described in paragraphs 62 and 63 shall be over and above the baseline number of supported housing units. For the purpose of calculating the "net

new" increase from October 1, 2011 through September 30, 2013, the District will use the same counting methodology that was used to arrive at the baseline number.

65.     The District shall develop a uniform and objective methodology for evaluating the need for supported housing, establish different levels of priority of need for supported housing, and assign all available supported housing using the methodology and prioritization.   The District must demonstrate that the methodology it develops is used by providers and enforced by DMH.   The District shall amend its housing rules to include the prioritization for supported housing.   Recognizing that, in individual circumstances, clinical needs may require a deviation from the priority categories below, it is the intent of the Parties that consumers diagnosed with a serious mental illness who do not have housing will, in the aggregate, receive priority for placement in the available supported housing slots/units.   The priority populations shall be the following:

- Consumers pending discharge from Saint Elizabeths Hospital;

- Homeless consumers with a serious mental illness; and

- Consumers who are moving to a less restrictive environment.

66.     By September 30, 2012, the District shall develop a strategic plan that includes resource development to address the identified need for supported housing.   The plan will be developed in consultation with consumers and consumer advocates, including advocates for the homeless.

## Supported Employment (Exit Criterion # 10)

67.     By March 31, 2012, the District shall establish a methodology for Core Service Agencies (CSAs) to use in assessing the need for supported employment, require that all CSAs use the methodology, and enforce compliance.   At a minimum, this methodology will include a

requirement that CSAs ask every adult with a Serious Mental Illness (SMI) if he or she wants to be employed.

68.     For the period from April 1, 2012 through September 30, 2013, of the total number of adults with SMI who are assessed for the need for supported employment and who express an interest in supported employment during the treatment planning process, the District shall ensure that at least 60% are referred to supported employment services.

69.     The District shall increase the number of consumers who received at least one supported employment service in FY 2012 by 10% over the total served in FY 2011.  The District shall provide Plaintiffs the total number served in FY 2011 by November 30, 2011.  The District shall increase the number of consumers who received at least one supported employment service in FY 2013 by 15% over the total number served in FY 2012.  The District shall provide Plaintiffs the total number served in FY 2012 by November 30, 2012.

## Continuity of Care (Exit Criterion # 17)

70.     The Parties agree to use the following definitions for the purposes of determining compliance with the Continuity of Care obligations described in paragraphs 71, 72, and 73:

> a)     "Psychiatric hospitalization" shall mean an involuntary admission to a community hospital's psychiatric inpatient unit or an involuntary admission to Saint Elizabeths Hospital.
>
> b)     Adults are defined as 18 years of age and older.
>
> c)     An eligible adult is someone who is enrolled in the DMH Mental Health Rehabilitation Services (MHRS) when discharged to the community following a psychiatric hospitalization.

d)      Children/youth are defined as 0-17 years of age.

e)      An eligible child/youth is someone who was under the age of 18 at the time of psychiatric hospitalization and enrolled in the DMH MHRS when discharged to the community.

f)      For purposes of reporting and to eliminate duplication, if someone is 17 at the date of the first service, DMH shall treat that individual as a child/youth during the entire four quarter period, even if the child turns 18 during the reporting period.

g)      A person (adult, youth, or child) who is discharged from a psychiatric inpatient facility and admitted to another psychiatric inpatient facility (community hospital, Saint Elizabeths Hospital, or psychiatric residential treatment facility) or to another institution (prison, nursing home, rehabilitation center, hospital medical unit or similar healthcare or correctional institution) on the same day or within twenty-four (24) hours of discharge is not an eligible person at the time of this transfer.  Notwithstanding the foregoing, persons who transfer from a psychiatric inpatient facility to another psychiatric inpatient facility (community hospital, Saint Elizabeths Hospital, or psychiatric residential treatment facility) will become an eligible person after discharge to the community from that final institutional setting.

h)      If the involuntary psychiatric hospitalization of an eligible person (adult, child, or youth) becomes voluntary during the course of the hospitalization, that person will remain eligible for continuity of care follow-up services upon discharge.

71.    By September 30, 2013, the District shall ensure that 70% of adults and 70% of children/youth receive at least one non-crisis service in a non-emergency setting within 7 days of discharge from a psychiatric hospitalization.

72.    By September 30, 2013, the District shall ensure 80% of adults and 80% of children/youth receive at least one non-crisis service in a non-emergency setting within 30 days of discharge from a psychiatric hospitalization.

73.    The District will develop, monitor, and enforce continuity of care performance standards for the CSAs.  These performance standards will be required in DMH policy and DMH Human Care Agreements.

### Reporting

74.    Every three (3) months, beginning three months after the Effective Date of this Agreement, the District shall report to Plaintiffs' counsel on the status of compliance with the terms described above.  After the submission of the last compliance report, detailing progress as of September 30, 2013, no additional reporting is required under this Agreement.  This report shall take the form of the Compliance Report, attached at Exhibit 5 to this Agreement.  Said form may be modified from time to time as needed and by written agreement of the Parties.


ACCEPTED FOR PLAINTIFFS BY:

*Anthony Herman* on *September 8*_____, 2011

ANTHONY HERMAN, Esq.
MARK H. LYNCH, Esq.
IRIS Y. GONZÁLEZ, Esq.
CHRISTIAN J. PISTILLI, Esq.
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 662-5544
Fax: (202) 778-5544


Page 21 of 22

ACCEPTED FOR DEFENDANTS BY:

IRVIN B. NATHAN
Attorney General
for the District of Columbia


_Ellen A. Efros_____ on __9/8___, 2011

ELLEN A. EFROS                          Grace Graham
Deputy Attorney General                 Chief, Equity Section
Public Interest Division                grace.graham@dc.gov
Office of the Attorney General          Tel: (202) 442-9784
for the District of Columbia            Fax: (202) 741-8892
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
ellen.efros@dc.gov
Tel: (202) 442-9886