## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JACQUALYN THORPE**, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:10-cv-02250 (ESH) |
| v. | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), the named Plaintiffs hereby move to certify

as a Plaintiff class in this action:

> **All persons with physical disabilities who, now or during the pendency of this lawsuit:**
>
> **(1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days;**
>
> **(2) are eligible to live in the community; and**
>
> **(3) would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-term care services in the community.**

As explained in Plaintiffs' Memorandum of Points and Authorities in Support of this

Motion, Plaintiffs' claims readily satisfy the requirements for class certification. *First*, the Plaintiff

class is estimated to be between 500 and 2,900 people, and therefore is so numerous that joinder of

all its members is impracticable. *Second*, common issues of fact and law predominate the claims of

each member of the proposed class, rooted in Defendant's systemic failure to implement a system

of transition assitance for providing services in the most integrated setting to Plaintiffs and those

similarly situated.  Among the many common questions of fact and law at issue is the question:

Does Defendant administer its programs and services in a manner that allows for even-handed access to community-based care for individuals with physical disabilities who currently receive care in nursing facilities? *Third,* the claims of the named Plaintiffs are typical of the claims of the proposed class; like the class members, Plaintiffs are unnecessarily segregated in nursing facilities, despite their ability and desire to live in the community with appropriate services and supports. *Fourth,* Plaintiffs and their counsel will adequately represent the class and are ready to vigorously pursue the class's claims. *Fifth*, certification is appropriate under Rule 23(b)(2) because the class has been subject to a common set of practices by Defendant, and only injunctive relief is sought.

Plaintiffs therefore respectfully move this Court for an Order certifying the class, appointing their attorneys as class counsel, and permitting this matter to proceed as a Rule 23(b)(2) class action. Plaintiffs conferred with Defendant on April 30, 2013, and Defendant opposes this motion, "except that Defendant takes no position on the adequacy of Plaintiffs' counsel."

An oral hearing is requested, and a proposed Order is attached.

Dated: May 6, 2013

Respectfully submitted,

    /s/ Brian D. Schneider
Marjorie Rifkin, D.C. Bar No. 437076
Jennifer Lav, D.C. Bar No. 499293
Victoria Thomas, D.C. Bar No. 1001027
Lyndsay Niles, D.C. Bar No. 1003427
mrifkin@uls-dc.org, jlav@uls-dc.org,
vthomas@uls-dc.org, lniles@uls-dc.org
University Legal Services–Protection &
Advocacy
220 I Street, NE #130
Washington, DC 20002
(202) 547-0198 ext. 128
Fax: (202) 547-2662

2

Kelly Bagby, D.C. Bar No. 462390
Kbagby@aarp.org
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049
(202) 434-2060
Fax: (202) 434-6424

Barbara Wahl, D.C. Bar No. 297978
Brian D. Schneider, D.C. Bar No. 983171
Alison Lima Andersen, D.C. Bar No. 997260
barbara.wahl@arentfox.com
brian.schneider@arentfox.com
alison.andersen@arentfox.com
Arent Fox LLP
1717 K Street, NW
Washington, DC  20036-5339
(202) 857-6000
Fax: (202) 857-6395

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on May 6, 2013, a true copy of the foregoing **Plaintiffs' Renewed Motion for Class Certification, and the accompanying proposed Order and Memorandum of Points and Authorities in Support of Motion for Class Certification** were served on all counsel of record by this Court's electronic filing system.

_____/s/_____

Brian D. Schneider

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JACQUALYN THORPE**, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:10-cv-02250 (ESH) |
| v. | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR RENEWED MOTION FOR CLASS CERTIFICATION**

LDR/417182.5

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

I.    BACKGROUND .......................................................................................................2

      A.    The ADA and the Rehabilitation Act's Integration Mandate .................................3

      B.    D.C. Medicaid's Existing Programs in the Community ..........................................3

      C.    The District's Transition Program .........................................................................4

      D.    The Named Plaintiffs ...........................................................................................10

      E.    Numerosity of the Class and Typicality of the Claims .........................................11

II.   THE PROPOSED CLASS DEFINITION IS CLEAR AND THE CLASS IS
      EASILY ASCERTAINABLE. ...............................................................................12

III.  THE PROPOSED CLASS WARRANTS CLASS CERTIFICATION. ...........................16

      A.    Plaintiffs Satisfy the Requirements of Rule 23(a). ..............................................18

            1.    Numerosity: The class of 500 to 2,900 individuals is so numerous
                  that joinder of all members is impracticable. .............................................18

            2.    Commonality: There are numerous questions of law and fact
                  common to the class resulting from Defendant's system-wide
                  discrimination. ...........................................................................................20

                  i.    The District's failure to establish or implement a system of
                        transitional assistance results in common harm, leads to
                        common questions, and can be remedied by classwide
                        relief. ..............................................................................................21

                  ii.   Wal-Mart and DL are readily distinguishable. .............................22

                  iii.  Other cases demonstrate the appropriateness of this case for
                        class certification post-Wal-Mart. ................................................26

                  iv.   Differences in disabilities and needs across class members
                        are irrelevant. ................................................................................28

            3.    Typicality: The named Plaintiffs' claims are typical of the claims
                  of the class. ................................................................................................30

            4.    Adequacy of Representation: The named Plaintiffs and their
                  attorneys will fairly and adequately protect the interests of the
                  class. ...........................................................................................................33

      B.    Rule 23(b)(2) is Satisfied Because Defendant Acted on Grounds Generally
            Applicable to the Class, Making Final Injunctive and Declaratory Relief
            Appropriate. ........................................................................................................35

      C.    The Court Should Designate Plaintiffs' Counsel as Class Counsel. ....................37

IV.   CONCLUSION ......................................................................................................37

ii

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ................................................................................17

*Barnes v. District of Columbia*,
    242 F.R.D. 113 (D.D.C. 2007) .....................................................................14

*Chambers v. City & County of San Francisco*,
    No. 06-CV-06346, slip op. (N.D. Cal. July 12, 2007) ..............................7

*Chang v. United States*,
    217 F.R.D. 262 (D.D.C. 2003) .....................................................................17

*Colbert v. Blagojevich*,
    No. 07-CV-4737, 2008 WL 4442597 (N.D. Ill. Sept. 29, 2008) ............17

*Connor B. v. Patrick*,
    278 F.R.D. 30 (D. Mass. 2011) ....................................................................23

*Cota v. Maxwell-Jolly*,
    688 F. Supp. 2d 980 (N.D. Cal. 2010) .......................................................18

*Daniels v. City of New York*,
    198 F.R.D. 409 (S.D.N.Y. 2001) .................................................................28

*Disability Rights Council of Greater Washington v. Washington Metropolitan Area*
    *Transit Authority*,
    239 F.R.D. 9 (D.D.C. 2006) ................................................................ passim

*DL v. District of Columbia*, No. 12-7042,
    2013 WL 1489471 (D.D.C. Apr. 12, 2013) ...............................20, 25, 36

*Frederick L. v. Department of Public Welfare*,
    364 F.3d 487 (3d Cir. 2004) ........................................................................18

*General Telephone Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) .......................................................................16, 30, 34

*Gray v. Golden Gate National Recreational Area*,
    279 F.R.D. 501 (N.D. Cal. 2011) ................................................................24

*Hampe v. Hamos*,
    No. 10-CV-3121, U.S. LEXIS 125858 (N.D. Ill. Nov. 22, 2010) .........18

LDR/417182.5

Page(s)

*Hardy v. District of Columbia,*
    283 F.R.D. 20 (D.D.C. 2012) .................................................................................16

*Hartman v. Duffy,*
    158 F.R.D. 525 (D.D.C. 1995) ..........................................................................28, 31

*Hartman v. Duffy,*
    19 F.3d 1459 (D.C. Cir. 1994), *cert. denied sub. nom., Dillon v. Powell*, 534 U.S.
    1078 (2002) ..............................................................................................16, 20, 28

*Henderson v. Thomas,*
    No. 2:11CV224–MHT WO, 2012 WL 3777146 (M.D. Ala. Aug. 30, 2012) .................29, 31

*In re Lorazepam & Clorazepate Antitrust Litigation,*
    202 F.R.D. 12 (D.D.C. 2001) ................................................................................31

*In re Rail Freight Fuel Surcharge Antitrust Litigation,*
    287 F.R.D. 1 (D.D.C. 2012) ..........................................................................14, 20

*In re Veneman,*
    309 F.3d 789 (D.C. Cir. 2002) ..............................................................................36

*In re Vitamins Antitrust Litigation,*
    209 F.R.D. 251 (D.D.C. 2002) ..............................................................................16

*Kifafi v. Hilton Hotels Retirement Plan,*
    189 F.R.D. 174 (D.D.C. 1999) ........................................................................19, 33

*Lane v. Kitzhaber,*
    283 F.R.D. 587 (D. Or. 2012) ..........................................................23, 27, 28, 36

*Long v. Benson,*
    No. 08-CV-0026, 2008 WL 4571904 (N.D. Fla. Oct. 14, 2008), *vacated as moot by*
    *legislative action*, slip op. (N.D. Fla. Jan. 3, 2012) ....................................... 17-18

*Love v. Johanns,*
    439 F.3d 723 (D.C. Cir. 2006) ..............................................................................26

*M.A.C. v. Betit,*
    284 F. Supp. 2d 1298 (D. Utah 2003) ...................................................................18

*McReynolds v. Sodexho Marriott Services, Inc.,*
    208 F.R.D. 428 (D.D.C. 2002) ........................................................................17, 30

iv

Page(s)

*Meijer v. Warner Chilcott Holdings, Inc.*
   246 F.R.D. 246 ...................................................................................................18, 33

*Moore v. Napolitano,*
   269 F.R.D. 21 (D.D.C. 2010) ........................................................................................20

*Olmstead ex rel. Zimring v. L.C.,*
   527 U.S. 581 (1999) ........................................................................................... passim

*Oster v. Lightbourne,*
   No. C 09–4668 CW, 2012 WL 685808 (N.D. Cal. Mar. 2, 2012) ...........................23

*Pashby v. Cansler,*
   279 F.R.D. 347 (E.D.N.C. 2011), *aff'd on other grounds,* 709 F.3d 307 (4th Cir.
   2013) ...............................................................................................................24

*Pigford v. Glickman,*
   182 F.R.D. 341 (D.D.C. 1998) ..............................................................................13, 14

*Pitts v. Greenstein,*
   No. 10-CV-635, 2011 WL 2193398 (M.D. La. June 6, 2011) ................................17

*State of Connecticut Office of Protection & Advocacy for Persons with Disabilities v.*
   *Connecticut,*
   706 F. Supp. 2d 266 (D. Conn. 2010) ................................................................7, 21

*Stewart v. Rubin,*
   948 F. Supp. 1077 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997) ...........30

*Vargas v. Meese,*
   119 F.R.D. 291 (D.D.C. 1987) ....................................................................................19

*Wagner v. Taylor,*
   836 F.2d 578 (D.C. Cir. 1987) ....................................................................................17

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ........................................................................................ passim

STATUTES

29 U.S.C. § 794(a) .............................................................................................................3

42 U.S.C. § 12132 .............................................................................................................3

v

Page(s)

OTHER AUTHORITIES

28 C.F.R. § 35.130 ...................................................................................................3

28 C.F.R. § 35.130(d) .............................................................................................3

28 C.F.R. § 35, App. ...............................................................................................3

Federal Rule of Civil Procedure 23 ................................................................ passim

D.C. Mun. Regs. Tit. 29, § 5009 ............................................................................4

5 James W. Moore *et al*., *Moore's Federal Practice* § 23.21[4][a] (3d ed. 2001) .......................17

1 Newberg on Class Actions (4th ed. 2002) § 3.5 at 247 ..........................................19

LDR/417182.5

## INDEX OF EXHIBITS

| Exhibit Numeral | Description |
| --- | --- |
| A | Declaration of Jacqualyn Thorpe (Apr. 2, 2013) |
| B | Declaration of Roy Foreman (Apr. 13, 2013) |
| C | Declaration of Larry McDonald (Mar. 26, 2013) |
| D | Declaration of Curtis Wilkerson (Dec. 27, 2012) |
| E | Declaration of Dr. Orit Simhoni (Apr. 5, 2013) |
| F | Declaration of Lavondia Carter (Apr. 23, 2013) |
| G | Declaration of Robert Collins (Mar. 27, 2013) |
| H | Declaration of Winifred Goines (Apr. 23, 2013) |
| I | Declaration of Joseph Gray (Apr. 29, 2013) |
| J | Declaration of Carl Magby (Apr. 13, 2013) |
| K | Declaration of Denise Rivers (Mar. 15, 2013) |
| L | Declaration of Andrea Procaccino (Apr. 29, 2013) |
| M | Declaration of James Boylan (Mar. 26, 2013) |
| N | Declaration of Michael Clark (Apr. 15, 2013) |
| O | Declaration of Leo Gantt (Apr. 15, 2013) |
| P | Declaration of George Glover (Apr. 15, 2013) |
| Q | Declaration of Katura Haskins (Apr. 15, 2013) |
| R | Declaration of Willie Lee (Mar. 15, 2013) |
| S | Declaration of Walter Muldrow (Mar. 15, 2013) |
| T | Declaration of Randolph Smith (May 3, 2013) |
| U | Declaration of Kelly Bagby, Esq. (Apr. 26, 2013) |
| V | Declaration of Marjorie L. Rifkin, Esq. (Apr. 3, 2013) |
| W | Declaration of Barbara S. Wahl, Esq. (May 3, 2013) |
| X | Deposition Transcript of Jacqualyn Thorpe (Mar. 7, 2013) |
| Y | Deposition Transcript of Roy Foreman (Mar. 21, 2013) |
| Z | Deposition Transcript of Leyla Sarigol (July 27, 2011) |
| AA | Deposition Transcript of Wayne Trunage (Mar. 15, 2013) |
| BB | 30(b)(6) Deposition Transcript of Leyla Sarigol (Feb. 25, 2013) |
| CC | 30(b)(6) Deposition Transcript of Chantelle Teasdell (Fed. 28, 2013 and Mar. 22, 2013) |
| DD | Deposition Transcript of Leyla Sarigol (Feb. 25, 2013) |
| EE | Deposition Transcript of Deputy Mayor Beatrice Otero (Mar. 27, 2013) |
| FF | Deposition Transcript of John J. Thompson, Ph.D. (Mar. 1, 2013) |
| GG | Deposition Transcript of Chantelle Teasdell (Fed. 28, 2013) |
| HH | Deposition Transcript of Yvonne Iscandari (Mar. 20, 2013) |
| II | Deposition Transcript of Beyshinah Woods (Mar. 14, 2013) |
| JJ | Deposition Transcript of Larry McDonald (Mar. 8, 2013) |
| KK | Deposition Transcript of Carl Magby (May 2, 2013) |
| LL | Deposition Transcript of Donald Dupree (Mar. 18, 2013) |
| MM | Exhibit 25; Deposition of Leyla Sarigol (Feb. 25, 2013) |

## INTRODUCTION

The named Plaintiffs and their proposed class members are stuck in nursing facilities, where their care is funded by the District of Columbia.  In those nursing facilities, the class members receive a set of D.C. Medicaid-funded services that include medical care, assistance with the activities of daily living, as well as food and shelter.  The District's existing programs provide these *same* services to Medicaid beneficiaries in the community.  Yet the Plaintiffs and class members cannot access those community-based services without additional assistance. They are stranded in nursing facilities because the District's existing policy does not connect them with the same services the District provides to others in less restrictive settings in the community.

The Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 require the District to do more.  Those laws' "integration mandates" prohibit the unnecessary institutionalization of individuals in nursing facilities when they could receive the long-term care services they need in their own homes in the community.  *See Olmstead ex rel. Zimring v. L.C.*, 527 U.S. 581, 600 (1999) (failure to provide services in the most integrated setting appropriate to the needs of people with disabilities is "unjustified institutional isolation of persons with disabilities" and constitutes discrimination under the ADA).  Plaintiffs therefore seek class certification to obtain relief for all those similarly situated who demand that Defendant implement an effective *Olmstead* integration system to transition Plaintiffs and putative class members from institutional nursing facilities to community settings.

Plaintiffs' class thus is comprised of individuals who reside in nursing facilities and who, based on information already accessible to the District, could and would live in the community if the District connected them with the services the District already provides in the community. The class includes:

> **All persons with physical disabilities who, now or during the pendency of this lawsuit:**
>
> **(1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days;**
>
> **(2) are eligible to live in the community; and**
>
> **(3) would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-term care services in the community.**

This definition aligns with Plaintiffs' requested relief, which will allow the Court to resolve the claims for the entire class without requiring the Court to unnecessarily intrude on the District's operations. A class action is therefore the optimal mechanism for Plaintiffs' claims to proceed.

## I.   BACKGROUND

The named Plaintiffs and class members are individuals with physical disabilities who are institutionalized in nursing facilities for 90 days or longer, where they receive long-term care funded by D.C. Medicaid. Third Amended Complaint ("Compl.") (Docket No. 98) ¶¶ 21-22, 31-32, 35, 55-56, 62 (ECF No. 98). Each has the ability to live in the community if given access to appropriate long-term care services and would prefer to receive services in the community and live with independence. *Id.*[1] Nevertheless, Plaintiffs are unnecessarily institutionalized and isolated from the community because Defendant's policy and practice fails to implement an effective system whereby class members can receive necessary long-term care services in integrated, community settings rather than in nursing facilities. *Id.* ¶¶ 1, 118-22,

---

[1] The named Plaintiffs and several other class members describe their experiences with Defendant's programs in attached declarations, and discuss their ability and desire to live in more integrated settings. *See* Thorpe Decl. ¶¶ 8, 10 (attached as Exhibit A); Foreman Decl. ¶¶ 4, 9, 19 (attached as Exhibit B); McDonald Decl. ¶¶ 7-8, 14 (attached as Exhibit C); Wilkerson Decl. ¶¶ 5-6, 10-11 (attached as Exhibit D); Simhoni Decl. ¶¶ 4, 6, 10 (attached as Exhibit E); Carter Decl. ¶¶ 6, 8, 13, 18 (attached as Exhibit F); Collins Decl. ¶¶ 7, 9, 10 (attached as Exhibit G); Goines Decl. ¶¶ 8-11(attached as Exhibit H); Gray Decl. ¶¶ 9-10, 13-14 (attached as Exhibit I); Magby Decl. ¶¶ 7-9 (attached as Exhibit J); Rivers Decl. ¶¶ 4, 6, 9-11(attached as Exhibit K).

131-35; *see, e.g.*, Thorpe Dep. Tr. at 19:5-20:1, 30:1-31:4, 32:14-22 (attached as Exhibit X) (describing class members' isolation and deprivation of free movement in and out of the nursing facility); Foreman Dep. Tr. at 34:19-36:13, 115:8-117:7-22 (attached as Exhibit Y) (describing the facility's refusal to allow class members to leave, comparing the nursing facility to a jail).

### A.  The ADA and the Rehabilitation Act's Integration Mandate

Title II of the ADA and the Rehabilitation Act, along with their implementing regulations, require state and local governments to provide services to persons with disabilities "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a); 28 C.F.R. § 35.130(d).  The most integrated, appropriate setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. § 35, App. B (describing requirements for integration under 28 C.F.R. § 35.130).  The Supreme Court has made clear that "[u]njustified isolation [of individuals with disabilities] . . . is properly regarded as discrimination based on disability."  *Olmstead*, 527 U.S. at 597.

### B.  D.C. Medicaid's Existing Programs in the Community

Through D.C. Medicaid, as currently administered by the District's Department of Health Care Finance ("DHCF"), Defendant coordinates and funds medical services for the District of Columbia's low-income residents with disabilities.  Compl. ¶ 106.  Among the benefits available to those with physical disabilities are long-term care services, including inpatient care in nursing facilities and community-based long-term care services, both available through the District's Medicaid program, either under the District's Medicaid State Plan or the Medicaid Waiver Program for People who are Elderly and/or have Physical Disabilities (the "EPD Waiver").  *Id.* ¶¶ 107-09; Sarigol 2011 Dep. Tr. at 19:10-23:5, 133:19-134:18 (attached as Exhibit Z) (describing the Medicaid State Plan and EPD Waiver Program).  *See also Day*

Mem. Op. at 12-19 (Docket No. 41) (same).  The EPD Waiver is available only to those people with physical disabilities who meet the District's uniform, level-of-need standard and are at least 18 years of age.  The District determines the functional "level-of-need" based on the assistance individuals need with activities of daily living (e.g., bathing, dressing, toileting, mobility, eating) and instrumental activities of daily living (e.g., meal preparation, grocery shopping, laundry, medication management).  The same level-of-need determination that qualifies Plaintiffs and class members to receive long-term care services in nursing facilities also qualifies them to receive long-term care services in the community under the EPD Waiver program.  Compl. ¶¶ 135, 140.  People aged 65 years and older are also eligible for EPD Waiver services as long as they meet the level-of-need criteria based on their need for help with the requisite number of activities of daily living.  Turnage Dep. Tr. at 141:5-8 (attached as Exhibit AA).

Those who are ineligible for the EPD Waiver may be served by other, existing State Plan programs such as the Personal Care Assistance ("PCA") program.  The PCA program services are available to provide assistance with activities of daily living.  D.C. Mun. Regs. Tit. 29, § 5009.  In this instance, class members may be served by the PCA program if, for example, their condition has improved while in the nursing facility and thus fall below the nursing home level of care, but nevertheless remain in the nursing facility.  Sarigol 30(b)(6) Dep. Tr. at 62:15-63:9 (attached as Exhibit BB).

### C.  The District's Transition Program

Defendant has not implemented a sufficient transition assistance program to help class members move from nursing facilities back to the community with the long-term care services they need.  In April 2011, Defendant moved to dismiss the present action, or, in the alternative, for summary judgment.  Defs.' Mot. to Dismiss (Docket No. 19).  Far from proving it has a

"comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings," *Olmstead*, 527 U.S. at 606, the District demonstrated it had transitioned a mere three nursing facility residents (including two then-named-plaintiffs) *in four years*, *Day* Mem. Op. at 24-25 (Docket No. 41).  The Court denied the District's motion.  *Id*.

Defendant's record has not improved substantially over the course of the litigation.  The District has since issued a written *Olmstead* policy in the form of its "One Community For All" policy ("Olmstead Plan") (filed at Docket No. 48).  But the District's plan is essentially meaningless; it contains no metrics, targets, or plans for transitions now or in the future.  Ex. BB, Sarigol 30(b)(6) Dep. Tr. at 31:1-4; Teasdell 30(b)(6) Dep. Tr. at 67:11-19 (attached as Exhibit CC); Sarigol 2013 Dep. Tr. at 214:13-16 (attached as Exhibit DD) (no DHCF FY 2013 Olmstead Plan developed).  The District does not have a single agency, department, person, or entity with sole responsibility for providing transition assistance to nursing facility residents who are eligible for community services. Ex. CC, Teasdell 30(b)(6) Dep. Tr. at 14:7-15:15; Ex. BB, Sarigol 30(b)(6) Dep. Tr. at 13:9-15:2; Otero Dep. Tr. at 31:16-32:5 (attached as Exhibit EE).  The District is far from having a "comprehensive, effectively working plan to implement the requirements" of *Olmstead*.  Compl. ¶¶ 140, 144-45.

Accordingly, the District is without leadership or direction:  the Deputy Mayor in charge of D.C. Medicaid confirmed there are no repercussions if the Olmstead Plan's goals are not met; she does not even request or require an explanation when these goals change.  Ex. EE, Otero Dep. Tr. at 65:9-66:12 (Deputy Mayor unable to identify anything her office did to hold DHCF accountable when it only met 38% of its target number for nursing facility transitions).  The head of DHCF, an agency charged with transitioning nursing facility residents to the community, is unaware if the agency ever finalized an Olmstead Plan for this year.  Ex. AA, Turnage Dep. Tr.

5

at 40:2-4.  The Executive Director of the District of Columbia Office on Aging ("DCOA"),

another agency purportedly responsible for implementing the Olmstead Plan, testified that his

agency's goal is to help people who are already living independently in the community; his

office does not focus on moving people from nursing facilities because they are not living

independently.  Thompson Dep. Tr. at 52:8-17 (attached as Exhibit FF) ("[o]ur job as the D.C.

Office on Aging is to insure that people lead independent lives, and so those are the individuals

in the community.  People in nursing homes, are not independent.").

      To the extent the District's Olmstead Plan is implemented at all, it is implemented in

piecemeal fashion solely through the Money Follows the Person ("MFP") program to transition

class members to the community.  Yet that program remains similarly without accountable goals

and is ineffective.   The Centers for Medicare and Medicaid Services ("CMS") established MFP

to incentivize states to transition to the community those people who have lived in institutions

(including nursing facilities) for at least 90 days.  *See* CMS, State Medicaid Director Letter #10-

012, at 3 (Jun, 22, 2010);[2] CMS, Policy Guidance: Eligible Individual-Revised, Length of time

required in an Inpatient Facility Medicaid Eligible-days required for eligibility;[3] Ex. DD, Sarigol

2013 Dep. Tr. at 98:8-19.  As an incentive to the states to rebalance their long-term care systems

in accordance with *Olmstead*, the MFP program increases the federal share (i.e., the

reimbursement to the states from CMS) for all Medicaid services provided to people transitioned

to community-based long-term care services for a one-year period.  *Id.*

      The District maintains no goals for transitions of people from nursing facilities apart from

the MFP program.  Teasdell Dep. Tr. at 56:5-12 (attached as Exhibit GG) (the DCOA FY 12

---

[2] Available at http://downloads.cms.gov/cmsgov/archived-
downloads/SMDL/downloads/SMD10012.pdf.

[3] Available at http://www.ncdhhs.gov/dma/MoneyFollows/CMSPolicy90Days.pdf.

Performance Plan does not contain objectives to transition nursing facility residents), 56:20-57:14 (the DCOA FY 11 and FY 10 Performance Plans do not contain objectives to transition nursing facility residents).  And the MFP program's goals are meaningless.  Defendant purportedly originally planned in 2007 to use MFP to transition 860 individuals from nursing facilities over five years (i.e., 172 people each year).  Ex. AA, Turnage Dep. Tr. at 187:4-20.  But Defendant reduced its 2011 target for transitions to only 26, and ultimately transitioned just 16 people that year.  Iscandari Dep. Tr. at 130:6-18, 133:8-17 (attached as Exhibit HH).  The District again reduced its transition targets for the next four years (2012-2016) to 40 per year.  *Id.* at 139:10-14; Ex. DD, Sarigol 2013 Dep. Tr. at 60:19-61:1 (describing MFP's failure to meet its repeatedly lowered targets of number of transitions). Yet Defendant actually transitioned only 17 people from nursing facilities in 2012, reflecting just 42% of the already reduced target.  Ex. HH, Iscandari Dep. Tr. at 65:13-21; Ex. GG, Teasdell Dep. Tr. at 184:11-20 ("[t]he MFP Program has been in a dormant stage for the past thirteen months").

By both lowering and failing to meet its target number of nursing facility transitions to the community, Defendant jeopardized its federal funding to provide transition assistance. Sarigol 2013 Dep. Ex. 25 at Bates No. 132442 (July 6, 2012 CMS Report) (attached as Exhibit MM).  In July 2012, CMS advised the District that "[t]he lack of meeting MFP transition benchmark issue and repeated revision to lower numbers since the start of the 2008 MFP Demonstration program has hampered meeting the intent of the Olmstead.  Without significant improvement . . . the continuation of the DC MFP program could be in jeopardy."  *Id*.  The District has no plan to continue transitions if federal funding is no longer available.  Ex. HH, Iscandari Dep. Tr. at 242:15-243:3.

The District also has announced no plans to increase EPD Waiver slots, acquire

additional housing vouchers, designate any additional vouchers to nursing facility residents, or designate DHCF staff to assist nursing facility residents to complete housing applications or put their names on the EPD Waiver waiting list.  Ex. DD, Sarigol 2013 Dep. Tr. at 215:14-216:10; *see also id.* at 186:10-19, 188:8-189:19 (Defendant failed to utilize savings resulting from the enhanced federal match of services provided through federal MFP funding to allocate EPD Waiver slots or housing vouchers to nursing facility residents).[4]  Despite the *known* demand for community-based services exceeding 500 nursing facility residents, Defendant reserved only 40 EPD Waiver slots for nursing facility residents in 2013, reflecting less than one percent of the 4,162 slots in the EPD Waiver program.  Ex. AA, Turnage Dep. Tr. at 150:13-151:1.  And even though there are unused EPD Waiver slots reserved for nursing facility residents, Defendant inexplicably requires class members who have housing in the community and seek to transition out of nursing facilities to wait up to a year in order to access the EPD Waiver services they need.  Ex. HH, Iscandari Dep. Tr. at 34:21-35:2, 74:10-75:1, 106:6-13, 136:15-137:1.

The District also fails to meaningfully provide information to nursing facility residents about community-based care options.  Defendant sometimes fails to provide the information at all, and the materials Defendant does provide to nursing facility residents about transition options are regarded as a "joke" and outdated.  Ex. DD, Sarigol 2013 Dep. Tr. at 124:8-125:4 (discussing Sarigol Deposition Exhibit 19, in which D.C. Long Term Care Ombudsman states ADRC

---

[4] In fact, Defendant instituted an EPD Waiver waiting list without regard to the fact that it prevented MFP nursing facility transitions and called into question whether the MFP program would continue at all.  Ex. DD, Sarigol 2013 Dep. Tr. at 40:10-15 (describing the EPD Waiver waiting list preventing transitions from nursing facilities), 64:10-65:4 (describing period when the continuation of the MFP program was in doubt because residents could not transition due to lack of EPD Waiver slots).  After creating that EPD Waiver waiting list, Defendant has wholly failed to ensure that it moves at a reasonable pace.  Ex. AA, Turnage Dep. Tr. at 160:4-162:3 (discussing Turnage Deposition Exhibit 25, a D.C. Council member letter describing mismanagement of the EPD Waiver list forcing Ms. L, a class member, and other class members on the EPD Waiver waiting list, to remain in nursing facilities); Ex. T, Smith Decl. ¶¶ 11-30.

transition resources are "completely not helpful" to nursing facility residents and Ms. Sarigol's awareness of other similar complaints about informational resources for nursing facility residents); Ex. CC, Teasdell 30(b)(6) Dep. Tr. at 89:12-93:9 (discussing Teasdell 30(b)(6) Deposition Exhibit 7, showing that ADRC Housing Coordinator shared an "outdated" housing list with D.C. Long Term Care Ombudsman). Even social workers, often trying to help, are unable to facilitate transitions. *See* Smith Decl. ¶¶ 8-10 (attached as Exhibit T) (social worker describes his inability to understand the District's communications about the EPD Waiver program); Ex. I, Gray Decl. ¶ 10 (despite requests to nursing facility social worker for information about services to become more independent and leave the nursing facility, Plaintiff Joseph Gray only learned about the option to live in the community with services when Plaintiffs' counsel provided outreach about this lawsuit).

Defendant therefore does not have a sufficient mechanism to transition nursing facility residents to more integrated settings. Further, Defendant's practices erect barriers to successful transitions for nursing facility residents who desperately want to return to their communities. In November 2011, MFP hired a private contractor, NCB Capital Impact, to evaluate MFP's Housing and Transition Strategy in the District. The resulting report identified major barriers to transitions resulting from the Defendant's lack of transition coordination and "lack of coordination among the agencies on a system-wide basis." Ex. DD, Sarigol 2013 Dep. Tr. at 126:2-130:14. The contractor also found a lack of "a range of housing financial options to include housing vouchers"; "sufficient staff"; and "working mechanisms to get approval for financial transactions to pay for household setup, leasing application fees, and security deposits"; as well as a lengthy "timeline . . . to get a financial transaction approved within the local DC Government"; and insufficient EPD Waiver slots. *Id.* at 197:9-200:20. These barriers remain.

In July 2012, CMS cited similar transition barriers in the District, such as the lack of leadership support, lack of sufficient staff, lack of EPD Waiver slots, and insufficient housing vouchers. Ex. MM, Sarigol 2013 Dep. Ex. 25 (CMS July 6, 2012 Report).

### D.  The Named Plaintiffs

The named Plaintiffs are all persons with physical disabilities, and Defendant has determined that each meets the criteria for D.C. Medicaid-funded long-term care services based on the need for assistance with activities of daily living and instrumental activities of daily living due to their disabilities.  Compl. ¶¶ 21, 105-06; Ex. DD, Sarigol 2013 Dep. Tr. at 28:4-29:21.  Each named Plaintiff resides or has resided in a 24-hour care nursing facility for 90 days or longer, and receives or has received care paid for in whole or in part by Defendant's Medicaid program.  Compl. ¶¶ 22, 26, 31, 41, 47, 55, 64, 71, 77, 82, 89, 97.[5]  Although the named Plaintiffs have varied medical conditions, they all have physical disabilities, they all meet the Defendant's criteria to receive long-term care services in nursing facilities or in the community, and they all are appropriate candidates for community placement with long-term care services.  Compl. ¶¶ 23, 70, 76, 80, 87, 92,101.[6]

The named Plaintiffs, like the putative class members, remain stuck in nursing facilities because they need transition services to connect them with Defendant's existing, community-based services, but Defendant fails to provide them with a system of effective transition

---

[5] Ex. A, Thorpe Decl. ¶ 3; Ex. B, Foreman Decl. ¶ 4; Ex. C, McDonald Decl. ¶ 4; Ex. D, Wilkerson Decl. ¶¶ 4-5; Ex. E, Simhoni Decl. ¶ 2; Ex. F, Carter Decl. ¶ 3; Ex. G, Collins Decl. ¶ 3; Ex. H, Goines Decl. ¶ 5; Ex. I, Gray Decl. ¶ 3; Ex. J, Magby Decl. ¶ 6; Ex. K, Rivers Decl. ¶ 5.  During the pendency of this case, named Plaintiffs Donald Dupree and Curtis Wilkerson transitioned back to the community.  Compl. ¶¶ 35, 62.  The Court held their transition did not moot their claims, and they remain named Plaintiffs.  Mem. Op. and Order (Docket No. 85).

[6] Ex. A,Thorpe Decl. ¶ 10; Ex. B, Foreman Decl. ¶ 19; Ex. C, McDonald Decl. ¶¶ 16-17; Ex. D, Wilkerson Decl. ¶ 6; Ex. E, Simhoni Decl. ¶ 10; Ex. F, Carter Decl. ¶ 20; Ex. G, Collins Decl. ¶ 11;  Ex. H, Goines Decl. ¶ 14; ; Ex. J, Magby Decl. ¶ 12; Ex. K, Rivers Decl. ¶ 16; Procaccino Decl. ¶ 10 (attached as Exhibit L).

assistance.  *See generally* Compl.; *See, e.g.*, Ex. DD, Sarigol 2013 Dep. Tr. at 107:11-108:9

(discussing the MFP Program's failure to assist Plaintiff Roy Foreman to transition to an

available apartment in the community); Woods Dep. Tr. at 106:17-108:2, 113:7-21 (attached as

Exhibit II) (discussing Woods Deposition Exhibits 10-15 regarding year-long failure to

determine whether Plaintiff Larry McDonald was eligible for MFP or ADRC assistance, and

failure to provide assistance), 128:7-129:14 (regarding delays in MFP re-screening of Plaintiff

Denise Rivers to determine whether she was eligible for MFP assistance), 279:5-20 (discussing

MFP's failure, over seven months, to ensure that Plaintiff Jacqualyn Thorpe's housing

application was submitted).  To the contrary, Defendant has erected barriers and hurdles keeping

the named Plaintiffs, like all class members, unnecessarily segregated in nursing facilities.  *See,*

*e.g.*, Ex. Y, Foreman Dep. Tr. at 72:13-73:2 (describing Plaintiff Roy Foreman's inability to

move into three different apartments offered to him because he could not access home health

services); McDonald Dep. Tr. at 65:10-21 (attached as Exhibit JJ) (describing MFP and nursing

facility staff responding to requests for transition assistance with jokes).[7]  Defendant's policy

therefore keeps the named Plaintiffs and all members of the class unnecessarily segregated in

nursing facilities.

### E.  Numerosity of the Class and Typicality of the Claims

There are between 500 and 2,900 individuals in the same circumstances as the named

Plaintiffs, unnecessarily segregated in nursing facilities but desirous and able to live in the

community with appropriate support.  Compl. ¶¶ 125, 154; Ex. HH, Iscandari Dep. Tr. at 48:10-

49:8, 50:13-21 (2010 MDS data reveal 21% of 2,499 nursing facility residents expressed a

---

[7] *See also* Ex. A, Thorpe Decl. ¶¶ 9-10; Ex. B, Foreman Decl. ¶¶ 11-20; Ex. C, McDonald Decl.
¶¶ 16-17; Ex. D, Wilkerson Decl. ¶¶ 6-10; Ex. E, Simhoni Decl. ¶¶ 11-13; Ex. F, Carter Decl.
¶¶ 9-11; Ex. G, Collins Decl. ¶¶ 8, 11-14; Ex. H, Goines Decl. ¶¶ 10-15; Ex. I, Gray Decl. ¶¶ 9-
13; Ex. J, Magby Decl. ¶¶ 12, 16, 17, 21; Ex. K, Rivers Decl. ¶¶ 11-14, 17-20.

preference to move back to the community); Ex. AA, Turnage Dep. Tr. at 95:15-19 (D.C.'s 2010

Operational Protocol references the demand by 580 nursing facility residents who expressed a

desire to move back to the community); Ex. DD, Sarigol 2013 Dep. Tr. at 146:16-21

(Defendant's own survey of 377 nursing facility residents found that 283 of those surveyed

would prefer to live in the community).  The named Plaintiffs are aware of many residents who

also reside in nursing facilities and who want to live in the community and are confident that

they could live in the community with appropriate services.[8]  As this case now extends into its

third year, more people confined to nursing facilities have spoken up about their desire to

transition back into the community.  Attached to this brief are the declarations of seven

additional class members who explain the challenges and frustration they have faced trying to

return to the community.[9]  The named Plaintiffs seek the same relief as the class:  declarations

that Defendant's conduct violates the ADA and the Rehabilitation Act, paired with a permanent

injunction requiring Defendant to provide ongoing transition assistance to allow class members

to be served in the community.  Compl. at 34-36.

## II.    THE PROPOSED CLASS DEFINITION IS CLEAR AND THE CLASS IS EASILY ASCERTAINABLE.

The members of the proposed class have physical disabilities and require existing,

community-based, long-term care services.  They reside in nursing facilities (and have for at

least 90 days), and need assistance to connect with the long-term care services the District

otherwise makes available in the community.  Accordingly, to access those community services,

they need transition assistance from the District.  Plaintiffs thus have proposed a class definition

---

[8] Ex. A, Thorpe Decl. ¶ 11; Ex. Y, Foreman Dep. Tr. at 115:8-118:7, 133:6-135:2; Ex. C, McDonald Decl. ¶ 19; Ex. J, Magby Decl. ¶ 22.

[9] *See* Boylan Decl. (attached as Ex. M); Clark Decl. (attached as Ex. N); Gantt Decl. (attached as Ex. O); Glover Decl. (attached as Ex. P); Haskins Decl. (attached as Ex. Q); Lee Decl. (attached as Ex. R); Muldrow Decl. (attached as Ex. S).

to identify these individuals injured by Defendant's failure to provide transition services:

> **All persons with physical disabilities who, now or during the pendency of this lawsuit:**
>
> **(1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days;**
>
> **(2) are eligible to live in the community; and**
>
> **(3) would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-term care services in the community.**

Explicit within this definition are objective elements that enable ready identification of individuals who: (1) are eligible for D.C. Medicaid; (2) are receiving D.C. Medicaid-funded services in nursing facilities (3) for 90 or more consecutive days; (4) have physical disabilities; (5) meet the uniform standard to receive D.C. Medicaid long-term care services in a nursing facility or in the community based on their need for assistance with activities of daily living; (6) desire to live in the community; and (7) without the District's assistance cannot successfully transition to living in the community rather than in a nursing facility.

The proposed definition is sufficiently discrete, objective, and readily ascertainable to satisfy the Court's need to manage the contours of class membership.  The purpose of seeking clarity in a class definition is "primarily to help the trial court manage the class." *Pigford v. Glickman*, 182 F.R.D. 341 (D.D.C. 1998).  "It is not designed to be a particularly stringent test." *Id.*  Rather, Plaintiffs must simply be able to "establish that 'the general outlines of the membership of the class are determinable at the outset of the litigation.'" *Id.* (quoting 7A Charles Alan Wright, Federal Practice & Procedure § 1760 at 118).  *See also Disability Rights Council of Greater Wash. v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 25 (D.D.C. 2006) ("All class members meeting this definition are individuals with disabilities who by

definition meet readily defined eligibility criteria for [defendant's] services."). Like the classes

of farmers in *Pigford* and customers in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287

F.R.D. 1 (D.D.C. 2012), the proposed class is "sufficiently clear to make the proposed class

administratively manageable; by looking at the class definition, counsel and putative class

members can easily ascertain whether they are members of the class." *Pigford*, 182 F.R.D. at

346; *see In re Rail Freight*, 287 F.R.D. at 29-31. *See also Barnes v. District of Columbia*, 242

F.R.D. 113, 120 (D.D.C. 2007) (class is well-defined if an individual class member "would be

able to determine, simply by reading the definition, whether he or she was a member of the

proposed class.").

The proposed class members here are easily identifiable based on three overarching

objective criteria. First, class membership is tied to an easily discernible temporal requirement

that class members receive D.C. Medicaid long-term care services in a nursing facility for at

least 90 consecutive days. Compl. ¶ 153.[10]

Second, Plaintiff class members must also be "eligible to live in the community" based

on the objective level of care criteria under which Defendant determines level-of-need to qualify

for long-term care services under D.C. Medicaid. The District's uniform standard for

determining whether class members meet the required level of care is based on their need for

assistance with a designated number of activities of daily living (e.g., bathing, dressing, toileting,

eating, transferring/mobility) and instrumental activities of daily living (e.g., meal preparation,

grocery shopping, laundry, housekeeping). *Id.* The District has already determined that all of

the Plaintiffs are eligible for a nursing facility level of care, which means the District has

---

[10] The 90-day period makes it more likely that a nursing facility resident is stuck in a facility, rather than receiving brief treatment, and it reflects the same 90-day period built into the MFP program, described *supra* at 6-7.

determined their disabilities are significant enough to require the level of services provided in a

nursing facility.  *Id.* ¶ 135.  Importantly, the same "level of care" is used to determine eligibility

for EPD Waiver services in the community and for participation in the MFP program to

transition to the community.  *Id.*; *see also id.* ¶ 140.  Accordingly, all those who meet the nursing

facility level of care may be served in the community under the District's existing programs

(either under the EPD Waiver or PCA program).  Ex. BB, Sarigol 30(b)(6) Dep. Tr. at 61:4-63:7

(even nursing facility residents requiring 24-hour care may be served in the community).[11]

Additionally, Defendant already has this information for every nursing facility resident, as such

evaluations must be updated in every patient's file on a regular basis.  Ex. HH, Iscandari Dep. Tr.

at 52:6-53:13, 181:12-183:11 (reviews done annually based on review of patients' records).  *See*

*also* Ex. DD, Sarigol 2013 Dep. Tr. at 132:11-140:1 (discussing screenings performed for MFP

eligibility).

       Third, Plaintiffs' proposed class definition limits the class to those individuals who would

prefer to live in the community instead of a nursing facility "if the District of Columbia would

provide transition assistance to facilitate their access to long-term care services in the

community."  Whether a person falls within this third prong is ascertained by asking Medicaid-

funded nursing facility residents whether they would prefer community-based services rather

than nursing facility services, with transition assistance by the District.  The District *already* has

access to this information, as the District is required by CMS to elicit nursing facility residents'

preferences for community-based versus nursing facility services as part of the "Minimum Data

---

[11] For purposes of class certification, Defendant's ability to apply objective criteria to identify
class members is important, and Defendant will be able to do so here.  Plaintiffs reserve the right
to later challenge the Defendant's determinations of class members' eligibility for community
transition, if appropriate, but the details of how Defendant makes such judgments are not
pertinent for purposes of this motion for class certification.

Set" surveys.  Ex. HH, Iscandari Dep. Tr. at 48:17-49:4 (MDS asks nursing facility residents

whether they are "wanting to come out into the community" and includes details about their

functional needs for services.).  The surveys are conducted periodically by nursing facilities and

reviewed by the District's contractor, Delmarva Foundation.  *Id.* at 49:14-52:10.  The members

of the proposed class thus are readily ascertainable among D.C. Medicaid-funded long-term

nursing facility residents with physical disabilities using existing data, and the class definition is

administratively practical.  *See Hardy v. District of Columbia*, 283 F.R.D. 20, 26 (D.D.C. 2012)

(identification of class members from existing databases demonstrates ascertainability).

The Plaintiffs' proposed definition therefore identifies all individuals with physical

disabilities who could and would live in the community, but instead receive D.C. Medicaid-

funded long-term care in nursing facilities for 90 or more consecutive days, and are thereby

injured by Defendant's lack of policies, programs, and practices to connect them with the

services in the community.[12]

### III.    THE PROPOSED CLASS WARRANTS CLASS CERTIFICATION.

A class action is appropriate to conserve "the resources of both the courts and the parties

by permitting an issue potentially affecting every [class member] to be litigated in an economical

fashion under Rule 23."  *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982)

(internal quotation omitted).  "A district court has broad discretion in deciding whether to allow a

case to proceed as a class action."  *Hartman v. Duffy*, 19 F.3d 1459, 1471 (D.C. Cir. 1994)

(citations omitted), *cert. denied sub. nom.*, *Dillon v. Powell*, 534 U.S. 1078 (2002).  "[T]he

allegations in the complaint are presumed true for purposes of a motion for class certification

---

[12] Plaintiffs note that if this Court believes further clarification is necessary, the Court may
appropriately revise the definition.  *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 256
(D.D.C. 2002).

. . . ." *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 431 (D.D.C. 2002).  While

merits questions may be considered to the extent necessary to determine whether Rule 23's

requirements are met, "Rule 23 grants courts no license to engage in free-ranging merits

inquiries at the certification stage."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.

Ct. 1184, 1194-95 (2013).

      Parties seeking class certification must satisfy all of the requirements of Federal Rule of

Civil Procedure 23(a), as well as at least one subsection of Rule 23(b).  These requirements are

met if plaintiffs make a "specific presentation" of facts demonstrating a "reasonable basis for

crediting the assertion that aggrieved individuals do exist in the broader class they propose . . . ."

*Wagner v. Taylor*, 836 F.2d 578, 587 n.57, 589 (D.C. Cir. 1987) (citation omitted).  A class

description is sufficient if it provides "the general outlines of the membership of the class."

*Chang v. United States*, 217 F.R.D. 262, 269 (D.D.C. 2003); *see also* 5 James W. Moore *et al*.,

*Moore's Federal Practice* § 23.21[4][a] (3d ed. 2001).

      The Supreme Court's *Wal-Mart* decision, and the more recent D.C. Circuit opinion in

*DL*, do not alter the analysis here, and Plaintiffs readily satisfy these requirements for class

certification, just as similar classes across the country seeking injunctive relief under *Olmstead*

have repeatedly been found to satisfy those requirements.  *See State of Conn. Office of Prot. &*

*Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 273 (D. Conn.

2010) (granting class certification for similarly defined class with nearly identical *Olmstead*

claims); *Colbert v. Blagojevich*, No. 07-CV-4737, 2008 WL 4442597 (N.D. Ill. Sept. 29, 2008)

(same); *Chambers v. City & Cnty. of San Francisco,* No. 06-CV-06346, slip op. at 9 (N.D. Cal.

July 12, 2007) (same); *Pitts v. Greenstein,* No. 10-CV-635, 2011 WL 2193398 (M.D. La. June 6,

2011) (granting class certification for *Olmstead* class defined as those at risk of

institutionalization); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980 (N.D. Cal. 2010) (same);

*Hampe v. Hamos*, No. 10-CV-3121, U.S. LEXIS 125858 (N.D. Ill. Nov. 22, 2010) (same); *Long*

*v. Benson*, No. 08-CV-0026, 2008 WL 4571904 (N.D. Fla. Oct. 14, 2008) (certifying class of

disabled Medicaid recipients who could and "would reside in the community with appropriate

community-based services"), *vacated as moot by legislative action*, slip op. at 2 (N.D. Fla. Jan.

3, 2012); *Frederick L. v. Department of Pub. Welfare*, 364 F.3d 487, 498 (3d Cir. 2004)

(granting certification of a class of institutionalized persons with mental illness "who are

qualified for and wish to be placed in a community-care setting."); *M.A.C. v. Betit*, 284 F. Supp.

2d 1298, 1303 (D. Utah 2003) (granting class certification for class of Medicaid-eligible,

disabled individuals "[denied] a meaningful choice between [community-based] services and

institutionalization . . . .").

### A.  Plaintiffs Satisfy the Requirements of Rule 23(a).

Rule 23(a) enables members of a class to sue as representative parties on behalf of all

class members if:

> (1) the class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact common to the
> class, (3) that the claims or defenses of the representative parties
> are typical of the claims or defenses of the class; and (4) that the
> representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are commonly referred to as numerosity,

commonality, typicality, and adequacy of representation.

### 1.      Numerosity: The class of 500 to 2,900 individuals is so numerous that joinder of all members is impracticable.

A class action may be maintained if "the class is so numerous that joinder of all parties is

impracticable."  Fed. R. Civ. P. 23(a)(1).  Impracticability addresses the expense and burden, to

the parties and the court, of litigating each claim individually, rendering the case difficult or

inconvenient without joining all members of the class.  *Meijer v. Warner Chilcott Holdings, Inc.* 246 F.R.D. 246, 306-07.  Typically, a proposed class of at least 40 members satisfies the numerosity requirement.  *See, e.g.*, *id.* at 306; *Disability Rights Council*, 239 F.R.D. at 25-26 ("courts in this jurisdiction have observed that a class of at least forty members is sufficiently large") 1 Newberg on Class Actions (4th ed. 2002) § 3.5 at 247 ("as few as 40 class members should raise a presumption that joinder is impracticable").  The fact that the exact size of the class cannot be easily ascertained does not preclude class certification, so long as there is a reasonable basis for the estimate.  *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999); *Vargas v. Meese*, 119 F.R.D. 291, 293 (D.D.C. 1987) ("plaintiffs . . . need not show a precise number of class members").

Here, the proposed class consists of at least 500 people and possibly as many as 2,900.  Compl. ¶¶ 125, 154.  The lowest figure is based upon publicly available data for the number of individuals living in District nursing facilities who have affirmatively stated a preference to live in the community, and the number is likely higher.  Compl. ¶ 125; Ex. HH, Iscandari Dep. Tr. at 48:10-49:8, 50:13-21, 95:15-19 (District reported to CMS the demand for community transition by 580 class members); Ex. DD, Sarigol 2013 Dep. Tr. at 146:16-21 (Defendant's survey of nursing facility residents found that over eighty percent of those surveyed preferred to, and could, live in the community).  The highest figure is based on the population of D.C. Medicaid-funded nursing facility residents.  Ex. AA, Turnage Dep. Tr. at 99:14-18 (there are 2,765 beds in D.C. nursing facilities); Ex. HH, Iscandari Dep. Tr. at 24:1-16 (approximately 200 D.C. residents in nursing facilities outside of D.C.).  Joinder is thus impracticable, and the numerosity requirement is satisfied.

2.      **Commonality: There are numerous questions of law and fact common to the class resulting from Defendant's system-wide discrimination.**

The second requirement for class certification under Rule 23(a) is commonality, which exists when there are questions of law or fact common to all members of the class.  Fed. R. Civ. P. 23(a)(2).  Only one common question is required.  *Wal-Mart*, 131 S. Ct. 2556; *In re Rail Freight Fuel*, 287 F.R.D. at 30.  The answer to the common question then must "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.  *See In re Rail Freight* , 287 F.R.D. at 21 ("[P]laintiffs' burden at the class certification stage is to demonstrate that the elements of their claim are 'capable of proof at trial through evidence that is common to the class rather than individual to its members'") (citation omitted). The commonality analysis thus asks whether a classwide proceeding would "generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original).

At the class certification stage, it is sufficient for Plaintiffs to show that "members of the class suffered from a common policy of discrimination . . . ," *Hartman*, 19 F.3d at 1472, or identify a "uniform policy or practice that affects all class members."  *DL v. District of Columbia*, No. 12-7042, 2013 WL 1489471, at *6 (D.C. Cir. Apr. 12, 2013).  While the same provision of law "can be violated in many different ways . . . identification of a policy or practice that affects all members of the class" would be sufficient.  *See DL*, 2013 WL 1489471, at *5 (quoting *Wal-Mart*, 131 S. Ct. at 2551).  Indeed, class actions seeking injunctive and declaratory relief "'by their very nature' present common questions of law and fact."  *Moore v. Napolitano*, 269 F.R.D. 21, 28 (D.D.C. 2010) (internal quotations omitted); *Disability Rights Council*, 239 F.R.D. at 26 (quoting 7A Wright, Miller & Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2006)).

i.      *The District's failure to establish or implement a system of transitional assistance results in common harm, leads to common questions, and can be remedied by classwide relief.*

The single policy and practice at issue here is the District's failure to establish or implement a system of transition assistance for those who are unnecessarily segregated in nursing facilities to transition to more integrated, community settings. This policy and resulting practice cause a consistent form of discrimination against Plaintiffs. *Accord State of Conn.*, 706 F. Supp. at 287 (granting class certification for nursing facility resident plaintiffs with *Olmstead* claims very similar to the present case).

This policy and practice cause a common harm to class members – the harm of unnecessary segregation in nursing facilities. All class members have been in nursing facilities at least 90 days, but could live in the community if they were connected with the right services there. They are stuck because of Defendant's policy and resulting inaction.

Common questions clearly exist here. In addition to the common questions listed in the Third Amended Complaint, Compl. ¶ 156, the District's policy leads to the central question at the heart of this case: ***Does Defendant administer its programs and services in a manner that allows for even-handed access to community-based care for individuals with physical disabilities who currently receive care in nursing facilities*?** Plaintiffs believe the resounding answer to this question is "no" and, therefore, Defendant unnecessarily segregates the class members in nursing facilities. The Court's answer to this common question thus would resolve an issue central to the validity of the claims of all class members.

The answer, too, would lead to common relief. Because they are all stranded in nursing facilities unnecessarily, the class members share a common need for transition assistance. All class members are in need of a unified system that informs them of their options, elicits their preferences for nursing facility or community placement, identifies their needs, begins their

21

discharge planning upon admission to the nursing facilities, and connects them with the community long-term care services and supports they need in a manner that affords them a real opportunity to transition to the community.  Accordingly, all of them would benefit from each aspect of the relief requested:  each would benefit from a determination that Defendant's failure to develop and implement an effective *Olmstead*-compliant system violates the ADA and the Rehabilitation Act, and an injunction requiring Defendant to transition class members to community settings based on sufficient practices.  *See* Compl. at 34-36 (remedy requested).

### ii.      *Wal-Mart and DL are readily distinguishable.*

The commonality analysis in this case is unchanged following *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).  The Supreme Court reaffirmed in *Wal-Mart* that class certification is appropriate in civil rights cases like this one, where plaintiffs seek injunctive relief based on a common contention of law or fact that is capable of class-wide resolution.  *Wal-Mart*, 131 S. Ct. at 2557-58 ("'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture.") (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997)).  The *Wal-Mart* plaintiffs, who did not obtain class certification, presented claims that were very different from those at issue here.  They sought back pay and injunctive relief under Title VII of the 1964 Civil Rights Act through "one of the most expansive class actions ever," consisting of current and former store employees who allegedly were paid or promoted improperly based on gender.  *Id.* at 2547.  The Supreme Court determined that the plaintiffs' claims lacked commonality because they could identify no corporate-wide discriminatory policy or practice that was responsible for their injuries.  *Id.* at 2552.  Millions of pay and promotion decisions made by thousands of store managers in different locations nationwide made on an individual, discretionary basis could not be adjudicated across the class.  *Id.*

By contrast, this case hinges on Defendant's failure to create and implement effective transition policies and practices to connect individuals who are eligible for and desirous of community-based long-term care services, in violation of Title II of the ADA and the Rehabilitation Act.  The "glue" holding the class together is Defendant's singular failure to provide an effectively working system to integrate nursing facility residents into the local community – connecting them with the existing services that others with the same conditions receive in the community.  As a result of this failure, class members suffer the common injury of unnecessary segregation in institutional nursing facilities – an injury that could be remedied with "a single injunction or declaratory judgment."  *Id.* at 2554, 2557.  The relief sought in this case seeks just that:  implementation of a working system of transition assistance with procedural elements to ensure that class members are continuously informed about community-based long-term care alternatives, regularly asked about their preferences and needs, provided ongoing assistance with discharge planning, and ultimately transitioned to the community with appropriate long-term care services.  Compl. at 34-36.

These differences between *Wal-Mart* and the present *Olmstead* class have been acknowledged by practically every court that has considered similar ADA Title II or Rehabilitation Act claims since the Supreme Court decided the *Wal-Mart* case.  *See, e.g.*, *Connor B. v. Patrick*, 278 F.R.D. 30, 33-34 (D. Mass. 2011) (denying defendants' motion to decertify class of foster children alleging harm due to "specific and overarching systemic deficiencies" in foster care system); *Gray v. Golden Gate Nat'l Recreational Area*, 279 F.R.D. 501, 518 (N.D. Cal. 2011) ("Since Rehabilitation Act claims do not require proof of the intent . . . the Title VII analysis in *Wal-Mart* is not closely on point."); *Lane v. Kitzhaber*, 283 F.R.D. 587, 595 (D. Or. 2012) ("the Title VII analysis in *Wal-Mart* is not closely on point"); *Oster v. Lightbourne*, No. C

23

09–4668 CW, 2012 WL 685808, at *5 (N.D. Cal. Mar. 2, 2012) (distinguishing *Wal-Mart*);

*Pashby v. Cansler*, 279 F.R.D. 347, 353-54 (E.D.N.C. 2011) (same), *aff'd on other grounds*, 709

F.3d 307 (4th Cir. 2013).  In other words, as courts in many different jurisdictions have shown,

*Wal-Mart* has not changed the judicial recognition that cases like this one should be treated as

class actions.

  For many of the same reasons, the D.C. Circuit Court of Appeals' recent decision in *DL*

*v. District of Columbia*, No. 12-7042, 2013 WL 1489471, at *6 (D.C. Cir. Apr. 12, 2013), is

instructive but distinguishable.  In *DL*, the D.C. Circuit decertified a class of children with

disabilities who alleged the District violated their various statutory rights under the Individuals

with Disabilities Education Act ("IDEA").  *Id.* at *2, *7.  As part of the provision of a "free

appropriate public education" under the IDEA, regulations require states to undertake several

steps: (1) identify, (2) locate, and (3) evaluate children, and (4) ensure that certain of them

experience smooth and effective transitions.  *Id.* at *1.  Plaintiffs can sue when states fail to

accomplish any one of these four tasks.  *Id.*  The court reasoned that the plaintiffs therefore

suffered several, distinct harms, some of which were not felt by every class member.  Some were

harmed because they were not identified or located, some because they were not evaluated and

provided an individual education plan, and still others because the District failed to ensure a

smooth transition.  *Id.* at *6.  The various alleged violations and harms "involve[d] different

policies and practices at different stages of the District's . . .  process[, and] *the district court*

*identified no single or uniform policy or practice that bridges all their claims*."  *Id.* at *6

(emphasis added).

  In contrast to *DL*, the named Plaintiffs and class members in this case claim a single

violation of the integration mandate resulting from Defendant's uniform failure to develop and

implement an effective system through which they can end their unnecessary isolation in nursing

facilities and receive the Medicaid-funded services they need to re-integrate into their

communities.  Where the *DL* plaintiffs called for multiple, separate systems to identify, evaluate,

and serve them, the Plaintiffs here seek a system to bridge their transition back to the community

– a helping hand to connect them with the services they need outside of nursing facilities and

resolve their unnecessary segregation.  Because of Defendant's failure to establish a system to

effectively transition nursing facility residents who want to return to the community, each class

member is now forced to make an untenable choice between their desire for independence and

freedom and their need for critical Medicaid-funded supports and services they require but

cannot access unless they are in a nursing facility.  The peril of such a choice is the very reason

that the Supreme Court ruled that unnecessary isolation of people with disabilities in institutions

is discrimination under the ADA.  *Olmstead*, 527 U.S. 581.

The distinction between *DL* and the case at bar is further evidenced in the class

definitions.[13]  The class definition in *DL* was disjunctive, repeatedly using the word "or" to

capture the many different categories of plaintiffs.  This class relies on a single set of factors; the

word "and" demonstrates that all plaintiffs have the same relevant characteristics.  *Compare DL*

at *2 (*DL* class definition) *with* Compl. ¶ 153 (*Thorpe* class definition).  The *DL* court pointed

out that there was no "common 'tru[e] or fals[e]' question [that] can be answered for each of

[the] different claims of harm that would assist the district court in determining the District's

---

[13] The class definition in *DL* included: "All children who are or may be eligible for special
education and related services, who live in, or are wards of, the District of Columbia, and (1)
whom defendants did not identify, locate, evaluate or offer special education and related services
to when the child was between the ages of three and five years old, inclusive, or (2) whom
defendants have not or will not identify, locate, evaluate or offer special education and related
services to when the child is between the ages of three and five years old, inclusive." *DL*, 2013
WL 1489471, at *2.

liability as to each group" of plaintiffs. *Id.* at \*6. As a result, the relief requested in *DL* would not remedy the harms of each plaintiff, as they were harmed in varying ways. *Id.* Here, there *is* a common question that will assist the Court in determining liability as to the entire class: Does Defendant administer its programs and services in a manner that allows for even-handed access to community-based care for individuals with physical disabilities who currently receive care in nursing facilities? And, unlike *DL*, this case presents common requests for relief that can be resolved in a "single stroke." *Id.* Unlike in *DL*, every part of the relief requested here would benefit each and every class member. *Compare id.* at \*6-7 *with* Compl. at 34-36.

<strong>iii.　　Other cases demonstrate the appropriateness of this case for<br>class certification post-Wal-Mart.</strong>

In contrast to *Wal-Mart* and *DL*, two recent cases highlight the sustainability of civil rights class actions similar to this one. Though the D.C. Circuit's decision in *Disability Rights Council v. Washington Metro Area Transit Authority* was before *Wal-Mart*, the analysis applies with equal vigor. The plaintiffs alleged that the Washington Metro Area Transit Authority ("WMATA") systemically discriminated against them with regard to the availability of "comparable" transit services for disabled individuals, in violation of the ADA and the Rehabilitation Act. *Disability Rights Council*, 239 F.R.D. at 9. WMATA opposed class certification on the theory that plaintiffs had not alleged a broad policy of discrimination that affected the class members in the same way, so that the individual class members' injuries could not be sufficiently linked to system-wide discrimination. *Id.* at 26-27. In support of its position, WMATA pointed to cases like *Love v. Johanns*, where the court held that commonality was lacking because claims of discrimination in USDA's loan programs ultimately "turn[ed] on a series of individualized inquiries" about each plaintiff's experience. *Id.* (citing *Love v. Johanns*, 439 F.3d 723, 730 (D.C. Cir. 2006)).

The court disagreed, finding the comparison to *Love* inapt.  The court explained that, although evidence pertaining to each individual's discrimination would be relevant to the dispute, the "evidence [would] be assessed in the context of a comprehensive inquiry into WMATA's systems, patterns, and practices."  *Id.* at 27.  Concluding that class certification was appropriate, the court determined that the disabled plaintiffs' claims were "fundamentally different":

> This is a universal claim, the metric for which is systemic, rather than specific; either the *system* provided to the putative class members is comparable, or it is not.   Unlike the typical discrimination claim, the individualized claims are not so much that the plaintiffs have suffered targeted, personalized discrimination, but rather that they have been individually discriminated against via systems-level violations of the ADA (and, derivatively, the Rehabilitation Act and § 1983).

*Id.* at 26 (emphasis in original).  Thus, the court granted class certification despite the distinct disabilities and needs of the individual class members.  *Id.*

Similarly, the commonality analysis in a post-*Wal-Mart* case in Oregon, *Lane v. Kitzhaber*, is instructive.  There, the named plaintiffs sought certification of a class under *Olmstead* of those "'who are in, or who have been referred to, sheltered workshops' and 'who are qualified for supported employment services.'"  *Lane*, 283 F.R.D. at 589.  Oregon officials argued that *Wal-Mart* changed the landscape for discrimination class actions and that, accordingly, commonality was lacking because the case called for individualized inquiries about class members' disabilities and accommodations.  *Id.* at 595.  The court disagreed, concluding that common questions predominated about the state's practices, including "whether defendants have failed to plan, administer, operate and fund *a system* that provides employment services that allow persons with disabilities to work in the most integrated setting."  *Id.* at 598 (emphasis added).  The court went on to conclude that "[a]s required by *Wal–Mart*, this class action can be

27

resolved 'in one stroke' with an appropriate injunction applicable to all class members." *Id.* at 602.

The same is true here. The class's common harm (unnecessary segregation) is the result of a common policy of failing to create a meaningful and effective system to end the unnecessary institutionalization of people with disabilities by transitioning them from nursing facilities to the community, and that common harm may be commonly addressed by the requested relief.

### iv.     *Differences in disabilities and needs across class members are irrelevant.*

That the class members in this matter may have different chronic conditions resulting in their disabilities, or different transitional needs, does not defeat class certification and neither *Wal-Mart* nor *DL* alters this conclusion. It is well-settled that variations in the personal circumstances of individual plaintiffs in similar cases are not pertinent for purposes of class certification. *See, e.g.*, *Hartman*, 19 F.3d at 1472 (commonality found notwithstanding differences in job descriptions); *Disability Rights Council*, 239 F.R.D. at 25 (commonality found despite differences in disabilities and particular service needs); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (commonality found where class members' circumstances were individual but injuries were derived from "unitary course of conduct by a single system") (quoting *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)); *see also Hartman v. Duffy*, 158 F.R.D. 525, 537 (D.D.C. 1995) ("[F]actual variations are not sufficient to deny class treatment to the claims that have a common thread of discrimination.") (quoting *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982), *cert. denied*, 460 U.S. 1083 (1983)) (emphasis added). This remains the case post-*Wal-Mart. See, e.g.*, *Lane*, 283 F.R.D. at 598 (that some may need different services does not defeat the fact that "[named plaintiffs] and all similarly situated persons suffer the same injury of unnecessary segregation in the employment

28

setting."); *Henderson v. Thomas*, No. 2:11CV224–MHT WO, 2012 WL 3777146, at *5 (M.D. Ala. Aug. 30, 2012) (defendant's policy affected every class member in the same way, despite differences among class members).

Here, individual class members may have different disabilities but all require the same services:  long-term personal care assistance.  The relief sought here is not based on each individual class member's medical conditions, nor is it premised on ordering the provision of specific medical or transition services.  The class members' claims are based on Defendant's failure to provide a system to connect them with community-based long-term care services to help them with their activities of daily living, regardless of each individual's specific physical disabilities and needs.

Furthermore, that some members of the class may have both a physical disability and a mental illness is irrelevant.  Plaintiffs confirmed through their revised class definition that the class includes only those with physical disabilities and thus does not include people with only mental illness who may be assisted by the Department of Mental Health ("DMH") to get out of nursing facilities.  This is because all transition services for those with physical disabilities in nursing facilities, whether or not they may also have mental health needs, are coordinated through the District's Aging and Disability Resource Center ("ADRC") or DHCF.  Ex. BB, Sarigol 30(b)(6) Dep. Tr. at 59:3-10 (MFP assists those with physical and mental health needs); Ex. CC, Teasdell 30(b)(6) Dep. Tr. at 17:10-19, 98:8-99:14 (DHCF and ADRC are the two agencies responsible for the day-to-day assistance of nursing facility residents to transition to the community); Ex. DD, Sarigol 2013 Dep. Tr. at 140:4-141:5 (Defendant determines whether nursing facility residents fall into one of two categories for transition assistance: MFP assistance, or ADRC assistance); Ex. GG, Teasdell Dep. Tr. at 288:5-14 (discharge planning by ADRC staff

includes identifying home health services and mental health services).

In light of the common questions of fact and law, litigation as a class is the most efficient and appropriate way to proceed.[14]

### 3.      Typicality: The named Plaintiffs' claims are typical of the claims of the class.

Rule 23(a)(3) requires that the claims of the class representatives be typical of the class claims. Fed. R. Civ. P. 23(a)(3).  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (internal citations omitted).  The primary purpose of the typicality requirement is to ensure that the interests of the class members will be fairly and adequately protected in their absence.  *Wal-Mart*, 131 S. Ct. at 2550; *Falcon*, 457 U.S. at 157.  In other words, the interests of the class representatives must align with the interests of the class.  *See Disability Rights Council*, 239 F.R.D. at 28 (finding typicality where the named plaintiffs' claims derive from the same legal theories as the claims of the proposed class).  When analyzing whether a named plaintiff's claim is typical under Rule 23(a)(3), courts look to whether the defendant's conduct gives rise to claims of other class members "based on the same legal theory." *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997).

The Supreme Court has recognized that "'[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'"  *Wal-Mart*, 131 S. Ct. at 2551 n.5 (quoting *Falcon*, 457 U.S. at 157 n.13).  In discrimination cases, "[t]he court must consider whether the [class representatives] suffered injury from a specific discriminatory [practice] in the same manner that the members of the proposed class did . . . ." *McReynolds*, 208 F.R.D. at 445.  Accordingly, the typicality prong

---

[14] Plaintiffs believe that subclasses would not be appropriate or useful in this case because of the unitary nature of the class, Defendant's failures, and the relief sought.  However, if the Court concludes subclasses would be appropriate, Plaintiffs can propose them.

of Rule 23(a) is met when plaintiffs "[make] a convincing showing of a common policy of discriminatory treatment . . . ." *Id.* Thus, plaintiffs may satisfy the typicality requirement despite differences in individual factual circumstances and in damages. *See, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 28 (D.D.C. 2001) (typicality present despite differences in damages); *Hartman v. Duffy*, 158 F.R.D. 525, 537 (D.D.C. 1994) (commonality and typicality satisfied in sexual discrimination action despite factual differences among the plaintiffs); *Henderson*, 2012 WL 3777146, at *5.

Here, the named Plaintiffs, like the class members, are individuals with physical disabilities who have been institutionalized in nursing facilities for at least 90 days and who are eligible for, and wish to receive, long-term care services in the community. Their claims typify the claims of the class, and they seek the same relief as all class members. The named Plaintiffs' factual characteristics are consistent with the proposed class:

   a. Defendant has determined that each of the named Plaintiffs, like all class members, has a physical disability. Compl. ¶¶ 21, 55.

   b. The named Plaintiffs, like all class members, currently reside, or resided, in a nursing facility where they receive, or received, care funded by the District for at least 90 consecutive days. Compl. ¶¶ 22, 26, 31, 41, 47, 55, 64, 71, 77, 82, 89, 97.

   c. Each of the named Plaintiffs, like all class members, could live in the community with necessary long-term care services and supports, which the Defendant could provide. Compl. ¶ 23.[15]

   d. Each of the named Plaintiffs, like all class members, would rather live in the community instead of in a nursing facility. Compl. ¶ 25.[16]

[15] *See* Ex. A, Thorpe Decl.¶¶ 10, 30, 44, 53, 67, 87, 89; Ex. B, Foreman Decl. ¶ 19; Ex. C, McDonald Decl. ¶¶ 16-17; Ex. D, Wilkerson Decl. ¶ 6; Ex. E, Simhoni Decl. ¶ 10; Ex. F, Carter Decl. ¶ 20; Ex. G, Collins Decl. ¶ 11;  Ex. H, Goines Decl. ¶ 14; Ex. J, Magby Decl. ¶ 12; Ex. K, Rivers Decl. ¶ 16, Ex. L, Procaccino Decl. ¶ 10.

[16] *See* Ex. A, Thorpe Decl.¶¶ 8-10; Ex. X, Thorpe Dep. Tr. at 35:15-22, 37:6-39:4; Ex. B, Foreman Decl. ¶¶ 4, 9, 19; Ex. Y, Foreman Dep. Tr. at 118:8-18; Ex. C, McDonald Decl. ¶¶ 7-8, 14; Ex. JJ, McDonald Dep. Tr. at 65:10-18, 99:16-22; Ex. D, Wilkerson Decl. ¶¶ 5-6, 10-11; Ex.

Similarly, the named Plaintiffs' legal claims are typical of the class's claims because they arise from the same course of systemic, discriminatory conduct by Defendant resulting in unnecessary segregation of the named Plaintiffs and all class members in nursing facilities. Regardless of any individual differences among named Plaintiffs and other class members, each has experienced the same unnecessary institutionalization and sustained the same injury resulting from the same failure of Defendant to develop and implement an effective system of transition assistance.

Importantly, the named Plaintiffs in this matter, who all have physical disabilities, do not challenge the adequacy of medical treatment in nursing facilities, but rather the fact that they must remain segregated in those facilities if they want to continue to receive Medicaid-funded long-term care services to assist them with their activities of daily living.  Individual differences in their specific disabilities and care needs are therefore not relevant, and the named Plaintiffs' interests are aligned with the class.  *See also supra* at 23-25.  The named Plaintiffs and class members meet the nursing facility level-of-care standard based on their need for help with activities of daily living, which also means they meet the eligibility standard for Medicaid-funded community-based long-term care services and supports through the Medicaid-funded EPD Waiver.  Not surprisingly, the Plaintiffs would prefer to receive their long-term care services in non-institutional community settings so they can return to their communities and interact with friends and family in that setting.  Compl. ¶¶ 123-29.

The relief the named Plaintiffs seek would benefit all members of the class.  A declaration and injunction from the Court would require Defendant to accomplish the meaningful

---

E, Simhoni Decl. ¶¶ 4, 6, 10; Ex. F, Carter Decl. ¶¶ 6, 8, 13, 18; Ex. G, Collins Decl. ¶¶ 7, 9, 10; Ex. H, Goines Decl. ¶¶ 8-11; Ex. I, Gray Decl. ¶¶ 9-10, 13-14; Ex. J, Magby Decl. ¶¶ 7-9; Ex. K, Rivers Decl. ¶¶ 4, 6, 10-11.

integration of class members through outreach, assessment, capacity building, case management, and implementation of actual, timely transitions of set numbers of individuals from nursing facilities to the community.  Accordingly, the typicality requirement of Rule 23 is satisfied.

**4.      Adequacy of Representation: The named Plaintiffs and their attorneys will fairly and adequately protect the interests of the class.**

The fourth requirement of Rule 23(a) is that the representative parties must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To satisfy the requirements of Rule 23(a)(4), the interests of the class representatives must not be antagonistic to those of the remaining class members, and the representative parties, through their attorneys, must be prepared to vigorously prosecute the action.  *Kifafi*, 189 F.R.D. at 177 (citations omitted); *Meijer*, 246 F.R.D. at 302.  Consequently, the adequacy of representation requirement focuses on "concerns about the competency of class counsel and conflicts of interest."  *Falcon*, 457 U.S. at 157 n.13.

The class representatives do not have any interests antagonistic to the interests of the class.  As discussed above, the individual named Plaintiffs' circumstances and their claims and injuries are typical of those of the proposed class members.  None of the named Plaintiffs seeks personal monetary damages or other individualized relief to the exclusion of other class members.  To the contrary, the focus of this litigation is the grant of broad injunctive relief that will benefit the entire class.  No conflicts exist that could hinder the named Plaintiffs' ability to vigorously pursue the litigation on behalf of the class, and the named Plaintiffs are prepared to fairly and adequately protect the interests of the class.[17]  As named Plaintiff Roy Foreman

---

[17] *See* Ex. A, Thorpe Decl. ¶ 12; Dupree Dep. Tr. at 108:14-21, 109:17-111:1-9, 112:2-113:12-20 (attached as Exhibit LL); Ex. B, Foreman Decl. ¶ 22; Ex. Y, Foreman Dep. Tr. at 114:4-117:22; 132:4-135:2; Ex. C, McDonald Decl. ¶ 20; Ex. D, Wilkerson Decl. ¶ 11; Ex. E, Simhoni Decl. ¶ 16; Ex. F, Carter Decl. ¶ 21; Ex. G, Collins Decl. ¶ 16; Ex. H, Goines Decl. ¶ 17; Ex. I, Gray Decl. ¶ 16; Ex. J, Magby Decl. ¶ 23; Magby Dep. Tr. at 100:6-15; Ex. K, Rivers Decl. ¶ 22.

explained in response to the question of how he would represent members of the class:

> [M]ost of . . . what occurs [to] me, everybody else going through the same occurrence. . . . We talk about it among ourselves, but nobody else hears it. And this is the main part, a grown person in this place, you can't even use your own voice to get out. . . . Peoples have lost homes and cars and everything by being in here… that's what everybody complaining about. See, but the government won't do anything about that. And I mention take better control over that situation.

Ex. Y, Foreman Dep. Tr. at 133:6-134:22. Named Plaintiff Jacqualyn Thorpe responded similarly when asked about the motivation of other Plaintiffs in the case: "I assume it's for the same reason I am," which Ms. Thorpe explained is "[b]ecause I want to live on my own. I want to be back to being a normal, regular person." Ex. X, Thorpe Dep. Tr. at 109:2-10; 35:15-22. Named Plaintiff Carl Magby explained in his deposition that he is part of the lawsuit because the Defendant should not "keep people in [nursing facilities] for financial reasons or any other reasons against their will." Magby Dep. Tr. at 100:14-15 (attached as Exhibit KK).

      Similarly, named Plaintiffs' counsel are prepared to vigorously pursue the class's interests. No conflicts exist between counsel, named Plaintiffs, and the proposed class members that would compromise their ability to represent the class. Plaintiffs' attorneys are counsel with deep experience in many public interest cases and in the litigation of complex federal actions, including class actions involving disability and health programs. They are highly qualified, and their resources are more than adequate to represent the class completely:

–  AARP Foundation Litigation is an advocate in courts nationwide for the rights of people 50 and older addressing diverse legal issues. Kelly Bagby specializes in civil rights, disability rights, special education, health law, and other public interest areas, with an emphasis on litigation. Bagby Decl. ¶ 3 (attached as Exhibit U). She is presently class counsel in *Darling v. Douglas* (formerly *Cota v. Maxwell-Jolly* and *Brantley v. Maxwell-Jolly*), No. 09-CV-0148 (N.D. Cal.), a case that resulted in a settlement agreement to protect Medi-Cal beneficiaries from unnecessary institutionalization in nursing facilities

because of State cuts to their community-based services.  Ex. U ¶ 3.

- University Legal Services ("ULS") is the designated protection and advocacy program for the District of Columbia that represents people with disabilities to promote their civil rights and ensure their access to quality services and supports in the most integrated settings appropriate to their needs.  Rifkin Decl. ¶¶ 1-2 (attached as Exhibit V).  Marjorie Rifkin is a Managing Attorney at ULS, where she has worked since 1999.  *Id.* ¶ 1.  During her time at ULS and prior to coming to ULS, Ms. Rifkin has litigated many complex civil rights cases, most of which were class actions, including *Young v. District of Columbia*, Case No. 01-CV-0650 (D.D.C.), a class action resulting in a consent order that addresses the failure of the District of Columbia's Housing Authority to have sufficient numbers of accessible housing units.  Ex. V ¶ 6.  Jennifer Lav is a Managing Attorney at ULS who has worked on many civil rights cases in federal court, both while at ULS and while with the Alabama Disabilities Advocacy Program.  *Id.* ¶¶ 13, 19.  Victoria Thomas has extensive disability experience and a great deal of legal experience.  *Id.* ¶ 25.  Lyndsay Niles also has extensive disability experience, specifically in the *Olmstead* context and federal class action litigation.  *Id.* ¶¶ 33-34.

- Arent Fox LLP is a law firm headquartered in Washington, D.C., and has served as class counsel in many large discrimination class action cases.  Wahl Decl. ¶ 2 (attached as Exhibit W).  Barbara Wahl has been a partner in the Commercial Litigation practice group at Arent Fox since 1987.  *Id.* ¶ 3.  She has served as class counsel in many class action cases, including *Love v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009).  Ex. W ¶ 4.  Brian D. Schneider is an associate at Arent Fox with significant experience in complex civil litigation before state and federal courts.  *Id.* ¶ 5.  He focuses on cases affecting the health care industry.  *Id.*  Alison Lima Andersen also is an associate at Arent Fox with significant class action and complex litigation experience.  *Id.* ¶ 6.

Plaintiffs thus are ready to pursue the class's claims, and their counsel are prepared to support

that objective.  The adequacy of representation requirement is plainly met.

> ### B.  Rule 23(b)(2) is Satisfied Because Defendant Acted on Grounds Generally Applicable to the Class, Making Final Injunctive and Declaratory Relief Appropriate.

Plaintiffs easily satisfy Rule 23(b)(2)'s requirement that "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief

or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ.

P. 23(b)(2); *see also Disability Rights Council*, 239 F.R.D. at 28 (Rule 23(b)(2) satisfied when

"(1) the defendant's action or refusal to act [is] generally applicable to the class; and (2)

plaintiffs must seek final injunctive relief or corresponding declaratory relief on behalf of the class."); 7A Wright, Miller & Kane § 1775 (same).  The key to a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 131 S. Ct. at 2557 (internal quotation marks and citation omitted).  Civil rights cases against parties charged with class-based discrimination are "prime examples" of appropriate actions under Rule 23(b)(2).  *Wal-Mart*, 131 S. Ct. at 2557 (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997)); *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) (Rule 23(b)(2) certification is "particularly well-suited for civil rights actions where 'a party is charged with discriminating unlawfully against a class.'") (quoting Fed. R. Civ. P. 23(b)(2) Advisory Comm. Notes).

This case fits precisely within Rule 23(b)(2) because Defendant's insufficient *Olmstead* policies and practices affect all members of the class, Plaintiffs seek only declaratory and injunctive relief, and remediation of Defendant's violations of federal law will apply to all class members.  Unlike in *DL*, where a variety of injunctions would be required to remedy distinct harms suffered by distinct groups, in this case "a single injunction or declaratory judgment would provide relief to each member of the class."  *DL*, 2013 WL 1489471, at *4 (quoting *Wal-Mart*, 131 S. Ct. at 2557).  Every piece of relief requested by Plaintiffs would apply to each member of the class.

Furthermore, the injunctive relief in this case would apply to all class members and would not require the Court to make individualized determinations.  Plaintiffs seek "specific classwide operational action to comply with the integration mandate."  *Lane*, 283 F.R.D. at 601.  While class members may require varying levels of existing community long-term care services,

Plaintiffs' requested injunctive relief will afford all class members the transitional services they need to *access* these existing services.  Class-wide issues thus predominate, and Rule 23(b)(2) is satisfied.

### C.  The Court Should Designate Plaintiffs' Counsel as Class Counsel.

Upon certifying the class, the Court also must appoint class counsel.  Fed. R. Civ. P. 23(c)(1)(B), (g).  The Federal Rules list four factors a court must consider in appointing class counsel:  "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  Pursuant to these four factors, Plaintiffs' counsel qualify for appointment in this case.  As demonstrated through the course of this litigation to date, Plaintiffs' counsel have committed extensive time and resources to investigating and analyzing Plaintiffs' claims.  They are experienced in class actions and complex litigation, and they have extensive knowledge of discrimination, disability, and benefits law.  *See* Ex. U; Ex. V; Ex. W.  The Court thus should appoint Plaintiffs' counsel as class counsel in its class certification order.

## IV.  CONCLUSION

Hundreds, if not thousands, of individuals with disabilities, including the named Plaintiffs and those in the proposed class, are stuck in nursing facilities due to the District's discriminatory practices.  Plaintiffs are anxious to move forward, together.  Plaintiffs thus respectfully request this Court:

> a.  Certify this case as a Rule 23(b)(2) class action; and

> b.  Appoint Plaintiffs' counsel to serve as class counsel.

An oral hearing is requested.

Dated:  May 6, 2013

Respectfully submitted,

_____/s/ Brian D. Schneider_____
Marjorie Rifkin, D.C. Bar No. 437076
Jennifer Lav, D.C. Bar No. 499293
Victoria Thomas, D.C. Bar No. 1001027
Lyndsay Niles, D.C. Bar No. 1003427
mrifkin@uls-dc.org, jlav@uls-dc.org,
vthomas@uls-dc.org, lniles@uls-dc.org
University Legal Services–Protection &
Advocacy
220 I Street, NE #130
Washington, DC 20002
(202) 547-0198 ext. 128
Fax: (202) 547-2662

Kelly Bagby, D.C. Bar No. 462390
Kbagby@aarp.org
AARP Foundation Litigation
601 E Street, NW
Washington, DC 20049
(202) 434-2060
Fax: (202) 434-6424

Barbara Wahl, D.C. Bar No. 297978
Brian D. Schneider, D.C. Bar No. 983171
Alison Lima Andersen, D.C. Bar No. 997260
barbara.wahl@arentfox.com
brian.schneider@arentfox.com
alison.andersen@arentfox.com
Arent Fox LLP
1717 K Street, NW
Washington, DC  20036-5339
(202) 857-6000
Fax: (202) 857-6395

*Counsel for Plaintiffs*

38