UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
JACQUALYN THORPE, *et al*.                  )
                                            )
            Plaintiffs,                     )          Civil Action No. 10-2250 (ESH)
                                            )
      v.                                    )
                                            )
THE DISTRICT OF COLUMBIA,                   )
                                            )
            Defendant.                      )
_____)

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**RENEWED MOTION FOR CLASS CERTIFICATION**

**PRELIMINARY STATEMENT**

Nearly two-and-a-half years after commencing this litigation, Plaintiffs move the Court—for a second time—to certify a class consisting of as many as 2,900 nursing facility residents who they allege have been injured as a result of the District's purported failure to create "an effectively working system" to integrate them into the local community.  Plaintiffs' Renewed Motion for Class Certification ("Motion" or "Mot."), at 23.  In their Third Amended Complaint ("TAC"), Plaintiffs seek a multi-part injunction compelling the District to, *inter alia,* create a "working system" to assist nursing facility residents to access "all appropriate resources available in the community," and "[s]uccessfully transition" specified minimum numbers of putative class members into community-based settings over a four-year period.  *See* TAC, Request for Relief.  Plaintiffs also seek to impose specific and distinct programmatic and reporting requirements with respect to each of the above functions.  *Id.*

Yet, despite having had a full opportunity to take discovery with respect to their claims, Plaintiffs still are unable to articulate a class capable of certification or even identify a "uniform

policy or practice" that allegedly is responsible for a class-wide injury.  Plaintiffs appear to believe that the mere repetition of the buzz words "systemic," and "policies and practices" serve as a talisman to magically transform the individualized needs of the putative class members and the disparate programs available to them into a single cohesive claim capable of class-wide resolution. Controlling case law, however, makes clear that Plaintiffs' claims—which are inherently individualized—are inappropriate for class certification. *See Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011); *DL v. District of District of Columbia*, --- F.3d ---, 2013 WL 1489471 (D.C. Cir. April 12, 2013).

Discovery has revealed that even the named Plaintiffs view the lack of affordable housing— and not the District's administration of its Medicaid program—as the primary obstacle preventing them from moving out of their nursing facilities.  Due to this fact, Plaintiffs cannot demonstrate that the provision of the "transition assistance" they purport to seek will actually remedy their allegedly "unjustified" isolation in nursing facilities.  For these reasons, and as discussed more fully below, Plaintiffs Motion should be denied with prejudice.

## FACTUAL BACKGROUND

### A.    Background Concerning the District's Medicaid Program

The District's Medicaid program, which is locally administered by the Department of Health Care Finance ("DHCF"), provides health care coverage to more than 200,000 low-income residents—nearly one third of the District's entire population.[1]  This program covers a variety of medical care services to a variety of vulnerable populations, including children, pregnant women,

---

[1] DEP'T OF HEALTH CARE FIN., FY 2013 PERFORMANCE PLAN, at 1 (Mar. 2013), available at http://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DHCF13.pdf (last visited May 8, 2013).

the elderly, and individuals with disabilities.[2]  In general, an individual qualifies for services under

the District's Medicaid State Plan if she is aged 65 or over, or an individual with a disability, and

(i) her income does not exceed 100% of the Federal Poverty Line; (ii) her assets do not exceed

$4000; (iii) she is a resident of the District; and (iv) she is a U.S. citizen, or an eligible non-citizen.[3]

i.      *Nursing Facilities*

Pursuant to federal law, the District's Medicaid State Plan is required to reimburse long-

term medical care provided in a nursing facility.  *See* 42 U.S.C. §§ 1396a(a)(10)(A); 1396d(a)(4).

In order to qualify for long-term care services in a nursing facility under DC Medicaid, a

beneficiary must meet a minimum "level of care" based on an assessment of his or her functional

limitations in five "basic activities of daily living" ("BADLs") – bathing, dressing, mobility, eating,

and toilet use – and five "instrumental activities of daily living" ("IADLs") – medication

management, meal preparation, housekeeping, money management and telephone use.  To satisfy

the requisite "level of care" for nursing facility services, an individual must require "extensive

assistance" or "total dependence" with at least 2 of the 5 BADLs, or require "supervision" or

"limited assistance" with at least 2 of the 5 BADLs and "extensive assistance, total dependence,

supervision, or limited assistance" with 3 of the 5 IADLs.  Ex. 1 [Iscandari Tr.], at 27:19-28:20.

In the District, inpatient long-term care services are provided through privately-owned and

operated nursing facilities, and, in a few cases, nursing facilities that are owned by the District and

operated by a private management company.  TAC ¶ 110.  There are a total of 2774 licensed beds in

---

[2]*See generally* DEP'T OF HEALTH CARE FIN., MEDICAID & ALLIANCE FACT SHEET (June 6, 2012), available at: http://dhcf.dc.gov/sites/default/files/dc/sites/dhcf/publication/attachments/ DCMedicaidAllianceFactSheet.pdf (last visited June 4, 2013).

[3] DEP'T OF HEALTH CARE FIN., MEDICAID & ALLIANCE FACT SHEET (June 6, 2012), available at: http://dhcf.dc.gov/sites/default/files/dc/sites/dhcf/publication/attachments/DCMedicaidAllianceFactSheet.pdf (last visited May 30, 2013).

19 nursing facilities[4] in the District of Columbia.  TAC ¶ 111; Ex. 2 [DC Interrog. Res.], at 15.

Although the population of DC Medicaid beneficiaries in nursing facilities fluctuates over time,

District Medicaid claims data show the following numbers of individuals with a paid, non-zero

nursing facility claim with the following specific dates of service:

| Date of Service | Number of Individuals |
| --- | --- |
| January 1, 2010 | 2,212 |
| January 1, 2011 | 2,345 |
| January 1, 2012 | 2,334 |

Ex. 2 [DC Interrog. Res.], at 15.

    *ii.*       *Medicaid State Plan Home- and Community-Based Services*

       In addition to inpatient long-term care services, the District's Medicaid State Plan also

covers certain long-term care services in home- and community-based settings ("HCBS"), including

personal care aide services and home health services.[5]  The personal care assistance ("PCA")

benefit of the Medicaid State Plan covers an in-home aide for up to 8 hours per day and 1040 hours

per year to assist the beneficiary with activities of daily living.  Ex. 1 [Iscandari Tr.], at 53:14-54:4;

55:7-13; TAC ¶ 115.  The PCA benefit is available to all Medicaid beneficiaries who have extensive

need for assistance with at least one activity of daily living, such as bathing, dressing, and preparing

meals.  *Id.* at 53:17-54:4.

---

[4] These nursing facilities are:  Capitol Hill Nursing Center, Carroll Manor Nursing and Rehabilitation Center, Deanwood Rehabilitation and Wellness Center, Specialty Hospital of Washington – Hadley, Carolyn Boone Lewis Health Care Center, Jeanne Jugan Residence, Knollwood, Lisner Louise, Ingleside Presbyterian, Rock Creek Manor, Sibley Memorial Hospital SNF, Stoddard Baptist, Methodist Home of District of Columbia, The Washington Home, Health and Rehabilitation Center at Thomas Circle, Washington Center for Aging Services, Washington Nursing Facility, Unique Residential Care Center, and United Medical Nursing Center.

[5] *See generally* DEP'T OF HEALTH CARE FIN., DC MEDICAID FEE-FOR-SERVICE HANDBOOK, at 20 (Aug. 31, 2012) ("Medicaid Handbook"), available at: http://dhcf.dc.gov/sites/default/files/dc/sites/ dhcf/publication/attachments/DHCF%20FFS%20Medicaid%20Version%2013_red.pdf (lasted visited May 30, 2013).

The home health services covered by the Medicaid State Plan allow beneficiaries to receive in-home services provided by skilled health professionals and unskilled home health aides. Such services may include, for example, wound care, oxygen therapy, or speech and physical therapy. *See* Medicaid Handbook, at 20. The home health services covered by the Medicaid State Plan are limited to 4 hours per visit, and 36 visits per year without prior authorization from DHCF.[6]

iii.     *Medicaid Waiver for the Elderly and Individuals with Physical Disabilities*

In addition to the Medicaid State Plan, the District funds home- and community-based long-term care services through its Medicaid waiver for the Elderly and Individuals with Physical Disabilities ("EPD Waiver"). The EPD Waiver is designed to fund HCBS to individuals who have a "level of care" that would qualify them for services in a nursing facility. Ex. 1 [Iscandari Tr.], at 27:19-28:20. The EPD Waiver funds services not only for nursing facility residents seeking to live in the community, but also for individuals in the community seeking to avoid entering a nursing facility in the first place.

An individual is eligible to participate in the EPD Waiver if he or she: (i) is at least 65 years of age, or an adult between the ages of 18 and 64 with a physical disability; (ii) meets the functional equivalent of a nursing facility level of care; (iii) is Medicaid eligible with a maximum monthly income of 300% of Supplemental Security Income (SSI); and (iv) is not an inpatient of a hospital, nursing facility, or intermediate care facility for the mentally retarded. Doc. No. 61-2 [EPD Waiver Application], at 32.

The services funded through the EPD Waiver include case management, homemaker services, personal care aides, respite care, environmental accessibility and adaptation services, personal emergency response system services, assisted living services, participant directed goods

---

[6] *See* DC Medicaid State Plan, Supplement 1 to Attachment 3.1A, at 9-10, available at
http://dhcf.dc.gov/sites/default/files/dc/sites/dhcf/publication/attachments/DHCFStatePlanAttach3-1aSup1_0.pdf (last visited May 30, 2013).

and services, participant directed personal care services, and chore aide services. *Id.* App., C-1. The personal care aide services covered by the EPD Waiver are limited to 16 hours per day.   TAC ¶ 115; Doc. No. 61-2 [EPD Waiver Application], App., C-1.  In addition, the EPD Waiver, like the Medicaid State Plan, does not pay for a beneficiary's housing in the community.  *See* 42 CFR § 441.301(a)(2); Doc. No. 61-2 [EPD Waiver Application], at 7.

*                      *                      *

The home- and community-based services funded by the District through its Medicaid State Plan and the EPD Waiver are accessible by individuals in nursing facilities.  Indeed, an analysis of the District's Medicaid Management Information System ("MMIS") data indicates that, between 2010 and 2012, a **total of 328** D.C. Medicaid beneficiaries discharged from nursing facilities and began receiving community-based long-term care services in the community funded by the Medicaid State Plan and/or the EPD Waiver.  *See* Ex. 3 [D.C. Supp. Interrog. Response], Response No. 11, Supp. Ex. 1.  These figures represent nursing facility residents who transitioned to less restrictive settings independently, or with the assistance of either privately-employed nursing home staff, District employees, their family or friends, or some combination across these groups.

In addition, DHCF has contacted Plaintiffs Jacqualyn Thorpe, Larry McDonald, Roy Foreman, Lavonia Carter, Winifred Goines, Denise Rivers, Robert Collins, and Carl Magby to inform each of them of an available slot in the EPD Waiver program.  Ex. 4 [Iscandari Decl.] ¶¶ 7-8.  To date, Lavonia Carter is the only one of these individuals to have contacted DHCF to begin the waiver enrollment process.  *Id.*

**B.**     **The District's Intra-Agency Efforts to Assist Nursing Home Residents Access Community-Based Services**

There is not a *single* agency or department with exclusive responsibility over the District's efforts to assist nursing facility residents access the community-based long-term care services

described above. Ex. 5 [Teasdell 30(b)(6) Tr.], at 14:7-15:15.  Rather, the District has multiple

programs, implemented by DHCF, the District's Office on Aging ("DCOA"), and the Department

of Mental Health ("DMH"), to actively assist nursing facility residents access community-based

long-term care services. These programs include the District's Money Follows the Person ("MFP")

Demonstration, DCOA's Aging and Disability Resource Center ("ADRC"), and DMH's Division of

Integrated Care.[7]

### i.    Money Follows the Person

The MFP Demonstration, which is jointly administered pursuant to a Memorandum of

Understanding between DHCF and DCOA, is specifically designed to facilitate the transition of

eligible nursing facility residents from institutional to community-based settings. Doc. 19-3 [Sarigol

Aff.] ¶¶ 4-5; Doc. 19-8 [MFP Operational Protocol ("MFP OP")], at 3.  To date, MFP has assisted

43 nursing facility residents in successfully transitioning to community-based settings.  Ex. 6

[Sarigol Decl.] ¶ 25.  Of these, a total of 19 have successfully transitioned since August 2012.  *Id.* ¶

24.

No single District agency is tasked with the responsibility for the implementation of the

MFP demonstration. Ex. 7 [Sarigol 30(b)(6) Tr.], at 13:9-15.  Rather, implementation of the MFP

demonstration is a "collaborative effort" between DHCF, DCOA, and DMH, based upon "the

resident who is transitioning and the services that [are] needed to transition that person."  *Id.* at

18:7-19:18.

---

[7] Indeed, the District has chosen to improve its transition program by assigning specific responsibilities to a number of municipal agencies.  First, DHCF is a stand-alone agency with the legal responsibility to administer the Medicaid program and to determine eligibility.  MFP, a Medicaid program, is also managed by DHCF in conjunction with DCOA/ADRC.  Other agencies, such as ADRC and DMH, are appropriately positioned—depending on the specific medical and health needs of the individual—to assist in transitioning nursing facility residents to home and community-based care.

MFP staff includes two full-time "Transition Coordinators," who are staffed at DHCF and are solely responsible for assisting eligible nursing facility residents identify and procure the services necessary to allow them to live in the community.  *Id.* at 22:1-23:19; Doc. 19-3 [Sarigol Aff.] ¶ 14; Doc. No. 61-4 [Sarigol Decl.] ¶ 7.  In addition, the MFP program funds a participant's first year of home- and community-based services, as well as a one-time transition service payment of up to $5,000 to purchase furniture, cooking utensils, and other items essential to living in the community, and to cover moving expenses.  Doc. 19-3 [Sarigol Aff.] ¶ 19.  MFP does not pay for a participant's housing in the community.  Doc. 19-3 [Sarigol Aff.] ¶ 19.

To qualify for participation in MFP, an individual must meet the financial and clinical eligibility requirements for the EPD Waiver and have been institutionalized for a minimum of 90 days.  Doc. 19-8 [MFP OP], at 35.  In order to identify potential MFP participants, the MFP Community Outreach Specialist—which is a full-time position staffed at DCOA—visits nursing facilities to conduct information sessions and conduct initial eligibility screenings for all interested residents.  *See* Doc. No. 61-4 [Sarigol Decl.] ¶¶ 11a-f.  If a nursing facility resident is not eligible for MFP, they are referred to the ADRC for further assistance.  Ex. 7 [Sarigol 30(b)(6) Tr.], at 77:8-12.

In 2012, MFP conducted at least one information session at each of the nursing facilities in the District with Medicaid beneficiaries.  Ex. 8 [Sarigol Tr.], at 76:20-77:14.  As a result of this outreach, MFP staff screened a total of 354 DC residents residing in nursing facilities.  Ex. 2 [DC Interrog. Res.], at 5.  Of these individuals, 132 were preliminary determined to be eligible for MFP, and 124 were determined to be ineligible for MFP and were referred to the DCOA for further assistance.  *Id.*  Further, of the 355 nursing facility residents screened by MFP as of January 30, 2013, 297—or 83%--reported needing subsidized housing in order to transition.  *Id.* at 7 & n. 1.

Currently, the District's MFP Demonstration has funding capacity to support the participation of 40 nursing facility residents on an annual basis. Doc. 19-8 [MFP OP], at 3.  As MFP does not pay for a participant's housing, in August 2012, MFP began transition coordination for all MFP-eligible nursing home residents who already had an identified home address in the community.  Ex. 6 [Sarigol Decl.] ¶ 4.  In addition, on March 1, 2013, MFP held a "lottery" to select 40 MFP-eligible nursing facility residents who do not have an identified housing option in the community to participate in the demonstration with the assistance of housing subsidies. *Id.* ¶ 5.  Thirty (30) of the individuals selected in the March "lottery" will be assigned a Housing Choice Voucher, which previously had been allocated for use by MFP.  These subsidies represent all of the remaining housing subsidies that are set aside for potential MFP participants.  *Id.*  MFP will assist the remaining ten (10) individuals selected obtain a public housing unit through the District of Columbia Housing Authority ("DCHA").  *Id.*

A total of 130 nursing facility residents participated in the March 2013 MFP "lottery," including Plaintiffs Jacqualyn Thorpe, Lavondia Carter, Robert Collins, Winifred Goines, Carl Magby, and Denise Rivers.  *Id.* ¶ 6.  Plaintiffs Lavondia Carter and Winifred Goines were each selected in this "lottery" to participate in MFP and receive available subsidized housing assistance. *Id.* ¶ 9.  The 91 nursing facility residents who were not selected in the MFP "lottery" have been referred to the ADRC for further assistance.  *Id.* ¶ 8.

### ii.    DCOA/ADRC

In addition to MFP, in April 2013, DCOA hired 5 full-time Transition Care Specialists who are staffed at ADRC and are tasked exclusively with assisting nursing facility residents transition to community-based settings.  Ex. 9 [Teasdell Decl.] ¶ 4.  DCOA additionally hired another full-time employee to supervise the new transition coordinators, and another full-time employee as support staff.  *Id.* ¶ 5.  Specifically, these Transition Care Specialists are tasked with assisting nursing

facility residents transition to less restrictive settings, regardless of whether they qualify for benefits through the EPD Waiver or the Medicaid State Plan. *Id.* ¶ 6. Since this new staff was hired in April 2013, they have successfully transitioned 11 nursing facility residents to community-based settings. *Id.* ¶ 7.

### iii. DMH Division of Integrated Care

DMH's Division of Integrated Care is responsible for ensuring that DMH consumers—including nursing facility residents—are being served in least restrictive setting appropriate to their needs.[8] This includes assisting individuals with serious, persistent mental illnesses move from institutional setting, including nursing homes, to community-based settings. Ex. 10 [Berhow Decl.] ¶ 6.

Notwithstanding ADRC's role in initiating the process, the Division of Integrated Care is actively involved in assisting discharge efforts for individuals with serious and persistent mental illnesses. *Id.* ¶ 7. There is no bright-line method for determining the degree of the Division of Integrated Care's role in effectuating the discharge of a nursing home resident with a serious and persistent mental illness, as it varies depending on the individual resident's particularized needs, and the degree to which the individual's mental health needs predominate over her physical disabilities. *Id.* ¶¶ 10-12.

In FY 2012, the Division of Integrated Care assisted 8 nursing facility residents transition to less restrictive settings. *Id.* ¶ 13. Since October 1, 2012, the Division of Integrated Care assisted 4 nursing facility residents transition to less restrictive settings. *Id.* In addition, the Division of

---

[8] As discussed below and in the District's Motion to Dismiss the Third Amended Complaint, Plaintiffs' proposed class definition includes individuals with serious and persistent mental illnesses despite the Court's explicit instruction to exclude from the proposed class individuals who receive transitional assistance through DMH. Jan. 7, 2013 Hearing Tr., at 86:6-89:19; 93:21-94:20. Although the District does not believe that DMH consumers may be part of the class in this matter, they are addressed here in light of the class definition proposed by Plaintiffs.

Integrated Care is currently working with 6 nursing facility residents with serious and persistent mental illness to assist them with their transition to a less restrictive setting. *Id.* ¶ 14.

### iv.   "Transition Assistance"

There is no formal definition of the term "transition assistance" as Plaintiffs use it in their class definition.  As described above, however, District employees are available, depending on the individual's particularized needs, to assist nursing facility residents plan a discharge to a less restrictive setting.  These employees are staffed either at DHCF, DCOA/ADRC, or DMH.

### LEGAL BACKGROUND

### A.   Statutory and Regulatory Background

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is one who "with or without reasonable modifications to rules, policies, or practices . . .  meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  The term "public entity" is defined to include "any State or local government," as well as "any department, agency, special purpose district or other instrumentality of a State . . . or local government."  42 U.S.C. § 12131(1)(a)(A),(B).

Further, the regulations implementing Title II of the ADA provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), which is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible," 28 C.F.R. pt. 35, App. B.  This so-called "integration mandate," however, is not

unqualified.  A public entity is required only to make "reasonable modifications" to avoid unduly

segregating the disabled, and it nevertheless is relieved of this obligation, once the modification is

shown to be reasonable and necessary to avoid discrimination, if the entity can show "that making

the modifications would fundamentally alter the nature of the service, program, or activity." 28

C.F.R. § 35.130(b)(7); *see also Martin v. Taft*, 222 F. Supp. 2d 940, 972 n.26 (S.D. Ohio 2002)

(explaining applicable burden shifts).

Similarly, section 504 of the Rehabilitation Act, which applies to programs receiving federal

financial assistance, contains a similar anti-discrimination provision, 29 U.S.C. § 794(a), and a

parallel regulation requiring that recipients "administer programs and activities in the most

integrated setting appropriate."  28 C.F.R. § 41.51(d).  Consistent with the ADA's regulatory

scheme, the regulations implementing the Rehabilitation Act provide that a recipient of federal

funding need not accommodate a disabled person when the proposed accommodation would impose

an "undue hardship" on the recipient. 28 C.F.R. §§ 41.53, 42.511(c).

**B.**     ***Olmstead v. L.C. ex rel. Zimring***

In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court answered "a qualified yes" to the

question of whether the "integration mandate" of the ADA[9] "may require placement of persons with

mental disabilities in community settings rather than in institutions."  527 U.S. 581, 587 (1999).

Specifically, the Court found that the ADA required community placement where:  (i) the State's

treatment professionals have determined that community placement is appropriate; (ii) the affected

individual desires placement in a less restrictive setting; and (iii) the placement can be reasonably

accommodated, taking into account the resources available to the State and the needs of others with

disabilities.  *Id.*

---

[9] Generally, courts have found that the Rehabilitation Act is "similar in substance" to the ADA and, therefore, "cases interpreting either are applicable and interchangeable." *The Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1262 n.2 (D.C. Cir. 2008).

In so holding, the Court emphasized that a State's obligation under the antidiscrimination provisions of Title II of the ADA is limited to *existing* programs and services. *See id.* at 602 (noting that in the absence of an individual's qualification for a community-based program, it would be "inappropriate to remove a patient from the more restrictive setting"); *id*. at 603 n.14 (emphasizing that Court's holding is limited "with regard to the services that [States] in fact provide"); *see also id.* at 613 (Kennedy, J., concurring) ("It follows that a State may not be forced to create a community-treatment program where none exists." ).

In addition, the Court explicitly refused to hold that "the ADA imposes on the States a standard of care for what medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." *Id.* Accordingly, federal courts have held that an *Olmstead* claim can survive "only if it truly alleges a 'discriminatory denial of services' and must be dismissed if it instead concerns the 'adequacy' of the services provided." *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1207 (D. Or. 2012); *see also Buchanan v. Maine*, 469 F.3d 158, 174-75 (1st Cir. 2006) (holding that plaintiff failed to state a claim under the ADA or *Olmstead* where he asserted that the services he was provided by the State were inadequate to "assist him to understand and to obtain the help he needed to continue to live with some independence and dignity in the community"); *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999) ("*Olmstead* reaffirms that the ADA does not mandate the provision of new benefits.").

Further, the Court stressed that a determination as to whether a community placement constitutes a *reasonable* accommodation must be made in consideration of the State's "need to maintain a range of facilities for the care and treatment of persons with diverse [ ] disabilities, and the States' obligation to administer services with an even hand." *Id.* at 597. Consequently, the Court observed that one way a State could establish a "fundamental alteration defense" was by

demonstrating that "it had a comprehensive, effectively working plan for placing qualified persons

with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace

not controlled by the State's endeavors to keep its institutions fully populated." *Id*. at 605-06.

### LEGAL STANDARD GOVERNING CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation

marks omitted). Courts should proceed carefully before certifying a class under Rule 23, and this

Court must deny a certification motion that does not meet the rule's legal requirements. As a

threshold matter, courts within this Circuit have recognized that the class definition must be

sufficiently definite for the Court to easily determine the membership of the class. *See, e.g.*, *Pigford

v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998). Further, to meet Rule 23's requirements, the

movant must demonstrate that: (1) there are questions of law or fact common to the class; (2) the

claims of and defenses applicable to the putative representatives are typical of the class; (3) the

named plaintiffs and their counsel will adequately represent the interests of the class; and (4) the

class is so numerous that joinder of all members would be impracticable; Fed. R. Civ. P. 23(a).

Additionally, the movant must further demonstrate that they satisfy one of the three types of classes

set forth in Rule 23(b).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 131 S. Ct. at 2551.

Named plaintiffs at all times retain the burden of showing compliance; "actual, not presumed,

conformance with Rule 23(a) remains . . . indispensable." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147,

160 (1982). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,

that the prerequisites of Rule 23(a) have been satisfied.'" *Wal-Mart*, 131 S. Ct. at 2551 (quoting

*Falcon*).  A district court has broad discretion to decide whether the party moving for class certification has carried its burden.  *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994).

## ARGUMENT

### I.    Plaintiffs' Proposed Class Definition Is Fundamentally Flawed

As discussed in the District's Motion to Dismiss the Third Amended Complaint (Doc. No. 99, the "MTD"), which currently is pending before the Court, Plaintiffs' proposed class definition is fatally defective because the members of the class are not readily ascertainable and is overly broad to the extent it includes DMH consumers and individuals without identified housing in the community.  MTD, at 7-13.  In the interest of avoiding duplication, the District respectfully refers the Court to its Motion to Dismiss for a full discussion of these points and incorporates them herein by reference.

### II.   Plaintiffs Have Failed to Demonstrate Commonality Because They Have Not Identified A Single Uniform Policy or Practice That Allegedly Is Responsible For A Class-Wide Injury

As the D.C. Circuit has recognized, the Supreme Court's decision in *Wal-Mart* "changed the landscape" with respect to analyzing Rule 23(a)(2) commonality.[10]  *DL v. District of Columbia*, --- F.3d ---, 2013 WL 1489471, at *5 (D.C. Cir. April 12, 2013).  To establish "commonality" in light of *Wal-Mart*, a party seeking class certification must demonstrate that "the class members 'have suffered the same injury.'"  *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157).  But a named Plaintiff does not so demonstrate merely by showing that class members "have all suffered a violation of the same provision of law."  *Id.*  Instead, all class members suffer the same injury for purposes of Rule 23(a) only if their claims turn on a common contention "of such a nature that it is

---

[10] Plaintiffs' inexplicable assertion that "[t]he Supreme Court's *Wal-Mart* decision, and the more recent D.C. Circuit opinion in *DL*, do not alter the analysis" (Motion, at 17) with respect to class certification is meritless on its face, and should be disregarded.

capable of classwide resolution—which means that *determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke*." *Id.* (emphasis added). That is because "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original)). "Without some glue holding the alleged *reasons* for [the challenged decisions] together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 2552.

"Mere allegations of systemic violations of the law, however, will not automatically satisfy Rule 23(a)'s commonality requirement; a discrete legal or factual question common to the class must exist." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010). *See also Reinholdson v. State of Minn.*, No. 02 Civ. 795, 2002 WL 31026580, at *8 (D. Minn. Sept. 9, 2002) (noting that "the reciting of the word 'systemic' in mantra-like fashion . . . does not overcome the prerequisites of class certification"). Rather, as the D.C. Circuit has recognized, to establish commonality in keeping with *Wal-Mart*, plaintiffs must identify a "uniform policy or practice that affects all class members." *DL*, 2013 WL 1489471, at *6. Moreover, Plaintiffs cannot establish commonality by alleging injuries to class members based on "multiple, disparate failures" to comply with the law, rather than "a truly systemic policy or practice which affects them all." *Id.* at *6 (quoting *Jamie S. v. Milwaukee Public Schs.*, 668 F.3d 481, 504-05 (7th Cir. 2012)).

In *DL v. District of Columbia*—the case that should control the Court's analysis here—

plaintiffs alleged that the District had failed to implement an effective "Child Find" system to identify, locate, evaluate, and offer special education and related services to disabled preschool-age children.  As a result, plaintiffs alleged that they, and a class of similarly situated individuals, were denied a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA").  Plaintiffs sought systemic injunctive relief compelling the District to "develop and implement adequate and effective policies and procedures and a practical method of identifying, locating and evaluating plaintiffs for special education and related services."  *DL,* 2013 WL 1489471, at *2.

The District Court granted plaintiffs' motion for class certification, finding Rule 23(a) commonality satisfied because "plaintiffs . . . have a common injury, namely the denial of a FAPE under the IDEA," and all "allege that defendants have violated the Child Find requirement."  *Id.* at *2.  The District Court found that the "glue" binding together the various reasons why individuals class members were denied a FAPE to be the "systemic failure" within the District's education system, stating that the "[p]laintiffs presented credible evidence of [the District's] ineffective policies and practices, which persisted for years without leading to any significant increase in the number of preschool-age children receiving a FAPE."  *Id.* at *3.

A three-judge panel of the D.C. Circuit unanimously vacated the class certification order, finding that the alleged "systemic failures" of the District were insufficient to establish commonality "[i]n the absence of identification of a policy or practice that affects all members of the class in the manner *Wal-Mart* requires."  *Id.* at *5.  The Court explained that:

> [a]fter *Wal-Mart* it is clear that defining the class by reference to the District's pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members "have all suffered a violation of the same provision of law," which the Supreme Court has now instructed is insufficient to

establish commonality given that the same provision of law "can be violated in many different ways." *Wal-Mart*, 131 S.Ct. at 2551.

*Id.* at 5.

The Court reasoned that the harms alleged by the plaintiffs involved "different policies and practices at different stages of the District's Child Find and FAPE process," and that "*Wal-Mart* instructs that holding that the District has violated the IDEA as to each class member is not enough to establish Rule 23(a) commonality in the absence of a uniform policy or practice that affects all class members." *Id.* at *6.

Here, like in *DL*, Plaintiffs cannot establish Rule 23(a) commonality because they have failed to identify a uniform policy or practice that is responsible for an injury common to the class. Plaintiffs contend vaguely that the "glue" holding their claims together is the District's "singular failure to provide an effectively working system to integrate nursing facility residents into the local community." Motion, at 23. This assertion, however, is far too broad to satisfy Rule 23(a) commonality, as it amounts, at best, to nothing more than an allegation that class members "have all suffered a violation of the same provision of law"—namely, the "integration mandate" of the Americans with Disabilities Act. *See Wal-Mart*, 131 S. Ct. at 2551; *DL*, 2013 WL 1489471, at *5.[11]

Similar to the "Child Find" and FAPE process at issue in *DL*, the District's deinstitutionalization efforts with respect to the nursing facility population involve multiple programs (*e.g.*, MFP, ADRC, and the Division of Integrated Care) implemented by multiple agencies (*e.g.*, DHCF, DCOA, and DMH) that serve nursing facility residents with different

---

[11] Similarly, Plaintiffs' asserted "common question" of "[d]oes Defendant administer its programs and services in a manner that allows for even-handed access to community-based care for individuals with physical disabilities who currently receive care in nursing facilities" is merely a reformulation of the ultimate question of liability at issue, and is thus insufficient. *See Jamie S.*, 668 F.3d at 497 (rejecting re-formulation of "bottom-line liability question in any individual plaintiff's [ ] claim" as a basis to find commonality); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 81 (E.D.N.Y. 2007) ("the common issues must be expressed with a degree of particularity and specificity in order to satisfy this requirement, because at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.") (citations omitted).

disabilities in different factual settings that give rise to different obstacles to transition. *See supra*, at

7-11.  *See DL*, 2013 WL 1489471, at *4, *6.  Without the identification of a specific policy or

practice that affects all members of the class, there is simply no common contention whose

determination "will resolve an issue  . . . central to the validity of each one of the claims in one

stroke." *Wal-Mart*, 131 S. Ct. at 2551.

 Closer inspection of the deficiencies Plaintiffs allege bring the analogy to the Child Find

process at issue in *DL* into sharper focus.  As the Circuit noted, Child Find obligates the District to

identify certain special needs children, evaluate their needs, make determinations as to their

eligibility, and to transition them to appropriate pre-school programs.  *DL,* 2013 WL 1489471,

at *4.  While couched in different language, Plaintiffs' description of the "transition assistance"

they claim to need is functionally identical: they want the District to locate nursing home residents

who desire to leave; determine the home- and community-based services they would require in the

community; assess their eligibility for relevant programs; and effectuate their transition from the

nursing home to the community.  *Compare* TAC, Request for Relief *with DL*, 2013 WL 1489471, at

*4.  One important, substantive difference between this case and *DL* is that the District's obligation

to perform the Child Find functions are expressly laid out in statute.  By contrast, the District's

obligation to perform the functions Plaintiffs identify is far more ambiguous; no statute expressly

mandates that the District must identify potential candidates for HCBS or transition individuals

from nursing facilities.  *Olmstead*'s holistic focus is on a State's general provision of community-

based options.

 The legal authority cited by Plaintiffs is not sufficient to distinguish *Wal-Mart* and *DL* from

the instant matter.  For example, *Gray v. Golden Gate National Recreational Area*, 279 F.R.D. 501

(N.D. Cal. 2011), involved a Rehabilitation Act challenge by a class of individuals with visual

and/or mobility issues who alleged that they had encountered access barriers at multiple parks with the Golden Gate National Recreational Area ("GGNRA"). *Gray*, 279 F.R.D. at 504. In ruling on plaintiffs' motion for class certification, the Court explicitly recognized—as did the D.C. Circuit in *DL*—that, under *Wal-Mart*, "Plaintiffs [] need to show that the class was harmed by one or more across-the-board discriminatory practices or policies to establish commonality." *Id.* at 518; *see also id.* at 518-519 ("[E]ven in Rehabilitation Act cases, there must be evidence of some common policy or practice . . . to certify a class."). The Court found that plaintiffs had met this burden by submitting evidence of a survey report prepared by the defendant, which "*identified approximately thirty system-wide deficiencies in policies and procedures* that undergirded the failure to remove multiple barriers" that had resulted in a common injury to class members. *Id.* at 519 (emphasis added). Unlike in *Gray*, Plaintiffs have failed to identify *any* specific policy or practice of the District that has led to a class-wide injury.

Further, unlike the cases relied upon in the Motion, which are not binding upon this Court, Plaintiffs' claims are not directed toward activities that fall under the authority of a centralized District decision maker. For example, in certifying the class in *Gray*, the Court recognized there was "no dispute that overall governance of the GGNRA, including decisions affecting accessibility, is centrally controlled by the Park Superintendent." *Id.* at 519. In *Connor B. v. Patrick*, 278 F.R.D. 30 (D. Mass 2011), the Court was able to find commonality, in part, because the putative class at issue was "within the custody of a *single agency*[.]" *Connor B.*, 278 F.R.D. at 34 (emphasis added). Similarly, the class in *Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Or. 2012) alleged a discriminatory denial of certain employment services that were funded and administered by a single state agency— the Oregon Department of Human Services. *See Lane*, 283 F.R.D. at 591-92.[12] In contrast to the

---

[12] In addition, in finding class certification appropriate, the Court in *Lane* relied, in part, on the District Court's analysis in *DL*—which, of course, has now been vacated by the D.C. Circuit. *See Lane*, 283 F.R.D. at

putative classes in *Gray*, *Connor B.* and *Lane*, and as Plaintiffs explicitly note in their Motion, "[t]he District does not have a single agency, department, person, or entity with sole responsibility for providing transition assistance to nursing facility residents who are eligible for community services."  Motion, at 5.[13]

Even if an alleged "failure to implement a system of transition assistance" were sufficient to support commonality in light of *Wal-Mart* and *DL*, which it is not, the record does not support a finding that the "transition assistance" Plaintiffs have requested would remedy the alleged common injury—*i.e.*, Plaintiffs' alleged "unnecessary segregation in nursing facilities."  Motion, at 21. Indeed, rather than a lack of "transition assistance," the record demonstrates that the most prevalent obstacle preventing putative class members from leaving their nursing facilities is a lack of available, accessible, and affordable housing.  *See* Ex. 11 [Carter Tr.], at 90:17-22 (stating that locating housing is the only thing still needed to move out of the nursing facility; "[e]verything else has been taken care of"); Ex. 12 [Collins Tr.], at 44:13-45:4 (stating that the lack of housing is the only thing preventing him from moving out of the nursing facility); Ex. 13 [Dupree Tr.], at 112:6-21 (stating that, if victorious in this action, he would like the Court to "help me get a house"); Ex. 14 [Gray Interrog. Res.], at 9 ("I would like to live in my own apartment, house or other private residence but I do not have a place to go right now."); Ex. 15 [Magby Interrog. Res.], at 11 ("Right now there is nowhere I can live."); Ex. 16  [McDonald Interrog Res.], at 9 ("I do not have anywhere to live unless I get housing through my applications or MFP or ADRC."); Ex. 17 [Rivers Tr.], at 72:11-18 ("[I]f they had affordable housing for me to get back in the community, then it wouldn't be no problem."); Ex. 18 [Thorpe Tr.], at 102:17-21 (conceding that the lack of an identified place to

597.  Accordingly, for this additional reason, *Lane* does not lend support to Plaintiffs' request for class certification here.

[13] Moreover, Plaintiffs have not provided any authority suggesting that the District is required to establish such a single agency, department, person, or entity.

live is the primary reason that she is still in a nursing facility); *see also* Ex. 2 [DC Interrog. Res.], at 7 & n. 1 (83% of nursing facility residents screened by MFP in 2012 reported a need for subsidized housing); Doc. No. 61-6 [Gebreyes Decl] (explaining the waiting list for housing through DCHA).

The Court previously has recognized that *Olmstead* does not obligate the District to provide housing (*see* Doc. No. 41, [Memorandum Opinion], at 53), and Plaintiffs are not seeking housing as part of their remedy (TAC, Request for Relief).  Consequently, in the absence of additional subsidized housing, and in light of the record above, there is no basis to infer that the "transition assistance" Plaintiffs seek will, in fact, remedy their alleged "unnecessary segregation."  *See DL*, 2013 WL 1489471, at *6 ("[G]iven *Wal-Mart's* interpretation of Rule 23(a) commonality, the requested relief must respond, at least in part, to a common harm suffered as a result of a policy or practice that affects each class member.").[14]

Similarly, Plaintiffs have utterly failed to meet their burden of demonstrating a system-wide deficiency in how nursing facility residents access community-based long-term care services. Where issues of commonality overlap with the merits, the "rigorous analysis" in which a court must engage extends to an evaluation of the merits.  As the Ninth Circuit has observed:

> [T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements.

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing *Wal-Mart*, 131 S. Ct. at 2551-52) (emphasis in original); *see also Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 21-

---

[14] Plaintiffs cannot salvage commonality by asserting that their lack of identified housing is the result of the District's failure to assist them in applying for subsidized housing.  While Plaintiffs predictably point to no authority that establishes that the District must provide them with assistance in the application process, the publicly available records of the District of Columbia Housing Authority indicate that 10 of the 11 named Plaintiffs have successfully applied for subsidized housing with the DCHA.  *See* Ex. 19 [DCHA Housing Application Status].

22 (D.D.C. 2012).  Although the moving party need not prove its case at the class certification

stage, courts in this and other Circuits have held that a district court must resolve factual disputes

relevant to the requirements for class certification—even if that requires considerations enmeshed in

the factual and legal issues comprising plaintiffs' claim on the merits—applying a preponderance of

evidence standard of proof.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 22

(D.D.C. 2012); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008); *see also*

*Wal-Mart*, 131 S. Ct. at 2551-52.

     In stark contrast to the deficiencies that Plaintiffs claim based on the anecdotal evidence of

the named Plaintiffs, and a handful of putative class members, the factual record demonstrates that

the District's community-based long-term care services, in fact, are meaningfully accessible to

nursing facility residents.  *See* Ex. 3, [D.C. Supp. Interrog. Response], Response No. 11, Supp. Ex.

1 (providing the names of 328 nursing facility residents who discharged to community-based long-

term care services between 2010 and 2012); Ex. 6 [Sarigol Decl.] ¶¶ 24-25; Ex. 9 [Teasdell Decl.] ¶

7; Ex. 10 [Berhow Decl.] ¶ 13.  These results indicate that nursing facility residents are moving to

less restrictive settings at a reasonable pace.  *See Olmstead*, 527 U.S. at 606.  Moreover, the

District's EPD Waiver currently funds home- and community-based services for more than 4100

individual who have a nursing facility "level-of-care"—thus keeping such individuals out of nursing

facilities in the first place.  *See* Doc. No. 61-2 [EPD Waiver Application], at p. 28, Appendix B-

3(a)-(b).

     Additionally, contrary to Plaintiffs' unsupported conclusion that assistance from the District

is unavailable for individuals leaving nursing facilities, the record establishes that MFP, ADRC, and

DMH all have staff who assist nursing facility residents discharge to less restrictive settings. *See* Ex.

7 [Sarigol 30(b)(6) Tr.], at 22:1-23:19; Ex. 9 [Teasdell Decl.] ¶¶ 4-6; Ex 10 [Berhow Decl.] ¶¶ 8-9.

Plaintiffs' complaints that the District should provide more, better, and/or faster transition assistance do not give rise to a cognizable *Olmstead* claim. *See Buchanan*, 469 F.3d at 174-75; *Lane*, 841 F. Supp. 2d at 1207.

As Plaintiffs have failed to identify a uniform policy or practice that allegedly is responsible for a class-wide injury, or demonstrate that their requested relief will respond to a common harm, they have failed to establish Rule 23(a) commonality. Accordingly, their Motion must be dismissed.

III.   **The Named Plaintiffs Have Failed to Demonstrate That They Are Typical of the Putative Class**

Analysis of the commonality requirement often overlaps with analysis of other Rule 23(a) requirements, especially typicality. *Wal-Mart*, 131 S. Ct. at 2551 n.5. Rule 23(a)(3)'s typicality element requires that "the claims or defenses of the represented parties [be] typical of the claims and defenses of the class." Essentially, the requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart*, 131 S. Ct. at 2550. As Plaintiffs point out in the Motion, in discrimination cases, "[t]he court must consider whether the [class representatives] suffered injury from a *specific discriminatory [] practice in the same manner* that the members of the proposed class did and whether [the class representatives] and the class members were injured in the same fashion by a general policy of [] discrimination." *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 445 (D.D.C. 2002) (Huvelle, J.) (emphasis added). The Court's analysis of Rule 23 typicality "properly focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597-98 (3d Cir. 2009) (citations omitted).

      i.      *Plaintiffs have not identified a specific discriminatory practice that has injured the named Plaintiffs and the putative class in the same manner*

The analysis of commonality set forth above applies equally to typicality.  Plaintiffs assert that they are "typical" of the putative class because they have all "experienced the same unnecessary institutionalization" as a result of the "same failure of the Defendant to develop and implement an effective system of transition assistance."  Motion, at 32.  Yet, as discussed above, this assertion fails to identify any *specific practice* that allegedly has injured the named Plaintiffs and the putative class *in the same manner.  See McReynolds*, 208 F.R.D. at 445 (emphasis added); *supra* at 18-20.

Indeed, the named Plaintiffs are "typical" only to the extent that the Court accepts an ill-defined and unfocused class, because the provision of "effective . . . transition assistance" is amorphous, and necessarily will vary based upon the particular needs and circumstances of individual class members.  For example, to the extent that Plaintiffs have sought to define "transition assistance" in the context of their claims, they contend that it includes, *inter alia*, "assistance with completing applications for. . . housing."  Doc. No. 102, Opposition to MTD, at 10.  The publicly available records of the DCHA indicate, however, that, as of the date of this brief, 10 of the 11 named Plaintiffs have successfully applied for subsidized housing—many having done so several years ago.  *See* Ex. 19 [DCHA Housing Applications Status].  Consequently, as these individuals have successfully applied for housing—with or without the District's assistance—they are not "typical" of a class that has been harmed by the District's alleged failure to provide assistance with completing housing applications.

As Plaintiffs have not identified a *specific practice* on the part of the District that has injured the named Plaintiffs and the putative class in the *same manner*, they have not met their burden of establishing typicality.  Their Motion must therefore be denied.

ii.     *Several of the named Plaintiffs do not meet the proposed class definition*

In addition, several of the named Plaintiffs are not "typical" of the putative class because they do not meet the proposed class definition. "Inherent in Rule 23 is the requirement that the class representatives be members of the class." *Virtue v. Int'l Brotherhood of Teamsters Retirement and Family Protection Plan*, --- F.Supp.2d ----, 2013 WL 1769804, at *5 (D.D.C. Apr. 25, 2013) (quoting *Great Rivers Co-op. of Southeastern Iowa v. Farmland Industries, Inc.,* 120 F.3d 893, 899 (8th Cir.1997)).

Although Plaintiffs' class definition is limited to individuals with "physical disabilities," Plaintiff Larry McDonald repeatedly conceded during his deposition that he does not have any physical disabilities or requires assistance with any activities of daily living.  Ex. 20 [McDonald Tr.], at 39:21-42:20; 74:11-75:3; 76:5-15.  Conversely, although Plaintiffs assert that all class members "could live in the community with necessary long-term care services and supports, which the Defendant could provide," the record demonstrates that Plaintiff Roy Foreman has medical needs that cannot be met by the community-based services covered by the EPD Waiver and/or the Medicaid State Plan. Ex. 6 [Sarigol Decl.] ¶¶ 17-21.  Due to the complexity of his medical needs, three medical providers who have assessed Mr. Foreman have declined to serve him outside of the nursing facility.  *Id.; see also* Ex. 21 [Foreman Tr.], at 41:2-15; 58:16-20.  In fact, Mr. Foreman testified that he is satisfied with the assistance that he has received from the District.  *Id.* at 56:5-57:22; 119:5-121:7.

In addition, Plaintiff Carl Magby is not typical of the putative class because his authorized medical agent opposes his discharge from the nursing facility.  Ex. 22, [Magby Tr.], at 23:15-24:14, 39:2-42:9; Ex. 23 [Magby POA], at 2 (authorizing agent to determine location of medical treatment, including "whether [Magby] should be in a . . . nursing home").  Mr. Magby therefore fails to meet

the third-prong of Plaintiffs' class definition, as he will continue to receive treatment in the nursing facility, regardless of any "transition assistance" provided by the District, until his medical agent consents to his discharge.

As Plaintiffs Foreman, McDonald and Magby do not meet the class proposed class definition, they are not typical of the class. *See Virtue*, 2013 WL 1769804, at *5.[15]

     *iii.     The District has unique defenses applicable to several named Plaintiffs*

The existence of unique defenses applicable to Jacqualyn Thorpe, Larry McDonald, Winifred Goines, Roy Foreman, Denise Rivers, Robert Collins, Carl Magby, and Joseph Gray defeats any contention that these individuals are typical of the putative class. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 598 (atypical defenses may defeat typicality). Despite participating as represented named Plaintiffs in a lawsuit asserting a discriminatory denial of home- and community-based services, the record demonstrates that Plaintiffs Thorpe, McDonald, Goines, Rivers, Foreman, Collins, and Magby were offered opportunities months ago to participate in the EPD Waiver, but none of them have contacted the District to begin the enrollment process.  Ex. 4 [Iscandari Decl.] ¶¶ 7-8.  Further, it does not appear that Plaintiff Joseph Gray has ever sought a place on the wait list for the EPD Waiver, or otherwise has made any attempt to access any community-based services provided by the District.  *Id.* ¶ 9; Ex. 24 [Gray Tr.], at 47:2-7; 49:16-50:6.  Additionally, MFP has conducted <u>eight</u> <u>informational</u> <u>outreach</u> <u>sessions</u> at Mr. Gray's nursing facility since 2010 to identify and screen potential candidates, but Mr. Gray did not attend any of these events.  Ex. 6 [Sarigol Decl.] ¶ 23.  As an equitable matter, the Court should not afford these Plaintiffs injunctive relief if they do not avail themselves of the potential remedies at their disposal.

---

[15]  Moreover, these examples of named Plaintiffs failing to meet the class definition underscore the impossibility of certifying the class as proposed because of the complexity and variation of putative class members' particular living situations and needs.

Separately, the District has a unique defense with respect to Plaintiff Donald Dupree, based on the Court's previous ruling that it would not order systemic changes to DMH in light of the settlement in *Dixon v. Gray*.  Jan. 7, 2013 Hearing Tr., at 86.  In so ruling, the Court correctly recognized that an individual "can't be a class member if [he] is not entitled to relief."  *Id.* at 87; *see also id.* at 94:16-19 (noting that "if transitional services . . . belong to the Department of Mental Health, they're already taken care of").  There is no dispute that Plaintiff Dupree successfully discharged from his nursing facility to an assisted living facility last fall with the assistance of DMH's Division of Integrated Care.  Doc. No. 64-3 [Berhow Decl.] ¶¶ 3-4.  Accordingly, as Plaintiff Dupree received transition assistance through DMH, he is not entitled to the relief sought in this matter, and therefore cannot be a member of the putative class.  *See* Jan. 7, 2013 Hearing Tr., at 95:23-96:2.  Therefore, because Plaintiff Dupree is subject to a unique defense, he is not typical of the proposed class.

**IV.    The Named Plaintiffs Cannot Adequately Represent the Interests of the Class**

  *i.    Plaintiffs' Decision Not to Pursue Monetary Damages Raises a Potential Conflict of Interest with the Putative Class*

The named Plaintiffs cannot adequately represent the interests of their proposed class due to a potential conflict of interest.  Despite the potential availability of compensatory damages for violations of the ADA and Rehabilitation Act, the named Plaintiffs seek solely injunctive and declaratory relief.  While the named Plaintiffs obviously are entitled to determine what, if any, remedies they seek as part of this lawsuit on their own behalves, the members of the proposed class are also entitled to elect their desired remedies.  Were the Court to certify a class under Fed. R. Civ. P. 23(b)(2) as Plaintiffs request, the named Plaintiffs will jeopardize the putative class members' ability to seek compensatory damages in future litigation.  *See Nat'l Ass'n of Regional Medical*

*Programs, Inc. v. Mathews*, 551 F.2d 340, 346 (D.C. Cir. 1976) (quoting *Dierks v. Thompson*, 414 F.2d 453, 456 (1st Cir. 1969)).

The Supreme Court recently warned against the "perverse incentives" for plaintiffs seeking class certification under the more lenient Rule 23(b)(2) standard to strategically omit claims for monetary relief.  *Wal-Mart*, 131 S. Ct. at 2559.  As the Court explained, the omission of potentially valid claims for damages, while perhaps avoiding an inquiry into whether the monetary relief predominates over injunctive or declaratory relief required for Rule 23(b)(3) classes, carries with it the risk that class members' claims might be precluded from seeking future monetary relief, due to preclusion principles, if the certified action is ultimately unsuccessful.  *Id.*  "That possibility underscores the need for plaintiffs with individual monetary claims to decide for themselves whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have."  *Id.*

Damages are an available remedy in a suit brought pursuant to the ADA or Rehabilitation Act where the plaintiff establishes intentional discrimination.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  While the D.C. Circuit has not had occasion to decide the issue, other Circuits have permitted compensatory damages upon the less demanding standard of deliberate indifference.  *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 n.4 (8th Cir. 2011) (surveying cases).  While the District strongly asserts that there is no deliberate indifference here—much less intentional discrimination—sufficient to support any claim, at least some members of the class may have colorable claims for damages that they may wish to assert and that may be put in jeopardy by certifying a 23(b)(2) class.

The District wishes to be clear on this point: it does not concede the availability of compensatory damages should Plaintiffs prevail in this litigation.  Indeed, the District would

vigorously argue the contrary proposition.  But, for purposes of determining the adequacy element of class certification, even a colorable claim for such relief creates an irreconcilable conflict between the named Plaintiffs and the putative class.[16]  *See Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974) ("Unless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs."); *see also McReynolds*, 208 F.R.D. at 446 (Huvelle, J).

Courts routinely deny class certification for lack of adequate representation where the proposed class representatives do not seek all relief to which the class might be arguably entitled. *See, e.g.*, *Rouse v. Caruso*, No. 06 Civ. 10961, 2013 WL 588916, at *5-6 (E.D. Mich. Jan. 7, 2013) ("[A]lthough it does not expressly so hold, [*Wal-Mart v.*] *Dukes* suggests that a Rule 23(b)(2) class is inappropriate where the claims asserted are the type that are susceptible to monetary damage awards, even if monetary damages are not actually sought by the named plaintiffs"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 562-65 (C.D. Cal. 2012) ("Here, Cholakyan seeks injunctive and declaratory relief on behalf of a Rule 23(b)(2) class; by doing so, he has, at a minimum, placed class members' ability to pursue individualized claims for monetary relief in question."); *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 634 (W.D. Wash. 2011) ("Ms. Fosmire's attempt to split her putative class members' claim by excluding stigma damages creates a conflict between her interests and the interests of the putative class, rendering her an inadequate class representative."); *Brown v. Kerhoff*, 279 F.R.D. 479 (S.D. Iowa 2012) (denying certification because "any trial on the merits of the claims of the proposed Plaintiffs' class would risk a waiver

---

[16] Moreover, even if the TAC included claims for compensatory damages, a motion for class certification would certainly fail because each putative class member would have an individualized claim for damages. *See Jane Does I-III v. District of Columbia*, No. 01-02398 (HHK), 2006 WL 2864483, at *3 (D.D.C. Oct. 5, 2006) (such damage determinations must be "grounded in determinations of plaintiffs' actual losses").  There is no way to determine any such damages on a class-wide basis.

of any claims of individual Plaintiff class members, potentially precluding claims for misrepresentation and personal injury.").

That the D.C. Circuit held thirty years ago that damages claims are not barred by membership in a class seeking solely equitable relief does not alter the analysis. *See Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983). As explained by the court in *Rouse*, while a subsequent claim for damages may not be barred by operation of *res judicata*, the plaintiff in a later suit may be barred by collateral estoppel or issue preclusion from contesting any issues of fact or law that are decided in the defendant's favor, upon which the damages claim necessarily depends. 2013 WL 588916, at *6 n. 3. "It is for this reason that a (b)(2) class would 'create[ ] the possibility . . . that individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from.'" *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2559).

As the named Plaintiffs cannot serve as class representatives because of the existence of a potential conflict of interest between them and the absent members of the putative class, the motion for class certification should be denied.

> ii.  *The Individual Circumstances of Several of the Named Plaintiffs Render Them Inadequate to Represent the Putative Class*

In addition to the potential conflict of interest discussed above, the record demonstrates that several of the named Plaintiffs are not able to adequately represent the interests of the putative class. As an initial matter, Plaintiff Lavondia Carter recently passed away, and Plaintiffs have sought to voluntarily withdraw her. *See* Doc. No. 105. She therefore cannot serve as a class representative

Separately, Plaintiffs Dupree and Magby are inadequate class representatives because they are incompetent to bring a lawsuit on their own behalf, as each has a legal guardian or an authorized medical agent—neither of whom is a party to this action—responsible for making decisions concerning the location of their medical care. *See* Ex. 23 [Magby POA], at 2 (authorizing medical

agent to make decisions, including whether Magby "should be in a . . . nursing home"); Doc. No.
54-11 [Simhoni Decl.] ¶ 1; Doc. No. 54-9 [Dupree Decl.] ¶ 10. Fed. R. Civ. P. 17(c).  As these
individuals are not competent to represent their own interests, they are certainly not adequate to
represent the interests of the putative class.

        In addition, several of the named Plaintiffs are inadequate to represent the interests of the
class because they lack a basic understanding concerning the issues before the Court.  Named
Plaintiffs who have little familiarity with the litigation or their function as class representatives are
inadequate.  *See, e.g.*, *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir.
2000) (certification may be denied where representatives have so little knowledge of the case to
protect against the possibly competing interest of their attorneys); *Kirkpatrick v. J.C. Bradford &
Co.*, 827 F.2d 718, 728 (11th Cir. 1987) (certification should be denied where the named plaintiffs'
"participation is so minimal that they virtually have abdicated to their attorneys the conduct of the
case"); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 534-35 (N.D. Tex. 2005) (finding named
representative inadequate where plaintiff was solicited by class counsel for the lawsuit, had done no
independent investigation into the background and experience of class counsel, and demonstrated a
lack of knowledge about the case).  Here, Plaintiff Magby expressly stated during his deposition
that he is *not* seeking to serve as a representative of the putative class in this matter because he does
not consider himself to be sufficiently "knowledgeable" to do so.[17]  Ex. 22 [Magby Tr.], at 105:4-
106:4.  Similarly, Plaintiffs Collins, Magby, and Gray stated that they did not know or were not

---

[17] Plaintiffs have tendered a declaration from Mr. Magby in which he contradicts his deposition testimony,
stating "I am willing to serve as a class representative and to undertake the resulting responsibilities."
Docket Entry No. 103-11 at ¶ 23.  The declaration is in plain violation of the so-called "sham affidavit rule"
and should be disregarded by the Court in ruling upon this motion.  *See Galvin v. Eli Lilly and Co.*, 488 F.3d
1026, 1030 (D.C. Cir. 2007).  Indeed, Plaintiff Magby's deposition testimony reflects why he is a poor
candidate to represent a class here: he testified that he did not know whether the District of Columbia
violated any of his legal rights (98:2-5), had never reviewed the complaint (98:17-11), and does not know the
responsibilities of a class action representative, (104:9-16).

aware of any responsibilities associated with being a class representative.  Ex. 22 [Magby Tr.], at 106:1-4; Ex. 24 [Gray Tr.], at 67:13-68:3; Ex. 12 [Collins Tr.], at 78:15-18.  Plaintiff Denise Rivers stated her belief that her responsibilities as a class representative were limited to appearing for her deposition. Ex. 17 [Rivers Tr.], at 76:16-77:6.  Accordingly, in light of the lack of understanding regarding their potential responsibilities as class representatives, Plaintiffs Magby, Gray, Collins and Rivers are inadequate to represent the putative class.

Moreover, two of the proposed class representatives, Donald Dupree and Curtis Wilkerson, have already moved out of nursing facilities and receive home- and community-based services. Notwithstanding the Court's holding that they nevertheless have justiciable claims, whatever personal stake they have in the outcome of this lawsuit is necessarily lessened by the fact that they are no longer "isolated" in a nursing home, like other members of the putative class claim to be. *See Ligas ex rel. Foster v. Maram*, No. 05 C 4331, 2006 WL 644474, at *4 (N.D. Ill. March 7, 2006) (finding that three named Plaintiffs who moved to less restrictive settings were not adequate class representatives and their claims were not typical of the class), *vacated on other grounds by* 2009 WL 9057733 (July 7, 2009).  Dupree and Wilkerson will not collect damages if the suit is successful, nor will any relief ordered by the Court affect them unless they return to a nursing facility at a later time.  *See* Ex. 25 [Wilkerson Tr.] at 124:14-125:6 (conceding that relief would not affect him but would make him happy for others).  Dupree and Wilkerson's interest in this action, whatever it may be, is not as strong as class members who are currently residing in institutionalized settings.  Therefore, for these reasons, Plaintiffs Wilkerson and Dupree cannot adequately protect the interests of the class or, alternatively, are not typical of the putative class.

## V.    Plaintiffs Have Failed to Meet Their Burden of Establishing Numerosity

As Plaintiffs correctly point out, many courts have found classes that exceed 40 members satisfy the numerosity requirement.  Mot. at 19.  However, Plaintiffs mistakenly rely upon outdated

authorities in arguing that numerosity may be shown based upon mere estimates as to the class'
size.  *Id.*  The Supreme Court has recently clarified that numerosity is an element of Rule 23(a) that
must be proven, and that a party seeking certification must show "that there are *in fact* sufficiently
numerous parties."  *See Wal-Mart,* 131 S. Ct. at 2551; *accord Comcast Corp. v. Behrend*, --- U.S. ---
, 133 S. Ct. 1426, 1432 (2013).  Plaintiffs have failed to carry this burden.

      Plaintiffs argue that the size of their proposed class is between 500 and 2,900, claiming that
the lower number is based on "publicly available data"[18] and the higher figure based on the number
of Medicaid-funded nursing home residents.  The higher figure is irrelevant to a determination of
numerosity, because it does not incorporate the various limitations of the class definition.  Though
Plaintiffs do not state what publicly available data they rely upon in concluding the class consists of
at least 500 individuals, the District assumes that Plaintiffs refer a nationwide study of responses to
the Minimum Data Set's Section Q, which asks nursing home residents whether they are interested
in speaking with someone about returning to the community.  However, the answer to that question
merely reveals an individual's desire to leave the nursing home; it does not indicate whether a
person would be appropriate for community living or whether they would meet the financial and
clinical eligibility requirements of any Medicaid-funded community-based long-term care services.
Additionally, if the Court agrees that the class must be limited to individuals with an identified
housing option (*see* MTD, at 11), nothing in the Minimum Data Set survey sheds light on an
individual's housing status.

---

[18] Plaintiffs cite the deposition of Yvonne Iscandari ostensibly to authenticate a document that they printed
from the internet.  However, Ms. Iscandari testified that she did not recognize the document, (*see* Mot., Ex.
HH, Docket Entry No. 103-35, at 49:14-18.), which Plaintiffs have not introduced into the record.  Further,
the questions of Plaintiffs' counsel are not competent evidence upon which the Court may rely.  (*See id.*)
There is thus no evidentiary basis for Plaintiffs' argument.  Additionally, though Plaintiffs cite page 95 of
Ms. Iscandari's deposition, the citation does not appear relevant to their discussion.

Moreover, the numerosity inquiry is made even more difficult because Plaintiffs have chosen to limit the class to individuals who "would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-term care services in the community." TAC ¶ 153.  As explained in greater detail in the District's Motion to Dismiss the TAC and in its Reply in support thereof, the many nursing home residents who are able to access, and have accessed, home- and community-based services with the help of privately-employed nursing home staff, or their friends or family, are excluded from Plaintiffs' proposed definition.  Only those nursing home residents who require additional assistance from District employees than what is being offered through the nursing home would be members of this class.  Yet, there is no way, subjective or objective, to determine who could transition *only* with assistance from the District.

Accordingly, Plaintiffs have failed to demonstrate that the class is sufficiently numerous as to warrant class certification, and their Motion should be denied.

**VI.        Plaintiffs Have Not Satisfied Rule 23(b)(2)**

Plaintiffs have fallen well short of their burden to demonstrate that they satisfy Rule 23(b)(2).  Rule 23(b)(2) permits class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart*, 131 S. Ct. at 2557.   In other words, a class may be certified under Rule 23(b)(2) "only when a single injunction or declaratory judgment would provide relief to each member of the class," and not "when each individual class

member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*  "[T]he relief sought must … affect the entire class at once."  *Id.* at 2558.

Following *Wal-Mart*, courts interpreting Rule 23(b)(2) in the context of systemic claims against the government have increasingly declined to certify classes in such cases.  *See Jamie S.*, 668 F.3d at 498-500; *M.D. v. Perry*, 675 F.3d at 845-48.  In *Jamie S.*, the Seventh Circuit vacated a class-certification order in "a long-running class-action lawsuit seeking structural reform of special education in the Milwaukee public school district."  668 F.3d at 484-85.  The plaintiffs there challenged Milwaukee's compliance with provisions of the Individuals with Disabilities Education Act ("IDEA") requiring school districts to identify children with disabilities and to develop individualized education programs for each student.  *Id.* at 485.  Following a bench trial, the district court issued an injunction ordering Milwaukee to implement a court-monitored system to bring it into compliance with the IDEA, requiring Milwaukee to identify affected children and provide appropriate compensatory-education remedies to them.  *Id.*

The Seventh Circuit found certification under Rule 23(b)(2) to have been error, noting that the plaintiffs sought class-wide relief "in name only."  *Id.* at 499.  "[A]s a substantive matter[,] the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made."  *Id.*  The remedial order fashioned by the district court "d[id] not, on its own, provide 'final' relief to any class member," notwithstanding that the order affected the entire class by ordering the school district to locate children with disabilities and provide education appropriate to their needs.  *Id.*  According to the Seventh Circuit, "[i]f individualized relief is sought—even individual injunctive relief—the named plaintiffs must look elsewhere in Rule 23(b) to obtain certification."  *Id.*

The Fifth Circuit vacated a similar certification order in a case alleging "systemic failures" in Texas' provision of long-term foster care. *M.D.*, 675 F.3d at 835. More specifically, the plaintiffs in *M.D.* alleged that Texas violated, *inter alia*, their substantive and procedural due process rights by failing to adequately provide for their safety and permanency through the placement protocols designed to "match a child to the most appropriate placement resource." *Id.* (citations omitted). The plaintiffs asked the court to issue injunctive relief to bring Texas' foster system into compliance, for example, by requiring that Texas caseworkers did not have caseloads in excess of nationwide standards, and to establish expert panels to review class members' particular cases. *M.D.*, 675 F.3d at 845-46. The district court certified a class, finding that "[a]ll class members are within the same system and subject to the alleged deficiencies in that system," and that "all of the class members will benefit from relief which forces the defendant to provide, in the manner required by law, the services to which class members either are currently or at some future point will become entitled." *Id.* at 838-39, 846.

The Fifth Circuit held that the district court had abused its discretion in certifying a Rule 23(b)(2) class, finding that the proposed relief would not apply uniformly across the class. *Id.* at 847. "A proposed class cannot avoid Rule 23(b)(2)'s prohibition on claims for individualized relief by petitioning the district court to order the defendant to craft individualized 'injunctive-type' relief for certain class members." *Id.* (citing *Jamie S.*, 668 F.3d at 499). In addition, the Fifth Circuit held that plaintiffs could not satisfy Rule 23(b)(2) by demanding an injunction requiring the provision of "appropriate levels of service" without defining with some precision what "appropriate" means. *Id.* at 848 (citing *Shook v. Bd. of County Comm'rs of County of El Paso*, 543 F.3d 597, 605-06 (10th Cir. 2008) ("The problem in our case is that plaintiffs have eschewed any effort to give content to

37

what it would mean to provide adequate mental health staff, adequate screening, or an adequate system for delivering medication.")).

Class certification under Rule 23(b)(2) is not appropriate here because the named Plaintiffs have not sought an "indivisible" injunction or declaratory judgment of the type *Wal-Mart* says must be "warranted" before a (b)(2) class is authorized.  131 S. Ct. at 2557.  In the TAC, Plaintiffs seek a complex, multi-part injunction aimed at addressing perceived failures on the part of the District in at least 5 distinct administrative functions, including:  (i) disseminating information about community-based long-term care alternatives to nursing facilities; (ii)  eliciting nursing facility residents' preference for community or nursing facility placement; (iii) initiating and monitoring discharge planning for nursing facility residents; (iv) assisting nursing facility residents to access "appropriate resources available in the community"; and (v) ensuring "sufficient capacity" in programs providing community-based long-term care services.  *See* TAC, Request for Relief.  Plaintiffs also seek specific and distinct programmatic and reporting requirements with respect to each of the above functions, and to compel the District to "[s]uccessfully transition" a minimum number of putative class members into community-based settings on an annual basis over a four-year period.  *Id.*

The multi-faceted nature of Plaintiffs' requested injunction, standing alone, is tacit acknowledgement that no one-size-fits-all injunction that can provide relief to all members of the putative class as required by Rule 23(b)(2).  Plaintiffs cannot satisfy Rule 23(b)(2)'s requirement of "indivisible" class-wide relief requirement by seeking to redress multiple, distinct alleged failures on the part of the District.  *See Lightfoot v. District of Columbia*, 273 F.R.D. 314, 236 (D.D.C. 2011) ("[C]ourts [interpreting Rule 23(b)(2)] have approached with skepticism efforts to aggregate myriad practices under the guise of 'systemic' violations.").

Further, the injunctive relief requested by the named Plaintiffs does not meet the requirements of Rule 23(b)(2) because it will not benefit the entire class equally. *See Cholakyan*, 281 F.R.D. at 559  ("Plaintiff cannot seek certification under Rule 23(b)(2) by combining an array of remedies, some of which will benefit only certain subsets of the class, and contending that each member of the class can avail himself or herself of one or more of the proposed remedies.") (citing cases); *see also Wal-Mart*, 131 S. Ct. at 2558 (A class cannot be certified under Rule 23(b)(2) unless the injunction sought provides final relief, is indivisible, and benefits all of the members of the class at once.).  As discussed, the reasons why different class members may not have been successful to date in transitioning out of their nursing facilities vary based upon the particular needs and circumstances of the individual.  Similarly, the nature and extent of the transition assistance needed by a putative class will necessarily depended on the particular needs and circumstances of that individual.

As a result, Plaintiffs' request that the District develop and implement a "working system" that addresses the distinct alleged failures identified above is nothing more than a request that the Court order the District "to craft individualized 'injunctive-type' relief for certain class members," which is not appropriate under Rule 23(b)(2).  *M.D.*, 675 F.3d at 847.  The demand for a "working system" in the TAC is virtually indistinguishable from Plaintiffs' demand for the provision of "appropriate supports and services" sought in Plaintiffs' prior motion for class certification that was rejected by the Court.  Indeed, Plaintiffs' request for a "working system" of transition assistance is functionally the same as the request by Plaintiffs in *DL* "to develop adequate and effective policies and procedures and a practical method of identifying, locating and evaluating plaintiffs for special education and related services."  *See DL*, 2013 WL 1489471, at *2.   The same is true of Plaintiffs' request for an order compelling the District to "[s]uccessfully transition" certain minimum numbers

39

of putative class members into community-based settings on an annual basis.  TAC, Request for

Relief.  Accordingly, certification is impossible under 23(b)(2) because, at bottom, final relief

cannot be afforded to all class members without being individually-tailored to the needs of each

member of the class.[19]  *See Wal-Mart*, 131 S. Ct. at 2557; *Jamie S.*, 668 F.3d at 499; *M.D.*, 675 F.3d

at 847.

Relatedly, the injunctive relief Plaintiffs seek will not equally benefit proposed class

members who do not have homes in which to receive community-based care.  Assuming *arguendo*

that such individuals may be considered part of the class, which the District contests, injunctive

relief for those who do not have housing would be illusory.  Without a home, there is simply no

place for individuals to receive home- and community-based care.  In other words, even if Plaintiffs

successfully persuade the Court that the District's administration of Medicaid requires substantial

reform, an injunction requiring reform to the Medicaid program would not facilitate the provision

home- and community-based services to the majority of the putative class.

Plaintiffs have failed to demonstrate that a single injunction will produce the kind of final

class-wide relief permitted by Rule 23(b)(2).  Their motion should accordingly be denied.

## CONCLUSION

For the foregoing reasons, the District respectfully submits that Plaintiffs' Renewed Motion

for Class Certification must be denied.

---

[19] As noted in the District's Motion to Dismiss the Third Amended Complaint, there is no basis in the record
to infer that the reporting requirements requested by Plaintiffs in the TAC will afford final relief to *any*
putative class member.  *See* MTD, at 14-16.  Accordingly, such relief cannot support certification of the class
under Rule 23(b)(2).

Dated:  June 4, 2013

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN EFROS
Deputy Attorney General
Public Interest Division

/s/ Grace Graham
GRACE GRAHAM, D.C. Bar No. 472878
Chief, Equity Section
441 Fourth Street, NW
Sixth Floor South
Washington, DC 20001
Telephone: (202) 442-9784
Facsimile: (202) 741-8892
Email: grace.graham@dc.gov

/s/ Bradford C. Patrick
BRADFORD C. PATRICK, D.C. Bar No. 1004979
Assistant Attorney General
441 Fourth Street, NW, Sixth Floor South
Washington, DC 20001
Telephone: (202) 724-6627
Facsimile: (202) 741-0599
Email: bradford.patrick@dc.gov

/s/ Chad A. Naso
CHAD A. NASO, D.C. Bar No. 1001694
Assistant Attorney General
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

*Counsel for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JACQUALYN THORPE, *et al*.                )
                                          )
                Plaintiffs,               )        Civil Action No. 10-2250 (ESH)
                                          )
        v.                                )
                                          )
THE DISTRICT OF COLUMBIA,                 )
                                          )
                Defendant.                )
_____)

**ORDER**

Upon consideration of Plaintiffs' Renewed Motion for Class Certification, the Opposition

filed by the District of Columbia, and any reply thereto, and in consideration of the entire record

herein, it is hereby **ORDERED** that Plaintiffs' Motion be **DENIED.**


**SO ORDERED.**


Dated: _____              _____
                                     Hon. Ellen S. Huvelle
                                     United States District Court Judge

1