## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
)
**JACQUALYN THORPE,** *et al.*, )
)
**Plaintiffs,** )
)
**v.** )          **Civil Action No. 10-2250 (ESH)**
)
**DISTRICT OF COLUMBIA,** )
)
**Defendant.** )
———————————————————————— )

## <u>MEMORANDUM OPINION</u>

In this *Olmstead* action, plaintiffs, who include nine[1] current and former nursing facility

residents, claim that the District of Columbia ("District" or "defendant") provides Medicaid-

funded long-term care services to individuals with physical disabilities in a manner that results in

the unnecessary segregation of such individuals in nursing facilities in violation of Title II of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the

Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*[2] (Third Am. Compl., Mar. 27, 2013 [ECF No. 98]

("3d Am. Compl.").)  Before the Court is plaintiffs' renewed motion for class certification,

seeking to certify a class of nursing facility residents who allegedly are "stuck" in nursing

facilities due to the District's lack of an "effective system of transition assistance."  (Pls.'

Renewed Mot. for Class Certification, May 6, 2013 [ECF No. 103] ("CC Mot.").)  Defendant

---

[1] The Third Amended Complaint names eleven plaintiffs, but two (Lavondia Carter and Carl Magby) have since passed away.  The remaining nine are Jacqualyn Thorpe, Donald Dupree, Roy Foreman, Larry McDonald, Curtis Wilkerson, Robert Collins, Winifred Goines, and Joseph Gray, and Denise Rivers.

[2] These actions are named for the 1999 Supreme Court decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), which recognized for the first time that unjustified segregation was a form of discrimination prohibited by the ADA and the Rehabilitation Act.

opposes the motion (Def.'s Opp'n to CC Mot., June 4, 2013 [ECF No. 106] ("CC Opp.")), and

has moved to dismiss the complaint.  (Def.'s Mot. to Dismiss, Apr. 11, 2013 [ECF No. 99]

("MTD Mot.").)  For the reasons stated herein, defendant's motion to dismiss is denied and

plaintiffs' motion for class certification is granted.

## BACKGROUND[3]

## I.   LEGAL BACKGROUND: THE INTEGRATION MANDATE

The Supreme Court concluded in *Olmstead* that the "integration mandate" of the ADA

and the Rehabilitation Act requires a public entity such as the District to administer its Medicaid

program in a manner that does not result in the "unjustified segregation or isolation" of

individuals with disabilities.  *See Olmstead v. L.C.*, 527 U.S. 581, 607 (1999).[4]  Thus, under

*Olmstead*, the District is "required to provide community-based treatment for persons with . . .

disabilities" when three conditions are satisfied: (1) the District's "treatment professionals

determine that such placement is appropriate"; (2) the "affected persons do not oppose such

treatment"; and (3) "placement can be reasonably accommodated, taking into account the

resources available to the [District] and the needs of others with . . . disabilities."  *See Olmstead*,

---

[3] The Court assumes familiarity with its prior opinion and the background set forth therein.  *See Day v. District of Columbia*, 894 F. Supp. 2d 1  (D.D.C. 2012).

[4] The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2). The Rehabilitation Act provides that no person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

527 U.S. at 607; *see also* 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d).[5]  However, even if these three conditions are satisfied, there is no violation of law if the public entity can show "that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), or that it has "a comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated."  *Olmstead*, 527 U.S. at 605-06.

Since *Olmstead*, numerous "integration mandate" or "*Olmstead*" cases have been brought.[6]  Across a wide range of services, programs and activities, these cases have challenged undue segregation of individuals with disabilities (or at risk of segregation) in nursing facilities,[7] mental health facilities,[8] institutions for individuals with intellectual and developmental

---

[5] The ADA's implementing regulations provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The Rehabilitation Act's implementing regulations provide that programs, services, and activities must be administered in "the most integrated setting appropriate" to the needs of individuals with disabilities.  28 C.F.R. § 41.51(d). The "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. B.

[6] *See, e.g.*, U.S. Dep't of Justice, Olmstead: Community Integration for Everyone (http://www.ada.gov/olmstead/index.htm) (listing Olmstead cases with DOJ involvement); *see also* Terence Ng, Alice Wong and Charlese Harrington, UCSF National Center for Personal Assistance Services, Olmstead and Olmstead-related Lawsuits (updated May 2013) (http://www.pascenter.org/state_based_stats/olmstead/olmsteadcases.php) (listing of Olmstead lawsuits by state).

[7] *See, e.g.*, *United States v. Florida*, No. 1:13-cv-61576 (S.D. Fla. filed July 22, 2013); *A.R. v. Dudek*, No. 0:12-cv-60460 (S.D. filed Mar. 13, 2012) (consolidated with *United States v. Florida* on Dec. 12, 2013); *Steward v. Perry*, No. 5:10-cv-1025 (W.D. Tex. filed Dec. 20, 2010); *Hiltibran v. Levy*, No. 2:10-cv-4185 (W.D. Mo. filed Aug. 23, 2011); *Boyd v. Mullins*, No. 10-cv-00688 (M.D. Ala. filed Aug. 12, 2010); *Haddad v. Arnold*, No. 3:10-cv-414 (M.D. Fla. filed May 13, 2010); *Long v. Benson*, No. 4:08-cv-0026 (N.D. Fla. filed Jan. 15, 2008); *Conn. Office of Protection and Advocacy v. Connecticut*, No. 06-cv-00179 (D. Conn. filed Feb. 6, 2006).

[8] *See, e.g.*, *United States v. New York*, No. 1:13-cv-4165 (E.D.N.Y. filed July 23, 2013); *United States v. North Carolina*, No. 5:12-cv-557 (E.D.N.C. filed Aug. 23, 2012); *Amanda D. v.*

disabilities,[9] and sheltered workshops/segregated day services.[10]  Some cases are private actions

brought by individuals, some are class actions, and some are enforcement actions by the

Department of Justice.  Where a private action raises systemic issues, courts have uniformly

granted class certification to allow plaintiffs to pursue those claims, even after the Supreme

Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), which

arguably tightened the standard for class certification.[11]  In the present case, named plaintiffs

seek to bring a class action on behalf of individuals with physical disabilities who are receiving

---

*Hassan*, No. 1:12-cv-53 (D.N.H. filed Feb. 9, 2012); *United States v. Delaware*, No. 1:11-cv-0591 (D. Del. filed July 6, 2011); *United States v. Georgia*, No. 1:10-cv-249 (N.D. Ga. filed Jan. 28, 2010); *Williams v. Quinn*, No. 05-cv-4673 (N.D. Ill. filed Aug. 15, 2005).

[9] *See*, *e.g.*, *United States v. Virginia*, No. 3:12-cv-0059 (E.D. Va. filed Jan. 26, 2012); *United States v. Nebraska*, No. 8:08-cv-0271 (D. Neb. filed June 30, 2008); *Benjamin v. Pennsylvania Dept. of Public Welfare*, No. 1:09-cv-1182 (M.D. Pa. filed Jun. 22, 2009); *Disability Rights New Jersey, Inc. v. Velez*, No. 3:05-cv-4723 (D.N.J. filed Sept. 29, 2005); *Ligas v. Hamos,* No. 05-cv-04331 (N.D. Ill. filed July 28, 2005).

[10] *See, e.g.*, *United States v. Rhode Island*, No. 1:13-cv-00442 (D.R.I. filed June 13, 2013); *Lane v. Kitzhaber*, 283 F.R.D. 587, 589 (D. Ore. 2012).

[11] *See, e.g.*, *Kenneth R. v. Hassan*, 293 F.R.D. 254, 271-72 (D.N.H. 2013) (certifying class of adults with serious mental illness seeking expanded and enhanced community-based services); *Lane v. Kitzhaber*, 283 F.R.D. at 589 (certifying class under Rule 23(b)(2) of "all individuals in Oregon with intellectual or developmental disabilities who are in, or who have been referred to, sheltered workshops" and "who are qualified for supported employment services"); *Oster v. Lightbourne*, 2012 WL 685808, at *6 (N.D.Cal. March 2, 2012) (certifying class of persons whose state in-home support services would be "limited, cut, or terminated" by 20% under a new law); *Pashby v. Cansler*, 279 F.R.D. 347 (E.D.N.C. 2011) (certifying class of eligible adult Medicaid recipients challenging the legality of a new rule that would terminate eligibility for in-home care).  Pre-*Wal-Mart* cases include: *Hampe v. Hamos*, 1:10-cv-3121 (N.D. Ill. Nov. 22, 2010) (certifying class of young adults seeking to challenge a state policy that places medically fragile individuals with disabilities at risk of institutionalization after turning 21); *Connecticut Office of Protection and Advocacy v. Connecticut*, 706 F. Supp. 2d 266 (D. Conn. Mar. 31, 2010) (certifying class of individuals with mental illness challenging state's reliance on nursing facilities to provide care); *Benjamin v. Pennsylvania Dep't of Public Welfare*, No. 1:09-cv-1182 (M.D. Pa. Sept. 2, 2009) (certifying class of individuals with developmental disabilities seeking to end segregation in state's large, publicly-run congregate care institutions); *Long v. Benson*, No. 4:08-cv-0026, 2008 WL 4571904, at *3 (N.D. Fla. Oct. 14, 2008) (certifying class of Medicaid-eligible adults who are unnecessarily confined to a nursing facility).

Medicaid-covered long-term care services in nursing facilities, but who want to be receiving

such services in the community.

## II.    FACTUAL BACKGROUND

### A.    Existing Medicaid Coverage of Long-Term Care Services for Individuals with Physical Disabilities

In the District, individuals with physical disabilities who require Medicaid-covered long-term care services[12] have three options for accessing those services: (1) in a nursing facility; (2) in the community with services provided by a Medicaid waiver program; or (3) in the community with personal care assistance services covered by the District's Medicaid Plan.

*Nursing Facility Care*: Federal rules provide that all Medicaid programs must cover long-term care services provided by an institution (*e.g.*, a nursing facility),[13] although states determine the "level-of-care" criteria an individual must satisfy to qualify for such services. To define level-of-care criteria, states may use "functional" criteria, such as an individual's ability to perform certain Activities of Daily Living ("ADLs"); or "clinical" level-of-care criteria, such as diagnosis of an illness, injury, disability or other medical condition; treatment and medications; or a combination of both. In the District, a Medicaid beneficiary qualifies for long-term care

---

[12] Long-term care services "refer to a broad range of health and health-related services and supports needed by individuals who lack the capacity for self-care due to a physical, cognitive, or mental disability or condition. Often the individual's disability or condition results in the need for hands-on assistance or supervision over an extended period of time." Kirsten J. Colello, Congressional Research Service 7-5700, Medicaid Coverage of Long-Term Services and Supports 1 (2013); *see also* District of Columbia Dep't of Health Care Finance, EPD Waiver Program Participant Handbook 9 (long-term care services "assist people who are aging, have disabilities, or have chronic care needs and who require assistance to maintain their independence in personal or health-related activities").

[13] Long-term care is one of the three primary types of services provided by nursing facilities. The other two are skilled nursing (medical care and related services) and rehabilitation. Federal Medicaid rules preclude states from limiting access to nursing facility services or making them subject to waiting lists. *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Institutional-Care/Nursing-Facilities-NF.html.

services in a nursing facility if he/she requires (1) "extensive assistance" or "total dependence"

with at least two of five "basic activities of daily living" ("BADLs")—"bathing, dressing,

mobility, eating, and toilet use," or (2) "supervision" or "limited assistance" with at least two of

the five BADLs and "extensive assistance, total dependence, supervision, or limited assistance"

with three of five "instrumental activities of daily living" ("IADLs")—"medication management,

meal preparation, housekeeping, money management and telephone use."  (Def.'s Response to

the Court's Oral Order During the Dec. 11, 2013 Hrg. 4, Dec. 13, 2013 [ECF No. 122] ("Def.'s

12/13/2013 Supp. Filing") (citing Iscandari Dep. 27-28, Mar. 20, 2013)); *see also* 29 D.C. Mun.

Regs. § 5099.

As of January 1, 2013, there were 2,765 available beds in nineteen Medicaid-certified

nursing facilities in the District and 2388 of those beds were filled by Medicaid recipients.[14]

(Def.'s 12/13/2013 Supp. Filing  2; Turnage Dep. 99-100, Mar. 15, 2013.)  Of the Medicaid

recipients, 2019 had been in the nursing facility for more than 90 days.[15]  (Def.'s 12/13/2013

Supp. Filing  2.)  In addition, there were approximately 200 D.C. Medicaid beneficiaries in

nursing facilities outside of the District.  (*See* Iscandari Dep. 24.)  Approximately 21% of the

District's nursing facility population is under the age of 65.  2012 NHDC, *supra n*.14, at 156

(Table 3.5).

---

[14] Occupancy rates in the District's nursing facilities have historically exceeded 90%.  *See* Center for Medicare & Medicaid Services, 2012 Nursing Home Data Compendium  ("2012 NHDC") at 156 (Table 3.5) (showing occupancy rates of 92.9% in 2007; 91.8% in 2008; 93.3% in 2009; 92.2% in 2010; and 90.9% in 2011) (available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/downloads/nursinghomedatacompendium_508.pdf); *see also Day*, 894 F. Supp. 2d at 28 ("the District's nursing home population from 1995 to 2009 decreased by only 45 individuals").

[15] The 2012 numbers were very similar.  As of January 1, 2012, there were 2343 Medicaid recipients in nursing facilities in the District, and 1990 of those individuals had been in a nursing facility for more than 90 days.  (Def.'s 12/13/2013 Supp. Filing 1.)

The existing record does not establish with certainty how many nursing facility residents have "physical disabilities" within the meaning of the ADA and the Rehabilitation Act. Plaintiffs take the position that "most" do based on the fact that in order to enter a nursing home, an individual must meet the requirements for nursing home level of care.  Plaintiffs' assumption is not without flaws, but it is not unreasonable.  First, even though the ADA's definition of a physical disability and the District's nursing home level-of-care standard are not identical, there is substantial overlap.[16]  Indeed, the only exception suggested by the District is an individual who suffers from a developmental disability, a population that has few, if any, individuals still residing in District nursing facilities.  Second, although a nursing facility resident's condition may have improved over time such that he/she no longer qualifies for a nursing home level of care, annual record reviews of all nursing facility residents are performed to assess whether a current resident continues to require a nursing facility level of care.[17]  (Iscandari Dep. 52-53, 181-183.)  At trial, of course, any material factual disputes will need to be addressed, but at present it is reasonable to assume that most nursing facility residents are also individuals who satisfy the legal definition of an individual with a physical disability.

The existing record also does not establish with certainty how many current nursing facility residents (other than the named plaintiffs who still reside in nursing homes) would prefer

---

[16] Under the ADA, an individual has a disability if he or she has "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12102(2)(A).  In addition, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  *Id.* § 12102(2)(B).

[17] One study in 2011 found that 22% of the District's nursing facility residents had zero ADL impairments.  2012 NHDC at 158 (Table 3.7).

to live in the community.  The closest proxy for that information comes from a survey mandated by the Center for Medicare and Medicaid Services ("CMS") that nursing facilities administer to their residents on a quarterly basis.  As part of that survey, known as the "Minimum Data Set" ("MDS") survey, each resident is asked "Do you want to talk to someone about the possibility of returning to the community?"  (Def.'s Reply Brief in Support of its Mot. to Dismiss the Third Am. Compl. ("MTD Reply") [ECF No. 107] Ex. C, at 31, June 4, 2013 (2010 MDS Survey) (Q500B); *see also* Iscandari Dep. 48-50.)  In 2010, approximately 524 nursing facility residents (out of 2,499 surveyed) answered yes to that question.  (*See* Turnage Dep. 97-98; Iscandari Dep. 48-50; *see also* Turnage Dep. 95 & Ex. 14 (Oct. 22, 2010 DHCF MFP Operational Protocol Amendment) (indicating that 580 residents had expressed desire to move).) The existing record does not include any information about more recent answers to this question.  Publicly available data from the MDS survey,[18] however, suggests that the number of residents who are interested in returning to the community has remained fairly stable.  For example, for the fourth quarter of 2013 (the most recent available data), 27.50% of 2182 residents surveyed (approximately 600 individuals) "expect[ed] to be discharged to the community."  *See* MDS 3.0 Frequency Report, 4th Quarter 2013, *supra n.*18.  The only other preference data in the existing record comes from a screening the District did in 2012:  at that time it screened 354 nursing facility residents and identified 256 who wanted to return to the community.  (Def.'s Resps. to Pls.' First Set of Interrogatories 5, Feb. 15, 2013 ("Def.'s Interrog. Resps.").)

---

[18] The MDS 3.0 Frequency Reports are publicly available reports summarizing by state the answers to questions in the MDS survey for every quarter from the fourth quarter of 2011 through the fourth quarter of 2013, but all responses are not included.  *See* CMS, MDS 3.0 Frequency Report, 4th Quarter 2013 (available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/Minimum-Data-Set-3-0-Public-Reports/Minimum-Data-Set-3-0-Frequency-Report.html ("Q0500B: Participation in Assessment and Goal Setting - Possibility of returning to Community.  Q0500B is not included in the Current Resident Information Report.")

*Home and Community-Based Services Waiver Programs*: In addition to the mandatory coverage of long-term care services provided in a nursing facility, a state Medicaid program may opt to cover home and community-based long-term care services via a "Home and Community Based Services (HCBS) Waiver" program.  *See* 42 U.S.C. § 1396n(c).[19]  Generally, a waiver program serves targeted population groups, such as individuals with mental illnesses, intellectual disabilities, or physical disabilities.  Subject to approval by CMS, each state decides how many waiver programs to offer and determines the eligibility requirements, number of participants, and scope of services covered.[20]  Waiver participants remain eligible for all other Medicaid-covered services.

In the District, the "Elderly and Persons with Disabilities Waiver" ("EPD Waiver") covers home and community-based long-term care services for individuals who are aged 65 and over and adults with physical disabilities who are 18 or older who meet the District's nursing home level-of-care requirements.[21]  29 D.C. Mun. Regs. § 4200 (citing 42 CFR § 440.40; 42

---

[19] Section 42 U.S.C. § 1396n(c)(1) provides in pertinent part:

> The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility . . . the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1). Prior to its enactment, the Medicaid Act precluded state Medicaid plans from covering home and community-based long-term care services.

[20] Forty-seven states and the District are now operating at least one waiver program, with more than 300 waiver programs active nationwide. *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Long-Term-Services-and-Support/Home-and-Community-Based-Services/Home-and-Community-Based-Services-1915-c.html.

[21] The EPD Waiver covers case management services, homemaker services, respite services, chore services, personal care aide services (PCA), personal emergency response services

CFR § 440.155).  A participant can receive up to sixteen hours of care per day without prior

authorization and up to twenty-four hours with prior authorization.  (Iscandari Dep. 55, 164.)

The District began enrolling individuals in the EPD Waiver in 2008.  At the time the

District did not keep track of whether EPD Waiver participants were coming directly from the

community or from nursing facilities.  By August 2011, the available slots (3940) were filled,

and on August 17, 2011, the Department of Health Care Finance ("DHCF") started a waiting list.

(*See* DHCF Transmittal No. 11-24; DHCF Transmittal No. 11-32; Iscandari Dep. 33.)  In

December 2011, the EPD waiver was reauthorized for the next five years (from January 4, 2012

– January 3, 2017).  (Iscandari Dep. 24.)  For the first year, there were 4050 slots; for the second

year, there were 4162 slots; and the number was set to increase to 4278 in 2014, 4387 in 2015

and 4520 in 2016.[22]  (EPD Waiver Renewal Application, Appendix B; Turnage Dep. 150-51.)

Forty slots per year are reserved for nursing facility residents.  (Turnage Dep. 150; Iscandari

Dep. 34-35.)

By July 2012, there were 681 people on the EPD waiver waiting list.  (Turnage Dep. 158-

59.)  By the beginning of January 2013, there were 1084, including 114 nursing facility

residents, seven of whom were named plaintiffs (Carter, Collins, Goines, Magby, McDonald,

Rivers, and Thorpe).  (Iscandari Decl. ¶¶ 6-7, June 3, 2013.)  On January 7, 2013, the District

sent letters offering waiver slots to the 1084 individuals then on the waiting list.  (Iscandari Decl.

¶ 4.)  By June 4, 2013, the District reported that of the 1084 individuals who had been sent offer

letters, approximately 246 had enrolled; 472 were in the process of enrolling; and 366 had not

---

(PERS), assisted living, and environmental accessibility adaptation services (EAA).  EPD
Waiver Program Participant Handbook 11-12.

[22] These numbers represents the "maximum number of participants served at any point during the
year."  EPD Waiver Renewal, Appendix B (available at http://www.medicaid.gov/Medicaid-
CHIP-Program-Information/By-Topics/Waivers/Waivers.html?filterBy=1915(c)#waivers).

responded, including all of the named plaintiffs.  (Iscandari Decl. ¶ 5.)  Additional names have

been added to the waiting list since January 2013, but it is not clear how many.  (*Compare*

Iscandari Dep. 105 (estimating that 220 individuals were added to the waiting list between

January 7, 2013 and March 20, 2013); Iscandari Decl. ¶ 4 (as of May 21, 2013, there were 1519

individuals on the EPD Waiver waiting list, out of which 1084 had been offered waiver spots)

*with* DHCF, DC Medical Care Advisory Committee Report ("MCAC"),[23] Apr. 2013 (reporting

1397 individuals on the EPD Waiver waiting list, 1084 of whom had been notified of an

available slot); *id.*, Jan. 2014 (same).)

>     ***State Plan Coverage of Personal Care Services***:  Finally, a state Medicaid program may

opt to cover certain "personal care assistance" services.  The District's Medicaid State Plan

includes coverage for "personal care assistance" for up to eight hours per day or 1040 hours per

year, although additional care may be authorized.  *See* 29 D.C. Mun. Regs. §§ 5003.5, 5003.6;

(Iscandari Dep. 55.)  To be eligible to receive personal care assistance services, a Medicaid

beneficiary must have an "extensive need for assistance with at least one of the activities of daily

living," making these services available to individuals who may not meet the nursing

facility/EPD Waiver level-of-care requirements.  (Iscandari Dep. 53-56.)

> **B.      Transitioning Individuals from Nursing Facilities to Home and Community-
>           Based Long-Term Care Services**

> **1.      Money Follows the Person ("MFP") Program**

The MFP Program is a federally-funded grant program with the specific goal of helping

Medicaid beneficiaries who have been in an institutional setting for over 90 days transition to a

---

[23] The DC MCAC Reports are available at http://dhcf.dc.gov/page/dc-medical-care-advisory-
committee.

home and community-based services waiver.[24]  *See Day*, 894 F. Supp. 2d at 13-16; (Sarigol Dep.

21, July 27, 2011).  The District's first official attempt to transition nursing facility residents to

community-based long term care services began in October 2010 when it implemented its MFP

program targeting individuals in nursing facilities who qualified for services under the EPD

Waiver.  (2010 MFP Operational Protocol Amendment 35.)  Since then, 49 nursing facility

residents have transitioned to the community through the MFP program.  Although this number

is not negligible, it is far fewer than the District predicted and there is record evidence that many

more residents are eligible for but have not yet received assistance from the MFP program.

First, as a prerequisite for participation in the MFP program, the District is required to set

annual targets or benchmarks for the number of physically disabled nursing facility residents it

anticipates transitioning via MFP to the EPD Waiver.  In 2007, when the District first applied for

and received approval to participate in the MFP program, the District proposed transitioning a

total of 645 individuals with physical disabilities out of nursing facilities at a rate of over 100 per

year.  (*See* Turnage Dep. 186-88 & Ex. 27 (2007 MFP Rebalancing Demonstration Grant Award

for the District of Columbia)); *see also Day*, 894 F. Supp. 2d at 14.  In 2010, the District's

benchmarks were reduced to 30 residents in 2010; 40 residents in 2011[25]; 40 residents in 2012;

40 residents in 2013; and 40 residents in 2014.  (2013 Olmstead Plan at 39; Sarigol 2013 Dep.

60-61; Def.'s 12/13/2013 Supp. Filing 5.)  To date, the MFP program has consistently fallen far

---

[24] MFP participants are eligible for a payment of up to $5000 in transition expenses related to moving and household set up, total case management during the MFP Demonstration Year, and a one-time community integration payment of up to $1500.  The District had previously been approved for and was using MFP grant money to transition developmentally disabled individuals from intermediate care facilities to the IDD Waiver.  *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Waivers.html?filterBy=1915 (c)#waivers.

[25] At one point, the District had set its benchmark for 2011 at 80 (Turnage Dep. 188), but it then reduced it to 40.  In July 2011, it further reduced it to 26.  (Iscandari Dep. 129-130; Sarigol 2013 Dep. 60.)

short of its targets, transitioning 0 residents in 2010, 17 residents in 2011; 16 residents in 2012;

and 16 residents in 2013, for a total of 49 MFP program transitions from October 2010 through

December 6, 2013.  (Def.'s 12/13/2013 Supp. Filing 1-2 & Ex. 1 ("MMIS Data Chart"); Sarigol

2013 Dep. 58-59, 65-66.)  And although the District reiterated in December 2013 that it had a

goal of 40 MFP transitions for 2014 (Def.'s 12/13/2013 Supp. Filing 5), it has now reduced that

to goal to 30.  (*See* Notice of the District of Columbia's Public Release of Fiscal Year 2014

Agency Olmstead Goals Ex. 1, Mar. 11, 2014 ("2014 Olmstead Goals") [ECF No. 127].)

　　　　Second, in 2012, the MFP program screened 354 nursing facility residents who had either

"asked to be screened or [were] otherwise referred to the Transition Coordinators" and identified

256 who desired to return to the community.  (Def.'s Interrog. Resps. 5.)  Out of the 256, 132

were preliminarily determined to be eligible for MFP.  (Def.'s Interrog. Resps. 5; Sarigol Dep.

140, Feb. 25, 2013.)  In August 2012, the MFP program purportedly "began assisting *all* MFP-

eligible nursing home residents with an identified home address outside of the nursing facility for

whom funding in the [EPD] Waiver program [wa]s available to continue home and community-

based long term services in the year following the MFP Demonstration" (Sarigol Decl. ¶ 4, June

4, 2013 ("Sarigol Decl. I")), but the record does not indicate how many residents fell into this

category or how many transitions resulted from this assistance.  In March 2013, DHCF held a

lottery among the MFP-eligible group (130 individuals) to select 40 residents who did not have

an identified housing option to participate in MFP with the assistance of housing subsidies.[26]

---

[26] Of the 40 selected, 30 were to be assigned Housing Choice Vouchers while 10 were to receive
assistance finding housing through the District of Columbia Housing Authority.  Six named
plaintiffs (Carter, Collins, Goines, Magby, Rivers, and Thorpe) participated in the lottery and
two (Carter and Goines) were selected.  (Sarigol Decl. I ¶¶ 6, 7, 9.)  Carter died before she was
able to transition.  (Sarigol Decl. I ¶ 13.)  As of June 4, 2013, the transition process for Goines
was underway (Sarigol Decl. I ¶¶ 14-15), but the record does not reflect whether she has since
transitioned.  Of the remaining plaintiffs, two (Dupree and Wilkerson) were no longer in a

(Sarigol Decl. I ¶¶ 5, 6.)  Of those 40, only 16 had transitioned by December 2013.  The record does not reflect whether, and, if so, when, any more of the 40 are expected to transition or whether the District has selected any new MFP participants since then.

The pace of the District's transitions through the MFP program has been flagged as too slow by CMS.  Following an "on-site" visit, CMS sent a letter to the DHCF's Medicaid Director in July 2012, noting that there had been a "limited number of transitions" via MFP as of May 2012, and advising the District that "[t]he lack of meeting MFP transition benchmark issue and repeated revision to lower numbers since the start of the 2008 MFP Demonstration program has hampered meeting the intent of [] Olmstead.  Without significant improvement in the number of individuals with significant disabilities transitioned, there is a distinct possibility the continuation of the DC MFP program could be in jeopardy."  (Sarigol 2013 Dep. Ex. 25, at 2 (July 6, 2012 CMS letter to DHCF Medicaid Director)[27]; Teasdell Dep. 184, Feb. 28, 2013 (describing the MFP Program as having "been in a dormant stage for the past thirteen months").)   CMS also "identified several practices that could be improved" in the administration of the MFP Program and "provide[d] recommendations for action."[28]  (Sarigol Dep. Ex. 25, at 1.)  As a result of the CMS review, the District's MFP Program was placed "on an Action Plan for not meeting its

---

nursing home, one (Foreman) had been selected to participate in MFP in 2011, although he had not yet transitioned, and one (Gray) has not been identified as MFP-eligible.  (Sarigol Decl. I ¶¶ 16, 19, 22-23.)

[27] CMS's visit and letter addressed both the EPD and IDD components of the MFP program. (Sarigol Dep. Ex. 25, at 1.)

[28] Among the issues noted by CMS were: "numerous organizational and management/leadership changes in the past 1-2 years," a lack of "robust" "leadership support," potential underutilization of MFP funds due to the implementation of a waiting list for the EPD Waiver, a need for "additional transition case managers and housing specialists to assist with the requirement of increasing the number of transitions, along with other pertinent programmatic transition services such as advocacy, housing, pre-transition services, employment, and other in-kind support services," incomplete outreach and marketing of the MFP program to nursing home residents, and "inadequate assistance in finding housing."  (Sarigol Dep. Ex. 25 at 2-6.)

transition benchmarks for 2011," and the District was told that "the expectation is for [the District] to meet its required transition benchmarks for 2012."  (Sarigol Dep. Ex. 25, at 6.)  CMS further advised the District that "[i]f this requirement as specified in the terms and conditions of the MFP grant does not occur, the receipt of future supplemental funds for 2013 and possibly the future operations of MFP in DC could be negatively impacted."  (Sarigol Dep. Ex. 26, at 6.)  Since the CMS letter, the number of MFP transitions has increased, but it remains far below the transition benchmarks.

### 2.    The District's Olmstead Plan

In April 2012, the District released its first official "Olmstead Plan," which it updated in April 2013.  (Def.'s 12/13/2013 Supp. Filing  Ex. 1, at 2 (District of Columbia, *Olmstead Community Integration Plan: One Community for All*, Apr. 2013 ("2013 Olmstead Plan")).)  Under the Plan, the District's overall goal is to "institute a comprehensive, effectively working plan for placing individuals with disabilities in less restrictive settings" in order "to meet the needs and preferences of the individual while allowing him or her to choose where s/he wants to live in the community with the appropriate supports and services."  (*Id*. at 2.)  Moving nursing facility residents back to the community is one component of the plan.[29]  (2013 Olmstead Plan at 17, 38.)

Two entities in the District are identified as having a role in nursing facility transitions: DHCF and the Aging and Disability Resource Center ("ADRC"), which is part of the District's Office on Aging.  (2013 Olmstead Plan at 17, 38.)  DHCF administers the MFP Program and the EPD Waiver, both of which were in place prior to the adoption of the written Olmstead Plan.  The ADRC's role with respect to nursing facility transitions has developed during the pendency

---

[29] A total of nine District agencies are part of the District's Olmstead Plan, covering a wide range of services and disabilities.  (2013 Olmstead Plan at 1.)

of this case.[30]   After the MFP program completed its screening in 2012, it referred the 124

residents who wanted to move but were not eligible for MFP to the ADRC for further assistance,

and it thereafter referred the 91 individuals who were not selected in the March 2013 lottery.

(Def.'s Interrog. Resp. 5; Sarigol Decl. I ¶ 8.)  In April 2013, ADRC established a "Nursing

Home Transition Team" to "provide assistance to all nursing home residents who wish to move

to less restrictive settings," hired five "full-time Transition Care Specialists" whose sole job is

"assisting nursing facility residents transition to community-based settings" (Teasdell Decl. ¶ 4,

June 4, 2013), and began tracking 175 current residents whom DHCF had identified as interested

in moving to the community.  (Def.'s Notice of Data in Resp. to the Court's Order of Nov. 22,

2013, at 2, Dec. 6, 2013 [ECF No. 118] ("Def.'s 12/6/2013 Supp. Filing"); Def.'s 12/6/2013

Supp. Filing  Ex. 2 (ADRC Nursing Home Transition Team Report) ("ADRC Tracking Rep.").)

ADRC's assistance is available to all nursing facility residents, not just Medicaid beneficiaries.

(Teasdell Decl. ¶ 6.)  In 2013, the District calculates that the ADRC has assisted 56 residents

transition to less restrictive settings.  (Def.'s Reply to Pls.' Resp. to Def.'s Dec. 13, 2013 Supp.

Submission of Nursing Facility Data 5, Dec. 20, 2013 [ECF 124] ("Def.'s 12/20/2013 Supp.

Filing").)  It now oversees all nursing facility transitions except those accomplished under the

MFP program, and if a nursing facility resident indicates in the MDS survey an interest in

moving to the community, the nursing facility is supposed to give that individual's name to the

ADRC.

---

[30] In 2012, although it reported that it "collaborated with DHCF, through a memorandum of
understanding, to assist nursing facility residents in transitioning into community-based settings"
and set a goal of transitioning 60 individuals from both hospitals and nursing facilities, the 41
transitions it accomplished that year were all from hospital settings and not from nursing
facilities.  *See* District of Columbia Gov't Office of Disability Rights, DC – One Community for
All, FY 2012 Summary 5 (Feb. 12, 2013).

The District has not yet issued an updated Olmstead Plan for 2014, but it has publicly released numerical "Olmstead goals" for fiscal year 2014.  (*See* 2014 Olmstead Goals.)  As noted, the MFP goal for 2014 is 30 transitions, 10 less than the MFP benchmark.  For the first time, DHCF has also set a numerical goal of transitioning 25 nursing facility residents directly to the EPD waiver (2014 Olmstead Goals at 10), although it is not clear whether there are any waiver slots available for the nursing facility residents who are seeking to transition outside of the MFP program.  (*See* Turnage Dep. 150; Iscandari Dep. 34-35.)  Also for the first time, ADRC has distinguished between hospital discharges and nursing facility discharges and set a goal of assisting 80 nursing facility residents transition to the community.  For ADRC, though, any nursing facility resident who transitions, regardless of Medicaid coverage or length of stay, is counted toward that goal.  (2014 Olmstead Goals at 3.)

### 3.    Transition Data

Getting an accurate picture of how many nursing facility residents in the District have transitioned to community-based long-term care services since *Olmstead* is exceedingly difficult given the variety of sources of data (some of which is conflicting) both within and outside the District, the significant gaps in the available data, and the parties' disputes over its accuracy and how it is to be interpreted.

According to data submitted by the District,[31] since this lawsuit was filed, a total of 412 Medicaid beneficiaries have been discharged from nursing facilities to community-based long-

---

[31] In an attempt to obtain more current transition data, the Court asked the District to provide it with "updated information as to the number of nursing home residents in 2013 that have been discharged to less restrictive settings with home- and community-based services."  (Order, Nov. 22, 2013 [ECF No. 117].)  The District attempted to do so, relying primarily on data extracted from its Medicaid Management Information System ("MMIS"), a system that keeps track of Medicaid claims for a particular service, *e.g.* long-term care, but is admittedly not up-to-date because providers have up to a year after the service is provided to submit their claims.  (Def.'s 12/6/2013 Supp. Filing 1.)  It supplemented its initial response to answer additional questions

term care services (102 in 2010; 118 in 2011; 112 in 2012; and 81 in 2013 (as of Dec. 6, 2013)0.

(Def.'s 12/6/2013 Supp. Filing 2.)  Out of the 412, approximately 221 had been in a nursing

home for 90 days or longer.  (Def.'s 12/6/2013 Supp. Filing 2.)  Of the over 90-day transitions,

49 were through the MFP program and 14 were through ADRC.[32]  (Def.'s Reply to Pls.' Resp. to

Def.'s Dec. 13, 2013 Supp. Submission of Nursing Facility Data 5, Dec. 20, 2013 [ECF No. 124]

("Def.'s 12/20/2013 Supp. Filing").)

The District has further broken down the overall discharge numbers for 2012 and 2013

for Medicaid beneficiaries who had been in the nursing home for over 90 days to identify how

many transitions came under the MFP program, how many were attributable to the ADRC, and

how many were not attributable to either the MFP program or the ADRC.  For 2012, the District

calculates that there were a total of 63 discharges, 16 under the MFP program, zero with

assistance from the ADRC, and 47 "other" discharges.  (Def.'s 12/13/2013 Supp. Filing 1.)  For

2013, the District calculates a total of 57 discharges, 16 under the MFP program, 14 assisted by

the ADRC, and 27 other discharges.  (Def.'s 12/13/2013 Supp. Filing 2; Def.'s 12/20/2013 Supp.

Filing 5.)

This data, as has been the situation throughout this litigation, is fraught with problems.

At the time of the Court's prior decision, the District had very little information about nursing

home transitions.  *See Day*, 894 F. Supp. at 28.  The record showed that as of October 2011 only

three residents had moved via the MFP program but no data existed as to how many residents

---

from the Court (*see* Def.'s 12/13/2013 Supp. Filing), which led plaintiffs to file a response
challenging various aspects of the District's generation and interpretation of its data (Pls.' Resp.
to Def.'s Dec. 13, 2013 Supp. Submission of Nursing Facility Data, Dec. 18, 2013 ("Pls.'
12/18/2013 Supp. Filing"), and the to file a reply thereto.  (Def.'s 12/20/2013 Supp. Filing.)
Although these disputes will ultimately have to be resolved, it is neither necessary nor possible
of the Court to do so based on the existing record.

[32] Plaintiffs contend that ADRC assisted at most only nine over 90-day Medicaid-recipients.
(Pls.' 12/18/2013 Supp. Filing 3.)

had moved to the EPD Waiver or the State Plan.  *Id.*  Since then, we know from the District that, as of its latest filing in late 2013, it calculates that for the period 2010-2013, there were 221 discharges of Medicaid residents who had been in a nursing home for over 90 days, 49 residents had moved via the MFP program, 14 residents had been assisted by ADRC, and some unknown number of the remaining 160 "other discharges" may have been assisted by the District in their return to community-based long-term care services.  But even assuming that the total discharges of persons in nursing homes for over 90 days to community-based services is 221, that figure covers a four-year period and its significance is vigorously disputed by plaintiffs.

## III.   PROCEDURAL BACKGROUND

Plaintiffs commenced this litigation in December 2010, 11 years after the Supreme Court's decision in *Olmstead*.  After plaintiffs filed their first amended complaint (1st Am. Compl., Mar. 30, 2011 [ECF No. 17]), defendants filed a motion to dismiss or, in the alternative, for summary judgment.  (Def.'s Mot. to Dismiss Or, in the Alternative, for Summary Judgment, April. 27, 2011 [ECF No. 19].)  In addition to its arguments for dismissal, defendants argued that they were entitled to summary judgment because "the District ha[d] instituted several comprehensive and effective programs that facilitate community-based care and transitions from nursing facilities to community-based care."  (*Id.*)  Plaintiffs were allowed discovery in order to respond to the motion for summary judgment.  (Minute Order, Apr. 29, 2011.)  On February 14, 2012, the Court denied the motion, except that it dismissed all claims against the individual defendants on the ground that official capacity claims against them were redundant of the claims against the District.  *See Day v. DC*, 894 F. Supp. 2d 1, 33 (D.D.C. 2012).  The Court concluded that (1) plaintiffs had alleged a sufficient causal connection between their injury and the District's actions to establish standing, *id.* at 22-23; (2) plaintiffs did not need to allege, in order to state an *Olmstead* integration claim, that the District's own health-care professionals had

determined that community-based services were appropriate, given the allegation that other

"health-care professionals" had made that determination, *id.* at 23-24, or that the cost of

community-based care would be less than the cost of care in a nursing facility, *id* at 24-25; and

(3) the undisputed facts did not establish that the District had a "measurable commitment to

deinstitutionalization," an "essential component of an 'effectively working' [Olmstead

integration] plan," but rather that the evidence as of October 2011 demonstrated that the

District's nursing facility population had remained constant; only three nursing facility residents

had transitioned to the EPD Waiver through the MFP program, and although the EPD Waiver

had been available since 1999, the District kept no record of how many waiver slots were filled

by nursing facility residents.  *Id.* at 27-28 (quoting *Olmstead*, 527 U.S. at 606–07).

### A.      Second Amended Complaint & First Motion for Class Certification

Thereafter, plaintiffs filed their second amended complaint (2d Am. Compl., Apr. 2, 2012

[ECF No. 46]), and shortly thereafter, their first motion for class certification.  (Pls.' Mot. for

Class Certification, May 15, 2012 ("1st CC Mot.") [ECF No. 54].)  Plaintiffs sought to certify a

class composed of:

> All persons with disabilities who are eligible for Medicaid funded services from
> the District of Columbia and who (1) with appropriate supports and services could
> and would live in the community; and (2) now or during the pendency of this
> litigation are receiving services funded by the District of Columbia in a nursing
> facility.

(1st CC Mot. 2.)[33]  As relief, plaintiffs sought "a permanent injunction requiring Defendant to

promptly take such steps as are necessary to serve Named Plaintiffs and class members in the

most integrated settings appropriate to their needs."  (2d Am. Compl., Prayer for Relief.)

---

[33] In their original and first amended complaints, plaintiffs defined the class as:

> All those persons who (1) have a disability; (2) receive services in nursing
> facilities located in the District of Columbia or funded by Defendants at any time

The Court held a hearing on plaintiffs' motion on January 7, 2013.  During the hearing, the Court confirmed that plaintiffs were seeking only systemic relief and that they were not seeking any relief from the Department of Mental Health ("DMH").  At the end of the hearing, the Court advised plaintiffs that it would not grant the motion to certify the class as "presently constituted" for several reasons, including (1) the discrepancy between the purported systemic goals of the litigation and the undefined but individualized injunctive relief sought by the second amended complaint; and (2) plaintiffs' failure to avoid overlap between their claims and the class action settlement in *Dixon v. Gray*, No. 74-cv-0285 (D.D.C. Feb. 16, 2012), which created an integrated community-based mental health system designed to guarantee the rights of individuals with mental illness to community-based treatment under the least restrictive conditions.[34]  (Hrg. Tr. 92-94, Jan. 7, 2013 ("1/7/13 Hrg. Tr.").)  To allow plaintiffs an opportunity to address these deficiencies, the Court denied the motion for class certification without prejudice and set a schedule for plaintiffs to file a third amended complaint and a renewed motion for class certification.  (Am. Scheduling Order, Jan. 17, 2013 [ECF No. 87].)  The District, in the meantime, sought a stay "to allow for the implementation of a new nursing facility community transition initiative"[35] that would "likely be highly relevant to the merits of Plaintiffs' claims,

during the pendency of this litigation; (3) could live in the community with appropriate supports and services from Defendants; and (4) prefer to live in the community rather than in nursing facilities.

(Compl. ¶ 90; 1st Am. Compl. ¶ 96.)

[34] *See* Consent Order, *Dixon v. Gray*, No. 74-0285 (D.D.C. Feb. 16, 2012) (approving settlement agreement whose purpose was to "ensure continuity of numerous improvements made by the District government to its community-based mental health system over the last decade, increase the stock of supported housing within the District, and ensure the expansion of numerous evidence-based practices of importance to mental health consumers"); *see also Dixon v. Weinberger*, 405 F. Supp. 974, 975, 979-80 (D.D.C. 1975).

[35] Presumably, this new initiative is the initiative that appeared a few months later in the 2013 Olmstead Plan.

and will almost certainly impact the scope of any injunctive relief that the Court may ultimately

order." (Proposed Revised Case Mgmt. Order 1-2, Jan. 15, 2013 [ECF No. 86].) This request

was denied, but the District's request to delay the identification of experts and expert discovery

until after a decision on class certification was granted. (Hrg. Tr. 3, 7, Jan. 17, 2013 ("1/17/2013

Hrg. Tr."))

## B.     Third Amended Complaint & Renewed Motion for Class Certification

On March 27, 2013, plaintiffs filed their third amended complaint, which added six new

class representatives, revised the proposed class definition in several ways, and amplified

plaintiffs' requests for relief. Of the remaining nine named plaintiffs, *see supra* n.1, six (Thorpe,

McDonald, Collins, Goines, Gray and Rivers) presently reside in nursing facilities and receive

Medicaid-covered long-term care services,[36] while three (Dupree, Foreman, and Wilkerson) have

transitioned to less restrictive settings during the pendency of this lawsuit.[37]

The revised class definition differs from the prior definition in that it limits the class to

individuals who have a physical disability, have been in a nursing facility for over 90 days, and

---

[36] Collins has resided in a nursing facility since January 19, 2012 (Collins Decl. ¶ 3, Mar. 27, 2013); Goines has resided in a nursing facility since December 1, 2009 (Goines Decl. ¶ 5, Apr. 23, 2013); Gray has resided in a nursing facility since February 16, 2010; McDonald has resided in a nursing facility for over six years (McDonald Decl. ¶ 4, Mar. 26, 2013); Rivers has resided in a nursing facility since June 22, 2011 (Rivers Decl. ¶ 5, Mar. 15, 2013); Thorpe has resided at a nursing facility since March 2008. (Thorpe Decl. ¶ 3, Apr. 2, 2013.)

[37] Dupree spent approximately six years, from 2006 to August 2012, in a nursing facility before transitioning to an assisted living facility. (Simhoni Decl. ¶ 2.) On September 18, 2012, the District filed a motion to dismiss the claims of Dupree as moot due to his move out of the nursing facility. (Def.'s Mot. to Dismiss the Claims of Plaintiff Donald Dupree as Moot, Sept. 18, 2012 [ECF No. 64].) Wilkerson spent almost ten years in a nursing facility, from December 2003 to October 10, 2012, before transitioning to the community. (Wilkerson Decl. ¶¶ 4-6, Dec. 27, 2012.) On December 13, 2012, the District also moved to dismiss Wilkerson's claims as moot. (Def.'s Mot. to Dismiss the Claims of Plaintiff Curtis Wilkerson as Moot, Dec. 13, 2012 [ECF No. 81].) In January 2013, the Court denied both motions. (*See* Mem. Op. and Order, Jan. 9, 2013 [ECF No. 85].) Since then, Foreman, who had spent over seven years in a nursing facility from May 12, 2006, to September 25, 2013, transitioned to the community. (Foreman Decl. ¶ 4, Apr.13, 2013; Foreman Decl. ¶ 2, Oct. 22, 2013).)

need transition assistance from the District in order to leave the nursing facility and obtain

community-based long-term care services.  The proposed revised class definition reads:

> All persons with physical disabilities who, now or during the pendency of this lawsuit: (1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days; (2) are eligible[38] to live in the community; and (3) would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-term care services in the community.

(3d Am. Compl. ¶ 153.)

According to this latest iteration, the class "requires a District-wide common system of

transition services to connect its members with community-based supports and long-term care

services."  (3d Am. Compl. at 2.)  It alleges that the District's existing system of transition

assistance is deficient because the District "fails to":

> i. Assure that individuals with physical disabilities receive long-term care services in the most integrated community-based setting appropriate to their needs;

> ii. Develop and implement a comprehensive and effectively working integration plan with measurable targets for transitioning sufficient numbers of Plaintiffs from nursing facilities to the community within specified time frames, demonstrate progress toward meeting those targets, and sustainability of the transition process and community-based service infrastructure through resource allocation and systemic reform that rebalances the long-term care service system. The integration plan must guide the District's inter-agency actions to: inform Plaintiffs about community-based alternatives, identifies Plaintiffs prefer to get their long-term care services in the community, and help them move to the community with the long-term care services and supports they need;

> iii. Ensure capacity in its Medicaid long-term care programs and services under the EPD Waiver Program, the State Plan Personal Care Assistance Program, Money Follows the Person Program, and programs for senior citizens and adults with physical disabilities to enable named Plaintiffs and class members to transition from nursing facilities to the community with these long-term care services and case management assistance;

---

[38] Plaintiffs have clarified that they are using the term "eligible" to mean eligible for existing Medicaid-covered home and community-based long-term care services for the physically disabled, such as through the EPD Waiver or the Medicaid State Plan.

iv. Ensure sufficient staffing to inform individuals with physical disabilities in nursing facilities about available long-term care services in the community and assess the community eligibility of individuals with physical disabilities in nursing facilities and provide transition assistance, i.e., assist named Plaintiffs and class members to obtain identification documents, complete housing applications, and arrange long-term care services upon discharge from the nursing facilities;

v. Provide adequate and appropriate community-based long-term care services to assist Plaintiffs with their activities of daily living (bathing, dressing, mobility, toileting, eating) and instrumental activities of daily living (*e.g.*, meal preparation, grocery shopping, laundry), and skilled nursing needs;

vi. Assure that people with physical disabilities are not unnecessarily placed in nursing facilities by, for example, informing them prior to, and upon admission of the availability of integrated, community-based options for long-term care services as an alternative to nursing facility placement, offering them a meaningful choice of community placement, or offering any assistance to those who seek to return to live in the community;

vii. Assure that individuals with physical disabilities residing in nursing facilities are periodically asked about their interest in, assessed for, and where appropriate, transitioned from nursing facilities to community-based long-term care services;

viii. Ensure that all nursing facilities that receive DC Medicaid funding inform individuals with physical disabilities about community-based alternatives and begin discharge planning upon admission to assist Plaintiffs to transition back to the community from nursing facilities;

ix. Provide clear and accurate information to Plaintiffs regarding their eligibility for community-based long-term care services, the process for accessing these services, and assisting them to apply for the services;

x. Provide information, transitional assistance, and referrals to facilitate Plaintiffs' access to supportive housing as necessary to enable Plaintiffs to no longer be unnecessarily segregated in nursing facilities; and

xi. Take adequate steps to preserve Plaintiffs' existing community housing subsidies during periods of placement in nursing facilities so that people can maintain homes to which they may return.

(3d Am. Compl. ¶ 139.)

The above request for relief still seeks broad and far-ranging institutional reform of the

care and treatment of several thousand DC Medicaid recipients who have physical disabilities

and currently reside in nursing homes.  Specifically, the relief goes far beyond transitional
services by seeking "a permanent injunction requiring Defendant to promptly take *the following
steps that are necessary* to serve Plaintiffs in the most integrated settings appropriate to their
needs," with the steps defined as "develop[ing] and implementing a working system of transition
assistance for Plaintiffs," "ensur[ing] sufficient capacity of community-based long-term care
services," "successfully transition[ing] Plaintiffs from nursing facilities to the community with
the appropriate long-term care community-based services" with a specified "minimum number
of transitions in each of the next four years,"[39] and "sustain[ing] the transition process and
community-based long-term care service infrastructure."  (3d Am. Compl., Prayer for Relief
(emphasis added).)[40]

---

[39] Plaintiffs' request to move a targeted number of people on an annual basis appears to directly
contradict counsel's representation at the January 7, 2013 hearing that they were *not* seeking an
injunction to move a certain number of people.  (1/7/2013 Hrg. Tr. 17 ("[W]e're not asking this
Court to give us a number of people to have to get out in a year.  Because we believe that what
we would like to see is that the system is built.").)  Despite this representation, plaintiffs persist
in seeking a specified number of transitions per year for four years, even though this arguably
runs afoul of *Wal-Mart*'s prohibition against individualized injunctive relief, *see Wal-Mart*, 131
S. Ct. at 2557, a limitation that was extensively addressed by the Court at the January 7 hearing
(*see* 1/17/2013 Hrg. Tr. 19, 36, 62, 98-99) and acknowledged by plaintiffs' counsel.  (1/7/2013
Hrg. Tr. 62.)

[40] Plaintiffs request that the District be ordered to:

> i) Develop and implement a working system of transition assistance for Plaintiffs
> whereby Defendant, at a minimum, (a) informs DC Medicaid-funded nursing
> facility residents, upon admission and at least every three months thereafter, about
> community-based long-term care alternatives to nursing facilities; (b) elicits DC
> Medicaid-funded nursing facility residents' preferences for community or nursing
> facility placement upon admission and at least every three months thereafter; (c)
> begins DC Medicaid-funded nursing facility residents' discharge planning upon
> admission and reviews at least every month the progress made on that plan; and
> (d) provides DC Medicaid-funded nursing facility residents who do not oppose
> living in the community with assistance accessing all appropriate resources
> available in the community.

> ii) Ensure sufficient capacity of community-based long-term care services for
> Plaintiffs under the EPD, MFP, and PCA programs, and other long-term care

On April 11, 2013, the District filed a motion to dismiss the third amended complaint. On May 6, 2013, plaintiffs filed their renewed motion for class certification based on the third amended complaint.  The United States is not a party to this litigation but it filed a Statement of Interest in support of the plaintiffs' renewed motion for class certification.  (Statement of Interest of the United States of America, June 26, 2013 [ECF No. 109].)  On December 13, 2013, the Court held a hearing on both motions.

## ANALYSIS

The pending motions present many challenging issues, several of which raise serious questions as to whether plaintiffs can prevail on the merits and whether they are entitled to the far-ranging systemic relief they seek.  For example, many nursing facility residents, including named plaintiffs, lack readily affordable housing in the community, and it is agreed that the

---

service programs, to serve Plaintiffs in the most integrated setting appropriate to their needs, as measured by enrollment in these long-term care programs;

iii) Successfully transition Plaintiffs from nursing facilities to the community with the appropriate long-term care community-based services under the EPD, MFP, and PCA programs, and any other longterm care programs, with the following minimum numbers of transitions in each of the next four years:

> 80 class members in Year 1;
> 120 class members in Year 2;
> 200 class members in Year 3; and
> 200 class members in Year 4.

iv) Sustain the transition process and community-based long-term care service infrastructure to demonstrate the District's ongoing commitment to deinstitutionalization by, at a minimum, publicly reporting on at least a semi-annual basis the total number of DC Medicaid-funded nursing facility residents who do not oppose living in the community; the number of those individuals assisted by Defendant to transition to the community with long-term care services through each of the MFP, EPD, and PCA, and other long-term care programs; and the aggregate dollars Defendant saves (or fails to save) by serving individuals in the community rather than in nursing facilities.

Court cannot order the District to provide housing.  Plaintiffs may therefore be unable to

establish causation – a causal link between any proven deficiencies in the District's system of

transition assistance and the injury associated with being "stuck" in a nursing facility.  Similarly,

there is a substantial question as to whether plaintiffs' request for injunctive relief exceeds the

scope of their claims (in particular their request for "sufficient capacity of community-based

long-term care services" and the transition of a specified number of individuals ranging from 80

per year to 200 class members in year 4), even if they succeed in proving that the District's

system is deficient and that there is a causal link between those deficiencies and their injuries.  In

addition, ruling on plaintiffs' motion for class certification is complicated by the Supreme

Court's decision in *Wal-Mart* and the application of that decision by the Court of Appeals in *DL*.

As discussed herein, these decisions suggest that a court must take a hard look at the merits

before finding that the commonality requirement has been satisfied, but how this is to be

accomplished in an *Olmstead* case prior to an adjudication on the merits is far from clear,

especially since the District's progress to date has been, at best, difficult to assess.[41]

Nonetheless, despite these serious problems, the Court concludes that plaintiffs here have

carried their burden under Rule 23.  Although admittedly the District has made some progress in

the recent past, and this progress appears to be continuing, there remain a number of indisputable

facts that support class certification.  Over the course of this litigation, the number of Medicaid

---

[41] Obviously, if the District is ultimately able to demonstrate that its Olmstead Plan is effective, it may be that it will be appropriate to revisit certification.  For instance, an *Olmstead* class of nursing facility residents or potential residents was decertified in the Northern District of Florida in *Lee v. Dudek*, No. 4:08-cv-0026 (N.D. Fla. Jan. 3, 2012) after the judge found that "[a]n unrelated legislative development—a virtually limitless appropriation for transitioning Medicaid beneficiaries from nursing homes into the community—led to substantial changes in the state's Medicaid program," with the result that it "was no longer true that the state 'has refused to act on grounds that apply generally to the class" and, therefore, the class no longer satisfied the requirements of Rule 23(b)(2).  *Id*. at 2, 12.

recipients who have been in nursing facilities for more than 90 days has been a relatively constant figure of approximately 2000.  Despite goals under the MFP to transition 40 nursing facility residents per year from 2011-2013,[42] during that three-year time period only 49 residents (or approximately 40% of the goal) were in fact transitioned.  The 2014 Olmstead goal for ADRC has been set at 80 nursing home residents (2014 Olmstead Goals at 3), but that goal encompasses all nursing home residents, not only Medicaid beneficiaries and not dependent on the length of stay.  And, in 2013, while the ADRC assisted a total of 56 residents, at most 14 of these individuals were Medicaid recipients who had been in a nursing home for over 90 days. With respect to nursing facility transitions directly to the EPD Waiver, the District does not keep track of that information on a current basis, although to some extent it can extract the information from the MMIS data.  In addition, questions remain about the availability of waiver slots and the status of the waiver waiting list, making it hard to know what to make of the 2014 Olmstead goal of 25 transitions from nursing facilities directly to the EPD waiver.  Yet, it is undisputed that many Medicaid residents in nursing homes have expressed a desire to receive services in a less restrictive setting in the community, but have not been able to do so.

In short, the District has yet to demonstrate that its Olmstead Plan is an "effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated."  *Olmstead*, 527 U.S. at 606-07.  On this basis, to the extent that *Wal-Mart* requires the Court to take a hard look at the merits in deciding whether the Rule 23 prerequisites for deciding class certification have been met, the Court finds, as more fully explained below, that these requirements have been met.

---

[42] If 2010 were included, where the target was 30 residents, but no residents transitioned, the rate would fall to approximately 33%.

## I.   THE DISTRICT'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

### A.   Implied Requirement of Definiteness

The District first argues that the Third Amended Complaint should be dismissed because the proposed class definition has "several, fatal defects" that render it "not sufficiently definite to permit certification."[43]  (MTD 5.)

The requirement of "definiteness" has been imposed by courts as an "implied requirement" for class certification, in addition to the express requirements in Rule 23.  *See DL v. District of Columbia*, No. 05-cv-1437, 2013 WL 6913117, at *11 (D.D.C. Nov. 8, 2013) ("Definiteness is not mandated by Rule 23 but is a judicial creation requiring that the class be (1) adequately defined; and (2) clearly ascertainable." (internal quotations omitted)).  The "common-sense requirement" that plaintiffs "establish that a class exists" is "not designed to be a particularly stringent test," but rather requires plaintiffs to "be able to establish [that] 'the general outlines of the membership of the class are determinable at the outset of the litigation.'"  *See Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C.1998) (quoting 7A Charles Alan Wright, *et al.*, Federal Practice & Procedure § 1760 (3d ed.)).  "The level of precision . . . required varies depending on the type of class sought to be certified" under Rule 23(b).  *See Kenneth R. v. Hassan*, 293 F.R.D. 254, 263-64 (D.N.H. 2013); William B. Rubenstein, Newberg on Class Actions § 3:7 (5th ed.).  For example, in a Rule 23(b)(3) class action, "a high level of precision in defining class membership is necessary . . . because all class members must be identified in order to notify each of his or her opt-out rights, and, later, to distribute monetary relief."[44]  *Kenneth R.*, 293

---

[43] Although the District first raises this argument in its motion to dismiss, it also adopts it by reference in its opposition to plaintiffs' motion for class certification.  (*See* CC Opp. 15.)

[44] Fed. R. Civ. P. 23(b)(3) provides that a class action "may be maintained if" . . . "the court finds that the questions of law or fact common to class members predominate over any questions

F.R.D. at 264; *see also* Newberg on Class Actions § 3:3 (critical question is whether class membership "can be ascertained" with reference to "objective criteria").  By contrast, "where certification of a (b)(2) injunctive class is sought, actual membership of the class need not . . . be precisely delimited" because such cases will not require individualized notice, opt-out rights, or individual damage assessments, and the defendant will be required to comply with the relief ordered no matter who is in the class.[45]  *Kenneth R.*, 293 F.R.D. at 264 (internal quotations omitted); *see* Newberg on Class Actions § 3:7.  In those cases, the definiteness requirement is satisfied as long as plaintiffs can establish the "existence of a class" and propose a class definition that "accurately articulates 'the general demarcations' of the class of individuals who are being harmed by the alleged deficiencies."  *See, e.g., Kenneth R.*, 293 F.R.D. at 264; *see also DL*, 2013 WL 6913117, at *12 ("Because the rationale for precise ascertainability is inapposite in the 23(b)(2) context, . . . it is not required in cases such as this where only injunctive relief is sought and notice is not required.").[46]

---

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

[45] *See also McCuin v. Sec. of Health and Human Svcs.*, 817 F.2d 161, 167 (1st Cir. 1987) ("[W]here only declaratory and injunctive relief is sought for a class, plaintiffs are not required to identify the class members once the existence of the class has been demonstrated."); *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("Rule 23(b)(2) [is] well suited for cases where the composition of a class is not easily ascertainable" due to the "shifting" nature of the population, although "[e]lements of manageability and efficiency are not categorically precluded in determining whether to certify a 23(b)(2) class."); *Floyd v. City of New York*, 283 F.R.D. 153, 172 (S.D.N.Y. 2012) ("[G]eneral class descriptions based on the harm allegedly suffered by plaintiffs are acceptable in class actions seeking only declaratory and injunctive relief under Rule 23(b)(2).") (internal quotations omitted).

[46] The cases cited by the District are not to the contrary for none of them sought certification under Rule 23(b)(2).  (*See* MTD 4 (citing *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443 (5th Cir. 2007); *Schilling v. Kenton County*, No. 10-cv-0143, 2011 WL 293759, at *6-7 (E.D. Ky. Jan. 27, 2011); *Hylaszek v. Aetna Life Ins. Co.*, No. 94-cv-5961, 1998 WL 381064 (N.D. Ill. July 1, 1998)).)

The District urges the Court to reject the proposed class definition for lack of definiteness because (1) the identity of class members is not "readily ascertainable" with reference to "objective criteria" now that the proposed class includes only individuals who need transition assistance from the District[47]; and (2) the definition is overbroad because it does not exclude individuals who lack identified housing in the community or individuals who are under DMH's umbrella.

### 1.    Ascertainability

The District contends that the identity of class members is not "readily ascertainable" with reference to "objective criteria" because the term "transition assistance" is too "vague,"[48] and even if the term had a clear definition, it would be impossible to know who needs transition assistance from the District without extensive "individualized" inquiry.  (MTD 7; MTD Reply 2.)  Neither criticism is persuasive.

Although the term "transition assistance" could mean a number of things, plaintiffs have set forth in their complaint (*see* 3d Am. Compl. ¶ 139 & Prayer for Relief), and in response to the District's motion, a fairly specific description of what they intend it to mean:

> Defendant must establish and implement a policy of transition assistance that identifies the services each class member currently receives and needs, identifies the corresponding services available in the community, and then takes steps to bridge the divide.  The Court is asked only to order the implementation of the

---

[47] Plaintiffs agree that the revised definition includes this limitation.  (MTD Opp. 8 ("If individuals, on their own, are able to leave nursing facilities and subsequently obtain long-term care services from the District in the community, they have not been harmed by the District's policies governing their access to community-based long-term care services to help them with their activities of daily living, and its resulting failure to provide assistance to enable them to transition to the community.  Plaintiffs have proposed the more narrow definition to ensure Defendant's resources are not misdirected toward people who are not suffering violations of their Olmstead rights.  The class thus includes only those who are stuck in nursing facilities because they need assistance to return to the community").)

[48] The District makes a similar point when challenging plaintiffs' ability to show typicality.  *See infra* § II.A.3.a.

system itself; the system will then carry out the work needed to desegregate the class members.  This might include, for example: the distribution of, and assistance with completing applications for identification documents, housing, transportation, and personal care assistance services, and the arrangement of these services prior to nursing facility discharge to ensure implementation upon class members' transition to the community.  Defendant's policy and practice must make assistance available to class members to enable them to complete the steps toward moving back to the community with the Medicaid long-term personal care assistance services that exist in the community and are needed by all class members to help them with their activities of daily living.

(Pls.' Opp'n to Def.'s Mot. to Dismiss the Third Am. Compl. at 10, May 6, 2013 ("MTD Opp.") [ECF No. 102]).

Moreover, while it may be correct that it is impossible to identify specifically who needs transition assistance from the District without individualized determinations (*see* MTD 6-7),[49] this is not a "fatal" defect.  First, as this is a Rule 23(b)(2) class action, absolute precision is not required.  *See supra* § I.A*; see also Kenneth R*., 293 F.R.D. at 264.  Second, although exact identification of class members who need transition assistance would be impossible without individualized inquiries, the proposed class definition also includes a requirement that residents have been in a nursing facility for more than 90 days, which plaintiffs suggest is a fair proxy for determining which residents are "stuck" in a nursing facility and need the District's assistance to leave.  (MTD Opp. 9.)  As plaintiffs point out, the MFP Program uses a similar 90-day length of stay requirement to ensure that the program serves its purpose of increasing the use of home and community-based rather than institutional long-term care services.  (MTD Opp. 9.)  Of course, not every resident who has been in a facility for over 90 days necessarily needs transition assistance, but that criteria is an adequate proxy to "accurately articulate[] 'the general

---

[49] The Court does not agree with plaintiffs' suggestion that the 2010 MDS survey data provides this information.  (*See* MTD Opp. 5.)  The MDS data only identifies residents who wish to speak to someone about moving to the community (or expect to move to the community), but does not include information about whether they need transition assistance from the District to do so.

demarcations' of the class of individuals who are being harmed by the alleged deficiencies"

under Rule 23(b)(2).  *See, e.g., Kenneth R.*, 293 F.R.D. at 264.  If plaintiffs ultimately prevail,

the District may have to implement a system that identifies which residents need transition

assistance and what assistance they need, but until then, there is no reason for the Court to insist

on a more definitive class definition.

## 2.      Overbreadth

The District also argues that the proposed class definition is "fatally overbroad in two

important respects" -- it fails "to exclude *Dixon* class members and/or individuals who would

receive assistance from DMH," and individuals "who lack a housing option in the community."

(MTD 9-11.)  According to the District, "[c]ourts will not certify a class where the definition

includes a substantial number of individuals who have no claim to relief."  (MTD 9 (citing *Vigus*

*v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.RD. 229, 235 (S.D. Ill. 2011) ("Where a class is

overbroad and could include a substantial number of people who have no claim under the theory

advanced by the named plaintiff, the class is not sufficiently definite.").)

The District's analysis is flawed.  First, the court in *Vigus* was applying a stringent

version of the definiteness requirement, which is not required for a Rule 23(b)(2) class action.

Second, and more importantly, the inclusion of DMH consumers and those who lack identified

housing in the community does not render the class overbroad.

### a.      Failure to Exclude All DMH Consumers

As the District rightly points out, the proposed class definition "continues to incorporate

individuals with serious and persistent mental illnesses" if those individuals also have physical

disabilities.  (MTD 9; MTD Reply 10.) The District argues that these individuals should be

excluded because DMH "would assist [their] moving into less restrictive settings."  (MTD 9;

MTD Reply 10.)  Plaintiffs maintain that by limiting the class to individuals with physical

disabilities, they have excluded residents who are exclusively the DMH's responsibility, but that residents who have both physical and mental disabilities are properly part of the class because DHCF and DCOA are the agencies through which they access community-based long-term care services.  (MTD Opp. 12.)[50]

At this point, plaintiffs' revised class definition satisfies the Court's primary concern, for it excludes any request for systemic changes to DMH, which is the subject of the *Dixon* settlement.  The District reads the discussion during the January 7, 2013 hearing as requiring the exclusion of all DMH consumers and requiring plaintiffs to conduct discovery to identify those individuals.  (*See* MTD 11 n.5.)  But the Court agrees with plaintiffs that there is no need for the class to be narrowed to that extent as long as the DMH consumers in the class are also physically disabled and eligible for long-term care services and transition assistance administered by DHCF or DCOA. The Court finds ample evidence in the record to support plaintiffs' contention that these individuals are no different than any other Medicaid-covered physically disabled resident in terms of their eligibility for the long-term care services administered by DHCF and for nursing facility transition assistance provided by DHCF and DCOA.  Contrary to the District's view, it is not necessary for plaintiffs to establish "that DMH has no role in assisting individuals with physical disabilities to leave nursing facilities."  (MTD Reply 9-11.)  DMH clearly has a role, but just because a resident is a DMH consumer and eligible for transition assistance from the DMH does not preclude him or her  from being eligible for and benefiting from transition assistance from DHCF or DCOA.  (*See, e.g.*,  Teasdell 30(b)(6) Dep. 98–99, Feb. 28, 2013; Sarigol 2011

---

[50] The record supports this contention.  (*See* 2013 Olmstead Plan; Sarigol 30(b)(6) Dep. 59 (MFP assists those with physical and mental health needs); Teasdell 30(b)(6) Dep. 17-19, 98-99 (DHCF and ADRC are the two agencies responsible for the day-to-day assistance of nursing facility residents to transition to the community); Teasdell Dep. 288 (discharge planning by ADRC staff includes identifying home health services and mental health services).)

Dep. 19-21), Absent evidence that the DMH has exclusive responsibility for DMH consumers in nursing facilities, these individuals do not have to be excluded from the class.

### b.       Failure to Exclude Residents Who Lack Housing

The District also argues that the revised class definition is overbroad because it fails to exclude nursing facility residents who lack "an identified housing option" in the community. (MTD 11.)  According to the District, such individuals must be excluded because they cannot be in need of "transition assistance." (MTD Reply 9 ("To demand that the District provide transition assistance to individuals without a place to go is baffling").)  Plaintiffs counter that even though they have "never requested the Court to order [the District] to create, or even fund, housing," part of an effective system of transition assistance would include assistance to "access available housing resources in the community."  (MTD Opp. 13, 18.)

There is no question that many of the proposed class members lack an "identified housing option."  (*See* Def.'s Interrog. Resps. 7 & n.1; *see also* CC Opp. 21-22 (list of citations to record re housing problem).)  What this will mean for plaintiffs' case on liability cannot be determined at this stage, for if the only barrier to movement for most residents is the lack of a place to go (and not the lack of transition services), plaintiffs may not be able to prove a causal link between the alleged deficiencies in the District's system of transition assistance and the alleged unnecessary segregation.

At this stage, however, the Court is not in a position to resolve the merits, but only whether the proposed class definition is overbroad.  On that limited issue, the Court agrees with plaintiffs that there is no overbreadth problem.  Just because a resident lacks readily-identifiable housing in the community does not automatically mean that plaintiffs will not be able to show that there is "transition assistance" that the District could and should provide.  Indeed, one of the named plaintiffs who initially lacked readily identifiable housing in the community (*see* Dupree

Dep. 112), has since been able to transition.  (Simhoni Decl. ¶ 10, Apr. 5, 2013.)  Accordingly,

the Court agrees with plaintiffs that a lack of readily-identifiable housing does not require

categorical exclusion from the class.[51]

### B.      Standing Arguments

The District's motion to dismiss also challenges plaintiffs' standing on two grounds,

neither of which has merit.  First, it argues that if the proposed class definition is deficient, the

named plaintiffs "lack standing to pursue the system-wide injunctive relief set forth therein."

(Mot. to Dismiss at 12.)  As the Court has rejected the District's challenges to the proposed class

definition, this argument is moot.

The District also argues that named plaintiffs lack standing even if the class definition is

not rejected because "the broad systemic relief requested . . . still far exceeds the specific injuries

alleged by the named Plaintiffs."  (MTD 16 (complaint "seeks relief to address purported

inadequacies of the District's long-term care system that are not even alleged to have injured the

named Plaintiffs").)  To support this argument the District relies *Lewis v. Casey*, wherein the

Supreme Court observed:

> That a suit may be a class action . . . adds nothing to the question of standing, for
> even named plaintiffs who represent a class must allege and show that they
> personally have been injured, not that injury has been suffered by other,
> unidentified members of the class to which they belong and which they purport to
> represent.

518 U.S. 343, 357 (1996) (internal quotations omitted).

---

[51] There are significant factual disputes pertaining to the availability of housing vouchers and
other housing-related issues.  (*Compare* MTD Opp. 13 (the District should provide assistance "to
access the 1,500 housing subsidy vouchers currently administered by [the District]") (citing
Otero Dep. 82-84 & Ex. 15 (chart dated July 1, 2011, showing "Federal Vouchers Set Aside for
City-related Projects"), Mar. 27, 2013 *with* MTD Reply 8-9 ("[t]he reality is that only 30
Housing Choice Vouchers are set aside for nursing home residents who are not DMH consumers,
and those Vouchers have already been allocated through a lottery administered by MFP earlier
this year" (citing Sarigol Decl. I ¶ 5).)

In *Lewis*, a class action challenging various prison rules, the Court vacated the systemic aspects of the district court's injunction on the ground that the district court had "found actual injury on the part of only one named plaintiff." *Id*. at 358. Under those circumstances, the Court explained, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*, 518 U.S. at 357.

The District ignores, however, that *Lewis* was in a different posture from the present case. In *Lewis*, the Supreme Court was reviewing an injunction that had been entered after a trial on the merits. In reaching its decision, the Court emphasized that the procedural posture of a case was critical when considering whether the elements of standing were satisfied. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id*. at 358 (internal quotations omitted). "[A]t the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id*. (internal quotations omitted).

Here, the District is asking the Court to reject plaintiffs' requested relief for lack of standing at the motion to dismiss stage. Although the Court agrees with the District that there is a serious question as to whether at least a part of the "broad systemic relief requested . . . exceeds the specific injuries alleged by the named plaintiffs" (MTD 16), that is not the case for all of the relief. Moreover, plaintiffs' potential inability to prove an injury that justifies the relief sought does not require that their claims be dismissed for lack of standing.[52]

---

[52] Having considered and rejected the District's motion to dismiss on the merits, the Court need not address plaintiffs' contention that the District was barred from filing its motion by Fed. R. Civ. P. 12(g) and 12(h)(2). (*See* MTD Opp. 22-24.)

While the Court will undoubtedly have to return to *Lewis*'s admonition that not only must the remedy be limited to a proven inadequacy, but the "inadequacy [must be] widespread enough to justify systemwide relief," *Lewis*, 518 U.S. at 359, that inquiry will have to wait until another day.[53]

## II.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A.   LEGAL STANDARD

A principal purpose of class certification is to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical manner.  *See General Tel. Co.. v. Falcon,* 457 U.S. 147, 155 (1982).  Rule 23(a) sets forth the formal "prerequisites" for any class action:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

If these prerequisites are satisfied, Rule 23(b)(2) provides that a class action "may be maintained" if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  "The party requesting class certification under Rule 23 bears the burden of showing the existence of a class, that all prerequisites of Rule 23(a) are

---

[53] *See also Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977) ("[I]nstead of tailoring a remedy commensurate with the three specific violations, the Court of Appeals imposed a systemwide remedy going beyond their scope"); *id.*, at 420 ("[O]nly if there has been a systemwide impact may there be a systemwide remedy"); *Califano v. Yamasaki*, 442 U.S. 682, 702, (1979) ("scope of injunctive relief is dictated by the extent of the violation established").

satisfied[,] and the class falls within one of the categories of Rule 23(b)." *Bynum v. District of Columbia,* 214 F.R.D. 27, 30–31 (D.D.C. 2003) (citations omitted); *Johnson v. District of Columbia*, 248 F.R.D. 46, 51 (D.D.C. 2008).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 131 S. Ct. at 2551. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (internal quotations omitted); *see also Falcon*, 457 U.S. at 160 ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable"). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Wal-Mart*, 131 S. Ct. at 2551-52 (quoting *Falcon*, 457 U.S. at 160). However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *DL v. District of Columbia*, 713 F.3d 120, 125-26 (D.C. Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013)). Ultimately, "[a] district court exercises broad discretion in deciding whether to permit a case to proceed as a class action." *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) (trial courts are "uniquely well situated to make class certification decisions" as they "have the primary responsibility of ensuring the orderly management of litigation and that

the purpose of class actions lies in advanc[ing] the efficiency and economy of multi-party litigation" (internal quotations omitted)).

### B.   RULE 23 REQUIREMENTS

#### 1.   Numerosity (Rule 23(a)(1))

The first requirement for a class action is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no specified or minimum number of plaintiffs needed to maintain a class action." *Pashby v. Cansler*, 279 F.R.D. 347, 353 (E.D.N.C. 2011). Here, the parties agree that a class of 40 or more is sufficiently numerous (CC Mot. 19; CC Opp. 33), but the District argues that plaintiffs have failed to meet their burden to show that there are "*in fact*" a sufficient number of class members. *See Wal-Mart*, 131 S. Ct. at 2551.

Despite weaknesses in plaintiffs' arguments,[54] the Court is satisfied that the numerosity requirement has been met based on the following: (1) the total population of Medicaid-recipients in nursing facilities in the District who have been there for over 90 days exceeds 2000, and that number has not significantly changed in the past few years; (2) each quarter, there are usually more than 500 current nursing facility residents who have either expressed interest in speaking to someone about receiving services in the community or want to return to the community (*See*

---

[54] Plaintiffs initially asserted that "the proposed class consists of at least 500 people and possibly as many as 2,900," taking the lower number from the 2010 MDS survey data and the higher number from the total population of D.C. Medicaid recipients in nursing facilities. (CC Mot. at 19.) This initial estimate had serious flaws. First, the total population of D.C. Medicaid beneficiaries is closer to 2600 (2388 in nursing facilities in the District plus approximately 200 in out-of-state facilities). Nor does the "total population" of Medicaid recipients account for the other criteria for class membership. Nor does it make sense to assume that every nursing home resident who had indicated an interest in talking to someone about moving to the community (the MDS preference number) satisfies all of the other criteria for class membership. Even the 256 residents identified through the MFP screening, which the plaintiffs focus on in their reply, may not satisfy all of the other criteria for class membership.

MDS 3.0 Frequency Reports  2011-2013); (3) when the District's MFP program did a screening of 354 residents in 2012, it identified 256 who wanted to move to the community, and 132 of those individuals were eligible for MFP; (4) the District's initial estimate of the number of individuals with physical disabilities that it would transition through the MFP program was 645; (5) since the MFP program formally began in 2010, the District has set annual targets of at least 40 MFP transitions, even though it has never met those targets; and (6) in addition to a goal of 30 MFP transitions for 2014 (10 fewer than the MFP "target"), the District has set a goal of transitioning an additional 105 nursing facility residents to the community (25 through DHCF directly to the EPD Waiver and 80[55] more through ADRC).  In addition to these numbers, plaintiffs have submitted declarations from the named plaintiffs and other nursing facility residents who know other residents who would like to return to the community and need assistance to do so.[56]  So even if the size of the potential class cannot be precisely determined, it is reasonable to conclude from the available evidence that plaintiffs have established numerosity.

## 2.    Commonality (Rule 23(a)(2))

The "commonality" requirement of Rule 23(a)(2) "require[s] a plaintiff to show that 'there are questions of law or fact common to the class.'"  *Wal-Mart*, 131 S. Ct. at 2250-51 (quoting Rule 23(a)(2)).  Prior to the Supreme Court's decision in *Wal-Mart*, the commonality inquiry was rarely the subject of disagreement, but *Wal-Mart* "defined common question with more specificity than it had in prior decisions while reiterating the importance of . . . centrality."  Newberg on Class Actions § 3:18.  As explained in *Wal-Mart*, a common question is one that "is such a nature that it is capable of classwide resolution—which means that determination of its

---

[55] As noted, the ADRC's goal of 80 nursing facility transitions covers all transitions out of nursing facilities irrespective of length of stay, Medicaid coverage, or a need for community-based services, so it is impossible to know how many of those 80 are potential class members.

[56] (*See, e.g.*, Thorpe Decl. ¶ 11; McDonald Decl. ¶ 19; Boylan Decl. ¶ 9.)

truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2251; *see also Kenneth R.*, 293 F.R.D. at 267 (common questions "can be answered either 'yes' or 'no' for the entire class" – they are "central questions whose answers will not vary by individual class members" (internal quotations omitted)).  Even a single common question will do, but the question must be more specific than simply asking whether plaintiffs "have all suffered a violation of the same provision of law" because the same provision of law "can be violated in many different ways." *Wal–Mart*, 131 S. Ct. at 2551, 2556 ("What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."); *see also Love v. Johanns*, 439 F.3d 723, 729–30 (D.C. Cir. 2006) ("at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality" (internal quotations omitted)); *see also Kenneth R.*, 293 F.R.D. at 266 (plaintiffs must "avoid framing common questions so generally that they encompass myriad, distinct claims"); Newberg on Class Actions § 3:18.  Rather, plaintiffs must bridge the "gap" between individual claims of harm and the "'existence of a class of persons who have suffered the same injury as that individual.'" *Wal-Mart*, 131 S. Ct. at 2553 (quoting *Falcon*, 457 U.S. at 157); *DL*, 2013 WL 6913117, at *6 (commonality requires the plaintiff to demonstrate that the "class members have suffered the same injury *for the same reason*, such as a uniform policy or practice that is illegal").  "[W]here plaintiffs allege widespread wrongdoing by a defendant . . . a 'uniform policy or practice that affects all class members' bridges the gap." *DL*, 2013 WL 6913117, at *6 (quoting *DL*, 713 F.3d at 128)); *see also Kenneth R.*, 293 F.R.D. at 266 (plaintiffs must "provide significant proof that 'there exists a common policy or practice . . . that is the alleged source of

the harm to [the] class members.'" (quoting *M.D. v. Perry*, 294 F.R.D. 7, 28–29 (S.D. Tex. Aug. 27, 2013).

In *Wal-Mart*, the Court concluded that the gap was impossible to overcome because plaintiffs sought to certify a class of one and a half million women, all current or former employees of Wal-Mart, who alleged that "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." 131 S. Ct. at 2546. The pay and promotion decisions, however, were made by thousands of geographically-dispersed managers and "[w]ithout some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored." *Id.* at 2552 (emphasis in original).

Thereafter, in *DL*, a case brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., the Circuit Court for the District of Columbia reversed the district court's decision to certify a single class where the class members alleged that the District had failed to comply with each distinct step of the four-step "Child Find" process required under the IDEA due to "multiple, disparate failures" associated with each step. 713 F.3d at 128. The Court of Appeals found that because "the harms alleged to have been suffered by the plaintiffs here involve different policies and practices at different stages of the District's Child Find and FAPE process," the district court had "identified no single or uniform policy or practice that bridges all their claims." *Id.* at 127. The Court concluded that "[a]fter *Wal–Mart* it is clear that defining the class by reference to the District's pattern and practice of failing to provide FAPEs speaks too broadly because it constitutes only an allegation that the class members 'have all suffered a violation of the same provision of law,'" *DL*, 713 F.3d at 126 (quoting *Wal-Mart*, 131

S. Ct. at 2551)), that is, whether "the District has violated the IDEA as to each class member." *Id*. at 128..

On remand, the district court certified four subclasses based on each step of the Child Find process. *DL*, 2013 WL 6913117, at *7 ("Each proposed subclass poses the question whether the District's policies were adequate to fulfill a specific statutory obligation under the IDEA."). Following the district court's certification decision, defendants sought an interlocutory appeal under Fed. R. Civ. P. 23(f), but the Court of Appeals rejected the petition, finding that the defendants "ha[d] not adequately demonstrated that interlocutory review of the district court's class certification decision is necessary or appropriate" and "ha[d] not shown that the class certification decision is 'manifestly erroneous.'" Order, *In re District of Columbia*, No. 13-8009 (D.C. Cir. Jan. 30, 2014).

Plaintiffs contend that this case raises a number of "common" questions that satisfy both *Wal-Mart* and *DL*. (CC Mot. 21; *see also* 3d Am. Compl. ¶ 156.) The Court agrees. The gravamen of plaintiffs' case is their contention that the District is violating the integration mandate and injuring each and every class member by virtue of its failure to implement an effective system of transition assistance.[57] (*See* CC Mot. 23 ("this case hinges on [the District's] failure to create and implement effective transition policies and practices to connect individuals who are eligible for and desirous of community-based long-term care services").) Thus, plaintiffs' claims raise the following common questions: (1) are there deficiencies in the District's existing system of transition assistance? (2) if so, what are those deficiencies?[58] and

---

[57] The District's argument that "transition assistance" is too amorphous a concept to constitute a "uniform practice or policy," thus defeating typicality, is addressed below. *See infra* § II.B.3.a.

[58] To prevail on the merits and obtain the relief they seek, plaintiffs will have to prove concrete systemic deficiencies. For example, does the District in fact "fail[] to offer sufficient discharge planning" or "fail[] to inform and provide [nursing facility residents] with meaningful choices of

(3) are the proven deficiencies causing unnecessary segregation?  True or false, resolution of these common contentions will generate common answers for the entire class and resolve issues that are central (and potentially dispositive) to the validity of each plaintiff's claim and the claims of the class as a whole.[59]

Although there are no post-*Wal-Mart Olmstead* cases in this Circuit, courts elsewhere have distinguished *Wal-Mart* and found commonality.  *See, e.g., Kenneth R.*, 293 F.R.D. at 267 ("common questions susceptible to common answers" included "whether there is a systemic deficiency in the availability of community-based services, and whether that deficiency follows from the State's policies and practices"); *Lane v. Kitzhaber*, 283 F.R.D. 587, 597 (D. Ore. 2012) ("despite the individual dissimilarities among class members, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members" (internal quotations omitted)).  Recognizing that "it may be a matter of degree, and perhaps discretion, as to where the line should be drawn," this Court agrees with the holdings in *Kenneth R.* and *Lane* and concludes that plaintiffs in this case have identified at least one common question "at a low enough level of generality (or high enough level of specificity) to pass muster under *Wal–Mart*" and to satisfy the requirement of commonality.  *Kenneth R.*, 293 F.R.D. at 268.[60]

---

community-based long-term care alternatives to nursing facilities."  (3d Am. Compl. ¶ 156.)

[59] Not all of the "common questions" identified by plaintiffs raise satisfy these requirements.  For example, the question "[w]hether Defendant segregates Plaintiffs in nursing facilities in order to receive long-term care services, rather than providing those services in more integrated, community-based settings" (3d Am. Compl. ¶ 156) is really "nothing more than an allegation that class members 'have all suffered a violation of the same provision of law'– namely the 'integration mandate' of the Americans with Disabilities Act."  (CC Opp. 18.)  But the Court does not agree with the District that the transition assistance plaintiffs seek is "functionally identical" to the relief that was rejected by *Wal-Mart* and *DL* since plaintiffs purport not to be seeking individualized relief.

[60] The District also challenges commonality based on plaintiffs' lack of housing, arguing that

### 3.    Typicality (Rule 23(a)(3))

The third prerequisite for class certification is that "the claims or defenses of the represented parties are typical of the claims and defenses of the class."  Fed. R. Civ. P. 23(a)(3). The "typicality" requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart*, 131 S. Ct. at 2550.  "The typicality requirement aims at ensuring that the class representatives have suffered injuries in the same general fashion as absent class members."  *Hardy v. District of Columbia*, 283 F.R.D. 20, 24-25 (D.D.C. 2012) (internal quotations omitted).  "The facts and claims of each class member do not have to be identical to support a finding of typicality," *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 338 (D.D.C. 2007), but the class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Falcon*, 457 U.S. at 156 (internal quotations omitted); *Pigford*, 182 F.R.D. at 349 (typicality requirement "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability").

Plaintiffs contend that the named plaintiffs claims are "typical" of the class as a whole because they have all "experienced the same unnecessary institutionalization and sustained the same injury resulting from the same failure of the [the District] to develop and implement an effective system of transition assistance."  (CC Mot. 32.)  The District challenges plaintiffs' claim of typicality on three grounds: (1) that plaintiffs have not identified a "specific

---

housing status operates to defeat commonality (and typicality) because it, rather than the lack of transition assistance, is the cause of plaintiffs' segregation.  (CC Opp. 21-22 ("the most prevalent obstacle preventing putative class members from leaving their nursing facilities is a lack of available, accessible, and affordable housing").)  However, as the Court has previously noted, the effect of a lack of housing is a question that cannot be decided at this stage.

discriminatory practice" that has injured the named plaintiffs and the putative class in the same

manner; (2) that several of the named plaintiffs do not meet the proposed class definition; and (3)

that the District has unique defenses applicable to several of the named plaintiffs.  (CC Opp. 25-

28.)

### a.    Same Manner of Injury

According to the District, the lack of "effective . . . transition assistance" is too

"amorphous" a concept to constitute a specific discriminatory practice that has injured class

members in the same manner because the transition assistance required "necessarily will vary

based upon the particular needs and circumstances of individual class members."[61]  (CC Opp.

25.)  While this question is not free from doubt, the Court is persuaded that the concept of a

system of transition assistance is sufficiently definite to constitute a practice that could violate

*Olmstead*'s integration mandate, if the lack of transition services contributes to the lack of

placements of residents into community-based services.

In the area of *Olmstead* litigation, "transition assistance" has been defined in a concrete

manner.  Even if the particulars change depending on the nature of the claim and the facts of an

individual case, the key components of an effective system of transition assistance for

individuals in nursing facilities or other institutional settings are: (1) individual assessments upon

admission and periodically thereafter for all residents to determine interest in community-based

services; (2) provision of accurate information about available community-based services and

---

[61] There is no question that if the "specific discriminatory practice" of "lack of transition
assistance" were defined any more narrowly, it is unlikely that named plaintiffs' claims would be
typical.  For example, as the District points out, one of the things that plaintiffs include in their
definition of transition assistance is "assistance with completing applications for. . . housing"
(MTD Opp. 10), but as of June 2013 "10 of the 11 named Plaintiffs ha[d] successfully applied
for subsidized housing."  (CC Opp. 25 (citing CC Opp. Ex. 19 (DCHA Housing Applications
Status)).)

eligibility requirements for those services; (3) discharge/transition planning that commences

upon admission and includes a comprehensive written discharge/transition plans; (4)

identification of what community-based services are needed and assistance in arranging for those

services; (5) assistance in applying for and enrolling in available waivers or transition programs;

and (6) identification of barriers to transition and assistance in overcoming those barriers to the

extent possible (*e.g.*, if housing is a barrier, providing assistance in applying for supported

housing). *See, e.g.*, Interim Settlement Agreement, *Steward v. Perry*, No. 5:10-cv-1025 (W.D.

Tex. Aug. 19, 2013);; Order Entering Settlement Agreement, *United States v. Delaware*, No.

1:11-cv-0591 (D. Del. July 18, 2011); Class Action Settlement Agreement, *Kenneth R.*, No.

1:12-cv-0053 (D.N.H. Feb. 12, 2014); Settlement Agreement, *United States v. North Carolina*,

No. 5:12-cv-557 (E.D.N.C. Aug. 23, 2012); Amended Settlement Agreement,*United States v.

New York*, No. 1:13-cv-4165 (E.D.N.Y. Mar. 17, 2014).  Transition assistance has also been

defined to include ensuring sufficient waiver capacity and increased transition funding.  *See, e.g.*,

Order Amending and Entering Settlement Agreement, *United States v. Georgia*, No. 1:10-cv-249

(N.D. Ga. Oct. 29, 2010); Settlement Agreement as Final Order,*United States v. Virginia*, No.

3:12-cv-0059 (E.D. Va. Aug. 23, 2012).  In addition, plaintiffs have alleged a number of concrete

deficiencies in the District's existing system (*see* 3d Am. Compl. ¶ 139; CC Mot. 4-9) which

help to clarify what they conceive of as an "effective system of transition assistance."  Plaintiffs

identify as deficiencies the lack of: (1) an effective Olmstead Plan; (2) a successful and

appropriately-sized MFP program; (3) effective use of EPD Waiver slots; (4) adequate assistance

with respect to obtaining necessary documentation, completing housing and other applications,

tracking applications and keeping them up-to-date, arranging for community-based service

providers, responding to offers of housing or EPD waiver slots, and visiting community living

options prior to transitioning; (5) interagency coordination as to housing options; (6) the provision to residents of up-to-date, accurate information about community-based care options; and (7) appropriate and measurable transition goals.  (CC Mot. 4-9.)  Given this explication of deficiencies and relevant caselaw, the concept of transition assistance is sufficiently concrete to constitute a discriminatory practice that injures class members in the same manner.

### b.    Meeting the Class Definition

The District next argues that two of the remaining named plaintiffs (McDonald and Foreman) are not "typical" of the putative class because each fails to meet the proposed class definition.  (CC Opp. 26 (citing *Virtue v. Int'l Brotherhood of Teamsters Retirement & Family Protection Plan*, 292 F.R.D. 8, 13 (D.D.C. 2013) ("Inherent in Rule 23 is the requirement that the class representatives be members of the class.").  The Court does not agree.

First, the District contends that McDonald does not satisfy the class definition because he does not have a "physical disability."  (CC Opp. 26 ("McDonald repeatedly conceded during his deposition that he does not have any physical disabilities or require[] assistance with any activities of daily living") (citing McDonald Dep. 39-42, 74-76, Mar. 8, 2013).)  However, McDonald's testimony is not that clear.  Although he initially answered no to the question whether he "consider[s] [him]self to have any physical disabilities, he also appeared to be confused by the question, stating that he "didn't have to go to school to learn that stuff." (McDonald Dep. 39-40.)  In addition, his declaration states that he has a seizure disorder and mild dementia and needs help with his medications.  (McDonald Decl. ¶¶ 9, 12; *see also* McDonald Dep. 113 ("I don't know when I need any of that medication.").)  As for Foreman, the District asserts that he does not satisfy the class definition "due to the complexity of his medical needs," which "cannot be met by the community-based [long-term care] services covered by the EPD Waiver and/or the Medicaid State Plan."  (CC Opp. 26 (citing Sarigol Decl. I ¶¶ 17-21).)

Since the District made that argument, though, Foreman has in fact successfully transitioned to long-term care services in the community (Foreman Decl. ¶ 2, Oct. 22, 2013; Sarigol Decl. ¶ 21, Nov. 8, 2013 ("Sarigol Decl. II")), belying the District's contention that he required more services than are available.  Moreover, even if Foreman had not yet transitioned, the record indicates that 24-hour care is available under either the EPD Waiver or the District's Medicaid Plan's personal care assistance benefit (*see* Sarigol 2013 Dep. 148; Sarigol 30(b)(6) Dep. 60-61; Iscandari Dep. 163-64), but that the problem for Foreman had been the need to locate an available provider.  (Sarigol Decl. II ¶¶ 10-11.) The fact that Foreman needed assistance with identifying and securing providers would not exclude him from the class; to the contrary, such assistance is presumably part of the system of transition assistance that plaintiffs seek. Accordingly, the District has not demonstrated that either McDonald or Foreman fails to meet the class definition.

### c.    Unique Defenses

The District's final challenge to typicality is to assert that it has three "unique defenses" to the claims of several named plaintiffs.  First, it claims that it has a unique defense to the claims of all the named plaintiffs who were offered the chance in January 2013 to participate in the EPD Waiver, but who failed to contact the District by June 2013 to begin the enrollment process.  Second, as to Gray, it claims that he never sought a place on the EPD Waiver waitlist or attempted to access any community-based services.  And, as to Dupree, it claims that he was discharged from the nursing facility with the help of DMH, not DHCF or ADRC.  The critical question for the Court is not whether these defenses are legally viable, but rather, assuming they are supportable,[62] whether they would "skew the focus of the litigation and create a danger that

---

[62] As plaintiffs point out, there is evidence in the record that suggests that these defenses are not supportable.  For example, there is evidence that the EPD Waiver office was badly run (Turnage

absent class members will suffer [because] their representative is preoccupied with defenses

unique to it."  *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 302 (D.D.C.

2007).  The Court does not foresee any such risk.  Indeed, characterizing any of these defenses as

"unique" is somewhat misleading, as they likely apply to a number of potential class members.

Accordingly, the Court is not persuaded that the District has "unique defenses" that "destroy

typicality."

### 4.    Adequacy of Representation (Rule 23(a)(4))

The fourth Rule 23(a) requirement that is that "the representative parties will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Two criteria for

---

Dep. Ex. 25 (letter from DC Council member Mary Cheh to Turnage alleging that office is "so poorly run, so poorly managed that we have eligible people who are not getting the money that is available"); Iscandari Dep. 76 (case management provider reported on 2/13/2012 that 10 of the 23 names she submitted had not made it to the waiting list); Smith Decl. ¶ 8 ("management of the EPD Waiver Program remains a mystery to those of us who try to enroll our frail clients"); that slot letters were incomprehensible (Smith Decl. ¶¶ 10 (describing waiver offer letter as "jargon-filled"); Turnage Dep. Ex. 25 (describing waiver offer letter as "such a collection of gobbledygook of bureaucratese that the person receiving it had absolutely no idea what it meant"); that DHCF was unresponsive to callers who did respond to the slot offer letters (Turnage Dep. Ex. 25; Smith Decl. ¶ 10 ("letter instructed recipients to call a phone number at Health Care Finance that led to a recording telling them to call *one of three other* phone numbers and to *not* leave a message"); and no evidence that EPD Waiver slots were in fact available. There is also evidence that Gray did not know he had the option of living in the community until plaintiffs' counsel explained it to him (Gray Dep. 59, Apr. 29, 2013; Gray Decl. ¶ 10, Apr. 29, 2013 ("On February 6, 2012, I learned about this lawsuit and the option of living in the community and getting the services I need.  No one had ever talked to me about that possibility before even though I am always telling anyone who will listen that I want to get out of here."); was not aware of any MFP information sessions at his nursing facility because, despite his repeated requests for help with community transition to his nursing facility social workers, neither MFP nor the nursing facility staff informed him of his options (Gray Dep. 50); and would not have applied for the EPD Waiver in any event because he believes he needs only the daily Medicaid State Plan PCA services of eight hours or less.  (Gray Dep. 68; Gray Decl. ¶ 14.) Finally, as previously discussed, even if Dupree ultimately received assistance from DMH, that does not mean that he was not eligible for and could not have benefitted from a system of transition assistance aimed at all nursing facility residents with physical disabilities, irrespective of whether a resident also has a mental health diagnosis.  *See supra* n.48.

determining the adequacy of representation are generally recognized: (1) the named

representative must not have antagonistic or conflicting interests with the unnamed members of

the class, and (2) the representative must appear able to vigorously prosecute the interests of the

class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575

(D.C. Cir. 1997) (internal quotations omitted); *see also Falcon*, 457 U.S. at 157 n.13 (adequacy

of representation focuses on "concerns about the competency of class counsel and conflicts of

interest"); Newberg on Class Actions § 3:54 ("[T]he standard for adequacy splits into two

prongs: adequacy of the proposed class representative and adequacy of the attorneys seeking

appointment as class counsel.").  The District does not challenge the competency of counsel, but

only challenges the adequacy of the named plaintiffs.

The District first argues that plaintiffs' decision not to pursue monetary damages raises a

potential conflict of interest with the putative class.  On the contrary, it is well-established that

damage claims are not barred by membership in a class seeking solely equitable relief.  *See*

*Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983).  That said, a plaintiff in a later suit

might be barred by collateral estoppel or issue preclusion from contesting an issue of fact or law

that is decided in the defendant's favor.  *See Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 874

(1984) ("A judgment in favor of either side [in a class action] is conclusive in a subsequent

action between them on any issue actually litigated and determined, if its determination was

essential to that judgment.")  Here, though, there is no real conflict of interest, since the scope of

the current litigation is limited to a systemic challenge, and the District has not identified any

issues that if decided in its favor would preclude an individual *Olmstead* action for damages.

The District also argues that the individual circumstances of several plaintiffs (Collins,

Gray, and Rivers) render them inadequate to represent the class, focusing on statements that

suggest that they have limited legal knowledge about the facts or legal theories of the case or a limited understanding about class action generally and the role of a "class representative."  (CC Opp. 32-33.)  However, Rule 23(a)(4) does not require either that the proposed class representatives have legal knowledge or a complete understanding of the representative's role in class litigation.  *See, e.g.*, *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard." (internal quotations omitted)); Newberg on Class Actions § 3:67 ("lack of knowledge about the facts or legal theories of a particular case will usually not bar a finding that the proposed representative can adequately represent the class"); *id*. ("Adequacy is satisfied, though, if the plaintiff has some rudimentary knowledge of her role as a class representative and is committed to serving in that role in the litigation").  Moreover, given the circumstances of the named plaintiffs, it is unrealistic to expect that they understand the legal intricacies of class actions, which remain a mystery to many in the legal profession.

Accordingly, the Court concludes that plaintiffs have satisfied the adequacy of representation requirement.

### 5.    Rule 23(b)(2)

The final issue is whether plaintiffs satisfy Rule 23(b)(2), which provides that a class action "may be maintained" if  "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). Plaintiffs' claim is that the District has violated the *Olmstead* integration mandate by failing to implement an effective system of transition assistance, and they seek injunctive and declaratory relief to remedy that alleged failure.  As recently explained by the Supreme Court in *Wal-Mart*,

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

131 S. Ct. at 2557 (internal quotations and citations omitted). As numerous other courts have recognized, both before and after the Supreme Court's decision in *Wal-Mart*, plaintiffs' claim is precisely the type of claim that satisfies Rule 23(b)(2).

First, the District's alleged failure to implement an effective system of transition assistance is obviously an action or inaction that "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id. at 2557*. Next, the Court has already determined that plaintiffs' claim raises common questions that will generate common answers, and that these common answers will determine what, if any, injunctive relief plaintiffs are entitled to, satisfying the requirement that a single injunction "would provide relief to each member of the class." *See id.*; *see, e.g.*, *Lane*, 283 F.R.D. at 602 (Rule 23(b)(2) satisfied where plaintiffs seek an injunction "that describes each of the activities that must be undertaken to modify the defendants' employment service system, including infrastructure modifications, service definitions, provider development, staff training, family education, and interagency coordination"). Although particular aspects of the relief that plaintiffs seek may exceed the relief that the Court would order even if plaintiffs were to prevail on the merits, other elements of the relief sought may well be warranted if plaintiffs prove that the deficiencies in the District's system of transition assistance have caused their injuries. For purposes of satisfying Rule 23(b)(2), it is sufficient that plaintiffs have proffered evidence of systemic deficiencies in the District's system of transition assistance and that those deficiencies appear to be affecting the

class.  *See, e.g.*, *Kenneth R.*, 293 F.R.D. at 270-71 (Rule 23(b)(2) satisfied where plaintiffs

"submitted evidence to support their allegation that a systemic deficiency in the State's

community-based mental health services system affects the class"); *M.D. v. Perry*, 675 F.3d 832,

847-48 (5th Cir. 2012) ("class claims could conceivably be based on an allegation that the State

engages in a pattern or practice of agency action or inaction—including a failure to correct a

structural deficiency within the agency, such as insufficient staffing—with respect to the class,

so long as declaratory or injunctive relief settling the legality of the [State's] behavior with

respect to the class as a whole is appropriate"); *M.D. v. Perry*, 294 F.R.D. at  47 ("The Court

need not, at this stage, determine what remedy Plaintiffs would be entitled to if they prevailed on

the merits of their claim. Rather, the Court must determine that the Plaintiffs' claim is one that is

susceptible to common, specific relief.").  The Court's conclusion is "consistent with the intent

of the drafters of Rule 23(b)(2), who explicitly endorsed its use in cases such as this that

challenge widespread illegal practices because the class members are often 'incapable of specific

enumeration.'"  *DL*, 2013 WL 6913117, at *12 (quoting Adv. Comm. Notes to Rule 23).

Finally, plaintiffs have repeatedly assured the Court that they are not seeking individualized

relief, and thus this is not a case where "each individual class member would be entitled to a

*different* injunction or declaratory judgment against the defendant."  *Wal-Mart*, 131 S. Ct. at

2557.

## CONCLUSION

As a district court in New Hampshire recently noted in a similar case:

Reasonable minds may of course differ as to whether the traditional approach
taken in ADA integration cases (or related disability cases) of certifying broad
classes of persons with different specific disabilities, needs, and preferences (an
approach taken both before and after *Wal–Mart*), is in tension with *Wal–Mart*'s
recent procedural commands.

*Kenneth R.*, 293 F.R.D. at 271.  But this Court agrees with that court's conclusion that plaintiffs

in an *Olmstead* case can "meet *Wal-Mart*'s demands" where they

> have defined the class more narrowly than is usually done in ADA integration
> cases; their class claims are limited to parallel claims under the ADA and RA;
> they challenge alleged deficiencies related to a discrete set or class of services;
> and they seek a single declaration or injunction aimed at correcting a systemic
> discriminatory imbalance (not mini-injunctions for each class member . . . .

*Id.*

Plaintiffs have met this standard, and therefore, their motion for class certification, with

minor modifications to the proposed class definition, will be granted and the District's motion to

dismiss the third amended complaint will be denied.  A separate Order accompanies this

Memorandum Opinion.


                                        _____/s/_____
                                        ELLEN SEGAL HUVELLE
                                        United States District Judge

Date:  March 29, 2014