## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IVY BROWN )
Transitions Healthcare Capitol City )
2425 25th Street SE )
Washington, DC 20020; )
)
DONALD DUPREE )
Joye Assisted Living )
6417 Kansas Avenue NE )
Washington, DC 20012; )
)
ROY FOREMAN )
1845 Harvard Street NW )
Washington, DC 20009; )
)
LARRY MCDONALD )
Unique Residential Care Center )
901 First Street NW )
Washington, DC 20001; )   **PLAINTIFFS'**
)   **FOURTH AMENDED COMPLAINT**
JAMES BUMPASS )   Civil Action No. 1:10-cv-02250 (ESH)
United Medical Center Nursing Facility )
1310 Southern Avenue SE )
Washington, DC 20032; )
)
TANITA SANDERS )
Transitions Healthcare Capitol City )
2425 25th Street SE )
Washington, DC 20020; )
)
DENISE RIVERS )
United Medical Center Nursing Facility )
1310 Southern Avenue SE )
Washington, DC 20032; )
)
on behalf of themselves and all others )
similarly situated, )
)
             Plaintiffs, )
)
       v. )

|  | ) |
| DISTRICT OF COLUMBIA, a municipal | ) |
| Corporation, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## FOURTH AMENDED CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Federal law requires that the District of Columbia provide services to people with disabilities in the most integrated setting appropriate to their needs. But the District has failed to comply with this obligation, leaving an estimated 500 to 2,900 people with disabilities unnecessarily institutionalized in nursing facilities, segregated and isolated from their families and friends. These individuals desperately want to return to their communities and could do so if the District were to comply with federal law.

This class action therefore seeks injunctive and declaratory relief to require the District of Columbia to comply with its long-standing, federally-mandated obligations and prohibit its unlawful practice of unnecessarily segregating people with physical disabilities in nursing facilities in order to access the long-term care services they need. This class, which includes each of the Named Plaintiffs, requires a District-wide common system of transition services to connect its members with community-based supports and long-term care services.

## PRELIMINARY STATEMENT

1.      Plaintiffs are the named individuals and a class of similarly-situated individuals with physical disabilities who desperately desire the freedom to live in their community but instead remain institutionalized in nursing facilities against their will. Plaintiffs could be served in community-integrated settings, but remain – and likely will continue to remain – in nursing

facilities for years because Defendant provides few opportunities, if any, for Plaintiffs to obtain long-term care services in more integrated settings.

2.      Defendant, the District of Columbia, through its Mayor and the officials who plan, oversee, fund, and regulate services, programs, and activities for persons with disabilities, has unnecessarily and inappropriately institutionalized Plaintiffs in nursing facilities despite federal law requiring that Defendant honor the class members' desires and abilities to live in more integrated settings in the community with appropriate long-term care services and supports.

3.      Defendant is in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, because it unlawfully discriminates against Plaintiffs by institutionalizing them in nursing facilities and isolating them from their communities.

4.      Title II of the ADA prohibits discrimination against individuals with disabilities. In enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. § 12101(a)(5). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The United States Department of Justice promulgated regulations under Title II requiring that "[a] public entity shall administer services, programs, and activities *in the most integrated setting appropriate to the needs* of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added).

5.      Section 504 of the Rehabilitation Act provides that no person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Regulations implementing Section 504 require that a public entity administer programs, services, and activities in "the most integrated setting appropriate" to the needs of individuals with disabilities. 28 C.F.R. § 41.51(d).

6.      The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA. The Court concluded that state and local governments may be held liable for failing to serve people with disabilities in the most integrated settings appropriate to their needs.

7.      Despite the passage of sixteen years since the decision in *Olmstead*, Defendant continues to fail to facilitate access to community-based long-term care services and supports for Plaintiffs in the most integrated setting appropriate to their needs for assistance with activities of daily living (e.g., bathing, dressing, toileting, mobility, eating) and instrumental activities of daily living (e.g., grocery shopping, meal preparation, laundry, medication management).

8.      Because of Defendant's failure to fund or otherwise make available sufficient community-based alternatives, individuals with physical disabilities often have nowhere to go but nursing facilities.

9.      Defendant's programs and activities for persons with physical disabilities systematically deny or ignore Plaintiffs' choices and preferences for integrated community-based long-term care, leaving them to languish in institutional nursing facilities even though appropriate community-based long-term care services and settings exist that could be made available at the same or even lower cost.

4

10.     Defendant is able to appropriately discharge Plaintiffs with community-based long-term care services.

11.     Plaintiffs are needlessly segregated from their families, friends, and community life.

12.     Plaintiffs' plight is shared by many. According to federal and local data, when offered a choice between community and nursing facility-based care, more than 500 District of Columbia nursing facility residents would choose to receive long-term care services in more integrated settings in the community instead of being forced to remain in a nursing facility. Based on local data, 84% of individuals screened are eligible to live in the community with the existing network of community-based long-term care services.

13.     Upon information and belief, many more nursing facility residents would choose to live in more integrated settings in the community if they were informed about community-based options to assist them with their activities of daily living (e.g., bathing, dressing, toileting, mobility, eating), and instrumental activities of daily living (e.g., meal preparation, grocery shopping, laundry, housekeeping).

14.     Plaintiffs bring this action to compel Defendant to comply with its federal legal obligations.

## JURISDICTION

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983. At all times relevant to this action, Defendant has acted under color of state law.

16.     Plaintiffs' claims for violations of Title II of the ADA, 42 U.S.C. §§ 12131 and 12132 *et seq.*, are asserted against the District of Columbia, a "State or local government" as defined by the statute.

17.     Plaintiffs' claims for violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, are asserted against the District of Columbia, a "State or local government" as defined by the statute.

## VENUE

18.     Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1)-(2) because the Defendant is the District of Columbia, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District.

## DEFENDANT

19.     Defendant District of Columbia is responsible for operating its programs, services, and activities in conformity with the ADA and Section 504 of the Rehabilitation Act. In light of the violations by its governmental agencies individually and collectively, the District of Columbia is sued under the Rehabilitation Act and the ADA.

20.     At all times relevant to this Complaint, Defendant knew or should have known of the policies, practices, acts, and conditions alleged herein.

## PLAINTIFFS

### All Plaintiffs

21.     Plaintiffs are all District of Columbia residents with physical disabilities that substantially limit their ability to perform major life activities. They are also regarded by Defendant as having such impairments, and therefore are individuals with disabilities for purposes of the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12102; 29 U.S.C. § 705(20).

6

22.     Plaintiffs are all currently housed in nursing facilities and their care is funded by the District.

23.     All Plaintiffs could be served in the community through the long-term care services Defendant already has available.

24.     Although residing in the community with long-term care services is the most integrated setting where the Plaintiffs' needs can be met, Defendant has offered them personal care and long-term care services only in a nursing facility setting.

25.     All Plaintiffs want to leave the nursing facilities in which they reside, and they could do so with appropriate long-term care services and supports.

**The Named Plaintiffs**

**Plaintiff Ivy Brown**

26.     Plaintiff Ivy Brown is a fifty-nine year old woman who has resided at Transitions Healthcare Capitol City since August 2013. Ms. Brown was admitted to the nursing facility after being hospitalized when she had a stroke in April 2013. Prior to her stroke, she lived in the community with her mother.

27.     Ms. Brown is diagnosed with hyperlipidemia, hypertension, morbid obesity, obstructive sleep apnea, and has a history of malignant neoplasm. She uses a wheelchair and needs assistance getting in and out of bed, bathing, dressing, toileting, managing her medications, and housekeeping. Ms. Brown does not require assistance feeding herself.

28.     Ms. Brown could live in the community with appropriate health care and personal care assistance services and supports. She has been determined appropriate for community placement.

7

29.     Ms. Brown has told nursing facility staff and the District that she wants to leave the nursing facility and return to the community. Ms. Brown, with the assistance of her nursing facility social worker, was referred to the ADRC and MFP on several occasions since 2013. She was entered into the 2015 MFP lottery pool but received a notice that she was not selected. Ms. Brown has not received transition assistance from Defendant. She continues to express her desire to leave the nursing facility, to live in wheelchair-accessible housing in the community, attend church, and continue to pursue her leisurely activities independently.

**Plaintiff Donald Dupree**

30.     Plaintiff Donald Dupree is a fifty-one year old man who resided at Washington Nursing Facility from June 2006 until his discharge in late August 2012. He was initially admitted for post-surgery recovery after he had a brain tumor removed.

31.     Mr. Dupree has been diagnosed with a cerebellopointe angle (CPA) tumor and schizophrenia. His nursing facility records indicate that he requires assistance with the following activities of daily living: medication management, bathing, meal preparation, overall mobility, money management, and housekeeping.

32.     Mr. Dupree is capable of living independently in the community with appropriate health care, personal care assistance, and residential supports. He has been determined by health care professionals to be appropriate for community placement.

33.     Mr. Dupree wanted to live in the community. Dr. Orit Simhoni is his court-appointed guardian. She supports his desire to live in the community and located a community placement for him and arranged for him to get the services he needed.

34.     Mr. Dupree was discharged from Washington Nursing Facility to an assisted living facility on August 29, 2012.

35.    Mr. Dupree did not start receiving his home health services until September 8, 2012.

36.    On September 13, 2012, he was assigned to an Assertive Case Management (ACT) team for case management services.

37.    Mr. Dupree began day program services on September 11, 2012. Mr. Dupree was briefly hospitalized in the winter of 2013 and in June 2013.

38.    Mr. Dupree lives in fear that he may be forced to return to a nursing facility in the future should he require even short-term hospitalization.

**Plaintiff Roy Foreman**

39.    Plaintiff Roy Foreman is a seventy year old man who resided at Washington Center for Aging Services until his discharge to the community on September 25, 2013.

41.    Mr. Foreman was admitted to Washington Center for Aging Services in 2006 after sustaining a fall at home that led to a spinal cord injury resulting in paraplegia. He has a history of strokes and is also diagnosed with acute respiratory failure, decubitus ulcers, diabetes, and has a colostomy.

40.    Mr. Foreman lives in a wheelchair-accessible public housing apartment in Northwest DC. He receives health care services under DC Medicaid and long-term care services under the Medicaid Waiver Program for People who are Elderly and/or have Physical Disabilities (EPD Waiver Program) from the Medstar Medical Housecalls Program.

41.    Mr. Foreman lives in the community with appropriate services and supports to help him with transferring in and out of his wheelchair, bathing, dressing, bowel and bladder care, grocery shopping, laundry, and housekeeping. He also receives nurse visits for medication management, colostomy and wound care.

42.     He has been determined by health care professionals to be appropriate for community placement.

43.     Mr. Foreman has maintained a strong preference to live independently in the community and has consistently asked for transition assistance at the nursing facility and the hospitals to which he was admitted subsequently. The District failed to provide Mr. Foreman with transition assistance to access long-term home and community based services. Prior to his discharge from the nursing facility, the DC Housing Authority had offered Mr. Foreman three wheelchair-accessible apartments but failed to assist him to access the Medicaid Waiver for People who are Elderly or have Physical Disabilities (EPD Waiver).

44.     Due to his chronic conditions, Mr. Foreman has been hospitalized approximately six times since his discharge from the nursing facility.

45.     Mr. Foreman lives in fear that he may be forced to return to a nursing facility in the future should he require even short-term hospitalization.

**Plaintiff Larry McDonald**

46.     Plaintiff Larry McDonald is a sixty-one year old man who has resided at Unique Residential Care Center since September 2006 when he was first admitted for a seizure that lasted three days.

47.     Mr. McDonald is diagnosed with a seizure disorder, hypertension, and dementia. His nursing facility records indicate that he requires assistance with medication management, bathing, and dressing. Based on the level of his needs, Defendant has recertified Mr. McDonald for nursing facility care.

48.     Mr. McDonald could live independently in the community, with either a family member or on his own with appropriate health care, personal care, and residential supports. He

needs help with managing medications, meal preparation, getting to appointments, housekeeping, counseling, sobriety supports and finding community doctors and specialists.

49.     He has been determined by health care professionals to be appropriate for community placement.

50.     Mr. McDonald has family with whom he wants to spend time in the community, and he prefers to live in the community. He told his social worker and other staff at the nursing facility that he wants to move into the community.

51.     In the summer of 2011, MFP staff visited Mr. McDonald and found him eligible for MFP assistance. In 2012 and again in 2014, he was referred by his nursing facility social worker to the ADRC in hopes that he would receive transition assistance. .

52.     Mr. McDonald applied for public housing in June 2011.

53.     Mr. McDonald has not received further transition assistance from Defendant to help him move back to the community. He has not received any notice regarding his MFP status.

**Plaintiff James Bumpass**

54.     Plaintiff James Bumpass is sixty-one years old. He has resided at United Medical Center (UMC) since November 7, 2012.

55.     Mr. Bumpass has physical disabilities due to a toe amputation and neuropathy, secondary to diabetes. He has also been diagnosed with hyperlipidemia, anxiety, depression, gastritis, gastroparesis, incontinence due to neurogenic bladder, and cataracts.

56.     Mr. Bumpass experiences intense pain in his legs; he is unsteady and primarily uses a wheelchair to move around. He needs assistance with transferring, bathing, using the bathroom, managing medications and mobility.

11

57.     Mr. Bumpass has been requesting to leave the nursing facility at least since 2013. He told the nursing facility social workers that he would like to leave. He has been deemed eligible to live in the community. He is not aware of his status with MFP. To date, he does not believe anyone from the District of Columbia is providing the transition assistance he needs to move out.

58.     Mr. Bumpass would like to leave the nursing facility and live by himself in the community, as he has done the majority of his life.

**Plaintiff Tanita Sanders**

59.     Plaintiff Tanita Sanders is a thirty-four year old woman. She has resided at Transitions Healthcare Capitol City since March 1, 2013. Prior to her admission, she resided in the community with her four children.

60.     Ms. Sanders has physical disabilities due to a stroke which resulted in paralysis of her left side. She also has a history of seizure disorder, diabetes, left hip and leg pain, pulmonary embolism, and obesity.

61.     Ms. Sanders uses a motorized wheelchair and needs assistance with bathing, dressing, toileting, transferring, and overall mobility.

62.     Ms. Sanders has expressed her desire to leave the facility and transition back to the community to her social worker and the staff of District of Columbia since 2013.

63.     She has been deemed eligible to live in the community. Her family and social worker at the nursing facility support her desire to return to the community. .

64.     Ms. Sanders' nursing facility social worker referred her to the ADRC in May 2013 for transition assistance. She was entered into the March 2015 MFP lottery pool but was not selected. Ms. Sanders continues to express her strong desire to leave the facility and live with

her children in a wheelchair- accessible apartment. No one from DC government has provided her with the assistance she needs to move back to the community with the long-term care services she needs.

65.     Ms. Sanders knows other residents who are interested in transitioning back to the community.

**Plaintiff Denise Rivers**

66.     Plaintiff Denise Rivers is fifty three years old. She has resided at the nursing facility at United Medical Center (UMC) since June 22, 2011.

67.     Ms. Rivers has physical disabilities due to a blood vessel that burst in her leg which led to surgery. She also has hepatitis C, diabetes, and osteoarthritis. Some of her osteoarthritis symptoms include contracture of her joints, joint pain, inflammation, and muscle weakness. Ms. Rivers uses a wheelchair to get around.

68.      Ms. Rivers needs assistance with bathing, getting dressed, using the bathroom, medication management, mobility, and meal preparation. She can transfer independently in and out of her bed and wheelchair, but due to limited mobility, needs assistance with bathing and dressing. With that help, she is capable of independent living.

69.     UMC is housed within a hospital; it is sterile and nothing like a home. Ms. Rivers has no privacy and no control over her living space.

70.     Nursing facility health care professionals have determined that she meets the EPD Waiver level of care requirements.

71.     Ms. Rivers, through her nursing facility social worker, repeatedly requested assistance from MFP because she meets the required level of care for both the EPD Waiver and

MFP. To date, no one from the DC government, including MFP, has provided the assistance Ms. Rivers needs to move back to the community.

72.     Ms. Rivers has expressed her desire to leave the nursing facility and live with her family in an apartment.

## GENERAL ALLEGATIONS

73.     Individuals with long-term care needs requiring assistance with activities of daily living (bathing, dressing, mobility, toileting, and eating) are eligible to receive long-term care services from the District of Columbia.

74.     Defendant funds these services largely through the Medicaid program, a joint federal and state program that provides medically-necessary services to low-income persons pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*.

75.      Approximately 83 percent of D.C. nursing facility residents are D.C. Medicaid recipients.

76.     The District receives 70 cents in federal reimbursement for every dollar it spends on Medicaid services.

77.     The District also participates in the federal MFP Program designed to provide federal funds to state Medicaid programs to transition people into community-based settings. The District would receive 85 cents in federal Medicaid reimbursement for each dollar it spends for services provided to people who transition from nursing facilities to the community under the MFP Program.

78.     Defendant provides nursing facility-based services through privately-owned and operated nursing facilities – many of which are for-profit businesses – and through nursing facilities (such as Unique Residential and a skilled nursing facility unit at United Medical

14

Center) that are owned by the District and operated through leasing arrangements or contracts with nursing facility management companies.

79.     There are approximately 2,700 beds in 19 skilled nursing facilities in the District of Columbia, with an occupancy rate of over 95 percent.

80.     Approximately 200 *additional* D.C. residents currently are placed in 31 out-of-state nursing facilities; D.C. Medicaid continues to fund their care.

81.     The District also provides in-home and community-based long-term care services to people with disabilities under the Medicaid program.

82.     People with disabilities are entitled to personal care aide services in their homes under the District of Columbia's Medicaid State Plan and the Medicaid Waiver Programs for those who are Elderly or have Physical Disabilities ("EPD Waiver"). The District's EPD Waiver program had a fixed number of slots (4,278 ) for beneficiaries for 2014.The District's Medicaid EPD Waiver Program provides up to sixteen hours of daily home and community-based long-term care services for adults with physical disabilities, including personal care services. The Medicaid State Plan provides up to eight hours of daily personal care services as well as skilled nursing services. The Department on Aging also provides home health care assistance to individuals with physical disabilities.

83.     Under these options, people with disabilities who would otherwise qualify for nursing facility services are able to live independently with long-term care community-based supports and services, including personal care services, personal emergency response services, and other long-term care services otherwise found in nursing facilities.

84.     Defendant licenses, certifies, or contracts with private home health agencies and community support agencies to provide these long-term care services in the community.

15

### Nursing Facilities Are Institutions

85.     Nursing facilities are, for the most part, neither integrated into nor part of the communities in which their residents live. They are not real homes or even home-like. They are segregated institutions housing large numbers of unrelated people, both elderly and non-elderly, in congregate settings. Many nursing facilities provide only beds, meals, and sparse rehabilitative services.

86.     Many nursing facilities resemble hospitals and secure facilities. For example, Unique Residential is surrounded by a security fence with an electronic lock and requires most residents to have escorts and special permission to leave the facility even for brief periods of time. Some D.C. nursing facilities have curfews, and, at times, security guards posted to monitor people entering and leaving the facilities. Inside, many facilities have nurses' stations and are filled with the hard sterile surfaces normally found in medical facilities.

87.     Often there is little, if any, privacy for nursing facility residents. Often residents must share rooms and bathrooms with other residents they did not know previously and with whom they did not choose to live; their beds are separated by only a curtain. In some facilities, such as Unique Residential, entire wards of individuals share bathrooms and shower facilities. Often residents have minimal space to call their own or to use to safeguard their personal belongings, and many residents report that their personal property has been stolen or damaged. Nursing facility residents often lack their own telephones and are frequently restricted in the use of the nursing facility telephones, which lack privacy. Medications are often dispensed publicly at specific times, with residents waiting in line.

88.     Nursing facilities often place many limitations on residents' autonomy. In many facilities, residents are subjected to a highly regimented lifestyle characterized by restrictive

rules and policies. Daily activities are often conducted in a central location in the facility, in the company of large numbers of other individuals with disabilities. Residents may sit idle for most of the day, with little or nothing to do. Many nursing facilities offer few places for residents to gather or meet with visitors.

89.     Often residents have limited access to the community; it is difficult for most, and impossible for many, to participate in community activities offered by churches, clubs, or other organizations.

**Plaintiffs Desire and Are Able to Live in the Community**

90.     The named plaintiffs identified above (the "Named Plaintiffs") and all class members (together with the Named Plaintiffs, the "Plaintiffs") prefer to live in the community with appropriate long-term care services, rather than reside in nursing facilities.

91.     All Plaintiffs would prefer to live with family, in their own apartments or homes, or in permanent supported housing – which are all more integrated settings appropriate to their needs than the nursing facilities in which they currently reside. The District of Columbia-based nursing facilities' self-reported Medicaid data reports that, in the fourth quarter of 2013, 27.50% of 2182 D.C. nursing facility residents surveyed (approximately 600 individuals) "expected to be discharged to the community" or otherwise indicated that they wanted to live in the community instead of a nursing facility. In its Operational Protocol, the MFP Program acknowledges the demand by 580 people with physical disabilities in nursing facilities for community-based long-term care services.

92.     This data vastly undercounts the preferences of nursing facility residents because of their lack of awareness of community-based long-term care options.

93.     Many of the class members may need education and support in order to make an informed choice about whether to receive long-term care services in nursing facilities or in the community in more integrated settings.

94.     All of the Plaintiffs could be served safely and appropriately in the community if Defendant facilitated their access to community-based, long-term care services and supports. These options would afford far more choice, freedom, and privacy, as well as the opportunity to maintain regular family relationships and interact with and form friendships with a variety of people. With appropriate supports and services, persons with disabilities of all ages and levels of disability can successfully move into and remain in the community and live more independently.

95.     All of the Plaintiffs desire and are capable of living in a community-based setting with appropriate services and supports.

**Defendant Continues to Violate Title II of the ADA and *Olmstead***

96.     Despite Plaintiffs' desire and ability to live independently in the community with the services they need, Defendant has failed to take any meaningful action to ensure that Plaintiffs receive services in the most integrated setting appropriate to their needs.

97.     Sixteen years after the United States Supreme Court decision in *Olmstead,* the District of Columbia still does not have a comprehensive, effectively-working system through which it can implement the requirements described in that decision. The essential components of an effectively-working integration plan which are lacking in the District's plan are: targets for transitioning sufficient numbers of people with disabilities from nursing facilities within specified time frames; demonstrable progress toward meeting those transition targets; interagency coordination designed to facilitate transitions of people from nursing facilities, and

mechanisms for sustaining the transitions systems and community-based long-term care alternatives to nursing facility placement through resource allocation and systemic reform.

98.     Instead of providing community-based long-term care services, Defendant relies heavily on nursing facilities to provide long-term care services to individuals with disabilities.

99.     Defendant's services, programs, and activities for persons with physical disabilities that require assistance with activities of daily living leave many hundreds of people languishing and isolated in nursing facilities. Defendant's actions and inactions have resulted in the needless isolation, segregation, and institutionalization of individuals with disabilities in nursing facilities.

100.    Many of the individuals to whom Defendant currently provides community-based long-term care services have physical conditions and functional capacities that are the same as, or are similar to, the class members currently living in nursing facilities.

101.    The District of Columbia has determined that all of the Plaintiffs are eligible for a nursing facility "level of care," which means that it has determined that their disabilities are significant enough to require the level of services provided in a nursing facility. The same "level of care" is used to determine eligibility for EPD waiver services and for participation in the MFP Program.

102.    Some Plaintiffs may subsequently require a reduced level of service below the nursing facility level of care because their condition has improved, and those Plaintiffs typically are still eligible for long-term care assistance in the community through the District's State Plan Personal Care Assistance (PCA) program.

103.    The Medicaid-funded personal care services all Plaintiffs receive in nursing facilities could be provided in the community at the same or lower cost.

104.    The District of Columbia's 2013 average annual expenditure for nursing facility care was $153,842 per year per person, and the average annual cost per person in the EPD Waiver Program in the community was approximately $54,704.

105.    Among other things, Defendant fails to:

i.   Assure that individuals with physical disabilities receive long-term care services in the most integrated community-based setting appropriate to their needs;

ii.  Develop and implement a comprehensive and effectively working integration plan with measurable targets for transitioning sufficient numbers of Plaintiffs from nursing facilities to the community within specified time frames, demonstrate progress toward meeting those targets, and sustainability of the transition process and community-based service infrastructure through resource allocation and systemic reform that rebalances the long-term care service system. The integration plan must guide the District's inter-agency actions to: inform Plaintiffs about community-based alternatives, identifies Plaintiffs prefer to get their long-term care services in the community, and help them move to the community with the long-term care services and supports they need;

iii. Ensure capacity in its Medicaid long-term care programs and services under the EPD Waiver Program, the State Plan Personal Care Assistance Program, Money Follows the Person Program, and programs for senior citizens and adults with physical disabilities to enable named Plaintiffs and class members to transition from nursing facilities to the community with these long-term care services and case management assistance;

iv. Ensure sufficient staffing to inform individuals with physical disabilities in nursing facilities about available long-term care services in the community and assess the community eligibility of individuals with physical disabilities in nursing facilities and provide transition assistance, *i.e.,* assist named Plaintiffs and class members to obtain identification documents, complete housing applications, and arrange long-term care services upon discharge from the nursing facilities;

v.  Provide adequate and appropriate community-based long-term care services to assist Plaintiffs with their activities of daily living (bathing, dressing, mobility, toileting, eating) and instrumental activities of daily living (e.g., meal preparation, grocery shopping, laundry), and skilled nursing needs;

vi. Assure that people with physical disabilities are not unnecessarily placed in nursing facilities by, for example, informing them prior to, and upon

20

admission of the availability of integrated, community-based options for long-term care services as an alternative to nursing facility placement, offering them a meaningful choice of community placement, or offering any assistance to those who seek to return to live in the community;

vii.   Assure that individuals with physical disabilities residing in nursing facilities are periodically asked about their interest in, assessed for, and where appropriate, transitioned from nursing facilities to community-based long-term care services;

viii.  Ensure that all nursing facilities that receive DC Medicaid funding inform individuals with physical disabilities about community-based alternatives and begin discharge planning upon admission to assist Plaintiffs to transition back to the community from nursing facilities;

ix.   Provide clear and accurate information to Plaintiffs regarding their eligibility for community-based long-term care services, the process for accessing these services, and assisting them to apply for the services;

x.   Provide information, transitional assistance, and referrals to facilitate Plaintiffs' access to supportive housing as necessary to enable Plaintiffs to no longer be unnecessarily segregated in nursing facilities; and

xi.   Take adequate steps to preserve Plaintiffs' existing community housing subsidies during periods of placement in nursing facilities so that people can maintain homes to which they may return.

**Defendant's Policies Undermine *Olmstead's* Requirements**

106.   Defendant administers its Medicaid Program and services for adults with physical disabilities in a manner that perpetuates the segregation of persons with physical disabilities. All Named Plaintiffs and class members are subject to the District's policy and practice that determines their level-of-need for assistance with activities of daily living (e.g., bathing, dressing, toileting, mobility, eating) and instrumental activities of daily living (e.g., meal preparation, grocery shopping, laundry, housekeeping). The District's level-of-need determination qualifies all Plaintiffs to receive long-term care services either in nursing facilities or in the community under the Medicaid Waiver Program for People Who are Elderly and/or have Physical Disabilities (EPD Waiver). The District's methods of administration arbitrarily

21

limit access to integrated, long-term community support services by persons with physical disabilities in nursing facilities. As a result of the District's unbalanced long-term care system, community-based long-term care services are unavailable to many people with disabilities who need and want them, effectively compelling their institutionalization in nursing facilities.

107.    In 2006, the District was approved to receive over $26 million in federal funds through a five-year grant to support the transition of 1,100 people from nursing facilities and other institutions to the community to live independently with the services they need. The grant period was extended through 2016. Now in its ninth year of the grant period, the District has transitioned only a tiny fraction of the original targeted number of persons from nursing facilities under the grant.

108.    *Olmstead*'s integration mandate may be excused only where a state demonstrates that compliance with the mandate would result in a "fundamental alteration" of the state's services and programs. *Olmstead*, 527 U.S. at 603. This defense is not available, however, to states that have not developed an effectively working plan to comply with the *Olmstead* mandate. *Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 158-59 (3d Cir. 2005).

109.    In 2007, Defendant began work on a written "Olmstead Plan" which was not released until 2012, thirteen years after the Supreme Court's landmark decision.

110.    Defendant's plan is not a comprehensive or effectively working integration plan because, among other things, it fails to establish or implement inter-agency mechanisms to transition Plaintiffs from nursing facilities into more integrated community settings in sufficient numbers within specific time frames. The plan also lacks evidence of sustainability demonstrated through allocation of resources and system reform to rebalance the long-term care system away

from its reliance on institutional nursing facility care rather than community-based services. Furthermore, the plan contains no measurable objectives beyond 2012.

111.    The fact that the District of Columbia's system of long-term care does not operate effectively to meet its obligations under *Olmstead* and the ADA is shown most dramatically by the Defendant's failure to make demonstrable progress toward meeting the very low numeric targets the agencies that serve people in nursing facilities have committed to meet.

112.    The District of Columbia's Department of Health Care Finance Administration ("DHCF") is responsible for administering the District of Columbia's long-term care system for people with disabilities. *See* D.C. Code § 7-771.07(9). DHCF must "maximize federal assistance," "[c]oordinate with other District government agencies to ensure effective and efficient use of Medicaid dollars," and "ensure coordinated health-care access and delivery for publicly funded health-care services." D.C. Code § 7-771.07(3)-(5). DHCF also is "the single state agency" that administers the District of Columbia's Medicaid program. *See* 42 U.S.C. § 1396a(a)(5); D.C. Code § 7-771.07(1).

113.    Defendant's violations of its federal obligations worsened in 2011 to 2012 due to DHCF's proposal to reduce home-based personal care aide services under the Medicaid State Plan from 1,040 hours per year per person, with additional hours available pursuant to physicians' orders and DHCF prior authorization, to 520 hours per year per person, with no provision for additional hours. As a result of these proposed cuts, the District advised approximately 2,900 Medicaid beneficiaries who had not previously been serviced under the EPD waiver to apply for slots under that waiver in order to maintain their services. The addition of several hundred Medicaid beneficiaries in the community to the EPD Waiver program exhausted the 4,000 allotted community-based EPD Waiver slots. In August 2011, the District

23

established a waiting list for participation in the EPD Waiver Program and Plaintiffs and other

class members seeking placements out of nursing facilities are subject to this waiting list. But the

District fails to inform or assist people with physical disabilities in nursing facilities to get on the

EPD Waiver waiting list. The District suspended the EPD Waiver waiting list on March 27,

2014.

114.    On May 7, 2010, counsel for Named Plaintiffs sent a letter to former District of

Columbia Mayor Adrian Fenty and former Attorney General Peter Nickles detailing the

violations of Plaintiffs' rights under the integration mandate of Title II of the ADA and the

Supreme Court's ruling in *Olmstead.* The letter cited policies and practices such as the District's

"failure to inform nursing home residents about the availability of integrated community-based

options for mental health and other health care" and the lack of a "*comprehen*sive and effective

plan for identifying individuals with mental or physical disabilities who are needlessly in nursing

facilities and for helping them move to more integrated settings." The letter urged former Mayor

Fenty "to take strong and swift action to enable people with disabilities in nursing facilities to

receive services in integrated settings."

115.    Six months before the present lawsuit was filed, on July 13, 2010, and July 27,

2010, Plaintiffs' counsel met with former Mayor Fenty's designees, including former Attorney

General Peter Nickles and designees from DMH, regarding Plaintiffs' May 7th letter.

116.    During 2012, the parties engaged in mediation for over three months in an effort

to negotiate a settlement.

117.    Defendant has not resolved Plaintiffs' grievances.

## CLASS ACTION ALLEGATIONS

118.    Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, and

Local Rule 23.1, the Named Plaintiffs bring this action for prospective relief on behalf of

themselves and all other persons similarly situated.

119.    In March 2014, the U.S. District Court for the District of Columbia certified the

Plaintiff class under Fed. R. Civ. P. 23(b)(2). In June 2015, the U.S. Court of Appeals for the

D.C. Circuit dismissed Defendant's petition that sought an interlocutory appeal of the District

Court's class certification.

120.    The class consists of:

> All persons with physical disabilities who, now or during the pendency of this
> lawsuit:
> (1) receive DC Medicaid-funded long-term care services in a nursing facility for
> 90 or more consecutive days;
> (2) are eligible for Medicaid-covered home and community-based long-term care
> services that would enable them to live in the community; and
> (3) would prefer to live in the community instead of a nursing facility but need the
> District of Columbia to provide transition assistance to facilitate their access to
> long-term care services in the community.

121.    ***Numerosity***: The Plaintiff class is so numerous that joinder of all its members is

impracticable. The exact number of individuals in the class is not known but is believed to be

between 500 and 2,900 individuals.

122.    Joinder is also impracticable because class members lack the knowledge and

financial means to maintain individual actions.

123.    ***Commonality***: There are questions of law or fact that are common to all the

Plaintiffs, including:

> a.    Whether Defendant segregates Plaintiffs in nursing facilities in order to
> receive long-term care services, rather than providing those services in
> more integrated, community-based settings;

b.  Whether Defendant administers its long-term care services, programs, and activities in the most integrated setting appropriate to the needs of individuals with physical disabilities residing in nursing facilities;

c.  Whether Defendant fails to offer sufficient discharge planning to enable individuals with physical disabilities residing in nursing facilities to be served in more integrated, community-based settings;

d.  Whether Defendant fails to develop, fund, and effectively utilize existing long-term care community-based programs so that individuals with physical disabilities residing in nursing facilities may be placed in more integrated, community-based settings;

e.  Whether Defendant fails to establish and implement a comprehensive, effective working plan to place individuals with physical disabilities who reside in nursing facilities into more integrated, community-based settings;

f.  Whether Defendant fails to administer and implement federal programs such as EPD Medicaid Waiver long-term care services, Medicaid State Plan Personal Care Assistance Services, and Money Follows the Person to afford access to community-based long-term care service programs by people with physical disabilities in nursing facilities; and

g.  Whether Defendant fails to inform and provide Plaintiffs with meaningful choices of community-based long-term care alternatives to nursing facilities.

124.  ***Typicality:*** The claims of the Named Plaintiffs are typical of the claims of the class as a whole in that both the Named Plaintiffs and the class members currently are unnecessarily isolated in nursing facilities and, based on their level of need, receiving long-term care services funded by the District of Columbia; they could live in more integrated settings with appropriate long-term care to assist with their activities of daily living (e.g., bathing, dressing, toileting, mobility, eating) and instrumental activities of daily living (e.g., grocery shopping, meal preparation, laundry, housekeeping), personal care assistance, and support services; and they desire to live in more integrated, community-based settings.

125.    Named Plaintiffs' claims that Defendant has failed to administer its long-term care Medicaid programs to provide services in the most integrated setting appropriate to their needs are typical of the claims of the class.

126.    ***Adequate representation***: The Named Plaintiffs will fairly represent and adequately protect the interests of members of the class as a whole because they suffer from deprivations identical to those of the class members and have been denied the same federal rights that they seek to enforce on behalf of the other class members, many of whom are unable to pursue claims on their own behalf as a result of their disabilities, their limited financial resources, and the actions of the Defendant to deprive them of their rights. The Named Plaintiffs' interests are consistent with and are not antagonistic to those of other class members. By filing this action, the Named Plaintiffs express their interest in vindicating their rights, as well as the rights of others who are similarly situated. The relief sought by the Named Plaintiffs will inure to the benefit of members of the class generally. The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, disability discrimination, Medicaid law, practice and procedure in the federal courts, and the prosecution and management of class action litigation.

127.    Defendant has acted or refused to act on grounds generally applicable to the class by unnecessarily segregating class members, thereby making final injunctive relief appropriate with respect to the class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure. For example, Defendant has failed to inform class members of their right to community services and failed to provide them with long-term care services in the most integrated setting appropriate to their needs. Although the specific disabilities of the class members vary, they also share a common need for Medicaid and locally-funded long-term care services. In addition, Plaintiffs are

all subject to the District's policy and practice under which their level of need is determined

which, in turn, qualifies them to receive long-term care services either in nursing facilities or in

the community under the Medicaid EPD Waiver Program.

128.    A class action is superior to individual lawsuits for resolving this controversy.

Declaratory and injunctive relief with respect to the entire class is appropriate.

## COUNT 1
## AMERICANS WITH DISABILITIES ACT

129.    Paragraphs 1 through 128 are incorporated by reference.

130.    Each Named Plaintiff and class member is an "individual with a disability" within

the meaning of the ADA in that they have disabilities that substantially limit one or more major

life activities, such as self-care and social interaction. They also have a history of such

impairments and are regarded by Defendant as having such impairments.

131.    Each Named Plaintiff and class member is a "[q]ualified individual with a

disability" within the meaning of the ADA, 42 U.S.C. § 12131(2), because he or she is qualified

to participate in Defendant's more integrated, community-based programs and services.

132.    Defendant District of Columbia is a public entity covered by Title II of the ADA.

As such, the ADA prohibits Defendant from discriminating against individuals with disabilities

in its programs and services. *See* 42 U.S.C. §§ 12131 and 12132.

133.    Regulations implementing Title II of the ADA require that "[a] public entity

administer services, programs, and activities in the most integrated setting appropriate to the

needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

134.    The ADA's implementing regulations further provide:

> A public entity may not, directly or through contractual or
> other arrangements, utilize criteria or methods of

28

> administration: (i) That have the effect of subjecting
> qualified individuals with disabilities to discrimination on
> the basis of disability; [or] (ii) That have the purpose or
> effect of defeating or substantially impairing
> accomplishment of the objectives of the public entity's
> program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3)(i)-(ii).

135.    Defendant has caused the Named Plaintiffs and class members to be confined unnecessarily in nursing facilities in order to obtain long-term care services, rather than facilitate their transition to the community with appropriate services and supports.

136.    Defendant's actions violate Title II of the ADA.

### COUNT II
### REHABILITATION ACT

137.    Paragraphs 1 through 128 are incorporated by reference.

138.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

139.    Defendant District of Columbia and its governmental agencies receive federal financial assistance within the meaning of Section 504.

140.    Each Named Plaintiff and class member is an "individual with a disability" within the meaning of Section 504 because they have disabilities that substantially limit one or more major life activities, such as self-care, transferring to and from wheelchairs, and social interaction. They also have such impairments and are regarded by Defendant as having such impairments.

29

141.    Each Named Plaintiff and class member is a "qualified person with disabilities" within the meaning of Section 504 because he or she is qualified to participate in Defendant's more integrated, community-based programs and services.

142.    Regulations implementing Section 504 require that a public entity administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

143.    Regulations implementing Section 504 prohibit recipients of federal financial assistance from:

> [U]tiliz[ing] criteria or methods of administration . . . (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

45 C.F.R. § 84.4(b)(4)(i)-(ii); 28 C.F.R. § 41.51(b)(3)(i)-(ii).

144.    Defendant's actions violate Section 504 of the Rehabilitation Act.

## REQUEST FOR RELIEF

WHEREFORE, Named Plaintiffs and class members (together, "Plaintiffs") respectfully request

that this Court:

a.   Certify this action as a class action.

b.   Declare that Defendant's failure to provide Plaintiffs with long-term care services in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act.

c.   Declare that Defendant's failure to provide Plaintiffs with long-term care services in the most integrated setting appropriate to their needs violates Section 504 of the Rehabilitation Act.

d.   Enter a permanent injunction requiring Defendant to promptly take the following steps that are necessary to serve Plaintiffs in the most integrated settings appropriate to their needs:

i)   Develop and implement a working system of transition assistance for Plaintiffs whereby Defendant, at a minimum, (a) informs DC Medicaid-funded nursing facility residents, upon admission and at least every three months thereafter, about community-based long-term care alternatives to nursing facilities; (b) elicits DC Medicaid-funded nursing facility residents' preferences for community or nursing facility placement upon admission and at least every three months thereafter; (c) begins DC Medicaid-funded nursing facility residents' discharge planning upon admission and reviews at least every month the progress made on that plan; and (d) provides DC Medicaid-funded nursing facility residents who do not oppose living in the community with assistance accessing all appropriate resources available in the community.

ii)   Ensure sufficient capacity of community-based long-term care services for Plaintiffs under the EPD, MFP, and PCA programs, and other long-term care service programs, to serve Plaintiffs in the most integrated setting appropriate to their needs, as measured by enrollment in these long-term care programs;

iii)   Successfully transition Plaintiffs from nursing facilities to the community with the appropriate long-term care community-based services under the EPD, MFP, and PCA programs, and any other long-term care programs, with the following minimum numbers of transitions in each of the next four years:

80 class members in Year 1;

120 class members in Year 2;

200 class members in Year 3; and

200 class members in Year 4.

iv)    Sustain the transition process and community-based long-term care service infrastructure to demonstrate the District's ongoing commitment to deinstitutionalization by, at a minimum, publicly reporting on at least a semi-annual basis the total number of DC Medicaid-funded nursing facility residents who do not oppose living in the community; the number of those individuals assisted by Defendant to transition to the community with long-term care services through each of the MFP, EPD, and PCA, and other long-term care programs; and the aggregate dollars Defendant saves (or fails to save) by serving individuals in the community rather than in nursing facilities.

e.    Award Named Plaintiffs and class members their reasonable attorneys' fees, litigation expenses, and costs; and

f.    Grant such other and further relief as this Court deems just and proper.

Dated: September 1, 2015                          Respectfully submitted,

                          /s/ Brian D. Schneider
                          Marjorie Rifkin, D.C. Bar No. 437076
                          Jennifer Lav, D.C. Bar No. 499293
                          Lyndsay Niles, D.C. Bar No. 1003427
                          Kristina Majewski, D.C. Bar. No. 1024975
                          mrifkin@uls-dc.org
                          jlav@uls-dc.org
                          lniles@uls-dc.org
                          kmajewski@uls-dc.org
                          University Legal Services–Protection &
                          Advocacy
                          220 I Street NE #130
                          Washington, DC 20002
                          (202) 547-0198 ext. 128
                          Fax: (202) 547-2662

                          Kelly Bagby, D.C. Bar No. 462390
                          Iris Gonzalez, DC Bar No. 987156
                          Kbagby@aarp.org
                          igonzalez@aarp.org
                          AARP Foundation Litigation
                          601 E Street, NW
                          Washington, DC 20049
                          (202) 434-2103
                          Fax: (202) 434-6424

                          Barbara Wahl, D.C. Bar No. 297978
                          Brian D. Schneider, D.C. Bar No. 983171
                          Alison L. Andersen, D.C. Bar No. 997260
                          wahl.barbara@arentfox.com
                          schneider.brian@arentfox.com
                          alison.andersen@arentfox.com
                          Arent Fox LLP
                          1717 K St., NW
                          Washington, DC 20036
                          (202) 857-6000
                          Fax: (202) 857-6395

                          *Counsel for Plaintiffs*