# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IVY BROWN, *et al.*,

                **Plaintiffs,**

                **v.**

DISTRICT OF COLUMBIA,

                **Defendant.**

Civil Action No. 10-2250 (ESH)

## MEMORANDUM OPINION

This action was brought by a class of individuals with physical disabilities who (1) have received DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days; (2) are eligible for Medicaid-covered home and community-based long-term care services; and (3) would prefer to live in the community instead of a nursing facility. (4th Am. Compl. ¶ 120, Sept. 10, 2015, ECF No. 162.) Plaintiffs allege that the District's failure to provide effective transition services has caused the class to remain in nursing facilities, in violation of the integration mandate of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* (*See id.* ¶¶ 1–3.)

The integration mandate was first recognized by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). Under *Olmstead*, the essential inquiry is whether a state administers its Medicaid programs in a manner that unjustly segregates individuals with disabilities. *Olmstead* involved the question of whether the integration mandate had been violated with respect to two disabled individuals. Here, plaintiffs are proceeding as a class

action, and therefore, the question is far more complicated.

To succeed, plaintiffs have the burden under Rule 23, as interpreted by Supreme Court and Circuit precedent, to show a systemic policy or practice of the District's operation of its Medicaid system that has caused a common harm to plaintiffs. Plaintiffs have a further burden to show that the common harm can be remedied by a single injunction, which would result in the class members being transitioned out of the nursing facilities. Thus, the essential question before the Court is whether plaintiffs have shown concrete systemic deficiencies that harm the class and, if these deficiencies exist, whether they are redressable by a single injunction.

Based on the testimony and exhibits admitted at trial, the parties' arguments, and the applicable law, the Court has reached the Findings of Fact and Conclusions of Law set forth below, and it concludes that plaintiffs have failed to demonstrate that they are entitled to class-wide relief under Fed. R. Civ. P. 23. The class-wide claims will therefore be dismissed, and as plaintiffs do not seek individual relief, judgment will be entered for the District.

**BACKGROUND**[1]

**I.     LEGAL BACKGROUND**

Proceeding under an *Olmstead* theory of liability, plaintiffs contend that the District is violating the so-called "integration mandate" of Title II of the ADA and Section 504 of the Rehabilitation Act by failing to provide effective transition services to a class of physically disabled individuals who receive Medicaid-funded long-term care, have lived in nursing facilities for more than 90 days, and would prefer to live in the community. Plaintiffs seek class-wide

---

[1] Both the legal and factual background has been laid out in great detail in the Court's prior opinions in this case. *See Day v. District of Columbia*, 894 F. Supp. 2d 1 (D.D.C. 2012); *Thorpe v. District of Columbia*, 916 F. Supp. 2d 65 (D.D.C. 2013) ("*Thorpe I*"); *Thorpe v. District of Columbia*, 303 F.R.D. 120 (D.D.C. 2014) ("*Thorpe II*"), *petition for interlocutory appeal denied*, *In re District of Columbia*, 792 F.3d 96 (D.C. Cir. 2015).

declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2).

**A.      The Integration Mandate of the ADA and the Rehabilitation Act**

Title II of the ADA and Section 504 of the Rehabilitation Act, along with their implementing regulations, require that public entities and programs receiving federal funds take reasonable steps to avoid administering their programs in a manner that results in the segregation of individuals with disabilities.  This is the crux of the integration mandate.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" under the ADA is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2).  A "public entity" is "any State or local government," and "any department, agency, [or] special purpose district," including the District of Columbia.  *See id.* §§ 12131(1)(A), (B).

Congress included in Title II of the ADA its express finding that "segregation" of persons with disabilities is a "form[] of discrimination" forbidden by the statute.  *Id.* § 12101(a)(5); *see id.* § 12101(a)(2) ("[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.").  Congress instructed the Attorney General to promulgate regulations implementing Title II's proscription against disability-based discrimination, including unjust segregation.  *See id.* § 12134(a).  To this end,

the ADA's implementing regulations include an "integration" provision, which requires that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities,"  28 C.F.R. § 35.130(d).  The regulations define the "most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  *Id.* pt. 35, App. B.

Similarly, Section 504 of the Rehabilitation Act, which applies to "any program or activity receiving Federal financial assistance," such as Medicaid, provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination." 29 U.S.C. § 794(a).  Although the Rehabilitation Act does not contain an express finding that segregation is a form of discrimination, the Rehabilitation Act's implementing regulations mirror those of Title II of the ADA by requiring that programs, services, and activities be administered in "the most integrated setting appropriate" to the needs of individuals with disabilities.  *See* 28 C.F.R. § 41.51(d).

Albeit in slightly different formulations, the regulations implementing both statutes require "reasonable accommodations" to avoid discrimination of individuals with disabilities. Under ADA regulations, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id.* § 35.130(b)(7). Similarly, under the Rehabilitation Act, the recipient of federal funds must "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation

would impose an undue hardship on the operation of its program." *Id.* § 41.53. These

regulations, while not identical, are intended to be "consistent." *See* 42 U.S.C. § 12134(b) (the

regulations implementing the ADA "shall be consistent with" the regulations implementing

Section 504).

> The regulations of each law also prohibit the use, direct or otherwise, of
>
> criteria or methods of administration: (i) That have the effect of subjecting
> qualified individuals with disabilities to discrimination on the basis of disability;
> [or] (ii) That have the purpose or effect of defeating or substantially impairing
> accomplishment of the objectives of the public entity's program with respect to
> individuals with disabilities.

28 C.F.R. § 35.130(b)(3) (ADA); 45 C.F.R. § 84.4(b)(4)(i)–(ii) (Rehabilitation Act). Read

together, these regulations require that public entities and programs receiving federal funds take

reasonable steps to avoid administering their programs in ways that result in discrimination.

### B.      *Olmstead*

In *Olmstead*, the Supreme Court expounded on the meaning of the integration mandate

for disabled individuals receiving Medicaid-funded care in institutions. In that case, the Court

considered whether the "proscription of discrimination" in Title II of the ADA "may require

placement of persons with mental disabilities in community settings rather than in institutions."

527 U.S. at 587. The Court answered with "a qualified yes," holding a state government liable

for its failure to provide community care for two individual plaintiffs with mental disabilities.

*Id.* at 587, 598.[2]

---

[2] This case differs from *Olmstead*. First, plaintiffs in this case bring causes of action under both
Title II of the ADA and Section 504 of the Rehabilitation Act. Although *Olmstead* only dealt
with Title II of the ADA, "the courts have tended to construe section 504 *in pari materia* with
Title II of the ADA, reasoning that these statutory provisions are similar in substance . . . [and
consequently] cases interpreting either are applicable and interchangeable." *Am. Council of the
Blind v. Paulson*, 525 F.3d 1256, 1261 n.2 (D.C. Cir. 2008) (internal citations and quotation
marks omitted).

The Court first held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597. In doing so, the Court concluded that "[u]njustified isolation" of individuals with disabilities, even without a showing of disparate treatment, constitutes discrimination prohibited by Title II of the ADA, *id.*, and that the government's failure to provide "reasonable accommodations" for individuals with disabilities to access community care is actionable under the law, *id.* at 601.

*Olmstead* sets forth a three-part test to determine whether a state has unjustly segregated an individual with a disability. Community placement for individuals with disabilities "is in order" when (1) "the State's treatment professionals have determined that community placement is appropriate," (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587. The Court cautioned that it was not holding "that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities,'" but rather, "that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id.* at 603 n.14.

Applying the three-part test to the two individuals in *Olmstead*, the Court noted that it was undisputed that the two plaintiffs satisfied the first two prongs, as they were "qualified for

_____

Second, plaintiffs in this case are physically disabled, unlike the *Olmstead* plaintiffs, who had mental disabilities. Nevertheless, *Olmstead* applies with equal force to individuals with physical disabilities. *See* 42 U.S.C. § 12102(1)(A) (qualifying disability under the ADA includes "a *physical or mental impairment* that substantially limits one or more of the major life activities of such individual" (emphasis added)); *see, e.g.*, *M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011) (plaintiffs were both mentally and physically disabled); *Grooms v. Maram*, 563 F. Supp. 2d 840, 852 (N.D. Ill. 840) (plaintiff was physically disabled only).

noninstitutional care" and did not "oppose[] such treatment." *Id.* at 602–03.  However, as to the

third factor—whether community placement for those plaintiffs was could be "reasonably

accommodated"—the Court remanded the matter for the lower courts to determine in the first

instance whether providing community care to the plaintiffs would have been "reasonable." *Id.*

at 607.  The Court counseled that, although it is a fact-bound inquiry, a state's obligation to make

particular modifications is "not boundless." *Id.* at 603.  For instance, states are not required to

make a modification that would constitute a "fundamenta[l] alter[ation]" of the existing services.

*Id.* (quoting 28 C.F.R. § 35.130(b)(7)).

A plurality of the Court expounded on the scope of "[t]he State's responsibility, once it

provides community-based treatment to qualified persons with disabilities." *Id.* at 603.  The

plurality observed that "[t]o maintain a range of facilities and to administer services with an even

hand, the State must have more leeway than the courts below understood the fundamental-

alteration defense to allow." *Id.* at 605.  For instance, the plurality reasoned that it would not be

proper to compare the cost of community-based treatment for the two individual plaintiffs who

brought the lawsuit against the entire mental health budget of the state.  Instead,

> the fundamental-alteration component of the reasonable-modifications regulation
> would allow the State to show that, in the allocation of available resources,
> immediate relief for the plaintiffs would be inequitable, given the responsibility
> the State has undertaken for the care and treatment of a large and diverse
> population of persons with mental disabilities.

*Id.* at 604.

According to the plurality, one way that a state could defeat liability with a fundamental-

alteration defense was by "demonstrat[ing] that it had a comprehensive, effectively working plan

for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list

that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions

fully populated." *Id.* at 605–06. Such a comprehensive, effectively working plan is now commonly known as an "*Olmstead* Plan." A number of states, as well as the District, have adopted their own *Olmstead* Plans, although the name alone is obviously not enough to make it a legally sufficient defense.

### C.    Federal Rule of Civil Procedure 23: Class Actions

As will be discussed more fully herein, plaintiffs in this case proceed as a class under Federal Rule of Civil Procedure 23(b)(2), unlike the two plaintiffs in *Olmstead*, who sought individual injunctive relief. *See infra* Conclusions of Law Part I. Thus, plaintiffs carry an additional burden under Rule 23 to demonstrate that they have met the Rule 23(a) prerequisites.[3] As plaintiffs seek declaratory and injunctive relief, they must also show that the action meets the requirements of Rule 23(b)(2).

> Certification under Rule 23(b)(2) for injunctive relief requires plaintiffs to show that the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Courts may certify classes under this provision "only when a single injunction or declaratory judgment would provide relief to each member of the class."

*DL v. District of Columbia*, 860 F.3d 713, 723 (D.C. Cir. 2017) ("*DL II*") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)).To proceed as a Rule 23(b)(2) class, the party seeking certification must "adequately allege[] that the class has suffered a uniform deprivation, and that such deprivation could be remedied by a single injunction" for purposes of

---

[3] Federal Rule of Civil Procedure 23(a) requires plaintiffs to show that

> (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

commonality. *In re District of Columbia*, 792 F.3d 96, 101 (D.C. Cir. 2015). In other words, a Rule 23(b)(2) class must identify a "policy or practice affecting all members of the class." *Id.* at 100 (citing *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013) ("*DL I*")). This requirement means that plaintiffs here must "proffer[] evidence of systemic deficiencies in the District's system of transition assistance and that those deficiencies appear to be affecting the class." *Thorpe v. District of Columbia,* 303 F.R.D. 120, 151 (D.D.C. 2014) ("*Thorpe II*").

At the class certification stage, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350. But at the trial stage, the class must do more than "be prepared to prove" the Rule 23 requirements. *See id.* Instead, the class must actually prove that it has complied with Rule 23. Importantly, the class must answer the common questions that they identified at the class certification stage, and the answers to those questions must justify "final injunctive relief or corresponding declaratory relief . . . respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Here, "to prevail on the merits and obtain the relief they seek, plaintiffs [must] prove concrete[,] systemic deficiencies" in the District's system of transition assistance and that these deficiencies have caused a common harm to class members. *See Thorpe II,* 303 F.R.D. at 146 n.58, 151.

## II.   PROCEDURAL HISTORY

### A.   Plaintiffs' Initial Complaint and the District's First Motion to Dismiss

On December 23, 2010, four plaintiffs filed a putative class action against the District, the Mayor of the District, and various District officials seeking declaratory and injunctive relief

for the plaintiffs' alleged segregation. (Compl. at 27 (Request for Relief), ECF No. 1.)[4] At the

time, the proposed class consisted of

> [a]ll those persons who (1) have a disability; (2) receive services in nursing
> facilities located in the District of Columbia or funded by [the District] at any
> time during the pendency of this litigation; (3) could live in the community with
> appropriate supports and services from [the District]; and (4) prefer to live in the
> community rather than in nursing facilities.

(*Id.* ¶ 90.) The Complaint alleged that the District's "programs and activities for persons with

disabilities systematically deny or ignore Plaintiffs' choices and preferences for integrated

community care," in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

(*Id.* ¶ 9.) At the time, by virtue of not qualifying "disability," the proposed class included

individuals with both mental and physical disabilities. (*See* Status Conf. Tr. at 3:25–4:3, Apr.

29, 2011, ECF No. 22 ("4/29/2011 Status Conf. Tr.").)

Before defendants filed a responsive pleading, plaintiffs amended their Complaint to add

an additional plaintiff. (*See* 1st Am. Compl., March 30, 2011, ECF No. 17.) On April 27, 2011,

defendants then filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. (Defs.'

Mot. to Dismiss 1st Am. Compl., ECF No. 19.)

The parties appeared for a Status Conference on April 29, 2011, at which the Court set a

briefing schedule on the pending Motion to Dismiss and relieved plaintiffs of the filing deadline

for their motion for class certification. (*See* Minute Order, April 29, 2011.) Consistent with the

Court's Minute Order, plaintiffs filed their Opposition to the District's Motion to Dismiss on

---

[4] The original named individual defendants, sued only in their official capacities, were Adrian M.
Fenty, the Mayor of the District of Columbia; Julie A. Hudman, Director of the District of
Columbia's Department of Health Care Finance ("DHCF"); and Stephen Baron, Director of the
District of Columbia's Department of Mental Health ("DMH"). (Compl. at 1–2.) Since
February 14, 2012, when the Court granted in part these defendants' motion to dismiss, the
District has been the sole defendant. *Day*, 894 F. Supp. 2d at 33.

September 1, 2011.  (Pls.' Opp'n to Defs.' Mot. to Dismiss 1st Am. Compl., ECF No. 28.)

Defendants filed their Reply on October 3, 2011.  (Defs.' Reply in Support of Mot. to Dismiss

1st Am. Compl., ECF No. 30.)

On February 14, 2012, this Court granted in part and denied in part the District's motion.

*Day v. District of Columbia*, 894 F. Supp. 2d 1, 33 (D.D.C. 2012).  In doing so, the Court

rejected the District's argument that plaintiffs had failed to state a claim because they had not

properly alleged "a causal connection between the injury and the conduct complained of," or, in

other words, that plaintiffs had not properly alleged that "the injury [is] fairly traceable to the

challenged action of the defendant."  (Defs.' Mot. to Dismiss 1st Am. Compl. at 10–11 (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).)  The Court concluded that it was

sufficient for plaintiffs to have alleged that

> the District provides, administers and/or funds the existing service system through
> which plaintiffs receive long-term care services and/or that the District, in so
> doing, has utilized criteria or methods of administration that have "caused
> [plaintiffs] . . . to be confined unnecessarily in nursing facilities in order to obtain
> long-term care services, rather than facilitate their transition to the community
> with appropriate services and supports."

*Day*, 894 F. Supp. 2d at 22 (quoting 1st Am. Compl. ¶ 111).

The Court also rejected the District's argument that summary judgment should be granted

because it had adopted an *Olmstead* Integration Plan and specific programs designed to further

deinstitutionalization.  *Id.* at 29.  The undisputed figures regarding the District's nursing-home

occupancy "clearly undercut" its contention that it had any "plan that demonstrates a measurable

commitment to deinstitutionalization," one generally accepted component of an "effectively

working" *Olmstead* plan.  *Id.* at 28.  Moreover, the District had operated a waiver program for

elderly and physically disabled individuals ("EPD Waiver") since 1999, and it was impossible to

determine how many individuals had transitioned to community-based long-term care from

nursing facilities, as the District did not keep any such data. *Id.* at 29. But at least with respect to the Money Follows the Person ("MFP") federal grant program, operated in part to transition physically disabled nursing-facility residents to community-based long-term care, the District had only transitioned three such individuals as of October 3, 2011, even though the program had been authorized in 2007. *Id.* Given the fact that, at the time, there were at least 526 physically disabled individuals living in nursing facilities who expressed an interest in living in the community, the undisputed facts demonstrated that the Districts' *Olmstead* Plan had not been effective. *Id.*

However, the Court was persuaded by the District's argument that the claims against the individual defendants were redundant to those against the District. *Id.* at 33. The Court therefore dismissed plaintiffs' claims against the individual defendants, leaving the District as the sole remaining defendant. *Id.*

### B.    Plaintiffs' Second Amended Complaint and First Motion for Class Certification

On February 28, 2012, the District answered plaintiffs' Amended Complaint. (Answer to 1st Am. Compl., ECF No. 44.) On April 2, 2012, Plaintiffs filed a Second Amended Complaint, which removed three plaintiffs and added four new plaintiffs. (2d Am. Compl., ECF No. 46.) The District filed its Answer to the Second Amended Complaint on April 17, 2012. (Answer to 2d Am. Compl., ECF No. 51.) Then, based on the parties' request, the matter was referred to a Magistrate Judge for mediation, which did not succeed.

Between the first and second settlement conferences, plaintiffs filed their Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. (Pls.' Mot. for Class Cert. May 15, 2012, ECF No. 54.) The District filed its Opposition on August 20, 2012 (Def.'s Opp'n to Pls.' Mot. for Class Cert., ECF No. 61), and a supplemental Memorandum in Opposition on

September 20, 2012.  (Def.'s Supp. Opp'n to Pls.' Mot. for Class Cert., ECF No. 68.)  Plaintiffs

file their reply on September 28, 2012.  (Pls.' Reply in Support of Mot. for Class Certification,

ECF No. 70.)

Before the Court decided plaintiffs' Motion for Class Certification, the District filed three

additional motions:  (1) a Motion to Amend its Answer to the Second Amended Complaint,

which sought leave to add the defenses of *res judicata* and collateral estoppel to the claims of

those putative class members whose "claims overlap with claims previously litigated and

resolved in *Dixon v. Gray*."[5]  (Def.'s Mot. to Amend Answer to 2d Am. Compl. at 1, Sept. 18,

2012, ECF No. 65); (2) a Motion to Dismiss for Lack of Jurisdiction the Claims of Plaintiff

Donald Dupree (Def.'s Mot. to Dismiss Claims of Donald Dupree as Moot, Sept. 18, 2012, ECF

No. 64); and (3) a Motion to Dismiss for Lack of Jurisdiction the Claims of Plaintiff Curtis

Wilkerson.  (Def.'s Mot. to Dismiss Claim of Curtis Wilkerson as Moot, Dec. 13, 2012, ECF No.

81.)  On January 7, 2013, the Court heard argument on the District's pending motions.  (Minute

Entry, Jan. 7, 2013.)

At the hearing, the Court granted the District's motion to amend its answer.  (Hrg. Tr. at

87:11–12, Jan. 7, 2013, ECF No. 90 ("1/7/2013 Hrg. Tr."); Minute Order, Jan. 7, 2013.)  , The

Court also indicated that it would deny the District's two remaining motions, which sought

dismissal for lack of jurisdiction of two individual plaintiffs, as their claims satisfied a number of

exceptions to the mootness doctrine.  (1/7/2013 Hrg. Tr. at 3:19–23.)[6]

---

[5] *Dixon v. Gray*, Civil Action No. 74-0285, "created an integrated community-based mental
health system designed to guarantee the rights of individuals with mental illness to community-
based treatment under the least restrictive conditions."  *Thorpe II*, 303 F.R.D. at 134.  The
transition services created as a result of the *Dixon* litigation are administered by the Department
of Mental Health.  *Id.* at 141.

> At the end of the hearing, the Court advised plaintiffs that it would not grant the motion to certify the class as "presently constituted" for several reasons, including (1) the discrepancy between the purported systemic goals of the litigation and the undefined but individualized injunctive relief sought by the second amended complaint; and (2) plaintiffs' failure to avoid overlap between their claims and the class action settlement in *Dixon*.

*Thorpe II*, 303 F.R.D. at 134 (quoting 1/7/2013 Hrg. Tr. at 98:1). The Court was persuaded that it would be inappropriate to issue an injunction that included orders to the Department of Mental Health, which was already under a consent decree in the *Dixon* case. (1/7/2013 Hrg. Tr. at 86:7–9.)

In order for plaintiffs to address the deficiencies the Court identified, the Court denied plaintiffs' first Motion for Class Certification without prejudice and set a schedule for plaintiffs to file a Third Amended Complaint and a renewed Motion for Class Certification. (Minute Order, Jan. 17, 2013; Am. Scheduling Order, Jan. 17, 2013, ECF No. 87.) The Court determined that fact discovery would continue but that expert discovery would be stayed until after the Court ruled on the renewed Motion for Class Certification. (Am. Scheduling Order at 1-2.).)

### C. Plaintiffs' Third Amended Complaint and Renewed Motion for Class Certification

On March 27, 2013, plaintiffs filed their Third Amended Complaint. (3d Am. Compl., ECF No. 98.) The Third Amended Complaint "added six new class representatives, revised the proposed class definition in several ways, and amplified plaintiffs' requests for relief." *Thorpe II*, 303 F.R.D. at 135. Under the Third Amended Complaint, the class was defined as

> [a]ll persons with physical disabilities who, now or during the pendency of this lawsuit: (1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days; (2) are eligible to live in the community; and (3) would live in the community instead of a nursing facility if the District of Columbia would provide transition assistance to facilitate their access to long-

---

[6] The Court issued a Memorandum Opinion summarizing its rulings on January 9, 2013. *Thorpe I*, 916 F. Supp. 2d at 66-67.

term care services in the community.

(3d Am. Compl. ¶ 153.)  This definition "limit[ed] the class to individuals who have a physical disability, have been in a nursing facility for over 90 days, and need transition assistance from the District in order to leave the nursing facility and obtain community-based long-term care services."  *Thorpe II*, 303 F.R.D. at 135.  The Third Amended Complaint alleged a laundry list of some 11 deficiencies in the District's transition services, which the Court characterized as "broad and far-ranging institutional reform" that went "far beyond transitional services."  *Id.* at 136 (discussing 3d Am. Compl. ¶ 139).

On April 11, 2013, the District filed a Motion to Dismiss the Third Amended Complaint. (Def.'s Mot. to Dismiss 3d Am. Compl., ECF No. 99.)  On May 6, 2013, plaintiffs filed their Renewed Motion for Class Certification (Pls.' Renewed Mot. for Class Cert., ECF No. 103), and the Department of Justice filed a Statement of Interest in support of plaintiffs' renewed Motion for Class Certification.  (Statement of Interest of the United States, June 26, 2013, ECF No. 109.)

In its motion, the District argued that the Third Amended Complaint should be dismissed because the proposed class was not "readily ascertainable" with reference to "objective criteria" and that the class was overbroad.  (Def.'s Mem. in Support of Mot. to Dismiss 3d Am. Compl. at 5-6.)  The District further argued that, should the Court find the proposed class to be deficient, plaintiffs would lack standing to seek "system-wide injunctive relief" and that, even if the class were certified, plaintiffs would lack standing to seek "broad systemic relief [that] . . . exceeds the specific injuries alleged."  (*Id.* at 12, 15.)  On December 13, 2013, the Court held a hearing on the two pending motions, and on March 29, 2014, the Court issued a Memorandum Opinion denying the District's Motion to Dismiss and granting plaintiffs' renewed Motion for Class Certification.  *Thorpe II*, 303 F.R.D. at 124.

As to the District's Motion to Dismiss, the Court found that the class was sufficiently definite, notwithstanding plaintiffs' use of the length of stay in the nursing facility as a proxy for needing the District's transition assistance. *Id.* at 140–41. The Court also found that it was not fatal to plaintiffs' case that individuals who lack housing (or physically disabled individuals who are also mentally disabled) were included in the class. *Id.* at 141–42. The Court, mindful that its role at the motion to dismiss stage was "not . . .to resolve the merits," found no overbreadth problem even though it expressed concern about plaintiffs' ability to prove "a causal link between the alleged deficiencies in the District's system of transition assistance and the alleged unnecessary segregation." *Id.* at 142.

The Court also explained its conclusion that, "despite . . . serious problems" as to whether plaintiffs would be able to prevail on the merits and prove their entitlement to the class-wide relief they sought in their Complaint, plaintiffs had, at that juncture, carried their burden under Rule 23. *Id.* at 138. The Court found that "the District ha[d] yet to demonstrate that its *Olmstead* Plan is an 'effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated.'" *Id.* (quoting *Olmstead*, 527 U.S. at 606–07).

Importantly, grappling with the Supreme Court's decision in *Wal-Mart* and the D.C. Circuit's decision in *DL I*, the Court identified common questions whose "common *answers* [were] apt to drive the resolution of the litigation." *Id.* at 145–46 (quoting *Wal-Mart*, 564 U.S. at 350). Namely, the Court determined that

> [t]o prevail on the merits and obtain the relief they seek, plaintiffs will have to prove concrete systemic deficiencies. For example, does the District in fact "fail[] to offer sufficient discharge planning" or "fail[] to inform and provide [nursing facility residents] with meaningful choices of community-based long-term care

alternatives to nursing facilities.

*Id.* at 146 n.58 (quoting 3d Am. Compl. ¶ 156(c), (g)).

The Court modified slightly plaintiffs' proposed class definition, and, pursuant to Fed. R.

Civ. P. 23(a) and 23(b)(2), it certified a class of

> [a]ll persons with physical disabilities who, now or during the pendency of this lawsuit:
>
> (1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days;
>
> (2) are eligible for Medicaid-covered home and community-based long-term care services that would enable them to live in the community; and
>
> (3) would prefer to live in the community instead of a nursing facility but need the District of Columbia to provide transition assistance to facilitate their access to long-term care services in the community.

(Order, March 29, 2014, at 1.)

### D. The District's Petition for Interlocutory Appeal

After the Court certified the class, the District filed its Answer to the Third Amended

Complaint. (Def.'s Answer to 3d Am. Compl., Apr. 14, 2014, ECF No. 131.) The next day, the

District filed a petition to the U.S. Court of Appeals for the D.C. Circuit pursuant to Fed. R. Civ.

P. 23(f) for an interlocutory appeal of the class-certification decision. (*See* Notice of Petition for

Interlocutory Appeal, Apr. 15, 2014, ECF No. 132.)

A merits panel of the D.C. Circuit held oral argument on the District's petition on

February 6, 2015, and on June 26, 2015, it denied the Petition for Interlocutory Appeal. *In re*

*District of Columbia*, 792 F.3d at 102. Although the D.C. Circuit expressed serious doubts about

plaintiffs' ability to ultimately meet the requirements of Rule 23, the panel concluded that it was

not "manifest error to conclude, at this procedural juncture, that those two alleged deficiencies"–

failing to offer sufficient discharge planning and failing to inform nursing facility residents of

community-based alternatives to nursing facilities–"could represent the sort of systemic failure that might constitute a policy or practice affecting all members of the class in the manner *Wal–Mart* requires for certification." *Id.* at 100 (citing *DL I*, 713 F.3d at 126, 128). That is to say, the "two specific deficiencies" identified by this Court in a footnote of its Memorandum Opinion were pivotal to the panel's holding that this Court did not manifestly err by finding sufficient allegations that "the class has suffered a uniform deprivation, and that such deprivation could be remedied by a single injunction." *Id.* at 101 (citing *Thorpe II*, 303 F.R.D. at 146 n.58).

### E.    Plaintiffs' Fourth Amended Complaint and Pretrial Conference

After the Court of Appeals denied interlocutory review, this Court permitted expert discovery and set deadlines for the parties to complete all discovery. (Scheduling Order, July 15, 2015, ECF No. 158.) By consent motion, plaintiffs sought to amend their Third Amended Complaint to account for recent developments in the litigation. (Pls.' Mot. to Amend 3d Am. Compl., Sept. 1, 2015, ECF No. 160.) The Court granted the motion by Minute Order on September 10, 2015, and plaintiffs filed their Fourth Amended Complaint the same day.

The Fourth Amended Complaint—the operative complaint at the time of trial–added two new named plaintiffs, removed named plaintiffs who had died during the pendency of the litigation, and "updated [plaintiffs'] factual averments," but did not "alter the substance or basis for Plaintiffs' claims." (Pls.' Mot. to Amend 3d Am. Compl. at 1.) Importantly, the 11 alleged failures or deficiencies of the District's transition system from the Third Amended Complaint remained the same. (*Compare* 3d Am. Compl. ¶ 139 *with* 4th Am. Compl. ¶ 105.) The class definition, although slightly modified from the Third Amended Complaint, was identical to the class definition in the Court's Order certifying the class. (*Compare* 4th Am. Compl. ¶ 120 *with* Order, March 29, 2014, at 1.) The District answered the Fourth Amended Complaint on September 24, 2015. (Def.'s Answer to 4th Am. Compl., ECF No. 166.) In the Joint Pretrial

18

Statement, plaintiffs set forth their proposed injunction, which would set deadlines for the District to transition class members and require it to "[d]evelop and implement a working system of transition assistance to facilitate all class members' access to long-term care services in community-based settings."  (Joint Pretrial Statement at 10, Aug. 8, 2016, ECF No. 190.)

At the pretrial conference, the Court decided that the bench trial would be bifurcated into a "liability" phase and, if necessary, a "relief" phase.  In the first phase of trial, the Court would determine whether plaintiffs had proven that deficient transition services had resulted in a violation of *Olmstead*'s integration mandate, entitling them to class-wide relief.  In other words, plaintiffs would first present their evidence that they were unjustly segregated under *Olmstead* and that the District has a uniform policy or practice causing the unjust segregation that could be remedied in a single injunction, as required by Rule 23(b)(2).  If plaintiffs were successful in proving liability, the Court would then decide the scope of the injunction.  At this second phase, the District could raise the "fundamental alteration" defense recognized by the plurality in *Olmstead*.  *See* 527 U.S. at 604.

### F.      The Trial

The liability phase of the bench trial was held on September 13, 14, and 16; October 4 and 5; and November 8, 9, and 15, 2016.  The issue before the Court related to the District's current efforts to comply with *Olmstead*; the deficiencies in its transition services; and whether the lack of transition services contributed to the class members' segregation in nursing facilities. The evidence related to the years 2014–2016, as the Court's prior opinion in *Thorpe II* covered in detail the District's failure to transition class members through 2013.  *See* 303 F.R.D. at 132– 33.  But that Opinion expressly left unanswered the question of whether the problem of available housing, as opposed to a lack of transition services, resulted in the class members' continued segregation in nursing facilities, since that was an issue of fact that had to be decided at trial.  *Id.*

at 147 n.60.

Plaintiffs presented their case-in-chief over five days, calling ten live witnesses, reading portions of the depositions of four other witnesses, and introducing exhibits. After plaintiffs rested, the District moved for Judgment as a Matter of Law. (Def.'s Mot. for Judgment as a Matter of Law, Oct. 6, 2016, ECF No. 223.) The Court took the motion under advisement and ultimately permitted the parties to incorporate by reference their arguments from their memoranda addressing the District's Motion for Judgment as a Matter of Law into their Proposed Findings of Fact and Conclusions of Law.

The District presented its defense over four days, calling six live witnesses, reading counter-designations of the depositions of plaintiffs' four deposition witnesses, and introducing exhibits.

## G. Briefing and Argument on the Court's Findings of Fact and Conclusions of Law

After the close of the first phase of trial, the Court ordered the parties to "specifically address liability, causation, and the propriety of maintaining a class under Fed. R. Civ. P. 23." (Order, Nov. 15, 2016, ECF No. 227, at 1.) Thereafter, the parties submitted simultaneous Proposed Findings of Fact and Conclusions of Law (Pls.' Proposed FF&CL, Jan. 30, 2017, ECF No. 232; Def.'s Proposed FF&CL, Jan. 30, 2017, ECF No. 233) and simultaneous responses to the opposing party's Proposed Findings of Fact and Conclusions of Law. (Pls.' Response to Def.'s Proposed FF&CL, March 10, 2017, ECF No. 239; Def.'s Response to Pls.' Proposed FF&CL, March 10, 2017, ECF No. 239.)

On July 20, 2017, the Court held oral argument. Prior to the hearing, the Court posed specific questions and ordered the District to produce some updated information regarding evidence that had been admitted at trial. (Notice to Counsel, July 12, 2017, ECF No. 248; *see*

20

Def.'s Response to Order of the Court, July 24, 2017, ECF No. 252.)[7]  The first question related

to causation:

> How should the Court analyze the argument that factors beyond the District's
> control resulted in the plaintiffs' unjustified segregation?
>
> > i. Under ADA and/or Rehabilitation Act case law;
> >
> > ii. As a question of commonality under Rule 23(a);
> >
> > iii. As an issue of redressability; or
> >
> > iv. As a matter of the third *Olmstead* factor–"the placement can be
> > reasonably accommodated, taking into account the resources available to
> > the State and the needs of others with mental disabilities." 527 U.S. 581,
> > 587 (1999).

(Notice to Counsel at 1.)  The parties could not agree on a governing legal standard, nor could

they cite any relevant case law involving an *Olmstead* class action.

The District stated that "[t]he standard is whether the District is administering its

Medicaid program in the least restrictive setting appropriate when considering the state's

resources."  (Hrg. Tr., July 20, 2016, at 6:8–15.)  The District further argued that, without

plaintiffs having identified a "uniform policy or practice," plaintiffs' claims should fail.  (*See id.*

at 8:12–20.)  In response, plaintiffs argued that the causation standard is "substantial factor," *i.e.*,

plaintiffs must prove that the District's deficient policy or practice with respect to transition

services was a substantial factor in causing the class members' segregation.  (*Id.* at 23:15–25)

Plaintiffs stated that the "substantial factor" causation standard "is in the Department of Justice's

guidance on how to implement the integration mandates."  (*Id.*; *see* Pls.' Opp'n to Def.'s Motion

---

[7] Plaintiffs objected to the Court's reliance on any materials outside of the trial record.  (*See* Pls.'
Response to Def.'s Suppl. Submission, July 27, 2017, ECF No. 253.)

for Judgment as a Matter of Law at 5, Oct. 28, 2016, ECF No. 225.)[8]

In addition to grappling with identifying the appropriate legal standard for analyzing causation, the Court has, since the inception of this case, expressed its concern about the existence of barriers beyond the District's control that have resulted in the class members' inability to move out of nursing facilities. The gravamen of the District's position has consistently been that the lack of available, affordable, and accessible housing is the real reason that class members have not been able to move out of nursing facilities to receive long-term care in the community. Plaintiffs, for their part, have maintained that housing is not a barrier, nor is it the cause of class members' institutionalization. Both parties, however, agree that the supply of public and subsidized housing is under the control of the D.C. Housing Authority ("DCHA"), which is an independent authority not subject to the control of the District.

At the very first Status Conference, the Court asked plaintiffs where the putative class members would live if they received long-term care outside of a nursing facility. Plaintiffs represented that the supply of accessible, affordable housing was not an issue, but that class members needed assistance securing the required documents to apply for housing. (*See* 4/29/2011 Status Conf. Tr. at 5:16–21 ("[A]s an initial matter, people would obviously have to have homes to live in. . . . [T]he good news . . . is that there are hundreds of wheelchair accessible units available in the District of Columbia now."); *id.* at 7:17–20 ("People have to

---

[8] The DOJ's *Olmstead* Statement notes that, "[i]n *Olmstead*, the Court held that the plaintiffs could make out a case under the integration mandate even if they could not prove 'but for' their disability, they would have received the community-based services they sought." U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.* (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm. This statement, however, was made in the context of an individual discrimination case under the ADA, not in a class action alleging an *Olmstead* violation on a behalf of class of physically-disabled people.

apply for the units and go through the application process, but they need assistance as part of that process to reestablish documentation, their identification.").)

Plaintiffs further represented that housing was not a barrier for many of the putative class members. According to plaintiffs, many class members "have houses already. They have apartments. They have homes, they have families. But what their families don't have is the capacity to provide the home care necessary to support them, and they don't have capacity to help to make physical accommodations to their houses so that people can be wheeled in." (*Id.* at 17:5–11.)

At the January 7, 2013 hearing, the Court pointed out that it had no power to order the District to create new housing, even if that is what would solve class members' institutionalization. Plaintiffs responded that they were not asking the District "to provide the housing." (1/7/2013 Hrg. Tr. at 16:1.) Rather, plaintiffs maintained that "there are housing resources in the District of Columbia that people with disabilities who are Medicaid recipients can access. But they can't do it from where they sit in a nursing home." (*Id.* at 16:2-5.) Rather than a lack of housing, plaintiffs argued that class members remained in nursing facilities because they were unable to "[g]et their driver's license, fill out the applications, get on the wait list, all the things that are barriers that are keeping our class members unnecessarily segregated." (*Id.* at 63:8–11.)

At the December 11, 2013 hearing, the Court again brought up the causation issue that had been looming from the outset of the litigation. The Court reasoned that it would have to resolve this as a factual issue. (*See* Hrg. Tr., Dec. 11, 2013, at 3:7–14.) Plaintiffs again maintained that the lack of transition services, not housing, was the problem:

> [Plaintiffs are] not asking DC to provide the housing through this lawsuit, but there are available housing vouchers and there are accessible housing units in the

District of Columbia. In order to make that application, you need identification documents, you need the application, you need to fill out the application, you need to track the application that's been filled out proper. Which is what a lot of our plaintiffs are doing.

(*Id.* at 13:24–14:7.)

The Court also reminded plaintiffs that they have the burden to demonstrate that any injunction would solve class members' institutionalization. The Court noted that it "would have to find by [a] preponderance of the evidence [that plaintiffs] have shown that the absence of transition services means the person is stuck, not the inability to have a house, [a] place to live [in]." (*Id.* at 46:25–47:3.) The Court asked plaintiffs, "[h]ow are you going to prove at trial that if we beef up the services that you're actually going to succeed in getting people out. You have to prove causation. And that gets down to the old housing problem." (*Id.* at 33:8–12.)

Plaintiffs responded that expert testimony is "how we would prove a big part of that case. Because this is not rocket science." (*Id.* at 33:15–17.) Using then-named-plaintiff Jacqualyn Thorpe as an example, plaintiffs doubled down on their argument that housing presented no insurmountable barrier to class members: "The fact is, you know, if people were assisting Miss Thorpe and other people to secure the necessary documents, applications, different things to get housing, Miss Thorpe, you know, could get housing." (*Id.* at 61:20–23.)

## FINDINGS OF FACT

As explained above, the trial focused on the current state of the District's efforts to comply with *Olmstead*'s integration mandate,[9] and whether there were specific, concrete deficiencies in the District's transition services that "represent[ed] the sort of systemic failure that . . . constitute[d] a policy or practice affecting all members of the class in the manner *Wal-*

---

[9] In *Thorpe II*, the Court had found that the District had yet to transition meaningful numbers of class members into community-based care. 303 F.R.D. at 138.

*Mart* requires for certification. *In re District of Columbia*, 792 F.3d at 100 (citing *DL I*, 713 F.3d at 126, 128).

## I.     PLAINTIFFS' WITNESSES

Plaintiffs offered testimony from the following named plaintiffs, former named plaintiffs, and two class members, either live, by deposition, or through a guardian:

### A.     Jacqualyn Thorpe

1.      On September 13, 2016, plaintiffs read excerpts of Jacqualyn Thorpe's March 7, 2013 deposition. The District read counter-designations of Ms. Thorpe's deposition in the afternoon of November 9, 2016, and plaintiffs read additional designations in response to the District's counter-designations on the same day.

2.      Ms. Thorpe, who was formerly a named plaintiff, is now deceased. (Joint Pretrial Statement, Appendix B, at 3.)[10] Ms. Thorpe was a Medicaid recipient. (Trial Tr., Sept. 13, 2016, a.m., at 15:24–16:1.) Ms. Thorpe was physically disabled and needed a wheelchair. (*Id.* at 16:9–22.) She needed assistance getting in and out of the wheelchair to get into bed, cooking, and getting in and out of the bathtub. (*Id.* at 16:23–17:22.) However, Ms. Thorpe did not need assistance using a phone or filling out paperwork. (*Id.* at 19:9–20.)

3.      As of March 2013, Ms. Thorpe resided at Deanwood Rehabilitation Center in Washington, D.C. (*Id.* at 14:2–3.) At the time of her March 2013 deposition, Ms. Thorpe had resided in that nursing facility for approximately five years. (*Id.* at 15:5–6.) Ms. Thorpe wanted to move out of the nursing facility into the community. (*Id.* at 23:8–10.)

---

[10] Ms. Thorpe was removed as a named plaintiff on September 10, 2010, when plaintiffs filed their Fourth Amended Complaint, as "her health rendered her unable to continue in her role as a Named Plaintiff." (*See* Pls.' Mem. in Support of Consent Mot. to Amend 3d Am. Compl. at 2 n.1.)

4.    Prior to moving to the nursing facility, Ms. Thorpe lived with her sister in the community.  (*Id.* at 15:13–15.)  She moved to the nursing facility because of a worsening medical condition that impaired her mobility.  (*Id.* at 15:18–23.)  Ms. Thorpe believed that she would eventually return to live with her sister, but her sister died.  (*Id.* at 29:10–12.)

5.    Although Ms. Thorpe wanted to move out of the nursing facility, she agreed that the "lack of an identified place to move is the prior reason why [she was] still in the nursing home." (Trial Tr., Nov. 9, 2016, a.m., at 17:19–22.)  She did not know where she would move to.  (Trial Tr., Sept. 13, 2016, a.m., at 25:14–17.)  She had not visited any housing options, and she was not aware of what housing was available.  (*Id.* at 27:21, 28:3–5.)

6.    Ms. Thorpe spoke to her social worker about moving to the community.  (*Id.* at 28:7–12.) She did not ask for information on housing, because she was initially planning on moving back in with her sister.  (Trial Tr., Nov. 9, 2016, a.m., at 11:6–12.)  Ms. Thorpe knew of one or two meetings about community-based options held at her nursing facility.  (Trial Tr., Sept. 13, 2016, a.m., at 30:25–31:12.)  Ms. Thorpe spoke to another nursing-facility staff member about applying for public housing and submitted her application.  (*Id.* at 31:13–32:22.)  She also spoke with a transition coordinator from the District's Money Follows the Person ("MFP") grant program, who had apparently been notified by Ms. Thorpe's social worker that she wanted to move to community care.  (*Id.* at 32:23–11.)[11]

## B.    Larry McDonald

7.    Larry McDonald testified live on September 13, 2016.  "As of July 25, 2016, Plaintiff

---

[11] The record does not support plaintiffs' contention, based on their expert's conclusion, that "DC's failure to provide information about available services prevented [Thorpe] from moving out."  (*See* Pls.' Proposed Findings of Fact and Conclusions of Law at 10, ¶ 27, Jan. 30, 2017, ECF No. 232 ("Pls.' FF&CL").)  Rather, it appears Ms. Thorpe did receive information from the nursing home staff and from the MFP staff.

Larry McDonald had at least one physical disability and required assistance with at least two activities of daily living." (Joint Pretrial Statement, Appendix A, Stipulated Facts ¶ 18 ("Stipulated Facts").) At the time of trial, Mr. McDonald had been living in a District nursing facility for approximately 12 years, since September 2004. (Trial Tr., Sept. 13, 2016, a.m., at 39:7–16.)

8.      Mr. McDonald does not have housing in the community. (*Id.* at 65:24–67:18.) His nephew had a private family home, but he would not allow Mr. McDonald to move in with him because of Mr. McDonald's drug history. (*Id.* at 67:4–5; Trial Tr., Oct. 7, 2016, p.m., at 29:12–20 (Newland).)

9.      As of the time of trial, Mr. McDonald was in contact with social workers at the nursing home and employees of the District, who were "working on papers" for him to transition to the community. (Trial Tr., Sept. 13, 2016, a.m., at 56:2–58:12.)

### C.      Lavondia Carter

10.      Excerpts of Lavondia Carter's April 23, 2013 deposition were read into the record on September 13, 2016. On November 15, 2016, the District read counter-designations of Ms. Carter's deposition, and on the same day, plaintiffs read additional designations in rebuttal to the District's counter-designations.

11.      Ms. Carter, formerly a named plaintiff, is now deceased. (Notice of Death, May 28, 2013, ECF No. 105.) At the time of her deposition, Ms. Carter was living in a District nursing facility. (Trial Tr., Sept. 13, 2016, a.m., at 71:9–11.) She had been living there since April 2011. (*Id.* at 71:12–16.) Ms. Carter died on May 20, 2013. (Notice of Death at 1.)

12.      Ms. Carter did not have housing in the community when she was seeking to transition to community-based care. (Trial Tr., Sept. 13, 2016, a.m., at 76:21–24.) She previously lived on her own in the community. (*Id.* at 71:17–25.) She wanted to live in the nursing facility during

her recovery from an illness. (Trial Tr., Nov. 15, 2016, p.m., at 59:16–24.) She gave up her apartment in July 2011, 3 months after she moved to the nursing home, because she couldn't pay her rent. (Trial Tr., Sept. 13, 2016, a.m., at 75:1–10.) In addition to an apartment, she needed a home health aide. (*Id.* at 76:24–25.) She did not actively try to move out of the nursing home at first; instead she "just waited around to see if [she] could find another residence." (Trial Tr., Nov. 15, 2016, p.m., at 61:8–15.) At first, there were no openings at her former residence so she "just left it alone." (*Id.* at 61:22–62:1.) She testified that she would need a wheelchair accessible apartment. (*Id.* at 62:9–18.) Nevertheless, she temporarily moved back into her former residence, which was not wheelchair accessible. (*Id.* at 62:9–18.)[12]

13.     Ms. Carter worked with the District to move out of the nursing home. (Trial Tr., Sept. 13, 2016, a.m., at 78:14–17.) She was a winner of the 2013 MFP lottery. (*Id.* at 77:16–24.) She was told to have her mother go look at potential apartments for her or to use Metro Access to see the apartments herself. (*Id.* at 79:3–10.) Ms. Carter did not want to use Metro Access because she would have to "wait so long just to get back." (*Id.* at 79:9–10.)

### D.     Orit Simhoni

14.     Orit Simhoni testified on September 13, 2016. She is a court-appointed guardian, occupational therapist, and District case worker for the EPD waiver. (*Id.* at 81:11–18.) As a legal guardian, she is an advocate on behalf of the individuals on her caseload. (*Id.* at 81:11–18.)

15.     Ms. Simhoni is the legal guardian of named plaintiff Donald Dupree. (*Id.* at 82:2–4.) She became Dupree's legal guardian in May 2010. (*Id.* at 82:5–6.) At that time, Dupree was living in a nursing facility in the District. (*Id.* 83:6–13.) "As of July 25, 2016, Plaintiff Donald

---

[12] Ms. Carter died before she permanently transitioned out of a nursing facility. *Thorpe II*, 303 F.R.D. at 130 n.26.

Dupree had at least one physical disability and required assistance with at least two activities of daily living," and he "resided in a setting other than a nursing facility." (Stipulated Facts ¶¶ 14–15.)

16.      Mr. Dupree was diagnosed with schizophrenia and was receiving care from Community Connections, a Department of Behavioral Health contractor, while living in the nursing facility. (Trial Tr., Sept. 13, 2016, p.m., at 35:20–37:14.) Doctors at St. Elizabeth's and doctors at Community Connections determined he was not a candidate for community transition because of his performance on various health assessments. (*Id*. at 37:1–39:19.) Ms. Simhoni disagreed with the opinion of Mr. Dupree's care providers and the "totally subjective" assessments. (*Id.* at 39:4–19.) After two years in the nursing facility, in August 2012, Ms. Simhoni succeeded in transitioning Mr. Dupree to a community-based assisted living facility. (*Id.* at 36:5–6, 37:21–38:10.)

17.      Since December 2014, Ms. Simhoni has been the guardian of "Mr. R.," a class member who is not named in the complaint. (*Id*. at 7:8–12.) Mr. R. was living in a nursing facility in December 2014, receiving long-term Medicaid services there, and has a physical disability. (*Id.* at 7:13–8:10.) When he was admitted to the nursing home, Mr. R. had housing in the community. (*Id.* at 8:11–17.) The first obstacle for Mr. R. was the Delmarva assessment of the number of personal-care hours Mr. R. required. (*Id.* at 13:2–7.) Mr. R. had to go through an appeals process to secure the number of hours Ms. Simhoni thought would be appropriate for him to live in the community. (*Id.* at 13:7–8.) The "huge delay" was to "assure[] his needs were met when he got home." (*Id.* at 13:8–11.)

18.      Class member Mr. R. expressed his desire to move back to the community to Ms. Simhoni at the end of December 2014. (*Id.* at 8:18–9:2.) One to two months later, in January or

February of 2015, Ms. Simhoni contacted the MFP program, the ombudsman, DCOA and DHCF on his behalf. (*Id.* at 9:25–10:10, 11:11–16.) The MFP staff had apparently already gotten a referral for Mr. R. (*Id.* at 14:7–13.) Mr. R. transitioned to the community in August 2016, approximately a year and a half after Ms. Simhoni contacted the District government on his behalf. (*Id.* at 12:4–9.)

19.    Although he had housing and was being cared for under the State-plan PCA services before moving to the community, Mr. R. needed to secure EPD Waiver services for personal-care assistance in addition to those provided under the State Medicaid Plan before he could move back to his original housing. (*Id.* at 12:18–13:2.) In Ms. Simhoni's words, "you can't consent to discharge without knowing that it's going to be . . . a safe and successful discharge home. He needed equipment, he needed supplies." (*Id.* at 17:22–25.)

20.    MFP transition coordinators provided assistance to Mr. R. (*Id.* at 16:1–12.) Although the coordinators were not actively working with Mr. R. when Ms. Simhoni became his guardian, they "start[ed] to work on the situation again." (*Id.*) The District paid Mr. R.'s rent through the MFP program, although it was paid late "because of delays in processing." (*Id.* at 20:19–22.)

### E.    Tijuana Tucker

21.    Class member Tijuana Tucker testified on September 13, 2016. Ms. Tucker has lived in a nursing facility for at least seven years, and her long-term care is paid for by Medicaid. (*Id.* at 45:7–10, 46:7–8.) She needs a wheelchair to move around and needs assistance bathing, but she can otherwise care for herself. (*Id.* at 47:19–48:15.) At the time of trial, Ms. Tucker wanted to live in the community. (*Id.* at 52:13.)

22.    Ms. Tucker has declined to live in a private, family residence instead of the nursing facility. She would be allowed to live with either of her two children, but she does not want to live with them. (*Id.* at 51:25–52:6.) Instead, she would prefer to live alone. (*Id.* at 52:4–5.)

23.     Ms. Tucker was apparently working with the District to secure public or subsidized housing.  She entered into a lottery with the MFP program and was selected for a set-aside housing-choice voucher.  (*Id.* at 53:2–6.)  Ms. Tucker had not used her voucher as of the trial.  The problem was a lack of available housing that could accommodate her wheelchair.  (*Id.* at 64:22–65:5.)

24.     Ms. Tucker assumed that she "would be able to move once they find [her] a place and stuff like that," but the District "never brought [her] the voucher."  (*Id.* at 53:18–25.)  Ms. Tucker visited one apartment in the community.  (*Id.* at 58:22–25.)  It was not fully wheelchair accessible.  (*Id.* at 59:2–5.)  She never went to see the other apartments that might have been available, and the District did not offer to take her to see them.  (*Id.* at 59:6-13.)  Her daughter-in-law was looking for apartments for her.  (*Id.* at 61:19–25.)

25.     The MFP vouchers are generally for one-bedroom apartments.  (Trial Tr., Oct. 7, 2016, p.m., at 28:23–25 (Newland).)  Ms. Tucker preferred to live with her daughter and grandson, so she had to go through a process to get approved for a three-bedroom unit.  (*Id.* at 28:21–29:2 (Newland).)  After the lottery, Ms. Tucker got to the top of the public-housing waiting list for a three-bedroom unit, but she chose to not take the unit and attempt to find a private, subsidized unit with the MFP voucher instead.  (*Id.* at 29:3–6 (Newland).)  At the time of trial, Ms. Tucker was awaiting DCHA's decision on whether she could use the MFP voucher for a three-bedroom unit, which would require her daughter to be approved as a live-in aide.  (*Id.* at 29:6–11 (Newland).)

### F.     Ivy Brown

26.     Named plaintiff Ivy Brown testified on September 13, 2016.  She was admitted to a nursing facility in April of 2013 after she had a stroke.  (Trial Tr., Sept. 13, 2016, p.m., at 6:22–23.)  Thus, at the time of trial, she had been living in a nursing facility for over three years.

27.     Ms. Brown does not have housing in the community. (*Id.* at 16:12–17.) Before she went to the nursing facility, she lived with her mother, but she can no longer navigate the stairs in her mother's house. (*Id.* at 11:6–9.) In 2015 or the beginning of 2016, the District paid for an assessment of the modifications necessary to make her mother's house accessible. (*Id.* at 17:18-21, 18:16–19.) Modification of Ms. Brown's mother's home was not an option, as it would have been "prohibitively expensive." (Trial Tr., Oct. 7, 2016, p.m., at 48:13–25 (Newland).) She cannot live with her brother or sister because their homes are not wheelchair accessible. (Trial Tr., Sept. 13, 2016, p.m., at 11:13–18.) Ms. Brown's sister declined to modify her home if there was a risk of damage to her home. (*Id.* at 19:16–22.)

28.     When Ms. Brown first got to the nursing home, a social worker asked her various questions, including about her preference to live in the community. (*Id.* at 20:4–21:2.) Another social worker asked her the same set of questions the next year. (*Id.* at 20:4–21:2.) She expressed her desire to leave the nursing facility and receive home-based care on both occasions. (*Id.* at 20:4–21:2.) However, according to her October 27, 2015 deposition testimony, Ms. Brown twice, in December 2014 and January 2015, expressed her desire to transition to community care only *after s*he finished her rehabilitation in the nursing facility. (*Id.* at 22:13–23:1.) She has changed her mind about transitioning and indicated that she wanted to wait to leave the nursing facility. (Trial Tr., Oct. 7, 2016, p.m., at 49:1–14 (Newland).)  Ms. Brown explained that she had indicated that she wanted to continue to look for housing while she did her rehabilitation, and she "was fine staying" in the nursing home "as long as they continued to give [her] therapy while [she] was looking for housing in the community." (Trial Tr., Sept. 13, 2016, p.m., at 22:22–23:1.)

29.     Ms. Brown entered the 2015 MFP lottery but was not selected to receive one of the

vouchers.  (Pls.' Ex. 78.)

### G.    Roy Foreman

30.    Excerpts of Roy Foreman's March 21, 2013 deposition were read into the record on

October 4 and November 15, 2016.  At the time of trial, Mr. Foreman was unavailable to testify

due to his medical condition.  (Trial Tr., Oct. 4, 2016, p.m., at 62:18–23.)  Mr. Foreman was a

named plaintiff at the time of trial.  (Joint Pretrial Statement, Appendix A, Stipulated Definitions

¶ 1 ("Stipulated Definitions").)  He died on January 15, 2017, after the close of trial.  (Notice of

Death, Jan. 17, 2017, ECF No. 231.)

31.    In 2006, after a stay in the hospital, Mr. Foreman moved from the community to a

nursing facility.  (Trial Tr., Oct. 4, 2016, p.m., at 64:1–5, 66:22–24.)  At the time of his March

2013 deposition, Mr. Foreman was still in a nursing facility.  (*Id.* at 64:22–65:1.)  "As of July 25,

2016, Plaintiff Roy Foreman resided in a setting other than a nursing facility."  (Stipulated Facts

¶ 23.)  Thus, Mr. Foreman lived for between six and ten years in a nursing facility before he

transitioned to community-based long-term care.

32.    During his nursing-facility stay, Mr. Foreman did not move back in with his sister, with

whom he previously lived, because she did not want to tend to his medical needs any more.

(Trial Tr., Nov. 15, 2016, p.m., at 66:9–67:1.)  Mr. Foreman would accept housing only in the

Northwest quadrant of the District.  (*Id.* at 68:21–69:5.)

33.    In order to move out of the nursing home, Mr. Foreman applied for public housing, got

Metro Access services, and looked at four apartments between 2006 and 2010.  (Trial Tr., Oct. 4,

2016, p.m., at 66:25–67:14.)  He accepted an apartment at the Regency.  (*Id.* at 67:18–20.)

However, at the time of the deposition he had not moved because he had not located a home care

agency that could provide the 24-hour care he needed.  (*Id.* at 67:21–25.)  Mr. Foreman had

previously attempted to take two other apartments, but he could not sign the lease before his

home care assistance was in place.  (*Id.* at 68:1–13.)  After his deposition was taken, Mr.

Foreman transitioned to the community.  (Stipulated Facts ¶ 23.)

34.     Mr. Foreman received transition assistance from the MFP program, which paid his rent

while he waited for approval for 24-hour Medicaid-funded personal care assistance.  (Trial Tr.,

Nov. 15, 2016, p.m., at 74:17–75:6.)

### H.     Curtis Wilkerson

35.     Excerpts of Curtis Wilkerson's March 28, 2013 deposition were read into the record on

October 4 and November 15, 2016.  Mr. Wilkerson was formerly a named plaintiff, but he died

before trial.  (Notice of Death, Jan. 21, 2015, ECF No. 151.)

36.     Mr. Wilkerson was physically disabled, as a spinal cord injury left him paralyzed from

the chest down.  (Trial Tr., Oct. 4, 2016, p.m., at 80:5–13.)  He received long-term care through

Medicaid.  (*Id.* at 79:20–25.)  Mr. Wilkerson entered a series of nursing facilities after a surgery

in January 2002, and he resided in nursing facilities for over ten years.  (*Id.* at 78:16–18; 97:4–9).

In March 2012, a year after he had updated his application to reflect that he required a

wheelchair-accessible unit, Mr. Wilkerson reached the top of the public housing waiting list.  (*Id.*

at 96:11–97:9.)

37.     Prior to his surgery, Mr. Wilkerson was living with his parents in the community.  (*Id.* at

78:6–15.)  However, he could not climb the steps to his parents' property, which was on the top

floor of the building.  (*Id.*)  Because he was unable to get into his parents' home and could not

find another suitable place to live, he went into a nursing home after his rehabilitation.  (Trial

Tr., Nov. 15, 2016, p.m., at 4:16–25.)  At the time, Mr. Wilkerson thought the nursing facility

was the "best place to meet [his] needs."  (*Id.* at 5:4–7.)  Mr. Wilkerson could not get home care

assistance from his family members.  (Trial Tr., Oct. 4, 2016, p.m., at 79:8–19.)

38.     Mr. Wilkerson had been on the public housing waiting list since 2002.  (*Id.* at 86:18–22.)

He updated his preferences in 2008 and again in 2011.  (*Id.* at 86:18-87:3; 96:11–14.)  In March

2012, DCHA contacted Mr. Wilkerson to notify him that public-housing unit was available, and

he saw the apartment in June or July of 2012.  (*Id.* at 84:19–85:4.)  Mr. Wilkerson testified that

his wheelchair could not fit in the elevator, but he managed to see the apartment and paid a $100

deposit.  (*Id.* at 85:10–24.)  The next day, he called DCHA to say he would not take the

apartment.  (*Id.*)  Without services in place, he did not want to take the apartment.  (*Id.* at 85:25–

86:5.)  At the time of his 2013 deposition, Mr. Wilkerson had transitioned from a nursing facility

to the community.  (*Id.* at 77:2–19.)

39.     Mr. Wilkerson heard about the MFP grant program in 2009.  (*Id.* at 80:17–81:9.)  He

attempted to make contact with the MFP program coordinators in 2009 and 2010, but he was

unsuccessful because the voicemail of the number he had was full.  (*Id.* at 81:17–82:4.)  He

spoke to a nursing home social worker about the program in 2009.  (*Id.* at 82:5–8.)  He also

attended an MFP information session in 2011 with the woman whom he had attempted to contact

in 2009 and 2010.  (*Id.* at 82:18–83:6.)

40.     As of at least 2012, Mr. Wilkerson was in contact with MFP transition coordinators.  (*Id.*

at 85:17–24.)  He did not tell the MFP staff when DCHA notified him for the first time about an

available apartment in March 2012.  (*Id.* at 86:10–17.)   The next time Mr. Wilkerson was

notified of an open apartment, he told the MFP transition coordinators about it immediately.  (*Id.*

at 89:10–12.)  He met with an MFP transition coordinator to have a planning meeting thereafter.

(*Id.* at 90:9–22.)  To assist his transition, MFP paid for Mr. Wilkerson's furniture and paid $520

of his apartment fees.  (*See* Pls.' Ex. 511, at 21.)  MFP also reimbursed him for the security

deposit and the first month's rent that he paid on his own.  (Trial Tr., Oct. 4, 2016, p.m., at

88:11–88:22.)

In addition to the named plaintiffs and class members present at trial, plaintiffs called the following witnesses:

### I.    Randy Smith

41.    Randy Smith testified on September 13 and 14, 2016.  Mr. Smith is a part-time social worker for Iona Senior Services, one of five "lead" agencies that is partially funded by the District to provide case management to individuals living in a given geographic area of the District.  (Trial Tr., Sept. 13, 2016, p.m., at 66:22–25, 67:8–68:4.)  Iona case workers help individuals living in the community "get in touch with or learn about options for home care which would include the EPD Waiver, the Medicaid State Plan or private home agencies," access transportation, and enroll in other benefits programs.  (*Id.* at 68:5–69:18.)

42.    Mr. Smith primarily serves individuals already living in the community, never having had more than "one client at a time, at any given time [who was in a nursing facility]. And maybe not even that."  (Trial Tr., Sept. 14, 2016, a.m., at 59:18–60:6.)  Since "Iona helps people in the community," Mr. Smith would only interact with nursing-facility residents if someone on his caseload moved from the community to a nursing facility.  (*Id.* at 59:18–60:1.)

43.    Mr. Smith has tried to get his clients subsidized housing vouchers.  (*Id.* at 59:12–14.)  According to Mr. Smith, getting a subsidized rent apartment through a voucher is "like gold."  (*Id.* at 59:5–7.)  However, he has never succeeded in getting a client a voucher, as "it's impossible" to secure one.  (*Id.* at 59:15–17.)  Mr. Smith notes that securing coverage "easy . . . if there's family to help out.  Or if [the individual seeking long-term care in the community] ha[s] sufficient resources."  (Trial Tr., Sept. 13, 2016, p.m., at 72:4–7.)

### J.    Leyla Sarigol

44.    Leyla Sarigol testified on September 14 and 16, 2016.  Ms. Sarigol is the project director for the District's MFP grant program, a federal initiative administered by the District in order to

assist disabled individuals transition from nursing facilities to community-based care within the District's Department of Health Care Finance ("DHCF").  (Trial Tr., Sept. 14, 2016, p.m., at 5:23–24, 6:2–6.)

### K.    Claudia Schlosberg

45.    Claudia Schlosberg testified on September 16 and November 9, 2016.  She has been senior deputy director of DHCF and the State Medicaid Director for the District since April 2014.  (Trial Tr., Sept. 16, 2016, p.m., at 17:23–18:9.)  Ms. Schlosberg has over 30 years of experience in the Medicaid field, during which most of her work has related to long-term care. (Trial Tr., Nov. 9, 2016, a.m., at 63:7–13.)

### L.    Brenda Fisher

46.    Brenda Fisher testified on October 4, 2016.  She is the director of social work at Transitions Nursing Facility, a nursing facility in the District.  (Trial Tr., Oct. 4, 2016, a.m., at 5:22–6:4.)

### M.    Jennifer Crawley

47.    Jennifer Crawley testified on October 4, 2016.  Ms. Crawley has been the DHCF program director of long-term care since November 16, 2015.  (*Id.* at 31:8–18; 31:23–24.)  In this capacity, she oversees the operation of the EPD Waiver and the Medicaid State Plan Personal-Care Assistance ("State Plan PCA") program.  (*Id.* at 31:25–32:5.)

48.    Ms. Crawley holds a master's degree in social work, and she has been a licensed social worker since 1998.  (*Id.* at 86:21–87:4.)  She has over fifteen years of experience in long-term care in the District, having worked for MedStar Health Washington Hospital Center's House Call Program from 2001 until November 2015.  (*Id.* at 83:23–84:16.).  There, she began as a community social worker and was eventually promoted to senior social worker and chief social worker.  (*Id.* at 84:17–86:13.)

### N.    Gerald Kasunic

49.    Gerald Kasunic testified on October 5, 2016.  He has been the deputy associate director at the Aging and Disability Resource Center ("the ADRC"), within the D.C. Office on Aging ("DCOA"), since October 2014.  (Trial Tr., Oct. 5, 2016, a.m., at 4:25-5:2; 5:14–16).

50.    From 1999 to 2010, Mr. Kasunic was the District's Long-Term Care Ombudsman.  (*Id.* at 5:21–6:14, 8:25–9:3.)  The Long-Term Care Ombudsman's office is an independent, federally-mandated office, which is contracted through DCOA.  (*Id.* at 7:11–15.)  Its mission is "to improve quality care and long[-]term care facilities" and "to actually reach the outcome desired by the resident," including assisting with transitions from nursing homes to the community.  (*Id.* at 8:2–18.)  Mr. Kasunic assisted with transitions, educated nursing facility residents about services available in the community, and trained his team to do the same.  (*Id.* at 8:16–9:13.)

### O.    Roger Auerbach

51.    Roger Auerbach, plaintiffs' retained expert, submitted his expert report in lieu of testifying on direct examination, as required by the Court.  (*See* Pls.' Ex. 884.)  The District cross examined Mr. Auerbach on October 5, 2016.

52.    Mr. Auerbach provides consulting services to states regarding their long-term care programs.  (*See* Pls.' Ex. 884, ¶ 11 & Appendix A.)  He was retained by plaintiffs to offer his opinions about the District's efforts to assist Medicaid beneficiaries with physical disabilities who live in nursing facilities and want to return to community-based settings.  (*Id.* ¶ 1.)

## II.    THE DISTRICT'S WITNESSES

In addition to recalling Ms. Schlosberg and reading counter-designations, the District called the following live witnesses:

### A.    Laura Newland

53.    Laura Newland testified on October 7 and November 8, 2016.  She has been the

executive director of DCOA since November 2015.  (Trial Tr., Oct. 7, 2016, a.m., at 5:14–18.)
DCOA provides services and supports for people who are age 60 and older, adults with
disabilities, and their caregivers.  (*Id.* at 8:24–9:2.)

54.     Before beginning in her current role at DCOA, Ms. Newland was special assistant for
community living to the Deputy Mayor for Health and Human Services, Brenda Donald.  (*Id.* at
6:1–11.)  The special assistant for community living is the liaison for DCOA, the Department on
Disability Services (DDS), DHCF, and the Office of Disability Rights.  (*Id.* at 6:24–7:5.)  Ms.
Newland's work was primarily focused on assessing the agencies' collective long-term care
services and supports.  (*Id.* at 7:6–11.)

### B.     Sharon Lewis

55.     Sharon Lewis testified on November 8, 2016.  She is the senior deputy director of the
Health Regulation and Licensing Administration at the D.C. Department of Health.  (Trial Tr.,
Nov. 8, 2016, p.m., at 25:6–9.)  In that role, Ms. Lewis is responsible for overseeing regulatory
compliance of health facilities within the District, including nursing facilities.  (*Id.* at 25:18–23.)

### C.     Hammare Gebreyes

56.     Hammare Gebreyes testified on November 8, 2016.  She is the chief of staff at DCHA.
(*Id.* at 56:2–4.)  DCHA administers the District's public-housing and subsidized-housing
programs.  (*Id.* at 55:23–56:1.)

### D.     Ronald McCoy

57.     Ronald McCoy testified on November 9, 2016.  He is the DCHA's director for the
Housing Choice Voucher Program.  (Trial Tr., Nov. 9, 2016, a.m., at 24:25–25:3.)  In that
capacity, Mr. McCoy manages the federal vouchers and the local-housing vouchers in the Local
Rent Supplement Program.  (*Id.* at 25:8–26:6.)

### E.     Nathan Bovelle

58.     Nathan Bovelle testified on November 15, 2016.  He is the deputy executive director for

operations at DCHA.  (Trial Tr., Nov. 15, 2016, p.m., at 25:9–14.)  In that capacity, he oversees

the administration of the public-housing units owned and operated by the District.  (*Id.* at 25:24–

26:6.)

### III.     MEDICAID-FUNDED LONG-TERM CARE IN THE DISTRICT

59.     Medicaid, a federal program administered in the District by the local government, funds

long-term care for individuals in the District who have physical disabilities and meet certain

financial requirements.  "A 'Medicaid State Plan' is an agreement between a state and the

Federal government that describes how that state shall administer its Medicaid program and

provides assurance that a state will abide by Federal rules and may claim Federal matching funds

for its program activities."  (Stipulated Definitions ¶ 11.)  The Center for Medicare and Medicaid

("CMS") is the federal agency that provides oversight of services provided under the District's

Medicaid plan.

60.     Under the District's Medicaid plan, individuals may receive long-term care in nursing

facilities or through "Home and Community-Based Services."  In either setting, individuals are

provided with assistance performing activities of daily living ("ADLs") or instrumental activities

of daily living ("IADLs").  ADLs are "self-care tasks, including eating, bathing, toileting,

dressing, and mobility/transferring."  (*Id.* ¶ 8.)  IADLs include "medication management, meal

preparation, housekeeping, money management, and telephone use."  (Pls.' Ex. 139, at 1.)

61.     The federal government reimburses a portion of the District's expenditures on its

Medicaid-funded long-term care, based on what is known as the Federal Medicaid Assistance

Percentage ("FMAP").  (*See* Stipulated Facts ¶ 39.)  Under the standard FMAP, applicable to

nursing-facility services and home and community-based care, the federal government pays 70%

of Medicaid costs, and the District pays 30%.  (*See id.*)

### A.      Nursing Facilities

62.      A nursing facility is "any facility licensed to operate as a nursing facility under Title 22B, Section 3200 *et seq.* of the D.C. Municipal Regulations."  (Stipulated Definitions ¶ 10.) "Nursing facilities are 'institutions' within the meaning of *Olmstead* . . . and Title XIX of the Social Security Act, 42 U.S.C.A. § 1396r."  (Stipulated Facts ¶ 27.)  The District does not operate nursing facilities itself; rather, it funds long-term care in nursing facilities for eligible Medicaid beneficiaries through its Medicaid State Plan.  (Trial Tr., Nov. 9, 2016, a.m., at 79:14–80:3.)

63.      "There are 19 nursing facilities in the District that are certified for reimbursement through DC Medicaid."  (Stipulated Facts ¶ 25.)  Those nursing facilities provide approximately 2,770 beds to the DC Medicaid population.  (Trial Tr., Sept. 16, 2016, a.m., at 73:1–10; Pls.' Ex. 87, at 19).  To be eligible for Medicaid-funded long-term care in a nursing facility, an individual must meet the "nursing-facility level of care," meaning he or she requires extensive assistance with two or more ADLs, or supervision with two or more ADLs and one IADL.  (Trial Tr., Sept. 16, 2016, p.m., at 22:2–19; Pls.' Ex. 139.)

64.      As discussed below, Qualis, the District's independent quality improvement organization contractor, determines whether an individual meets the nursing-facility level of care.  (Trial Tr., Sept. 16, 2016, p.m., at 34:9–15.)  Qualis conducts the initial assessment at the time of admission and does continuing reviews after 30 days, 6 months, one year, and then once a year thereafter. (Trial Tr., Nov. 9, 2016, a.m., at 82:6–12.)

65.      The class is defined as physically disabled people who have been receiving Medicaid-funded long-term care in such nursing facilities for over 90 days and wish to transition from

nursing homes to community care. (*See* 4th Am. Compl. ¶ 120.)[13]

66.   "The DC Medicaid Program does not maintain a waiting list for nursing facility placement." (Stipulated Facts ¶ 26.) According to the District's 2016 *Olmstead* Plan, the District's nursing facility occupancy rate for the fourth quarter of Fiscal Year 2014 was 98%. (Pls.' Ex. 87, at 19; *see* Trial Tr., Oct. 7, 2016, p.m., at 61:19–22.) The District's nursing-facility occupancy rate has remained well above 90% for the relevant timeframe—from 2012 to the present. (Trial Tr., Nov. 9, 2016, p.m., at 61:16–19.).

67.   In the fourth quarter of Fiscal Year 2014, the average length of stay in a nursing facility (for both class members and non-class members) in the District was 537 days. (Pls.' Ex. 87, at 19; Trial Tr., Sept. 16, 2016, a.m., at 73:22–74:6.) The District compiled data of the time spent in nursing facilities for individuals who successfully transitioned to community-based long-term care. (*See* Pls.' Ex. 803 (updated as of July 20, 2017 hearing).)[14]

68.   From 2011–2016, 182 class members transitioned from nursing facilities to home and community-based long-term care. (*See* Pls.' Ex. 803.)[15] In 2011, 16 class members transitioned:

---

[13] Plaintiffs presented a great deal of testimony related to class members' experiences in nursing facilities. Whether living in a nursing home is restrictive or unpleasant is not at issue in this case: under Olmstead, plaintiffs must show that class members can and want to live in a less restrictive environment in the community, not that they have suffered in nursing facilities.

[14] The Court included the reported data through the end of 2016, which the District supplemented at the July 2017 hearing. There are many ways to slice these data. The Court has focused only on class members, by eliminating any individuals who spent less than 90 days in nursing facilities. The Court grouped the class members who transitioned by the year that they left the nursing facility and by the type of housing to which they transitioned (private or public/subsidized). Public/subsidized housing includes public housing, senior housing, housing secured through a DCHA housing-choice voucher, or housing secured through the MFP housing voucher. The Court used the date of admission to the nursing facilities as the baseline, rather than the date that an individual requested transition assistance.

[15] The number of transitions specific to the MFP program are detailed below. (*See infra* Findings of Fact ¶¶ 88–99.)

all 16 went to public/subsidized housing, and they spent an average of 1,361 days in nursing

facilities.  (*See id.*)  In 2012, another 16 class members transitioned:  seven of them went to

private housing, spending an average of 410 days in nursing facilities; and nine went to

public/subsidized housing, spending an average of 1,193 days in nursing facilities.  (*See id.*)  In

2013, 27 class members transitioned:  16 went to private housing, spending an average of 240

days in nursing facilities; and 11 went to public/subsidized housing, spending an average of

1,087 days in a nursing facility.  (*See id*.)  In 2014, 39 class members transitioned:  13 went to

private housing, spending an average of 414 days in nursing facilities; and 26 went to

public/subsidized housing, spending an average of 1,083 days in nursing facilities.  (*See id.*)  In

2015, 42 class members transitioned:  21 went to private housing, spending an average of 320

days in nursing facilities; and 21 went to public/subsidized housing, spending an average of 909

days in nursing facilities.  (*See id.*)  In 2016, 51 class members transitioned:  18 went to private

housing, spending an average of 640 days in nursing facilities; 33 went to public/subsidized

housing, spending an average of 1,115 days in nursing facilities.  (*See id*.)

### B. Medicaid-Funded Home and Community-Based Services

69.     DC Medicaid runs two home and community-based long-term care programs that are

relevant to this case: the State Plan PCA services and the EPD Waiver.  (*See* Stipulated

Definitions ¶ 3 ("'DC Medicaid' refers to the State Plan for Medical Assistance approved by

CMS under Title XIX of the Social Security Act."); *id.* ¶ 4 (The "'EPD Waiver' is the Medicaid

Waiver for People who are Elderly and/or have Physical Disabilities established under Section

1915(c) of the Social Security Act."); *id.* ¶ 9 ("Home and Community-Based Services" are

"services provided in community settings under the District's Medicaid State Plan and the EPD

Waiver").)[16]

70.     Both the State Plan and the EPD Waiver are Medicaid-funded programs overseen by DHCF.  (Trial Tr., Oct. 4, 2016, a.m., at 34:22–35:15.)  Each program provides personal-care assistance in community-based settings, based on slightly different eligibility criteria.  (*See* Stipulated Facts ¶ 36 ("State Plan PCA services provide in-home personal care aides to Medicaid-eligible individuals.").)  The EPD Waiver, unlike the State Plan, also provides case-management and other services for individuals receiving long-term care in community-based settings.  In addition to personal-care assistance and case management, the EPD Waiver provides the following services:  adult day health, homemaker, chore aide, respite, personal emergency-response system, environmental-accessibility adaptations, assisted living, participant-directed service, occupational therapy, and physical therapy.  (Pls.' Ex. 87, at 20.)  An individual who receives the EPD Waiver can have a friend or family member provide personal care assistance instead of a home-health agency under the Participant Directed Care Initiative.  (Trial Tr., Sept. 14, 2016, a.m., at 64:10–24.)

71.     As of 2015, there have been more than enough EPD Waiver slots to accommodate all class members who need services under the EPD Waiver.  (Trial Tr., Sept. 16, 2016, p.m., at 38:23–39:9.)  This was not the case as of the time of *Thorpe II*, for at least through 2013, there was a waiting list of hundreds of individuals waiting for EPD Waiver services.  There is no longer a waiting list for the EPD Waiver.  (*Id.* at 56:6–9.)

72.     Eligibility for State Plan PCA services is based on an individual's need for "assistance with at least one [ADL]."  (Stipulated Facts ¶ 36.)  Because the State Plan does not require a

---

[16] The District also operates an "ID/DD Waiver" program for "individuals with developmental and intellectual disabilities."  (Pls.' Ex. 87, at 19.)  Individuals who have only intellectual disabilities are not included in the class.

"nursing facility level of care," authorization for Medicaid payments for State Plan PCA services does not require a level-of-care determination by the District's contractor, Qualis. (Trial Tr., Oct. 4, 2016, a.m., at 37:3–5.) Still, before Medicaid will pay for State Plan PCA services, an individual must be assessed by Delmarva, another District contractor, to determine the number of hours of personal care that he or she needs. (*Id*. at 37:5-8.)

73.     An individuals' eligibility for the EPD Waiver is the same as his or her eligibility for long-term care in a nursing facility. (*Id*. at 37:9–20; Trial Tr., Sept. 16, 2016, p.m. at 23:2–15; Pls.' Ex. 139.) That is, he or she must require extensive assistance with two or more ADLs or supervision with two or more ADLs and one IADL. (Trial Tr., Sept. 16, 2016, p.m. at 22:2–19; Pls.' Ex. 139.) Like eligibility for nursing-facility care, Qualis assesses whether an individual meets this requirement. (Trial Tr., Sept. 16, 2016, p.m., at 34:9–15.) As with State Plan PCA services, Delmarva determines the number of hours of PCA the individual needs before Medicaid will fund such services under the EPD Waiver.

74.     State Plan PCA services cover up to eight hours of personal-care assistance per day. (*Id*. at 26:7–11.) The EPD Waiver covers up to sixteen hours of personal-care assistance per day. (Trial Tr., Oct. 5, 2016, a.m., at 26:21–25.) An individual can access both sources of home and community-based long-term care at the same time: "[d]epending on a qualified individual's needs, PCA services available through the Medicaid State Plan and the EPD Waiver program can be combined so that a qualified individual receives 24 hours of care, seven days per week." (Stipulated Facts ¶ 37.) "Because the level-of-care eligibility requirement for State Plan PCA services is lower than the requirement for the EPD Waiver program, a qualified individual could receive State Plan PCA services even if not eligible for the EPD Waiver program." (*Id.* ¶ 38.)

75.     Case management (under the EPD Waiver) and home-health aide services (under the

EPD Waiver and/or the State Plan) are provided by two separate types of agencies in the District. The District has certified 19 home-health agencies ("HHAs") and 13 case management agencies. (Trial Tr., Oct. 4, 2016, a.m., at 33:3–6; 57:13–14.)[17] Under the District's "conflict-free case management" rule, the same agency may not provide both case management and home-health aide services. (*Id.* at 56:5–57:1.) The rule was mandated by CMS. (*Id.*) This new rule came into effect in November of 2015 and required all individuals whose cases were managed by a HHA to be transferred to a different case-management agency. (*Id.*) This in turn caused a back-log of EPD-Waiver applications. (Trial Tr., Sept. 16, 2016, p.m., at 76:15–24.)

76.     In December 2015, CMS placed the District's provision of PCA services (under both its EPD Waiver and State Plan PCA programs) under a Corrective Action Plan ("CAP"), which still remains in effect. (*Id.* at 59:3–24, 61:1–20; Pls.' Ex. 882, at 11.) CMS cited the District for abdicating responsibility for determining the amount of needed services to agency providers that stood to benefit from recommending additional services. (Trial Tr., Sept. 16, 2016, p.m., at 59:3–16; Pls.' Ex. 882, at 1–2.) This resulted in the "conflict-free" case management rule.

77.     In January 2016, CMS imposed a second CAP on DC's EPD Waiver program for failing to meet all six requirements to operate an EPD Waiver. (Trial Tr., Oct. 4, 2016, a.m., at 38:10–23; Pls.' Ex. 437, at 1–3; Pls.' Ex. 257; Pls.' Ex. 712; Trial Tr., Sept. 16, 2016, p.m., at 29:19–22.) Those requirements are (1) maintaining a process to monitor level of care determinations;

---

[17] The parties have agreed that there are a sufficient number of providers of PCA services in the District. (Hearing Tr., July 20, 2017, at 55:1–17.) Plaintiffs' complaint, however, is that there are insufficient transition services to connect class members with the needed services. Given the testimony of named plaintiffs' and class members' experiences, it appears that the problem is not always a lack of transition services but a dispute over the number of PCA hours that Delmarva is willing to authorize. (*See* Trial Tr., Sept. 16, 2016, p.m., at 78:20–79:7; Trial Tr., Sept. 13, 2016, p.m., at 13:2–11; 33:3–34:1 (Ms. Simhoni discussing the "huge delay" for class member Mr. R.).)

(2) ensuring that service plans for waiver participants actually meet their needs; (3) maintaining a process to ensure that services are provided by qualified providers; (4) ensuring that the health and welfare of participants is protected; (5) retaining adequate administrative authority over the waiver; and (6) maintaining adequate financial authority over the waiver.  (Pls.' Ex. 437, at 2–3; Trial Tr., Sept. 16, 2016, p.m., at 32:19–34:15.)  As conceded by Ms. Schlosberg, CMS's findings were "embarrassingly bad," but "not unexpected."  (Pls.' Ex. 432.)

78.     CMS faulted DC for failing to ensure quality monitoring of services and failing to (1) track how long it takes for class members to access EPD Waiver services; (2) accurately assess the services class members will need under the EPD Waiver once they leave the nursing facility; (3) have a system of resolving complaints regarding lack of access and authorization for EPD Waiver services; and (4) utilize existing slots in the EPD Waiver.  (Trial Tr., Sept. 16, 2016, p.m., at 32:19–33:13, 37:23–38:10, 38:16–39:2, 39:8–9, 42:22–43:10, 43:25–44:3; Pls.' Ex.. 437, at 5–6, 11, 13–15, 20, 36, 41; Trial Tr., Nov. 9, 2016, p.m., at 9:20–25; Pls.' Ex. 712, at 39; Trial Tr., Oct. 4, 2016, a.m., at 47:8–15.)

79.     As of October 1, 2015, there were 2,006 individuals enrolled in the District's EPD Waiver.  (Pls.' Ex. 87, at 20.)  The cap for the EPD Waiver at that time was 4,960.  (*Id.*)  Thus, the District had a 40% utilization rate of its EPD Waiver in 2015.  (*See id.*)  As of May 3, 2016, the number of enrollees in the EPD Waiver was 2,449.  (Trial Tr., Sept. 16, 2016, p.m., at 50:2-6; Pls.' Ex. 712, at 34.)  Compared with the cap of 5,060 in effect at the time, the District was using 48% of the available EPD Waivers.  (Pls.' Ex. 712, at 34.)  The District set the initial cap in 2007 and has requested the maximum increase of 100 slots per year regardless of the need for the slots.  (Trial Tr., Sept. 16, 2016, p.m., at 40:7-10.)  In the last decade, it has not reexamined the logic behind the original projections.  (*Id.*)

80.     As the District points out, the District's EPD-Waiver utilization rate of less than 50%

means that there is more than sufficient capacity to serve any individual who has housing in the

community and is eligible for Medicaid-funded home and community-based services.  In

addition, because individuals who require eight or fewer hours of personal-care assistance do not

have to enroll in the EPD Waiver to receive their needed assistance, the EPD enrollment figures

do not reflect the full population of individuals who receive Medicaid-funded home and

community-based services.  (*See* Trial Tr., Nov. 9, 2016, a.m., at 84:16–23; Trial Tr., Sept. 16,

2016, p.m., at 24:11–19.)

81.     The current EPD Waiver approved by CMS was set to expire on January 4, 2017.  The

District recently submitted a waiver renewal application to CMS, requesting approval of the

HCBS the District intends to offer under the EPD Waiver for the next five years.  (Trial Tr.,

Sept. 16, 2016, p.m., at 46:21-48:5; *see* Def.'s Ex. 126.)  The renewal application maintains the

services currently provided by the EPD Waiver and adds community-transition services.

(*Compare* Pls.' Ex. 134 *with* Def.'s Ex. 126, at 1.)  If approved by CMS, the 2017 EPD Waiver

will provide for up to $5,000 of non-recurring setup expenses for individuals transitioning from a

nursing facility to the community.  (Trial Tr., Nov. 9, 2016, p.m., at 7:2-14; Def.'s Ex. 126, at 1.)

## IV.     THE DISTRICT'S EXISING TRANSITION SERVICES

### A.     The ADRC's Community Transition Team ("CTT")

82.     Nursing home residents with physical disabilities seeking home and community-based

long-term care are assisted by the ADRC Community Transition Team ("CTT").  (Trial Tr., Oct.

7, 2016, a.m., at 11:7–14; 19:19–20:22.)  The CTT is comprised of eight ADRC nursing home

transition team members and three transition coordinators from the MFP program.  (*Id.*at 19:19–

20:22; Def.'s Ex. 125.)  Although these groups of transition coordinators used to be separate,

they were combined within the ADRC in 2015.  (Trial Tr., Nov. 9, 2016, a.m., at 74:18–25.)

83.     The eight nursing home transition team care specialists work with individuals in nursing facilities regardless of whether they meet the additional criteria for participation in the MFP. (Trial Tr., Oct. 7, 2016, a.m., at 19:24–20:2.)  The three MFP transition coordinators are funded through the federal MFP grant and work exclusively with nursing facility residents who have resided in a nursing facility for more than 90 days.  (Trial Tr., Sept. 14, 2016, p.m., at 15:2–8; Trial Tr., Oct. 7, 2016, a.m., at 20:16–21:6.)

84.     The District employs eight Medicaid Enrollment Specialist ("MES") staff members who work at the ADRC and whose sole responsibility is to assist with EPD Waiver enrollment.  (Trial Tr., Oct. 7, 2016, a.m., at 22:17–22:25.)  The MES staff visit nursing homes, hospitals, and people's homes to speak to them about the EPD Waiver, help them collect the required documentation, and assist with preparing and submitting the application.  (*Id.* at 23:1–14.)

85.     Although the CTT serves anyone wishing to leave a nursing home and receive community-based long-term care, "[t]he District labels certain nursing facility residents who have requested transition assistance as 'inactive.'"  (Stipulated Facts ¶ 28.)  Someone is labeled "inactive" when "a transition coordinator has exhausted all available options for circumventing any type of obstacle that would interfere with the transition."  (Trial Tr., Oct. 5, 2016, a.m., at 71:2–10.)  Obstacles that would interfere with a transition include lack of housing, income, and family support.  (*Id.*)  Lack of documentation may also be a barrier for some individuals.  (*Id.* at 71:11–14.)  An individual may not be put on the inactive list until the supervising case manager and the individual case manager review the determination.  (Trial Tr., Nov. 8, 2016, a.m., at 86:2–6.)

86.     There was no inactive list until 2015.  (Trial Tr., Oct. 5, 2016, a.m., at 72:2–9.)  Prior to that, all cases were marked "active," regardless of barriers to transition.  (*Id.*)  The ADRC

determined this was a "resource drain" and instituted the inactive list. (*Id.* at 72:11–24.) The CTT periodically revisits the cases of individuals on the inactive list. (*Id.* at 71:19–72:1.) Every six months the individual is visited in person or his or her legal guardian is contacted. (*Id.* at 73:6–11.)

**B.    Money Follows the Person ("MFP") Federal Grant Program**

87.    The District provides enhanced transition services to certain individuals seeking to transition from nursing facilities to the community through the MFP program.[18] MFP is a federally-funded grant program established under the Deficit Reduction Act of 2005. (*See* Stipulated Definitions ¶ 5.) The program is time-limited:  in 2010, spending was authorized for 2012 through the end of fiscal-year 2016. (Trial Tr., Nov. 9, 2016, a.m., at 72:4–12.) The current authorization includes funding through 2020, but the MFP program will be phased out in the District by 2020. (Trial Tr., Nov. 8, 2016, a.m., at 68:16–23.) The District has written a sustainability plan for phasing out MFP. (*Id.* at 64:16–21.)

88.    "To be eligible for the MFP Program, elderly individuals and individuals with physical disabilities must meet the EPD Waiver program's level of care requirements, must have resided in a nursing facility for at least 90 days, and must have had their nursing facility services paid for by Medicaid for at least one day during the last 30 days." (Stipulated Facts ¶ 32.)

89.    There are nine District staff members who work exclusively on the MFP program. (Trial Tr., Sept. 14, 2016, p.m., at 8:24–9:1.) In addition to the MFP Project Director (Ms. Sarigol), there is an MFP Project Coordinator, an MFP Community Outreach Specialist, an MFP

---

[18] MFP is for elderly/physically disabled individuals and individuals with intellectual and developmental disabilities. Only those services for elderly and physically disabled individuals—those who would receive community-based long-term care under the EPD Waiver—are relevant here.

Management Assistant, three MFP Transition Coordinators, and two MFP Transition Case Managers. (*Id.* at 16:22–17:24; Pls.' Ex. 653.)

90.     "The District receives an enhanced [federal repayment] of 85% for the costs of EPD Waiver services provided to MFP Program participants" for the first year that the individual participates in MFP. (Stipulated Facts ¶ 39; Trial Tr., Sept. 14, 2016, p.m., at 18:10–13.) Thus, the District would save money for each individual in the first year that he or she is enrolled in PCA services through MFP: The District would pay 15% —rather than 30% under the standard repayment—of the costs of long-term care during that year. (*Id.* at 12:16–20.)

91.     MFP "is designed specifically to help elderly individuals and individuals with physical disabilities transition from nursing facilities to the community." (Stipulated Facts ¶ 31.) MFP provides "intensive wrap-around services," including "funds to cover 'set-up' costs incurred as part of the transition." (Pls.' Ex. 87, at 20.) Specifically, under MFP, the District provides outreach and education, transition coordination, environmental accessibility adaptations up to $10,000, household setup costs up to $5,000, and intensive case management during the transition and for 365 days following discharge from the nursing facility. (Trial Tr., Sept. 16, 2016, p.m., at 10:6–20.) The household setup funds can pay for a security deposit for an apartment or home, essential household furnishings, initiation fees or deposits for utilities, and moving expenses. (Pls.' Ex. 129; Pls.' Ex. 511.) The District tracks how MFP funds are spent for each MFP participant. (*See id.*) After transitioning, MFP participants may receive PCA services in the community through the Medicaid State Plan (for those who require 8 or fewer hours of PCA per day), the EPD Waiver (for those who require more than 8 hours of PCA per day) or both (for those who require more than 16 hours of PCA services per day). (*See* Trial Tr., Sept. 16, 2016, p.m., at 28:7–17.)

92.     Prior to 2010, the District's MFP targeted only individuals with intellectual disabilities. (Trial Tr., Sept. 14, 2016, p.m., at 36:14–22.)  Thus, MFP did not transition any elderly or physically disabled individuals in 2008 or 2009.

93.     In 2007, when the District first applied for and received approval to participate in the MFP program, the District proposed transitioning roughly 172 elderly or physically disabled individuals residing in nursing facilities per year from 2008-2013.  (Pls.' Ex. 847, at 2.)  In 2010, the District began providing MFP-funded transition services to elderly and physically disabled individuals and reset its benchmarks based on the program's success with transitioning intellectually disabled individuals in 2008 and 2009.  (Pls.' Ex. 129, at 22; Trial Tr., Sept. 14, 2016, p.m. at 36:2-22.)

94.     In 2010, the District's proposed to transition 30 elderly or physically disabled nursing facility residents in 2010 and 40 each year thereafter, for a total of 150 transitions from 2010–2013.  (Pls.' Ex. 129, at 22; Pls.' Ex. 113, at 2.)  MFP fell far short of its targets each year from 2010–2013:  it transitioned zero in 2010, 17 in 2011, 16 in 2012, and 16 in 2013.  The total number of MFP transitions was 49, or 33% of its revised goal.  (*See* Pls.' Ex. 129, at 22; Trial Tr., Sept. 14, 2016, p.m., at 41:23–43:19.)[19]

95.     CMS placed DC under CAPs from 2012 through 2014, as a consequence of DC missing its MFP targets.  (*Id.* at 49:21–50:11; Trial Tr., Nov. 8, 2016, a.m., at 58:14–22; Pls.' Ex. 107; Trial Tr., Nov. 9, 2016, p.m., at 19:23–20:7.)

96.     "In 2014, the District reduced the annual goal for transitioning nursing facility residents to [home and community-based long-term care] through the MFP Program from 40 to 30."

---

[19] The District retroactively reduced its goal for 2011 from 40 transitions to 26 transitions.  (Pls.' Ex. 113, at 2; Trial Tr., Sept. 14, 2016, p.m., at 40:18–41:6.)  Even with the revision, the District only met 62% of its goal that year.  (*See id.* at 42:12–14.)

(Stipulated Facts ¶ 34.)  "In 2014, 24 people were transitioned from nursing facilities to the community through the MFP Program, representing 80% of the District's goal."  (*Id.* ¶ 35.)  Thus, even after reducing its target for 2014, the District failed to meet its transition goal.

97.     For 2015, the District again set a goal of using MFP to transition 30 individuals who qualified for the EPD Waiver from nursing facilities to the community.  (Pls.' Ex. 781; Trial Tr., Sept. 16, 2016, p.m., at 14:25–15:6.)  The District, for the first time since it began the MFP program, met (and exceeded) its goal, transitioning 36 elderly and physically disabled individuals that year.  (*Id.*)

98.     In 2015, the MFP staff was relocated to the ADRC "so that there could be synergy between the locally funded transition coordinators and the MFP staff."  (Trial Tr., Nov. 9, 2016, a.m., at 74:18–25.)  Previously the MFP staff was housed within DHCF.  (*Id.*)

99.     In 2016, the District's goal was to transition 30 additional people through the MFP demonstration.  (Pls.' Ex. 781.)  By June 2016, the District had transitioned 16 MFP participants during calendar year 2016.  (*Id.*; Trial Tr., Sept. 16, 2016, p.m., at 15:19-16:3.)  The District was therefore on track to transition 32 MFP participants in 2016 and meet the revised goal.[20]

## C.     MFP Housing Vouchers

100.    In addition to enhanced case management services, MFP has 65 "set-aside" housing choice vouchers that the program distributes to individuals who meet the program's requirements.  (Trial Tr., Oct. 7, 2016, p.m., at 15:21–22.)

101.    MFP participants are eligible for the 65 set-aside vouchers, provided that they can meet the financial eligibility requirements that DCHA imposes for participants in subsidized-housing

---

[20] In fact, the figure was 40 by the end of 2016.  (*See* Pls.' Ex. 365 (updated as of July 20, 2017 hearing).)

programs. As explained below, an individual would be identified as a potential MFP participant when he or she is referred to the ADRC. If the individual needs affordable housing, he or she would be entered into the MFP's housing-voucher lottery, which "is held when we have vouchers available." (*Id.* at 15:1–2.)

102. MFP has never been able to "fully employ all of [their] vouchers that are set aside for housing." (*Id.* at 17:7–10.) A voucher is only "used" when a lease is signed and the individual has moved into the property. (*Id.* at 21:10–12.) There are unused vouchers at any given time because MFP participants may choose not to accept a housing unit, or a landlord can, for a host of reasons, reject an applicant. (*Id.* at 20:12–19; 22:6-21.) If this happens multiple times, the voucher will be redistributed to an alternate from the voucher lottery. (*Id.* at 21:4–6; 22:23–23:2.)

103. Winning the lottery for a housing voucher gives the recipient the opportunity to secure private, subsidized housing (as opposed to public housing) that will be paid for primarily through the voucher funds. (*Id.* at 17:20–18:3.) However, it does not guarantee housing. (*Id.*) The vouchers of individuals who cannot meet the eligibility requirements or cannot secure housing are reallocated to "alternates," who are also selected during the lottery.

104. Lottery winners must furnish documentation and complete the DCHA eligibility screening within 30 days, unless the MFP staff determines (on a case-by-case basis) that the applicant has attempted to fulfill the requirements but needs additional time. (*Id.* at 21:20–22:3.) MFP staff assist the lottery winner to fill out those forms. (Trial Tr., Sept. 14, 2016, p.m., at 31:4–7.)

105. In addition, DCHA maintains a list of landlords who accept vouchers, and MFP has hired a contractor, VCare, that provides lists of landlords who accept vouchers. (Trial Tr., Oct. 7,

2016, p.m., at 18:5–12.)  The ADRC partners with local organizations D.C. Housing Counseling and D.C. Housing Search to help individuals looking for a subsidized housing unit.  (Trial Tr., Oct. 5, 2016, a.m., at 70:7–13.)  The ADRC also employs a housing coordinator who assists the CTT in helping locate housing for individuals and who has informal relationships with real estate developers and other landlords.  (*Id.*; Trial Tr., Oct. 7, 2016, p.m., at 18:5–12.)  The ADRC coordinates with DCHA staff who assist individuals with housing-choice vouchers to find suitable housing.  (Trial Tr., Nov. 15, 2016, p.m., at 37:15–24.)  In addition, transition coordinators assist nursing-facility residents to apply for income benefits.  (Trial Tr., Oct. 7, 2016, p.m., at 19:2–8.)

106.    Once the DCHA eligibility requirements are complete, lottery winners must find suitable private housing.  They can lose their opportunity to use their vouchers for a number of reasons: (1) if they are offered a public-housing unit from DCHA, (2) if they are rejected by three landlords, or (3) if they reject 5 properties.  (Trial Tr., Sept. 16, 2016, a.m., at 46:22–47:11.)  The latter two reasons are known as the "3-5 Rule."  (Trial Tr., Nov. 8, 2016, p.m., 20:4–12.)

107.    The lottery was designed to promote fairness, both for individuals who win the lottery and for those who do not.  (Trial Tr., Oct. 7, 2016, p.m., at 19:16–22; 22:4–16.)  Instead of allowing an individual to have a voucher earmarked for his or her use indefinitely, the eligibility-determination deadline and the 3-5 Rule ensure that alternates will have an opportunity to attempt to use the voucher.  (*Id*. at 22:4–23:2; Trial Tr., Nov. 8, 2016, p.m., at 20:4–12.)  Exceptions to the 3-5 Rule, just like the 30-day timeframe to verify financial eligibility, can be made on a case-by-case basis.  (Trial Tr., Nov. 8, 2016, p.m., at 21:8–18.)

108.    Since the MFP program began, it has held three lotteries—in 2013, 2015, and 2016.  .  (Trial Tr., Sept. 14, 2016, p.m., at 32:22–33:1.)  Sixty individuals were selected in the 2015

lottery.  By December 31, 2015, 44 of the 60 lottery winners were unable to use their vouchers.  (Pls.' Ex. 348, at 2.)  Four accepted public housing or subsidized housing through another program.  (*Id.*)  Nineteen declined services, either themselves or through a guardian or individual with power of attorney.  (*Id.*)  Ten could not meet the 30-day timeline to demonstrate financial eligibility to DCHA or a 30-day deadline to complete other actions.  (*Id.*)  Five died.  (*Id.*)  One individual was discharged.  (*Id.*)  Five were excluded by virtue of the 3-5 Rule.  (*Id.*)

109.    The most recent lottery was held on February 29, 2016.  (Trial Tr., Sept. 14, 2016, p.m., at 25:8–11.)  There were 18 available vouchers at the time.  (*Id.* at 22:3–12.)  At the time of trial, roughly seven months after the lottery, two of the lottery winners had signed a lease and two more were in the process of signing a lease.  (*Id.* at 25:12–19.)

### D.    EPD Waiver Enrollment Assistance

110.    To receive either State Plan PCA services or EPD Waiver services, an individual must demonstrate that he or she meets certain financial and clinical eligibility requirements.  (Trial Tr., Oct. 4, 2016, a.m., at 36:2–14.)  The Economic Security Administration ("ESA") determines an applicant's financial eligibility.  The District uses a private contractor, Qualis, to verify an applicant's clinical eligibility–whether the individual meets the minimum level of care for the EPD Waiver.  (Trial Tr., Sept. 16, 2016, a.m., at 6:10–15.)[21]  Another contractor, Delmarva, approves the number of personal-care hours that Medicaid will fund.

111.    In June 2015, DCOA and DHCF created a new EPD Waiver enrollment process.  (Trial Tr., Oct. 7, 2016, a.m., at 27:3–22; Def.'s Ex. 63.)  Under this new process, the ADRC is the "single point of entry for the EPD Waiver program."  (Trial Tr., Oct. 4, 2016, a.m., at 56:2–7.)[22]

---

[21] Access to State Plan PCA services does not depend on the Qualis level-of-care determination.

[22] Jennifer Crawley testified that, as of July 2016, some EPD case managers were unfamiliar with the new enrollment process, which came from CMS's conflict-free case management

112.    The District tracks the time it takes to complete each step of the EPD Waiver enrollment process, from the initial referral through the enrollment for all applicants.  (*See* Def.'s Ex. 118; Trial Tr., Oct. 7, 2016, a.m., at 37:16–38:4.)  It does so in a biweekly report that the ADRC provides to DHCF.  (*See* Def.'s Ex. 118.)

113.    The first step, which initiates the EPD Waiver enrollment process, is "intake."  At this stage, the ADRC is notified—by a social worker or another individual—that someone residing in a nursing home would like to enroll in the EPD Waiver.  (Pls.' Ex. 706, at 1.)  Once an individual is referred to the ADRC, an MES is assigned to the case.  (*See* Trial Tr., Oct. 7, 2016, a.m., at 39:2–19.)  From March 25, 2016, until August 26, 2016, 978 individuals were referred to the ADRC, ranging from 55-128 individuals each biweekly reporting period.  (*See* Def.'s Ex. 118 (listing unique referrals for 11 biweekly periods); Trial Tr., Oct. 7, 2016, a.m., at 36:16–37:14 (explaining the "Total Individuals" column in Def.'s Ex. 118).)

114.    From March 25, 2016, to August 26, 2016, the average time between intake and assignment to an MES decreased steadily.  (*See* Def.'s Ex. 118.)  In the first biweekly reporting period, March 25–April 8, 2016, the average time was 83 days, with a range of 25–126 days. (*Id.*)  Roughly two months later, from May 23–June 3, 2016, the average time was 37 days, with a range of 7–113 days.  (*Id.*)  For the last six biweekly reporting periods, from June 6–August 26, 2016, the average time was less than 20 days, with a range of 1–79 days.  The outliers at the top of the range exist because of staffing limitations at the ADRC or a lack of response from the potential applicant.  (Trial Tr., Oct. 7, 2016, a.m., at 39:20–40:15.)

115.    The second step of the enrollment process is a face-to-face consultation between the MES

---

requirement, and the EPD Waiver case managers were not responsive to case-management referrals.  (Trial Tr., Oct. 4, 2016, a.m., at 55:14–57:1.)  The data provided by ADRC reflects that some of the difficulties that the ADRC had early on have improved since.

and the applicant. (*Id*. at 42:14–22.) At the face-to-face meeting, the MES determines whether the individual is eligible for MFP or will be served by the ADRC's transition coordinators. The average time for the MES to conduct the face-to-face consultation has varied between 8–27 days in the 11 biweekly reporting periods from March 25–August 26, 2016. (Def.'s Ex. 118.) In the most recent reporting period—August 15–August 26, 2016–the average time was 24 days, with a range of 8–70 days. (*Id.*) Most often, the variance is caused by scheduling difficulties with the potential applicant, although staffing issues at the ADRC can also contribute. (Trial Tr., Oct. 7, 2016, a.m., at 42:23–43:11.)

116.    The EPD Waiver "application" is actually five distinct forms:  (1) a Beneficiary Freedom of Choice form, for the individual's consent to receive home and community-based long-term care; (2) a Level of Care certification, which must be approved by an approved DC Medicaid Provider; (3) a Long-Term Care Application; (4) a Combined Medicaid Application (for EPD waiver applicants who are not already enrolled in State Plan Medicaid); and (5) a Case Management Attestation Form, where an applicant indicates his or her preferences for case-management agencies. (Pls.' Ex. 706, at 1.)

117.    Although CMS does not dictate the particular forms that the ADRC uses in its EPD Waiver application, it requires the District to maintain certain documentation. (Trial Tr., Oct. 4, 2016, p.m., at 36:5–37:10.) For instance, the District must have an application for certain services, like long-term care and Medicaid, and to collect certain information, like the freedom of choice form, during the application process. (*Id*.)

118.    The EPD Waiver requires the applicant to submit various official documents. An EPD Waiver applicant must have (1) proof of identity; (2) proof of residency; (3) proof of social security number; (4) proof of income and assets; (5) proof of insurances; (6) unpaid medical bills

from the past three months; (7) proof of power of attorney; and (8) proof of guardianship. (Pls.' Ex. 706, at 1.) The MES works with the applicant to gather the required documentation and secure the Level of Care determination. (Trial Tr., Oct. 7, 2016, a.m., at 48:17–25.) In the alternative, a community social worker can aid the applicant in securing the documentation before the MES refers the case for the Level of Care determination. (*See* Pls.' Ex. 706, at 1.)

119.    To complete the Level of Care determination, the MES assigns the case to Qualis. (Pls.' Ex. 706, at 2.) Qualis is supposed to verify the level of care within 72 hours of the referral. (*Id.*) If the applicant meets the level of care requirement, the MES sends the application to ESA for a determination of financial eligibility. (*Id.*) As of the most recent biweekly reporting period, August 15–August 26, 2016, it took an average of 53 days, with a range of 8-150 days, between the MES's in-person consultation and the submission of the completed application to ESA. (Def.'s Ex. 118.) The average time has increased, from a low of 12 days during the March 25, 2016, to April 8, 2016 biweekly reporting period. (*Id.*)

120.    The ADRC's role in the EPD Waiver application process—from intake until submission of a completed application to ESA–takes 94 days on average, as of the most recent biweekly reporting period. (Trial Tr., Oct. 7, 2016, a.m., at 44:25–45:5; Def.'s Ex. 118.) That is it takes approximately three months for the ADRC to assist a nursing-facility resident to complete an EPD waiver application after the ADRC is notified that the individual would like to receive community-based long-term care. (Trial Tr., Oct. 7, 2016, a.m., at 44:25–45:5.)

121.    ESA is given 60 days to process the application and determine the applicant's financial eligibility. (Pls.' Ex. 706, at 2.) From March 25–August 26, 2016, ESA adjudicated 350 EPD Waiver applications. (Def.'s Ex. 118.) In the first three biweekly reporting periods beginning on March 25, 2016, the average time for ESA to process the application took longer than 60 days.

(*See* Def.'s Ex. 118 (94 days from March 25–April 8, 2016; 132 days from April 11–April 22, 2016; and 74 days from May 9–May 20, 2016).)  Beginning on May 23, 2016, as the number of applications adjudicated leveled off, the average time of processing fell below 60 days.  (*See id.*)  Outliers during those reporting periods, however, still took more than 60 days.  (*See id.* (range of 5–147 days from May 23–June 3, 2016; range of 4–144 days from June 6–June 17, 2016.)  From June 20–August 26, 2016, ESA adjudicated all applications within 60 days.  (*See id.* (range of 4-57 days).)  Provided that ESA determines that the applicant is eligible, the MES notifies the applicant when the case is transferred to the EPD Waiver case-management agency.  (Pls.' Ex. 706, at 2.)

122.    Separate from the application procedure through ESA, in order to authorize Medicaid payments for personal-care assistance, each applicant must be assessed for the number of personal-care hours he or she requires.  The District employs Delmarva to perform these "conflict free" face-to-face assessments.  (Trial Tr., Sept. 16, 2016, p.m., at 72:17-21.)  The applicant must secure a physician order form, which acts as a referral to Delmarva.  (*Id.* at 74:23-75:1.)  The MES works with the applicant to secure the physician order form by, for instance, calling doctors.  (Trial Tr., Oct. 7, 2016, a.m., at 55:9–56:1.)  The ADRC has augmented its staffing in order to help applicants secure the physician order form.  (*Id.* at 55:19–21.) The MES sends the applicant's physician order form to Delmarva to initiate the assessment.  (*Id.* at 49:9–14.)

123.    Once Delmarva receives the physician's order form, it has three days to contact the applicant and five days after the initial contact to conduct the assessment.  (Trial Tr., Sept. 16, 2016, p.m., at 75:1–6.)  After assessing the applicant, Delmarva has two days to issue the determination letter.  (*Id.* at 75:6–8.)  The average time between receiving the physician order

form and conducting the assessment for the biweekly reporting periods from March 25–August 26, 2016, ranged from 6–12 days. (Def.'s Ex. 118.) During the period from March 25–August 26, 2016, the average time between the assessment and the determination has been two days or less. (*See* Def.'s Ex. 118 (range of 0-2 days.) For the three most recent biweekly reporting periods before trial, the average time was zero days, meaning that Delmarva issued the determination on the same day as the assessment. (Trial Tr., Oct. 7, 2016, a.m., at 50:1-12.)

124. Community social workers were not always able to apply for EPD Waiver services on behalf of their clients, but, in response to requests from stakeholders, the District recently began allowing these social workers to enroll clients in the EPD Waiver. (Trial Tr., Sept. 13, 2016, p.m., at 84:17–85:3; Pls.' Ex. 706.) Community social workers who are completing the application process for their clients are provided with information to review with their clients. (Pls.' Ex. 706, at 1.) This includes five specific publications that discuss eligibility requirements, the application process, what to expect after enrollment, required documentation, and other policies and procedures related to the EPD Waiver. (*Id.*)

125. Community Social Worker Randy Smith discussed the EPD Waiver enrollment process and provided three anecdotes from his experience as a case manager.[23] In the first example, Mr. Smith's client entered a nursing home on June 28, 2016. (Trial Tr., Sept. 14, 2016, a.m., at 43:11–19.) Mr. Smith filed a waiver application on the client's behalf on July 7, 2016. (*Id.*)

---

[23] Despite the fact that Mr. Smith was working primarily with individuals who live in the community (and therefore are not class members), plaintiffs offer his testimony on the EPD Waiver application process because it is "the same process that nursing facility social workers would have to use." (Trial Tr., Sept. 14, 2016, a.m., at 66:14–20.) Mr. Smith's primary role is to keep people in their housing, not to transition people from nursing homes into the community. (Trial Tr., Sept. 14, 2016, a.m., at 61:13–22.) Even if his experiences were relevant, his testimony does not illuminate any systemic deficiencies in the District's transition services, but rather it exposes an arguably needlessly bureaucratic process.

The client was declined for waiver services by letter dated August 11, 2016.  (*Id*. at 28:7–9.)  At the time Mr. Smith provided assistance to his client to apply for EPD Waiver services, his client had not been in the nursing home for 90 days.  The reason the application was rejected was that Mr. Smith only indicated that his client needed assistance with one ADL, but assistance with two ADLs is required under the waiver program.  (*Id*. at 30:10-15.)  As of the time of his testimony, approximately one month after his client was rejected for EPD Waiver services, Mr. Smith had not filed a new application.  He still has to "resubmit [her application] with enough boxes checked."  (*Id*. at 43:25–44:1.)  At the time of his testimony, this client still had housing in the community.  (Trial Tr., Sept. 14, 2016, a.m., at 44:15–17.)

126.    In the second example, Mr. Smith discussed his client "C.C."  C.C. never lived in a nursing home.  (*Id*. at 42:23-25.)  In February 2016, Mr. Smith brought concerns about this client's enrollment delays to a City Council meeting.  (*Id*. at 35:23–25.)  After that, Ms. Crawley of DHCF reached out to him to help him "unstick" C.C.'s waiver application.  (*Id*. at 62:14–24.)  A Delmarva nurse assessed Mr. Smith's client for home-care services shortly thereafter.  (*Id*. at 35:23–36:1.)

127.    The client did not receive services for three weeks after that, so Mr. Smith reached out to Ms. Crawley again.  (*Id.* at 36:1–6.)  The reason for the delay was that C.C. was "rejected by home health agencies."  (*Id.* at 36:4–6, 63:5–7.)  Thereafter, Ms. Crawley facilitated C.C.'s application to a fourth home health care agency that accepted her request for services.  (*Id.* at 37:1–3.)  That client ultimately received home care assistance in March 2016, approximately seven months after beginning the process.  (*Id.* at 32:10–12.)

128.    In the third example, Mr. Smith decided not to apply for EPD Waiver services for another client, who is an amputee.  (*Id.* at 54:8–9.)  The client had been approved for EPD Waiver

services and assessed for fourteen hours of personal-care assistance, but Mr. Smith only applied for State PCA services. (*Id.* at 54:12–16.) He reasoned that, given his experience with the lengthy EPD Waiver enrollment process, the "easiest route" was the State Plan. (*Id.* at 54:23.) Still, Mr. Smith concedes that, at least "in the last few months," things have improved, since social workers have been "invited to play a role" in securing long-term care in the community. (*Id.* at 63:9–15.)[24]

### E.    The District's Nursing-Facility Outreach

129.    The District conducts outreach to nursing facility residents regarding their options for community-based long-term care, including face-to-face outreach by the MFP outreach coordinator and community transition team (Trial Tr., Oct. 7, 2016, p.m., at 9:22–10:11); the ADRC's Information Referral and Assistance unit (Trial Tr., Oct. 5, 2016, a.m., at 50:12–22); regular assessments by Qualis (Trial Tr., Oct. 7, 2016, p.m., at 24:14–25:5); and information provided through nursing facility social workers (Trial Tr., Nov. 8, 2016, p.m., at 34:9–13).

130.    The MFP outreach coordinator visits every nursing facility in the District at least once a month to conduct outreach. (Trial Tr., Oct. 7, 2016, p.m., at 9:22–10:6.) The ADRC's community transition team meets with every person on their caseload at least once a month. (*Id.*

---

[24] Plaintiffs' expert characterized this testimony as evidence that "even for people already living in the community, it takes a minimum of seven months to get services to [individuals] under the EPD Waiver program following an application." (Pls.' Ex. 884, ¶ 64.) Plaintiffs argue that this is evidence that "miscommunication and confusion significantly delay the EPD Waiver enrollment process." (Pls.' FF&CL at 7, ¶ 17.) But again this does not necessarily reflect on the adequacy of the District's transition services.

One of the clients never lived in a nursing home, and the second never had a complete application submitted. Mr. Smith did not apply for EPD Waiver services for the third. At best, Mr. Smith provided one example of the EPD Waiver enrollment process taking seven months. However, Mr. Smith's testimony reveals that errors that he committed in turn protracted the application process. Indeed, his client who is in a nursing home did not even have an EPD-Waiver enrollment application pending, even though Mr. Smith would merely have had to resubmit the paperwork with an appropriate level of care indicated.

at 9:22–10:6.)  While at the nursing facilities, the community transition team also speaks to nursing home social workers, administrators, and other residents about community transitions. (*Id*. at 10:7-11.)  The ADRC holds monthly meetings for community social workers, and the Longterm Care Coalition holds monthly meetings at a case management agency.  (Trial Tr., Sept. 14, 2016, a.m., at 60:13-19.)

131.    Nursing facilities are required to ask residents if they would like to speak with someone about returning to the community as part of Section Q of the Minimum Data Set (MDS) survey. (Trial Tr., Nov. 8, 2016, p.m., at 26:7-14, 32:22-33:2.).  That survey is given within 14 days of admission and each year thereafter.  (Trial Tr., Sept. 16, 2016, p.m., at 62:14-20.)  Residents who respond "yes" are referred to the ADRC.  (Trial Tr., Nov. 8, 2016, p.m., at 34:9-13, 38:10-13.)

## V.    HOUSING AND OTHER BARRIERS TO TRANSITION

### A.    Access to Public & Subsidized Housing in the District

132.    Over 80% of nursing facility residents who want to move to the community need public housing or subsidized housing.  (Pls.' Ex. 348, at 2.)  Further, many (if not most) of the physically disabled nursing facility residents require wheelchair-accessible units.[25]  Without available, affordable, and accessible housing, those individuals are not able to receive community-based long-term care.  At present, there is not a sufficient supply of available, affordable, and accessible housing.

133.    The District of Columbia is the fourth most expensive rental market of the 50 largest cities in the United States of America (behind New York, San Francisco, and Boston).  (Pls. Ex.

---

[25] Four of the current or former named plaintiffs or class members who testified, who had some of the longest waits to transition or were unable to transition out of nursing facilities, needed wheelchair-accessible housing.  *See supra* Findings of Fact ¶ 2 (Thorpe), ¶ 23 (Tucker), ¶ 27 (Brown), ¶ 38 (Wilkerson).

469, at 51.) DCHA provides housing assistance to over 20,000 households through public housing and private, subsidized housing (*i.e.*, federally and locally funded housing-choice vouchers). (*Id.* at 47.)

> DCHA's public housing portfolio consists of over 8,360 units at 63 developments, serving families, seniors and non-elderly disabled individuals. In addition, the agency administers 11,881 federally funded vouchers through its Housing Choice Voucher program. DCHA also manages 2,304 housing subsidies through the Local Rent Supplemental Program (LRSP), a locally funded affordable housing program modeled after the federal voucher program.

(*Id.*).

134. Over 63,000 residents live in public housing, Section 202 projects (for the elderly), Section 811 projects (for the disabled), project-based Section 8 housing, or subsidized housing through the Housing Choice Voucher program. (*Id.* at 82.) Nineteen percent of those public or subsidized housing residents are persons with disabilities, even though there are relatively few Section 202 or Section 811 projects in the District. (*Id.*)

135. "Special needs populations including older adults and persons with disabilities, are disproportionately affected by housing problems, and may require costly home modifications and supportive services." (*Id.* at 32.) In 2015, about 1/3 of 68,143 disabled residents (21,496) were directly served by District government through Medicaid funded services: 18% (4,000) received support in an institutional setting, while 82% (17,000) lived in community-based setting. 20% of those in community housing (3,650) qualified for institutional care. (*Id.* at 105.)

136. Unfortunately, "[n]o one authoritative data source that identifies housing units restricted to older adults or persons with disabilities currently exists." (*Id.* at 105) Within the first quarter of 2016, the ADRC had 634 cases for housing assistance were open. (*Id.* at 107.) Of those, only 6 cases were closed within that period, largely due to lack of available and affordable senior housing in the District. (*Id.*)

137.   "The limited supply of HUD 202 (senior) and 811 (disabled) units compared to the city's population of persons living with a disability (11%) and older adults (16%) exacerbates the lack of available housing options for low-income seniors and disabled."  (*Id.* at 83.)  And, the overall supply of affordable housing options is likely to contract in the coming years: 15,226 affordable housing unit subsidies across 145 projects are set to expire between May 2016 and 2020, which will result in an estimated loss of 1,714 units from the affordable-housing stock.  (*Id.* at 82.)

138.   Of the 8,360 units of public housing in the District, 6,500 (including 2,000 which are in senior or disabled properties) require some sort of rehabilitation or improvements.  (*Id.* at 50.) Further, only 691 of the 8,360 units meet the Uniform Federal Accessibility Standards ("UFAS") that would allow a disabled person with a mobility impairment to reside there.  (*Id.* at 49.)  Still, DCHA is outpacing the requirement that 6% of public housing units meet these federal standards.  (*Id.*)

> The DC Housing Authority also installs accessible features in its public housing units (i.e. grab bars, roll-in showers, raised toilet seats, etc.) through the reasonable accommodation process.  In FY 2015, the DC Housing authority processed 1,130 requests for accessible units from public housing applicants, ranging from the examples provided above to UFAS accessible units.  The housing authority processed 488 public housing resident requests for accessible units/unit features.

(*Id.* at 50.)

139.   Subsidized housing options through the Housing Choice Voucher Program are limited since "many neighborhoods in DC exceed HUD-defined market rents."  (*Id.* at 26.)  Participants in the voucher program must find a suitable unit where the owner agrees to rent under the voucher program.  (*Id.* at 79.)  Former named plaintiff Roy Foreman would only accept housing in the Northwest quadrant of the city, which is far more expensive on average than other areas of the District.  (Trial Tr., Nov. 15, 2016, p.m., at 68:21-69:5.)  Once they have secured housing,

Housing Choice Voucher participants pay at least 30% of their income for rent and utilities, and DCHA then pays the subsidy directly to the landlord to cover the shortfall between the total rent and the resident's income contribution, up to the maximum allowable voucher payment. (Pls.' Ex. 469, at 79-80.) If the total rent minus 30% of the resident's income is greater than the maximum voucher payment, the resident must make up the difference. (*Id*. at 80.) Approximately half of the housing in the District was built before 1950, which makes it difficult to comply with environmental standards and housing regulations. (*Id.* at 74.) Thus, many of those units are unsuitable for elderly and disabled individuals who require wheelchair access or have other mobility impairments. (*Id.* at 59.)

140.     More than 18,000 of the poorest disabled individuals receive Supplemental Security Income ("SSI"), "a federal income supplement program designed to help the aged and disabled, who have little or no income to pay for basic needs, such as food, clothing, and shelter." (*Id.*) SSI recipients represent 27% of the total disabled population and 81% of disabled individuals with income under the federal poverty line. (*Id.*) DC SSI monthly payments are $721 or 16% of the median income in the District. (*Id.*)

141.     The overall occupancy rate of public housing in the District is 97%. (Trial Tr., Nov. 15, 2016, p.m., at 53:8–10.) DCHA maintains one waiting list for all of the public and subsidized housing programs that it operates. (*Id.* at 32:16–33:10.) In other words, all individuals who are seeking public housing, vouchers for subsidized housing, and/or access to another housing program are all on the same waiting list, which reflects their preference to participate in one or more of the programs. In addition to choosing which particular housing programs to participate in, an individual on the waiting list indicates whether he or she requires a UFAS unit or is eligible for senior housing. Over 42,091 individuals and families are on DCHA's waiting list for

public housing or subsidized housing, and over 20,000 of those individuals and families report being homeless.  (*Id*. at 33:11-14; Pls.' Ex. 469, at 50.)

142.    As a result of the volume of individuals and families on the waiting list, DCHA is not currently accepting additions to the waiting list, which has been closed since April 2013.  (Trial Tr., Nov. 15, 2016, p.m., at 32:11–15.)  Between 400 and 600 people are moved off of the DCHA waiting list per year.  (*Id.* at 38:17–23.)  But no one moves onto the waiting list.  DCHA has determined that, for some categories of housing, it will not have to open the waiting list for over 20 years.  (*Id.* at 56:3–11.)

143.    DCHA does not determine whether all individuals on the waiting list are financially eligible for public or subsidized housing.  (*Id.* at 54:1–5.)  Rather, an individual's financial eligibility is determined when he or she gets near the top of the waiting list, when DCHA expects to be able to offer housing within six months.  (*Id.* at 54:6–12.)  That is because DCHA's certification of someone's financial eligibility for public or subsidized housing is only valid for six months.  (*Id.*)  The roughly 250 individuals whose financial eligibility has been determined are part of the "selection pool" for newly-available housing.  (*Id.* at 54:13–16.)  The "selection pool" is a subset of the waiting list, not a separate waiting list.  (*Id.* at 53:23–25.)

144.    There is no separate waiting list for wheelchair accessible units.[26]  However, HUD

---

[26]  Plaintiffs urge the Court to find otherwise.  In support of their contention that there is a separate waiting list and that the waiting list is not frozen, plaintiffs cite to Ms. Newland's testimony that she "thinks" there is a separate waiting list for ADA units (Pls.' Opp'n to Def.'s Mot. for J.M.O.L. at 40 (citing Trial Tr., Oct. 7, 2016, p.m., at 58:25–59:5)) and Mr. Bovelle's testimony that DCHA would reopen the waiting list to ensure that it met its obligation to keep 100 individuals certified for UFAS units in a "selection pool," (Pls.' FF&CL at 26-27, ¶ 76 (citing Trial Tr., Nov. 15, 2016, p.m., at 46:17–47:1).)

    On the basis of the trial record, the Court finds the opposite to be true:  there is no separate waiting list for wheelchair-accessible units, and the public and subsidized housing waiting list, from which DCHA draws when a new UFAS unit is available, is closed and has been closed since April 2013.

requires DCHA to maintain at least 100 people who have been found to be eligible for

wheelchair-accessible housing in a "selection pool" for newly-available UFAS units. (*Id.* at

46:10–21.) To be in the "selection pool," the individual's need for a UFAS unit is first verified

and then his or her financial eligibility is confirmed when DCHA expects to be able to offer him

or her a UFAS unit within six months. (*Id.* at 30:20–31:8.)

145.     When a public housing unit or housing voucher becomes available, DCHA chooses the

next individual on the waiting list for that particular program, drawing from the "selection pool"

of individuals whose eligibility has already been verified. If that unit is UFAS accessible or

---

First, Ms. Newland's testimony that she "thinks" there is a separate "ADA waiting list" directly contradicts the testimony of Mr. Bovelle that there is only one waiting list. As Mr. Bovelle oversees DCHA's operations (including the waiting list), his testimony is more credible on this point. The fact that DCHA would reopen the waiting list to comply with its obligations to keep a "selection pool" of 100 individuals certified for UFAS units does not mean that class members can be added to the waiting list. In fact, Mr. Bovelle testified that the waiting list has not been reopened since April 2013, notwithstanding DCHA's obligation to maintain a "selection pool" of 100 UFAS-eligible housing applicants.

Mr. Bovelle's testimony makes clear that no new names have been added to the waiting list since April 2013, even for UFAS units in the public-housing inventory. (Trial Tr., Nov. 15, 2016, p.m., at 56:3–11.) Rather, individuals who were already on the waiting list as of April 2013 have been moved to the "selection pool" of those DCHA has certified deemed medically eligible for a UFAS unit. Even if it is true that "many class members who have moved during this litigation (25%) have moved into public housing" (Pls.' Response to Def.'s Suppl. Submission at 6), the trial record supports only the conclusion that those class members were added to the public-housing waiting list before it closed in April 2013. It is possible that those class members could have updated their information with DCHA to reflect that they were residing at a nursing home, which would give them preference in securing a public-housing unit as a "homeless" individual. But it does not mean that they were added to the waiting list after it was closed, even if they entered nursing homes after April 2013. When the waiting list was open, class members were joining the waiting list: as of June 2013, two months after the waiting list was closed, 10 of the 11 then-named plaintiffs had applied for subsidized housing. *Thorpe II*, 303 F.R.D. at 148 n.61.

Former named plaintiff Roy Foreman joined the DCHA waiting list in 2006 and was on the waiting list for approximately seven years. (FF ¶ 33.) Former named plaintiff Curtis Wilkerson was on the DCHA waiting list for 10 years, beginning in 2002, before he reached the top of the waiting list. (*Id.* ¶ 38.) He updated his preferences twice when he was in the nursing facility. (*Id.*)

designated for a senior, the next qualifying individual in the "selection pool" for such units (*i.e.*, whose need for such a unit has been verified by DCHA) will get the unit. However, individuals who already reside in public housing whose circumstances have changed such that they require a UFAS unit are given preference as a "transfer" when a UFAS unit becomes available. (*Id.* at 29:16–25.)

146. "DCHA has a ranking preference and only pulls from households reporting that they are homeless at time of admission." (Pls.' Ex. 469, at 48 n.2.) Consequently, individuals or families reporting that they are homeless have gotten off of the waiting list and into public or subsidized housing since the waiting list was instituted. (*Id.*) Nursing home residents qualify as "homeless" for purposes of DCHA's ranking preference. (Trial Tr. Nov. 8, 2016, p.m., at 86:9–87:15.)

147. At the time of trial, there were 25 vacant wheelchair accessible units out of the 678 wheelchair-accessible public-housing units. (Trial Tr., Nov. 15, 2016, p.m., at 27:17–21.) Those units are in the process of being prepared for new tenants and will be filled from individuals who are on the transfer list or the "selection pool" for UFAS units. (*See id.* at 28:7–11.) At that time there were 96 individuals on the UFAS "selection pool" whose need for a UFAS unit was verified and 16 current public-housing tenants seeking a "transfer" to a UFAS unit. (*Id.* at 30:7-12, 31:15–18.) DCHA is in the process of approving five more individuals from the waiting list to be part of the UFAS "selection pool." (*Id.* at 30:7–12.) In the six months preceding trial, from May 2016 to November 2016, DCHA filled approximately 35 UFAS public-housing units that had become vacant. (*Id.* at 32:2–8.) This was "a little higher than usual" because of new units and completed renovations that to previously unavailable units. (*Id.* at 57:6–14.)

148. As demonstrated by the extensive waiting list, the available, affordable housing stock does not meet the needs of the District's population. (Trial Tr. Nov. 8, 2016, p.m., at 57:14–18;

Pls.' Ex. 469, at 74, 82.) Because of the minimal turnover in public housing and housing-choice voucher programs, DCHA can house only a miniscule portion of the waiting list, and that list has been closed since April 2013. (*Id.* at 82.)

### B.     Other Barriers to Transitioning

149.    Over the course of trial, various other barriers to transitioning of class members were identified. For instance, Brenda Fisher testified that, in addition to a lack of housing in the community, nursing facility residents are impeded by the lack of proper identification required to access community-based services and lack of family support for their transition. (Trial Tr., Oct. 4, 2016, a.m., at 24:15–25:3.)

150.    Ms. Crawley testified that, in addition to the lack of housing, barriers to nursing facility residents include (1) finding a home health agency to staff an individual's care needs; (2) understanding the requirements of a completed EPD waiver; (3) getting a physician determination of the required level of care or the number of personal-care hours; (4) a lack of support in the community; (5) the medical complexity of the individual; and (6) a lack of training of family members who would otherwise provide personal care assistance. (*Id.* at 40:16–41:14.)

151.    Ms. Simhoni testified that class member Mr. R.'s transition was slowed by a change in District policy requiring "conflict-free case management." (Trial Tr., Sept. 13, 2016, p.m., at 13:12–21.) Prior to 2013, when Medicaid fraud was discovered in the District, case managers and personal care assistants could work for the same agency. (*Id.* at 24:6–19.) Now, home health agencies cannot also provide case management services to the individuals they serve. (*Id.* at 24:11–19.) All individuals whose case management was done by their home-health agency had to be transferred to case managers in "conflict free" agencies. (*Id.*) The home-health agencies were given approximately three years to complete the transitions. (*Id.* at 24:20–22.)

152.    An individual may have trouble accessing a home health agency if the agency lacks

staffing capacity or if the patient is medically complex. (Trial Tr., Sept. 14, 2016, p.m., at 56:8–

19; Trial Tr., Oct. 4, 2016, a.m., at 41:4–9.) Medical complexity might include a bariatric patient

whom a single aide would be unable to move around. (Trial Tr., Oct. 4, 2016, a.m., at 93:22–

94:1.) Sometimes home health agencies will not take on a patient who "has been assessed for 16

hours but the individual has only eligibility for eight hours," which could be the case if the

person has not yet applied for the EPD waiver. (*Id.* at 41:20–42:10.) Sometimes an individual

has not been assessed for the number of hours a social worker thinks the individual needs and

will then seek reconsideration from Delmarva. (*Id.* at 42:11–14.) An individual home health

care provider or agency can also decline to work with a patient for environmental reasons (the

condition of the living quarters) or for personality reasons. (*Id.* at 92:19–93:6.)

## CONCLUSIONS OF LAW[27]

This case presents the difficult legal issue of what a class of plaintiffs proceeding under

an *Olmstead* theory of liability must prove in order to demonstrate their entitlement to relief

under Rule 23. Under a traditional *Olmstead* case, the proof of a violation (*i.e.*, that a disabled

individual has been unjustly segregated) is that the individual is eligible for community-based

care, does not oppose receiving community-based care, and could reasonably be served in the

community. The resulting relief is narrow; for instance, a court could order the state to take

reasonable steps to serve that individual in the community.

By contrast, in a class action, the class can be defined to include only those individuals

who can be served in the community and prefer to receive community-based care (*i.e.*, those who

are already segregated). In this case, for instance, the class includes all physically disabled

individuals who have resided in nursing facilities for over 90 days, are eligible for community-

---

[27] Hereafter, citations to the Court's Findings of Fact are noted with the abbreviation "FF."

based care, prefer to receive long-term care in the community, and need the District's assistance to transition to the community. The resulting relief in an *Olmstead* class suit is far more wide-ranging than in an individual *Olmstead* action, for the Court can order systemic reforms. But Rule 23 imposes additional burdens on an *Olmstead* class to ensure that class-wide relief is appropriate, and that any class-wide relief that the Court orders would redress the common harm.

As explained more fully herein, the Court concludes that, under Rule 23, plaintiffs must prove more than generalized allegations of deficient transition services as measured by the lack of a significant number of transitions out of nursing facilities. Rather, plaintiffs must prove that the District maintains a policy or practice (*i.e.*, a concrete systemic deficiency) that has caused the class members to remain in nursing facilities despite their preference to receive long-term care in the community. The Court further concludes that plaintiffs have failed to carry their burden of proving the existence of a concrete systemic deficiency in the District's transition services. Given the barriers to transitioning—both systemic and individualized—that are outside the District's control, plaintiffs have also failed to prove that the class members' institutionalization is caused by systemic deficiencies in the District's transition services or that the harm can be redressed by a single injunction

## I. UNDER RULE 23, PLAINTIFFS MUST PROVE MORE THAN GENERALIZED ALLEGATIONS OF "DEFICIENT" TRANSITION SERVICES

Two aspects of Rule 23 are implicated in this case: Rule 23(a)(2), which demands a plaintiff class to demonstrate that "there are questions of law or fact common to the class," and Rule 23(b)(2), which provides that a class action "may be maintained" if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  The requirements of Rule 23(b)(2) for class-wide injunctive or declaratory relief also

implicate the requirement of commonality: the answers to the common questions identified at the

class-certification stage determine whether the District "acted or refused to act on grounds that

apply generally to the class," and whether "relief is appropriate respecting the class as a whole."

*See In re District of Columbia*, 792 F.3d at 101–02 (noting that the District's challenge in this

case under Rule 23(b)(2) was "the same as" its argument that the class lacked commonality

under Rule 23(a)(2)).

Under Rule 23(a)(2), a common question is one that "is "of such a nature that it is

capable of classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*,

564 U.S. at 350; *see id.* ("What matters to class certification . . . is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." (internal quotation marks

omitted)).  The common answers serve to bridge the "gap" between individual claims of harm

and the "existence of a class of persons who have suffered the same injury as that individual."

*Id.* at 352–53 (internal quotation marks omitted)).  "Without some glue holding the alleged

*reasons* for all those decisions together, it will be impossible to say that examination of all the

class members' claims for relief will produce a common answer to the crucial question *why was I

disfavored.*"  *Id.* at 352.

This Court found a number of common questions at the class-certification stage based on

plaintiffs' allegations:  "(1) are there deficiencies in the District's existing system of transition

assistance? (2) if so, what are those deficiencies? and (3) are the proven deficiencies causing

unnecessary segregation?"  *Thorpe II*, 303 F.R.D. at 146.  The Court expounded on those

questions, noting that

> [t]o prevail on the merits and obtain the relief they seek, plaintiffs will have to prove concrete systemic deficiencies. For example, does the District in fact "fail[ ] to offer sufficient discharge planning" or "fail[ ] to inform and provide [nursing facility residents] with meaningful choices of community-based long-term care alternatives to nursing facilities."

*Id.* at 146 n.58 (quoting 3d Am. Compl. ¶ 156).

As the D.C. Circuit has explained, under *Wal-Mart*, it is not enough for commonality to show that the defendant merely violated the law as to all class members. *DL I*, 713 F.3d at 128. Rather, commonality requires a "uniform policy or practice that affects all class members." *Id.* When a class is "defined by reference to a uniform policy or practice," it is "cast around common harm[s] susceptible to common proof and curable by a single injunction." *DL II*, 860 F.3d at 724 (citing *Wal-Mart*, 564 U.S. at 360).

According to the Circuit, had this Court identified only the most general questions of "deficiencies in the District's existing system of transition assistance," this Court's class certification decision might not have survived the District's petition for interlocutory review. *In re District of Columbia*, 792 F.3d at 100 ("Indeed, if the [generalized questions] were all the District Court had to say about commonality, we might well agree with the District that class certification was defective in view of *Wal–Mart* and *DL [I]*.). But, this Court's further identification in footnote 58 of common questions with reference to plaintiffs' allegations of specific transition services could, according to the Court of Appeals, "represent the sort of systemic failure that might constitute a policy or practice affecting all members of the class in the manner *Wal–Mart* requires for certification." *Id.* The Court of Appeals therefore held that it was not manifestly erroneous for this Court to find that plaintiffs "adequately alleged that the class has suffered a uniform deprivation, and that such deprivation could be remedied by a single

injunction." *Id.* at 101.

The Court of Appeals' decision makes clear that, in order to prove commonality, plaintiffs must prove a uniform deprivation (or a concrete systemic deficiency) at a higher level of specificity than a general claim that the provision of "transition services" to the class was deficient. *Id.* at 100–01. Plaintiffs also carry the burden of proving that their segregation "could be remedied by a single injunction," by showing that the concrete systemic deficiency caused the class members' continued institutionalization. *Id.* at 101. Absent the causal link between the deficiency and the segregation, the injunction would not be able to remedy the alleged harm. As the Supreme Court has counseled, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey,* 518 U.S. 343, 357 (1996).

At the time that this Court certified the class, it noted "serious questions as to whether plaintiffs can prevail on the merits and whether they are entitled to the far-ranging systemic relief they seek." *Thorpe II*, 303 F.R.D. at 137. In addition to proving the existence of the alleged concrete deficiencies in the District's transition services, plaintiffs would have to prove causation. The Court observed that

> many nursing facility residents, including named plaintiffs, lack readily affordable housing in the community, and it is agreed that the Court cannot order the District to provide housing. Plaintiffs may . . . be unable to establish causation—a causal link between any proven deficiencies in the District's system of transition assistance and the injury associated with being "stuck" in a nursing facility.

*Id.* In deciding plaintiffs' entitlement to class-wide relief, the Court would also "undoubtedly have to return to [the Supreme Court's] admonition that not only must the remedy be limited to a proven inadequacy, but the 'inadequacy [must be] widespread enough to justify systemwide relief.'" *Id.* at 143 (quoting *Lewis,* 518 U.S. at 359). In its review of the District's petition for

interlocutory appeal, the D.C. Circuit echoed these same sentiments, recognizing that its decision on the Rule 23(f) petition was in no way predictive of plaintiffs' chances of success in a subsequent appeal on the merits. *In re District of Columbia*, 792 F.3d at 101.

There is no question that plaintiffs have presented compelling evidence that many class members are stuck in nursing facilities and that the number of class members who have transitioned over the last five years is far from satisfactory. (FF ¶¶ 66–68.) However, the issue before the Court is whether the District's current transition services—not its past failures[28]— constitute a concrete deficiency, and second, whether the deficiency has caused class members to remain in nursing facilities.[29]

The Court sets forth its conclusions with respect to the specific deficiencies in transition services cited by plaintiffs in Part II. The Court's conclusions as to causation are set forth in Part III.

## II.     PLAINTIFFS HAVE FAILED TO PROVE THE EXISTENCE OF ANY CONCRETE, SYSTEMIC DEFICIENCY

As explained above, it is not enough to prove that the District's transition services are deficient by showing merely that there are numerous disabled individuals in nursing facilities who could receive their long-term care in the community and who want to receive their long-term care in the community. Rather, they must show that the District systematically—as a policy

---

[28] It is significant that the experiences of four of the current or former named plaintiffs who testified (Thorpe, Wilkerson, Carter, and Foreman) related to 2013 or earlier and that one former class member (Dupree) transitioned before 2013.

[29] Given the requirements of Rule 23(a)(2) and (b)(2), the Court need not decide if the causal link must be defined, as argued by plaintiffs, in terms of the deficiency being a substantial factor causing the class members' segregation. (*See* Pls.' Opp'n to Def.'s Mot. for J. as a Matter of Law at 5.) Rather, within the context of Rule 23, the issue is whether the class suffered a common harm that can be remedied by a single injunction. *See In re District of Columbia*, 792 F.3d at 101.

or practice—denies class members concrete aspects of a reasonable transition-assistance program.

While the Court indicated that plaintiffs' class status was appropriate to determine whether the District had "deficient transition services," it noted that, "[i]n the area of *Olmstead* litigation, 'transition assistance' has been defined in a concrete manner." *Thorpe II*, 303 F.R.D. at 148. The Court enumerated six "key components of an effective system of transition assistance for individuals in nursing facilities":

> (1) individual assessments upon admission and periodically thereafter for all residents to determine interest in community-based services; (2) provision of accurate information about available community-based services and eligibility requirements for those services; (3) discharge/transition planning that commences upon admission and includes a comprehensive written discharge/transition plans; (4) identification of what community-based services are needed and assistance in arranging for those services; (5) assistance in applying for and enrolling in available waivers or transition programs; and (6) identification of barriers to transition and assistance in overcoming those barriers to the extent possible (*e.g.,* if housing is a barrier, providing assistance in applying for supported housing).

*Id.* (citations omitted).[30]

### A.      Plaintiffs Have Not Proven that the District Fails to Disseminate Information Regarding Home and Community-Based Long-Term Care Options

---

[30] These specific components of a program of reasonable transition assistance align with plaintiffs' characterization of the District's failures in their complaint (*See* 4th Am. Compl. ¶ 105), the Joint Pretrial Statement (Joint Pretrial Statement at 10–11), and plaintiffs' Proposed Findings of Fact. (*See* Pls.' Proposed FF&CL, Part I.D–E.) They also include the two specific questions regarding the District's deficiencies that formed the basis of the D.C. Circuit's denial of the District's petition for interlocutory review. *See In re District of Columbia*, 792 F.3d at 100 (citing *Thorpe II*, 303 F.R.D. at 146 n.58).

Plaintiffs also alleged that the District failed to ensure sufficient capacity in its EPD Waiver program, which would be necessary to provide home and community-based long-term care for physically disabled Medicaid recipients. (*See* 4th Am. Compl. ¶ 105(iii).) However, given that there is no longer a waiting list for EPD Waiver enrollment and that there is sufficient capacity in the District's EPD Waiver, this is no longer an issue. (*See* FF ¶ 71.)

Plaintiffs have not shown that the District provided faulty or incomplete information or failed to provide information to class members about community-based long-term care services. To the contrary, the evidence at trial showed that the District is now providing information both directly to nursing-facility residents and to other stakeholders whom it leverages to disseminate that information. Those stakeholders include nursing-facility staff, the District's contractors who perform health assessments in nursing facilities, and community non-profits.

Nursing-facility residents are first informed of community-based options upon admission to a nursing facility. At the time of admission, residents are given the MDS Section Q survey, which asks whether they would like to speak to someone about receiving care in the community. (*See* FF ¶ 131.) If an individual responds to the MDS Section Q questionnaire that he or she would like information about community-based care, the nursing facility contacts the ADRC, and the CTT staff meets face-to-face with that individual to provide information about community-based care. (*Id.* ¶¶ 113, 115, 131.)

In addition, the CTT staff conducts monthly outreach sessions at each nursing facility in the District. (*Id.* ¶ 130.) Former named plaintiff Jacqualyn Thorpe reported attending one such meeting. (*See id.* ¶ 6.) The District also conducts more general outreach to nursing facilities and provides information about how to apply for and receive community-based services. (*Id.* ¶ 130.) The ADRC also maintains publications to inform nursing-facility residents seeking to transition and to educate groups that assist those nursing-facility residents to transition. (*See* Pls.' Ex. 706.)

The named plaintiffs, former named plaintiffs, and class members who testified experienced the ADRC's outreach or were otherwise put in contact with the District for assistance in receiving home and community-based long-term care. (*See, e.g.,* FF ¶ 6 (Thorpe

spoke to a social worker, attended meetings at her nursing facility, worked with an MFP transition coordinator); *id.* ¶ 9 (McDonald was in contact with nursing-facility social workers and District employees); *id.* ¶ 13 (Carter worked with the District through MFP); *id.* ¶ 23 (Tucker worked with the District through MFP); *id.* ¶ 28 (Brown was given information by a nursing-facility social worker and worked with the District through MFP); *id.* ¶ 34 (Foreman worked with the District through MFP).)

Given this evidence, the Court finds that plaintiffs have failed to prove that the District systematically fails to disseminate information on its home and community-based long-term care options.

**B.      Plaintiffs Have Not Proven that the District Fails to Identify Individuals in Nursing Facilities Who Would Prefer to Receive Long-Term Care in the Community**

The District identifies class members in a number of ways.  First, the District uses the results of the MDS Section Q questionnaire.  (*See id.* ¶ 131.)  Nursing-facility staff are required to administer the MDS at the time of admission and each year thereafter.  (*Id.*)  Without labeling it as "Section Q," named plaintiff Ivy Brown testified to being asked about her preference for community-based care when she entered the nursing facility in 2013 and at least two times thereafter.  (*See id.* ¶ 28 (Brown was asked her preference upon admission and one year later; she gave her preferences in December 2014 and January 2015).)

Section Q is designed to ensure that "all individuals have the opportunity to learn about home and community-based services and have an opportunity to receive long-term care in the least restrictive setting possible."  (Pls.' Ex. 643, at 2.)  Section Q specifically asks whether an individual in a nursing facility would like to speak to someone about receiving home and community-based long-term care.  (FF ¶ 131.)  If that person responds positively to Section Q, the nursing facility is required to notify the ADRC.  (*Id.*)  That notification acts as a referral for

that individual, and the CTT then assigns a staff member to that case who would initiate a face-to-face meeting with the individual.  (*See id.* ¶ 113.)

While there was some suggestion that nursing homes do not always administer the MDS as they should, the District does not have a policy or practice of not administering this CMS-mandated questionnaire or ignoring the data it receives from it.  As a federal requirement, the U.S. Department of Health and Human Services ("HHS")–not the District– ensures that nursing facilities are administering Section Q and making the necessary referrals.  (*See* Pls.' Ex. 643, at 1.)  HHS cited a District nursing facility based on its 2013 reporting for failing to properly administer Section Q and to make the proper referrals in all cases.  (*Id.*)  Even if the District relied exclusively on Section Q referrals from nursing facilities to identify individuals in need of transitions, evidence of a single nursing facility's failure to make all Section Q referrals would not constitute a systemic failure in the District's transition services.

DHCF has access to MDS data from the federal government, including the Section Q survey.  (Trial Tr., Nov. 8, 2016, p.m., at 43:9-19.)  Historically, the ADRC did not have access these data.  However, as of July 2016, upon request, the ADRC can view the MDS data, rather than relying on nursing facilities to report the outcome of the Section Q survey.  (Trial Tr., Sept. 16, 2016, a.m., at 65:23–66:1.)  As of the time of trial, the ADRC had not yet had occasion to do so.  (*Id.* at 66:10–14.)

There was no suggestion that the District ignores referrals or uses Section Q exclusively to identify individuals who would like assistance transitioning out of nursing facilities.  In addition to nursing-facility outreach, the ADRC accepts referrals from anyone who calls the office.  (Trial Tr., Oct. 5, 2016, a.m., at 19:9–21.)  When someone is referred to the ADRC through a phone call, the referral functions the same way as if it had come from nursing facility

staff: a member of the CTT is assigned to the case and performs a face-to-face visit to initiate discharge planning. (*See id.* at 22:21–23:9) The evidence showed that the ADRC receives a steady flow of referrals for individuals seeking transition assistance. (FF ¶ 113 (noting 55–128 referrals each two weeks, for a total of 978 referrals, from March 25–August 26, 2016).)

## C. Plaintiffs Have Not Proven that the District Fails to Provide Assistance with Enrollment in Home and Community-Based Long-Term Care or Other Public Benefits.

As of the close of trial, the District employed 11 transition coordinators (8 within the ADRC and 3 through MFP) and 8 MES staff members, who collectively make up the CTT. (*Id.* ¶ 82.) The record reflects that the District currently assists class members to obtain identification, complete applications, and arrange long-term care services. (*See id.* ¶¶ 83–84.) Those who are eligible for the MFP program (which includes all class members) receive additional case-management services and "wrap-around" transition services. (*Id.* ¶¶ 88, 91.) Through the CTT, the District provides assistance for those seeking housing through the ADRC's housing coordinator, the ADRC's contractor VCare, and the CTT transition coordinators. (*Id.* ¶ 105.)

The District acknowledged that staffing issues have caused delays in receiving transition services, (*id.* ¶ 115), but the record does not reveal any instances where staffing issues have systematically denied class members those transition services. In addition, plaintiffs make much of the ADRC's "inactive" list, touting it as an example of a practice that systematically denies transition services to certain class members. However, the record shows that the "inactive" designation is only used after the transition coordinator has determined that transition support at that time would be futile and the transition supervisor has approved that determination. (*Id.* ¶ 85.) Further, individuals on the "inactive" list are contacted by the ADRC every six months for the CTT to determine whether it could assist the individual in transitioning at that point. (*Id.*

¶ 86.)[31]

**D.    Plaintiffs Have Not Shown that the District Fails to Track Individual
Progress and Overall Programmatic Success.**

It is true that the District has not always kept meticulous data about individuals seeking to

transition to community-based long-term care.  In fact, CMS's Corrective Action Plan that is

currently in place was due in large part to the lack of data for years 2012–2014 for CMS to

evaluate the District's EPD Waiver program.  (*See, e.g.*, Pls.' Ex. 437, at 7.)  However, at

present, the ADRC tracks data on its EPD Waiver, both on an individual and programmatic

basis.  (*See* Def.'s Ex. 118 (ADRC referral timeline).)  CMS noted that "The District's 2015 data

and remediation that includes the new enrollment process indicates that the District has made

internal improvements on this process, but continued oversight and monitoring is required to

ensure continued improvement."  (Pls.' Ex. 437, at 7.)  On the basis of the evidence introduced at

trial, the Court concludes that plaintiffs have failed to carry their burden to prove that the District

systematically fails to track individuals who are seeking to transition to home and community-

based long-term care or fails to track its overall programmatic success.

On an individual level, each person who contacts or is referred to the ADRC for

transition assistance is recorded and assigned an MES.  (FF ¶ 113.)  Although there is no single

document that contains specific information about each individual's progress in transitioning, the

CTT keeps separate records about each individual on its caseload.  (Trial Tr., Oct. 7, 2016, p.m.,

at 78:23–80:4.)  Thus, for any individual working with the ADRC, the District could contact the

---

[31] Notably, as of the time of trial, the "vast majority" of class members on the inactive list were
there due to a lack of housing, with "only a handful" whose transitions were stymied by barriers
other than housing.  (Trial Tr., Oct. 7, 2016, p.m., at 53:24–54:12; Trial Tr., Nov. 8, 2016, a.m.,
at 85:16–86:6; *see* Trial Tr., Oct. 5, 2016, a.m., at 74:20–23 ("a majority" are "inactive" due to
housing problems).)

CTT and determine at what point in the transition process that individual is and identify potential barriers that individual is facing or where in the process the transition might have gotten delayed. The ADRC also keeps track of those individuals who are on the "inactive" list or who have reached an insurmountable barrier, so that the CTT can reach out to those individuals periodically and reassess their ability to transition to home and community-based long-term care. (*See* FF ¶ 85–86.)

The ADRC also keeps program-wide data on referrals and the time it took those referrals to go through each step of the process of enrolling in home and community-based long-term care. (*See* Def.'s Ex. 118.) The ADRC tracks its overall effectiveness and reports to DHCF the time it takes to complete the various steps of the EPD Waiver enrollment on a bi-weekly basis. (FF ¶ 112.) The reporting makes the process more transparent and demonstrates improvements in the ADRC's effectiveness in providing enrollment support over time. The MFP program keeps additional records, including the outcome of its housing voucher lotteries, the "wrap-around" transition services expenditures made for individuals in the MFP program, and its overall transitions. (*See, e.g.*, Pls.' Ex. 78; Pls.' Ex. 348; Pls.' Ex. 511; Pls.' Ex. 781.)

## III.    PLAINTIFFS HAVE FAILED TO PROVE THEIR INJURY WOULD BE REDRESSIBLE BY A SINGLE, CLASS-WIDE INJUNCTION

As shown above, plaintiffs have failed to prove a concrete, systemic deficiency. In addition, as explained herein, the Court concludes that there are both systemic and individualized barriers to transitioning that are beyond the control of the District, so a single injunction could not remedy plaintiffs' institutionalization. In other words, the evidence at trial made clear that "the unique totality of barriers to community transition for each individual class member makes grouping of the claims inappropriate." *See In re District of Columbia*, 792 F.3d at 102.

Individuals seeking home and community-based long-term care have four basic discharge

needs: housing, income, wrap-around services, and in-home supports. (Pls.' Ex. 447, at 2.)
While not having wrap-around services or in-home supports in place can delay a transition, a
lack of housing and income can prevent a transition altogether. (*Id.*) Class members face a
common barrier—a lack of available, accessible, and affordable housing. Class members also
face individualized issues relating to housing and other aspects of securing home and
community-based long-term care.

### A.  The Lack of Available, Affordable, and Accessible Housing

A lack of housing and a lack of income to secure housing are the most common barriers
to discharge from a nursing facility. (*See id.*) The trial witnesses who work in long-term care in
the District consistently labeled the lack of housing as a "primary" or significant barrier to
transitions for nursing facility residents. (*E.g.*, Trial Tr., Oct. 4, 2016, a.m., at 27:7–13 (Fisher);
Trial Tr., Nov. 9, 2016, p.m., at 80:1–6 (Schlosberg); *see e.g.*, Trial Tr., Sept. 14, 2016, p.m., at
70:2–7 (Sarigol); Trial Tr., Oct. 4, 2016, a.m., at 75:1–7 (Crawley); Trial Tr., Oct. 5, 2016, a.m.,
at 70:8–13, 70:18-22, 84:3–18, (Kasunic); Trial Tr., Oct. 7, 2016, p.m., at 7:10–20 (Newland).)
Plaintiffs' own expert agreed that "housing is one of the biggest obstacles" for class members.
(Trial Tr., Oct. 5, 2016, p.m., at 14:14–17; *see id.* at 16:21–24.) Many of the current and former
named plaintiffs and one class member testified that they did not have access to private housing
and that they needed access to public or subsidized housing. (*See* FF ¶ 5 (Thorpe); *id.* ¶ 8
(McDonald); *id.* ¶ 12 (Carter); *id.* ¶¶ 22, 25 (Tucker); *id.* ¶ 27 (Brown); *id.* ¶ 33 (Foreman); *id.* ¶
38 (Wilkerson).)

Plaintiffs' expert Roger Auerbach grounds his opinion that the District fails to provide
effective transition services on the faulty premise that there is affordable, accessible housing in
the District that is available to class members. (*See* Pls.' Ex. 884, ¶ 84.) This premise, as well as
his basic conclusion that deficiencies in the District's transition services are causing the class

members' continued institutionalization is flatly inconsistent with a November 2012 report that Mr. Auerbach co-authored. That report found that the biggest barrier hindering successful implementation of the MFP program was a lack of affordable housing in the District. (Trial Tr., Oct. 5, 2016, p.m., at, 26:20–28:1.) Indeed, the evidence at trial showed that, even though there are UFAS accessible units in the public-housing stock, class members who are not already on the DCHA waiting list cannot access those units.[32]

The state of affordable housing in the District is bleak. (*See* FF Part V.A.) More than 80% of individuals in nursing facilities who want to move to the community need some form of public assistance to secure housing. (*Id.* ¶ 133.) At present, and since April 2013, the DCHA waiting list for public and subsidized housing in the District is closed. (*Id.* ¶ 143.) Individuals seeking public assistance with housing cannot, at present, be added to the waiting list under any circumstances. (*Id.* ¶ 144 n.26.) The waiting list has over 40,000 names on it, and, for some categories, it will not need to be opened for over 20 years. (*Id.* ¶ 143.) Former named plaintiffs Roy Foreman and Curtis Wilkerson, who joined the DCHA waiting list before it was closed, waited seven and ten years respectively before reaching the top. (*Id.* ¶¶ 33, 38.) For class

---

[32] Mr. Auerbach's testimony about housing was not credible. Importantly, Mr. Auerbach misunderstands the DCHA waiting list and "selection pools." (*Compare* Pls.' Ex. 884, ¶ 87 *with* FF ¶¶ 143–49.) Mr. Auerbach reasons that "to accommodate everyone on the current waiting list for [UFAS] units, only about a quarter of the [691] units would need to become available." (Pls.' Ex. 884 ¶, 87.) However, that is because what Mr. Auerbach describes as the "waiting list for [UFAS] units" is actually what Mr. Bovelle explained to be a "selection pool" of 100 individuals whose eligibility for UFAS units has already been determined. (*See* FF ¶ 145.) DCHA has agreed to pre-screen 100 individuals for UFAS units, regardless of how soon it expects to house those individuals. (Trial Tr., Nov. 15, 2016, p.m., at 46:17–47:1.) Those 100 individuals do not represent the entire share of the 42,000 individuals on the waiting list who require a UFAS unit.

Moreover, Mr. Auerbach did not appear to understand that the DCHA waiting list has been closed since April 2013. (Trial Tr., Oct. 5, 2016, p.m., at 35:2–24.) Nor was he thoroughly familiar with the HUD study on the District's housing, admitted as plaintiffs' exhibit 469, when he formulated his opinion about available housing. (*Id.* at 29:1–8.)

members who did not add themselves to the DCHA waiting list before it closed in April 2013, the MFP voucher lottery is essentially the only viable avenue for securing subsidized housing. With only 65 MFP set-aside vouchers, there is nowhere near enough capacity to provide housing to all class members.

While plaintiffs cite the District's failure to utilize all MFP housing vouchers as evidence of its deficient transition services, the Court concludes that this fact speaks to the difficulty of finding housing, even when an individual has a housing-choice voucher. In addition to lamenting the failure to utilize all MFP vouchers, plaintiffs complain that the District takes vouchers away from lottery winners who are unable to find housing. (*See id.* ¶ 107.) Unlike some states, the District does not "target people based on how they believe they will be successful in community transitions," by, for instance, eliminating all individuals over 80 from consideration. (Trial Tr., Nov. 9, 2016, p.m., at 81:7–13.) The District struck a balance between the efficient use of the housing vouchers, fairness to the individual who has a voucher set aside for his or her use, and fairness to those individuals who have not yet had an opportunity to obtain a housing voucher. (*See* FF ¶ 108.) As many, if not the majority, of class members, including those who testified at trial, require wheelchair-accessible units, finding appropriate housing is even more difficult for this population. (*See id.* ¶ 133.) And as discussed below, some class members face additional, individualized barriers to using housing-choice vouchers because of their credit history or criminal background.

It is true that some class members have transitioned from nursing facilities to public or subsidized housing. (*See* Pls.' Ex. 884, ¶ 84.) However, that does not mean, as plaintiffs' expert contends, that "[t]he District's programs do not have the infrastructure to help individuals identify and then move to <u>existing and available</u> housing options." (*See id.* at 26.) Rather, it

means that those individuals joined the DCHA waiting list before it closed or were among the few who were selected for an MFP voucher and were able to find suitable housing. Compared to those class members who moved to private housing, class members moving to public or subsidized housing spend considerably longer in nursing facilities. (*See* FOF ¶ 68 (in years 2012–2016, it took class members an average of 410, 240, 414, 320, and 640 days to move to private housing versus an average of 1,193, 1,087, 1,083, 909, and 1,115 days to move to public/subsidized housing).) The time it takes for class members to transition to private housing, as compared to those without private housing, is further proof that finding a place to live in the community is often an insurmountable barrier for those who need public or subsidized housing.

Also, the Court cannot agree with plaintiffs' argument that the District has failed to assist class members in obtaining housing. MFP helps class members to fill out forms necessary for housing and other benefits. (FF ¶ 105.)[33] MFP has hired a contractor (VCare) to locate landlords who accept vouchers. (*Id.* ¶ 106.) The ADRC employs a housing coordinator to assist the CTT to find housing, while the ADRC transition coordinators help individuals apply for income benefits. (*Id.*)

## B. Individualized Issues Prevent Class Members from Accessing Housing

Even when a class member has a housing option in the community or has access to a housing voucher, individualized issues can prevent a successful transition. For instance, when a class member's existing private housing is not wheelchair accessible and modifications are prohibitively expensive, he or she will not be able to transition. That was the case for named

---

[33] Even in 2014, this Court noted that the provision of transition services for completing applications of public and subsidized housing did not appear to be an issue, since "10 out of the 11 named plaintiffs ha[d] successfully applied for subsidized housing." *Thorpe II*, 303 F.R.D. at 148 n.61.

plaintiff Ivy Brown. (*See id.* ¶ 27.)

Also, when a class member has access to a housing voucher, he or she may not be able to use it for a number of reasons. First, there is a dearth of wheelchair-accessible housing in the District overall, and many private units accepting vouchers may not be accessible. (*See, e.g.*, *id.* ¶ 139.)

Second, an individual's personal history might prevent a landlord from renting to him or her if, for instance, that person has a poor credit history or a criminal record. Although only certain infractions will disqualify someone from receiving a housing-choice voucher, landlords can reject an applicant for their criminal history, even if it would not otherwise categorically disqualify the applicant. (Trial Tr., Sept. 16, 2016, a.m., at 47:20-48:7; *see* Trial Tr., Nov. 15, 2016, p.m., at 43:10-14.) The District cannot force a landlord to rent to any particular voucher applicant. (Trial Tr., Oct. 5, 2016, a.m., at 77:17–21.)

Lastly, an individual will not be eligible for any public or subsidized housing program if he or she owes a debt to the federal government for a housing program. (Trial Tr., Nov. 15, 2016, p.m., at 43:15–18.) Thus, an MFP lottery winner would not be able to qualify to use the voucher if he or she has such an outstanding debt.

### C. Other Individualized Issues Can Delay Transitions

An individual's transition may be delayed for various other individualized reasons unrelated to housing. (*See* FF ¶¶ 150–53.) Indeed, the process of securing home and community-based long-term care once an individual has resided in a nursing facility for over 90 days is bureaucratic and complex. But, plaintiffs have shown only case-specific, individualized issues, not system-wide deficiencies.

If an individual does not have services in place, the transition may be delayed. While the parties agree that there is no lack of providers of PCA services in the District, disagreements

between Delmarva and class members or their guardians over the number of PCA hours authorized cause delays.  Further, it may take time to find a home-health agency to staff the number of hours that Delmarva authorizes.  Finding appropriate staffing may also be hampered by the medical complexity of individual's needs.  (*Id.* ¶ 153.)  Nevertheless, an individual cannot responsibly be discharged until the needed services are in place.

### D.    A Single Injunction Could Not Remedy Plaintiffs' Institutionalization

Because of the lack of available, affordable, and accessible housing; the individualized issues that prevent class members from accessing housing even when it is available; and other individualized issues that can derail transitions, the Court concludes that it cannot remedy plaintiffs' institutionalization through a single injunction.

Class members who have private housing in the community are on substantially different footing than class members who must rely on public or subsidized housing, as is evidenced by the grossly disproportionate times the two groups of class members spend in nursing facilities before they are able to transition.  (*See id.* ¶ 68.)  However, because of the lack of affordable housing in the District, the Court cannot order relief that would facilitate quicker transitions for those who need public or subsidized housing.  In addition, each class member, regardless of his or her access to housing, faces a myriad of individualized barriers that must be addressed on a case-by-case basis in order to ensure a responsible transition to community care.

Given the "the unique totality of barriers to community transition for each individual class member," a single injunction that would result in the class members being transitioned to community-based long-term care cannot be crafted.  *See In re District of Columbia*, 792 F.3d at 102.  Thus, "grouping of the claims [is] inappropriate."  *See id.*  Instead of issuing "a single declaration or injunction aimed at correcting a systemic discriminatory imbalance," the Court would be forced to impose "mini-injunctions for each class member," and/or groups of class

members, in violation of Rule 23(b)(2).  *See Thorpe II*, 303 F.R.D. at 152 (quoting *Kenneth R. ex rel. Tri-Cty. CAP, Inc.*, 293 F.R.D. 254, 271 (D.N.H. 2013)).

## CONCLUSION

The District has little to be proud of regarding its historic inability to comply with *Olmstead*'s integration mandate.  However, plaintiffs have failed to demonstrate the existence of a concrete, systemic failure that entitles them to class-wide relief.  Mindful that "the remedy must be limited to a proven inadequacy, [and that] the 'inadequacy [must be] widespread enough to justify systemwide relief,'" the Court concludes that plaintiffs have failed to carry their burden to prove that class-wide relief is appropriate under Rule 23(b)(2).  *See id.* at 143 (quoting *Lewis*, 518 U.S. at 359).

As the Court has concluded that plaintiffs have failed to meet their burden under Rule 23, it will dismiss plaintiffs' class-wide claims.  Because plaintiffs do not seek individual relief, judgment will be entered for the District.  A separate Order (ECF No. 256) accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 13, 2017