**Plaintiffs' Exhibit 5**

Civ. No. 10-2250 (ESH)

U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

FEB 12 2014

**FILED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Amanda D., et al., and others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Margaret W. Hassan, Governor, et al., ) | |
| ) | |
| Defendants. ) | Civ. No. 1:12-cv-53-SM |
| ──────────────────────── ) | |
| United States of America, ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| State of New Hampshire, ) | |
| ) | |
| Defendant. ) | |

## CLASS ACTION SETTLEMENT AGREEMENT

### I.    Background and Introduction

A.    This case involves the services, programs, and activities offered to thousands of persons with serious mental illness ("SMI") in the State of New Hampshire's mental health system. The State's mental health system includes the New Hampshire Hospital ("NHH") in Concord, NH, the Glencliff Home ("Glencliff") in Benton, NH, and services, programs, and activities at other sites, including but not limited to those offered by the community mental health programs and providers across the state.

B.    In 2010 and 2011, the United States investigated the State of New Hampshire's mental health system to assess compliance with Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and its implementing regulations, 28 C.F.R. pt. 35, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 794 *et seq.*

C.    On April 7, 2011, the United States issued its findings and conclusions in a letter sent to the State of New Hampshire.

D.   The New Hampshire Disabilities Rights Center, Inc. ("DRC") had earlier conducted an investigation of the State's mental health system and sent its own findings letter to the State on November 2, 2010.

E.   On February 9, 2012, six individuals filed a class action Complaint on behalf of themselves and others similarly situated (collectively, "Plaintiffs"), in the United States District Court for the District of New Hampshire, alleging New Hampshire's administration of its mental health system violates the rights of individuals with SMI under the ADA, 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.* In addition, the Plaintiffs alleged that the State and the other Defendant officials (collectively "the State" or "Defendants") have failed to comply with the requirements of the Nursing Home Reform Act ("NHRA"), 42 U.S.C. §§ 1396r *et seq.*

F.   On March 27, 2012, the United States moved to intervene in the matter as Plaintiff-Intervenor, and on April 4, 2012, the Court granted its motion to intervene.

G.   The State denies all violations alleged by the Plaintiffs and the United States. By entering into this Settlement Agreement, the State does not admit to the truth or validity of any claim or allegation made against it by Plaintiffs or the United States. Nothing in this Settlement Agreement shall be construed as an acknowledgement, an admission, or evidence of liability of the State under the ADA, the Rehabilitation Act, or the NHRA, or any federal or state law. This Settlement Agreement may not be used as evidence of Defendants' liability in any civil or criminal proceeding, except proceedings to enforce or implement this Settlement Agreement.

H.   On September 17, 2013, the United States District Court certified a class comprised of:

> All persons with serious mental illness who are unnecessarily institutionalized in New Hampshire Hospital or Glencliff or who are at serious risk of unnecessary institutionalization in these facilities.

> At risk of institutionalization means persons who, within a two year period: (1) had multiple hospitalizations; (2) used crisis or emergency room services for psychiatric reasons; (3) had criminal justice involvement as a result of their mental illness; or (4) were unable to access needed community services.

I.   The Joint Motion referenced in Section III will request that the certified class include all claims brought pursuant to the ADA, the Rehabilitation Act, and the NHRA.

J.   In order to resolve ongoing issues between the Parties without the expense, risks, delays, and uncertainties of litigation, the Parties, have agreed to settle this matter on the terms and conditions set forth below in this Settlement Agreement. The purpose of this Settlement Agreement is to make a full and final compromise and settlement of any and all claims or allegations of the Plaintiffs and the United States set forth in the instant lawsuit.

## II.    Definitions

A.    "Community mental health program or provider" or "CMHP" means an entity or its subcontractor that provides community mental health services to any individual with SMI in New Hampshire, pursuant to a contract with the State.

B.    "Persons with serious mental illness" means individuals 18 years of age or older whom the State defines as having either severe mental illness or severe and persistent mental illness ("SPMI") pursuant to N.H. Code Admin. R. He-M 401, and those whom the State defines as "severely mentally disabled" pursuant to N.H. Rev. Stat. Ann. 135-C:2, XV.

## III.    Legal Foundation

A.    The Parties agree to file this Settlement Agreement with the United States District Court for the District of New Hampshire along with a joint motion (the "Joint Motion") requesting that the Court enter the Settlement Agreement as an order of the Court. The Joint Motion will also request that the Court retain jurisdiction to enforce the Settlement Agreement, in accordance with Section X. The Parties will cooperate in drafting the Joint Motion and agree to provide their best efforts to support the Joint Motion at any hearing or argument.

B.    The Parties acknowledge that the Court has jurisdiction over this case and authority to enter this Settlement Agreement and to enforce its terms in accordance with Section X.

C.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 42 U.S.C. §§ 12131-12132.

D.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

E.    This Settlement Agreement constitutes the entire, exclusive, integrated agreement of the Parties. It supersedes any previous understandings and agreements between the Parties concerning the subject matter of the instant lawsuit other than the Parties' Joint Stipulation Regarding Discovery and the Court-ordered Protective Order (Doc. 55).

F.    The Parties represent and acknowledge that this Settlement Agreement is the result of extensive, thorough, and good faith negotiations. The Parties represent and acknowledge that the terms of this Settlement Agreement have been voluntarily accepted, after consultation with counsel.

G.    Once entered by the Court, this Settlement Agreement is legally binding upon and judicially enforceable by the Parties, and it shall be applicable to and binding upon all of the Parties, including their officers, employees, successors, assigns, and agents, as well as the guardians of the class members (and their representatives, estates, next of kin, administrators, executors, and any other individual that has the authority to bring a claim or suit on their behalf regarding the claims and allegations raised in this lawsuit). Notwithstanding the foregoing, and any suggestion to the contrary, if any, in this Settlement Agreement, Defendants do not and cannot bind the New Hampshire General Court, which has the authority under the New

Hampshire Constitution and New Hampshire statutes to appropriate funds for the State's mental health system and to pass laws concerning the State's mental health system. Should the New Hampshire General Court enact laws or direct appropriations that limit the State's performance of any of its obligations under this Settlement Agreement, the provisions of Section X.F. shall apply.

H.      Should the Court deny the Joint Motion, the Parties agree to work cooperatively and in good faith to modify any terms of this Settlement Agreement the Court may find objectionable and resubmit a Joint Motion and revised Settlement Agreement. If the Parties are unable to reach agreement on the issues raised by the Court through negotiation, the Parties agree to enter into mediation upon the request of any Party. If, after mediation, a modified Settlement Agreement is not reached and/or the Parties are unable to obtain the approval of the Settlement Agreement by the Court, this and any modified Settlement Agreement shall become null and void and the litigation shall proceed. This provision of the Settlement Agreement is binding and effective immediately upon all Parties signing this Agreement.

## IV.     Intent of the Parties

A.      The Parties are committed to compliance with the ADA, 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, the NHRA, 42 U.S.C. §§ 1396r *et seq.,* and related laws.

B.      According to the United States Department of Justice's regulations, 28 C.F.R. § 35.130(d) in particular, the ADA requires, among other provisions, that, to the extent the State offers services, programs, and activities to qualified individuals with disabilities, such services, programs, and activities will be provided in the most integrated setting appropriate to meet their needs.

C.      The Parties recognize and support the purposes of the ADA to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities. 42 U.S.C. § 12101(a)(7).

D.      The general observations and statements of intent in this Section IV are made without prejudice to the right of any Party to assert either their support for or alternative interpretations of the relevant laws in the event the Settlement Agreement is vacated and/or this matter is reinstated on the Court's trial docket. The Parties also reserve their right to offer alternative interpretations of the relevant laws in any other matter, and none of the statements in this Section IV may be used as evidence in any other matter.

## V.      Substantive Provisions

A.      In order to comply with this Settlement Agreement, the State shall develop and implement the services set forth below in this Settlement Agreement. The services may be provided directly by the State or through contracts with CMHPs.

B.    <u>Target Population</u>

1.   The Target Population for the community services described in this Agreement is the subset of adults within the State who have SMI, and who are institutionalized or at serious risk of institutionalization at NHH or Glencliff (collectively, hereinafter "individuals"). SMI, as used herein, includes individuals whom the State defines as having either SMI or SPMI pursuant to N.H. Code Admin. R. He-M 401, and those whom the State defines as "severely mentally disabled" pursuant to N.H. Rev. Stat. Ann. 135-C:2, XV.

2.   The first priority for receipt of services and supports will be given to individuals who reside at NHH or Glencliff.

3.   The second priority for receipt of services and supports will be given to the following individuals within the target population due to their serious risk of institutionalization:

    (a)    individuals who have been admitted two or more times to NHH within the last two years;

    (b)    individuals who have used crisis or emergency services for psychiatric reasons within the last two years;

    (c)    individuals who have had criminal justice involvement as a result of their mental illness in the last two years;

    (d)    individuals who were unable to access needed community services within the last two years; and

    (e)    individuals who reside at the Transitional Housing Services programs ("THS") or who have resided at THS within the last two years.

4.   The State will allocate services and supports under this Agreement consistent with these priorities.

C.    <u>Crisis Service System</u>

1.   The State will develop a crisis system that:

    (a)    is available 24 hours per day, seven days per week;

    (b)    provides timely and accessible services and supports to individuals with mental illness (including those with co-occurring substance abuse disorders) who are experiencing a mental health crisis;

(c)      stabilizes individuals as quickly as practicable and assists them in returning to their pre-crisis level of functioning;

(d)      provides interventions to avoid unnecessary hospitalization, incarceration, and/or Designated Receiving Facility, Acute Psychiatric Residential Treatment Program, emergency room, or nursing home admission;

(e)      provides services and supports at the site of the crisis, including at the individual's residence; and

(f)      promptly assesses individual needs, identifies the services and supports that are necessary to meet those needs, and connects the individual to those services and supports in a timely manner.

2.  Crisis System Components

   (a)    *Mobile Crisis Teams*

   i.    The State will develop and implement measures to ensure that mobile crisis teams:

      a.  are available 24 hours per day, seven days per week;

      b.  are composed of clinicians trained to provide behavioral health emergency services and crisis intervention services, and also include at least one peer specialist and one on-call psychiatrist;

      c.  are able to respond to individuals 24 hours per day, seven days per week onsite in their homes and in other natural environments and community settings where crises arise, including in crisis apartments described more fully below;

      d.  are able to offer services and supports via telephone and, whenever necessary, consistent with legitimate safety concerns, meet face-to-face to de-escalate crises without removing the individuals from their homes and/or community programs;

      e.  are able to provide services and supports until the crisis subsides, up to seven days following the onset of the crisis;

      f.  may provide, in their discretion, services and supports to individuals beyond the immediate crisis; and

      g.  are able to work with law enforcement personnel to respond to individuals in mental health crisis who come into contact with law enforcement.

ii.     For individuals served by an Assertive Community Treatment ("ACT") team, described more fully below, the ACT team shall serve as their mobile crisis team.

iii.    The State's network will have three mobile crisis teams that are able to respond onsite to any individual crisis within one hour from the time of contact within three Mental Health Regions, including Region 4 (Concord), Region 7 (Manchester), and Region 6 (Nashua). In all other regions, the State shall, at a minimum, maintain its current crisis system, including existing crisis beds or implement mobile crisis teams.

iv.     By the time each mobile crisis team becomes operational consistent with the requirements of this section and the implementation timelines in section V.C.3 below, each team will have available to it at least four community crisis apartment beds, with no more than two beds per crisis apartment.

*(b)     Community Crisis Apartments*

i.      Consistent with its Ten-Year Plan, the State will develop and implement the measures set forth below to expand short-term community crisis beds and to involve peers in providing crisis services and supports. These measures are in addition to crisis apartments that already have been established, which will be maintained by the State.

ii.     As an alternative to hospitalization and/or institutionalization, the State will expand its community network of crisis apartments in the regions served by the mobile crisis teams described above, where individuals can stay for a limited time to receive crisis services and interventions in the community before returning home. In all other regions, the State shall, at a minimum, maintain its current crisis system, including existing crisis beds, or implement mobile crisis teams.

iii.    Crisis apartments will be operated with sufficient clinical support and oversight, and peer staffing, as is reasonably necessary to prevent unnecessary institutionalization. Each crisis apartment will have peer staff and clinical staff available to be onsite, 24 hours per day, seven days per week, whenever necessary, to meet individualized needs.

iv.     Individual stays at a crisis apartment will be limited to seven days.

v.      The crisis apartments will have sufficient dedicated staff capacity to meet the needs of the individuals served at each apartment.

vi.     Each crisis apartment will provide transportation for individuals from the site of the crisis to the apartment, and to their home or other residential setting after stabilization has occurred.

3.  Implementation of Crisis Service System

 (a) By June 30, 2015, the State will add mobile crisis capacity and crisis apartments in Mental Health Region 4 (Concord) that meet the standards set forth above in Section V.C.2.

 (b) By June 30, 2016, the State will add mobile crisis capacity and crisis apartments in Mental Health Region 7 (Manchester) that meet the standards set forth above in Section V.C.2.

 (c) By June 30, 2017, the State will add mobile crisis capacity and crisis apartments in Mental Health Region 6 (Nashua) that meet the standards set forth above in Section V.C.2.

 (d) The State shall maintain its current crisis services, or implement mobile crisis teams, in all other regions.

D. <u>Assertive Community Treatment ("ACT")</u>

1.  Consistent with its Ten-Year Plan, the State will develop and implement the measures set forth below to expand ACT.

2.  ACT Team Components

The State will develop and implement measures to ensure that ACT teams:

 (a) are available 24 hours per day, seven days per week, with on-call availability from midnight to 8:00am, consistent with Section V.D.2(b);

 (b) are able to deliver comprehensive, individualized, and flexible services, supports, treatment, and rehabilitation to people 24 hours per day, seven days per week in a timely manner as needed, onsite in their homes and in other natural environments and community settings, or alternatively, via telephone where appropriate to meet the needs of the individual;

 (c) offer services, supports, treatment, and rehabilitation that are customized to an individual's needs and vary over time as needs change; these may include case management, initial and ongoing assessments, psychiatric services, assistance with employment and housing, family support and education, substance abuse services, crisis services, and other services, supports, treatment, and rehabilitation critical to allow the individual a reasonable opportunity to live independently in the community;

 (d) are composed of a multi-disciplinary group of between 7 and 10 professionals, including, at a minimum, a psychiatrist, a nurse, a Masters-level clinician (or functional equivalent therapist), functional support worker, and a

peer specialist; the teams also will have members who have been trained and are competent to provide substance abuse support services, housing assistance, and supported employment; to accommodate geographic concerns in Regions 1, 2, and 5, teams may employ up to 12 members per ACT Team;

(e)     ordinarily serve no more than 10 people per ACT team member (excluding the psychiatrist); if circumstances unique to New Hampshire require a team to serve more than 12 people per ACT team member, the State will create an additional ACT team to meet the need for services within six months, provided the team in question is, at that time, still serving more than 12 people per ACT team member; no more than 70 people will be served per 0.5 FTE psychiatrist;

(f)     consistent with legitimate safety concerns, are able to offer services, supports, treatment, and rehabilitation face-to-face in a timely manner to de-escalate crises, until the crises subside, without removing the individuals from their homes and/or community programs; and

(g)     are able to work with law enforcement personnel to respond to people in mental health crisis who come into contact with law enforcement.

3.  Implementation of Assertive Community Treatment

(a)     By October 1, 2014, the State will ensure that all of its 11 existing adult ACT teams operate in accordance with the standards set forth above in Section V.D.2.

(b)     By June 30, 2014, the State will ensure that each mental health region has at least one adult ACT team.

(c)     By June 30, 2015, the State will provide ACT team services consistent with the standards set forth above in Section V.D.2, with the capacity to serve at least 1,300 individuals in the Target Population at any given time.

(d)     By June 30, 2016, the State will provide ACT team services consistent with the standards set forth above in Section V.D.2, for an additional 200 people, with the capacity to serve at least 1,500 individuals in the Target Population at any given time.

(e)     By June 30, 2017, the State, through its community mental health providers, will identify and maintain a list of all individuals admitted to, or at serious risk of being admitted to, NHH and/or Glencliff for whom ACT services are needed but unavailable, specifying the Mental Health Region in which the individuals reside, and, to the extent it has not already done so, develop effective regional and statewide plans for providing sufficient ACT services to ensure reasonable access by eligible individuals in the future.

E.    Housing

1.  Supported Housing

Consistent with its Ten-Year Plan, the State will develop and implement the measures below to ensure that supported housing meets individuals' needs:

(a)    supported housing will be permanent housing with tenancy rights, where obtaining tenancy rights is not conditioned on individuals' participation in treatment or compliance with mandatory programmatic criteria; supported housing includes support services to enable individuals to attain and maintain integrated affordable housing, and includes support services that are flexible and available as needed and desired;

(b)    all new supported housing created pursuant to this Settlement Agreement will be scattered-site supported housing, with no more than two units or 10 percent of the units in a multi-unit building with 10 or more units, whichever is greater, and no more than two units in any building with fewer than 10 units known by the State to be occupied by individuals in the Target Population;

(c)    all new supported housing created pursuant to this Settlement Agreement will be single occupancy or single family housing unless the individual prefers to live with a roommate; if the individual chooses to live with a roommate, there will be a private bedroom for each person; the individual will be able to select his or her roommate;

(d)    "supported housing," as used in this Settlement Agreement, includes housing supported by subsidies from any source, including State-funded rental subsidies through the State's Bridge Subsidy Program or funding from the U.S. Department of Housing and Urban Development ("HUD"), coupled with other ongoing mental health and tenancy support services provided by ACT, case management, and/or a housing specialist.

2.  Community Residences

(a)    Notwithstanding the provisions regarding supported housing set forth above, the State may prospectively transition individuals with mental illness and complex health care needs, who could not be cost-effectively served in supported housing, into a community setting serving up to four persons with complex health care needs where the community home provides or coordinates the delivery of needed health care services, supports, and treatments. Such community settings may include enhanced family care, supported roommate, or non-congregate community residences. Consistent with the provisions of subparagraph V.E.2(b) below, the cost of these community settings shall not exceed an annual budget of

10

$100,000 per person or $400,000 per community setting.[1] This paragraph does not require the State to remove individuals currently in community residences that house more than four persons. Utilizing the resources and expertise within the State Bureau of Elderly and Adult Services and/or any other appropriate agency, the State will develop and implement, consistent with the individual's or guardian's desires, individual transition plans, as set forth in this Settlement Agreement, for any individual placed in a community setting.

(b)     The implementation of community residences for medically complex individuals described in subparagraph V.E.2(a) above and Sections V.E.3(g) – (j) below, may be accomplished through openings in or expansion of existing community service capacity or by a vendor selected after issuing a Request for Proposals ("RFP") in 2014. The service provider or RFP vendor shall have a budget cap of $100,000 per person served or $400,000 per community setting. If existing programs or acceptable vendors are not located through the 2014 RFP process, the State will, subject to the budget cap, continue its efforts to transition medically complex individuals to community settings through openings in or expansion of existing programs and will issue a second RFP in 2015. If, after the completion of the second RFP process, the State remains unable to develop the capacity to serve at least four individuals with SMI and complex health care needs by January 1, 2016, the State shall reallocate the General Fund share of the funding described above to fund additional supported housing, supported employment, mobile crisis, and/or ACT. The reallocation of funds shall be the General Fund amount of $50,000 for each of the 16 community settings described in Sections V.E.3(g)-(i) below, or the prorated share thereof, if some, but not all, of the community capacity is developed or utilized.

3.  Implementation of Housing

(a)     By June 30, 2014, the State will have 240 supported housing units that meet the standards set forth above in Section V.E.1.

(b)     By December 31, 2014, the State will create an additional 50 supported housing units that meet the standards set forth above in Section V.E.1, for a total of 290 supported housing units.

(c)     By June 30, 2015, the State will create an additional 50 supported housing units that meet the standards set forth above in Section V.E.1, for a total of 340 supported housing units.

(d)     By June 30, 2016, the State will create an additional 110 supported housing units that meet the standards set forth above in Section V.E.1, for a total of 450 supported housing units.

---

[1] "Community setting" costs do not include routine medical, mental health, or waiver services provided under the State Medicaid program.

11

(e)     By June 30, 2017, the State will make all reasonable efforts to apply for and obtain HUD funding for an additional 150 supported housing units for a total of 600 supported housing units.

(f)     By January 1, 2017, the State will identify and maintain a waitlist of all individuals within the Target Population requiring supported housing services, and whenever there are 25 individuals on the waitlist, each of whom has been on the waitlist for more than two months, the State will add program capacity on an ongoing basis sufficient to ensure that no individual waits longer than six months for supported housing.

(g)     By June 30, 2015, the State will have the capacity to serve in the community four individuals with mental illness and complex health care needs residing at Glencliff who cannot be cost-effectively served in supported housing, consistent with the provisions set forth above in Section V.E.2.

(h)     By June 30, 2016, the State will have the capacity to serve in the community six additional individuals with mental illness and complex health care needs residing at Glencliff who cannot be cost-effectively served in supported housing, consistent with the provisions set forth above in Section V.E.2.

(i)     By June 30, 2017, the State will have the capacity to serve in the community six additional individuals with mental illness and complex health care needs residing at Glencliff who cannot be cost-effectively served in supported housing consistent with the provisions set forth above in Section V.E.2.

(j)     By June 30, 2017, the State will identify and maintain a list of all individuals with mental illness and complex health care needs residing at Glencliff who cannot be cost-effectively served in supported housing and, to the extent it has not done so already, develop an effective plan for providing sufficient community-based residential supports for such individuals in the future.

F.    Supported Employment

1. The State will, through its community mental health providers, deliver supported employment services in accordance with the Dartmouth evidence-based model. Supported employment services include providing individualized assistance in identifying, obtaining, and maintaining integrated, paid, competitive employment. Consistent with the Dartmouth model, supported employment services should be provided in the amount, duration and intensity to allow the opportunity for individuals to work the maximum number of hours in integrated community settings consistent with their individual treatment plans. Services offered should include job development, job finding, job carving, job customization, co-worker and peer supports, self-employment supports, re-employment supports, time management training, benefits counseling, job coaching, transportation, workplace

12

accommodations, assistive technology assistance, specialized on-the-job training, and, if not already provided, individually-tailored case management and supervision.

2. Implementation of Supported Employment

    (a)    By October 1, 2014, all individuals receiving ACT services will have access to supported employment services from employment specialists on their ACT teams.

    (b)    By June 30, 2014, the State will increase its penetration rate of individuals with SMI receiving supported employment services by two percent over the 2012 penetration rate of 12.1 percent reported to the Substance Abuse and Mental Health Services Administration (SAMHSA), to 14.1 percent of eligible individuals with SMI.

    (c)    By June 30, 2015, the State will increase its penetration rate of individuals with SMI receiving supported employment services by an additional two percent, to 16.1 percent of eligible individuals with SMI.

    (d)    By June 30, 2016, the State will increase its penetration rate of individuals with SMI receiving supported employment services by an additional two percent, to 18.1 percent of eligible individuals with SMI.

    (e)    By June 30, 2017, the State will increase its penetration rate of individuals with SMI receiving supported employment services by an additional 0.5 percent, to 18.6 percent of eligible individuals with SMI.

    (f)    By June 30, 2017, the State will identify and maintain a list of individuals with SMI who would benefit from supported employment services, but for whom supported employment services are unavailable, and, to the extent it has not already done so, develop an effective plan for providing sufficient supported employment services to ensure reasonable access to eligible individuals in the future.

G.    <u>Family and Peer Supports</u>

1. The State will have an effective family support program to meet the needs of families of individuals throughout the State. The family support program will teach families skills and strategies for better supporting their family members' treatment and recovery in the community. The family support program will include training on identifying a crisis and connecting individuals in crisis to services and supports, as well as education about mental illness and available ongoing community-based services and supports. Family supports can be provided in individual and group settings.

2. The State will have an effective peer support program to help individuals develop skills in managing and coping with symptoms of illness, in self-advocacy, and in identifying and using natural supports. The peer support program will train peers who have personal experience with mental illness and recovery to deliver the peer services and supports. Peer supports can be provided in individual and group settings, in person, or by phone.

3. Implementation of Family and Peer Supports

   (a)     By June 30, 2014, the State will maintain family support services statewide consistent with the provisions set forth in Section V.G.1. Notwithstanding anything to the contrary in this Agreement, the State's current contract with its vendor for the provision of family support services (or a substantially similar agreement with another entity offering similar services) satisfies the requirements of this subsection.

   (b)     By June 30, 2014, the State will have a system of peer support services, which are offered through peer support centers, open a minimum of eight hours per day, five-and-a-half days per week, or the hourly equivalent thereof, in each Mental Health Region in the State, consistent with the provisions set forth above in Section V.G.2.

## VI.    Transition Process

A.    Transition Planning and Transition Plans for People in Facilities

1. The State, through its community mental health providers and/or other relevant community providers, will provide each individual in NHH and Glencliff with effective transition planning and a written transition plan as set forth below. The written transition plan may be incorporated into the individual's discharge summary and paperwork from NHH or Glencliff.

2. Transition planning will:

   (a)     begin with the presumption that with sufficient services and supports, individuals can live in an integrated community setting;

   (b)     be developed and implemented through a person-centered planning process in which the individual has a primary role and is based on the principle of self-determination;

   (c)     include persons who have the linguistic and cultural competence to serve the individuals;

   (d)     be based on each individual's needs and not on the availability, perceived or actual, of current community resources and capacity; and

14

(e)     not exclude any individual from consideration for community living based solely on his or her level of disability.

3.   The transition planning process will result in an effective written transition plan that:

(a)     sets forth in reasonable detail the particular services and supports, including their scope, frequency, and duration, that each individual needs in order to successfully transition to and live in an integrated community setting, whether or not a suitable community setting is currently available; such services and supports may include housing, transportation, staffing, mental health care, health care, and other professional services;

(b)     sets forth which persons and/or organizations have responsibility for delivering needed services and supports before, during, and after the transition;

(c)     sets forth the date the transition should occur, as well as the timeframes for completion of needed steps to effect the transition;

(d)     sets forth any barriers to transition to an integrated community setting and how to overcome them, if possible; and

(e)     sets forth a post-transition schedule of monitoring visits by community mental health providers to the new community setting to assess whether the needs of the individual are being met.

4.   In developing the transition plans, the State will make all reasonable efforts to avoid placing individuals into nursing homes or other institutional settings. Before adopting a transition plan that places an individual in a nursing home or other institutional setting, the State must consider all possible alternatives and describe the steps it took to implement the alternatives. If the final transition plan results in placement of the individual in a nursing home or other institutional setting, the plan shall be used to identify the barriers to placement in a more integrated setting and describe steps the State will take to address the barriers.

5.   Similarly, the State will make all reasonable efforts to avoid admitting persons with developmental disabilities to NHH, except where individuals' acute psychiatric needs cannot be addressed in a more integrated service or treatment setting. If such individuals are admitted, the State will document the basis for their admission and immediately begin transition planning on their behalf, consistent with the requirements of Section VI.

6.   The State will create a central team to assist in addressing and overcoming any of the barriers to discharge identified during transition planning and/or set forth in the transition plans. The central team will include personnel with experience and expertise in how to successfully resolve barriers to discharge including ACT team

15

members, supported housing providers, and peers who work for community providers.

7.  The State will design and implement a system for in-reach activities. The in-reach system will include meetings between individuals in NHH and Glencliff and the community mental health program or provider from their respective regions to develop relationships of trust and to actively support these individuals in transitioning to the community. The in-reach system will also include opportunities for meetings with the State and to obtain the State's assistance in identifying and addressing barriers to community living. In conducting in-reach:

    (a)    the State, through the community mental health program or provider will, among other things:

        i.    explain fully the benefits of community living, including ACT, supported housing, and supported employment;

        ii.    facilitate visits to community settings and accompany residents of these facilities on these visits;

        iii.    explore and work to address the concerns of any individuals who decline the opportunity to move to a community setting or who are ambivalent about moving to a community setting;

        iv.    review with reasonable regularity (at least quarterly), these individuals' housing preferences and interest in community living; and

    (b)    the State will:

        i.    offer to meet with any individual and/or their guardian, if one has been appointed, that continues to express reservations about living in the community, to ensure that the individual and guardian fully understand the community living options; and

        ii.    propose individualized strategies to address the individual's or guardian's concerns, provide opportunities to visit community programs, and facilitate conversations with providers about the services that will be available in the community and with individuals who have successfully transitioned from institutional settings to living in the community.

8.  If an individual and/or guardian is opposed to a community setting, the State will document the steps taken to fully inform them of the community options and document the particular concerns that the individual and/or guardian has with moving to the community. The State will develop individualized strategies to address the individual's or guardian's concerns, to be discussed at future meetings. The State will

16

establish a system for re-contacting these individuals and/or their guardians regularly, and at least annually, regarding their interest in community alternatives.

9. The State will identify individuals at NHH or Glencliff within the Target Population who have a dual diagnosis of developmental disability and mental illness and provide each individual with effective transition planning and a written transition plan as set forth in this section, using services and supports available from both the developmental disabilities and mental health services delivery systems to meet their needs.[2]

10. Any individual referred to Glencliff, whether from the community, NHH, or any other facility or hospital, will be reviewed pursuant to Pre-Admission Screening and Resident Review (PASRR), to determine if the individual has a developmental disability and/or mental illness and whether that individual's needs could be met in the community with adequate and appropriate services and supports. These PASRR reviews will be conducted by qualified developmental disability and/or mental health professionals. If the PASRR review determines that the individual's needs could be met in a community setting, the individual will be referred promptly to the appropriate Area Agency and/or Community Mental Health Center. Providers of developmental and mental health services will discuss and develop community options with the individual and will offer the individual appropriate services and supports in an integrated community setting.

B. Implementation of the Transition Planning Process

1. By February 1, 2014, the State will begin implementation of the provisions set forth above in Section VI.A., to be substantially completed by June 30, 2014.

## VII. Quality Assurance and Performance Improvement

A.    The State will develop and implement a quality assurance and performance improvement system, emphasizing the use of client-level outcome tools and measures, to ensure that existing community-based services described in the Agreement are offered in accordance with the individualized transition process set forth above, and that the individuals served are provided with the State's services and supports they need to ensure their health, safety, and welfare. The goal of the State's system will be to ensure that all mental health and other services and supports funded by the State are of good quality and are sufficient to provide reasonable opportunities to help individuals achieve increased independence, gain greater integration into the community, obtain and maintain stable housing, avoid harms, and decrease the incidence of hospital contacts and institutionalization.

---

[2] This paragraph is intended by the Parties to address the needs of individuals with intellectual and developmental disabilities and those with acquired brain injuries who also have SMI. Therefore, as used in this section, "developmental disabilities" means those individuals eligible for services under N.H. Rev. Stat. Ann. 171-A and 137-K, and their implementing regulations, N.H. Code Admin. R. He-M 503, 522.

17

B.   Provider Network

1.   The State will ensure an adequate network of qualified providers with the expertise and competency to effectively deliver the services and supports set forth in this Settlement Agreement.

2.   Program specifications for the services and supports set forth above in this Settlement Agreement will be developed by the State with input from the Plaintiffs and the United States.

3.   The State or Managed Care Organizations ("MCOs") will certify, and re-certify every two years, that providers of the community services set forth above are operating in compliance with all provider network requirements, and delivering services consistent with relevant program specifications. If a provider is not in compliance with these requirements, a corrective action plan will be developed, with timelines for implementation, oversight and monitoring by the responsible State agency.

4.   The State will execute performance-based contracts with CMHPs, either directly or through its managed care agents, that specifically describe expectations with regard to the individual outcomes to be achieved and the services and supports to be provided to individuals consistent with the provisions of this Settlement Agreement.

C.   Quality Assurance System

1.   The State will develop and implement a quality assurance review system that will regularly collect, aggregate, and analyze data related to transition efforts, including but not limited to information related to both successful and unsuccessful transitions, as well as the problems or barriers to serving and/or keeping individuals in the most integrated setting. Such problems or barriers may include, but not be limited to insufficient or inadequate housing, community resources, mental health care, crisis services, and supported employment. The State will review this information and use it to develop plans to reduce the incidence of such problems or barriers and implement prompt and effective measures, utilizing the services developed through this Agreement and other existing services, to overcome, if possible, the problems and barriers identified.

2.   The State will regularly review community providers and programs to identify gaps and weaknesses, as well as areas of highest demand, to provide information for comprehensive planning, administration, resource-targeting, and implementing needed remedies. The State will develop and implement effective measures that work to address any gaps or weaknesses identified.

D.   Quality Service Reviews

1.   As part of the Quality Assurance System outlined in Section VII.C., the State will use Quality Service Reviews ("QSRs") to evaluate the quality of services and supports.

Through the QSR process, the State will collect information through a sample of face-to-face interviews of the individual, relevant professional staff, and other people involved in the individual's life, as well as through review of individual treatment plans. Through the QSR process, the State will evaluate, among other things, whether individuals' needs are being identified, whether services and supports are meeting individuals' needs, and whether services and supports are designed around individuals' strengths and meeting individuals' goals.

2. The State will work collaboratively with the Plaintiffs and the United States to design a process (or adapt an existing process) for implementing QSRs and reporting on QSR findings. The State will work in good faith to obtain and consider recommendations of the Plaintiffs and the United States, but will have final decision-making authority on the process to be adopted.

3. The State will conduct QSR reviews of services and supports provided under this Settlement Agreement at least annually. The QSR review process will ensure statewide review of each service provision during the term of this Agreement.

4. The State will collect and analyze data from the QSRs and then use it to identify strengths and areas for improvement at the individual, provider, and systemwide levels; this will include issues related to barriers to meeting individualized needs in integrated community settings. The State will use the data from the QSRs to identify gaps and weaknesses, as well as areas of highest demand, to provide information for comprehensive planning, administration, and resource-targeting, to consider whether any areas are in need of improvement including whether additional community-based services and supports are necessary. The State will further use this information to develop and implement prompt and effective measures to utilize the services and supports developed pursuant to this Agreement, and other existing services, to address any areas in need of improvement and to ensure individuals have the opportunity to receive services in the most integrated setting.

E. Reporting

1. The State will provide to the Expert Reviewer (described below in Section VIII) and the Parties, on an annual basis, information:

    (a)    identifying the number of people served in each type of service described in this Settlement Agreement;

    (b)    detailing unmet needs using data gathered through the process set forth above in this section or the State's other quality assurance/improvement programs; and

    (c)    detailing the quality of services and supports provided by the State and its community providers using data collected through the State's quality

assurance/improvement systems, including any data gathered during the QSR process.

2. Nothing in Section VII.E.1 is intended to expand the Expert Reviewer's functions as set forth in VIII.F. and VIII.K.

3. The Expert Reviewer will periodically convene meetings with the Parties and members of the State's mental health services team at mutually convenient times and locations for discussions on implementation of the Agreement. Prior to the meetings, the State will provide the Expert Reviewer, Plaintiffs and the United States with data regarding implementation consistent with section VIII.I.

## VIII. Expert Reviewer

A.     The Parties will jointly agree on an Expert Reviewer within 90 days of the execution of this Settlement Agreement. The Expert Reviewer will be independent and no Party or any employee or agent of any Party shall have supervisory authority over the Expert Reviewer's activities, reports, and/or recommendations.

B.     The Expert Reviewer will have three functions. The Expert Reviewer may provide technical assistance as requested by the State to implement the provisions of this Settlement Agreement and to improve the State's mental health care system. The Expert Reviewer will mediate disputes between the Parties in accordance with Section X.D. The Expert Reviewer will assess and issue a public report to the Parties on the State's implementation of and compliance with the provisions of this Settlement Agreement.

C.     In the event the Expert Reviewer resigns, or the Parties agree to replace the Expert Reviewer, the Parties will:  (a) confer within 30 days of the resignation or agreement by the Parties to replace the Expert Reviewer, and (b) select a replacement and notify the Court of their joint selection. If the Parties are unable to agree on a replacement Expert Reviewer, the Parties will each submit to the Court, within 14 days of the conference, the names and *curricula vitae* of up to four individuals (up to two from the State and two from the Plaintiffs and the United States) as candidates for the Expert Reviewer position. The Parties will request that the Court select the Expert Reviewer from among those nominated.

D.     The Expert Reviewer will have the authority and responsibility to independently observe, assess, review, and issue public reports to the Parties on the State's implementation of and compliance with the provisions of this Settlement Agreement. The Expert Reviewer's assessments will provide the Parties with guidance on the State's efforts to implement the terms of this Settlement Agreement, ways to improve implementation, and other suggestions to enhance the State's mental health system. The Expert Reviewer's suggestions and assessments may not, however, modify any provision of this Settlement Agreement, absent an order of the Court. All Parties reserve their right to object to and contest any such order of the Court.

E.     The Expert Reviewer will review the services and supports provided to individuals in the State's mental health system and will devote such time as is necessary to fulfill the duties and

responsibilities of the Expert Reviewer pursuant to this Settlement Agreement, consistent with the budget allocated for his or her services. The Expert Reviewer may retain consultants to assist in carrying out his or her duties and responsibilities, to the extent funds are available in the Expert Reviewer's budget. In no event will the State be obligated to reimburse the Expert Reviewer for any fees, costs, or expenses that exceed the amount of the Expert Reviewer's maximum budget, as defined in Section VIII.P., except that the Parties may jointly agree to an increase in the Expert Reviewer's budget. Upon the request of a Party, the Court may approve, in extraordinary circumstances, an increase in the budget if there is an issue related to noncompliance that requires an unanticipated degree of additional work by the Expert Reviewer, limitations on the availability of information from the State necessary for the Expert Reviewer to fulfill his/her duties and responsibilities for assessing compliance, or a request by the Court for additional assistance or information necessary to ensure compliance and enforcement of its orders. In the event that a request is made to the Court for an increase in the budget of the Expert Reviewer, any Party may object and request a hearing on the issue.

F.      The Expert Reviewer will evaluate implementation of and compliance with the terms of the Settlement Agreement. These evaluations may include: onsite inspection of facilities and programs responsible for the delivery of services under the Agreement; interviews with staff, class members, guardians, and other stakeholders; data collection; and document and record review, including transition planning where the individual's team identified barriers to discharge or recommended placement in another institutional setting. The evaluations will include review and assessment of the status of individual transitions and the adequacy and quality of individualized services and supports.

G.      The Expert Reviewer and consultants will have full access, with reasonable notice, to the people, places, and documents that are necessary to assess the State's compliance and/or implementation efforts with this Settlement Agreement, to the extent they are within the State's custody or control,  including: (1) individuals receiving and/or offered services in the State's mental health system; (2) residences, facilities, buildings, services, programs, and activities in the State's mental health system, as well as the persons involved in providing services and supports at these locations; and (3) pertinent documents, records, and other materials, including departmental and/or individual residential medical and other records, associated with services, programs, and activities for individuals receiving and/or offered services in the State's mental health system. The Expert Reviewer shall exercise its access to State employees, facilities, and documents, in a reasonable manner in order to minimize disruption to State operations. The State has no obligation to require any individual or entity that is not a State employee, contractor, subcontractor, grantee, or provider of State-funded services to speak with the Expert Reviewer and/or his or her staff or consultants.

H.      The Expert Reviewer may communicate *ex parte* with the Court at its request, or with any of the Parties, including counsel, employees, agents, contractors, and all others working for or on behalf of the State to implement the terms of this Settlement Agreement, as well as anyone else the Expert Reviewer and any consultants deem necessary for completing the duties and responsibilities of the Expert Reviewer pursuant to this Settlement Agreement.

I.    The State will maintain sufficient records and collect sufficient data to document that the requirements of each element of this Settlement Agreement are being properly implemented, including data on the location and point of contact for individuals in crisis. The State will provide such data and records to the Expert Reviewer in a timely manner upon the Expert Reviewer's request. The Expert Reviewer may make requests for additional information that are reasonable and not unduly burdensome for purposes of evaluating compliance with the Settlement Agreement. All records and data shared with the Expert Reviewer will be provided by the State to the Plaintiffs and the United States in a timely manner.

J.    The Expert Reviewer may confer regularly and informally with the Parties on matters relating to implementation efforts and compliance. The Expert Reviewer will have the authority to convene meetings at mutually agreeable times and places.

K.    Twice a year, or more often if deemed appropriate by the Expert Reviewer, the Expert Reviewer will submit to the Parties a public report on the State's implementation efforts and compliance with the provisions of this Settlement Agreement, including, as appropriate, recommendations with regard to steps to be taken to facilitate or sustain compliance with the Settlement Agreement.

L.    In accordance with Section X.D., the Expert Reviewer will mediate any dispute regarding the implementation or enforcement of, or compliance with, this Settlement Agreement.

M.    The Expert Reviewer may testify in this case with regard to any matter relating to the implementation or enforcement of, or compliance with, the Settlement Agreement, including, but not limited to, the Expert Reviewer's observations, findings, and recommendations in this matter. Expert Reviewer testimony will be inadmissible in any other proceeding or matter, excluding any proceeding related to the implementation or enforcement of, or compliance with, this Settlement Agreement.

N.    The Expert Reviewer shall not be subject to formal discovery, including but not limited to depositions, requests for documents, requests for admissions, interrogatories, or other disclosures.

O.    Neither the Expert Reviewer nor any consultant shall be liable for any claim, lawsuit, or demand arising out of their activities under this Settlement Agreement. However, this paragraph does not apply to any proceeding for payment of contracts or subcontracts into which they have entered in connection with their work under this Settlement Agreement.

P.    The Expert Reviewer's reasonable fees, costs, and expenses (including costs of consultants or subcontractors, if any) will be borne by the State, up to a maximum budget of $175,000 per calendar year. In the event the Expert Reviewer does not use all of the funds in a particular year, any unused funds may be applied in a future year. The Expert Reviewer will invoice the State monthly for his or her fees, costs, and expenses. The monthly statements shall include daily records of time spent and expenses incurred, and shall include copies of supporting documentation including receipts. Monthly statements shall be provided to all Parties. The State and the Expert Reviewer will agree in advance on the scope and cost of any technical assistance

that the State requests and the Expert Reviewer provides. Any objection to the monthly statement shall be submitted to the Court within 21 days of receipt of a monthly statement. The Court retains the authority to resolve any dispute that may arise regarding costs, fees, or expenses charged by the Expert Reviewer. The State shall make payment to the Expert Reviewer within 30 days of receipt of the invoice, or upon order of the Court in the event there is a dispute regarding the Expert Reviewer's fees, costs, or expenses.

Q.     The Expert Reviewer shall not enter into or be offered any contract with the State, the Plaintiffs, the United States Department of Justice, or their counsel, in any litigation or investigation, while serving as the Expert Reviewer, unless agreed to by all Parties. If the Expert Reviewer resigns, the former Expert Reviewer may not enter into any contract with the State, or their counsel, in any litigation or investigation on a matter in New Hampshire during the pendency of this Settlement Agreement without the written consent of the Plaintiffs and the United States. Similarly, the former Expert Reviewer may not enter into any contract with the Plaintiffs, the United States Department of Justice, or their counsel, in any litigation or investigation on a matter in New Hampshire during the pendency of this Settlement Agreement without the written consent of the State.

## IX.     General Provisions

A.     Each Party to this Settlement Agreement represents and warrants that the person who has signed this Settlement Agreement on behalf of his or her entity is duly authorized to enter into this Settlement Agreement and to bind that Party to the terms and conditions of this Settlement Agreement.

B.     All individual Defendants are officers of the Executive Branch of the State of New Hampshire and are sued only in their official capacities.

C.     The State has authority and responsibility for the operation of NHH, Glencliff, and the rest of its mental health system.

D.     The Plaintiffs and the United States may make reasonable requests for documents or data not otherwise produced to the Expert Reviewer, provided the requests are not unduly burdensome to the State and are relevant to the implementation of this Settlement Agreement. Such requests will be made in the first instance to an individual identified by the State to serve as the point of contact for such requests. If that individual concludes such requests are relevant to the implementation of this Settlement Agreement and are not unduly burdensome, he or she will provide the documents or data in a timely manner. If that individual concludes the information is not relevant or is unduly burdensome, the request may be referred to the Expert Reviewer who will make a recommendation after conferring with the Parties. Nothing in this paragraph is intended to apply to document requests by, or production to, the DRC in cases of individual representation of class members or investigations.

E.     The Parties and the Expert Reviewer will be responsible for maintaining the confidentiality of records in their possession. Submissions to the Court that contain identifying

information of individuals (such as their full name, address, or social security number) shall be filed with the Court consistent with the Protective Order already entered in this matter.

F.      When necessary to fulfill their ethical responsibilities and monitor the implementation of this Settlement Agreement, the Plaintiffs and the United States will have reasonable access to relevant people, places, and information necessary to assess the State's compliance and/or implementation efforts with this Settlement Agreement, including: (1) individuals receiving and/or offered services in the State's mental health system; and (2) residences, facilities, buildings, services, programs, and activities in the State's mental health system, as well as the persons involved in providing services at these locations. The Plaintiffs and the United States will provide reasonable advanced notice of any monitoring visit or inspection. The Defendants may elect to have counsel present at any such visit or inspection in which the Plaintiffs or the United States intend to interview State employees for purposes of monitoring this Settlement Agreement. Where there is an emergency situation that presents an immediate threat to the life, health, or safety of individual(s), that is not being adequately handled by the State, the Plaintiffs and the United States will not be required to provide the State with notice of any such visit or inspection. Any request for documents or data under this Section not otherwise produced to the Expert Reviewer, shall comply with Section IX.D. Nothing in this Settlement Agreement shall limit access afforded to the DRC or the United States pursuant to any federal or state laws or other agreement(s).

G.      The State agrees that it will not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the Plaintiffs' and the United States' investigations or in any monitoring activities related to this Settlement Agreement. The State agrees that it will timely and thoroughly investigate any allegations of retaliation in violation of this Settlement Agreement and, where necessary, take corrective actions for any retaliation identified through such investigations.

H.      No person or entity is intended to be a third-party beneficiary of the provisions of this Settlement Agreement for purposes of any other civil, criminal, or administrative action. No person or entity may assert any claim or right as a beneficiary or protected class under this Settlement Agreement in any separate action. This Settlement Agreement is not intended to expand the right of any person or organization to seek relief against the State or their officials, employees, or agents.

I.      The Court may modify this Settlement Agreement pursuant to Fed. R. Civ. P. 60, but all Parties reserve the right to object to any such modification. The Parties agree to first provide reasonable notice, meet and confer, and seek to reach agreement about any proposed modification. Any modification to this Settlement Agreement agreed to by the Parties shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

J.      Upon full execution of this Settlement Agreement, all Parties agree that it may be filed electronically with the United States District Court for the District of New Hampshire, in conjunction with the filing of a Joint Motion as outlined in Section III.A.

24

K.      During the pendency of this Settlement Agreement, the United States and members of the Plaintiff Class are barred from bringing a new action in federal or state court against the Defendants under the ADA, the Rehabilitation Act, or the NHRA for any claim or allegation set forth in the lawsuit. Nothing in this provision is intended to preclude individual appeals on PASRR decisions.

L.      The United States and the State will bear the cost of their own fees and expenses incurred in connection with this case. The State agrees to pay Plaintiffs a total of $2,426,800 for all attorneys' fees, costs and monitoring in this case, except as provided in paragraph X.E. The total amount shall be paid in yearly installments in accordance with the following schedule: the first installment of $1,113,400 shall be paid 90 days from the Effective Date of this Agreement; the second installment of $1,113,400 shall be paid no later than 12 months from the due date of the first installment; the third installment of $75,000 shall be paid no later than 24 months from the due date of the first installment; the fourth installment of $75,000 shall be paid no later than 36 months from the due date of the first installment; and the fifth installment of $50,000 shall be paid no later than 48 months from the due date of the first installment. The Plaintiffs will file an assented-to motion for fees and expenses consistent with this paragraph and pursuant to Fed. R. Civ. P. 23(h) and L.R. 23.1(b)(4), and will not file any additional request for attorneys' fees in this matter except as provided in X.E.

M.      This Settlement Agreement will become effective upon signature of all Parties and approval by the Court ("Effective Date"), except as provided by Section III.H. of this Settlement Agreement.

N.      Provision of any information to the Expert Reviewer, Plaintiffs, or the United States pursuant to this Settlement Agreement will not constitute a waiver of any privilege that would otherwise protect the information from disclosure to third parties. This paragraph is intended to confer the full protections offered by Fed. R. Evid. 502(d).

O.      This Agreement may be executed in counterparts, each of which will be deemed an original, and the counterparts will together constitute one and the same agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

## X.      Construction and Enforcement

A.      Except where otherwise specified, the State will implement all provisions of this Settlement Agreement within 30 days of the Effective Date of this Settlement Agreement.

B.      The Parties agree that insignificant or brief, temporary deviations from the requirements set forth in this Settlement Agreement do not constitute noncompliance with the Agreement.

C.      Except as provided in Section X.F., and/or with the exception of a situation that poses an immediate and serious threat to the life, health, or safety of individuals covered by this Agreement to which the State is not adequately responding, if Plaintiffs or the United States believe that the State is failing or has failed to comply with any term(s) of this Settlement Agreement, the process contained in this Sections X.C.-E. constitutes the sole and exclusive

means to resolve disputes related to such claims of noncompliance with the terms of the Settlement Agreement.

1. Should an issue regarding the implementation or terms of this Settlement Agreement arise, the Party asserting the issue will confer with the other Parties and the Expert Reviewer in good faith in an effort to cure the issue. If informal resolution does not lead to complete and timely resolution, the Parties shall utilize the procedures set forth in Sections X.C.2-5.

2. A Party asserting a failure of the State to comply with this Settlement Agreement ("Complaining Party"), will give written notice ("Notice of Noncompliance") to the State that, with specificity, sets forth the details of the alleged noncompliance, including the specific provisions of this Settlement Agreement alleged to have been violated, and the reasons why the Complaining Party believes the provisions were violated.

3. Upon issuance of a written Notice of Noncompliance, the State will have 30 calendar days from the date of such written notice to respond, and to describe any steps that the State will take, if any, to cure the alleged noncompliance.

4. Following the State's response to the Notice of Noncompliance, the Complaining Party may either accept the State's response, or may request a conference to resolve the disagreement. A conference will be held within 14 calendar days of the request. At the conference, which may take place in person or, if any Party requests it, via telephone, the Parties agree to confer in good faith in an attempt to resolve their differences.

5. If these steps do not resolve the differences between the Parties, the Complaining Party may petition the Court to enforce the Settlement Agreement, in accordance with Section X.E.

D.      With respect to any dispute or other matter regarding the implementation of the Settlement Agreement, any Party may request that the Expert Reviewer mediate this dispute or make a recommendation to address an implementation matter. The Parties agree that upon the request of any Party for mediation by the Expert Reviewer, all Parties will participate in mediation in good faith.

E.      The Court shall have the power to enforce the Settlement Agreement and issue further orders as needed to ensure compliance. The Plaintiffs and the United States agree that they will not seek to enforce compliance with the terms of this Settlement Agreement through a motion for contempt, nor seek damages or penalties, in the first instance for any particular instance of alleged noncompliance. Any attorneys' fees or costs requested by Plaintiffs in connection with a petition to enforce the settlement will be reasonable. Such fees or costs will not be automatically awarded, but only after a hearing as to the propriety of such an award and its reasonableness. Defendants retain their rights to object to any such request.

F.      The Governor and the other individual Defendants agree to request from the New Hampshire General Court, and make their best efforts to secure, the funding they believe is necessary to implement the terms of the Settlement Agreement. In the event the New Hampshire General Court fails to appropriate the requested funds and precludes the Defendants from substantially complying with one or more provisions of the Agreement, the Plaintiffs and the United States may withdraw their consent to this Settlement Agreement, and revive any claims otherwise barred by operation of this Settlement Agreement. In the event of a failure to appropriate requested funds, nothing in this paragraph is intended to prohibit Plaintiffs or the United States from enforcing, consistent with this Agreement, those provisions, and only those provisions, of the Settlement Agreement that have been adequately funded by the General Court, but with which the Defendants are nevertheless not in compliance.

G.      Within 30 days of the filing of this Settlement Agreement with the Court, the State will identify for Plaintiffs and the United States an individual within the State to serve as a point of contact for the Plaintiffs, the United States, and the Expert Reviewer for purposes of implementation of this Settlement Agreement.

H.      All provisions of this Settlement Agreement will have ongoing effect until the final dismissal of this action.

I.      The Court shall retain jurisdiction of this action for all purposes until the State has complied with all provisions of this Settlement Agreement and maintained compliance with all provisions for a period of one year. The Parties anticipate that the State will have complied with all provisions of the Settlement Agreement within six years of its Effective Date and that the case will be dismissed with prejudice if compliance is achieved, consistent with this paragraph. The Parties may agree to jointly ask the Court to terminate the Settlement Agreement and dismiss the case with prejudice prior to the end of the six-year term. If the State asserts that it is in compliance and the Plaintiffs and/or the United States disputes the claim, the State will bear the burden of demonstrating that it has complied with all provisions of this Settlement Agreement and maintained compliance with all provisions for one year. The Parties may agree jointly at any time to allow for additional time to resolve compliance issues. Upon a determination of the Court that the State has demonstrated compliance with all of the provisions of this Settlement Agreement, including the provisions in this paragraph, the case shall be dismissed with prejudice.

J.      Failure by any Party to enforce this entire Settlement Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Settlement Agreement.

K.      The Parties will promptly notify each other of any court or administrative challenge to this Settlement Agreement or any portion thereof and shall defend against any challenge to the Settlement Agreement.

L.      The Parties agree that, as of the date the Court enters an order granting the Joint Motion, for purposes of the Parties' preservation obligations pursuant to Fed. R. Civ. P. 26, state and federal law, and the litigation hold letter sent to the State on June 17, 2011, the Parties are no

27

longer required to maintain any litigation holds. The State's outside counsel will maintain the data already collected from the State, in the manner in which it currently exists, or archived, until this case is dismissed with prejudice. With regard to the data and documents produced by the State and held by the United States and Plaintiffs, the United States and the Plaintiffs will abide by Section 16.f. of the Joint Stipulation between the Parties concerning electronically stored information.

/

/

/

/

/

/

/

/

/

/

/

/

/

The undersigned AGREE to the form and content of this Settlement Agreement:

## FOR THE UNITED STATES:

*/s/ John P. Kacavas*
JOHN P. KACAVAS
United States Attorney
District of New Hampshire

*/s/ John J. Farley*
JOHN J. FARLEY
New Hampshire Bar No. 16934
Assistant United States Attorney
United States Attorney's Office
District of New Hampshire
53 Pleasant Street
Concord, NH 03301
Telephone: (603) 225-1552
john.farley@usdoj.gov

*/s/ Jocelyn Samuels*
JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

*/s/ Eve L. Hill*
EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

*/s/ Jonathan M. Smith*
JONATHAN M. SMITH
Chief
Special Litigation Section

*/s/ Judy C. Preston*
JUDY C. PRESTON
Deputy Chief
Special Litigation Section

*/s/ Richard J. Farano*
RICHARD J. FARANO
District of Columbia Bar No. 424225
DEENA S. FOX
New York Bar Registration No. 4709655
KATHERINE V. HOUSTON
California Bar No. 224682
ALEXANDRA L. SHANDELL
District of Columbia Bar No. 992252
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building
Washington, DC 20530
Telephone: (202) 307-3116
richard.farano@usdoj.gov
deena.fox@usdoj.gov
katherine.houston@usdoj.gov
alexandra.shandell@usdoj.gov

29

**FOR THE PLAINTIFF CLASS:**

          /s/ Amy B. Messer
AMY B. MESSER
New Hampshire Bar No. 8815
C. ADRIENNE MALLINSON
New Hampshire Bar No. 17126
AARON J. GINSBERG
New Hampshire Bar No. 18705
Disabilities Rights Center, Inc.
18 Low Avenue
Concord, NH 03301
Telephone: (603) 228-0432
amym@drcnh.org
adriennem@drcnh.org
aarong@drcnh.org

          /s/ Steven J. Schwartz
STEVEN J. SCHWARTZ
Massachusetts Bar No. 448440
KATHRYN L. RUCKER
Massachusetts Bar No. 644697
Center for Public Representation
22 Green Street
Northampton, MA 01060
Telephone: (413) 586-6024
sschwartz@cpr-ma.org
krucker@cpr-ma.org

          /s/ Ira A. Burnim
IRA A. BURNIM
District of Columbia Bar No. 406154
JENNIFER MATHIS
District of Columbia Bar No. 444510
Judge David L. Bazelon Center for
  Mental Health Law
1101 15th Street, NW, Suite 1212
Washington, DC 20005
Telephone: (202) 467-5730
irab@bazelon.org
jenniferm@bazelon.org

30

      _/s/ Daniel E. Will_
      DANIEL E. WILL
      New Hampshire Bar No. 12176
      ELAINE M. MICHAUD
      New Hampshire Bar No. 10030
      JOSHUA M. WYATT
      New Hampshire Bar No. 18603
      Devine, Millimet & Branch, P.A.
      111 Amherst Street
      Manchester, NH 03101
      Telephone: (603) 669-1000
      dwill@devinemillimet.com
      emichaud@devinemillimet.com
      jwyatt@devinemillimet.com

**FOR THE DEFENDANTS:**

      _/s/ Joseph A. Foster_
      JOSEPH A. FOSTER
      New Hampshire Attorney General

      _/s/ Anne M. Edwards_
      ANNE M. EDWARDS
      New Hampshire Bar No. 6826
      REBECCA L. WOODARD
      New Hampshire Attorney General's Office
      New Hampshire Bar No. 17176
      33 Capitol Street
      Concord, NH 03301-6397
      Telephone: (603) 271-3650
      anne.edwards@doj.nh.gov
      rebecca.woodard@doj.nh.gov

      _/s/ John-Mark Turner_
      JOHN-MARK TURNER
      New Hampshire Bar No. 15610
      JAMES Q. SHIRLEY
      New Hampshire Bar No. 2332
      DAVID W. MCGRATH
      New Hampshire Bar No. 9347
      Sheehan Phinney Bass + Green. P.A.
      1000 Elm Street, PO Box 3701
      Manchester, NH 03105
      Telephone: (603) 668-0300
      jturner@sheehan.com
      jshirley@sheehan.com

WHEREFORE, the Parties to this action having agreed to the provisions in the Settlement Agreement set forth above, and the Court being advised in the premises, this Settlement Agreement is hereby entered as the Order and Judgment of this Court.

It is so ordered, this _12_ day of _February_, 2014, at Concord, New Hampshire.


HON. STEVEN J. McAULIFFE
United States District Judge