**Plaintiffs' Exhibit 6**

Civ. No. 10-2250 (ESH)

# SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES DEPARTMENT OF JUSTICE AND THE CITY AND COUNTY OF SAN FRANCISCO REGARDING THE LAGUNA HONDA HOSPITAL AND REHABILITATION CENTER

## *SETTLEMENT AGREEMENT*

The United States and the City and County of San Francisco and its Department of Public Health (hereinafter "the City"), agree to settle this matter, regarding the Laguna Honda Hospital and Rehabilitation Center ("LHH"), on the terms and conditions set forth below.

## I.     FRAMEWORK OF THE AGREEMENT

A.     This matter was instituted by the United States pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.

B.     This Settlement Agreement resolves the investigation conducted by the United States Department of Justice at LHH pursuant to CRIPA.  In conformity with CRIPA, this Agreement represents a voluntary effort by the City to meet the concerns raised by the United States' investigation.  See 42 U.S.C. § 1997b(a)(2)(B) and § 1997g.

C.     This Settlement Agreement is entered into between the United States and the City and County of San Francisco.

D.     LHH is an institution covered by CRIPA and is owned and operated by the City and County of San Francisco to provide skilled nursing and other health care and related supports and services to persons with particular health care needs.  At the time of the effective date of this Settlement Agreement, LHH is a certified "Provider" of nursing facility services under Title XVIII (Medicare) and Title XIX (Medicaid) of the Social Security Act.  The City has authority and responsibility for the operation of LHH and is responsible for the implementation of this Settlement Agreement.

E.     On February 7, 1997, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, notified the Mayor of San Francisco of the Department's intention to investigate allegations of unconstitutional and unlawful conditions at LHH pursuant to CRIPA.

F.     Following an investigation, on May 6, 1998, the Attorney General of the United States, by and through the Acting Assistant Attorney General, Civil Rights Division, provided the Mayor of San Francisco, the City's Director of Health, and the Interim Executive Administrator of LHH with a letter, pursuant to 42 U.S.C. § 1997b(a)(1), with specific findings, supporting facts, and recommended remedial measures.

G.      On April 1, 2003, the Assistant Attorney General, Civil Rights Division, provided the City Attorney, the City's Director of Health, and the Executive Administrator of LHH with a letter, pursuant to 42 U.S.C. § 1997b(a)(1), with specific supplemental findings, supporting facts, and recommended remedial measures made pursuant to the Americans with Disabilities Act ("ADA").

H.      In entering into this Settlement Agreement, City officials do not admit any violation of the Constitution or of any law, and this Settlement Agreement may not be used as evidence of liability in any other legal proceeding.  This Agreement is not intended to create any rights in any person or entity not a party to it.  Nothing herein is intended to waive any rights or claims with respect to third parties who are not parties to this Settlement Agreement.

I.      The provisions of this Settlement Agreement are a lawful, fair, and appropriate resolution of this matter and resolve all issues raised and findings issued against the City by the United States in the course of its investigation of LHH.

J.      This Settlement Agreement is binding upon the United States and the City and County of San Francisco, their officers, agents, employees, assigns, and successors.

K.      Except where otherwise specified, Defendants shall implement all provisions of this Settlement Agreement within 90 days of the effective date of the Settlement Agreement.  The effective date of the Settlement Agreement is the date when the last listed signatory has signed the Settlement Agreement.  This date shall be noted clearly on the signature page at the end of the Settlement Agreement.

L.      This Settlement Agreement provides for actions, practices, and procedures that the City has agreed to implement.  The City shall demonstrate that any identified area of non-compliance has been addressed by effective corrective action in a prompt manner.

M.      The purpose of the Settlement Agreement is that the City will achieve desired outcomes for and provide the necessary protections, supports and services to the residents of LHH.  The United States acknowledges the good faith efforts of the City in trying to address the remedial measures needed for the placement of appropriate individuals in the most integrated setting and for the improvement of care and treatment services provided to LHH residents.

N.      If the United States maintains that the City has failed to carry out any requirement of this Agreement, the United States shall so notify the City.  Throughout, the United States and the City will coordinate and discuss areas of disagreement and attempt to resolve outstanding differences.

O.      The United States shall have full and complete access to residents, persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials that are necessary to assess the City's compliance and/or implementation efforts with this Settlement Agreement.  Such access shall include departmental and/or individual resident medical and other

records.  The United States shall provide the City with reasonable notice of any visit or inspection, although the parties agree that no notice shall be required in an emergency situation where the life, immediate health or immediate safety of resident(s) is at issue.  Such access shall continue until this Settlement Agreement is terminated.

P.      This Settlement Agreement shall terminate three years from its effective date.  The parties may agree to terminate the Agreement prior to the end of the three-year term, provided the City has implemented all provisions of the Settlement Agreement and maintained implementation of all provisions of the Settlement Agreement for one year.

Q.      The City shall promptly notify the United States upon the death of any resident.  The City shall forward to the United States copies of any completed incident reports related to deaths, autopsies and/or death summaries of residents, as well as all final reports of investigations that involve residents.  The United States may require additional written reports from the City regarding the City's compliance with the Settlement Agreement.  The City will cooperate and comply with any such requests.

## II.     PLACEMENT IN THE MOST INTEGRATED SETTING

In accordance with Title II of the ADA, 42 U.S.C. § 12132, and implementing regulation 28 C.F.R. § 35.130(d), the City shall ensure that each LHH resident is served in the most integrated setting appropriate to meet each resident's individualized needs.  This shall include each prospective LHH resident who is about to be transferred to LHH from the San Francisco General Hospital ("SFGH").  LHH residents and prospective LHH residents who are to be transferred to LHH from SFGH will hereinafter be referred to as "affected individuals" or "individuals."

A.      City Implementation Steps for Placement in the Most Integrated Community Setting
In order to facilitate the service of affected individuals in the most integrated setting, the City agrees to take the following specific steps:

1.      *Individualized Interdisciplinary Team Assessments by Qualified Professionals*

 a.      The City shall ensure that appropriate, qualified professionals regularly conduct a reasonably thorough, comprehensive, and independent team evaluation of each affected individual to determine whether each individual meets the essential eligibility requirements for a community-based placement.  The team evaluations shall determine whether or not each individual has the ability to live in the community (with or without supports), and whether or not LHH is the most integrated setting appropriate to meet each person's individualized needs.

 b.      The City has already developed a Targeted Case Management ("TCM") program to provide individuals with such team evaluations and determinations with regard to placement in the most integrated setting.  In this Agreement, whenever there is a reference to a "team" process

or determination, this may include the TCM program or any other similarly configured program. The team will make individual determinations after conducting individualized screens and assessments.  In addition, the team will also provide and assist with active discharge and transition planning and case management and other monitoring services and supports to affected individuals.

   c.     Each team evaluation for community-based placement shall be based upon the affected individual's ability and need, not on the availability, perceived or actual, of current community resources.  No individual shall be excluded from consideration for community placement based on his or her level of disability.

   d.     The City agrees to adhere to the following time parameters with regard to providing needed team evaluations:

      i.     Any person to be admitted to LHH from SFGH shall be provided with such a comprehensive team evaluation prior to transfer to LHH.

      ii.     Any person newly admitted to LHH from anywhere other than SFGH shall be provided with such a comprehensive team evaluation at or near the time of admission, but no later than 14 days after admission to LHH.

      iii.     If any existing LHH resident does not have such a comprehensive team evaluation, he or she shall be provided one within a reasonably prompt period after the date of the filing of this Agreement.

      iv.     Any existing resident who has already been provided with such a comprehensive team evaluation shall be re-evaluated quarterly whenever appropriate, or if there is a significant change in the resident's physical or mental condition.

   e.     The team shall set forth in a written summary in each affected individual's record, the results of each of these comprehensive evaluations and re-evaluations.

   f.     As part of the team evaluation process, individual assessments shall be conducted by qualified professionals that include professionals other than LHH staff.  In order to be qualified, a professional must have adequate knowledge in his or her field of relevant professional standards and core competencies related to community-based services.  Professionals also must have adequate knowledge of the full variety of community living arrangements, including the most integrated options, and of the capacity of community systems to meet even the most challenging or complex individual needs.  The team of qualified professionals conducting individual assessments shall include whenever possible experts in the areas of medical care, nursing, social work, therapeutic services, activities of daily living ("ADL's"), auxiliary aids, and, where appropriate, communication, vocational/ recreational/ educational needs, mental health, substance abuse treatment, and mental retardation and developmental disabilities ("DD").

Individual assessments shall be based on regular face-to-face consultations with the individual who is being evaluated for community placement.

   g.     Whenever possible, the team evaluations shall include the participation of persons who know the individual best, including guardians, parents, or other interested family members.  The team evaluations shall also include wherever possible, persons whose participation is relevant to identifying the strengths, needs, preferences, capabilities and interests of the individual, and devising ways to meet them, such as client advocates.  The team evaluations shall also include wherever possible, the participation of persons who are knowledgeable about resources and opportunities in the community, including, where appropriate, regional staff, placement agencies, community professionals, as well as community provider and other support staff.

   h.     If the team evaluation concludes that LHH (or a nursing home in general) is not the most integrated setting for an individual, and/or that the individual has the ability to live in the community, the team's written summary of the evaluation shall set forth in reasonable detail the specific protections, services, and supports the individual will or may need in order to successfully transition to and live in the community.  As referenced below, once an individual is transitioning to the community, the individual's plan will be updated as needed, and implemented so as to provide the individual with the specific protections, services, and supports necessary.

   i.     If the team evaluation concludes that the individual should remain at LHH, the team's written summary of the evaluation shall set forth a meaningful and reasonably detailed rationale for the individual needing to stay at LHH, including the medical basis supporting the need for long-term care services at LHH.  This written evaluation shall include a detailed discussion of what barriers there are, if any, to placing the individual into the community, and a plan on how to address them.

2.     *Involved and Informed Decision-Making by the Affected Individual*

   a.     Throughout, the affected individual shall be involved in the team evaluation, decision-making, and planning process to the maximum extent practicable, using whatever communication method he or she prefers.  The affected individual shall be given the opportunity to express a choice regarding placement.  To foster each individual's self-determination and independence, the City shall continue to[1] use person-centered planning principles at every stage of the process.  This shall facilitate the identification of the individual's specific interests, goals, likes and dislikes, abilities and strengths, as well as deficits and support needs, which may factor into whether community placement is a viable option for the individual.

---

[1]  The United States does not concede that the words "continue to" or "maintain" throughout this Settlement Agreement mean or imply that the City has already been meeting residents' needs in each area.

b.      The City agrees to provide individuals with choice counseling, through trained staff or an independent entity, to help each individual make an informed decision concerning the option to receive home and community-based services as an alternative to institutional care.  Where appropriate, enhanced counseling efforts shall be directed to those LHH residents who have lived at the nursing home for more than one year and who may be less likely to entertain the notion of living independently.

c.      The City shall document in his or her record, the affected individual's support for or opposition to the team's placement determinations.

d.      The City need not effect a team decision that recommends community placement for an individual who opposes it.  However, the City shall help ensure that each affected individual makes an informed decision about team-proposed placements.  The team will document the steps taken to ensure that any individual objection is an informed one.  The team shall also set forth and implement individualized strategies to address concerns and objections to placement. Throughout the decision-making process, the City shall regularly educate affected individuals about the community and the various community options open to them.  Any written materials or presentations shall be easy for individuals to understand.  The City shall provide each affected individual with several viable placement alternatives to consider whenever possible.  The City shall provide field trips to these viable community sites and facilitate overnight stays at certain of the community residences, where appropriate and possible.  These efforts shall continue even after an individual expresses initial opposition to certain specific placement proposals.

e.      Team determinations with regard to proposed placements shall be documented in each individual's record regardless of the affected individual's opposition to them.

f.      Where family members have reservations about a team's community placement recommendation, the City shall provide ongoing educational opportunities to such family members with regard to placement and programming alternatives and options.  These educational opportunities shall include information about how the affected individual may have options other than living with the family members and/or become a "burden" to them once discharged from SFGH or LHH.

3.      *Development of Individualized Transition Plans*

Where the team has determined that the affected individual's transition to the community is appropriate and where the individual does not oppose transition, including those unopposed determinations made through the TCM process, the City shall take the following steps.

a.      The City shall prepare a detailed, individualized, written transition plan, developed through a person-centered planning process, specifying the needs of each individual and how those needs will be met at the alternative community setting.  These needs include all individually-necessary protections, services, and supports, including but not limited to:  housing,

medical and nursing care services, specialty health care services, various therapies, psychological and psychiatric services, communication and mobility supports, and assistance with activities of daily living. Each plan shall be developed to provide a successful transition to an appropriate alternative setting that is safe and meets the particular individual's needs. Each plan shall specify if any reasonable accommodations will be necessary to enable the individual to participate in community life. The transition plan may consist of a continuation or expansion of the evaluation and planning process initiated as part of the team planning process referenced above.

b.     Each transition plan shall identify the date the transition will occur. The transition plan shall include the name of the person or entity responsible for commencing transition planning, identifying community providers and other supports, connecting the individual with community providers, and assisting in transition activities as necessary. The responsible person(s) shall be properly trained to perform these functions.

c.     Each transition plan shall be developed sufficiently prior to discharge so as to enable the careful development and implementation of needed actions to occur before, during, and after the transition. This shall include identifying and overcoming, whenever possible, any barriers to transition. Needed protections, services, and supports are to be developed and in place at the alternate community site prior to the individual's discharge. The teams shall update the transition plans as needed throughout the planning and transition process based on new information and/or developments.

d.     Each transition plan shall specify with particularity the individualized protections, services, and supports needed to meet the needs and preferences of the individual in the alternative community setting, including their scope, frequency, and duration. Each plan shall include specific details about which particular community providers, including residential, health care, and program providers, have been selected to furnish needed protections, services, and supports. The City agrees to continue to develop housing resources to address the needs of the individuals leaving the institutional settings. This shall include residential facilities that accept SSI and residential care facilities that specialize in serving HIV-positive individuals.

e.     The City shall attempt to locate alternatives in regions based upon the presence of persons significant to the affected individual, including parents, siblings, other relatives, or close friends, where such efforts are consistent with the individual's desires.

f.     The City agrees to arrange for as many individual community, on-site, and overnight visits to various proposed residential placement sites as are appropriate and needed to ensure that the placement ultimately selected is and will be adequate and appropriate to meet the needs of each individual. The teams shall modify the transition plans as needed based on these community visits.

g.      In developing each plan, the City shall work closely with pertinent community agencies so that the protections, services, and supports that the individual needs are developed and in place at the alternate site prior to the individual's discharge.

h.      Each plan shall establish a schedule for monitoring visits to the new residence to assess whether the ongoing needs of the individual are being met.

i.      Upon request and where practicable, the City shall provide the United States with adequate advance notice and a copy of any transition plan for its review and comment prior to discharging any individual.  If the United States has any concern about the discharge plan or the alternative placement and so notifies the City, the parties shall meet or confer in an effort to resolve the concern prior to discharge so long as the meeting can be timely convened in a manner to facilitate the placement to a more integrated setting.

4.      *Implementation of the Team's Unopposed Transition Decision and Plan*

        For any affected individual with an unopposed transition plan, including those developed through the TCM process, the City shall take the following steps.

a.      The City shall implement in a timely manner the transition plans that can be reasonably accommodated by transferring each affected individual to an appropriate alternative community setting pursuant to the details set forth in the transition plan.  Individuals transitioning to community placements will be placed in appropriately planned and well-developed community placements which enable meaningful participation in community life so as to enhance the quality of lives of the individuals so placed.

b.      The City shall provide a system for transportation services in the community for each transitioned individual who may need them, whenever possible, such that their individual needs may be met on an ongoing basis.  This includes providing transportation, with escort services when needed, to and from health care and related professional or other appointments, to and from programming, vocational, and employment activities.

c.      The City will continue to take steps to support and successfully expand service and provider capacity in the community so as to better serve individuals who have already been placed and/or who are to be placed in the community in the future.  This shall include, but not be limited to, developing community capacity with regard to:  housing and residential services, health care and related professional services, transportation services, and programming, vocational, and employment resources for affected individuals.

5.      *Post-Placement Quality Assurance, Monitoring, and Follow-Up Efforts*

a.      The City shall develop and implement a system, including case management services, to adequately monitor community-based placements and programs to ensure that they are developed

in accordance with the individualized transition plans set forth above, and that the individuals placed are provided with the protections, services, and supports they need.  These and other mechanisms shall serve to help protect individuals from abuse, neglect, and mistreatment in their community residential and other programs.

b.      The City's case managers (including contract case managers) shall monitor and help coordinate the ongoing implementation of needed protections, services and supports identified in the individual's transition plan.  To encourage frequent individual contact, affected individuals who are placed in the community shall be served whenever appropriate by an adequate number of case managers to meet the needs of the affected individuals.  Case managers will carry an average caseload of no more than 40 individuals (without intensive needs) at a time during the calendar year.  Case managers involved with individuals with intensive needs will carry an average caseload of no more than 20 individuals at a time during the calendar year, with an operational goal of no more than 15 individuals at a time.  Average caseload is the total number of individuals in the case manager's active caseload during the year divided by 12.  All case managers shall receive appropriate and adequate supervision and competency-based training.  For individuals with multiple case managers, the City shall designate whenever appropriate "lead" case managers with the authority to work across programs and settings regardless of funding sources.

c.      The City's oversight shall include regular inspections of community residential and program sites; face-to-face meetings with affected individuals and staff; and in-depth reviews of treatment records, incident/injury data, and other provider records.

d.      The City shall provide whenever possible prompt and effective support and intervention services post-placement to individuals who present adjustment problems related to the transition process.  In the event that problems with a community placement occur post-placement, the City shall attempt to assist the individual to stay in that residence when appropriate, or be placed in another appropriate community setting.  These steps may include, but not be limited to: providing heightened and enhanced case management review of the individual/home; providing professional consultation, expert assistance, training, or other technical assistance to the individual/home; providing short-term supplemental staffing and/or other assistance at the home as long as the problem exists; developing and implementing other community residential alternative solutions for the individual.

e.      The City commits to maintaining discharged LHH residents in the least restrictive setting appropriate for their needs.  In cases where an individual is re-admitted to LHH, the City shall document the medical basis requiring the readmission and, where appropriate, conduct an assessment to identify and take steps to address any non-medical factors requiring the re-admission.

f.      The City agrees to continue its policy of preserving housing for individuals who are temporarily housed or placed in short-term rehabilitation at LHH by taking the steps necessary to maintain and make accessible, as needed, the individuals' housing whenever possible.

g.      The City shall collect, aggregate, and analyze data related to discharge efforts, including but not limited to information related to successful placements, as well as the barriers to placing residents in the most integrated and appropriate setting.  Such barriers may include, but not be limited to insufficient:  housing, community resources, health care, financial supports, and behavior management.  The City shall review this information on a regular basis and develop and implement strategies to overcome the barriers identified.  On an annual basis, the City shall use such information in its plans to address the barriers preventing affected individuals from receiving services and supports in the most integrated, appropriate settings.

h.      The City shall continue to review various subcontracted community programs to identify gaps, as well as areas of highest demand, to provide information for comprehensive planning, administration, resource-targeting, and implementing needed remedies.

i.      Building on the San Francisco Partnership for Community-Based Care and Support initiative and the Case Management Connect pilot initiative, the City agrees to continue to develop and implement a comprehensive program to provide coordinated and unified case management and service-delivery, with City leadership, between and among the City and private entities who now furnish community follow-up to affected individuals.  This program shall emphasize ease-of-use for the consumer.  The program shall specify that the lead City agency will whenever possible assume responsibility to identify and address the range of community-based needs presented by the individuals, particularly those who are hard to place.  The program shall specify a case management structure that provides for various levels of follow-up and intervention, including intensive case management for those with more complex needs.

6.      *New Physical Plant, Service Delivery Model*

        In the next year or so, the City will finish construction of several new inter-connected buildings on the LHH campus to replace the aging infrastructure of the existing physical plant.  The number of skilled nursing beds will be reduced from the 1,035 capacity of the existing facilities to approximately 780 skilled nursing and acute beds in the new inter-connected structure.  In shifting over from the old to the new physical space, LHH will also increase its emphasis on providing services and supports, through a continuum of care model, with a focus upon enhancing community living options to help enable individuals to age in place outside of LHH.  Whenever admission to the skilled nursing facility is medically necessary, LHH will work to care for and rehabilitate individuals in order to return them to the community as soon as possible and appropriate under the circumstances.  To help achieve this, the City shall develop and implement specified agreed-upon measures as set forth in the United States' letter of May 23, 2008.  Overall, the measures are to be developed to enhance affected individuals' ability to age in place in the community with appropriate services and supports.

- 10 -

7.      *Special Population Considerations*

      Consistent with the provisions set forth above, the City shall, in part through the use of the community living fund and the Intake and Screening Unit, work with affected individuals with complex needs who are transitioning to or already living in the community, per guidance from the Long-Term Care Coordinating Council ("LTCCC").  The City agrees to also take the following steps to address the particular needs of special populations within the affected individual community.

  a.      <u>Affected Individuals Who Are at Risk of Homelessness</u>

      i.      The City shall take reasonable steps to ensure that affected individuals who are at risk of homelessness are fully included in existing City homelessness initiatives, including those developed and implemented in the City's Ten-Year Plan to End Chronic Homelessness.  This includes those affected individuals who are about to be transferred to LHH from SFGH and those who are already current LHH residents.

      ii.      The City shall continue to develop appropriate community residential alternatives to institutional care for affected individuals who are at risk of homelessness, wherever appropriate.  The City agrees to assist in the submission of housing applications for individuals wherever appropriate.

      iii.      The City shall develop and implement community solutions for persons who are homeless or at risk of homelessness to expand their options where they have skilled nursing needs to prevent the need for their admission into LHH in order to receive needed services.  This effort shall include utilization of community stabilization centers, outreach teams, mobile support and treatment teams, roving behavioral teams, community health clinics, and alternative housing options.

  b.      <u>Affected Individuals with Developmental Disabilities</u>

      i.      The City shall maintain a current list of affected individuals residing at LHH with or who may have developmental disabilities ("DD").  The City shall on a regular basis update and share an updated list of such residents with the Golden Gate Regional Center ("GGRC").  The City shall work together with the GGRC to determine which of these individuals meet State/GGRC eligibility requirements.  For those individuals on the list who are not identified as GGRC clients, the City shall share needed documentation to support eligibility for individuals not yet accepted as GGRC clients.  For those determined to be eligible, the City shall work with the State and the GGRC to encourage the GGRC to accept those individuals as clients.

      ii.      Consistent with applicable regulations, the City shall alert the GGRC at an early stage of any affected individuals with or who may have DD.  This shall include providing

- 11 -

timely notification shortly after admission to LHH (within five business days), and shall also include notification from SFGH (prior to transfer to LHH) for those individuals with or who may have DD.

iii.     The City shall continue to seek to improve and enhance communication between the City and the GGRC with regard to LHH residents with, or suspected of having, DD and any services and supports they may require, including community placement services, not only at or near the time of admission to LHH, but throughout their stay at the nursing home.

iv.     Consistent with applicable requirements, the City shall facilitate updated team reviews for each affected individual with or suspected of having DD who currently lives at LHH, regardless of the existing schedule of reviews pursuant to the State's Individual Program Plan ("IPP") process.  These reviews will include the community placement requirements for all affected individuals as set forth in greater detail elsewhere in this Agreement.  The City shall invite GGRC personnel to the individual reviews for those individuals determined to be eligible for GGRC services.  The City shall revise and update – or create anew – any individualized plan for each individual with or suspected of having DD, where appropriate.

v.     The City shall continue to work collaboratively with the GGRC to improve training and other specialized DD services and supports needed to serve eligible residents with DD while they reside at LHH.  The City will continue to be receptive to the GGRC's input with regard to how to serve these LHH residents with DD, and incorporate it into daily service delivery to DD residents wherever appropriate.

vi.     The City shall implement all plans for each individual with, or suspected of having, DD so as to meet the ongoing specialized needs of these individuals.  This will include individuals with or suspected of having DD, regardless of whether or not they are deemed eligible to receive services from the GGRC.  The City will provide adequate and appropriate monitoring and follow-up of the implementation of these plans to ensure that individuals' needs are being met.  The City will update existing assessments and modify any plans whenever necessary, such as when the needs unexpectedly change of an affected person with, or suspected of having, DD.

c.     <u>Affected Individuals with Mental Illness</u>

The City shall develop and implement a plan seeking to adequately meet the individualized community placement and support needs of each affected individual with mental illness who is appropriate for placement into a more integrated community setting. In this plan, the City shall specify how it will meet the ongoing residential, health care, psychiatric, behavioral, and other needs of affected individuals with mental illness.

8.     *Meaningful Admission Criteria*

The City shall admit only those individuals to LHH's skilled nursing facility program that meet skilled nursing criteria upon admission.  The City shall conduct timely and adequate reviews, at least quarterly, to determine whether each resident of LHH continues to require care in a skilled nursing facility ("SNF").  Consistent with applicable regulations, the City shall review, revise and/or develop meaningful discharge criteria for LHH to ensure that individuals do not reside at the institution longer than is medically necessary.  The City shall train and supervise staff regarding any revised LHH admission criteria so that the desired outcomes are achieved.

9.     *The City's HMA Report Recommendations*

The City Controller commissioned an in-depth study to determine the effectiveness of the City and the City's Department of Public Health with regard to serving persons with long-term care ("LTC") needs.  Health Management Associates Report, The San Francisco Department of Public Health: Its Effectiveness as an Integrated Health Care Delivery System and Provider of a Continuum of Long Term Care Services, July 2005, at 1 (hereinafter "HMA Report").  This report placed special emphasis on LHH.  The City shall continue to implement the recommendations set forth in the HMA Report wherever appropriate and feasible under the circumstances that are not inconsistent with the terms of this agreement.

10.    *Initiatives with the State of California*

In order to ensure proper and timely implementation of this Agreement, the City shall continue to work with the State to develop and implement the range of supports and services needed to meet affected individuals' needs and overcome barriers to their placement in more integrated community settings.  This includes advocating that applicable Medicaid options, including those through the California State Plan and the various community Waivers, are sufficient in scope and depth to enable the transfer of any affected individual who may want to move from an institutional setting like LHH to a more integrated community setting.  This includes but is not limited to:  PACE and IHSS, the NF A/B Waiver, the MSSP Waiver, the AIDS Waiver, the DD Waiver, the IHMC Waiver, the Sub-Acute Waiver, and Waivers authorized by Section 1915(c) such as community mental health services pursuant to the City's SMHSC program.  The City shall continue to develop and implement assisted living solutions in the community for affected individuals.

III.  **CONDITIONS OF CARE AND TREATMENT AT LHH**

In accordance with LHH residents' federal constitutional and statutory rights, as well as applicable federal nursing home regulations, the City shall provide LHH residents with adequate and appropriate protections, care, treatment, supports, and services to meet the individualized needs of the residents and that are consistent with generally accepted professional standards.  See Youngberg v. Romeo, 457 U.S. 307 (1982); Grants to States for Medical Assistance Programs (Medicaid), 42 U.S.C. § 1396r; Health Insurance for Aged and Disabled (Medicare), 42 U.S.C. § 1395i-3; 42 C.F.R. § 483 Subparts B, C, D, and E.  Specifically, as set forth in greater detail below, the City shall ensure that residents are protected from harm, abuse, mistreatment, and neglect by other residents and staff, that residents are free from undue use of restraint, and that residents are provided with appropriate services, including basic care, proactive health care and related services and supports, psychiatric and behavioral services, and activity services, to meet their individualized needs such that they may attain or maintain their highest practicable physical, mental, and psychosocial well-being.

A.    Resident Safety, Protection from Harm

1.      The City shall provide a safe and humane environment for all residents and shall protect residents from neglect and abuse.  The City shall maintain a policy of "zero-tolerance" for neglect and abuse (including verbal, mental, sexual, or physical abuse), whether from other residents or from staff, and shall strive to ensure that residents are free from neglect and abuse.

2.      The City shall ensure that residents receive all protections, services and supports from trained staff.  The City shall provide adequate ongoing competency-based training to staff on recognizing and reporting potential signs and symptoms of abuse and/or neglect, and on the prevention of abuse and neglect of residents by staff.  Such training shall include providing staff with an explanation of the definitions of resident abuse and neglect, explaining to staff that abuse and neglect are prohibited, explaining to staff the requirement to report any suspected abuse or neglect, and advising staff of the potential consequences if they commit abuse or neglect or fail to report witnessed or suspected abuse or neglect.

3.      Before permitting any staff person to work with residents, the City shall investigate the criminal history (wherever legally permissible) and other relevant background factors regarding that staff person, whether full-time, part-time, temporary, or permanent, including regularly-scheduled volunteer staff with direct resident contact.  The City shall screen and take appropriate action to protect residents if the investigation indicates that the person would pose a risk of harm to the residents.

4.a.    All resident incidents and injuries shall be accurately documented.  Documentation of each injury shall be kept in the resident's file and in a central location, and all incidents and injuries shall be entered into a central database, which is capable of capturing the following

information:   the type of incident, the time the incident occurred, the location of the incident, the resident(s) and/or staff involved in the incident, and the nature and severity of the injury, if any.

   b.     The City shall ensure that the LHH quality management department, in conjunction with the facility administrator or designees, conducts a prompt in-depth review, as needed, of all significant incidents, including incidents of unknown or undetermined origin, and develop and implement appropriate remedial steps to minimize their occurrence in the future.

   c.     The City shall further develop and implement a comprehensive quality assurance program, which tracks and analyzes patterns and trends of incidents and injuries, including incidents and injuries of unknown origin, monitors the status and proper implementation of needed follow-up, and ensures the adequacy of staff training on incident management policies and procedures.

   d.     The LHH quality management department shall produce on a regular basis a written report, identifying and analyzing individuals who are vulnerable and at risk of harm, resident-to-resident issues, as well as the patterns and trends of incidents and injuries, and providing recommendations for reducing incidents and injuries in the future.  The City shall develop and implement prompt remedial measures to address recommendations contained within these reports.

5.     The City shall investigate all "significant" resident incidents. "Significant" resident incidents shall include all instances of:  alleged, suspected, and/or substantiated abuse and/or neglect; serious injury; actual or attempted elopement from the facility; and death.  The investigation of each significant incident shall be timely, complete, and independent. The findings and recommendations stemming from any such investigation shall be set forth in writing.  The City shall develop and implement prompt remedial measures to address and remedy the individual and systemic issues associated with these investigation reports.  The City shall track the implementation of the remedial measures on an ongoing basis to ensure that appropriate resident outcomes are achieved in each instance.  To this end, the City shall undertake the following specific steps:

   a.     The City shall maintain a policy that requires any staff who has knowledge of a significant incident to immediately report such knowledge according to policy requirements.

   b.     Whenever such an incident (other than death) occurs, the City immediately shall take appropriate measures to protect the safety and well-being of the resident(s) involved, including procuring any necessary basic care and/or health care treatment.

   c.     The City shall maintain a policy requiring that staff, including supervisory personnel, safeguard evidence of the significant incident.  The City shall maintain a policy requiring that all potential criminal matters are referred promptly to appropriate law enforcement authorities.

d.      The City shall develop and implement a policy, consistent with applicable law and regulations, to immediately remove any staff member suspected of staff-on-resident abuse or neglect from direct resident contact until the conclusion of the investigation and submission of the written findings and recommendations.

e.      The City shall develop and implement a policy, consistent with applicable law and regulations, to provide for appropriate disciplinary and/or corrective personnel action where a staff person is determined to have caused or been responsible for abuse and/or neglect, and against any staff person who fails to report a significant incident to supervisory or other appropriate personnel in a timely or accurate manner.

f.      The City shall develop and implement protocols for the adequate competency-based training of investigators and of any personnel who participate in the investigative process and have direct contact with residents, related to investigating significant incidents.

6.a.    The City shall identify vulnerable residents who are at higher risk of harm, and develop and implement measures to minimize potential risk factors.  The City shall place an emphasis on identifying and analyzing resident-to-resident interactions that create risk of harm and/or actual harm, and develop and implement measures to address these risk factors.  The City shall provide appropriate staff with competency-based training on the assessment of residents for risk of harm and that protections and therapeutic behavioral interventions are developed, documented, and implemented to prevent residents from harming themselves or others.

b.      The City shall continue to supervise and monitor residents, including residents with cognitive impairments or histories of exhibiting dangerous or threatening behaviors.  The City agrees to maintain sufficient numbers of adequately trained staff, particularly RNs and CNAs, present and on-duty on each shift to provide needed supervision of residents and to minimize resident harm.  The City shall conduct a regularly prompt review of all accident/injury findings to determine if sufficient staff, particularly RNs and CNAs, are on duty at LHH.  If a staffing shortfall is identified, the City shall take those measures necessary and possible to provide sufficient staff to supervise residents and to prevent otherwise avoidable injuries and incidents.

c.      The City shall continue to identify, through assessments on an ongoing basis, those residents with alcohol and/or substance abuse problems.  The City shall continue to pursue individualized treatment plans for these residents to address these problems.  Such treatment shall include, where appropriate, meaningful opportunities to participate in appropriate programs (e.g., Alcoholics Anonymous, etc.).  The City shall provide ongoing follow-up for these residents with intervention goals in their individualized plans to address their needs on an ongoing basis.

d.      The City shall develop and implement a comprehensive residential abuse prevention program to safeguard residents.

e.    The City shall provide proper notification to the resident, the resident's treatment team, family members, and external authorities, as required by applicable laws and regulations, if:  the resident is injured, there is a significant change in the resident's physical or mental health, or the resident must be relocated within units at LHH or discharged from LHH.

7.    To promote resident safety, the City agrees to continue to provide appropriate psychological and behavioral services consistent with generally accepted professional standards, including behavioral intervention programs with training and positive behavioral supports, where appropriate, to meet the individualized needs of each resident with problem behaviors.  These services shall be developed by qualified professionals, including a psychologist and psychiatrist whenever appropriate, consistent with current, generally accepted professional standards to enable such residents to attain or maintain their highest practicable physical, mental, and psychosocial well-being.  To this end, the City shall take the following measures:

a.    The interdisciplinary team shall evaluate each resident to determine the specific areas, if any, in which each resident needs behavioral interventions.  The physician shall consult with a psychiatrist and/or psychologist as needed to assess the residents.  These interdisciplinary evaluations shall be repeated for all residents at annual intervals, unless required more frequently by the safety and behavioral needs of particular residents.  On an ongoing basis, priority for assessments/reassessments shall be given to those residents with problem behaviors, including those residents who, in the past 12 months, have had a planned or unplanned physical restraint, emergency use of psychotropic drugs, or have sustained or caused frequent injuries or is at risk of serious harm due to his or her behaviors.

b.    Contemporaneous with the ongoing behavioral assessments, the City shall conduct whatever additional comprehensive assessments are necessary in other disciplines such as medical care, nursing, mental health care, and others (e.g., occupational therapy, physical therapy and speech therapy), so as to determine the medical, behavioral, mental health, environmental, and/or other factors that may be causing each resident's problem behaviors.  The City agrees to continue to address residents' problem behaviors, through the integration of services and treatment modalities, including psychology, psychiatry, neurology, nursing, medical and health care, and other ancillary services.

c.    Where clinically appropriate, a resident with a problem behavior shall be provided with a behavioral intervention care plan which shall identify the behavior(s) to address, the procedures for staff to follow to address the problem behaviors, the positive replacement behaviors that will be supported, and environmental changes to promote the development of positive behaviors.  All behavioral interventions shall be developed and implemented without resorting to the undue use of restrictive interventions.  The interdisciplinary team, consulting with the clinical psychiatric staff as needed, shall document their rationale for using specific behavioral interventions (including positive behavioral supports) through the use of Behavioral Monitoring Forms.  All behavior supports shall be developed and implemented without resorting to the undue use of restrictive interventions.

- 17 -

d.      The City shall provide structured and ongoing competency-based training for direct care and supervisory staff to ensure consistent and effective implementation of all aspects of the behavioral interventions, including positive behavior supports.

e.      Consistent with this section, the City shall maintain a system to regularly monitor each resident with behavior supports and revise and implement modified supports, as indicated by outcome data.

8.      To help ensure resident safety, the City shall provide adequate and appropriate mental health services to meet the individualized needs of each resident with mental illness, especially those with behavior problems to enable them to attain or maintain the highest practicable physical, mental, and psychosocial well-being.  These services shall be provided consistent with current, generally accepted professional standards to ensure and protect residents' rights.  To this end, the City shall take the following measures:

a.      At least once annually, or more often as needed, the City shall:

i.      Conduct a mental health assessment of each resident receiving psychotropic medication and each resident who has or may have a diagnosis of mental illness.  The assessments shall be sufficient to reach a reliable DSM-IV-TR diagnosis, if applicable, for each resident assessed.

ii.      Promptly thereafter, for each resident assessed as having mental illness, document a clinically justifiable, differential diagnosis consistent with DSM-IV-TR criteria.

iii.      Within 30 days of the formulation of a mental health diagnosis, develop and implement an overall treatment plan for each resident with a diagnosis of mental illness, and provide ongoing monitoring and revision of the treatment whenever necessary.

iv.      Review the current medication regimen of each resident to determine whether the type and dosage of the medication is appropriate and still necessary.

v.      Consult with the other treating professionals, who may include the resident's nurse or other appropriate members of the resident's interdisciplinary team, psychiatrists and/or psychologists, to determine whether different programs or interventions could be developed to address the resident's behavior problems and symptoms so as to reduce or eliminate the need for psychotropic medications.

b.      Where the nature of the mental illness diagnosis, behavioral intervention plan, or psychotropic medication regimen requires more specialized and expert treatment, such as where there is a significant adverse change in behavior, or an increase in significant injuries or incidents related to behaviors, or where the resident is subjected to an emergency use of psychotropic medication, or the resident is subjected to an unanticipated increase in repeated physical or

mechanical restraint, the City shall obtain participation by other professionals, including a psychologist and/or psychiatrist for consultation in developing and implementing an appropriate treatment plan.  In this situation:

> i.      The psychiatrist shall provide a psychiatric reassessment and revision to the diagnosis and treatment plan, as appropriate.

> ii.     The psychiatrist shall review the resident's current medication regimen to determine whether the type and dosage of the medication is appropriate and still necessary, and recommend any changes in the medication regimen, with attention toward the desirability of reduction or elimination of psychotropic medications.

> iii.    The psychiatrist shall provide consultation services as to whether the harmful effects of the resident's mental illness clearly outweigh the possible harmful side effects of the psychotropic medication and whether reasonable alternate treatment strategies are likely to be less effective or potentially more dangerous than the medication.

   c.    The City shall develop and implement an adequate system to regularly monitor the residents receiving psychotropic medications to ensure that use is appropriate, and make changes, when warranted, in the residents' treatment plans.  The monitoring review shall include a review of any current psychotropic medication provided, as well as a review of the pertinent behavioral and other data.

   d.    The City shall develop and implement a review of any drug-induced side effects of psychotropic medication to ensure they are being accurately and consistently detected, documented, reported, and responded to

   e.    The City shall develop and implement a protocol to minimize the administration of psychotropic medication on an unplanned basis.  Where psychotropic medication is used on an unplanned (including emergency) basis, a supervisor shall be notified immediately, there shall be continuous monitoring of the resident after administration of the medication, and a physician shall observe the effect of the medication by personally visiting the resident or directing supervision by a registered nurse.

> i.      The City shall also ensure that the use of polypharmacy for any resident is justified in that resident's treatment plan.  Clinical pharmacists shall review all medication orders on a monthly basis for any polypharmacy contra-indications.

B.     Restraints

1.      Consistent with applicable regulations, the City shall ensure that residents are free from undue use of restraint, including the undue use of bedrails.  The City shall follow protocols to minimize the use of restraint on residents.  The City shall ensure that restraints are used only

pursuant to accepted professional standards and are not used as punishment, in lieu of providing other needed activities, supports, or services, or for the convenience of staff. All restraints shall only be used consistent with professional standards.

2.      The City shall develop and implement a specific protocol to minimize the use of bedrail restraints. The protocol shall be based on current, generally accepted practice and shall emphasize keeping residents physically active, meaningfully engaged, and out of bed, whenever possible and appropriate. The protocol shall require enhanced justification for a "medical" or "safety" bedrail order, so as to minimize the likelihood that residents will remain unduly confined to bed for prolonged periods, which may cause physical deterioration, degeneration, and atrophy.

3.      The City shall identify each resident who, in the past 12 months, has been provided with a physical or mechanical restraint, including bedrails, or to the use of emergency psychotropic drugs. For each such resident during this period, the City shall develop and implement prompt and appropriate protections, services and supports that meet each resident's individualized needs that are consistent with professional standards.

4.      The City shall continue to provide structured and ongoing competency-based training to professional, direct care, and supervisory staff on how to properly address resident needs and behaviors without resorting to the undue use of restraints.

5.      The City shall continue the implementation of its protocol to fully document each use of any physical or mechanical restraint, including bedrails, specifying the exact type of restraint or procedure used, as well as the length of time it was used each time. Documentation of each use of restraint shall be kept in the resident's file and in a central location.

6.      The City shall develop and implement a protocol to minimize the use of standing PRN or "stat" orders for the unplanned or emergency administration of psychotropic medication.

C.      Activities

1.      The City agrees to provide each resident with appropriate sufficient, meaningful, and stimulating activities throughout each day, including during evenings and weekends, that meet the interests of each resident and maximize the physical, mental, and psychosocial well-being of each resident, in accordance with each resident's individualized, comprehensive assessment and care plan. Consistent with generally accepted practice, the City shall develop and implement an activities protocol that emphasizes keeping residents physically active, meaningfully engaged, and out of bed, whenever possible and appropriate, so as to avoid physical deterioration, degeneration, and atrophy.

2.      The City agrees to continue to administer the activities program at LHH under the direction of a qualified therapeutic recreation specialist or a qualified activities professional who shall provide regular competency-based training to all pertinent staff.

D.      Health Care and Related Services and Supports

The City shall develop and implement a protocol in order to accomplish the following requirements:

1.      The City shall provide LHH residents with adequate and appropriate proactive health care and related services and supports to meet the ongoing individualized needs of the residents and that are consistent with generally accepted professional standards such that the residents may attain or maintain their highest practicable physical, mental, and psychosocial well-being. Health care and related services and supports shall include medical care, neurological care, nursing care and services, basic care, nutritional and physical management, rehabilitative and restorative care, and related therapy services.  With regard to each of the areas identified above:

a.      The City shall provide adequate and appropriate, comprehensive, and in-depth individualized professional assessments of the needs of each resident.

b.      Based on these assessments, the City shall then promptly develop and implement written, tailored, and individualized care plan(s) to address each area.

c.      The City shall then provide adequate, appropriate, comprehensive, and in-depth monitoring and follow-up for each resident to ensure that the plan(s), as implemented, effectively meet the ongoing needs of each resident.  This monitoring and follow-up may prompt new assessments/reassessments and modification of existing diagnoses, plans and/or implementation efforts, whenever warranted by each resident's changing condition over time.

d.      The assessments, diagnoses/determinations, and plans shall be developed by an interdisciplinary team of professionals who are guided by generally accepted professional standards.

e.      The implementation of the plans and the ongoing monitoring, follow-up, and the determination of the need for new assessments/reassessments shall be accomplished by an interdisciplinary team of professionals in conjunction with direct care and other staff who have been provided with competency-based training in the proper implementation and monitoring/follow-up of each resident's plan(s), such that the professionals and staff meet the ongoing individualized needs of the residents.

f.      The City shall identify, on an ongoing basis, those residents who are at-risk, or present at-risk conditions.  The City shall ensure that these at-risk residents will be given heightened

attention and supervision such that needed health care and related
assessments/reassessments, diagnoses/determinations, plans, implementation, monitoring,
and follow-up are provided to them proactively, promptly, and whenever they are needed.

2.      The City shall take appropriate steps to protect residents' privacy in living areas, and
during bathing and toileting.

3.      The City agrees to maintain an effective infection control program.

4.      The City shall strive to maintain that all living areas are free of dangers that may cause
accidents by providing adequate surveillance of potential hazards and ensure that equipment is in
safe operating condition.  The City shall take prompt corrective action to remove and eliminate
environmental hazards and repair defective or inoperable equipment.

/

/

/

/

/

/

/

/

**FOR THE CITY AND COUNTY OF**
  **SAN FRANCISCO:**

  /s/ Mitchell H. Katz
MITCHELL H. KATZ, M.D.
Director of Health
San Francisco Department
 of Public Health
City and County of San Francisco

DENNIS J. HERRERA
City Attorney

 /s/ Aleeta M. Van Runkler
ALEETA M. VAN RUNKLE
Deputy City Attorney
Office of the City Attorney
City and County of San Francisco
Fox Plaza
1390 Market Street, 5th Floor
San Francisco, CA  94102-5408

**FOR THE UNITED STATES:**

 /s/ Grace Chung Becker
    GRACE CHUNG BECKER
Acting Assistant Attorney General
Civil Rights Division

 /s/ Shanetta Y. Cutlar
SHANETTA Y. CUTLAR
Chief
Special Litigation Section

 /s/ Judith C. Preston
JUDITH C. PRESTON
Deputy Chief
Special Litigation Section

 /s/ Richard J. Farano
RICHARD J. FARANO
LUIS E. SAUCEDO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB - Room 5020
Washington, DC  20530

Date of Final Signature and Effective Date of the Settlement Agreement: June 13 , 2008.