UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
IVY BROWN, <u>et al</u>.,                    )
                                              )
            Plaintiffs,                       )
                                              )
      v.                                      )        Civil Action No. 10-2250 (PLF)
                                              )
DISTRICT OF COLUMBIA,                         )
                                              )
            Defendant.                        )
_____)


<u>OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW</u>

        This case was tried before the Court without a jury for all or portions of 20 days

in the Fall of 2021.  Because the trial took place during the early days of the COVID pandemic,

the trial was conducted virtually.

        Upon careful review of the witness testimony and the exhibits admitted at trial,

the relevant evidence from the first trial before Judge Ellen Segal Huvelle, the parties'

arguments, and the applicable statutes, regulations, and case law, the Court finds that the District

of Columbia has failed to comply with the integration mandate of <u>Olmstead v. L.C. ex rel.</u>

<u>Zimring</u>, 527 U.S. 581 (1999), thereby violating the Americans with Disabilities Act and

Section 504 of the Rehabilitation Act.  The Court also considered the "fundamental alteration

defense" under <u>Olmstead</u> and has concluded, based on the evidence presented at trial, that the

District has failed to demonstrate that three of the four accommodations requested by plaintiffs

are unreasonable.  The Court therefore will enter judgment for the plaintiffs.

I.  BACKGROUND

Plaintiffs are a class of physically disabled individuals who have received Medicaid-funded long-term care in nursing facilities for more than 90 days but wish to transition – and are capable of transitioning – to the community to receive home- and community-based long-term care.  Plaintiffs contend that the District has for decades violated Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq., by causing their unjustified segregation in nursing facilities (i.e., institutions).  Proceeding under the framework of Olmstead v. L.C. ex rel. Zimring ("Olmstead"), 527 U.S. 581 (1999), plaintiffs seek declaratory and injunctive relief to compel the District to alter its policies and procedures so as to better facilitate the plaintiffs' successful transition to the community.

A.  *The Integration Mandate and* Olmstead

"Title II of the ADA and Section 504 of the Rehabilitation Act, along with their implementing regulations, require that public entities and programs receiving federal funds take reasonable steps to avoid administering their programs in a manner that results in the segregation of individuals with disabilities."  Brown v. District of Columbia ("Brown I"), 322 F.R.D. 51, 53 (D.D.C. 2017); see also 42 U.S.C. § 12101(b)(1) ("It is the purpose of [the ADA] . . . to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . .").

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; see also id. § 12131(2) (defining a "qualified individual with a

disability" as "an individual with a disability, who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity").[1]  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Pursuant to its authority to issue implementing regulations, the Attorney General of the United States promulgated several regulations elaborating on the government's obligations under Title II.  Pertinent here, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added); see also 28 C.F.R. Pt. 35, App. B (defining "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible").  Similarly, pursuant to an implementing regulation of Section 504 of the Rehabilitation Act, recipients of federal funds (including public entities) must

---

[1]        The ADA defines a "disability" to include, "with respect to an individual . . . a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  And "[a] 'public entity' is 'any State or local government,' and 'any department, agency, [or] special purpose district,' including the District of Columbia.  Brown I, 322 F.R.D. at 53 (quoting 42 U.S.C. § 12131(1)(A), (B)).

"administer programs and activities in the <u>most integrated setting</u> appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d) (emphasis added).

In <u>Olmstead v. L.C. ex rel. Zimring</u>, a majority of the Supreme Court interpreted Title II of the ADA and its implementing regulations to hold that the unjustified placement, retention, or isolation of persons with disabilities in institutions constitutes a form of discrimination on the basis of disability.  527 U.S. at 596-97; <u>see</u> <u>also</u> <u>id</u>. at 601 (noting that disabled individuals who are unjustifiably institutionalized experience dissimilar treatment because they are required to "relinquish participation in community life they could enjoy given reasonable accommodations" in order to receive medical services, while those without disabilities are not required to make such a sacrifice to receive medical services).[2]  In adopting the ADA, Congress expressly found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," and that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] segregation."  <u>Olmstead</u>, 527 U.S. at 600 (quoting 42 U.S.C. § 12101(a)(2), (5)).[3]

---

[2]    Although "<u>Olmstead</u> dealt specifically with the ADA and the mentally disabled[,] . . . its analysis applies equally to the Rehabilitation Act and the physically disabled."  <u>Brown v. District of Columbia</u> ("<u>Brown II</u>"), 928 F.3d 1070, 1077 n.6 (D.C. Cir. 2019) (citing <u>Am. Council of the Blind v. Paulson</u>, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) ("[T]he courts have tended to construe section 504 <u>in pari materia</u> with Title II of the ADA . . . .")); <u>accord</u> <u>Sanchez v. Johnson</u>, 416 F.3d 1051, 1062 (9th Cir. 2005); <u>Steimel v. Wernert</u>, 823 F.3d 902, 909 (7th Cir. 2016).

[3]    The Supreme Court recognized "two evident judgments" that justified its holding. <u>Olmstead</u>, 527 U.S. at 600.  "First, institutional placement of persons who can handle and benefit from community setting perpetuates unwarranted assumptions that persons so isolated are

4

The Supreme Court in Olmstead recognized an "integration mandate" under the ADA to "integrate eligible patients [with disabilities] into local community-based settings." Frederick L. v. Dep't of Pub. Welfare of Pa., 422 F.3d 151, 157 (3d Cir. 2005); see Steimel v. Wernert, 823 F.3d 902, 909 (7th Cir. 2016); Arc of Wash. State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005). Such integration "is in order when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." Olmstead, 527 U.S. at 587.

A plurality of the Supreme Court went on to note, however, that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." Olmstead, 527 U.S. at 603. Rather, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); see also Olmstead, 527 U.S. at 605 (noting that states must have some "leeway" "[t]o maintain a range of facilities and to administer services with an even hand").

The plurality of the Court recognized two affirmative defenses that a public entity may prove to demonstrate that plaintiffs' requested accommodations are unreasonable. First, a state may "show that, in the allocation of available resources, immediate relief for the plaintiffs

---

incapable or unworthy or participating in community life." Id. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 601.

would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." <u>Olmstead</u>, 527 U.S. at 604. Second, the state may "demonstrate that it ha[s] a comprehensive, effectively working plan [now called an "<u>Olmstead</u> Plan"] for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." <u>Id</u>. at 605-06; <u>see</u> <u>also</u> <u>Arc of Wash.</u> <u>State Inc. v. Braddock</u>, 427 F.3d at 618 (noting that courts "normally 'will not tinker with' comprehensive, effective state programs for providing care to the disabled").

### B.  Factual and Procedural History

On December 23, 2010, plaintiffs filed a putative class action against the District of Columbia seeking declaratory and injunctive relief, claiming that defendants had violated Title II of the ADA and Section 504 of the Rehabilitation Act. <u>See</u> Complaint [Dkt. No. 1]; <u>see</u> <u>also</u> <u>Brown I</u>, 322 F.R.D. at 56-57.[4] Specifically, plaintiffs alleged that the District of Columbia has caused numerous individuals with physical disabilities "to be confined unnecessarily in nursing facilities in order to obtain long-term care services, rather than facilitate [those individuals'] transition to the community with appropriate services and supports." Fourth Amended Complaint [Dkt. No. 162] ¶ 135. To remedy the District of Columbia's alleged violations of the ADA and the Rehabilitation Act, plaintiffs requested that the Court enter a permanent injunction requiring the District of Columbia to take four actions:

---

[4]    Judge Ellen Segal Huvelle presided over this case until her retirement, at which time the case was reassigned to the undersigned. Judge Huvelle's opinions set out the detailed background of this case, so the Court will include only the relevant factual and procedural history here. <u>See</u> <u>Brown I</u>, 322 F.R.D. at 56-64; <u>see</u> <u>also</u> <u>Day v. District of Columbia</u>, 894 F. Supp. 2d 1 (D.D.C. 2012); <u>Thorpe v. District of Columbia</u>, 303 F.R.D. 120 (D.D.C. 2014).

(i)  Develop and implement a working system of transition assistance for Plaintiffs whereby Defendant, at a minimum, (a) informs DC Medicaid-funded nursing facility residents, upon admission and at least every three months thereafter, about community-based long-term care alternatives to nursing facilities; (b) elicits DC Medicaid-funded nursing facility residents' preferences for community or nursing facility placement upon admission and at least every three months thereafter; (c) begins DC Medicaid-funded nursing facility residents' discharge planning upon admission and reviews at least every month the progress made on that plan; and (d) provides DC Medicaid-funded nursing facility residents who do not oppose living in the community with assistance accessing all appropriate resources available in the community.

(ii)  Ensure sufficient capacity of community-based long-term care services for Plaintiffs under the EPD, MFP, and PCA programs, and other long-term care services programs, to serve Plaintiffs in the most integrated setting appropriate to their needs, as measured by enrollment in these long-term care programs.

(iii)  Successfully transition Plaintiffs from nursing facilities to the community with the appropriate long-term care community-based services under the EPD, MFP, and PCA programs, and any other long-term care programs, with the following minimum numbers of transitions in each of the next four years:

> 80 class members in Year 1;
>
> 120 class members in Year 2;
>
> 200 class members in Year 3; and
>
> 200 class members in Year 4.

(iv)  Sustain the transition process and community-based long-term care service infrastructure to demonstrate the District's ongoing commitment to deinstitutionalization by, at a minimum, publicly reporting on at least a semi-annual basis the total number of DC Medicaid-funded nursing facility residents who do not oppose living in the community; the number of those individuals assisted by Defendant to transition to the community with long-term care services through each of the MFP, EPD, and PCA, and other long-term care programs; and the aggregate dollars Defendant saves (or fails to save) by serving individuals in the community rather than in nursing facilities.

Fourth Amended Complaint at 31-32.

On March 29, 2014, the Court certified a class of plaintiffs pursuant to Rule 23 of

the Federal Rules of Civil Procedure consisting of:

> All persons with physical disabilities who, now or during the
> pendency of this lawsuit: (1) receive DC Medicaid-funded long-
> term care services in a nursing facility for 90 or more consecutive
> days; (2) are eligible for Medicaid-covered home and community-
> based long-term care services that would enable them to live in the
> community; and (3) would prefer to live in the community instead
> of a nursing facility but need the District of Columbia to provide
> transition assistance to facilitate their access to long-term care
> services in the community.

Order [Dkt. No. 129] at 1; see Thorpe v. District of Columbia, 303 F.R.D. at 152, petition for

appeal of class cert. denied, In re District of Columbia, 792 F.3d 96 (D.C. Cir. 2015).  In 2016,

Judge Huvelle conducted a bench trial to determine whether the District of Columbia was

"liable," reserving until a later phase, if necessary, the question of what an appropriate remedy

might be.  See Brown I, 322 F.R.D. at 61-62.  At the outset, the Court observed that for plaintiffs

to prevail, they had "to show a systemic policy or practice of the District's operation of its

Medicaid system that has caused a common harm to plaintiffs" in the class and further "that the

common harm can be remedied by a single injunction, which would result in the class members

being transitioned out of the nursing facilities." Brown I, 322 F.R.D. at 53 (citing FED. R. CIV.

P. 23).

In September 2017, after the trial, Judge Huvelle concluded that plaintiffs had

failed to prove that the District of Columbia had violated the ADA and the Rehabilitation Act

and entered judgment for the District.  See Brown I, 322 F.R.D. at 96.  The Court concluded that

plaintiffs had failed to prove "the existence of a concrete systemic deficiency in the District's

transition services" that had caused plaintiffs "to remain in nursing facilities despite their

preference to receive long-term care in the community."  Id. at 87; see also id. at 56 (noting that,

under Rule 23, "to prevail on the merits and obtain the relief they seek, plaintiffs [must] prove concrete[,] systemic deficiencies in the District's system of transition assistance and that these deficiencies have caused a common harm to class members" (alteration in original) (internal quotation omitted)) .  Furthermore, in her judgment, plaintiffs had failed to prove either that any systemic deficiency caused plaintiffs' institutionalization or that the harm could be addressed by a single injunction.  See id.

On appeal, the D.C. Circuit reversed, holding that the Court had erred by requiring plaintiffs to shoulder the burden at trial of proving a "'concrete, systemic deficiency' in the District's transition services."  See Brown v. District of Columbia ("Brown II"), 928 F.3d 1070, 1079 (D.C. Cir. 2019).  The court concluded that under Olmstead it is the District of Columbia that should "bear[] the burden of proving the unreasonableness of [plaintiffs'] requested accommodation[s]" because plaintiffs had already established that "community placement is appropriate" and that "the transfer from institutional care to a less restrictive setting is not opposed."  Id. at 1077 (quoting Olmstead, 527 U.S. at 600); accord Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d 487, 492 n.4 (3d Cir. 2004) ("Under this scheme, the plaintiff first bears the burden of articulating a reasonable accommodation.  The burden of proof then shifts to the defendant, who must establish that the requested relief would require an unduly burdensome or fundamental alteration of state policy in light of its economic resources and its obligation to other [disabled] persons in the institutional setting.").

The D.C. Circuit proceeded to lay out two alternative ways that that the District can carry its burden.  First, the District can "'demonstrate that it ha[s] a comprehensive, effectively working plan for placing qualified persons with [physical] disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace not controlled by the

State's endeavors to keep its institutions fully populated,' i.e., an 'Olmstead Plan.'"  Brown II, 928 F.3d at 1078 (quoting Olmstead, 527 U.S. at 605-06).  Second, if the District cannot demonstrate that it has an adequate Olmstead Plan, it can demonstrate that each of plaintiffs' requested modifications to the District's policies and procedures "would be so costly as to require an unreasonable transfer of the State's limited resources away from other disabled individuals."  Id. at 1078.  If it cannot demonstrate either, the District "must make every [reasonable] modification to its policies and procedures requested by an institutionalized disabled individual who wishes to, and could, be cared for in the community."  Id.

Because this Court failed to analyze plaintiffs' claims "in clear terms and under the correct burden of proof," the D.C. Circuit remanded the case for further factfinding and consideration.  Brown II, 928 F.3d at 1084; see also id. at 1083-85 (providing detailed remand instructions).  Although on remand this Court remains "free to apply certain facts that it has already found to the legal standards articulated" by the court of appeals, id. at 1085, it cannot reuse "facts that were found based on an improper allocation of the burden of proof [on plaintiffs]," id. at 1085 n.14. [5]

---

[5]      The D.C. Circuit also addressed the parties' disputes regarding whether the case was properly certified as a class action under Rule 23(a)(2) and (b)(2) of the Federal Rules of Civil Procedure.  See Brown II, 928 F.3d at 1079-83.  With respect to the former, the court of appeals observed that "on the current record, there does not appear to be a Rule 23(a)(2) deficiency" because "common proof will lead to common answers" to the questions on which plaintiffs' claims turn.  Id. at 1082.  And with respect to the latter, the court suggested that the certified class action was proper because an injunction favoring plaintiffs would satisfy Rule 23(b)(2) so long as it "improved [each plaintiff's] likelihood of achieving the legally mandated outcome," i.e., transition to the community.  Id. at 1083; see also id. (noting "that the Supreme Court has called '[c]ivil rights cases against parties charged with unlawful, class-based discrimination' like this one, 'prime examples of what (b)(2) is meant to capture'" (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 361 (2011))).  The court of appeals noted, however, that on remand this Court may modify or decertify the class as necessary.  See id. at 1085; see also FED. R. CIV. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

After additional discovery and pretrial litigation, this case proceeded to a second bench trial before the undersigned that commenced on October 25, 2021.[6]  Pursuant to the D.C. Circuit's remand instructions regarding burden of proof, the District presented its case-in-chief first over eight days, calling eight witnesses and introducing numerous exhibits.  Plaintiffs then presented their opposition case over eight-and-a-half days, calling eleven witnesses (two of whom had testified during the District's case-in-chief) and introducing numerous exhibits.  The District presented its rebuttal case over two-and-a-half days, calling four witnesses (recalling two witnesses from its case-in-chief) and introducing additional exhibits.  The parties presented their closing arguments on the twentieth day of trial, December 20, 2021.

After the conclusion of the bench trial and in accordance with the schedule set by the Court, see Order [Dkt. No. 435], the parties simultaneously filed proposed findings of fact and conclusions of law, see Defendant's Proposed Findings of Fact and Conclusions of Law [Dkt. No. 442]; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Dkt. No. 441], and their respective responses thereto, see Plaintiffs' Response to Defendant's Proposed Findings of Fact and Conclusions of Law [Dkt. No. 446]; Defendant's Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Dkt. No. 447].[7]  In addition, at the Court's invitation,

---

[6]     On November 30, 2021, the parties jointly stipulated to the dismissal of one of three remaining named plaintiffs.  See Joint Stipulation of Dismissal of Donald Dupree [Dkt. No. 429].

[7]     In addition, plaintiffs filed two motions to strike portions of the District's submissions that assertedly relied on material that is not part of the evidentiary record.  See Plaintiffs' Motion to Strike Portions of Defendant's Proposed Findings of Fact and Conclusions of Law That Are Based Upon Documents That Were Not Admitted Into Evidence [Dkt. No. 445]; Plaintiffs' Motion to Strike Portions of Defendant's Response to Plaintiffs' Findings of Fact and Conclusions of Law [Dkt. No. 453].  Having reviewed plaintiffs' objections and the District's responses, the Court denied both motions by Order of September 18, 2024.  See Order of September 18, 2024 [Dkt. 503].  The Court stated in that order that it will not rely in this Opinion on those portions of the District's submissions that are still in dispute, thus rendering the

the parties filed supplemental post-trial briefs in January 2024.  See Plaintiffs' Supplemental

Post-Trial Brief [Dkt. No. 497]; Defendant's Supplemental Memorandum [Dkt. No. 498];

Defendant's Response to Plaintiffs' Supplemental Post-Trial Brief [Dkt. No. 499]; and Plaintiffs'

Response to Defendant's Supplemental Post-Trial Brief [Dkt. No. 500].[8]

     After carefully considering all of the admissible evidence from both bench trials

in this case, making credibility findings as necessary, and after reviewing the parties'

voluminous filings and the applicable law, the Court makes the following findings of fact and

conclusions of law.  See FED. R. CIV. P. 52(a).

## II.  FINDINGS OF FACT

     As the D.C. Circuit instructed, the trial focused on "whether the District can

establish that the plaintiffs' requested accommodations are in fact unreasonable."  Brown II, 928

---

motions moot.  It has relied in this Opinion exclusively on material that has been admitted in
evidence in order to resolve this case.

  [8]  In their filings, the parties agreed that there had been no material changes in the
applicable law since the close of trial, except with regard to one case, United States v. Florida,
682 F. Supp. 3d 1172 (S.D. Fla. 2023).  Defendant's Response to Plaintiffs' Supplemental Post-
Trial Brief at 1.  In that case, the court held the state liable for unjustifiably segregating
medically complex children in need of long-term care by institutionalizing them rather than
placing them in the most integrated setting appropriate to their needs, in violation of the ADA.
See United States v. Florida, 682 F. Supp. 3d 1172.  Plaintiffs argued that the District of
Columbia, like the state of Florida, "failed to address [ ] barriers through reasonable
accommodations to help the [plaintiff class] realize their integration rights."  Plaintiffs' Response
to Defendant's Supplemental Post-Trial Brief at 3.  The District pointed  out "several key
differences" between this case and the Florida case, including the fact that it involved private
duty nursing and the long waiting list for Medicaid waivers in Florida.  Defendant's
Supplemental Memorandum at 2-3.  It noted that there is no waiting list at all for EPD waivers in
the District of Columbia.  Id. at 3.  The Court finds that the decision in the Florida case was
largely fact-based and, as defendant points out, arose in a very different context from the one at
issue here.  The Court concludes that United States v. Florida is not relevant to its analysis in the
instant case.

F.3d at 1083-84.  As that court held, the District can meet its burden of proof in one of two ways.

First, "[t]he District can establish that it has a 'comprehensive, effectively working plan' for

transitioning [plaintiffs] to the community and a 'waiting list [for transition to the community]

that move[s] at a reasonable pace,' i.e., an adequate 'Olmstead Plan.'"  Id. at 1084 (third and

fourth alterations in original) (quoting Olmstead v. L.C. ex rel. Zimring, 527 U.S. at 605-06).

Second, if it cannot do so, "the District can establish, seriatim, that each of the four provisions of

Plaintiffs' requested injunction would be so costly as to require an unreasonable transfer of the

District's limited resources from other disabled individuals."  Id.

      The following findings of fact are based on the live testimony of witnesses at trial,

the documentary evidence admitted at trial, factual findings from the first bench trial in this case

that have been reaffirmed under the correct burden of proof, see Brown II, 928 F.3d at 1085 n.14,

and the parties' stipulations of undisputed facts.

## A.  The District's Witnesses

      The District of Columbia offered live testimony from the following District

officials and employees and from one expert witness.  The District also offered live testimony

from the two named plaintiffs and one of their guardians during plaintiffs' case-in-chief.

### Melisa Byrd

1.    Melisa Byrd has been the Medicaid Director and Senior Deputy Director of the

D.C. Department of Health Care Finance ("DHCF") since October 2018.  See Trial Transcript

("Tr.") at 39:8-16, 41:13-15 (Byrd).  In that role, Ms. Byrd oversees DHCF's administration of

the District's Medicaid State Plan and other programs, and she also plays a role in the agency's

policy decisions, budget formulation and decisions, and compliance with federal law, including the Medicaid statute.  See id. at 41:16-42:11, 43:18-20 (Byrd).[9]

### Tamara Freeman

2.    Tamara Freeman is a supervisory nurse consultant in the Health and Regulation and Licensing Administration of the D.C. Department of Health ("DOH").  See Tr. at 310:24-311:5 (Freeman).  Ms. Freeman holds a bachelor's degree in nursing and a master's degree in nursing leadership, is certified by the Centers for Medicare and Medicaid Services ("CMS") to conduct long-term care surveys, is a registered nurse, and was the director of nursing at a long-term care facility before joining DOH 15 years ago.  See id. at 311:10-8 (Freeman).  As a supervisory nurse consultant, Ms. Freeman oversees a team of nurses and a sanitarian who visit and inspect long-term care facilities to ensure that the care and services provided to residents accord with federal and state regulations.  See id. at 312:21-313:8 (Freeman).

### Laura Newland

3.    Laura Newland has been the Director of the D.C. Department of Aging and Community Living ("DACL"), previously known as the D.C. Office on Aging ("DCOA"), for about six years.  See Tr. at 499:7-15 (Newland).  In that role, Ms. Newland oversees the agency, which provides services and supports, directly or through grants or contracts, to D.C. residents aged 60 years and older, adults with disabilities, and their caregivers.  See id. at 502:12-503:8 (Newland).  Ms. Newland personally played a role in drafting the District's Olmstead Plan and

---

[9]    The present tense is frequently used throughout this Opinion.  Certain statements of fact – including the jobs held by witnesses and their titles – may not be accurate today.  But the evidence in this case closed on the last day of this non-jury trial, December 20, 2021.  The facts stated herein reflect the evidence and testimony as of the time of trial.

oversees DACL's implementation of its portion of the plan.  See id. at 507:9-13, 508:16-21, 549:10-550:9 (Newland).

4.      Before beginning her current role, Ms. Newland was special assistant for community living to the Deputy Mayor for Health and Human Services, Brenda Donald.  See Tr. at 499:23-500:4 (Newland).  In that role, Ms. Newland investigated the system of long-term services and supports provided through various D.C. agencies – including DACL, the D.C. Department of Health Care Finance ("DHCF"), the D.C. Department of Behavioral Health, DOH, the D.C. Department on Disability Services, and the Office of Disability Rights – and sought to increase collaboration between the agencies.  See id. at 500:13-19, 506:20-506:1, 553:23-554-9 (Newland).  She also studied the EPD Waiver application process and made recommendations to the Deputy Mayor on how to improve the process.  See id. at 500:23-501:7 (Newland).

Dr. Heather Stowe

5.      Dr. Heather Stowe was the Clinical Director of DACL from June 2019 through October 2021.  See Tr. at 965:11-20 (Stowe).  Dr. Stowe has a Ph.D. in social work and is a licensed clinical social worker, having worked in social work for approximately 30 years.  See id. at 967:11-13, 968:1-20 (Stowe).  As the Clinical Director, Dr. Stowe worked to ensure that the teams within DACL that provided direct services to clients were able to do so in an efficient, effective, and person-centered manner that allowed individuals to live safely in the community as long as possible.  See id. at 970:18-24 (Stowe).  She also was responsible for improving the professionalism of the clinical teams, particularly by establishing standard operating procedures and data collection practices.  See id. at 972:11-23.

15

Carolyn Punter

6.      Carolyn Punter was the Senior Vice President of the Housing Choice Voucher Program and Eligibility and Continued Occupancy Division of the D.C. Housing Authority ("DCHA") until late 2021.  See Tr. at 1200:1-4 (Punter).  Ms. Punter was responsible for overseeing the administration of locally- and federally-funded housing choice vouchers, inspections of units paid for with those vouchers, and the maintenance and management of the housing choice voucher wait list.  See id. at 1200:17-24 (Punter).

Kristy Greenwalt

7.      Kristy Greenwalt is an independent consultant who works with various cities, including the District of Columbia, to shape their homeless service system response.  See Tr. at 1428:19-22 (Greenwalt).  From 2014 to 2021, Ms. Greenwalt was the D.C. Director to End Homelessness, also known as the Director of the Interagency Council on Homelessness, a body composed of government officials and private- and nonprofit-sector partners that guide the District of Columbia's homeless service system response.  See id. at 1428:23-1430:8 (Greenwalt).

Jennifer Reed

8.      Since October 2017, Jennifer Reed has served as the Director of the D.C. Office of Budget and Performance Management.  See Tr. at 1565:6-14 (Reed).  In that position, Ms. Reed leads a budget team that is responsible for the formulation and implementation of the mayor's annual budget and financial plan, a performance team to drive strategic planning and service improvements across the District, and a third team that uses academic insights to improve District policies and programs.  See id. at 1566:24-1567:20.

Gwendolyn Noonan-Jones

9.      Gwendolyn Noonan-Jones is a transition care specialist at DACL, where she assists nursing facility residents to safely transition back to the community to receive services. See Tr. at 3544:15-20 (Noonan-Jones).  Ms. Noonan Jones worked with Ivy Brown, one of the two named plaintiffs, as her transition care specialist from 2016 to 2018.  See id. at 3545:23-3546:9 (Noonan-Jones).

Jemila Darku

10.      Jemila Darku was a transition care specialist at DACL from 2013 to 2016, and she worked with Ivy Brown as her transition care specialist from 2014 to 2016.  See Tr. 3589:2-11, 3611:1-6, 3613:20-22 (Darku); see also id. at 3546:5-15 (Noonan-Jones).  Since 2019, Ms. Darku has served as the community outreach coordinator for the community transition program of DACL, in which capacity she provides information to nursing facility residents, social workers, guardians, and family caregivers about the District's community transition program. See id. at 3589:19-3590:4 (Darku).

Wanda Seiler

11.      Wanda Seiler was retained by the District of Columbia as an expert.  See Def. Ex. 114.[10]  Ms. Seiler is a Managing Director with Alvarez & Marsal Public Sector Services, LLC, and has 24 years' experience providing government social services in South Dakota.  See id. ¶ 1; see also id. Appendix A.  She has previously "served as an expert in civil matters relating to the quality of services provided to people with developmental disabilities."  Id. ¶ 4.

---

[10]      Pursuant to the parties' stipulation, Ms. Seiler's written expert report constituted her direct testimony except to the extent it was supplemented at trial based on recent developments.

12.    Ms. Seiler was qualified by the Court as "an expert in the requirements of the Americans with Disabilities Act and <u>Olmstead</u> and how states can design and improve the programs under which they provide long-term care services and supports to people with disabilities, including <u>Olmstead</u> planning."  Tr. at 3788:4-11 (Seiler).

## B.  The Plaintiffs' Witnesses

Plaintiffs offered live testimony from the following individuals, including three expert witnesses, whose expert reports, pursuant to the parties' stipulation, constituted their direct testimony except to the extent it was supplemented at trial based on recent developments.

### Megan Fletcher

13.    Megan Fletcher was a management analyst at DACL from February 2020 until late November 2021.  <u>See</u> Tr. at 1897:10-23 (Fletcher).  In that capacity, Ms. Fletcher collected and analyzed data related to DACL's work, including data on the referral of nursing facility residents to DACL, giving insight into the department's performance and efficacy.  <u>See id</u>. at 1898:15-18, 1898:23-1899:15 (Fletcher).

### Larry McDonald

14.    Larry McDonald is a D.C. Medicaid Beneficiary who has lived in a nursing facility since at least 2006.  <u>See</u> Tr. at 2102:10-2103:16 (McDonald); Tr. at 2980:18-22 (Cason Daniel); <u>see also</u> Pl. Ex. 388 at 6.  Mr. McDonald has a physical disability and requires assistance with at least two activities of daily living.  <u>See</u> Pl. Ex. 388 at 6.  Mr. McDonald is one of two remaining named plaintiffs in this case.  <u>See</u> Plaintiffs' Fourth Amended Class Action Complaint [Dkt. No. 162] ¶¶ 46-53.

## Deborah Cason Daniel

15.     Deborah Cason Daniel has served as Mr. McDonald's legal guardian since April 2017, when Mr. McDonald's previous guardian was replaced.  See Tr. at 2980:6-9, 3001:5-16 (Cason Daniel).  Ms. Cason Daniel is an attorney who practices abuse and neglect law, represents wards and subjects in guardianship and conservatorship matters, and serves as the personal representative in probating estates.  See id. at 2979:20-2980:1 (Cason Daniel).

## Leyla Sarigol

16.     Leyla Sarigol is a project manager in the Long Term Care Administration of DHCF.  See Tr. at 2331:17-23 (Sarigol).  In that role, Ms. Sarigol coordinates and provides guidance regarding community transition programs, focusing on the Money Follows the Person Demonstration Grant ("MFP") program.  See id. at 2332:5-13 (Sarigol).  She is also DHCF's lead representative to the District's Olmstead Plan and for compliance with federal regulations governing home- and community-based services.  See id. at 2332:5-25 (Sarigol).

## Ivy Brown

17.     Ivy Brown is a D.C. Medicaid beneficiary who has lived in a nursing facility since May 2013.  See Tr. at 2866:7-9, 2868:8-25; Pl. Ex. 388 at 5.  Ms. Brown has a physical disability and requires assistance with at least two activities of daily living.  See Pl. Ex. 388 at 5.  Ms. Brown is one of two remaining named plaintiffs in this case.  See Plaintiffs' Fourth Amended Class Action Complaint [Dkt. No. 162] ¶¶ 26-29.

## Kenneth Slaughter

18.     Kenneth Slaughter is the Americans with Disabilities Act / Section 504 of the Rehabilitation Act Coordinator for DCHA.  See Tr. at 2960:23-2961:3 (Slaughter).  Mr.

Slaughter oversees requests from D.C. residents with disabilities who seek reasonable accommodations from DCHA.  See id. at 2961:4-13 (Slaughter).

Nancy Weston

19.    Nancy Weston was retained by plaintiffs as an expert.  See Pl. Ex. 140.  Ms. Weston is the Director of Nursing Facility Operations for the Massachusetts Department of Developmental Services, in which capacity she "manage[s] the statewide clinical eligibility process for persons with brain injuries and other disabilities requiring community placement through HCBS residential waivers in coordination with partner state agencies."  Pl. Ex. 141A at 1.  Ms. Weston is a licensed social worker, which informed her opinions regarding the work of nursing facility social workers and DACL transition care specialists.  See Tr. at 3058:24-3059:3 (Weston).  She has previously provided trial testimony in another Olmstead litigation, Steward v. Abbott, Civil Action No. 10-1025 (W.D. Tex.).  See Pl. Ex. 141A at 1, 40.

20.    Ms. Weston was qualified by the Court as "an expert in the administration of government programs to assist with the transition of people with disabilities from nursing facilities and other institutions, as well as an expert in Olmstead implementation and compliance."  Tr. at 3113:22-3114:1, 3115:1-4 (Weston); accord id. at 4054:4-14 (Weston).

Randall Webster

21.    Randall Webster was retained by plaintiffs as an expert.  See Pl. Ex. 140.  Mr. Webster has 44 years' experience in treatment and care for people with intellectual and developmental disabilities.  See Tr. at 3232:12-15 (Webster); see also Pl. Ex. 141A at 3.  Most recently, Mr. Webster served as a Consultant to the Massachusetts Department of Developmental

20

Services Special Projects, where he consulted on "key projected related to implementation" of an Olmstead Plan.  Pl. Ex. 141A at 3.

22.    Mr. Webster was qualified by the Court as "an expert in the implementation of state obligations under Title II of the ADA and Olmstead for people with disabilities in nursing facilities and other institutions" and as "an expert about transition assistance for populations of people with disabilities who have been institutionalized for long periods of time."  Tr. at 3535:6-19 (Webster).

Michael Petron

23.    Michael Petron was retained by plaintiffs as an expert.  See Pl. Ex. 142.  Mr. Petron is a Managing Director of Risius Ross, LLC, where he leads the Disputes, Compliance, and Investigations group.  See Pl. Ex. 143.  Relying on conclusions reached by plaintiffs' other two experts, Mr. Petron developed and implemented "a statistically valid random sample . . . to estimate a number of different attributes related to people with disabilities that are located within District of Columbia nursing facilities."  Pl. Ex. 142. ¶ 5.

24.    Mr. Petron was qualified by the Court as an "expert in the field of statistical sampling."  Tr. at 2740:24-2741:8 (Petron).

### C.  Medicaid-Funded Long-Term Care in the District

25.    Medicaid is a federal public health insurance program that "provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons."  Harris v. McRae, 448 U.S. 297, 301 (1980); see also Nat'l Fed'n Indep. Bus. v. Sebelius, 567 U.S. 519, 541 (2012) ("Medicaid offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical

care.").  States' participation in the Medicaid program is voluntary, but to do so "States must

comply with federal criteria governing matters such as who receives care and what services are

provided at what cost."  Nat'l Fed'n Indep Bus. v. Sebelius, 567 U.S. at 541-42.  As relevant

here, Medicaid is administered in the District of Columbia by the D.C. government and is used to

fund "long-term care" for low-income or disabled individuals and their families.  See Brown I,

322 F.R.D. at 71.

      26.     The Centers for Medicare and Medicaid Services ("CMS") is the federal agency,

housed within the U.S. Department of Health and Human Services ("HHS"), that regulates

Medicaid and oversees the services provided by states using Medicaid funding, including those

provided by long-term facilities like nursing facilities.  See Brown I, 322 F.R.D. at 71; Tr.

at 58:20-59:6 (Byrd).  The District regularly submits reports about its Medicaid-provided

programs to CMS, as the federal oversight agency, as well as to the Council of the District of

Columbia.  See, e.g., Def. Ex. 219 (report to CMS regarding EPD Waiver); Def. Ex. 230 (DHCF

Performance Plan).

      27.     "A 'Medicaid State Plan' is an agreement between a state – or here, the District of

Columbia – and the Federal government that describes how that state shall administer its

Medicaid program and provides assurance that a state will abide by Federal rules and may claim

Federal matching funds for its program activities."  Joint Stipulations of Fact ("Stipulated Facts")

[Dkt. No. 382] at 1-2; see Tr. at 50:17-51:6 (Byrd); see also 42 U.S.C. § 1396a(a) (setting forth

the requirements for a state plan).  Through the Federal Medical Assistance Percentage, the

federal government reimburses the District for 70% of the cost of direct services provided under

the District's Medicaid State Plan, leaving the District to pay for 30%.  See Tr. at 56:8-57:4

(Byrd); Def. Ex. 102 at 7; accord Brown I, 322 F.R.D. at 71.  The Medicaid program does not

provide direct services to individuals; it pays for services provided by others.  See id. at 45:19-25, 46:13-25 (Byrd); see also id. at 47:20-48:9 (Byrd) (noting several federal limitations on what a Medicaid program can provide).

28.    In addition to providing services pursuant to a Medicaid State Plan, states can petition CMS for waivers from the general Medicaid rules in order to provide additional services that are not typically authorized or to provide special services to certain subsets of the Medicaid-eligible population.  See Tr. at 66:8-67:13 (Byrd); see also Sanchez v. Johnson, 416 F.3d 1051, 1054 (9th Cir. 2005) ("In 1981, in response to the fact that a disproportionate percentage of Medicaid resources were being used for long-term institutional care and studies showing that many persons resident in Medicaid-funded institutions would be capable of living at home or in the community if additional support services were available, Congress authorized the Home and Community Based Services ('HCBS') waiver program."); see also 42 U.S.C. § 1396n(c)(1) (establishing the waiver program).

29.    The D.C. Department of Health Care Finance ("DHCF") is the agency responsible for administering the District's Medicaid program, including when a Medicaid function is delegated to another D.C. agency or an independent entity.  See Tr. at 41:13-42:3, 185:6-22 (Byrd).  DHCF oversees Medicaid-funded programs in the District of Columbia, including long-term care in nursing facilities, the Medicaid State Plan, the EPD Waiver, and the MFP Program, discussed further below.  See Def. Ex. 102 at 7, 11, 21, 25-26.

### 1. Long-Term Care Services and Supports in Nursing Facilities

30.    Under the District's Medicaid plan, individuals may (if appropriate) receive D.C. Medicaid-funded long-term care services and supports in an institutional setting, like a nursing facility, or in a community-based setting.  See Tr. at 52:18-53:8 (Byrd); Def. Ex. 202 at 5.

Generally, to qualify for Medicaid in the District of Columbia, an individual must fall within 200% of the federal poverty level.  See Tr. at 45:6-17 (Byrd).  Long-term care services and supports are "things which are necessary for individuals to be able to live successfully in their community."  Id. at 969:19-22 (Stowe); see also Brown I, 322 F.R.D. at 71 (noting that individuals in either setting are provided with assistance performing activities of daily living ('ADLs') – including self-care tasks like eating, bathing, toileting dressing, and mobility/transferring – and instrumental activities of daily living ('IADLs') – including "medication management, meal preparation, housekeeping, money management, and telephone use").

31.    A nursing facility is "any facility licensed to operate as a nursing facility under Title 22B, Section 3200 et seq. of the D.C. Municipal Regulations."  Stipulated Facts at 2; see also D.C. MUN. REGS. tit. 22-B, § 3299 ("[A] 24-hour institution . . . that: (1) is primarily engaged in providing nursing care and related services to residents who require medical or nursing care, or rehabilitation services for the rehabilitation of persons who are injured, disabled, or sick; (2) is not primarily for the care and treatment of mental diseases; and (3) has in effect a transfer agreement [with at least one hospital that meets federal statutory requirements].").  "Nursing facilities are 'institutions' within the meaning of Olmstead . . . and Title XIX of the Social Security Act, 42 U.S.C. § 1396r."  Stipulated Facts at 3.  The District does not operate nursing facilities itself; rather, it funds long-term care in nursing facilities for eligible Medicaid beneficiaries through its Medicaid State Plan.  Brown I, 322 F.R.D. at 71.

32.    As of the time of trial, "[t]here [we]re 17 nursing facilities in the District of Columbia that [we]re certified for reimbursement through DC Medicaid."  Stipulated Facts at 2; see also Pl. Ex. 850.  In 2020, the District asserted that it had access to a total of 6,574 nursing

facility beds, including beds both in nursing facilities in the District of Columbia and in
facilities in certain neighboring jurisdictions.  See Def. Ex. 102 at 50; Tr. at 246:2-5 (Byrd);
compare Pl. Ex. 850 (listing, as of June 30, 2021, 2,447 available beds across 17 nursing
facilities in the District of Columbia), with Tr. at 837:7-838:11 (Newland) (acknowledging
the 6,574 figure but testifying that the bed capacity inside District nursing facilities did not
significantly change between 2017 and 2020).  The District provides services and supports,
including transition assistance, to D.C. Medicaid beneficiaries in nursing facilities in
neighboring jurisdictions (e.g., Maryland, Virginia) whose services are provided by D.C.
Medicaid.  See Tr. at 577:3-578:11, 933:8-934:19 (Newland); id. at 1065:22-25 (Stowe).

33.    In 2014, there were 3,650 D.C. Medicaid beneficiaries – including class members
– living in nursing facilities in the District of Columbia and in neighboring jurisdictions.  See Pl.
Ex. 954 at 1-2 (showing that there were nursing facility residents in the District of Columbia,
Maryland, Virginia, Delaware, and Massachusetts).  In 2015, there were 3,742 unique D.C.
Medicaid beneficiaries in nursing facilities.  See id.  In 2016, there were 3,751 D.C. Medicaid
beneficiaries in nursing facilities.  See id.  In 2017, there were 4,166 D.C. Medicaid
beneficiaries in nursing facilities.  See id.  In 2018, there were 4,245 D.C. Medicaid
beneficiaries in nursing facilities.  See id.  In 2019, there were 4,107 D.C. Medicaid
beneficiaries in nursing facilities.  See id.  In 2020, there were 4,183 D.C. Medicaid
beneficiaries in nursing facilities.  See id.; see also Pl. Ex. 851 (showing that, in 2020, the
District had a nursing facility occupancy rate of 87%); Tr. at 241:23-242:9 (Byrd).  And as of

November 8, 2021, there were 4,099 D.C. Medicaid beneficiaries in nursing facilities.  See Pl.

Ex. 954 at 1-2.[11]

34.     As of 2016, the average length of stay of a resident in a nursing facility (for both

class members and non-class members) was 624 days.  See Def. Ex. 101 at 9; accord Pl.

Ex. 140 at 45-46; see also Brown I, 322 F.R.D. at 72 (noting that the average length of stay in a

nursing facility as of the fourth quarter of 2014 was 537 days).  The District compiles data of

the time spent by residents in nursing facilities before they successfully transition to

community-based long-term care with the District's transition assistance.  See Def. Ex. 112

(updated as of July 30, 2021).

35.     The D.C. Department of Health ("DOH") is the local agency responsible for

regulatory oversight of all health facilities in the District of Columbia, which responsibility

includes assessing nursing facilities' compliance with health and safety standards.  See Tr.

at 59:18-22 (Byrd); id. at 372:3-9 (Freeman).[12]  DOH regulates nursing facilities' compliance

with local regulations and federal statutes, like the Nursing Home Reform Act ("NHRA"),

which collectively govern the quality of care and services in nursing facilities.  See id.

at 372:10-373:2 (Freeman); 42 U.S.C. § 1396a(a)(9)(A).[13]

---

[11]     The Court acknowledges that the COVID-19 pandemic significantly impacted
nursing facilities residents, who were placed at particular risk of infection and death.  See Pl.
Ex. 405 at 1-2; Pl. Ex. 835B.

[12]     DOH does not have regulatory authority over nursing facilities outside of the
District of Columbia.  See Pl. Ex. 417 at 2.

[13]     DHCF also plays a role in regulating nursing facilities by requiring facilities to
comply with DOH regulations as a condition of participating in the Medicaid program.  See Tr.
at 59:23-61:11 (Byrd).

36.     DOH solicits and receives complaints about nursing facility care and services from nursing facility residents, their friends and family, ombudsmen, and nursing facility staff themselves.  See Tr. at 364:21-365:25 (Freeman).  DOH employees regularly, and often in response to complaints, visit and inspect nursing facilities and conduct interviews with nursing facility residents and staff.  See Tr. at 312:21-25, 335:17-336:23, 481:5-482:6, 483:17-484:8, 486:5-23 (Freeman).  DOH also oversees nursing facilities to ensure that nursing facility social workers are aiding residents who wish to transition to the community.  See Tr. at 314:18-24, 366:3-367:20 (Freeman); see also Tr. at 1001:4-1002:12 (Stowe) (discussing DACL's analogous role in overseeing and coordinating with nursing facility social workers' efforts to transition nursing facility residents to the community).

37.     To qualify for Medicaid-funded services and supports in a nursing facility, an individual must meet the nursing facility level of care, meaning "he or she requires extensive assistance with two or more ADLs, or supervision with two or more ADLs and one IADL." Brown I, 322 F.R.D. at 71-72; see Tr. at 62:16-63:4 (Byrd).[14]  DHCF retains a contractor called Liberty to conduct the initial assessment of whether an individual meets the nursing facility level of care.  See Tr. at 63:5-15, 64:1-4, 123:20-124:5 (Byrd); see also Def. Ex. 224.  DHCF retains a different contractor called Comagine to conduct additional assessments – known as "continuing stay reviews" – six months after the initial level of care determination and annually thereafter, verifying that the individual continues to meet the nursing facility level of care.  See Tr. at 63:5-25, 64:5-12 (Byrd).

---

[14]     As previously noted, "ADLs" are activities of daily living, and "IADLs" are instrumental activities of daily living.  See FF ¶ 30.

## 2. The Minimum Data Set

38.     Nursing facilities are required by federal law to periodically administer to nursing facility residents the Minimum Data Set ("MDS"), a set of questions that "provides a comprehensive assessment of each resident's functional capabilities and helps nursing home staff identify health problems." *Minimum Data Set 3.0 Public Reports*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/Minimum-Data-Set-3-0-Public-Reports (last modified Sept. 6, 2023); Tr. at 326:17-328:19, 465:8-23 (Freeman).  The District and its contractors indirectly oversee nursing facilities' administration of the MDS to nursing facility residents as required.  See Tr. at 236:4-7 (Byrd) (noting that the District's contractor, Comagine, reviews portions of nursing facility residents' responses to the MDS); id. at 333:9-334:18 (Freeman) (noting that DOH staff reviews nursing facility residents' MDS data prior to visiting a nursing facility).

39.     One section of the MDS referred to as "Section Q," is an assessment designed to "record the participation and expectations of the resident, family members, or significant other(s) in the assessment, and to understand the resident's overall goals" regarding receiving long-term care services and supports in a nursing facility or elsewhere.  Def. Ex. 113; Def. Ex. 113.1 (MDS RAI Manual, Oct. 2019).  Section Q "uses a person-centered approach to ensure that all individuals have the opportunity to learn about home- and community-based services and to receive long term care in the least restrictive setting possible."  Id.; see also Pl. Ex. 110 ("Section Q . . . provides a process that, if followed correctly, gives the resident a direct voice in expressing preference and gives the facility a means to assist residents in locating and transitioning to the most integrated setting.").  A resident is supposed to be administered the MDS Section Q once within the first 14 days of arriving in a nursing facility, once every quarter

28

thereafter, and whenever there is a significant change in the resident's status, including

discharge.  See Tr. at 327:8-15 (Freeman); id. at 1027:21-1028:2 (Stowe); Def. Ex. 109.

40.     Of the several questions contained within the MDS Section Q, question

"Q0500B" requires the assessor to "[a]sk the resident (or family or significant other or guardian

or legally authorized representative if resident is unable to understand or respond): 'Do you want

to talk to someone about the possibility of leaving this facility and returning to live and receive

services in the community?'"  Def. Ex. 113 at 15; see also Brown I, 322 F.R.D. at 82.[15]  Pursuant

to the CMS manual for administering the MDS (the "RAI Manual"), if a nursing facility resident

responds "yes" to MDS question Q0500B, the nursing facility is supposed to connect them with

the designated local contact agency for additional information regarding transitioning to the

community, which in turn may result in that individual receiving transition assistance should

they decide to move forward.  See Def. Ex. 113 at 17 ("A 'yes' response to item Q0500B will

trigger follow-up care planning and contact with the designated local contact agency (LCA)

about the resident's requires."); Pl. Ex. 110 at 4; Tr. at 388:12-20, 389:10-15 (Freeman); see also

Brown I, 322 F.R.D. at 82 ("Residents who respond 'yes' are referred to the ADRC.").[16]

41.     The RAI Manual provides that if he or she responds "yes" to MDS question

Q0500B, a nursing facility resident should be put in contact with the local contact agency within

---

[15]     A nursing facility resident may opt out of being asked MDS question Q0500B quarterly but may not opt out of being asked the question during the annual, comprehensive assessment.  See Def. Ex. 113 at 13-14, 19-20 (discussing questions "Q0490" and "Q0550"); see also id. at 19 ("Some individuals, such as those with cognitive impairments, mental illness, or end-stage life conditions, may be upset by asking them if they want to return to the community.").  In addition, a questioner may skip MDS question Q0500B if active discharge planning is already occurring for the nursing facility resident to transition to the community.  See id. at 9.

[16]     States designate local contact agencies to "provide individuals with information about community living options and available supports and services."  Def. Ex. 113 at 21-22.

10 business days.  See Def. Ex. 113 at 17 (noting that a state has discretion in setting its own

policy).  The District does not have a regulation or policy setting a specific timeframe within

which a nursing facility must put a nursing facility resident who responds "yes" to MDS question

Q0500B in contact with the District's local contact agency.  See Pl. Ex. 388 at 33.  If a nursing

facility resident responds affirmatively to MDS question Q0500B, the contractor administering

the MDS Section Q will give the resident brochures or flyers explaining home- and community-

based services and DACL's transition coordination services.  See Tr. at 125:18-126:22 (Byrd);

id. at 562:19-563:15 (Newland); Def. Ex. 104; Def. Ex. 106.

      42.     The MDS nevertheless recognizes that, in some circumstances, putting an

individual who responds "yes" to MDS question Q0500B in contact with a local contact agency

is not immediately required.  See Def. Ex. 113 at 21-23.  MDS question "Q0600" asks:  "Has a

referral been made to the Local Contact Agency?"  Id. at 21.  Under the MDS guidelines, nursing

facility staff are permitted to decline to refer a nursing facility resident to a local contact agency

(1) if the person responds "no" to MDS question Q0500B; (2) "[i]f the resident's discharge

planning has been completely developed by the nursing home staff, and there are no additional

needs that the [nursing facility] cannot arrange for"; and (3) in other limited circumstances where

"the designated local contact agency needs to be contacted but the referral [need] not be[]

initiated at this time."  Def. Ex. 113 at 21-23; see also id. at 23 (offering as an example of the

third category the circumstance in which a nursing facility resident wishes to transition to the

community but cannot safely do so in the immediate future due to health reasons).

      43.     In addition to caring for nursing facility residents, see Oct. 4, 2016 Tr. at 8:21-

10:3 (Fisher), nursing facility social workers also assist residents who wish to transition back to

the community by, among other things, helping those residents to obtain necessary documents,

like identification or Social Security cards, to identify and visit potential housing, and to develop and implement discharge plans.  <u>See</u> Tr. at 322:6-25, 324:14-325:3 (Freeman); <u>id</u>. at 999:5-9 (Stowe).

44.     A discharge plan is a plan that lays out the requirements for a person to safely transition from a nursing facility back to the community.  It typically will include information on housing, financial resources, social supports, Medicaid-funded and nonmedical home- and community-based services, and the necessity for home modifications and assistive technology. <u>See id</u>. at 999:10-19 (Stowe); Def. Ex. 110 at 5.  Discharge planning is necessarily individualized and is based on a resident's level of care requirements, personal circumstances, and existing familial and community support.  <u>See</u> Tr. at 330:7-331:7 (Freeman); <u>id</u>. at 999:10-25 (Stowe).

45.     Although nursing facilities are ultimately the entities that formally admit and discharge residents, <u>see</u> Tr. at 718:10-719:12 (Newland), the District has a major role in the discharge planning process, along with residents' other supporters, like family members, legal guardians, and case workers.  <u>See</u> Tr. at 1000:17-1001:7 (Stowe).  Witnesses testified that the District therefore seeks to build and maintain strong relationships with nursing facility staff, to educate nursing facility social workers about the services and supports that exist in the community as well as the services that District agencies provide, and to participate in the discharge planning and transition process.  <u>See id</u>. at 577:3-13, 581:17-582:4 (Newland); <u>id</u>. at 979:2-981:13, 1002:13-23, 1181:13-1182:6 (Stowe).

### 3.  <u>Home- and Community-Based Services and Support</u>

46.     The District administers two principal Medicaid-funded programs that are relevant to this case and provide home- and community-based long-term care services ("HCBS") to individuals: the State Plan Personal Care Assistance ("State Plan PCA") program, and the

Elderly and Persons with Physical Disabilities Waiver ("EPD Waiver") program, established

under Section 1915(c) of the Social Security Act.  See Tr. at 105:6-106:17; Def. Ex. 102

at 25-26; see also Stipulated Facts at 1-3.  Individuals can be enrolled in – and can receive

services funded by – both the State Plan PCA program and the EPD Waiver program.  See

Stipulated Facts at 3.  "Each program provides personal-care assistance in community-based

settings, based on slightly different eligibility criteria."  Brown I, 322 F.R.D. at 73.  DHCF uses

two independent contractors (Liberty and Comagine) to conduct assessments and determine

individuals' level of care and eligibility to receive home care services under the State Plan PCA

program and the EPD Waiver program.  See Tr. at 123:20-24, 235:7-16 (Byrd).

47.    The State Plan PCA program offers to all eligible Medicaid beneficiaries living in

the community up to eight hours daily of personal care aide services, including assistance with

bathing, grooming, toileting, transfers, ambulation, and exercise, meal preparation, eating,

attending medical appointments, obtaining and attending employment, attending approved

activities, and self-administering medication.  See Def. Ex. 102 at 26 ("Home Health and

Medicaid State Plan Services"); Tr. at 105:6-106:16 (Byrd).  There is no limit to the number of

District residents who can receive State Plan PCA services.  See Tr. at 69:20-70:3 (Byrd).  To be

eligible for State Plan PCA services, an individual does not need to meet a nursing facility level

of care.  See Stipulated Facts at 3; see also Tr. at 201:8-202:15 (Byrd); Brown I, 322 F.R.D. at

73.  "Because the level-of-care eligibility requirement for State Plan PCA services is lower than

the requirement for the EPD Waiver, a qualified individual [can] receive State Plan PCA services

even if not eligible for the EPD Waiver."  Stipulated Facts at 3.

48.    The EPD Waiver program, on the other hand, provides a broader array of services

than the State Plan PCA program to qualifying individuals, including case management, up to 16

hours daily of personal care aide services, adult day health programs, respite care, assisted living services, environmental-accessibility adaptations, participant-directed services (which allows a beneficiary to receive services from a non-professional chosen by the beneficiary), and community transition services.  See Def. Ex. 102 at 25-26 ("Elderly and Persons with Physical Disabilities (EPD) Waiver"); Tr. at 107:2-113:6 (Byrd); Stipulated Facts at 3.[17]  To be eligible for the EPD Waiver program, an individual must be eligible to receive long-term care in a nursing facility, meaning they must require a nursing facility level of care.  See Brown I, 322 F.R.D. at 73; Tr. at 123:10-19 (Byrd); see also Pl. Ex. 388 at 19.

49.    In contrast to the State Plan PCA program, the EPD Waiver program has a cap. As of 2021, no more than 5,560 individuals may receive services through the EPD Waiver program in a given year.  See Def. Ex. 213.1; Tr. at 75:2-76:2, 139:3-140:3 (Byrd) (discussing the EPD Waiver's number of waiver slots).  As of 2021, there were more than enough EPD Waiver slots to accommodate all class members who need services under the EPD Waiver.  See Def. Ex. 114 ¶ 38; Tr. at 139:4-140:6 (Byrd); see also Brown I, 322 F.R.D. at 75 (noting that a low EPD Waiver utilization rate "means there is more than sufficient capacity to serve any individual who has housing in the community and is eligible for Medicaid-funded home and community-based services").  Although there was a waiting list of hundreds of individuals waiting for EPD Waiver services at least through 2013, see Brown I, 322 F.R.D. at 73, there is no longer a waiting list for the EPD Waiver; there are more than enough EDP slots.  See Stipulated Facts at 3.

---

[17]    The District also operates an "ID/DD Waiver" program for individuals with developmental and intellectual disabilities.  See Def. Ex. 102 at 51.  Individuals who have only intellectual disabilities are not included in the plaintiff class.  See Order [Dkt. No. 129].

50.    "[I]ndividuals who require eight or fewer hours of personal-care assistance do not have to enroll in the EPD Waiver to receive their needed assistance" because they can obtain their needed services solely through the State Plan PCA program.  The EPD enrollment figures therefore "do not reflect the full population of individuals who receive Medicaid-funded home and community-based services."  Brown I, 322 F.R.D. at 75.

51.    At the time of trial, the EPD Waiver approved by CMS was set to expire in April 2022.  See Def. Ex. 105 at 1.  On February 7, 2022, CMS renewed the District's EPD Waiver for a five-year period, maintaining the services previously provided by the EPD Waiver and allowing enrollees to cumulatively access 24 daily hours of personal care aid services through a combination of the EPD Waiver and the State Plan PCA programs.  See Pl. Ex. 974 at 1-2 ("Under the current approved waiver, enrollees will be able to cumulatively access 24 daily hours of PCA through a combination of 16 daily hours under the EPD waiver, and 8 daily hours under the State [PCA] Plan, so long as such hours are medically necessary in accordance with the requirements set forth by law and policy, and duly determined upon assessment and consideration of all relevant evidence."); see also Tr. at 108:5-109:10 (Byrd).[18, 19]

---

[18]    After the conclusion of trial, the Court granted plaintiffs' unopposed motion to supplement the evidentiary record and admitted Plaintiffs' Exhibit 974 into evidence.  See April 19, 2022 Minute Order.

[19]    On two occasions, CMS has placed the District under a Corrective Action Plan for improperly administering its EPD Waiver program.  See Brown I, 322 F.R.D. at 74.  In December 2015, CMS imposed a CAP for "abdicating responsibility for determining the amount of needed services to agency providers that stood to benefit from recommending additional services."  Id.  And in January 2016, CMS imposed a second CAP for failing to (1) "ensure quality monitoring of services"; (2) "track how long it takes for class members to access EPD Waiver services"; (3) accurately assess the services class members will need under the EPD Waiver once they leave the nursing facility"; (4) "have a system of resolving complaints regarding lack of access and authorization for EPD Waiver services"; and (5) "utilize existing slots in the EPD Waiver."  Id.

52.    In addition to these two programs, the District administers the Money Follows the Person Demonstration Grant ("MFP") program, a federally-funded program that was established to provide states with financial incentives to move people from institutional settings back to the community with Medicaid services and supports.  See Tr. at 2333:2-15, 2334:15-22 (Sarigol); Def. Ex. 102 at 22; Def. Ex. 114 ¶ 41; see also Pl. Ex. 177 (noting that one objective of the MFP program is "[t]o increase the access to and use of home and community-based, rather than institutional, long-term care services").[20]  Under the MFP program, the federal government reimburses the District for an enhanced 85% – compared to the standard 70% under the State Plan PCA program – of the cost of direct services "in the [one] year after eligible DC residents transition from a nursing facility or hospital to home."  Def. Ex. 102 at 7, 22; see Tr. at 166:18-167:9 (Byrd); id. at 2333:18-2334:14 (Sarigol) (instead of 70% federal funding and 30% funding with local funding, this program provides 85% federal funding).

53.    More specifically, the MFP program covers "set-up" costs that are incurred by a nursing facility resident as they transition to the community, including "leasing application fees, security deposit, essential furnishings, and household set-up items including linens, kitchenware, and bathroom essentials."  Def. Ex. 102 at 22; see also Brown I, 322 F.R.D. at 76 (noting also that the MFP program funds "outreach and education, transition coordination, environmental accessibility adaptations up to $10,000, household setup costs up to $5,000, and intensive case management during the transition and for 365 days following discharge from the nursing facility").  To be eligible for the MFP program, individuals with physical disabilities must meet the EPD waiver program's level of care requirements (i.e., a nursing facility level of

---

[20]    Since 2010, the MFP program has been available to elderly or physically disabled individuals in addition to individuals with intellectual disabilities.  See Brown I, 322 F.R.D. at 76.

care), must have resided in a nursing facility for at least 60 days, and must have had their

nursing facility services paid for by Medicaid for at least one day during the last 30 days.  <u>See</u>

Pl. Ex. 388 at 24.

54.    The MFP program is called a "grant" program because it is time limited, although

it historically has been extended by Congress year after year and, at the time of trial, had been

extended through 2023.  <u>See</u> Tr. at 166:10-23 (Byrd).  When initially introduced, the MFP

program funded certain set-up services that were only available through the program.  But the

District has since incorporated those unique services into its EPD Waiver program, such that

even if the MFP program were to be discontinued, the services provided under it would still be

available to eligible and enrolled individuals.  <u>See id.</u> at 167:24-168:19 (Byrd); <u>id.</u> at 2334:23-

2336:5 (Sarigol) (noting that the District, anticipating that the federal government might sunset

the MFP program across the country, began to – and still does – provide the same services in a

"sustainability mode," that is, that D.C. has taken steps to maintain the commitments made

during the MFP program to assist people to transition back to the community).  Because of this,

the MFP program now functions effectively as an additional source of funding for home- and

community-based services that the District would otherwise provide.  <u>See</u> Def. Ex. 114 ¶¶ 43-

44; Tr. at 559:20-560:5 (Newland) (noting that the work of the District's transition care

specialists is agnostic as to whether an individual is a participant in the MFP program); <u>id.</u> at

167:24-168:19 (Byrd).

55.    Beginning in 2010, the District began providing MFP-funded transition services

to elderly and physically disabled individuals and proposed benchmarks for transitioning such

individuals to the community.  <u>See</u> <u>Brown I</u>, 322 F.R.D. at 77; Pl. Ex. 802 (listing the transition

benchmark totals from 2008 through May 2021).  In 2010, the District proposed to transition 30

elderly or physically disabled nursing facility residents to the community, but it did not transition any that year.  See Pl. Ex. 802 at 1; see also Tr. at 2344:2-10 (Sarigol) (noting that the numbers of individuals who transitioned each year counted only those individuals who "actually enrolled in the [MFP program] upon discharge from the nursing facility").  From 2011 through 2013, the District proposed transitioning 40 elderly or physically disabled individuals to the community each year, though it fell short: it transitioned 17 in 2011, 19 in 2012, and 16 in 2013.  See id.  After being placed under a Corrective Action Plan ("CAP") by CMS for missing its MFP benchmarks, the District reduced its benchmarks for 2014 through 2017 to 30 transitions a year.  See Brown I, 322 F.R.D. at 77; Pl. Ex. 802 at 1.  Although it missed its goal in 2014, transitioning only 24 elderly or physically disabled individuals, it exceeded its goals the following years:  it transitioned 36 in 2015, 40 in 2016, and 37 in 2017.  See Pl. Ex. 802 at 1.

56.     In 2018, the District exceeded its benchmark of 24 transitions by transitioning 32 elderly or physically disabled individuals.  See Pl. Ex. 802 at 1.  In 2019, although the District was not required by CMS to set an annual benchmark under the MFP program, see Tr. at 2370:17-2371:10 (Sarigol), the District transitioned 47 elderly or physically disabled individuals through the District's sustainability mode.  See Pl. Ex. 802 at 1.  In 2020, the District exceeded its benchmark of 39 transitions by transitioning 44 elderly or physically disabled individuals, and as of June 2021, only a portion of that calendar year, the District had transitioned 19 individuals through the MFP program.  See id.

57.     Every year, the District of Columbia spends hundreds of millions of dollars providing home- and community-based services and supports to District residents through these Medicaid-funded programs: the State Plan PCA Program, the EPD Waiver program, and the MFP program.  See Def. Ex 233; Def. Ex. 204 at 66; Tr. at 120:13-121:10 (Byrd).  Generally,

the average cost of providing services to a Medicaid recipient who resides in a nursing facility is greater than the average cost of providing home- and community-based services to a Medicaid recipient.  See Def. Ex. 204 at 66; Tr. at 121:11-122:24 (Byrd).

58.    Under federal law, the District is required to maintain "cost neutrality" – that is, ensure that the average cost of services provided under the EPD Waiver is less than the average cost of services provided in a nursing facility – or else risk the loss of certain Medicaid funding.  See Tr. at 115:19-119:2 (Byrd); see also Olmstead, 527 U.S. at 601 n.12 ("The waiver program provides Medicaid reimbursement to States for the provision of community-based services to individuals who would otherwise require institutional care, upon a showing that the average annual cost of such services is not more than the annual cost of institutional services." (citing 42 U.S.C. § 1396n(c))).  The EPD Waiver has been cost neutral for each of the five years covered by the District's April 2020 application to renew the EPD Waiver.  See Pl. Ex. 388 at 22; e.g., Def. Ex. 229; see also Def. Ex. 214 at 214 (projecting cost neutrality for the renewed EPD Waiver).

59.    Through these various Medicaid-funded programs, the District provides home- and community-based services and supports to thousands of District residents every year.  See Def. Ex. 103; Def. Ex. 426 at 2-3; Tr. at 699:17-700:2 (Newland).

### D.  The District's Provision of Transition Assistance

60.    For purposes of this litigation, nursing facility residents "transition" to the community if they move from a nursing facility to community-based housing that is appropriate to their needs, whether that be an apartment or a house where an individual can reside independently or in an assisted living facility where an individual will have access to more integrated services.  See Def. Ex. 102 at 10-15; see also 28 C.F.R. § 35.130(d) (requiring a public

entity to administer services and programs in "the most integrated setting appropriate to the needs of qualified individuals with disabilities"); Olmstead v. L.C. ex rel. Zimring, 527 U.S. at 600-01 (recognizing that "unjustified institutional isolation of persons with disabilities is a form of discrimination").

61.    Over the past decade, the District of Columbia has promulgated several "Olmstead Plans" that purport to outline the programs and strategies by which it ensures that individuals with disabilities can receive services in the most integrated setting appropriate to their needs.  See, e.g., Def. Ex. 101 (2017-2020 Olmstead Plan); Pl. Ex. 951 and Def. Ex. 102 (2021-2024 Olmstead Plan); see also Tr. at 507:25-508:15 (Newland) (describing an Olmstead Plan as "a tool for people with disabilities and caregivers to understand a jurisdiction's commitment to make sure that people receive services" in the most integrated setting possible); id. at 76:13-23 (Byrd).  Ms. Newland, among many others, developed the District's most recent Olmstead Plans.  See Tr. at 506:20-507:13, 508:19-21, 509:10-12 (Newland); see also Def. Ex. 102 at 6 (describing the "Olmstead Working Group": a group "comprised of representatives from District agencies as well as District residents with disabilities, their family members, community organizations, and disability rights advocates" that provided recommendations and revisions for future Olmstead Plans); Tr. at 510:14-511:16, 515:16-25 (Newland) (discussing the working group's role and composition).

62.    As summarized in its most recent Olmstead Plan, numerous District agencies collaborate to provide affordable, safe housing to individuals with disabilities and to transition nursing facility residents to community-based housing.  See Def. Ex. 102 at 11-15, 21-22.  One of those agencies, the D.C. Department of Aging and Community Living ("DACL"), which was previously known as the D.C. Office on Aging ("DCOA"), provides transition assistance to D.C.

residents aged 60 and over, adults living with disabilities, and their caregivers.  See Tr.

at 499:12-15, 502:9-503:8 (Newland); Def. Ex. 102 at 21-22; see also Stipulated Facts at 2.  The

primary purpose of DACL is to provide supports and services, whether directly or through grants

and contracts, to individuals of those populations to "ensure that [they] can live in the

community for as long as they safely can."  Id. at 502:13-16 (Newland); see also id. at 969:2-14

(Stowe).

### 1.    The D.C. Department of Aging and Community Living

63.    DACL provides a range of services to individuals living in nursing facilities who

wish to transition to the community as well as to individuals who are receiving home- and

community-based services in the community.  For example, DACL provides information

assistance to individuals, including those receiving care in nursing facilities, through a call center

that answers callers' questions and refers callers to other agencies or non-governmental

organizations.  See Tr. at 708:1-9 (Newland); id. at 972:24-973:11 (Stowe).  DACL provides

"options counseling" to individuals, helping them to identify appropriate care options that are

currently available – or will become available – given their level of care needs and particular

stage in life.  See Tr. at 555:25-556:8, 590:6-12 (Newland); id. at 995:18-23 (Stowe).  DACL

also funds the long-term care ombudsman, an advocate that raises nursing facility residents'

concerns to the DOH and occasionally makes referrals to DACL.  See Tr. at 335:8-16 (Freeman);

id. at 561:17-7, 563:17-20, 891:13-16 (Newland).

64.    DACL also provides outreach to individuals in both nursing facilities and in the

community.  For example, DACL conducts hundreds of outreach events in the community

every year.  See Tr. at 562:19-563:8, 708:10-19 (Newland); Def. Ex. 114 ¶ 63.  DACL

produces and distributes brochures and flyers that advertise the agency's services.  See id. at

563:9-13 (Newland); id. at 3594:1-3595:10 (Darku); Def. Ex. 106; see also Tr. at 693:3-9

(Newland) (noting that non-governmental entities also hand out flyers). DACL – primarily

through its community outreach coordinator, Ms. Darku – conducts outreach to nursing

facilities to explain the services that DACL provides and to build rapport with the nursing

facilities. See Tr. at 979:2-16, 1183:1-10 (Stowe).

      65.    DACL administers programs that assist individuals with physical disabilities to

live comfortably and safely in the community. For example, through the Safe At Home

program, DACL provides in-home adaptations (e.g., handrails, grab bars, shower seats) for

people with disabilities so they may live more safely in their own homes with decreased fall

risks. See Tr. at 503:21-504:12 (Newland); Def. Ex. 103; see also Tr. at 583:3-584:10

(Newland). DACL also provides meals to more than a thousand individuals every day through

home delivery or at community dining sites. See Tr. at 503:13-21, 700:18-701:15 (Newland);

Def. Ex. 102 at 10. DACL provides fitness and educational programs to individuals throughout

the District of Columbia, including at senior wellness centers. See Tr. at 702:15-23 (Newland).

DACL offers transportation programs to individuals to transport them to medical appointments

and to social and recreational activities, thereby enabling individuals with physical disabilities

to live and receive medical care in the community. See id. at 705:6-706:9 (Newland). And to

help individuals access these services, DACL employs several Medicaid Enrollment Specialists

who assist individuals with applying for the EPD Waiver. See id. at 558:8-12, 973:12-25

(Newland); Def. Ex. 400; see also Brown I, 322 F.R.D. at 75.

      66.    Within DACL sits the Aging and Disability Resource Center ("ADRC"), the

designated "Local Contact Agency" to which nursing facility residents who want information

about receiving home- and community-based services and supports are referred. See Tr. at

41

239:3-8 (Byrd); id. at 774:3-5 (Newland); id. at 1117:2-11 (Stowe); Def. Ex. 114 ¶ 53 ("In the

District, the ADRC is the single point of entry for older adults, individuals living with disabilities

and their caregivers to call for information and referral assistance."); see also Pl. Ex. 112 at 11

(listing the "DC Office on Aging/ADRC" as the District of Columbia's Section Q Component);

Stipulated Facts at 2.  The ADRC is the group within DACL that provides options counseling to

nursing home residents, "a person-centered discussion to help [residents] understand their long-

term care options and empower them to make decisions based on informed choice and personal

preferences."  Def. Ex. 102 at 28; see Def. Ex. 110 at 16; Tr. at 995:12-996:5 (Stowe).

### 2.   Transition Care Specialists

67.    The Nursing Home Transition Team ("NHT") sits within the ADRC.  It is

composed of eight DACL employees (six transition care specialists, one MFP community

outreach specialist, and one MFP special assistant), and it assists nursing facility residents with

physical disabilities to seek and obtain HCBS outside of nursing facilities and to transition back

into the community.  See Def. Ex. 400; Tr. at 558:22-559:19 (Newland); see also Brown I, 322

F.R.D. at 75.  The MFP community outreach specialist and the MFP special assistant are funded

through the federal MFP demonstration grant, but the NHT works with individuals in nursing

facilities regardless of whether they meet the additional criteria for participation in the MFP

program.  See Tr. at 559:15-560:5 (Newland); see also Brown I, 322 F.R.D. at 75.

68.    Each NHT transition care specialist on average is assigned to work with 12 to 15

nursing facility residents who have expressed an interest in transitioning back to the community

and have requested DACL's assistance in doing so.  See Tr. at 558:22-559:1 (Newland); id. at

1110:4-20 (Stowe); see also id. at 2011:1-12 (Fletcher) (noting that DACL monitors transition

care specialists' workloads so as not to overburden them).

69.     Transition care specialists are required to comply with DACL standard operating procedures that govern the process for assisting individuals to transition into the community. See Pl. Ex. 388; Def. Ex. 110; see Tr. at 982:2-19 (Stowe) (discussing the purpose of the standard operating procedures).[21]

70.     Generally, transition care specialists assist individuals seeking to transition into the community by locating and securing adequate housing, procuring necessary identification, setting up their new home, and connecting them to community services and supports.  See Tr. at 584:16-585:11, 615:5-616:25 (Newland); id. at 995:12-997:18 (Stowe).  As described in the District's 2021-2024 Olmstead Plan, transition assistance services that support a nursing facility resident's successful transition to the community may include:

- A referral to the DACL Community Transition Program when a resident expresses a desire to learn more about options for living in the community . . . .

- An assessment conducted to determine the District resident's wishes and willingness to return to the community.

- Collaboration between the individual, including their family, friends, and key persons in their circle of support, and their care planning team to develop an appropriate plan for the individual with goals, approaches, and strategies allowing the person to reasonably achieve a safe transition into the community.

- A review to ensure all necessary services and durable medical equipment needs are in place for the individual.

Def. Ex. 102 at 22.

---

[21]     Plaintiffs contend that the District is failing to provide adequate transition assistance to nursing facility residents who are referred to DACL because the NHT team is allegedly not in compliance with several provisions of the standard operating procedures.  More specifically, plaintiffs assert that transition care specialists are not developing person-centered discharge plans for every referred nursing facility resident; are not ensuring that residents' case files contain documents that are vital to a successful transition; are not keeping detailed and accurate notes in residents' case files; and are not seeking supervisory sign-off before closing open transition assistance cases.  See Pl. Ex. 140 at 21-32; see also Def. Ex. 110 at 5-7.

71.     According to the applicable standard operating procedures, transition care specialists must make weekly contact with their clients to ensure that work is progressing at an appropriate pace.  See Def. Ex. 110 at 5; Tr. at 985:7-17 (Stowe); see also Brown I, 322 F.R.D. at 77.  In addition, transition care specialists are expected to make initial contact with a nursing facility resident within 5 days of an initial referral, visiting them in-person shortly thereafter. See Def. Ex. 110 at 3-4.

72.     Transition care specialists are required to maintain case notes for nursing facility residents who receive transition assistance from DACL.  See Tr. at 988:7-989:6 (Stowe); see also Def. Ex. 110 at 5 ("All contacts with the client and collaterals must be documented . . . . Timeframes, barriers, goals, tasks and plans of care must be clearly documented in the case notes . . . .").  According to Dr. Stowe, case notes should be relatively brief, provide a summary of the relevant work being done for the nursing facility resident, and include supporting documentation.  See Tr. at 988:7-989:16, 990:4-991:3, 1121:16-1122:3 (Stowe).

73.     DACL currently uses an electronic record system called "CSTARS" to store all nursing facility residents' case notes.  See Tr. at 987:21-988:3 (Stowe).   Dr. Stowe noted that before she joined in 2019, "[t]here was inconsistent use of CSTARS . . . so not all case notes or case information was held in the electronic record."  Id. at 988:7-10 (Stowe).  At that time, transition care specialists inconsistently used both hard copy records and CSTARS to store case notes, and the quality of those notes were at times lacking.  See id. at 990:4-15, 1120:15-1121:12 (Stowe).

### 3.   Information:  Referrals and Community Outreach

74.     DACL does not conduct surveys across all nursing facilities to determine how many residents wish to transition to the community or would like to receive transition assistance

from the District to do so.  See Tr. at 1066:22-1067:12 (Stowe); id. at 2057:1-14 (Newland).

Rather, the District relies on two principal methods for assessing nursing facility residents' desire

to transition to the community and for generating referrals.  See Def. Ex. 102 at 21.

75.     First, DACL funds or relies upon a range of services – governmental and non-

governmental – to reach nursing facility residents about the prospect of transitioning to the

community.  Def. Ex. 102 at 28-29.  For example, DACL conducts group information sessions in

nursing facilities throughout the year to educate residents about home- and community-based

services and the transition assistance provided by DACL. See Tr. at 562:19-563:8, 708:10-19

(Newland); Def. Ex. 102 at 29.  DACL also relies on the word of mouth of people who work

with nursing facility residents – including nursing facility social workers, the long-term care

ombudsman, and the friends and family of residents – to inform nursing facility residents about

the possibility of transitioning to the community and the services that DACL provides in aiding a

transition.  See Tr. at 562:19-564:15, 2144:13-2145:18 (Newland) (noting that nursing facility

social workers, administrators, and nurses; third-party contractors; the long-term care

ombudsman; and DACL staff who visit nursing facilities all educate nursing facility residents

about home- and community-based services); Def. Ex. 102 at 29.

76.     These formal and informal educational programs and interactions generate

referrals to DACL of nursing facility residents who want to transition to the community and

expressly want DACL's assistance in doing so.  See Tr. at 3726:8-17 (Newland) ("[T]he initial

kind of referrals that we get, they're either going to be directly from the community, by which it

could be any nursing facility resident, or it can be a friend, family member, the ombudsman, etc.,

or it could be from a nursing facility . . . ."); Def. Ex. 114 ¶ 55 ("Referrals come from nursing

facility social workers and family members; through outreach activities, such as public

information campaigns; and from agency partners, such as DHCF and the long term care

ombudsman."); see also Brown I, 322 F.R.D. at 77.  To complete a referral to DACL, however, a

nursing facility resident, their legal representative or guardian, or a nursing facility social worker

on the resident's behalf must complete a community transition services referral form and submit

it to DACL.  See Def. Ex. 110 at 2-3; Pl. Ex. 283 at 4; Tr. at 561:9-16 (Newland); id. at 1134:19-

1135:6 (Stowe).  But see Tr. at 2387:24-2389:24 (Sarigol) (testifying that under the MFP

program – a "small subset" of referrals – only a nursing facility social worker may submit a

community transition services referral form to DACL); Pl. Ex. 416 at 21.

77.     Numerous witnesses for the District of Columbia testified that nursing facilities

are properly referring nursing facility residents who wish to obtain information about

transitioning to the community to DACL.  See, e.g., Tr. at 370:17-371:5 (Freeman) (testifying

that nursing facilities are "conduct[ing] their discharge planning" and "want residents to

transition back to the community"); id. at 625:2-9, 694:19-24 (Newland) ("We receive referrals, I

believe, from every [nursing] facility.  We've received at least one referral from every facility I

think within the past year, and we do track that.  And again, nursing facilities do not have to

make referrals to us.  In a lot of cases, nursing facilities won't."); id. at 1028:16-1029:1 (Stowe)

(testifying that she was unaware of any evidence "that nursing facilities were not referring clients

to DACL"); id. at 2011:20-2012:21 (Fletcher) (testifying that DACL found no evidence that

nursing facilities were failing to contact DACL if a nursing facility resident expressed a desire to

transition to the community).

78.     Second, DACL relies on MDS Section Q data to learn of nursing facility residents

who have expressed an interest in speaking to someone about the possibility of transitioning to

the community but have not yet been referred to DACL.  See Tr. at 3726:8-24 (Newland); Def.

Ex. 102 at 12; Def. Ex. 114 ¶ 67.  In the District's view, this method is not the "primary means" by which DACL learns of nursing facility residents who want or need transition assistance.  See Tr. at 3726:25-2727:8 (Newland).

79.    By administering the MDS Section Q – specifically MDS question Q0500B – to nursing facility residents during continuing stay reviews, Comagine periodically asks residents whether they would like to discuss returning to live and receive services in the community.  See Def. Ex. 113 at 15, 17; Tr. at 65:20-24 (Byrd); id. at 770:4-23 (Newland); Def. Ex. 109; see also Brown I, 322 F.R.D. at 77.  As the District's contractor, Comagine reports nursing facility residents' responses to MDS question Q0500B to DHCF, which shares those responses with DACL every month.  See Tr. at 173:10-21 (Byrd); id. at 621:4-16 (Newland); id. at 1106:22-1107:9 (Stowe); id. at 3605:6-23 (Darku).  DACL cross-checks these reports with DACL's own records of nursing facility residents who have completed a referral to DACL in order to receive transition assistance.  See Tr. at 621:4-21, 3726:8-24  (Newland); id. at 2378:6-23 (Sarigol); see also Pl. Ex. 950B; Tr. at 3693:16-22 (Darku).

80.    DACL's community outreach coordinator, Ms. Darku, uses this data received from Comagine to identify individuals who responded "yes" to MDS question Q0500B but have not been formally referred to DACL to begin receiving transition assistance.  See Tr. at 3607:11-3608:9 (Darku); Pl. Ex. 950B.[22]  Ms. Darku then reaches out to nursing facility social workers to

---

[22]    Ms. Darku began performing this function around May 2020.  See Tr. at 3693:4-6 (Darku); see also Pl. Ex. 388 ¶ 101 (admitting that the outreach coordinator position was vacant between April 2017 and July 2019).  Moreover, DACL ceased receiving monthly MDS Section Q data from DHCF for a period of time, preventing DACL from performing this "double check" of the comprehensiveness of its referral system.  See Pl. Ex. 47 at 1-3 ("We used to receive this data from DHCF to help us compare whether our referral system is working properly . . . , but we haven't received it lately."); Pl. Ex. 957 at 249-50.

inquire whether residents who responded "yes" but have not yet been referred to DACL for transition assistance indeed wish to transition to the community.  <u>See</u> Tr. at 3606:12-3607:9, 3607:16-3609:18, 3697:3-9 (Darku) (agreeing that DACL "rel[ies] exclusively on the social worker to tell [Ms. Darku] whether the resident want to talk with [her]"); <u>id</u>. at 621:4-624:5 (Newland); <u>id</u>. at 1139:20-1140:15 (Stowe).  <u>See</u> Tr. at 3847:6-19 (Seiler) (social worker referrals are the "primary referral source and Q as a backup seemed appropriate to me").

81.    Ms. Darku does not reach out directly to nursing facility residents unless the nursing facility social worker notifies her that a resident (or a legal representative on a resident's behalf) would like transition assistance from DACL.  <u>See</u> Tr. at 3606:12-3607:3, 3607:11-19, 3608:15-3609:8 (Darku); <u>see</u> <u>also</u> <u>id</u>. at 3700:14-22 (Darku) (noting that Ms. Darku stops "contacting the facility" if the nursing facility social worker represents that "the resident has no plans to transition at this time").[23]  If Ms. Darku does not receive a response from a nursing facility social worker about a resident, she will elevate the situation to DHCF, which will in turn get in touch with the nursing facility to address the lack of communication.  <u>See</u> Tr. at 3696:20-3697:2, 3697:20-3699:2 (Darku).

82.    On some occasions, Ms. Darku's follow-up with nursing facility social workers leads to referrals of the nursing facility resident to DACL for transition assistance.  <u>See</u> Pl. Ex. 950B; Tr. at 3694:18-25 (Darku); <u>see</u> <u>also</u> Tr. at 622:3-16 (Newland).  The majority of nursing facility residents who respond "yes" to MDS question Q0500B, however, are not

---

[23]    The RAI Manual notes that although "[s]ome States may determine that the LCAs can make an initial telephone contact to identify the resident's needs," the expectation is "that most residents will have a face-to-face visit."  Def. Ex. 113 at 17.  In contrast to this policy, DACL seemingly communicates with nursing facility residents who have responded "yes" to MDS question Q0500B only if a nursing facility social worker confirms that the resident wants transition assistance.

formally referred to DACL and therefore do not receive transition assistance.  See Pl. Ex. 20 at 2;

Pl. Ex. 155A at 9; Tr. at 1985:22-1987:2 (Fletcher).[24]  For this reason, the District views its

reliance on the Comagine reports and Ms. Darku's follow-up with nursing facility social workers

as a "supplement" to the "myriad ways" that the District learns of nursing facility residents'

desire to transition to the community.  See Tr. at 578:2-11, 3726:25-3727:11 (Newland); id.

at 3820:13-3822:2 (Seiler); Def. Ex. 114 ¶ 67.

83.    The District embraces a framework of "Person-Centered Planning," which

provides that individuals themselves – not the District of Columbia – are responsible for deciding

whether to receive services in a nursing facility or in a community setting.  See Def. Ex. 102

at 21-22, 25-28; see Tr. at 513:21-514:5 (Newland) ("It's the person who gets to make the

decisions.  It's the person who gets to say where they want to live, who they want to live with,

what kind of treatment that, you know, they want, those kinds of things.  And that the role of

government or any caregiver is really to support those decisions as much as possible for that

person."); id. at 553:12-19 (Newland); id. at 970:25-971:5 (Stowe).

84.    The District also adheres to the "No Wrong Door" principle, which provides that

an individual should be directed to whichever entity – whether governmental, community-based,

or non-profit – is the most appropriate to meet that individual's needs, regardless of which entity

is first approached.  See Def. Ex. 102 at 7 (describing "No Wrong Door" as a "government-wide

---

[24]    The District emphasizes – and plaintiffs sometimes conflate – the difference between a formal referral to DACL to receive transition assistance and a less formal referral that notifies DACL of a nursing facility resident's desire to speak to someone about the possibility of transitioning to the community.  According to the District, the former describes the process of formally opening a case with the NHT team by submitting a community transition services referral form.  See Tr. at 1976:9-13, 2008:21-2009:3 (Fletcher); id. at 1186:15-19, 1186:22-1187:14 (Stowe); 566:15-567:19 (Newland).  The latter describes the process of putting a nursing facility resident who responds "yes" to MDS question Q0500B in contact with DACL about the resident's request for information.  See Def. Ex. 113 at 16-17.

program which streamlines the eligibility process and provides District residents with accurate information, regardless of where they enter the system"); Tr. at 511:22-513:20 (Newland); see also Def. Ex. 114 ¶ 47.

4.  Transitioning to the Community

85.    A transition care specialist may close an individual's case when DACL determines that, in its view, there is no additional transition coordination assistance that can be provided at that time to help transition that individual from the nursing facility into the community.  See Tr. at 614:5-12 (Newland); id. at 1005:19-1006:15 (Stowe); see also Brown I, 322 F.R.D. at 75 ("Obstacles that would interfere with a transition include lack of housing, income, and family support.").[25]  Pursuant to the NHT standard operating procedures, a case may not be closed without supervisory approval.  See Def. Ex. 110 at 11-12; Tr. at 1006:16-1008:8 (Stowe).  Transition care specialists may occasionally revisit closed cases if they find resources or developments that might benefit the individual who was initially unable to transition.  See Tr. at 614:5-615:4 (Newland); see also Tr. at 1010:3-1011:6 (Stowe) (noting that transition care specialists encourage nursing facility residents who decide to cease attempting to transition to reach back out to DACL for transition assistance if they later change their minds).

86.    In recent years, between 40 to 60 nursing facility residents transition to the community every year with the transition assistance of DACL.  See Tr. at 717:16-718:9 (Newland); see also Brown I, 322 F.R.D. at 72 (noting that 16 nursing facility residents transitioned to the community in 2011; 16 nursing facility residents transitioned in 2012; 27 nursing facility residents transitioned in 2013; 39 nursing facility residents transitioned

---

[25]    Prior to 2015, cases were not closed and were instead kept active regardless of there being barriers to transition.  See Brown I, 322 F.R.D. at 75.  DACL began to close cases after determining that leaving cases open was a "resource drain."  Id.

in 2014; 42 nursing facility residents transitioned in 2015; and 51 nursing facility residents transitioned in 2016).  In 2017, 60 nursing facility residents transitioned to the community with DACL's transition assistance.  See Def. Ex. 102 at 53.  In 2018, 50 nursing facility residents transitioned to the community with DACL's transition assistance.  See id.  In 2019, 62 nursing facility residents transitioned to the community with DACL's transition assistance.  See id.  And in 2020, 61 nursing facility residents transitioned to the community with DACL's transition assistance.  And by the time of trial, 49 residents had transitioned to the community in the first half of 2021.  See id.[26]

87.    Approximately 50% of all nursing facility residents who are referred to DACL for transition assistance do not transition to the community for a number of reasons, including many that are not within the District's control.  See Def. Ex. 111 at 2 (noting that in the first half of 2021, 38% of DACL referrals were closed due to a successful transition); Pl. Ex. 406 at 4-5 (noting that, between January 2017 and April 2020, 44% of 543 unique referrals to DACL did not discharge); Pl. Ex. 155A (noting the closure reasons for DACL referrals in 2019 and 2020); see also Pl. Ex. 967 (suggesting that, between January 5, 2017, and July 30, 2021, 76% of nursing facility residents who were referred to DACL did not successfully transition to the community).  For example, some nursing facility residents receiving transition assistance from DACL ultimately do not transition because they (or their legal guardians on their behalf) withdraw a request for transition assistance, lack affordable and adequate housing to move into, or lack community or family support to facilitate a transition.  See Pl. Ex. 155A at 8; Pl. Ex. 406

---

[26]    Plaintiffs contend that these figures are deplorably low when compared to the number of nursing facility residents that plaintiffs' experts estimate wish to transition to the community but need DACL's assistance to do so.  See Pl. Ex. 140 at 37-39; Pl. Ex. 142 at 12; see also Tr. at 2686:7-19 (Petron).

at 5.  Some choose to stay in the nursing home due to declining health, and some die while

waiting to transition.  See Pl. Ex. 155A at 8; Pl. Ex. 406 at 5.

88.    Not every nursing facility resident who seeks to transition to the community

requires DACL's transition assistance to do so, and some individuals successfully transition

without DACL's support.  See Tr. at 602:12-603:16 (Newland); id. at 1024:22-1025:15 (Stowe)

(noting that individuals are discharged from nursing facilities on a daily basis without requesting

services or transition assistance from DACL "[b]ecause they [already] have whatever resources

they need"); id. at 1182:10-25 (Stowe) (noting that nursing home social workers also provide

services and transition coordination to residents); see id. at 1715:13-1716:13 (Seiler); see also

Def. Ex. 103 (listing the number of people who directly transitioned to the community without

transition assistance in the first three quarters of 2021).  In some circumstances, nursing facility

residents discharge against medical advice.  See Def. Ex. 111 at 2.

89.    In addition, a nursing facility resident's legal guardian may decide, over the

expressed interest of a nursing facility resident to transition to the community, that it is in the

best interest of the resident for them to continue receiving services in a nursing facility.  See Tr.

at 477:20-479:7 (Freeman); Pl. Ex. 406 at 5 (noting "guardian declined services" as a case

closure reason).

90.    Under its current Olmstead Plan, the District does not commit to transition a

specified number of nursing facility residents to the community every year.  See Tr.

at 599:18 600:1 (Newland); Def. Ex. 102.  In previous Olmstead Plans, the District had

committed to transitioning a specified number of nursing facility residents to the community

each year.  See, e.g., Def. Ex. 101 at 51-53 (listing District agencies' "Quantitative Transition

Goals").

*E.  Plaintiffs' Expert Witnesses*

91.    Plaintiffs called Nancy Weston, Randall Webster – who together had prepared an extensive expert report, Pl. Ex. 140, – and Michael Petron, as expert witnesses.  Ms. Weston, a trained social worker and Director of Nursing Facility Operations for the Massachusetts Department of Developmental Services, provided opinions regarding the work of nursing facility social workers and DACL transition care specialists.  Pl. Ex. 141 A (Appendix A, Resume of Nancy L. Weston); Tr. at 2800:7-22 (Weston).[27]  Mr. Petron was qualified as an expert in the field of statistical sampling.  Tr. at 2740:24-2741:8 (Petron).

92.    Ms. Weston and Mr. Webster reviewed a random sample of 69 nursing facility records for Medicaid beneficiaries residing in District of Columbia nursing homes to assess the need and provision of transition assistance.  Pl. Ex. 140 at 11, 13, 36; Tr. at 2488:12-18 (Weston).  Mr. Petron had developed this random sample of nursing facility residents from responses to Section Q of the Minimum Data Set ("MDS"), which is a federally mandated screening tool for assessing health care needs and abilities of residents in Medicare or Medicaid funded facilities.  Pl. Ex. 140 at 8, 12, 36-38.

93.    Section Q specifically asks residents questions related to returning to the community.  Pl. Ex. 140 at 9.  Plaintiffs' counsel received that data for 1,794 nursing home residents in D.C.  Id. at 12.[28]  Once Mr. Petron developed the sample of 69 residents, plaintiffs'

---

[27]    Mr. Webster was a consultant to the same Department.  Pl. Ex. 141 A (Appendix B, Resume of Randall Webster).

[28]    The Centers for Medicare and Medicaid Services ("CMS") provided plaintiffs' counsel with the Section Q of the MDS data reported to CMS from June 3, 2019 to September 1, 2019 for District of Columbia nursing home residents who had been in the facility for at least 90 days as of June 3, 2019.  Pl. Ex. 140 at 12.

counsel subpoenaed additional information and records with respect to these 69 residents, including their social work records and Care Plans.  Id. at 12.

94.     Ms. Weston and Mr. Webster created six descriptive categories and determined who of the 69 residents met each criterion.  Pl. Ex. 140 at 13.  Mr. Petron then used their conclusions to extrapolate to the relevant population of District of Columbia nursing home residents.  Id. at 13-14.  Ms. Weston and Mr. Webster referenced two criteria, Attribute A and B, as helping to measure the number of residents interested in moving to the community.  Tr. at 2790:25-2791:7 (Weston).  In their report, Ms. Weston and Mr. Webster describe Attribute A as residents whose nursing facility records indicated a "preference for returning to the community."  Pl. Ex. 140 at 36.  They found that 30 out of the 69 residents identified by Mr. Petron had Attribute A.  Id.  Mr. Petron used their conclusions with respect to Attribute A to calculate the plaintiff class size as 685 residents as of June 2019.  Pl. Ex. 140 at 1 n.2; Tr. at 2687:9-25, 2725:21-2726:4 (Petron).

95.     Attribute B consists of residents who responded affirmatively to Question Q-500 of Section Q of the MDS.  Pl. Ex. 140 at 8-9, 36; Tr. at 2485:1-6, 2488:19-25, 2489:1-4 (Weston).  Ms. Weston and Mr. Webster found that 13 of the 69 residents identified by Mr. Petron had said "yes" to Q-500, which asks if the individual wants "to talk to someone about the possibility of leaving the facility and returning to live and receive services in the community."  Pl. Ex 140 at 33, 36.  Of the 13 residents who responded "yes" to Q-500, Ms. Weston testified that 11 were never referred to the ADRC.  Pl. Ex. 140 at 33; Tr. at 2815:21-2816:2 (Weston).

96.     Ms. Weston further testified that it is her opinion that if there is an affirmative response to Q-500, the nursing facility is required to make a referral to the local contact agency, the ADRC.  Pl. Ex. 140 at 9; Tr. at 2484:18-25, 2485:1-14, 2489:6-14, 2499:1-21, 2502:4-

2503:10, 2512:2-2513:21, 2532:8-12, 2820:23-2821:1, 3084:11-20 (Weston).  She said that the nursing facility cannot insert its judgment to overrule a resident's expressed interest.  Tr. at 3084:25-3085:17 (Weston).  Nor can it refuse to make a referral because it believes there is no home in the community to go to or no support in the way of services.  Id.  Ms. Weston further testified that if a nursing home resident responds "yes" to Q-500 that indicates that he or she needs assistance from the ADRC in transitioning to the community.  Tr. at 3088:8-16 (Weston).

97.    Ms. Weston acknowledged that she did not consider whether – after expressing a preference for transition to the community – a resident might change his or her mind over time.  Tr. at 2785:11-2786:22, 2838:11-17 (Weston).  Rather, she said that expressing an interest is the same as preferring to live in the community.  Tr. at 2577:24-2578:10, 2582:24-2583:17, 2773:22-41 (Weston).  She further testified that people never change their desire to transition once they know what the options and available services are in the community.  Tr. at 2785:11-2786:22, 2838:11-17 (Weston).  That is why she said they all need transition services from the ADRC.  Tr. at 3088:8-16 (Weston).  She concluded that "anybody who is in a facility would not choose to be in a facility.  It would not be their first choice," and "that anybody in a facility would prefer to live in a home-like environment."  Tr. at 3131:24-3132:13 (Weston).

98.    Mr. Webster testified that D.C. had 91 referrals in the first two quarters of 2021.  Tr. at 3227:4-25 (Webster).  He obtained this information from one of DACL's 2021 quarterly reports on its clinical team.  Tr. at 3227:4-25 (Webster); Pl. Ex. 946 at 2.  Based on his experience in Massachusetts, Mr. Webster opined that with more robust outreach or transition services, there would be approximately 400 referrals a year rather than the current 91.  Tr. at 3227:4-25, 3228:6-3229:17, 3230:19-3231:17 (Webster).

99.     Michael Petron, the statistician, reviewed the expert report of Ms. Weston and Mr. Webster and relied exclusively on their conclusions; he did not review the content of the nursing facility files himself other than to calculate the sample size for his report.  Tr. at 2686:20-2687:3, 2725:7-20, 2726:14-18, 2732:19-24, 2734:4-12, 2740:2-23 (Petron).  Based on those conclusions and the assumptions provided to him by plaintiffs' counsel, he focused on three nursing facilities – out of 17 in the District of Columbia – chosen by plaintiffs' counsel.  Tr. at 2716:14-21 (Petron).  On these bases, he calculated that 685 residents in these facilities wanted to transition into the community.  Tr. at 2725:21-2726:4 (Petron).

100.    The Court finds Ms. Weston's analysis and opinions unreliable and gives them no credence – for three primary reasons:  (1) she started with the unfounded premise that every nursing home resident who expresses an interest in transitioning to the community in fact prefers to live in the community, Tr. at 2577:24-2578:10, 2582:24-2583:17, 2773:22-41 (Weston), and that such preference never changes; (2) based on this premise, she interpreted a "yes" answer to Q-500 to mean that a nursing home resident wants to transition to the community, rather than reflecting only a request for more information; and (3) she further assumed that everyone who wants to transition to the community needs the assistance of DACL's ADRC.  Tr. at 3088:8-16 (Weston).  Even her colleague, Mr. Webster, disagrees with this last conclusion.  Tr. at 3435:2-10 (Webster).

101.    Ms. Weston reads an affirmative answer to Q-500 as expressing a preference to move to the community, Tr. at 2583:10-17 (Weston), when in fact Q-500 only asks a nursing home resident whether he or she "want[s] to talk to someone about the <u>possibility</u> of leaving this facility and returning to live and receive service in the community?"  Def. Ex. 113 at Q-15

(MDS RAI, Section Q).[29]  See also Thorpe v. District of Columbia, 303 F.R.D. 120, 144 n. 54

(D.D.C. 2014) ("Nor does it make sense to assume that every nursing home resident who had

indicated an interest in talking to someone about moving to the community (the MDS preference

number) satisfies all of the other criteria for class membership.  Even the 256 residents identified

through the MFP screening, which the plaintiffs focus on in their reply, may not satisfy all of the

other criteria for class membership.")

> ### F.  Systemic and Individual Barriers to Successful Transitions, Particularly Housing

102.     Because of the challenges that a nursing facility resident may face when

navigating the complex administrative and logistical processes of transitioning back to the

community, many nursing facility residents are unable to successfully transition without

assistance from professional transition care specialists.  See Pl. Ex. 140 at 19; see Tr.

at 3850:18-23 (Seiler).  Among other things, transition care specialists may facilitate a successful

transition by helping residents obtain vital records and financial documentation, helping residents

apply for available home- and community-based services and supports, planning and

documenting the stages of a transition, coordinating with other members of a resident's support

network, helping residents secure housing, furniture, food, and household startup items, and

providing emotional and technical support.  See Pl. Ex. 140 at 19-20 (discussing the qualities of

"an effective system of transition assistance [that] helps people with numerous tasks necessary

for a safe and effective transition to the community").

---

[29]     Mr. Webster, by contrast, acknowledged that Q-500 asks only about a desire for more information regarding transition to the community.  Tr. at 3248:9-24, 3521:19-3522:14 (Webster).  Mr. Webster testified that it is not a good indicator of whether someone wants to return to the community.  Tr. at 3522:15-21 (Webster).  He also testified that not everyone needs transitional assistance.  Tr. at 3435:2-10 (Webster).

103.     There nevertheless are a multitude of various systemic and individual barriers that may inhibit a nursing facility resident's ability to transition to the community.  <u>See</u> Pl. Ex. 155A at 8; Pl. Ex. 406 at 5.  "[N]ursing facility residents [may be] impeded by [a] lack of proper identification to access community-based services and [a] lack of family support for their transition."  <u>Brown I</u>, 322 F.R.D. at 86.  In addition, a nursing facility resident may experience barriers to transition including:

> (1) finding a home health agency to staff [their] care needs;
> (2) understanding the requirements of a completed EPD waiver;
> (3) getting a . . . determination of the required level of care or the number of personal-care hours; (4) a lack of support in the community; (5) the medical complexity of the individual; and (6) a lack of training of family members who would otherwise provide personal care assistance.

<u>Id</u>.

104.     In addition, nursing facility residents with physical disabilities may lack self-confidence in their ability to navigate the complex administrative processes of applying for Medicaid-funded services, to secure subsidized housing, and most critically, to safely transition to the community, given their individual, particularized needs.  <u>See</u> Tr. at 2491:1-21 (Weston); <u>see also</u> Pl. Ex. 140 at 18-20.  Setting aside logistical and administrative challenges that make it difficult to transition, individuals with disabilities who require nursing facility level of care may also find the prospect of living alone in the community to be daunting.  <u>See</u> Tr. at 1007:14-17, 1010:3-1011:1 (Stowe).

105.     To successfully transition from an institution to the community, a physically disabled nursing facility resident must secure safe and affordable housing that is appropriate to their disability.  <u>See</u> Tr. at 518:16-519:6, 552:2-24 (Newland); Def. Ex. 102 at 10; <u>see also</u> <u>Brown I</u>, 322 F.R.D. at 83 ("Special needs populations including older adults and persons with

disabilities, are disproportionately affected by housing problems, and may require costly home modifications and supportive services.").

106.    Finding and securing appropriate housing can be a challenge for many nursing facility residents, particularly those of limited means – like the class members in this case – who also have needs specific to their disabilities.  See Tr. at 584:16-585:11 (Newland); id. at 993:3-12, 993:24-994:14 (Stowe); Def. Ex. 102 at 10; see also Tr. at 1490:5-1491:5 (Greenwalt) (noting that it is very rare for an extremely low income individual – 30% of the median family income – to be able to secure housing in the District without public assistance); Def. Ex. 609 at 4 (describing the various income levels of D.C. residents who receive housing assistance).

### 1.  The D.C. Housing Authority and Housing Vouchers

107.    The D.C. Housing Authority ("DCHA") is a public housing agency that provides safe, decent, affordable housing for extremely-low-to-moderate income families in the District of Columbia.  See Tr. at 1200:5-16 (Punter); Def. Ex. 609 at 2, 4; see also Tr. at 1247:18-1248:5 (Punter) (explaining that the extremely low income category pertains to those with incomes equal to 0-30% of the area median income).  DCHA is an independent agency; it is not formally part of the D.C. government but receives funding from both the U.S. Department of Housing and Urban Development ("HUD") and from the D.C. government to provide housing services to D.C. residents.  See id. at 1200:10-12, 1201:2-1202:16 (Punter).  DCHA serves individuals through traditional public housing and through housing voucher programs, which subsidize the expense of housing to allow individuals to offset their rent toward privately-owned housing.  See id. at 1203:4-1204:13, 1205:6-1207:10 (Punter); Def. Ex. 609; see also Def. Ex. 102 at 12.  Over 53,000 District residents benefit from DCHA programs and services, including through public

housing and the housing voucher programs.  See Def. Ex. 609 at 3.  Approximately 24% of those
public or subsidized housing residents are people with disabilities.  See id.

108.    DCHA administers approximately 17,000 housing vouchers, of which
approximately 12,000 are federal vouchers with the remainder being local vouchers.  See Tr. at
1218:6-18 (Punter) (explaining that federal vouchers are funded by HUD whereas local vouchers
are funded by the D.C. government); Def. Ex 609 at 3, 6.[30]

109.    There are three types of housing vouchers used by DCHA.  First, a "tenant-based"
voucher is a portable housing subsidy that follows the individual using the voucher from housing
unit to housing unit.  See Tr. at 1203:12-19 (Punter); Pl. Ex. 865 at 4.  Second, a "project-based"
voucher is a subsidy that is tied to a particular housing unit; if an individual moves out of the
subsidized unit, the subsidy will remain for the next individual who leases the unit if he or she is
eligible to receive the housing voucher.  See Tr. at 1203:22-1204:1 (Punter); Pl. Ex. 865 at 4.
Third, a "sponsor-based" or "special purpose" voucher is a subsidy that is referred out by
organizations that help to fill specific housing units with individuals from certain demographics.
See Tr. at 1245:23-1247:10 (Punter); Pl. Ex. 865 at 4.

110.    Housing vouchers are not used for public housing, which is administered by the
District through a separate program.  See Tr. at 1204:2-7 (Punter) (clarifying that a housing
voucher is "a tool to help subsidize on the private market").  Once an individual begins to use a
housing voucher to subsidize the payment rent, the voucher does not expire until that individual
no longer needs public assistance to afford housing.  See Tr. at 1204:8-13 (Punter).  "A voucher

---

[30]    The locally-funded housing subsidy program is called the Local Rent Supplement
Program ("LSRP") and provides for an additional approximately 5,000 housing vouchers.  See
Tr. at 1380:5-20, 1404:4-10 (Punter).  The D.C. government, not DCHA, decides how much
money to budget for LSRP vouchers and how many vouchers to set aside for certain populations.
See id. at 1381:6-1382:1 (Punter).

is only 'used' when a lease is signed and the individual has moved into the property."

<u>Brown I</u>, 322 F.R.D. at 77.

111.     To obtain a tenant-based or project-based voucher, an individual generally must receive one through DCHA's voucher waiting list.  <u>See</u> Tr. at 1207:25-1208:13 (Punter).  The waiting list comprises a list of applicants who desire to be considered for any of three programs: public housing, the housing choice voucher program, and the moderate rehabilitation program (not at issue here).  <u>See id</u>.  Applicants are expected to keep certain basic information up-to-date, like current housing status and the need for wheelchair-accessible housing.  <u>See</u> Tr. at 1254:3-1255:21 (Punter); <u>id</u>. at 2970:9-25 (Slaughter).

112.     At the time of trial, there were approximately 43,000 individuals total on the voucher waiting list, of whom approximately 39,000 had applied to receive housing vouchers and 27,000 had applied for public housing.  <u>See</u> Tr. at 1208:14-1209:11 (Punter); Def. Ex. 609 at 3.  The waiting list has been closed since April 2013, meaning that no new applicants can apply and be considered for any of the three housing assistance programs noted above.  <u>See</u> Tr. at 1209:19-25 (Punter).  "Between 400 and 600 people are moved off of the DCHA waiting list per year."  <u>See</u> <u>Brown I</u>, 322 F.R.D. at 84.

113.     Applicants on the waiting list indicate their preference to receive assistance through any of the three available programs – including the housing choice voucher program – as well as other demographic information requested by DCHA, such as whether an applicant is homeless, has a rent burden, or is in an emergency.  <u>See</u> Tr. at 1210:22-1211:24 (Punter).  Applicants are placed on the waiting list in order – and are selected to receive assistance through any of the available programs – according to the date and time of their applications as well as certain of their listed preferences.  <u>See id</u>. at 1210:22-1211:4 (Punter).  Certain preferences,

including whether an applicant is homeless, are afforded priority for receiving housing assistance. See id. at 1211:15-1212:3 (Punter); id. at 1235:19-1236:12 (Punter) (explaining that, in terms of priority, homelessness "is the top preference").[31] Nursing facility residents are considered "homeless" for purposes of the DCHA waitlist. See id. at 1251:12-1252:4 (Punter); see also Pl. Ex. 177 at 39 ("The definition of homeless includes families living in transitional housing, which includes nursing homes.").

114.    Once a waiting list applicant's name reaches the top of the list, DCHA will contact that applicant for an eligibility interview and background check to confirm the applicant's information and eligibility to receive housing assistance. See Tr. at 1212:4-23 (Punter); see also id. at 1215:20-1217:1 (Punter) (noting the different eligibility criteria for federally- and locally-funded housing vouchers); Brown I, 322 F.R.D. at 84 (explaining that an applicant's financial eligibility is determined only when that person is near the top of the waiting list "because DCHA's certification of someone's financial eligibility for public or subsidized housing is only valid for six months"). To complete the eligibility determination process, applicants must submit a DCHA application in addition to certain documentation, including identification, Social Security cards, birth certificates, and income information. See id. at 1212:24-1213:16; 1255:22-12 (Punter).

115.    In the case of a tenant-based housing voucher, once an applicant has been deemed eligible, they are issued a voucher with which to seek a unit on the private housing market. See Tr. at 1212:4-23 (Punter). Once a housing voucher recipient secures housing, they will pay 30% of their adjusted gross income towards rent, and the voucher will cover the remaining rent,

_____

[31]     Individuals who require wheelchair-accessible housing are prioritized to receive wheelchair-accessible units when they near the top of the waiting list. See Brown I, 322 F.R.D. at 84-85.

subject to a cap based on the fair market rent in that neighborhood (thereby imposing a "maximum allowable rent" that DCHA will finance).  See id. at 1220:16-1221:13, 1222:6-1225:14, 1249:23-1250:3 (Punter); Def. Ex. 609 at 3; see also Def. Ex. 607 (listing HUD's estimated fair market rents in the D.C. metropolitan area by ZIP Code).  DCHA may provide, as a reasonable accommodation, an exception to that cap to a disabled person who demonstrates difficulty securing housing appropriate to their needs.  See Tr. at 1248:18-25 (Punter).

116.    Generally, it is the responsibility of the housing voucher recipient to locate and lease up an accessible, affordable housing unit in which to live.  See Tr. at 1229:25-1230:16 (Punter) (noting that a housing voucher recipient must find a unit on the private housing market that meets that individual's needs and that "having a voucher in hand and searching doesn't guarantee that you would lease up in a unit").[32]  Ms. Greenwalt testified that, in her view, it is rare that someone is unable to use their housing voucher.  See Tr. at 1485:3-14 (Greenwalt) ("[M]ost people that are engaged and motivated with their housing search and supported will find a unit.").  She nevertheless acknowledged that it may take substantial time to secure housing, given the fierce competition for a limited number of affordable, accessible units.  See id.; see also id. at 994:24-995:11 (Stowe) (noting that an individual's credit rating and criminal history can make it difficult to secure housing, even with a housing voucher); id. at 1229:25-1231:2 (Punter) (noting that landlords and private owners may use screening criteria to deny a housing voucher recipient from leasing a unit).

117.    An individual who has been selected for an available housing voucher has 180 days to find and lease appropriate housing.  See Tr. at 1256:15-17 (Punter).  Upon request,

---

[32]    Housing, of course, is a limited resource, and the District of Columbia is consistently one of the most expensive rental markets in the United States.  See Brown I, 322 F.R.D. at 83.

however, the DCHA may afford housing voucher recipients unlimited extensions of the 180-day deadline for people who are experiencing difficulty securing housing.  See id. at 1256:18-1257:9 (Punter); cf. Pl. Ex. 868 at 10-11 (HUD document noting that a reasonable accommodation for disabled persons seeking to transition to the community "may include extending limited [public housing] application periods and permitting flexible application procedures or locations").

## 2.  Special Purpose Vouchers

118.    In contrast to tenant- and project-based vouchers, special purpose vouchers are not distributed to individuals through DCHA's voucher waiting list but rather by designated D.C. agencies that refer individuals to DCHA.  See Tr. at 1257:24-1258:10, 1266:15-1267:6 (Punter); see also id. at 1231:3-23 (Punter) (describing how DACL has "all the discretion" when deciding which individuals to refer to DCHA for a voucher).  As of February 25, 2020, DCHA administered 2,893 federally funded special purpose vouchers.  See id. at 1259:19-1260:11 (Punter); Pl. Ex. 45B.  DCHA's Board of Commissioners allocates the number of special purpose vouchers that are set aside for certain populations.  See Tr. at 1257:19-23 (Punter). Once special purpose vouchers are set aside, DCHA assigns them to a specific D.C. agency to refer them to individuals from the respective, designated population.  See id. at 1257:24-1258:10 (Punter).

119.    At the time of trial, there were only 85 special purpose vouchers assigned to DACL to make available to nursing facility residents seeking to transition to the community. See Pl. Ex. 957 at 189-90; Pl. Ex. 848B; Def. Ex. 114 ¶ 52; see also Brown I, 322 F.R.D. at 77-78 (discussing 65 set-aside "MFP housing choice vouchers").[33]  An individual is identified as a

---

[33]    Nursing facility residents seeking to transition to the community may also qualify for other special purpose vouchers, including those designated for veterans and for non-elderly,

potential special purpose voucher recipient when they are first referred to the ADRC.  See <u>Brown</u> <u>I</u>, 322 F.R.D. at 77; <u>see also</u> Tr. at 3743:12-3744:3740:20 (Newland).  If that individual needs affordable housing, they are entered into a housing-voucher lottery (an entirely distinct process from the voucher waiting list), which is periodically held when vouchers are available.  See <u>Brown I</u>, 322 F.R.D. at 77.

120.    Generally, there are some unused vouchers at any given time.  See <u>Brown I</u>, 322 F.R.D. at 77-78.  As of February 25, 2020, out of 65 MFP housing vouchers assigned to DACL, 54 were currently being utilized to house individuals, nine had been issued to recipients who were in the process of finding and leasing a unit, and two had not been issued.  See Pl. Ex. 45. If a housing voucher recipient fails to timely complete the eligibility determination process within 30 days, or is determined not to meet the eligibility requirements for the voucher program, or is unable to secure housing after a period of time, or for some other reason foregoes the opportunity to use the voucher, the voucher is reallocated to an alternate recipient.  See <u>Brown I</u>, 322 F.R.D. at 78 (explaining that the housing voucher lottery was "designed to promote fairness").

### 3. <u>Public Housing Alternative</u>

121.    DCHA also provides traditional and mixed-finance public housing to eligible D.C. residents.  See Tr. at 1201:2-23 (Punter); Def. Ex. 609 at 3, 5-7.  Traditional public housing refers to a building or site that consists entirely of public housing units owned and administered by DCHA.  See Tr. at 1205:9-13 (Punter).  Mixed-finance public housing refers to publicly subsidized housing that is privately owned and managed.  See Tr. at 2966:21-2967:10

---

disabled individuals.  See Tr. at 1261:6-20, 1262:8-18, 1265:12-1266:2, 1269:20-1270:23 (Punter); Pl Ex. 45B.

(Slaughter).  Like a housing voucher recipient, a public housing tenant pays 30% of their adjusted gross income as rent, and DCHA finances the remainder.  See Def. Ex. 609 at 3.

122.    As of March 2020, DCHA owned and administered approximately 8,500 units of public housing, which housed approximately 12,400 individuals, representing 22% of all people who benefitted from DCHA's housing programs and services.  See Tr. at 1205:14-18 (Punter); Def. Ex. 609 at 3.  Of those 8,500 units, approximately 2,600 are reserved for the elderly and disabled, of which 700 are wheelchair accessible.  See Nov. 15, 2016 Tr. at 25:24-26:15, 38:24-39:16, 47:2-25 (Buvelle); Tr. at 2967:11-2968:4 (Slaughter).

123.    DCHA grants a preference to individuals with physical disabilities who seek public housing, including leasing wheelchair accessible public housing units to individuals who need wheelchair accessible features.  See Tr. at 2968:5-2969:20 (Slaughter); see also Pl. Ex. 842 ("Although there is a waiting list for housing in the District of Columbia, preference is given to persons with mobility impairments, particularly those who serve as the head of a household. When there is a handicapped-accessible unit available, DCHA will go down its waiting list to look for applicants who have indicated they have mobility impairments.").

124.    Based on a study conducted by plaintiffs' experts, Nancy Weston and Randall Webster, between January 2018 and September 2020, of all nursing facility residents who successfully transitioned to the community using DACL's transition assistance, 46.3% returned to some form of private housing, 23.1% went to public housing, and 30.6% leased a private rental unit using a housing voucher.  See Pl. Ex. 140 at 45-46.  But see Brown I, 322 F.R.D. at 82 ("Over 80% of nursing facility residents who want to move to the community need public housing or subsidized housing.").

66

125.    DCHA is not the only agency that provides housing resources to District residents.  See Def. Ex. 102 at 10-15; see also Tr. at 1577:17-24 (Reed).  For example, DHCF funds assisted living facilities, "licensed facilit[ies] where participants can live while receiving and having access to the services they need to be as independent as possible."  Def. Ex. 102 at 15.  Similarly, the Department of Behavioral Health oversees licensed mental health community residential facilities, which provide individuals with varying services and supports appropriate to their health needs – with an emphasis on their mental health needs – while also facilitating independent living.  See Def. Ex. 102 at 14-15.  And the D.C. Department of Housing and Community Development receives and administers federal funds to create and preserve affordable housing in the District of Columbia.  See Def. Ex. 102 at 11-12.

126.    Nursing facility social workers, DACL employees, and others connect nursing facility residents with the DCHA in order to access housing resources that might effectuate a transition to the community.  See Tr. at 994:15-23 (Stowe); Def. Ex. 102 at 10 ("Non-housing agencies that facilitate or provide housing often partner with DCHA, which is an independent agency, to utilize housing vouchers provided by the local and federal government.").  DACL employs a housing coordinator to understand what types of housing are available throughout the District of Columbia and to develop relationships with various private management companies, private buildings, and the DCHA in order to connect nursing facility residents with housing opportunities when they are seeking to transition to the community.  See Tr. at 584:16-586:17 (Newland).

127.    DACL tracks the housing needs of nursing facility residents that have been referred to and are receiving transition assistance from the agency.  See Tr. at 905:21-906:13 (Newland).  Between 2019 and the second quarter of 2021, approximately 60% of nursing

facility residents who were referred to DACL to receive transition assistance had housing to return to at the time they were referred.  See Tr. at 910:13-911:2 (Newland); Pl. Ex. 803 at 9.[34] Moreover, according to DACL's analysis of its case closure data, only 7% of nursing facility residents who receive transition assistance from DACL but are unable to transition to the community identified a lack of affordable, appropriate housing as the primary reason for not transitioning.  See Pl. Ex. 406 at 5.

### F.  Class Member Ivy Brown

128.    Ivy Brown has a physical disability caused by lymphedema, which significantly limits her mobility, causes significant swelling in her right side, and causes her significant pain. See Tr. at 2870:5-13, 2871:1-12, 2877:1-19 (Brown) (noting that her lymphedema "makes the right side of [her] body very heavy" to lift); see also id. at 2871:12-2872:6 (Brown) (noting that Ms. Brown has used both a rollator, a walker, and a wheelchair to get around).  Due to her disability, Ms. Brown requires assistance to move around, to attend medical and physical therapy appointments, and with other activities of daily living.  See id. at 2874:8-23 (Brown) (noting that Ms. Brown needs assistance moving to and from her bed); Pl. Ex. 388 at 5. Treatment for Ms. Brown's lymphedema is available on an outpatient basis if she were to live in the community.  See Tr. at 2872:19-2873:14, 2873:23-25 (Brown).

129.    In May 2013, Ms. Brown entered a nursing facility – the Capitol City Rehabilitation and Health Care Center – after suffering from a stroke.  See Tr. at 2868:8-22 (Brown).  Before entering the nursing facility, Ms. Brown lived in her mother's house, where she received six hours of personal care aide services daily through the EPD Waiver.  See id.

---

[34]    The District notes, however, that a nursing facility resident's private housing may not always be adequate housing; for example, it may not be capable of accommodating (or being modified to accommodate) the resident's physical disability.

at 2883:19-21, 2899:2-13, 2904:11-24 (Brown).  Although Ms. Brown intended to remain in the

nursing facility for no longer than six months, she continues to reside there.  See id. at 2868:23-

25, 2880:25-2881:3 (Brown).  Ms. Brown testified that her physical disability does not require

her to reside in a nursing facility.  See id. at 2875:14-16 (Brown).

130.    Ms. Brown believes that she could successfully live in the community, and she

affirmatively wants the District's assistance to transition back into the community.  See Tr. at

2898:21-2900:3 (Brown); see also id. at 2926:14-21 (Brown) (denying that there ever was a time

when Ms. Brown did not want to move out of the nursing facility).  Ms. Brown feels, however,

that she will be unable to transition to the community without the assistance of a DACL

transition care specialist – including assistance with securing adequate housing and with

obtaining an assessment of the number of hours of personal care aid services that she needs.  See

id. at 2879:12-2882:15 (Brown); id. at 2876:6-23 (Brown) (noting that she needs assistance

obtaining a copy of her social security card).  According to Ms. Brown, nursing facility social

workers are unable or unwilling to help her with certain of these steps that are necessary for her

to transition.  See id. at 2881:19-2882:1 (Brown).

131.    There are several impediments to Ms. Brown's ability to transition back to the

community.  First, Ms. Brown is of limited means and currently receives a monthly income of

approximately $1,400 in disability benefits.  See Tr. at 2905:24-2906:16 (Brown); id. at 3617:8-

16 (Darku).  Second, Ms. Brown cannot move into her mother's or her sister's homes because

they cannot be properly adapted to accommodate Ms. Brown's disability.  See id. at 2883:22-

2884:15, 2905:81-23 (Brown); see also id. at 3617:173619:12 (Darku).  Third, Ms. Brown has

had difficulty obtaining vital documents, including her Social Security card.  See id. at 2876:11-

23 (Brown).

132.    Ms. Brown first began receiving transition assistance from DACL in 2014, when she began to be periodically visited by transition care specialists.  See Tr. at 2906:22-2908:1, 2908:13-2909:17 (Brown).  Jemila Darku was Ms. Brown's transition care specialist from 2014 to 2016, and Gwendolyn Noonan-Jones was Ms. Brown's transition care specialist from 2016 to 2018.  See id. 3589:2-11, 3611:1-6, 3613:20-22 (Darku); id. at 3545:23-3546:15 (Noonan-Jones).

133.    During that time, Ms. Darku and Ms. Noonan-Jones provided Ms. Brown with information about obtaining transportation through MetroAccess and D.C. Transport, securing assistance through the MFP program, and moving to an assisted living facility or another type of housing in the community.  See Def. Ex. 507.2 at 25-42; Tr. at 3557:16-3558:16, 3559:18-3560:5, 3561:5-13 (Noonan-Jones); id. at 3662:9-25 (Darku).  Ms. Darku and Ms. Noonan-Jones also occasionally attended care plan meetings during which the nursing facility resident, a nursing facility social worker, Ms. Darku or Ms. Noonan-Jones, medical and clinical workers, and family members gathered to discuss Ms. Brown's current condition and how best to move forward with her care and possible transition to the community.  See Def. Ex. 507.2 at 32; see also Tr. at 3555:4-13 (Noonan-Jones) (defining a care plan meeting).

134.    While she worked with Ms. Brown, Ms. Darku tried to find appropriate, affordable housing into which Ms. Brown could move from the nursing facility.  See Tr. at 3618:5-13 (Darku).  For example, Ms. Darku assessed whether it would be possible for Ms. Brown to move back into the house that she had been living in before she was admitted to the nursing facility.  Ms. Darku determined that would not be possible because the house could not be sufficiently modified to accommodate Ms. Brown's needs.  See id. at 3618:14-3619:12

(Darku).  Ms. Darku also helped Ms. Brown research moving into subsidized housing.  See id. at 3619:13-3620:21.

135.    In April 2018, Ms. Brown was selected for a special purpose housing voucher by DACL, enabling her to begin the application process to receive a voucher.  See Tr. at 2884:16-23, 2915:2-7 (Brown); Def. Ex. 507.2 at 30; see also id. at 3743:12-3744:10 (Newland) (explaining the housing choice voucher lottery).  Ms. Noonan-Jones proposed that Ms. Brown could use the housing voucher to move into an apartment complex that was being constructed at the time, but Ms. Brown disapproved because the apartment was in an inconvenient location for Ms. Brown and her family.  See id. at 2885:5-17, 2916:25-2918:14 (Brown).[35]

136.    Ms. Noonan-Jones also provided Ms. Brown with a list of documents that needed to be gathered in order to complete the housing choice voucher application, and Ms. Noonan-Jones informed Ms. Brown that she had to gather all the documents and submit her application within 30 days pursuant to DACL's policy for its special purpose housing vouchers.  See id. at 2885:18-2886:21, 2919:1-7 (Brown); see also id. at 3565:22-3567:19, 3568:19-3569:3 (Noonan-Jones); Def. Ex. 507.2 at 29.  Ms. Brown was not told that she could likely get an extension of the 30-day application deadline.  See Tr. at 2885:18-2887:25 (Brown); see also Def. Ex. 507.2 at 25, 29.  Rather than personally assist Ms. Brown to gather the required documents to complete the housing voucher application, Ms. Noonan-Jones relied on Ms. Brown and a nursing home social worker to do so.  See Tr. at 3565:22-3568:7 (Noonan-Jones).

137.    According to Ms. Noonan-Jones, Ms. Brown had reservations about transitioning to the community.  See Tr. at 3557:16-3558:1, 3568:19-8, 3571:23-3572:18 (Noonan-Jones);

---

[35]    Previously, Ms. Darku had discussed with Ms. Brown the types of housing and community-based services that might be available to Ms. Brown if she were to transition out of the nursing facility.  See Tr. at 2916:11-24 (Brown).

see also id. at 3575:12-3576:17 (Noonan-Jones); Def. Ex. 507.2 at 33.  Ms. Noonan-Jones

testified that when she received her housing choice voucher, Ms. Brown expressed her desire to

speak with her sister about the prospect of transitioning to the community at that time.  See id.

at 3565:22-3566:15, 3571:23-3572:24 (Noonan-Jones); see also Def. Ex. 507.2 at 29-30.

Several weeks later, Ms. Brown told Ms. Noonan-Jones that she was not feeling well and that it

was not an opportune time to move out of the nursing facility.  Ms. Brown said that her sister

was then taking care of her elderly grandmother and could not provide support to Ms. Brown if

she were to transition.  See Tr. at 3575:9-3576:8 (Noonan-Jones); see also Def. Ex. 507.2 at 25.

138.    On May 21, 2018, Ms. Noonan-Jones prepared a form entitled "Refusal to

Transition," which provided that Ms. Brown was "refusing to use Transition Services at th[e]

time" and was "no longer interested in transitioning back to the community due to poor health."

Def. Ex. 507.2 at 26; see also Tr. at 3577:9-24 (Noonan-Jones).  Although she did not recall

doing so, see Tr. at 2888:10-2890:21 (Brown), Ms. Brown signed the form.  See Def. Ex. 507.2

at 26; Tr. at 3577:25-3578:11 (Noonan-Jones); see also Def. Ex. 507.2 at 27-28; Tr. at 3578:12-

3579:18 (Noonan-Jones).

139.    Based upon Ms. Brown's statements and her signing of the Refusal to Transition,

Ms. Noonan-Jones closed Ms. Brown's case.  See Tr. at 3575:5-3576:8 (Noonan-Jones); see also

Def. Ex. 507.2 at 25.  Ms. Noonan-Jones testified that, prior to closing Ms. Brown's case, Ms.

Noonan-Jones told Ms. Brown that she could reach back out to DACL for transition assistance at

a later time.  See Tr. at 3575:5-3576:8 (Noonan-Jones); see also Def. Ex. 507.2 at 25 ("Worker

informed the client that her case would be closed, that [DACL] would accept a new referral

when she is ready to transition from the facility assistance would be provided.").[36]  Ms. Brown

testified that since her case was closed, she has in fact reached out to DACL on numerous

occasions seeking transition assistance but has never received a response.  See Tr. at 2924:20:-

2926:3 (Brown).

### G.  Class Member Larry McDonald

140.    Larry McDonald, an Army veteran with a physical disability, requires assistance

with at least two activities of daily living.  See Tr. at 2108:2-4 (McDonald); Pl. Ex. 388 at 6.  Mr.

McDonald has resided in a nursing facility – the J.B. Johnson Unique Rehabilitation and Health

Center – since September 2004.  See id.; Tr. at 2112:6-8 (McDonald); Tr. 2980:18-22 (Cason

Daniel).  Deborah Cason Daniel has served as Mr. McDonald's legal guardian since April 2017.

See Tr. at 2112:25-2113:3 (McDonald); id. at 2980:8-6-9 (Cason Daniel).  As Mr. McDonald's

legal guardian, Ms. Cason Daniel must make decisions that are in Mr. McDonald's best interests,

which are often consistent with his own articulated desires.  See id. at 2986:8-12, 2998:21-

2999:8 (Cason Daniel); see also D.C. Code § 21-2047(a)(6) (2008) ("[A] general guardian or

limited guardian shall . . . [m]ake decisions on behalf of the ward by conforming as closely as

possible to a standard of substituted judgment or, if the ward's wishes are unknown and remain

unknown after reasonable efforts to discern them, make the decision on the basis of the ward's

best interests . . . .").

141.    In testimony that can best be described as heartbreaking, an obviously frustrated

Larry McDonald testified that he wishes to transition from his nursing facility back to the

---

[36]    Previously, when Ms. Noonan-Jones was concerned that Ms. Brown was not
making any progress toward transitioning to the community, she proposed placing Ms. Brown's
case on hold – rather than closing it – until Ms. Brown was ready to consider transitioning back
to the community.  See Tr. at 3562:15-3564:1 (Noonan-Jones); see also Def. Ex. 507.2 at 31.

community.  See Tr. at 2112:9-10 (McDonald); id. at 2980:23-2981:5 (Cason Daniel).  Ms.

Cason Daniel believes Mr. McDonald can live in the community with services and support.  See

Tr. 2981:9-13; 2982:1-2983:16 (Cason Daniel).  Mr. McDonald feels that he will be unable to

transition to the community without the assistance of a DACL transition care specialist.  See id.

at 2113:7-22 (McDonald).  Specifically, he needs assistance with managing his medications,

with arranging transportation to medical appointments and other activities, with obtaining food,

and with applying for and securing housing.  See id. at 2113:7-22 (McDonald); see also id. at

2982:1-2983:16 (Cason Daniel).  Ms. Cason Daniel is not trained or experienced in these

matters, and she therefore also believes that it is necessary for Mr. McDonald to receive

transition assistance from DACL for him to successfully transition to the community.  See id. at

2983:17-20, 2984:10-22 (Cason Daniel).

142.    From 2013 to 2018, Mr. McDonald received transition assistance from DACL

through Ramona Butler, a transition care specialist.  See Tr. at 2119:17-2120:13 (McDonald);

Def. Ex. 512.2 at 10-20.  During that time, Ms. Butler attended discharge planning meetings,

provided information to Mr. McDonald about affordable housing and available home- and

community-based services and supports, coordinated with Mr. McDonald's legal guardians to

the extent possible, and worked with nursing home social workers to obtain Mr. McDonald's

vital records and recent income statements.  See Def. Ex. 512.2 at 10-20.  At a meeting Ms.

Cason Daniel and Mr. McDonald attended with Ms. Butler, Ms. Butler said that she thought Mr.

McDonald would be better off in a community residence facility, a CFR, or in an assisted living

facility rather than living on his own in the community.  See Tr. 2988:11-25; see id. at 2990:18;

2991:11 (Cason Daniel).

143.     In August 2016, Mr. McDonald was selected from the lottery to receive an MFP

housing voucher, which would have helped to subsidize the cost of renting independent housing.

See Def. Ex. 512.2 at 14; Tr. at 2986:25-2987:22 (Cason Daniel).  Without such financial

support, Mr. McDonald does not have sufficient income to afford independent housing in the

community.  See Tr. at 3015:18-20 (Cason Daniel); see also Def. Ex. 512.2 at 30, 45 (listing Mr.

McDonald's income from Social Security).  Upon receiving the MFP housing voucher, Mr.

McDonald had 30 days to secure suitable housing where he would reside, although he received

numerous extensions.  See Def. Ex. 512.2 at 14, 21 (noting that Mr. McDonald's MFP housing

voucher became null and void in November 2017); see also Def. Ex. 512.2 at 22-45 (the housing

application packet).

144.     Over the next 15 months, Mr. McDonald and Ms. Cason Daniel spoke with Ms.

Butler regarding the MFP housing voucher and the process for securing independent housing or

assisted living.  See Tr. at 2114:14-2115:7 (McDonald); id. at 2987:4-2989:15, 2991:2-2995:13

(Cason Daniel).  Ms. Butler searched for independent housing for Mr. McDonald, and she also

researched assisted living facilities, given her concern that Mr. McDonald might struggle to

successfully live independently due to his disability.  See Def. Ex. 512.2 at 16, 19; see also Tr. at

2988:11-2989:7, 2991:2-2993:2 (Cason Daniel) (noting that Ms. Cason Daniel also committed to

exploring assisted living programs to determine what would be the best fit for Mr. McDonald).

145.     At a care plan meeting in June 2017, Mr. McDonald, Ms. Cason Daniel, Ms.

Butler, and nursing facility staff discussed whether using the MFP housing voucher to obtain

independent housing for Mr. McDonald was appropriate.  See Tr. at 3011:2-13 (Cason Daniel);

Pl. Ex. 899 at 2-3.  At that meeting, there was a consensus that Mr. McDonald should be in a

community residential facility, group home, or assisted living facility – where services like

75

assistance with meal preparation, hygiene, and taking medication would be readily available – rather than in an apartment on his own.  <u>See</u> Tr. at 3011:10-3012:18.  But Ms. Cason Daniel testified, she did not agree with that.  <u>See</u> Tr. at 3011:14-3012:18 (Cason Daniel).[37]  Mr. McDonald's MFP housing voucher was annulled and voided soon thereafter.  <u>See</u> Def. Ex. 512.2 at 21; <u>see also</u> Tr. at 2115:24-2116:2 (McDonald).  According to Ms. Cason Daniel, although there was a consensus that an assisted living facility was preferable for Mr. McDonald, she did not tell Ms. Butler or anyone else that Mr. McDonald did not want to use the MFP housing voucher or that it should be relinquished.  <u>See</u> Tr. at 2994:16-23; 2994:16-20; <u>id</u>. at 2996:14-22; <u>id</u>. at 3011:10-3012:18 (Cason Daniel).

146.    After this meeting, Ms. Cason Daniel understood that there might need to be additional meetings and coordination with the D.C. Department of Behavioral Health to locate an assisted living facility for Mr. McDonald.  <u>See</u> Tr. at 3013:8-3014:6 (Cason Daniel).  Ms. Butler ceased to assist Mr. McDonald and Ms. Cason Daniel with coordinating with DBH or trying to find an assisted living facility into which Mr. McDonald could transition.  <u>See id</u>. at 2996:23-2997:14, 3013:15-3014:16 (Cason Daniel) (testifying that Ms. Butler "kind of dropped out of the picture by that point").  Neither Ms. Butler nor any other transition care specialist from DACL ever told Ms. Cason Daniel that Mr. McDonald's case had effectively been closed.  <u>See id</u>. at 2997:21-2998:5 (Cason Daniel).  Since 2018, Ms. Cason Daniel has not attempted to find any housing for Mr. McDonald – whether assisted living facility or independent housing – and she

---

[37]    Mr. McDonald has nevertheless continually expressed his desire to live in an apartment on his own, not in an assisted living facility or group home.  <u>See</u> Tr. at 2116:24-2118-1; 2124:21-2126:12 (McDonald).  Ms. Cason Daniel supported his preference to live on his own, but thinks a congregate setting would be more appropriate. See Tr. at 3017:18-3018:7; 3018:20-2019:2.  <u>See id</u>. at 2986:16-20; 3016:17-3017:25; 3018:9-3019:2 (Cason Daniel).

has not contacted DACL for further assistance.  See id. at 3014:7-16, 3015:2-3016:2, 3019:6-11 (Cason Daniel).

*H. The Potential Cost of Implementing Plaintiffs' Requested Accommodations*

147.    Assuming that the class consists of 1,100 class members, and further assuming that the District of Columbia would need to employ 60 additional transition care specialists, the District estimates that implementing plaintiffs' requested accommodations would cost approximately $7 million annually.  See Pl. Ex. 2 at 2; Tr. at 694:8-11, Tr. at 2165:7-2167:12; 2170:22-2171:20; 3738:20-3739:24 (Newland); see also id. at 631:9-633:24 (Newland) (noting the possibility that this cost could result in an additional loss of $2.46 million in federal Medicaid matching funds).[38]  The Director of the D.C. Budget Office testified that there would be "ancillary costs" related to the hiring of 60 additional employees, such as "computers, telephones, furniture, office space, additional salaries for supervisors, and other necessary expenses."  Pl. Ex. 2 at 2-3; see Tr. at 1588:5-1589:13 (Reed).  The precise amount of such costs is too difficult to estimate because there are "too many variables that would go into it."  See Tr. at 1588:11-22 (Reed).

148.    The District estimates that if these additional costs were imposed on DACL by virtue of a court order, the District might initially look to cover these costs by cutting existing DACL programs or services.  See Tr. at 694:25-695:9 (Newland); id. at 1584:9-1585:17 (Reed);

---

[38]    Plaintiffs' expert Randall Webster conducted his own calculations of the estimated cost of implementing plaintiffs' requested accommodations and opined that doing so would cost the District only approximately $1.7 million annually.  See Pl. Ex. 969B at 14; see also Tr. at 3230:19-3231:1 (Webster).  The Court does not credit this opinion of Mr. Webster, who was not qualified as an expert in such budgeting or personnel matters.  See Tr. at 3535:6-19 (Webster); FED. R. EVID. 702.

see also id. at 1587:2-1588:4 (Reed) (explaining that District agencies are required to budget "for a specific purpose and specific use every year," meaning that an unanticipated "significant recurring annual expenditures" would create "budget pressure" for an agency that had not appropriated money for it); see id. at 1648:19-1651:5 (Reed).  Although only able to speculate, the District suggests that implementing plaintiffs' requested accommodations would potentially require DACL to cut home- and community-based services that are currently being provided to District residents outside of nursing facilities.  See id. at 696:15-697:9 (Newland); see also id. at 697:8-699:16 (Newland) (testifying that these cuts might push individuals receiving home- and community-based services into nursing facilities and might also create new barriers for nursing facility residents seeking to transition to the community).[39]  The District posits that this in turn could increase the risk of institutionalization of physically-disabled individuals who would experience a cut to the home- and community-based services that enable them to successfully live in the community.  See Tr. at 698:3-12 (Newland).

149.    The District concedes, however, that the money to cover the cost of plaintiffs' requested accommodations could come from agencies or programs outside of DACL.  See Tr. at 638:20-639:6, 2166:8-25 (Newland).  If the District could not find available resources within DACL's budget to cover the budget pressure from implementing plaintiffs' requested accommodations, witnesses said that the District would first look to the Health and Human Services cluster, a group of agencies that includes DACL.  See id. at 1584:9-1586:2 (Reed); see

_____

[39]    Among the many home- and community-based services that the District suggests it might be forced to cut if it is required to implement plaintiffs' requested accommodations are: personal care aid; the Safe at Home program, which provides in-home adaptations that permit people with disabilities to live safely at home; nutrition services, including daily meal delivery; physical wellness centers and senior fitness centers; and transportation services.  See Tr. at 696:15-697:7, 298:22-299:10, 700:13-701:15, 702:15-703:21, 705:6-706:9 (Newland).

also id. at 553:23-554:9 (Newland) (describing the agencies that comprise the Health and Human Services cluster).

150.    The District could also look more broadly across all of the District of Columbia government and its agencies for additional funds.  See Tr. at 1584:9-1585:20 (Reed).  In planning for future years' budgets, DACL could request additional funding from the District to accommodate the additional cost of implementing plaintiffs' requested accommodations year over year.  See id. at 1642:13-1643:13, 1647:15-1649:2 (Reed) (explaining enhancement requests, which allow an agency to request additional funding that exceeds its "maximum allowable request ceiling," the maximum limit under which an agency must submit its proposed budget for local funds); see also id. at 1567:21-1569:23 (Reed) (explaining the District's annual budget process).  It is also possible for DACL to request, through a supplemental budget, additional funding to ameliorate any spending pressure in a fiscal year that has already been budgeted.  See id. at 1656:21-1657:22 (Reed).[40]

## III.  CONCLUSIONS OF LAW[41]

Under the Supreme Court's decision in Olmstead, the isolation of persons with disabilities violates the ADA and its implementing regulations "when [(1)] the State's treatment

---

[40]    The District of Columbia maintains four "reserve funds" that are generally used to pay for unforeseen, nonrecurring expenses (e.g., emergencies) or to account for the District's limited cash flow at certain times of the year.  See Tr. at 1589:14-1590:23 (Reed) (explaining the "emergency reserve," the "contingency cash reserve," the "fiscal stabilization reserve," and the "cash flow reserve").  The District also maintains a "Settlements and Judgements Fund" that is used to pay out settlements and judgments against the District in a fiscal year.  See id. at 1590:24-1591:25 (Reed).  Because these funds are intended to cover nonrecurring expenses, it is unclear whether the District could use these sources to cover the cost of implementing plaintiffs' requested accommodations.  See id. at 1591:10-1594:1 (Reed).

[41]    Hereinafter, citations to the Court's Findings of Fact are noted with the abbreviation "FF."

professionals have determined that community placement is appropriate, [(2)] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [(3)] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." Brown II, 928 F.3d at 1077 (quoting Olmstead, 527 U.S. at 587).[42]  The D.C. Circuit recognized – and both parties agree – that the first two elements have been established such that "this litigation boils down to resolution of the third Olmstead question: are the requested accommodations reasonable?" Id. at 1083.  To prevail, the District must establish that plaintiffs' requested accommodations are in fact unreasonable either because "the District has an adequate 'Olmstead Plan' in place, in which case every requested accommodation is categorically unreasonable" or because "each individual accommodation is so costly that it would be unreasonable to require the District to transfer its limited resources from other disabled individuals." Id. at 1083-84.

Having carefully considered the evidence respecting the District's complex system of long-term care services and supports for physically-disabled individuals in light of the applicable law, regulations, and agency guidance, the Court concludes that the District has violated Olmstead's integration mandate and does not have an effective Olmstead Plan in place. See Brown II, 928 F.3d at 1087 ("[T]reating individuals in institutions when they wish to and could be treated in the community is discrimination because of disability.").  As explained in further detail below, the District places too much reliance on nursing facilities to provide

---

[42]        As to the first element, "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." Olmstead, 527 U.S. at 602 (citing 28 C.F.R. § 35.130(d)).  As to the second, Olmstead does not require "that community-based treatment be imposed on patients who do not desire it." Id. (citing 28 C.F.R. § 35.130(e)).

transition assistance to nursing facility residents who wish to transition and are capable of transitioning to the community, rather than following up proactively and systematically through their transition care specialists.  See U.S. DEP'T OF JUSTICE, CIV. RTS. DIV., STATEMENT OF THE DEPARTMENT OF JUSTICE ON ENFORCEMENT OF THE INTEGRATION MANDATE OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND OLMSTEAD V. L.C. ("DOJ Olmstead Guidance") (last updated Feb. 28, 2020) [Pl. Ex. 399] at 3 ("[A] public entity may violate the ADA's integration mandate when it . . . through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs.").[43]

### A.  The District Has Failed to Demonstrate That It Has a Comprehensive and Effectively Working Olmstead Plan

In reversing the Court's prior judgment and remanding for a new trial, the D.C. Circuit noted that because the Court had improperly placed the burden on plaintiffs to prove a "'concrete, systemic deficiency' in the District's transition services," the District "ha[d] not yet demonstrated that it has an adequate 'Olmstead Plan' in place."  Brown II, 928 F.3d at 1079,

---

[43]     In reaching this conclusion, the Court reaffirms that the class was properly certified under Rule 23 of the Federal Rules of Civil Procedure.  See Brown II, 928 F.3d at 1085 (noting that this Court can modify or decertify the class on remand); see also DL v. District of Columbia, 860 F.3d 713 (D.C. Cir. 2017).  First, the Court finds that Rule 23(a)(2) is satisfied and echoes the reasoning of the D.C. Circuit, which observed that "[t]here is no commonality problem here because common proof will lead to common answers" to the questions whether the District has a comprehensive, effectively working Olmstead Plan with a waiting list for transition to the community that moves at a reasonable pace, and whether each provision of plaintiffs' requested injunction would be unreasonable, "considering the District's limited resources and its obligations to other disabled individuals."  Brown II, 928 F.3d at 1082.  See also Pappas v. District of Columbia, 2024 WL 1111298 at **4-6 (D.D.C. March 14, 2024); Springs v. Del Toro, 2022 WL 741865 at *6 (D.D.C. March 11, 2022).  Second, the Court finds that Rule 23(b)(2) is satisfied because an injunction that remedies the District's Olmstead violation will "provide[] each member of the class an increased opportunity to achieve" a successful transition to the community.  Id.  See also Pappas v. District of Columbia, 2024 WL 1111298 at *15.

1084.  This Court was directed to determine whether the District has carried its affirmative

burden to prove that it has a "comprehensive, effectively working plan" for transitioning willing

and able physically-disabled nursing facility residents to the community and a "waiting list [for

transition to the community] that move[s] at a reasonable pace."  Id. at 1078 (quoting Olmstead,

527 U.S. at 605-06) (alterations in original); see also id. at 1086 (noting that this Court "has

discretion in applying the 'comprehensive,' 'effective' and 'reasonable' standards").[44]

       "The issue is not whether there is a piece of paper that reflects that there will be

ongoing progress toward community placement," but whether the Plan going forward is

workable and is being implemented effectively to assure that individuals are actually being

moved to integrated settings.  See Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d 487,

500 (3d Cir. 2004).  As suggested by the Department of Justice in its statement on the

implementation of Olmstead:

> A comprehensive, effectively working plan must do more than
> provide vague assurances of future integrated options or describe
> the entity's general history of increased funding for community
> services and decreased institutional populations.  Instead, it must
> reflect an analysis of the extent to which the public entity is
> providing services in the most integrated setting and must contain
> concrete and reliable commitments to expand integrated
> opportunities.  The plan must have specific and reasonable
> timeframes and measurable goals for which the public entity may
> be held accountable, and there must be funding to support the plan,
> which may come from reallocating existing service dollars.  The
> plan should include commitments for each group of persons who
> are unnecessarily segregated, such as individuals residing in . . .
> nursing homes and board and care homes . . . .  To be effective, the
> plan must have demonstrated success in actually moving
> individuals to integrated settings in accordance with the plan.

---

[44]    Although this Court has "consistently held throughout this litigation that the
District does not have an adequate 'Olmstead Plan' in place," Brown II, 928 F.3d at 1084, the
D.C. Circuit expressly directed this Court to reconsider the question on remand by holding the
District to its burden of proof.  Id. at 85.

DOJ Olmstead Guidance at 7; see also U.S. DEP'T OF HEALTH & HUM. SERVS., OFF. FOR CIV.

RTS., DEVELOPING A STATE OLMSTEAD PLAN: WHO, [WH]AT, HOW, AND WHY  ("HHS Olmstead

Presentation") (2014) [Pl. Ex. 904] at 7-8 (certain minimum characteristics of effective,

workable Olmstead Plan).  In determining whether the District has a comprehensive, effectively

working Olmstead Plan, the Court also considers six characteristics of an effective system of

transition assistance for individuals in nursing facilities previously identified by this Court:

> (1) individual assessments upon admission and periodically
> thereafter for all residents to determine interest in community-
> based services; (2) provision of accurate information about
> available community-based services and eligibility requirements
> for those services; (3) discharge/transition planning that
> commences upon admission and includes a comprehensive written
> discharge/transition plan; (4) identification of what community-
> based services are needed and assistance in arranging for those
> services; (5) assistance in applying for and enrolling in available
> waivers or transition programs; and (6) identification of barriers to
> transition and assistance in overcoming those barriers to the extent
> possible (e.g., if housing is a barrier, providing assistance in
> applying for supported housing).

Brown I, 322 F.R.D. at 89-90 (quoting Thorpe v. District of Columbia, 303 F.R.D. at 148).  The

Court first will address the first two listed characteristics, related to assessment and outreach, and

then the other four, related to transition assistance.[45]

---

[45]     Plaintiffs argue at times that the simple fact that the District is not utilizing all of its EPD
Waivers demonstrates that the District does not have a comprehensive, effectively working
Olmstead Plan.  As noted by the Supreme Court, however, HHS "has a policy of encouraging
States to take advantage of the waiver program [providing funding for state-run home and
community-based care], and often approves more waiver slots than a State ultimately uses."
Olmstead, 527 U.S. at 601 (observing that Georgia was at the time utilizing less than a third of
its available waivers).  Although a state's underutilization of its waiver programs might be
indicative of an ineffective Olmstead Plan, the Court concludes that it alone is not proof of an
Olmstead Plan's inefficacy.

<u>1.  The District Has Not Proven That It Provides Effective
Outreach to Nursing Facility Residents Who May Wish to
Transition to the Community</u>

First, the Court concludes that the District's <u>Olmstead</u> Plan is not comprehensive or effectively working because the District fails to provide effective outreach to nursing facility residents to determine whether they are willing and able to transition to the community. Furthermore, the District does not provide residents with sufficient information to enable them to make informed decisions about whether to seek to transition to the community.

An adequate <u>Olmstead</u> Plan should provide a comprehensive "means of ensuring that the state has a reliable sense of how many individuals with disabilities are institutionalized and eligible for services in community-based settings and how many are at risk and need these services." HHS <u>Olmstead</u> Presentation at 13.  Furthermore, an adequate <u>Olmstead</u> Plan should "examine[] what information, education and referral system would be useful to ensure that people with disabilities receive the information necessary to make informed decisions," including "visits to community providers for individuals and their families to be educated, and providing peer supports." <u>Id</u>. at 15.  The District's <u>Olmstead</u> Plan does neither.

Rather than periodically survey the population of nursing facility residents to identify those residents who are able and willing to transition to the community, the District identifies class members in two ways of much more limited scope.  <u>See</u> FF ¶ 74.  First, the District effectively relies on word of mouth to generate referrals to inform nursing home residents about the services DACL provides for assistance in transitioning to the community. <u>See</u> <u>id</u>. ¶¶ 75-77.  For example, while DACL conducts group information sessions, distributes brochures and hangs flyers, it primarily relies on nursing facility staff and the long-term care ombudsman to spread the word about DACL's transition coordination services.  <u>See</u> <u>id</u>. ¶¶ 75-76.

Individuals exposed to these forms of outreach then may contact DACL directly or through a nursing facility social worker to make known their desire to transition to the community and their need for transition assistance.  See id. ¶ 76.  Second, to identify nursing facility residents who may wish to transition to the community, the District relies upon MDS Section Q data, but only as a "supplement" to these forms of outreach.  See FF ¶ 78 (Section Q data "is not the primary means by which DACL learns" of a nursing facility resident's intent in transitioning to the community).

In the Court's view, these efforts are insufficient for at least two reasons: (1)  they place the onus of obtaining information about home- and community-based services and seeking transition assistance on nursing facility residents themselves, and (2) the District has failed to consistently use and implement MDS Section Q as it is intended.  As to the first, nursing facility residents with physical disabilities are often ill-equipped to learn about and navigate the complex administrative processes for transitioning into the community, see FF ¶¶ 102-106; and the District does not do enough to bridge that gap.  Specifically, the District only learns of a nursing facility resident's desire to transition to the community if that resident affirmatively makes a request for transition coordination services to DACL or if a nursing facility social worker represents to DACL's community outreach coordinator that the resident would like transition assistance.  See FF ¶¶ 76, 81-82.  The record evidence demonstrates that DACL failed to implement the required procedures for a significant period of time either (1) because the community outreach coordinator position went unfilled or (2) because DACL ceased receiving MDS Section Q data from DHCF.  See id. ¶ 80 n.22.

Furthermore, the District does not have an adequate system for educating nursing facility residents about available home- and community-based services to enable them to make

informed decisions about whether to seek to transition to the community. The District's reliance on group presentations, brochures, flyers, and word of mouth to educate nursing facility residents about services in the community is insufficient. See FF ¶¶ 63-64, 75-76 (discussing community outreach events, distribution of brochures and flyers, and word of mouth as means for spreading information about services that are available to nursing facility residents). The District has offered little evidence that it meets face-to-face with individual nursing facility residents on a regular basis to provide information that is personalized to that individual's medical and financial circumstances.

Second, the record evidence shows that MDS Section Q is not being properly administered in the District of Columbia. Pursuant to guidance from the U.S. Department of Health and Human Services, if a nursing facility resident answers "yes" to Question Q0500B, "a referral to the local contact agency is required and the Local Contact Agency will establish contact with the resident to discuss the availability of appropriate services in the community." U.S. DEP'T OF HEALTH AND HUM. SERVS., OFF. FOR CIV. RTS., GUIDANCE AND RESOURCES FOR LONG TERM CARE FACILITIES: USING THE MINIMUM DATA SET TO FACILITATE OPPORTUNITIES TO LIVE IN THE MOST INTEGRATED SETTING (2016) [Pl. Ex. 110] at 4; see also id. at 3 (noting that nursing facility residents generally should be asked MDS question Q0500B unless they have active discharge plans that are currently being implemented). Referring nursing facility residents to the Local Contact Agency to learn about available home- and community-based services is vital because "[m]ost residents do not know what alternatives to inpatient care may exist." Id. at 4. See also Def. Ex. 113 at 15 ("[I]n many cases individuals requiring long term services, and/or their families, are unaware of community-based services and supports that could adequately support individuals in community living situations.") While not every nursing facility resident

who answers "yes" to Question Q0500B will ultimately decide they want to transition to the community, an affirmative answer at the very least means they want more information about transitioning and should be referred to the local contact agency.  See FF ¶¶ 100-101; Def. Ex. 113 at 14-18.

In administering the MDS question Q0500B, District contractors periodically ask nursing facility residents whether they would like to discuss returning to live and receive services in the community.  See FF ¶¶ 79-80.  For every nursing facility resident who answers "yes" to MDS question Q0500B but has not been referred for transition assistance, there is supposed to be a follow up contact arranged between the nursing facility and the local contact agency.  See id. ¶¶ 41-42.  Specifically, DACL's community outreach coordinator is supposed to reach out to a resident who has indicated they want more information or to the nursing facility social worker to inquire whether that resident wishes assistance to transition to the community.  See id. ¶¶ 80-81. The evidence at trial, however, showed that only if a nursing facility social worker advises DACL that the resident wishes to transition to the community will a DACL employee visit with that resident in person.  See id. ¶¶ 81-82.  The District relies "exclusively" on the social worker to determine whether a resident wants to talk to DACL.  See id. ¶ 81.  As a result, the majority of nursing facility residents who respond yes to question Q-500B are not referred to DACL and therefore do not receive transition assistance.  See FF ¶ 82.

Because the District has not implemented a sufficiently robust and comprehensive system for identifying individuals who are institutionalized yet eligible to receive long-term care in the community, the Court cannot conclude that the District's "commitment to the deinstitutionalization of those [disabled persons] for whom community integration is desirable, achievable and unopposed, is genuine, comprehensive and reasonable."  Arc of Wash. State Inc.

v. Braddock, 427 F.3d 615, 620 (9th Cir. 2005) (alteration in original) (quoting Sanchez v. Johnson, 416 F.3d 1051, 1067 (9th Cir. 2005.)  Furthermore, because the District does not know at any given time the total number of physically-disabled nursing facility residents who are willing and able to transition to the community, the District cannot maintain an accurate "waiting list [for transition to the community] that move[s] at a reasonable pace."  Brown II, 928 F.3d at 1078 (quoting Olmstead, 527 U.S. at 605-06).

> ### 2.  The District Has Not Proven That It Provides Adequate Transition Assistance to Nursing Facility Residents Who Wish to Transition to the Community

As counsel for the plaintiffs put it in her closing argument: "What the class seeks is that the [D]istrict provide them with the reasonable accommodation of a system of transition assistance that each member of the class can access, including regular ongoing outreach to inform people institutionalized in nursing facilities that transition assistance and community based services exist.  People isolated in institutions need to be formally informed about the existence of these services so that they can access them in the community rather than being forced to live out their years in nursing facilities."  Tr. at 3956:25-3957:9 (Bagby).  Furthermore, "it is the absence of transition assistance, the bridge between the nursing facility and the community based services that is lacking."  Tr. 3959:10-12.  The Court acknowledges that not every nursing facility resident who wishes to transition to the community requires DACL's transition assistance to do so.  See FF ¶ 88; see also Olmstead, 527 U.S. at 602 (noting that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it").  The Court nevertheless concludes that the District has failed to demonstrate that it provides meaningful transition assistance to those nursing facility residents who do want such

assistance and are referred to DACL. The District therefore does not have a comprehensive, effectively working Olmstead Plan.

A comprehensive, effectively working Olmstead Plan must "demonstrate[] a reasonably specific and measurable commitment to deinstitutionalization for which [the District] may be held accountable." Frederick L. v. Dep't of Pub. Welfare of Pa., 422 F.3d at 157. The District may not simply "proffer[] general assurances and good faith intentions to effectuate deinstitutionalization." Id. at 158. In addition, "past progress is not necessarily probative of future plans to continue deinstitutionalizing." Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d at 499. Transition care specialists are supposed to make weekly contact with their clients, keep careful notes of their contacts, and collaborate with the residents and their families; among other things, they are also to identify potential appropriate living facilities in the community for their clients. See FF ¶¶ 70-72. As illustrated by the experiences of the named plaintiffs and other evidence presented at trial, the District has failed in these obligations. The Court concludes that the District has failed in its responsibility to move willing and able nursing facility residents into less restrictive settings, in large part by relying on the residents themselves and on nursing facility staff to take the initiative – rather than on District of Columbia employees – to coordinate transitions to the community.

At the time of trial, the District employed six Nursing Home Transition Team ("NHT") transition care specialists to assist nursing facility residents who are referred to DACL with case management and transition coordination – to include locating and securing adequate housing, obtaining identification, and connecting with home- and community-based services. See FF ¶¶ 67-70. Each transition care specialist was assigned to work with 12 to 15 nursing facility residents who have expressed interest in transitioning back to the community. See id.

¶ 68. Transition care specialists – and the District of Columbia more generally – adhere to a standard of "person-centered planning," meaning that a nursing facility resident is ultimately responsible for deciding whether that resident prefers to receive services in a nursing facility or in the community.  See id. ¶ 83.

        The NHT transition care specialists have failed to meet the obligations imposed on them.  For example, Ivy Brown is a physically-disabled individual who has lived in a nursing facility for nearly 10 years.  See FF ¶ 129.  Although Ms. Brown testified that she has always wished to transition to the community, the District has interpreted her uncertainty and unfamiliarity with the transition process as a lack of commitment or desire to transition.  See id. ¶¶ 129-130, 135-139.  Specifically, when Ms. Brown was informed that she had been awarded a special purpose housing voucher from DACL to obtain subsidized housing, her assigned transition care specialist demonstrated little effort in trying to effectuate Ms. Brown's transition. See FF ¶¶ 135-139.  The record evidence establishes that the transition care specialist recommended housing to Ms. Brown that was unsuitable, given her disability and her desire to live close to her family.  See id. ¶¶ 135, 138.  But there is no evidence that the transition care specialist continued looking for housing alternatives that would be more suitable to Ms. Brown. In addition, while the transition care specialist provided Ms. Brown with a list of documents that she needed to gather to complete the housing voucher application, there is no evidence that the transition care specialist personally assisted Ms. Brown – who is wheelchair-bound and reliant on others for assistance – to collect or obtain those documents.  See id. ¶ 136.  Nor did the transition care specialist inform Ms. Brown that she could request an extension of the 30-day deadline to submit the housing voucher application to have more time to collect her vital documents and to speak with her family about housing that would be suitable to their collective

circumstances.  See id.  Furthermore, after Ms. Brown expressed reservations about transitioning to the community immediately – in light of her difficulty obtaining vital documents and locating adequate housing – her transition care specialist had Ms. Brown sign a "Refusal to Transition" form and closed her case, rather than seek an extension of the deadline or take other steps on Ms. Brown's behalf.  See FF ¶¶ 138-139.

As for Larry McDonald, the District of Columbia effectively ceased providing Mr. McDonald with transition assistance when his care planning team, including his legal guardian, collectively decided that an assisted living facility would be preferable to subsidized housing, given Mr. McDonald's physical disability and needs.  See FF ¶¶ 141-142, 144-145. There is no evidence demonstrating that DACL – or the District of Columbia more generally – provided Mr. McDonald with continuing assistance to try to place him in an assisted living facility, and Mr. McDonald continues to live in a nursing facility.  See id. ¶¶ 129, 135. Moreover, although Mr. McDonald's transition care specialist researched independent housing and assisted living facilities, there is no evidence that the transition care specialist communicated that information to Mr. McDonald's legal guardian to ensure that she made an informed decision regarding the best interests of Mr. McDonald.  See id. ¶¶ 144-145 & n.37; see also id. ¶ 141 (noting that Mr. McDonald's legal guardian is not experienced in such matters).

In the Court's view, Ms. Brown's and Mr. McDonald's experiences with DACL demonstrate that the District's Olmstead Plan is not effectively working.  Although the District espouses a person-centered approach of transition assistance, the District relies much too heavily on that principle to provide substandard services and support to residents who are seeking to transition.  It is certainly true that Olmstead does not require the deinstitutionalization of nursing facility residents "who do not desire it."  Olmstead, 527 U.S. at 602; see also id. at 601

("[N]othing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings."). But it is equally true that physically-disabled nursing facility residents are some of the most vulnerable members of society who require meaningful assistance to effectuate their transition to the community. See FF ¶¶ 102-104; Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d at 500. The District's Olmstead Plan places too much of the burden of transitioning to the community on nursing facility residents themselves, thereby effectively transferring to them and nursing facility staff the District's obligation to integrate persons with disabilities into community settings. As a result, the Court concludes that the District has no comprehensive effectively working Olmstead Plan.[46]

B.  *Fundamental Alteration Defense:  The District Has Demonstrated That Only One of Plaintiffs' Four Requested Accommodations Is Unreasonable*

In Olmstead, the Supreme Court declared that "unjustified isolation of persons with disabilities is a form of discrimination," Olmstead, 527 U.S. at 600, and that the ADA and its implementing regulations "require placement of persons with . . . disabilities in community settings rather than in institutions." Id. at 587. But the Court added this important caveat: placement in the community is required only so long as the placement "can be reasonably accommodated, taking into account the resources of the state and the needs of others." Id. States

---

[46]     In reaching this conclusion, the Court need not consider the overall rate at which nursing facility residents successfully transition to the community, which is subject to many other limiting conditions that are outside of the District's control. See, e.g., Brown II, 928 F.3d at 1087 ("The lack of housing is relevant to whether the pace of movement from the waiting list is 'reasonable,' which, in turn, is relevant to whether the District has an 'adequate Olmstead Plan' in place."); see also id. at 1092 (Wilkins, J., concurring in the judgment) (noting that the "number of completed or pending placements of disabled individuals in outside housing" need not be "the exclusive, or even predominant, factors" in determining whether the District has a comprehensive, effectively working Olmstead Plan).

can resist modifications requested by segregated disabled individuals, but only if the state "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Id. at 597 (quoting 28 C.F.R. § 35.130(b)(7)); see also Brown II, 928 F.3d at 1070, 1077. This fundamental alteration defense "allow[s] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities." Olmstead, 527 U.S. at 604; see Brown II, 928 F.3d 1077-78.

Because the Court has concluded that the District has not met its burden of demonstrating that it has a comprehensive effectively functioning Olmstead Plan, the Court now must determine whether plaintiffs' requested accommodations are unreasonable under the fundamental alteration defense. Pursuant to the D.C. Circuit's instructions, in doing so the Court "concentrate[s] on the accommodations that Plaintiffs in fact request [as reflected in] the proposed injunction." Brown II at 1083 n.10; see also Fourth Amended Complaint at 31-32 (setting forth four subsections of the proposed injunction).

The injunctive relief requested by plaintiffs has four distinct components. The Court will discuss each in turn.

1.   Subpart One of Proposed Injunction:  Cost of Developing Working System
of Transition Assistance

In the first subpart of their proposed injunction, plaintiffs request that the Court require the District to "[d]evelop and implement a working system of transition assistance" that, based on the evidence presented at trial, (1) periodically informs nursing facility residents for Medicaid-funded nursing facility residents "about community-based long-term care alternatives

to nursing facilities"; (2) periodically elicits nursing facility residents' preferences for transitioning to the community; (3) provides discharge planning to residents upon admission, with monthly progress reviews; and (4) provides Medicaid-funded nursing facility residents who wish to transition to the community with assistance accessing appropriate home- and community-based services.  See Fourth Amended Complaint at 31.  The District argues that implementing this system of transition assistance would not only be duplicative of the services nursing facilities and District of Columbia agencies already provide to class members, it would cost the District upwards of $7 million – and perhaps as much as $14 million – annually to do so. See FF ¶ 147.  To cover the cost of these services, the District continues, would require DACL or the Health and Human Services cluster within District government to cut a variety of home- and community-based services that enable disabled individuals to safely and productively live in the community.  See id. ¶¶ 147-149.

First, although the Court certainly agrees that costs are relevant, "budgetary constraints alone are insufficient to establish a fundamental-alteration defense."  Pennsylvania Prot & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 380 (3d Cir. 2005); accord Pashby v. Delia, 709 F.3d 307, 323 (4th Cir. 2013), abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008); see also DOJ Olmstead Guidance at 7 ("Budgetary shortages are not, in and of themselves, evidence that such relief would constitute a fundamental alteration.").  "In passing the ADA, Congress was clearly aware that '[w]hile the integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole.'"  Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1183 (10th Cir. 2003) (quoting H.R. REP. NO. 101-485, pt. 3, at 50 (1990)).  "If every alteration in a program or service that required

the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed." Id.; accord Steimel v. Wernert, 823 F.3d 902, 915 (7th Cir. 2016). The courts therefore take "a holistic approach" and consider both the "resources available" and the "needs of others with [physical] disabilities." Steimel v. Wernert, 823 F.3d at 915; see Olmstead, 527 U.S. at 597 (recognizing "the States' need to maintain a range of facilities for the care and treatment of persons with diverse . . . disabilities, and the States' obligation to administer services with an even hand"); see Brown II, 928 F.3d at 1089-90 (Wilkins, J., concurring in the judgment).[47]

        On the evidence presented at trial as it relates to costs, the Court concludes that plaintiffs' requested accommodations would not fundamentally alter the nature of the District's services, nor would they "be inequitable, given the responsibility the [District] has undertaken for the care and treatment of a large and diverse population of persons with [physical] disabilities." Brown II, 928 F.3d at 1077-78. As noted above, one of the reasons the District's Olmstead Plan is deficient is that it fails to comprehensively assess how many nursing facility residents are willing and able to transition to the community or have expressed an interest in

---

[47]    As noted by Justice Kennedy in Olmstead, this consideration balances the non-discrimination mandate of the ADA against federalism concerns:

> No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities. If, for example, funds for care and treatment of the mentally ill, including the severely mentally ill, are reduced in order to support programs directed to the treatment and care of other disabilities, the decision may be unfortunate. The judgment, however, is a political one and not within the reach of the [ADA]. Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs.

Olmstead, 527 U.S. at 612-13 (Kennedy, J., concurring).

talking to someone about the possibility of leaving the nursing facility and transitioning to the community. Another reason is that the District fails to ensure that residents are provided meaningful transition assistance once they have expressed an interest and been referred to DACL. See supra Section III.A.

The Court finds that the District overstates the burden placed on it by plaintiffs' requests when it estimates that implementing a working system of transition assistance would require employing 60 additional transition care specialists at an estimated cost of $7 million annually. See FF ¶ 147. Despite assertions by the District to the contrary, the evidence before the Court demonstrates that these deficiencies can be remedied and transition care assistance can be provided by fewer than 60 additional transition care specialists. Ensuring that individuals who respond affirmatively to the MDS question Q0500B are personally visited by a District employee who can provide personalized information about the possibility of transitioning to the community does not require an army of transition care specialists. As a result, the District's estimate that the cost of implementing the plaintiffs' requests would be approximately $7 million has not been demonstrated. Although the implementation of an effective system of transition assistance might be "costly," it would not "require an unreasonable transfer of the District's limited resources from other disabled individuals." Brown II, 928 F.3d at 1085 (emphasis added). As the Supreme Court noted, the cost of services provided to disabled individuals already living in the community – including meal delivery, fitness and education programs, and transportation, see FF ¶ 65 – cannot be used to justify the continuing segregation of class members, who also stand to benefit from those same services. Olmstead, 527 U.S. at 601.

96

2.  <u>Subpart Two of Proposed Injunction:  Home and Community Based
Services and Support</u>

Second, plaintiffs request that the District "[e]nsure sufficient capacity of

community-based long-term care services" provided through the various locally- and federally-

funded programs administered by the District to serve plaintiffs "in the most integrated setting

appropriate to their needs."  <u>See</u> Fourth Amended Complaint at 31.  The record evidence

establishes that there currently is sufficient capacity for nursing facility residents interested in

transitioning to receive such long-term care services in the community; and there is no indication

that the District would be unable to provide those services to class members if they were to

transition to the community.  The PCA program offers services of various kinds to all Medicaid

beneficiaries who have transitioned from a nursing facility to the community, and there "is no

limit to the number of District residents who can receive State Plan PCA services."  <u>See</u> FF ¶ 47.

And a qualified individual can receive PCA services even if not eligible for the EPD waiver

program, which is a program that provides a broader array of services.  <u>See</u> Stipulated Facts at 3;

FF ¶¶ 47-48.  Furthermore, at the time of trial, there were "more than enough EPD Waiver slots

to accommodate all class members who need services under the EPD Waiver."  <u>Id</u>. ¶ 49.  While

there was a waiting list for EPD waiver services a decade ago, there are now many more slots

available than there is demand for EPD waivers.  <u>See id</u>. ¶¶  48-49; <u>Brown I</u>, 322 F.R.D. at 73-

74; <u>see</u> <u>also</u> <u>supra</u> at 83 n.45.  The Court therefore concludes that implementing this subpart of

plaintiffs' proposed injunction would not be "so costly as to be unreasonable."  <u>Brown II</u>, 928

F.3d at 1082.

3.  <u>Subpart Three of Proposed Injunction:  Number of Residents
to be Transitioned Annually</u>

Third, plaintiffs request that the District be required to transition no fewer than 600 class members into the community over four years:  80 class members in Year 1; 120 class members in Year 2; 200 class members in Year 3; and 200 class members in Year 4.  <u>See</u> Fourth Amended Complaint at 31-32.  The Court has compared this to what the District has been capable of doing in recent years – even after being placed under a Corrective Action Plan by CMS:  24 nursing facility residents transitioned to the community in 2014; 36 in 2015; 40 in 2016; 37 in 2017; 32 in 2018; 47 in 2019; 44 in 2020; and 19 as of June 2021.  These numbers are far below the requirements plaintiffs ask the Court to impose on the District of Columbia going forward.  The question is whether plaintiffs' requests are realistic in view of the fact that there are substantial barriers to transitioning to the community, particularly the lack of available housing for nursing facility residents in the community, which is beyond the control of the District of Columbia.

To successfully transition to the community, a nursing facility resident must secure safe and affordable housing which meets their physical needs.  <u>See</u> FF ¶ 105.  At the least, greater than 50% of class members require public housing or housing subsidies in order to successfully transition to the community.  <u>See</u> FF ¶ 124; <u>see also</u> <u>Brown I</u>, 322 F.R.D. at 82 (noting that "[o]ver 80% of nursing facility residents who want to move to the community need public housing or subsidized housing").  Finding appropriate housing can be a challenge for many nursing facility residents and their families, particularly those with limited financial means.  <u>See</u> FF ¶ 106.  In addition, many nursing home residents lack the self-confidence necessary to navigate the administrative challenges that make it difficult to transition.  <u>See</u> FF ¶  104.

Furthermore, and most important, the D.C. Housing Authority ("DCHA") is an independent agency. While it receives funding from both the federal and D.C. governments to provide housing services to D.C. residents, it is not formally a part of the District of Columbia government. See FF ¶ 107. And even setting aside the difficulty some nursing facility residents may face in locating suitable housing, there continues to be a severely limited inventory of available public housing and housing choice vouchers in the District of Columbia. See id. ¶¶ 108-117. Realistically, the only viable option for nursing facility residents is the special purpose voucher. See id. ¶ 119.[48] And at the time of trial, there were only 85 special purpose vouchers assigned by DCHA to DACL to make available to nursing facility residents. See id. ¶¶ 118-120.

In vacating the Court's prior decision, the D.C. Circuit observed that "[i]f on remand the district court reaffirms the[] factual findings [regarding the lack of housing in the District of Columbia], it appears the third provision of the proposed injunction . . . would likely be so costly as to be unreasonable." Brown II, 928 F.3d at 1085 n.13 (internal citation omitted). This Court agrees. It simply is unrealistic to require the District of Columbia to transition 600 class members to the community over a four year period without any consideration of the likelihood that a lack of available housing will be an individualized barrier to transition for many. As plaintiffs acknowledge, it would likely require the District to reallocate special purpose housing vouchers from other populations to member of the class in this case. The problem is that DCHA, which administers the housing choice voucher waiting list, is an

---

[48]    As noted, there are three types of housing vouchers used by DCHA: tenant-based vouchers, project-based vouchers, and special purpose vouchers. See FF ¶ 109. At the time of trial, there were 43,000 people on the voucher waiting list, and the list had been closed since April 2013. See FF ¶¶ 112. Tenant-based vouchers and project-based vouchers are distributed through DCHA's voucher waiting list; special purpose vouchers are not. See FF ¶¶ 112-118.

independent public housing agency that is not subject to the District's control. And although DCHA administers approximately 2,900 special purpose vouchers, DCHA has assigned only 85 special purpose vouchers to DACL to make available to nursing facility residents. See FF ¶¶ 107-109.

4.    Subpart Four of Proposed Injunction:  Providing Public Reports
to Assure Transparency

Finally, plaintiffs request that the District be required to publicly report on a semi-annual basis a number of metrics that reflect the District's success in transitioning class members to the community: "the total number of DC Medicaid-funded nursing facility residents who do not oppose living in the community; the number of those individuals assisted by [the District] to transition to the community . . . ; and the aggregate dollars [saved] . . . by serving individuals in the community rather than in nursing facilities." Fourth Amended Complaint at 32.  In plaintiffs' view, through such transparent reporting, the public could assess the District's ongoing commitment to deinstitutionalization.  The District argues that the data it currently reports is sufficient, but it fails to meet its burden to explain how reporting the requested information would be so costly as to be unreasonable.  In the Court's view, such data could be easily collected as an ancillary matter when implementing the first subpart of plaintiffs' requested injunction.  Because the District has not shown that reporting such supplemental data would be unreasonable, see FF ¶ 26 (noting the District's regular reporting requirements); see also Def. Ex. 102 at 18-19, 31-34 (listing some of the District's reporting obligations under the current Olmstead Plan), the Court will require the District to make the requested accommodation.  See Brown II, 928 F.3d at 1081.

IV.  CONCLUSION

The Court concludes that the District of Columbia has violated both the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  It has violated the integration mandate of <u>Olmstead</u>, because it does not have a comprehensive and effectively working <u>Olmstead</u> Plan in place.  As a result, the Court has considered the alternative established by <u>Olmstead</u>:  whether the District has shown that "in the allocation of available resources," providing immediate relief to the plaintiffs "would be inequitable, given the responsibility the [District] has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities."  <u>Olmstead</u>, 527 U.S. at 604.  Applying this "fundamental alteration defense" to the facts found based on the evidence at trial, the Court concludes that three of plaintiffs' requested accommodations are reasonable; one is not.

Consistent with the foregoing Findings of Fact and Conclusions of Law, the Court finds the defendant District of Columbia liable for violating the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.  The Court also concludes that plaintiffs continue to satisfy the class certification requirements under Federal Rule of Civil Procedure 23(a) and 23(b)(2).  The Court therefore orders relief on behalf of all members of the class, defined as:

> All persons with physical disabilities who, now or during the pendency of this lawsuit:  (1)  receive D.C. Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days; (2) are eligible for Medicaid covered home and community-based long-term care services that would enable them to live in the community; and (3) would prefer to live in the community instead of a nursing facility but need the District of Columbia to provide transition assistance to facilitate their access to long-term care services in the community.

Pursuant to the Declaratory Judgment Act, the Court declares that defendant's failure to provide plaintiffs with long-term care services in the most integrated setting

appropriate to their needs violates Title II of the Americans with Disabilities Act.  It further declares that defendant's failure to provide plaintiffs with long-term care services in the most integrated setting appropriate to their needs violates Section 504 of the Rehabilitation Act.

The Court will enter a permanent injunction requiring defendant to promptly take the following steps that are necessary to serve plaintiffs in the most integrated settings appropriate to their needs: (1) develop and implement a working system of transition assistance for plaintiffs whereby defendant, at a minimum, (a) informs D.C. Medicaid-funded nursing facility residents, upon admission and at least every three months thereafter, about community-based long-term care alternatives to nursing facilities; (b) elicits D.C. Medicaid-funded nursing facility residents' preferences for community or nursing facility placement upon admission and at least every three months thereafter; (c) begins D.C. Medicaid-funded nursing facility residents' discharge planning upon admission and reviews at least every month the progress made on that plan; and (d) provides D.C. Medicaid-funded nursing facility residents who do not oppose living in the community with assistance accessing all appropriate resources available in the community;  (2) ensure sufficient capacity of community-based long-term care services for plaintiffs under the EPD, MFP, and PCA programs, and other long-term care service programs, to serve plaintiffs in the most integrated setting appropriate to their needs, as measured by enrollment in these long-term care programs; and (3) to demonstrate the District's ongoing commitment to deinstitutionalization by publicly reporting on at least a semi-annual basis the total number of D.C. Medicaid-funded nursing facility residents who do not oppose living in the community; the number of those individuals assisted by defendant to transition to the community with long-term care services through each of the MFP, EPD, and PCA, and other long-term care

programs; and the aggregate dollars defendant saves (or fails to save) by serving individuals in the community rather than in nursing facilities.

The Court expressly denies plaintiffs' request to enter an injunction directing the District of Columbia to transition members of the plaintiff class from nursing facilities to the community with the appropriate long-term care community-based services under the EPD, MFP, and PCA programs, and any other long-term care programs, with the following minimum numbers of transitions in each of the next four years:  80 class members in Year 1; 120 class members in Year 2; 200 class members in Year 3; and 200 class members in Year 4.

The Court directs the Clerk of the Court to enter a Final Judgment in favor of plaintiffs Ivy Brown and Larry McDonald and the Plaintiff Class. This is a final appealable order.  <u>See</u> Fed. R. App. P. 4 (a).

SO ORDERED.


PAUL L. FRIEDMAN
United States District Judge

DATE:  12|31|24