UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
IVY BROWN, et al.,                                  )
                                                    )
                Plaintiffs,                         )
                                                    )
        v.                                          )        Civil Action No. 10-2250 (PLF)
                                                    )
DISTRICT OF COLUMBIA,                               )
                                                    )
                Defendant.                          )
_____)


OPINION AND ORDER

On December 31, 2024, the Court issued its opinion, findings of fact, and conclusions of law in this case. See Brown v. District of Columbia ("Brown III"), 761 F. Supp. 3d 34 (D.D.C. 2024).[1] Consistent with its findings of fact and conclusions of law, the Court entered a permanent injunction against the District of Columbia ("the District"), directing the District to take several steps "necessary to serve plaintiffs in the most integrated settings appropriate to their needs." Id. at 96. On January 28, 2025, the District filed a Motion to Alter or Amend Judgment ("Def. Mot.") [Dkt. No. 508], under Rule 59(e) of the Federal Rules of Civil Procedure, asserting that the injunction "as entered evinces manifest errors of law" and

_____
[1] The Court has reviewed the following documents in connection with the pending motion: Defendant's Motion to Alter or Amend Judgment ("Def. Mot.") [Dkt. No. 508]; Plaintiffs' Opposition to Defendant's Motion to Alter or Amend Judgment ("Pls. Opp.") [Dkt. No. 514]; Defendant's Reply in Support of its Motion to Alter or Amend Judgment ("Def. Reply") [Dkt. No. 517]; Defendant's Supplemental Memorandum in Support of its Motion to Alter or Amend Judgment ("Def. Supp.") [Dkt. No. 521]; the parties' Proposed Revisions to Subpart Two of the Injunction and the District's Statement Regarding Subpart Three of the Injunction ("JSR") [Dkt. No. 522]; and Plaintiffs' Response Brief Pursuant to the Court's April 16, 2025 Memorandum Opinion and Order ("Pls. Supp.") [Dkt. No. 523].

should be vacated.  See Def. Mot. at 7; see also FED. R. CIV. P. 59(e).  After receiving plaintiffs'

opposition and other filings from the parties, the Court held oral argument on the District's

motion on April 15, 2025.  See Minute Entry of April 15, 2025.

Upon careful consideration of the parties' filings, the oral arguments, and the

relevant legal authorities, the Court will deny the District's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Court presumes familiarity with the complex factual and procedural history

of this case, which is described in the Court's recent opinion.  See Brown III, 761 F. Supp. 3d

at 41-47.  What follows is an overview of facts relevant to the District's pending motion.

Plaintiffs are a class of physically disabled individuals who have received

Medicaid-funded long-term care in nursing facilities for more than 90 days, but who wish to

transition—and are capable of transitioning—to the community to receive home- and

community-based care.  See Brown III, 761 F. Supp. 3d at 41.  On December 23, 2010, plaintiffs

filed a putative class action against the District, alleging that the District had violated Title II of

the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., and

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq.  See Brown III, 761 F. Supp. 3d

at 43; see also Brown v. District of Columbia ("Brown I"), 322 F.R.D. 51, 56-57 (D.D.C. 2017).

Plaintiffs argued that the District "ha[d] caused numerous individuals with physical disabilities

'to be confined unnecessarily in nursing facilities in order to obtain long-term care services,

rather than facilitate [those individuals'] transition to the community with appropriate services

and supports.'"  Brown III, 761 F. Supp. 3d at 43 (quoting Plaintiffs' Fourth Amended

Complaint [Dkt. No. 162] ¶ 135).  Plaintiffs sought declaratory and injunctive relief.  See id.

On March 29, 2014, Judge Ellen Segal Huvelle certified a class of plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure consisting of:

> All persons with physical disabilities who, now or during the pendency of this lawsuit: (1) receive DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days; (2) are eligible for Medicaid-covered home and community-based long-term care services that would enable them to live in the community; and (3) would prefer to live in the community instead of a nursing facility but need the District of Columbia to provide transition assistance to facilitate their access to long-term care services in the community.

Brown III, 761 F. Supp. 3d at 44 (quoting Order [Dkt. No. 129] at 1).  In 2016, Judge Huvelle conducted a bench trial to determine whether the District was "liable," reserving the issue of what an appropriate remedy might be for a later phase.  See id. (citing Brown I, 322 F.R.D. at 61-62).  After the trial, Judge Huvelle entered judgment for the District, finding that plaintiffs had failed to prove that the District had violated the ADA and the Rehabilitation Act.  See id. at 45 (citing Brown I, 322 F.R.D. at 96).  Specifically, "the Court concluded that plaintiffs had failed to prove 'the existence of a concrete systemic deficiency in the District's transition services' that had caused plaintiffs 'to remain in nursing facilities despite their preference to receive long-term care in the community.'"  Id. at 45 (quoting Brown I, 322 F.R.D. at 87).

On appeal, the D.C. Circuit reversed and remanded the case for further factfinding and consideration, holding that the Court had erred by requiring plaintiffs to bear the burden at trial of proving a "'concrete, systemic deficiency' in the District's transition services."  Brown v. District of Columbia ("Brown II"), 928 F.3d 1070, 1079 (D.C. Cir. 2019).  Pursuant to the Circuit's remand instructions regarding burden of proof, this case proceeded to a second bench trial before the undersigned that commenced on October 25, 2021.  See Brown III, 761 F. Supp. 3d at 46; see also Brown II, 928 F.3d at 1083-85 (providing detailed remand instructions).

On December 31, 2024, after carefully considering all of the admissible evidence from both bench trials and reviewing the parties' filings and the applicable law, the Court issued its opinion, findings of fact, and conclusions of law.  See Brown III, 761 F. Supp. 3d at 47-95. The Court found that the District's "complex system of long-term care services and supports for physically-disabled individuals," id. at 84, did not sufficiently satisfy the Supreme Court's "integration mandate" under the ADA to "integrate eligible patients [with disabilities] into local community-based settings."  Id. at 42 (quoting Frederick L. v. Dep't of Pub. Welfare of Pa., 422 F.3d 151, 157 (3d Cir. 2005)).  In Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), a majority of the Supreme Court interpreted Title II of the ADA and its implementing regulations to hold that the unjustified placement, retention, or isolation of persons with disabilities in institutions constitutes a form of discrimination on the basis of disability.  See id. at 596-97; see also id. at 601 (noting that disabled individuals who are unjustifiably institutionalized experience dissimilar treatment because they are required to "relinquish participation in community life they could enjoy given reasonable accommodations" in order to receive medical services, while those without disabilities are not required to make such a sacrifice to receive medical services).

The Olmstead Court thus recognized an "integration mandate" under the ADA for public entities to ensure "that patients eligible and desirous of community placement be discharged into community-based programs if placement can be reasonably accommodated, taking into account the resources of the state and the needs of other persons in its care." Frederick L. v. Dep't of Pub. Welfare of Pa., 422 F.3d at 157 (citing Olmstead, 527 U.S. at 587); see also Steimel v. Wernert, 823 F.3d 902, 909 (7th Cir. 2016); Arc of Wash. State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005).  But Olmstead's integration mandate "is not boundless."  Olmstead, 527 U.S. at 603.  A public entity may defend against integration claims

by demonstrating "that it ha[s] a comprehensive, effectively working plan [now called an

"Olmstead Plan"] for placing qualified persons with . . . disabilities in less restrictive settings,

and a waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to

keep its institutions fully populated."  Olmstead, 527 U.S. at 605-06; see also Arc of Wash. State

Inc. v. Braddock, 427 F.3d at 618 (noting that courts "normally 'will not tinker with'

comprehensive, effective state programs for providing care to the disabled.").

    In Brown III, this Court concluded "that the District has violated Olmstead's

integration mandate and does not have an effective Olmstead Plan in place."  761 F. Supp. 3d

at 84.  First, the Court explained that "the District's Olmstead Plan is not comprehensive or

effectively working because the District fails to provide effective outreach to nursing facility

residents to determine whether they are willing and able to transition to the community."

Id. at 86.  Specifically, "the District does not provide residents with sufficient information to

enable them to make informed decisions about whether to seek to transition to the community."

Id.  Second, the Court determined that the District "failed to demonstrate that it provides

meaningful transition assistance" to nursing facility residents who require such assistance from

the District.  Id. at 89.  Specifically, "the District places too much reliance on nursing facilities to

provide transition assistance to nursing facility residents who wish to transition and are capable

of transitioning to the community, rather than following up proactively and systematically

through their transition care specialists."  Id. at 84.

    Consistent with these findings of fact and conclusions of law, the Court found the

District liable for violating the ADA and the Rehabilitation Act, and ordered declaratory and

injunctive relief on behalf of all members of the plaintiff class.  See Brown III, 761 F. Supp. 3d

at 95-96.  First, pursuant to the Declaratory Judgment Act, see 28 U.S. Code § 2201, the Court

declared that the District's "failure to provide plaintiffs with long-term care services in the most

integrated setting appropriate to their needs violates Title II of the Americans with Disabilities

Act [and] Section 504 of the Rehabilitation Act." Brown III, 761 F. Supp. 3d at 96. Second, the

Court entered a permanent injunction requiring the District to "promptly take the following steps

that are necessary to serve plaintiffs in the most integrated settings appropriate to their needs":

>  (1) develop and implement a working system of transition
> assistance for plaintiffs whereby defendant, at a minimum,
>> (a) informs D.C. Medicaid-funded nursing facility
>> residents, upon admission and at least every three months
>> thereafter, about community-based long-term care
>> alternatives to nursing facilities;
>> (b) elicits D.C. Medicaid-funded nursing facility residents'
>> preferences for community or nursing facility placement
>> upon admission and at least every three months thereafter;
>> (c) begins D.C. Medicaid-funded nursing facility residents'
>> discharge planning upon admission and reviews at least
>> every month the progress made on that plan; and
>> (d) provides D.C. Medicaid-funded nursing facility
>> residents who do not oppose living in the community with
>> assistance accessing all appropriate resources available in
>> the community;
>
> (2) ensure sufficient capacity of community-based long-term care
> services for plaintiffs under the EPD, MFP, and PCA programs,
> and other long-term care service programs, to serve plaintiffs in the
> most integrated setting appropriate to their needs, as measured by
> enrollment in these long-term care programs; and
>
> (3) to demonstrate the District's ongoing commitment to
> deinstitutionalization by publicly reporting on at least a
> semi-annual basis the total number of D.C. Medicaid-funded
> nursing facility residents who do not oppose living in the
> community; the number of those individuals assisted by defendant
> to transition to the community with long-term care services
> through each of the MFP, EPD, and PCA, and other long-term care
> programs; and the aggregate dollars defendant saves (or fails to
> save) by serving individuals in the community rather than in
> nursing facilities.

Brown III, 761 F. Supp. 3d at 96. Lastly, the Court directed the Clerk of the Court to enter

judgment in favor of plaintiffs Ivy Brown and Larry McDonald and the plaintiff class. Id. at 97.

On January 28, 2025, the District moved to alter or amend the Court's judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. See Def. Mot. In its motion, the District argues that Subparts One, Two, and Three of the Court's injunction "evince[ ] manifest errors of law" and should be vacated, in whole or in part. Def. Mot. at 7. The District further argues that Subpart Two of the injunction is "fatally vague," and therefore commits manifest error under Rule 59(e). Id. at 19-20. On February 25, 2025, plaintiffs filed their opposition to the District's motion. See Plaintiffs' Opposition to Defendant's Motion to Alter or Amend Judgment ("Pls. Opp.") [Dkt. No. 514]. The District replied on March 19, 2025. See Reply in Support of Defendant's Motion to Alter or Amend Judgment ("Def. Reply") [Dkt. No. 517].

On April 15, 2025, the Court heard oral argument on the District's motion. See Minute Entry of April 15, 2025. The next day, the Court ordered the parties to file a joint status report including: (i) a joint proposed revision to Subpart Two of the injunction that "clarif[ies] the precise long-term care service programs that the District may use as enrollment benchmarks to ensure sufficient capacity of community-based long-term care service programs"; and (ii) a statement from the District "explain[ing] the nature of any objections [it] may have to promptly implementing Subpart Three of the Injunction." Memorandum Opinion and Order of April 16, 2025 [Dkt. No. 519] at 3. The Court further ordered the District to file a supplemental memorandum of law "providing any case law or precedent that directly supports" the proposition that "a judgment ordering injunctive relief that is not narrowly tailored constitutes clear error under Rule 59(e) of the Federal Rules of Civil Procedure." Id. at 4 (emphasis in original).[2]

_____

[2]     On April 16, 2025, the Court stayed its December 31, 2024 judgment "pending further order of the Court." See Mem. Op. and Order at 3 (granting the District's Motion to Stay Judgment Pending Reconsideration of the Judgment Entered [Dkt. No. 509]).

On May 6, 2025, the parties filed a joint status report proposing two different revisions to Subpart Two of the injunction and advising the Court of the District's objections to promptly implementing Subpart Three of the injunction.  See Proposed Revisions to Subpart Two of the Injunction and the District's Statement Regarding Subpart Three of the Injunction ("JSR") [Dkt. No. 522].  Pursuant to the Court's opinion and order of April 16, 2025, the District filed its supplemental memorandum of law on May 6, 2025.  See Defendant's Supplemental Memorandum ("Def. Supp.") [Dkt. No. 521].  Plaintiffs replied on May 13, 2025. See Plaintiffs' Response Brief ("Pls. Supp.") [Dkt. No. 523].  The parties have fully briefed the issues, and the District's Rule 59(e) motion for reconsideration is now ripe for decision.

## II.  LEGAL STANDARD

Rule 59(e) of the Federal Rules of Civil Procedure permits a party to file a motion to alter or amend a judgment within twenty-eight days of the judgment's entry.  See FED. R. CIV. P. 59(e).  To prevail on a Rule 59(e) motion, the moving party must identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Messina v. Krakower, 439 F.3d 755, 758 (D.C. Cir. 2006) (quoting Firestone v. Firestone ("Firestone"), 76 F.3d 1205, 1208 (D.C. Cir. 1996)).  "[C]ourts have required 'a very exacting standard'" in assessing "clear error" in the Rule 59(e) context, such that the "final judgment must be 'dead wrong' to constitute clear error."  Wannall v. Honeywell Int'l, Inc., Civil Action No. 10-351 (BAH), 2013 WL 12321549, at *3 (D.D.C. Oct. 24, 2013) (first quoting Bond v. U.S. Dep't of Just., 286 F.R.D. 16, 22 (D.D.C. 2012), then quoting Lardner v. FBI, 875 F. Supp. 2d 49, 53 (D.D.C. 2012)).  "Indeed, the Seventh Circuit has vividly observed that '[t]o be clearly erroneous, a decision must strike [a court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead

fish." Slate v. Am. Broad. Companies, Inc. ("Slate"), 12 F. Supp. 3d 30, 35 (D.D.C. 2013) (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988)).

"The strictness with which [Rule 59(e)] motions are viewed is justified by the need to protect both the integrity of the adversarial process in which parties are expected to bring all arguments before the court, and the ability of the parties and others to rely on the finality of judgments." Mahoney v. United States Capitol Police Bd. ("Mahoney"), Civil Action No. 21-2314 (JEB), 2024 WL 4235429, at *2 (D.D.C. July 31, 2024) (quoting Mohammadi v. Islamic Republic of Iran ("Mohammadi"), 947 F. Supp. 2d 48, 77 (D.D.C. 2013)) (alteration in original). Accordingly, "although courts have 'considerable discretion in ruling on a Rule 59(e) motion,' such motions are 'disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." Owen-Williams v. BB & T Servs., Inc., 797 F. Supp. 2d 118, 124 (D.D.C. 2011) (first quoting Piper v. U.S. Dep't of Justice, 312 F. Supp. 2d 17, 20 (D.D.C. 2004), then Niedermeier v. Office of Baucus, 153 F. Supp. 2d 23, 28 (D.D.C. 2001)). "Rule 59(e) does not provide a vehicle to 'relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" Schoenman v. FBI, 857 F. Supp. 2d 76, 80 (D.D.C. 2012) (quoting Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008)). Nor does Rule 59(e) provide a vehicle to express "mere disagreement" with a judgment. Wannall v. Honeywell Int'l, Inc., 2013 WL 12321549, at *3.

## III. ANALYSIS

The District of Columbia does not seek to vacate the Court's judgment in light of an "intervening change of controlling law," the "availability of new evidence," or the need to "prevent manifest injustice." Firestone, 76 F.3d at 1208. Instead, the District asserts that relief under Rule 59(e) is warranted in this case because the Court's injunction, as entered, "evinces

9

manifest errors of law" in three ways:  First, Subpart One of the injunction "affords relief to

non-Parties—not as a collateral benefit, but as an additional requirement and burden upon the

District."  Def. Mot. at 7.  Second, the District argues that Subparts One, Two, and Three of the

injunction are "not connected to or tailored to redress the conduct identified as problematic" in

the Court's findings of fact.  Id.  Lastly, the District argues that Subpart Two of the injunction is

"fatally vague" under Rule 65(d) of the Federal Rules of Civil Procedure, and therefore commits

"manifest error" warranting relief under Rule 59(e).  Id. at 19; see also FED. R. CIV. P. 65(d).[3]

       All three arguments "must clear a high hurdle."  Mahoney, 2024 WL 4235429,

at *6 (citing Leidos, Inc. v. Hellenic Republic ("Leidos"), 881 F.3d 213, 217 (D.C. Cir. 2018)

(describing granting relief under Rule 59(e) as "an extraordinary measure")).  Contrary to the

District's assertion that the Court may "correct any error apparent in the judgment" under

Rule 59(e), see Def. Supp. at 3 (emphasis added), in order to obtain relief under Rule 59(e)'s

"clear error" standard, the District must establish that the Court's December 31, 2024

"judgment [was] 'dead wrong.'"  Mohammadi, 947 F. Supp. 2d at 78 (quoting Lardner v.

FBI, 875 F. Supp. 2d at 53).  The Court must also ensure that the District is not using its

Rule 59(e) motion to "relitigate old matters, or to raise arguments . . . that could have been raised

prior to the entry of judgment."  Exxon Shipping Co. v. Baker, 554 U.S. at 485 n.5.

---

[3]     The District repeatedly asserts that relief under Rule 59(e) is warranted because
the Court's injunction evinces "manifest error[s]" of law.  See e.g., Def. Mot. at 8, 9, 11, 13, 14.
But as plaintiffs correctly note, Rule 59(e) affords the Court discretion to reconsider its judgment
"under three circumstances only: (1) if there is an intervening change of controlling law; (2) if
new evidence becomes available; or (3) if the judgment should be amended in order to correct a
clear error or prevent manifest injustice."  Pls. Opp. at 5 (quoting Leidos, Inc. v. Hellenic
Republic, 881 F.3d 213, 217 (D.C. Cir. 2018)).  "[T]he phrase 'manifest errors of law' is not a
standard under Rule 59(e)."  Id. (quoting Def. Mot. at 7).

Under this framework, the Court finds that the District's arguments either could have been—or were in fact—raised prior to the entry of the judgment, or simply reflect mere disagreement with the Court's ordered relief. The District therefore has not established a need to correct "clear error" such that relief under Rule 59(e) is warranted.

### A. The District's "Relief to Non-Parties" Argument

The District argues that Subpart One of the injunction evinces "clear error" under Rule 59(e) because it "extends relief to non-parties," and therefore the Court must vacate or, in the alternative, alter Subpart One. Def. Mot. at 7. Recall that Subpart One directs the District to:

> (1) develop and implement a working system of transition assistance for plaintiffs whereby defendant, at a minimum,
> > (a) informs D.C. Medicaid-funded nursing facility residents, <u>upon admission</u> and at least every three months thereafter, about community-based long-term care alternatives to nursing facilities;
> > (b) elicits D.C. Medicaid-funded nursing facility residents' preferences for community or nursing facility placement <u>upon admission</u> and at least every three months thereafter;
> > (c) begins D.C. Medicaid-funded nursing facility residents' discharge planning <u>upon admission</u> and reviews at least every month the progress made on that plan; and
> > (d) provides D.C. Medicaid-funded nursing facility residents who do not oppose living in the community with assistance accessing all appropriate resources available in the community.

<u>Brown III</u>, 761 F. Supp. 3d at 96 (emphasis added). And recall that the plaintiff class consists of:

> All persons with physical disabilities who, now or during the pendency of this lawsuit: (1) receive DC Medicaid-funded long-term care services in a nursing facility <u>for 90 or more consecutive days</u>; (2) are eligible for Medicaid-covered home and community-based long-term care services that would enable them to live in the community; and (3) would prefer to live in the community instead of a nursing facility but need the District of Columbia to provide transition assistance to facilitate their access to long-term care services in the community.

Order at 1 (emphasis added). The District argues that the injunction requires it to begin transition assistance "upon admission," but an individual "who has just been admitted to a nursing facility has not been in that nursing facility for '90 or more consecutive days,'" meaning "that person is therefore, definitively, not a member" of the plaintiff class. Def. Mot. at 8. Thus, the District argues, Subpart One "improperly extends relief to non-parties." Id. at 7.

The District acknowledges that "injunctive relief issued to a class" may sometimes "benefit[ ] non-parties, as a collateral effect," but asserts that Subpart One "does not just collaterally benefit non-parties." Def. Mot. at 8 (emphasis in original). Rather, "it requires dedication of specific and unique District resources to speak and work with residents who are not parties, that is, people who have been in nursing facilities less than 90 days." Id. Because Subpart One orders relief that may extend to non-parties—that is, people who have been in nursing facilities for up to 89 days—the District argues that this portion of the injunction commits clear "error warranting relief under Rule 59." Id. The District asks the Court to vacate Subpart One of the injunction or, in the alternative, "alter the Injunction to specify that the requirements of Subpart One do not begin 'upon admission,' but rather begin around a resident's 90th day of residence." Id. at 9 (quoting Brown III, 761 F. Supp. 3d at 96).

The Court concludes that the District's argument that Subpart One extends relief to non-parties fails for two separate reasons. First, the argument could have been raised prior to the entry of the Court's December 31, 2024 judgment. And second, the argument was in fact substantially raised previously by the District of Columbia before trial, at trial, and after trial.

As discussed, Judge Huvelle certified the plaintiff class on March 29, 2014. See Brown III, 761 F. Supp. 3d at 44; see also Order at 1. The class definition—including the "90 or more consecutive days" language—therefore has remained unchanged "[f]or over a

12

decade." Pls. Opp. at 10-11 (quoting Order at 1). Similarly, the injunctive relief sought by plaintiffs at trial, including the relief set out in Subpart One, has remained unchanged since plaintiffs' Third Amended Complaint [Dkt. No. 98], which was filed on March 27, 2013. See Third Amended Complaint at 35; see also Pls. Opp. at 11. And in their Fourth Amended Complaint, which was filed on September 10, 2015, plaintiffs again requested the relief set out in Subpart One. See Fourth Amended Complaint at 31; see also Pls. Opp. at 11. Furthermore, on December 31, 2019, after the D.C. Circuit remanded this case for further factfinding, see Brown II, 928 F.3d at 1083-85, plaintiffs once again stated their intent to seek the same injunctive relief set out in Subpart One. See Plaintiffs' Notice Regarding Injunctive Relief [Dkt. No. 299] at 1-2; see also Pls. Opp. at 11. The District thus had ample opportunity to raise its argument that the requested relief in Subpart One extends relief to non-parties. See Pls. Opp. at 11; see also Exxon Shipping Co. v. Baker, 554 U.S. at 485 n.5 (Rule 59(e) motions may not be used "to raise arguments . . . that could have been raised prior to the entry of judgment.").

Indeed, the District in fact did raise the argument that Subpart One extends relief to non-parties before trial, at trial, and after trial. See Pls. Opp. at 10. Before trial, in its October 13, 2021 Trial Memorandum ("Def. Tr. Mem.") [Dkt. No. 412], the District argued that Subpart One "primarily benefits, or offends, non-class members, because it requires survey of all nursing facility residents to determine their preferences, though class members are defined as those 'who would prefer' to live in the community." Def. Tr. Mem. at 13 (emphases in original). At trial, the District argued that Subpart One of plaintiffs' proposed injunction "would require the district to . . . elicit all residents' [placement] preferences every three months [and] begin all residents' discharge planning . . . confirm[ing] that Subpart I is designed to apply to all district Medicaid beneficiaries and not just the class." Transcript of Record, Brown III, Civil Action

No. 10-2250 (December 20, 2021 at 10:30 a.m.) [Dkt. No. 489] at 3936:21-3937:18

(emphasis added).  And in its post-trial Proposed Findings of Fact and Conclusions of Law

("Def. F&C") [Dkt. No. 442], the District again argued that Subpart One would only "provide a

de minimis benefit to the class," and would "primarily benefit[ ] non-class members, because it

requires survey of all nursing facility residents to determine their preference, though class

members are defined as those 'who would prefer' to live in the community."  Def. F&C ¶ 270.

        This Court, after carefully considering all admissible evidence from both bench

trials and reviewing the parties' pre- and post-trial filings, entered Subpart One of plaintiffs'

proposed injunction in its entirety.  Compare Brown III, 761 F. Supp. 3d at 96 (Subpart One of

the Court's injunction), with Plaintiffs' Fourth Amended Complaint at 31 (Subpart One of

plaintiffs' proposed injunction).  The Court was aware of the District's arguments about

Subpart One extending relief to non-parties when it entered Subpart One of its order.  The

District's current argument—that Subpart One extends relief to non-parties because it requires

the District to begin transition assistance "upon admission," rather than at the 90-day mark—is

merely a repackaged version of its previous argument, considered by the Court, that Subpart One

extends relief to non-parties by requiring the District to elicit all residents' placement preferences

rather than only plaintiffs' preferences.  And, as discussed, Rule 59(e) motions are not

"vehicle[s] to 'relitigate old matters.'"  Schoenman v. FBI, 857 F. Supp. 2d at 80 (Rule 59(e)

(quoting Exxon Shipping Co. v. Baker, 554 U.S. at 485 n.5)).  The Court therefore finds that the

District's argument that Subpart One extends relief to non-parties could have been—and in fact

was—substantially raised prior to entry of the judgment.  It thus provides no basis for relief

under Rule 59(e).

The District resists this conclusion, advancing three reasons for why its arguments are not barred.  First, the District argues that it "could not present the arguments set forth here . . . until the Court issued its Opinion, Findings of Fact, and final relief in this case."  Def. Mot. at 22.  But the District's argument that the terms of Subpart One extend relief to non-parties does not rely on the Court's December 24, 2024 judgment at all, as evinced by the fact that the argument was substantially raised before the Court entered its judgment.  Second, though the District concedes that it "did repeatedly argue that Plaintiffs' proposed relief swept beyond the Plaintiff Class and was not connected to the Plaintiffs' harms," see Def. Reply at 3; see also Def. Mot. at 23-24, the District asserts that its arguments are still within the scope of Rule 59(e) because "Rule 59(e) motions are aimed at "reconsideration," and "reconsideration implies prior consideration."  Def. Reply at 2 (quoting Leidos, 881 F.3d at 217).  But the District conveniently omits the full context of this quote from Leidos, which sets forth the same exacting "clear error" standard under Rule 59(e) that this Court has articulated.  See Leidos, 881 F.3d at 217.

Lastly, the District argues that although it previously raised several of its arguments, the Court did not address some of those arguments in its final judgment.  See Defs. Reply at 12.  But the Rule 59(e) inquiry does not turn on whether the Court addressed a particular argument in its final judgment, but on whether the moving party raised, or could have raised, that argument before judgment was entered.  See Leidos, 881 F.3d at 217 (explaining that Rule 59(e) "may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment." (quoting Exxon Shipping v. Baker, 554 U.S. at 486 n.5)).

And even assuming, arguendo, that the District's assertions regarding Subpart One were not barred, the District has not established that Subpart One evinces "clear error" under Rule 59(e).  In its findings of fact, the Court found that "[m]ost [nursing facility]

residents do not know what alternatives to inpatient care may exist." See Brown III, 761 F.

Supp. 3d at 87 (quoting U.S. DEP'T OF HEALTH AND HUM. SERVS., OFF. FOR CIV. RTS., GUIDANCE

AND RESOURCES FOR LONG TERM CARE FACILITIES: USING THE MINIMUM DATA SET TO

FACILITATE OPPORTUNITIES TO LIVE IN THE MOST INTEGRATED SETTING (2016) at 4); see also id.

at 87-88 ("[I]n many cases individuals requiring long term services, and/or their families, are

unaware of community-based services and supports that could adequately support individuals in

community living situations."). Then, in its conclusions of law, the Court determined that

Subpart One should issue, in part, because the District's Olmstead plan "fails to comprehensively

assess how many nursing facility residents are willing and able to transition to the community or

have expressed an interest in talking to someone about the possibility of leaving the nursing

facility and transitioning to the community." Brown III, 761 F. Supp. 3d at 93.

   The Court further concluded that "the District fails to provide effective outreach

to nursing facility residents to determine whether they are willing and able to transition to the

community," and that the District does not "provide residents with sufficient information to

enable them to make informed decisions about whether to seek to transition to the community."

Brown III, 761 F. Supp. 3d at 86. Lastly, the Court determined that the District's Olmstead Plan

fails to give the District "a reliable sense of how many individuals with disabilities are

institutionalized and eligible for services in community-based settings and how many are at risk

and need those services." Id. In sum, the Count found the District's Olmstead Plan inadequate

because it fails to assess how many nursing residents are eligible for and would prefer

community-based living alternatives, and also fails to provide nursing residents with the

information necessary to make informed choices and to form placement preferences.

Subpart One of the injunction directly addresses these inadequacies by requiring the District to "inform[ ] D.C. Medicaid-funded nursing facility residents, upon admission and at least every three months thereafter, about community-based long-term care alternatives to nursing facilities." Brown III, 761 F. Supp. 3d at 96. Subpart One further requires the District to "elicit[ ] D.C. Medicaid-funded nursing facility residents' preferences for community or nursing facility placement upon admission and at least every three months thereafter," and to "begin[ ] D.C. Medicaid-funded nursing facility residents' discharge planning upon admission and reviews at least every month the progress made on that plan." Id. Subpart One thus requires the District to: (i) provide nursing residents with information about community-based living alternatives upon admission; (ii) elicit the residents' informed placement preferences upon admission; and (iii) begin discharge planning upon admission. See Brown III, 761 F. Supp. 3d at 96.

The District is correct that the plaintiff class only includes individuals who have "receive[d] DC Medicaid-funded long-term care services in a nursing facility for 90 or more consecutive days." Def. Mot. at 8; see also Order at 1. So there is a chance that the relief ordered in Subpart One of the injunction may benefit some "non-class members who never become class members because they are able, with the provision of information and assistance, to move from a nursing facility before their 90th day" in the nursing facility. See Pls. Opp. at 18. But any information provided to non-parties is merely a collateral benefit of the injunction. See Brown v. Plata, 563 U.S. 493, 531 (2011) (holding that an injunctive remedy "does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class."). As plaintiffs correctly note, "[p]roviding nursing facility residents with the information they need to make informed decisions about whether they want to live in the community or remain in a nursing facility is foundational to being able to make a meaningful decision about community

17

living." Pls. Opp. at 22. And in order for potential class members to make "<u>informed</u> decisions" regarding community living once their 90th day in the nursing facility arrives, they need to be provided with information about community living and consulted about their preferences before the 90-day mark so that preparations can promptly begin. See Brown III, 761 F. Supp. 3d at 86.

The District may disagree with the Court's ordered start date for these steps of outreach, but that is insufficient to establish that the Court's judgment on this point is "clearly erroneous" under Rule 59(e). Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d at 233.[4]

## B. The District's "Narrowly Tailored" Arguments

The District further argues that Subparts One, Two, and Three of the injunction must be vacated, in whole or in part, because they are "not connected to or tailored to redress the conduct identified as problematic" in the Court's findings of fact. Def. Mot. at 7. In other words, the District argues that the Court's ordered relief is not "narrowly tailored to remedy the specific harm shown" to plaintiffs. Id. at 5 (quoting Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs., 435 F.3d 326, 330 (D.C. Cir. 2006)); see also id. at 6-7 (citing

---

[4] The District's argument that Subpart Three of the injunction extends relief to the public—a non-party—rather than the plaintiff class fails for similar reasons. See Def. Mot. at 17-18. For one, the argument could have been raised prior to the entry of judgment: just like Subpart One, the terms of Subpart Three have remained unchanged for over a decade. See Third Amended Complaint at 35; see also Fourth Amended Complaint at 32; Plaintiffs' Notice Regarding Injunctive Relief at 2; Pls. Opp. at 12-13. The District therefore had ample opportunity to object to the scope of the relief described in Subpart Three before, during, and after trial. See Pls. Opp. at 12-13; see also Transcript of Record, Brown III, Civil Action No. 10-2250 (December 20, 2021 at 10:30 a.m.) at 3942:7-8 (arguing that Subpart Three's data reporting requirement "wouldn't do the plaintiffs any good.").

But even if the District had not previously raised this argument, the District has failed to sufficiently demonstrate a need to correct "clear error." Subpart Three's reporting requirement directly benefits the plaintiff class—not just non-parties—by ensuring that the class receives data necessary to monitor the District's compliance with the injunction.

Lewis v. Casey ("Casey"), 518 U.S. 343 (1996), to argue that systemwide relief must be tailored to redress the systemic inadequacies that produced the injuries plaintiffs have established).

But under Rule 59(e), the Court may only reconsider its otherwise final judgment if: (1) there is an intervening change of law; (2) new evidence becomes available; or (3) there is a need "to correct a clear error or prevent manifest injustice." Leidos, 881 F.3d at 217. The District asserts that relief under Rule 59(e) is warranted here because there is a need to correct a "clear error." Def. Reply at 1. The District's "narrowly tailored" arguments therefore rely on the proposition that a judgment ordering injunctive relief that is not narrowly tailored constitutes "clear error" under Rule 59(e). Id. at 4 (arguing that "[i]t is clear error to enter injunctive relief not narrowly tailored to the Plaintiffs' harms and the Court should correct that error now.").

On April 16, 2025, the Court ordered the District to submit a supplemental memorandum of law offering authorities that directly support the proposition that a judgment ordering injunctive relief that is not narrowly tailored constitutes "clear error" under Rule 59(e). See Mem. Op. and Order at 4. Pursuant to the Court's order, the District filed a supplemental brief offering only one responsive case. See Def. Supp. at 1-2 (discussing Mahoney, 2024 WL 4235429). In Mahoney, plaintiff challenged the United States Capitol Police Board's regulations forbidding demonstrations on United States Capitol Building grounds. See 2024 WL 4235429, at *1. Chief Judge Boasberg determined that one of the regulations was facially unconstitutional in violation of the First Amendment, and entered a permanent, facial injunction against the defendants prohibiting them from enforcing the regulation. See id. at *2.

Defendants moved for reconsideration under Rule 59(e), arguing that "extending injunctive relief to non-parties where such relief is unnecessary to redress a plaintiff's injury is inappropriate," and requesting that the court alter its facial injunction to prohibit enforcement of

the regulation against the plaintiff only.  Mahoney, 2024 WL 4235429, at *6.  Judge Boasberg

characterized defendants' argument as "several variations on the theme that 'injunctive relief

should be no more burdensome to the defendant than necessary to provide complete relief to the

plaintiffs.'"  Mahoney, 2024 WL 4235429, at *8 (quoting Califano v. Yamasaki, 442

U.S. 682, 702 (1979)).  Judge Boasberg evaluated defendants' claims using the "clear error"

standard under Rule 59(e).  See id. (quoting Firestone, 76 F.3d at 1208).

       Judge Boasberg ultimately denied defendants' Rule 59(e) motion, concluding that

defendants had failed to establish a need to correct a "clear error" such that relief under

Rule 59(e) was warranted.  See Mahoney, 2024 WL 4235429, at *6.  Relying on the "dead

wrong" standard for clear error under Rule 59(e), Judge Boasberg explained that "[i]n light of the

many cases . . . affirming facial injunctions, this old chestnut and its progeny do not render the

relief entered here 'dead wrong,' as it must be to warrant reconsideration."  Id. at *8 (quoting

Mohammadi, 947 F. Supp. 2d at 78).  He further found that "[i]t cannot be the case that every

injunction granting facial relief for a facial constitutional violation is per se overbroad," and

"[h]ere, the facial infirmity in the at-issue regulation warranted the relief given."  Id.

       As the District concedes, "[t]he tailoring analysis in [Mahoney] is much different

from the consideration required" in the instant case "because this case does not involve a facial

challenge."  Def. Supp. at 2 n.1.  So Mahoney is instructive only insofar as it affirms the

framework that the Court has already articulated:  for a judgment to warrant reconsideration

under Rule 59(e)'s "clear error" standard, the court's ordered relief must be "dead wrong."

See Mahoney, 2024 WL 4235429, at *8 (explaining that none of the cases "affirming facial

injunctions . . . render the relief entered here "'dead wrong,' as it must be to warrant

reconsideration [under Rule 59(e)]." (quoting Mohammadi, 947 F. Supp. 2d at 78)).  The District

asks the Court to revisit its extensive findings of fact and conclusions of law, and to vacate or alter almost every subpart of a systemwide injunction.  See Def. Mot.; Def. Reply.  But as Judge Boasberg explained in Mahoney, in order to obtain relief for such an expansive request under Rule 59(e), the District bears the burden of demonstrating that the relief ordered by the Court was "dead wrong."  Lardner v. FBI, 875 F. Supp. 2d at 53.  Not just "maybe or probably wrong," but "wrong with the force of a five-week-old, unrefrigerated dead fish."  Slate, 12 F. Supp. 3d at 35 (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d at 233).

   The District's arguments do not meet this high standard because they evince mere disagreement with the precise scope of the Court's ordered relief or, more specifically, with the "fit" between the Court's findings of fact, conclusions of law, and ordered relief.  See Smith v. Lynch, 115 F. Supp. 3d at 12 (explaining that mere disagreement is insufficient to support a Rule 59(e) motion).  The Court, after "carefully consider[ing] the evidence respecting the District's complex system of long-term care services and supports for physically-disabled individuals in light of the applicable law, regulations, and agency guidance," concluded in Brown III "that the District has violated Olmstead's integration mandate and does not have an effective Olmstead Plan in place."  761 F. Supp. 3d at 84.  Citing to its extensive findings of fact, the Court reached the following relevant conclusions of law:

> [T]he District places too much reliance on nursing facilities to provide transition assistance to nursing facility residents who wish to transition and are capable of transitioning to the community, rather than following up proactively and systematically through their transition care specialists.  [Brown III, 761 F. Supp. 3d at 84]

> [T]he District fails to provide effective outreach to nursing facility residents to determine whether they are willing and able to transition to the community.  Furthermore, the District does not provide residents with sufficient information to enable them to make informed decisions about whether to seek to transition to the community.  [Id. at 86 (emphasis added)]

> The District's <u>Olmstead</u> Plan places too much of the burden of
> transitioning to the community on nursing facility residents
> themselves, thereby effectively transferring to them and nursing
> facility staff the District's obligation to integrate persons with
> disabilities into community settings.  [<u>Id</u>. at 90-91]

The Court accordingly ordered injunctive relief aimed at addressing these deficiencies in the

District's <u>Olmstead</u> plan, requiring the District to "develop and implement a working system of

transition assistance" that would allow current and future plaintiff class members to be served "in

the most integrated settings appropriate to their needs."  <u>Id</u>. at 96 (the injunction).

The District advances several arguments for why the Court's injunction is not

tailored to the plaintiff class or to the harms described in the Court's findings of fact.  <u>See</u> <u>e.g.</u>,

Def. Mot. at 11 (arguing that Subpart (a) of Subpart One should be vacated because "[t]here is no

finding that [the Named Plaintiffs] or <u>any</u> actual nursing home resident who is interested in

community living, does not know that community-based services exist."); <u>id</u>. at 14 (arguing that

Subpart (b) of Subpart One, which "requires the District to 'elicit' residents' preferences for

facility versus community living upon admission and every three months," should be vacated

because "[n]o finding of fact explains why asking [class members], over and over, if they prefer

to live in the community is necessary to provide relief," and because "it is unclear how this

service would be useful to Class members, who are defined to include persons who affirmatively,

already 'prefer' to the live in the community.");[5] <u>id</u>. at 17 (arguing that Subpart Two should be

vacated because the Court, in deciding whether to enter Subpart Two as a remedy, "did not

---

[5]     The Court finds the District's argument on this point especially puzzling.  Just as
one could not say they prefer the food in an open pot to that in a closed pot, it logically follows
that nursing facility residents—who may be potential class members—cannot meaningfully
express a "preference" for home- and community-based care over remaining in the nursing
facility without at least some information about the different options available to them.

consider whether entering this order was narrowly tailored to relieve any harms shown."); id.

at 18-19 (arguing that Subpart Three should be vacated because it extends relief to a non-party—

that is, the public—and therefore "is not narrowly tailored to address any harms shown.").

        The Court finds that the District's objections to the Court's ordered relief simply

do not establish that the Court's ordered relief was "dead wrong" such that the extraordinary

measure of reconsideration under Rule 59(e) is warranted.  The District's arguments are largely

premised on the proposition that a broad, systemwide injunction that affords programmatic relief

beyond the specific harms suffered by plaintiffs is not narrowly tailored.  See Def. Mot. at 6

(citing Casey, 518 U.S. 343).  In Casey, the Supreme Court held that the district court had erred

in granting injunctive relief mandating systemwide changes to the Arizona Department of

Corrections' law libraries and legal assistance programs.  See id. at 346-49.  The district court

found actual injury on the part of only one plaintiff and the cause of that injury was one facility's

failure to provide legal services in light of that plaintiff's illiteracy.  See id. at 358.  But despite

this limited injury, the district court ordered systemwide changes to all facilities controlled by the

Arizona Department of Corrections.  See id. at 347.  In reviewing the scope of the district court's

injunction, the Supreme Court asked: "[w]as that inadequacy widespread enough to justify

systemwide relief?"  Id. at 359.  The Court concluded that the inadequacy was not widespread

enough as the district court had not made a systemwide finding that, in general, "in Arizona

prisons illiterate prisoners cannot obtain the minimal help necessary to file particular claims that

they wish to bring before the courts."  Casey, 518 U.S. at 360.

        "If this Court were to ask itself the question posed in Casey"—that is, whether

the alleged inadequacies in the District's system of long-term care services and supports for

physically-disabled individuals are widespread enough to justify systemwide relief—"the answer

is clearly yes." Doe 2 v. Mattis, 344 F. Supp. 3d 16, 26 (D.D.C. 2018) (citing Casey, 518 U.S. at 359). This is not a case where one nursing facility resident who wished to transition—and was capable of transitioning—to the community to receive home- and community-based care faced systemic barriers in doing so. See Brown III, 761 F. Supp. 3d at 71 (detailing systemic and individual barriers to successful transitions). Rather, after considering all admissible evidence from two bench trials, the Court found that the District's "system of long-term care services and supports for physically-disabled individuals . . . violated Olmstead's integration mandate." Id. at 84. And having identified sweeping systemic issues, the Court determined that a systemwide injunction was the appropriate form of relief. See Dayton Bd. of Ed. v. Brinkman, 433 U.S. 406, 420 (1977) ("only if there has been a systemwide impact may there be a systemwide remedy.").

The District may disagree with this determination, but disagreement is insufficient to support a Rule 59(e) motion. See Wannall v. Honeywell Int'l, Inc., 2013 WL 12321549, at *3. The Court therefore rejects the District's arguments that the scope of the Court's injunction evinces "clear error" warranting relief under Rule 59(e).

### C. The District's "Fatally Vague" Argument

Finally, the District argues that Subpart Two of the injunction is "fatally vague" under Rule 65(d) of the Federal Rules of Civil Procedure, and therefore commits "clear error" under Rule 59(e). See Def. Mot. at 19-20. Rule 65 mandates that every order granting an injunction must "describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(C). "To prevent uncertainty and confusion on the part of the enjoined party, an injunction must provide 'explicit notice of precisely what conduct is outlawed.'" United States v. Philip Morris USA Inc., 566 F.3d 1095, 1137 (D.C. Cir. 2009) (quoting Schmidt v. Lessard, 414 U.S. 473, 476 (1974)); see also 11A CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2955 (3d ed. 2022) ("The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."); United States v. Philip Morris USA Inc. ("Philip Morris"), 682 F. Supp. 3d 32, 45-46 (D.D.C. 2023), appeal dismissed, No. 23-5203, 2024 WL 2790389 (D.C. Cir. May 28, 2024).

Nevertheless, this Court has explained that "an injunction must be understood in light of the circumstances surrounding its entry."  Philip Morris, 682 F. Supp. 3d at 46; see also Milk Wagon Drivers Union of Chi., Loc. 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 298 (1941) ("[A]n injunction must be read in the context of its circumstances."); Nat'l Org. for Women v. Operation Rescue, 37 F.3d 646, 657 (D.C. Cir. 1994) (the "meaning" of an injunction's terms "is constrained by the context in which they are actually used in the injunction.").  An injunction therefore is "subject to reasonable interpretation" based on the fair meaning of its text and the harm it was tailored to address.  Alley v. U.S. Dep't of Health & Hum. Servs., 590 F.3d 1195, 1207 (11th Cir. 2009); see also Nat'l Org. for Women v. Operation Rescue, 37 F.3d at 657 (considering "the context of ongoing unlawful [conduct]" when interpreting "language in the injunction"); United States v. Philip Morris USA Inc., 778 F. Supp. 2d 8, 11 (D.D.C. 2011) (interpreting an order's language "in conjunction with the purpose to be accomplished" by the injunction); In re Baldwin-United Corp (Single Premium Deferred Annuities Ins. Litig.). 770 F.2d 328, 339 (2d Cir. 1985) (considering "the context of the entire injunction" and "the judge's decision upon issuing the injunction" when construing ambiguous provisions); United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972) ("The language of an injunction must be read in the light of the circumstances surrounding its entry [and] the mischief that the injunction seeks to prevent.").

25

> Subpart Two of the injunction requires the District to:
>
> (2) ensure <u>sufficient capacity</u> of community-based long-term care services for plaintiffs under the EPD, MFP, and PCA programs, and <u>other long-term care service programs</u>, to serve plaintiffs in the most integrated setting appropriate to their needs, as measured by enrollment in these long-term care programs; and

<u>Brown III</u>, 761 F. Supp. 3d at 96 (emphasis added). The District argues that Subpart Two is "not specific or reasonably detailed," and therefore violates Rule 65(d)'s "fair notice" requirement. Def. Mot. at 20. For example, the District asks, "what does 'sufficient capacity' mean?" <u>Id</u>. And "[w]hat does it mean to measure 'sufficient capacity' by 'enrollment' in 'long-term care programs?'" <u>Id</u>. "Is the District supposed to freeze in place and maintain indefinitely all of its community-based long-term care services and programs?" <u>Id</u>. And "[w]hile the context of the litigation itself may sometimes be specific enough to provide notice to the parties of the acts the court seeks to restrain," the District asserts that that is not the case here because the Court has provided no "findings of fact or explanations of the legal violation giving rise to" its ordered relief. <u>Id</u>. at 20 (quoting <u>Gulf Oil Corp. v. Brock</u>, 778 F.2d 834, 843 (D.C. Cir. 1985)).

Plaintiffs urge the Court to reject "[d]efendant's attempt to claim uncertainty of what actions it must take under Subpart [Two]." Pls. Opp. at 34. Plaintiffs first note that the District "operates the long-term care services program[s] at issue,"—that is, the "EPD, MFP, and PCA programs"—and therefore "should not have difficulty understanding what those programs are and what capacity is needed to provide those services to the Plaintiff class." <u>Id</u>. at 32. Plaintiffs further argue that Subpart Two does not refer "to the capacity of every conceivable type of home and community-based service or program but instead identifies long-term care programs and services that must be provided to class members based on the demand for transition assistance to facilitate their transition to the community." <u>Id</u>. at 34. Lastly, plaintiffs

assert that the clause of Subpart Two referencing "'other long-term care service programs' can be understood through the relief sought by Plaintiffs and the findings of the Court." Id.

Recall that "an injunction must be understood in light of the circumstances surrounding its entry." Philip Morris, 682 F. Supp. 3d at 46. In its findings of fact, the Court found that the District "administers two principal Medicaid-funded programs that . . . provide home- and community-based long-term care services" to individuals. Brown III, 761 F. Supp. 3d at 57. The first program is called "the State Plan Personal Care Assistance ('State Plan PCA') program," and the second program is called the "Elderly and Persons with Physical Disabilities Waiver ('EPD Waiver') program." Id. at 57. Each of these programs "provide[ ] personal-care assistance in community-based settings, based on slightly different eligibility criteria." Id. (quoting Brown I, 322 F.R.D. at 73). The Court found that the District also "administers the Money Follows the Person Demonstration Grant ('MFP') program, a federally-funded program that [provides] states with financial incentives to move people from institutional settings back to the community with Medicaid services and supports." Id. at 59. The MFP program covers "set-up" costs incurred by nursing facility residents as they transition to community-based living, which can include leasing application fees, security deposit, essential furnishings, and household set-up items including linens, kitchenware, and bathroom essentials. Id. at 59. Under the MFP program, the federal government reimburses the District for 85% of the cost of direct services in the one year after eligible D.C. residents transition from a nursing facility or hospital to home. See id. "Through these various Medicaid-funded programs, the District provides home- and community-based services and supports to thousands of District residents every year." Id. at 61.

The Court further found that although there "is no limit to the number of District residents who can receive State Plan PCA services," Brown III, 761 F. Supp. 3d at 57, "the EPD

Waiver program has a cap." Id. at 58. As of 2021, "no more than 5,560 individuals may receive services through the EPD Waiver program in a given year." Id. In order to be eligible for the EPD Waiver program, "an individual must be eligible to receive long-term care in a nursing facility, meaning they must require a nursing facility level of care." Id. And in order to be eligible for the MFP grant program, "individuals with physical disabilities must meet the EPD waiver program's level of care requirements (i.e., a nursing facility level of care), must have resided in a nursing facility for at least 60 days, and must have had their nursing facility services paid for by Medicaid for at least one day during the last 30 days." Id. at 59.

        In its findings of fact, the Court also found that in addition to the State Plan PCA program, the EPD Waiver program, and the MFP grant program, "numerous District agencies collaborate to provide affordable, safe housing to individuals with disabilities and to transition nursing facility residents to community-based housing." Brown III, 761 F. Supp. 3d at 61. "One of those agencies, the D.C. Department of Aging and Community Living ('DACL') . . . provides transition assistance to D.C. residents aged 60 and over, adults living with disabilities, and their caregivers." Id. The Court found that the "primary purpose of DACL is to provide supports and services, whether directly or through grants and contracts, to individuals of those populations to 'ensure that [they] can live in the community for as long as they safely can.'" Id. at 61-62. Within DACL sits the Aging and Disability Resource Center ("ADRC"), which is "the designated 'Local Contact Agency' to which nursing facility residents who want information about receiving home- and community-based services and supports are referred." Brown III, 761 F. Supp. 3d at 63. And within the ADRC sits the Nursing Home Transition Team ("NHT"), a team composed of eight DACL employees that "assist nursing facility residents with physical disabilities to seek and obtain [home and community-based services] outside of nursing facilities

and to transition back into the community." Brown III, 761 F. Supp. 3d at 63. Six of these employees are "transition care specialists," who are responsible for "assist[ing] individuals seeking to transition into the community by locating and securing adequate housing, procuring necessary identification, setting up their new home, and connecting them to community services and supports." Id. The Court found that "[e]ach NHT transition care specialist on average is assigned to work with 12 to 15 nursing facility residents who have expressed an interest in transitioning back to the community and have requested DACL's assistance in doing so." Id.

In sum, the Court found that the District administers two principal long-term care service programs: the State Plan PCA program and the EPD Waiver program. The District also administers the MFP grant program, which covers "set-up" costs incurred by nursing facility residents as they transition to the community. The District also oversees the DACL, which houses a team of six transition care specialists that assist individuals seeking to transition to the community. Each of these entities have limited capacity: the EPD Waiver program is capped at a certain number of individuals every year, the MFP grant program has limited funding, and the DACL's team of transition care specialists each have a caseload of 12 to 15 nursing residents.

In its conclusions of law, the Court determined that "the District has not implemented a sufficiently robust and comprehensive system for identifying individuals who are institutionalized yet eligible to receive long-term care in the community." Brown III, 761 F. Supp. 3d at 88. The Court further determined that the District "does not know at any given time the total number of physically-disabled nursing facility residents who are willing and able to transition to the community," and therefore "cannot maintain an accurate 'waiting list [for transition to the community] that move[s] at a reasonable pace.'" Id. (quoting Brown II, 928 F.3d at 1078); see also Olmstead, 527 U.S. at 605-06. If the District does not know how many

residents are willing and able to transition and does not have a sufficient system for identifying

individuals who are eligible to receive long-term care in the community, how can it maintain an

accurate waiting list of residents who wish to transition to the community?  Accordingly,

Subpart One of the injunction directs the District to implement certain practices so that it can

better assess the "total number of physically-disabled facility residents who are willing and able

to transition to the community" at any given time.  Brown III, 761 F. Supp. 3d at 96.

But after the District assesses how many residents are willing and able to

transition to the community, how can it ensure that there is sufficient capacity in its long-term

care service programs, services, and supports such that the District can comply with Olmstead's

mandate to "maintain an accurate 'waiting list [for transition to the community] that move[s] at a

reasonable pace?'"  See Brown III, 761 F. Supp. 3d at 88; see Olmstead, 527 U.S. at 605-06.

Put differently, how can the Court ensure that the District continues to meet plaintiffs' demand

for community-based long-term care services as new individuals join the plaintiff class?[6]

To address this concern, the Court entered Subpart Two of the injunction to

ensure that the District maintains "sufficient capacity of community-based long-term care

services for plaintiffs under the EPD, MFP, and PCA programs and other long-term care service

programs to serve plaintiffs in the most integrated setting appropriate to their needs."

---

[6]    Defendants are correct that the Court, in considering whether to enter
Subpart Two as a remedy, found that the "evidence establishes that there currently is sufficient
capacity for nursing facility residents interested in transitioning to receive . . . long-term care
services in the community; and there is no indication that the District would be unable to provide
those services to class members if they were to transition to the community."  Def. Mot. at 17
(quoting Brown III, 761 F. Supp. 3d at 93) (emphasis added).  But that is the current state of
affairs:  Subpart Two of the injunction requires the District to ensure sufficient capacity of
community-based long-term care programs that are necessary for current and future class
members to access services in the most integrated setting appropriate to their needs.

Brown III, 761 F. Supp. 3d at 96.  "Sufficient capacity" is measured by "enrollment in these long-term care programs."  Id.  The District administers the EPD, MFP, and PCA, so the District is best-positioned to monitor enrollment numbers for those programs to ensure sufficient capacity for plaintiffs.[7]  The District also oversees the DACL, and is best-positioned to ensure that a sufficient number of transition care specialists are available to assist plaintiffs in seeking "the most integrated setting appropriate to their needs."  Brown III, 761 F. Supp. 3d at 96.

        The District argues that the term "other long-term care service programs" within Subpart Two is vague and is not sufficiently connected to the Court's findings of fact. See Def. Reply at 9.  In their opposition, plaintiffs suggest that the phrase "other long-term care service programs" describes "the transition assistance services provided by DACL, which includes the staffing of the MFP program and the Nursing Home Transition Team (NHT)."  Pls. Opp. at 29.  And at oral argument, plaintiffs explained that when they included the term "other long-term care service programs" in Subpart Two of their proposed injunction, they "recognized, having litigated with the district for quite [ ] a long time on other things, that services move around from agency to agency" within the DACL.  Transcript of Record, Brown v. D.C., Civil Action No. 10-2250 (April 15, 2025) [Dkt. No. 520] at 45:25-46:8.  In plaintiffs' view, the precise programs that "other long-term care service programs" intended to include "were the service providers that will be providing transition assistance" within the DACL.  Id. at 46:9-11.

        The Court ordered the parties to submit a "joint proposed revision" of Subpart Two that "clarif[ied] the precise long-term care service programs that the District may use as

---

[7]        Subparts One and Two work in tandem to address opposite sides of the same problem.  Subpart One ensures that the District has an accurate count of how many nursing facility residents are willing and able to transition to the community (the "demand").  And Subpart Two ensures that the District maintains sufficient capacity of community-based long-term care programs for plaintiffs once the transition process begins (the "supply").

enrollment benchmarks to ensure sufficient capacity of community-based long-term care services programs." See Mem. Op. and Order at 3. The parties were unable to reach an agreement on a proposed revision to Subpart Two, and instead submitted separate revisions. See JSR at 2-6.

Upon consideration of the parties' arguments, the Court finds that the term "other long-term care service programs" is sufficiently clear given the Court's findings of fact. The Court's findings provide adequate context for the terms of Subpart Two: the Court described the District's community-based, long-term care system at length, including the programs under the EPD waiver, the State Plan PCA services, the MFP grant program, and other long-term care programs like DACL's transition assistance program. And as this Court explained in its findings of fact, "numerous District agencies collaborate to provide affordable, safe housing to individuals with disabilities and to transition nursing facility residents to community-based housing." Brown III, 761 F. Supp. 3d at 61. Though certain teams within the DACL currently supply significant transition assistance services for nursing facility residents, those services may shift around from agency to agency in the future. The term "other long-term care service programs" therefore affords the District the flexibility to "ensure sufficient capacity of community-based long-term care services for plaintiffs under the EPD, MFP, and PCA programs," and any other District programs that provide community-based, long-term care services to plaintiff class members. It also alleviates the District's concern regarding having to "freeze in place and maintain indefinitely all of its community-based long-term care services and programs," see Def. Mot at 20, because the term "other long-term care service programs" is broad enough to capture changes in organizational structure within the District's agencies.

In conclusion, because the Court examined the landscape of the District's community-based long-term care programs and services at length in its findings of fact, the

Court finds that the District has received "fair notice" of what is required of it under Subpart Two of the injunction "in light of the circumstances surrounding [the injunction's] entry." Philip Morris, 682 F. Supp. 3d at 46; see also FED. R. CIV. P. 65(d)(1)(C). The District therefore has failed to demonstrate that there is a need to correct "clear error" under Rule 59(e).

Accordingly, it is hereby

ORDERED that the District's Motion to Alter or Amend Judgment [Dkt. No. 508] is DENIED; and it is

FURTHER ORDERED that the stay imposed by the Court in its Memorandum Opinion and Order of April 16, 2025 [Dkt. No. 519] is LIFTED.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8/15/25